CASE NO. 24-12823

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

JENNIFER SMITH,
*Plaintiff-Appellant*

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON
WATSON; DENISE D. WALLACE; LATONYA BAKER; LATRECHA SCOTT;
RICA CALHOUN; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E.
MITCHELL; and SARAH REINER,
*Defendants-Appellees.*

BRIEF OF APPELLANT

On Appeal from The United States District Court
for the Middle District of Florida, No. 6:24-cv-00457-PGB-RMN; and
The United States District Court for the Northern District of Florida,
No. 4:24-cv-00367-MW-MAF

Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy., Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023 (facsimile)
jensmithesq@aol.com; jensmithesq@yahoo.com (secondary)

Plaintiff-Appellant *pro se*

November 12, 2024

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26-1, Plaintiff-Appellant hereby files this Certificate of Interested Persons and Corporate Disclosure Statement:

1. Professor Jennifer Smith, *Plaintiff-Appellant*;

2. Florida Agricultural & Mechanical University (FAMU), *Defendant-Appellee (only responding party served below)*;

3. Maria Santoro, *counsel for Appellee-FAMU*;

4. Teresa Ward, *counsel for Appellee-FAMU*;

5. Sniffen & Spellman, P.A., *Law Firm for Appellee-FAMU*;

6. Gray Robinson, P.A., *former counsel for Appellee-FAMU*;

7. Richard Mitchell, *former counsel for Appellee-FAMU*;

8. Julie Zolty, *former counsel for Appellee-FAMU*;

9. Sarah Reiner, *outside counsel for Appellee-FAMU in another matter*;

10. Paul G. Byron, *U.S. District Judge for the Middle District of Florida, Orlando Division*;

11. Robert M. Norway, *U.S. Magistrate Judge for the Middle District of Florida, Orlando Division*;

12. Mark E. Walker, *U.S. District Judge for the Northern District of Florida, Tallahassee Division;*

13. Martin A. Fitzpatrick, *U.S. Magistrate Judge for the Northern District of Florida, Tallahassee Division.*

14. Plaintiff-Appellant, Professor Jennifer Smith knows the Honorable Charles R. Wilson and the Honorable Robin Rosenbaum and believes their involvement with the case may be a conflict.

<div align="right">/s/ Jennifer Smith</div>

## STATEMENT REGARDING ORAL ARGUMENT

Professor Smith ("Appellant") respectfully requests oral argument. Because the district court erroneously denied her motion for preliminary injunction and based its decision in part on public interest factors disfavoring the relief requested, oral argument is necessary to delineate the complex factual issues within this appeal. Moreover, the district court further compounded its error by refusing to apply binding Eleventh Circuit precedent and instead creating its own law. Oral argument will also provide an opportunity to address the novel issues concerning irreparable harm in FLSA cases, which was decided at first instance by the Middle District Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF CITATIONS ........................................................... iii

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 4

STATEMENT OF THE ISSUES .................................................... 5

STATEMENT OF THE CASE ....................................................... 6

STANDARD OF REVIEW ......................................................... 20

SUMMARY OF THE ARGUMENT ............................................. 20

ARGUMENT .......................................................................... 22

    I.     THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE APPELLANT ESTABLISHED IRREPARABLE HARM ............................................................................. 23

        A.     The District Court Erred by Relying on a Pleading that was Superseded to Deny Irreparable Harm While Relying on the Operative Pleading for the Remainder of the Decision. ........... 23

        B.     The District Court Erred by Failing to Consider the Harm Caused to Appellant's Ongoing Deprivation of Her Constitutional Speech and Petition Rights ........................................ 31

        C.     The District Court Erred by Refusing to Afford Appellant the Presumption of Irreparable Harm in Title VII Cases ................ 37

        D.     The District Court Erred by Failing to Consider the Irreparable Injury caused to Appellant's Reputation. ................................ 40

    II.    THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE THE BALANCE OF HARMS OR PUBLIC INTEREST HAVE MERGED AND AS MERGED SUPPORT INJUNCTIVE RELIEF ..................................................................... 49

CONCLUSION ....................................................................... 54

CERTIFICATE OF COMPLIANCE ........................................... 55

CERTIFICATE OF SERVICE .................................................... 55

# TABLE OF CITATIONS

**CASES**

*All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,*
    887 F.2d 1535 (11th Cir. 1989). ........................................................... 42, 50

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
    557 F.3d 1177 (11th Cir. 2009). .......................................................50

*Amer. Ass'n of Coll. Professors v. Bloomfield Coll.,*
    322 A.2d 846 (C.H. Div. 1974). .......................................................22

*Amer. Ass'n of Coll. Professors v. Bloomfield Coll.,*
    346 A.2d 615 (App. Div. 1975). .......................................................22

*Assaf v. University of Texas System,*
    399 F. Supp. 1245 (S.D. Tex. 1975)........................................ passim

*Assaf v. University of Texas System,*
    435 U.S. 992 (1978).......................................................................16

*Baker v. Buckeye Cellulose Corp.,*
    856 F.2d 167 (11th Cir. 1988). ..................................... 37, 38, 39, 40

*Blaine v. N. Brevard Cnty. Hosp. Div.,*
    312 F. Supp. 3d 1295 (M.D. Fla. 2018). ................................... 46, 47

*Bonner v. City of Prichard,*
    661 F.2d 1206, 1209 (11th Cir. 1981). ............................... 37, 38, 52

*Cate v. Oldham,*
    707 F.2d 1176 (11th Cir. 1983). .......................................................41

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019). .......................................................51

*Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER,*
    463 F.3d 1210 (11th Cir. 2006). ................................... 24, 25, 26, 28

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*,
    756 F.2d 1525 (11th Cir. 1985). .................................................................38

*E.E.O.C. v. White and Son Enterprises*,
    881 F.2d 1006 (11th Cir. 1989). ...............................................................39

*Elrod v. Burns*,
    427 U.S. 347 (1976)...................................................................................24

*Ferrero v. Associated Materials Inc.*,
    923 F.2d 1441 (11th Cir. 1991). ...............................................................40

*FF Cosms. FL, Inc. v. City of Miami Beach*,
    866 F.3d 1290 (11th Cir. 2017). ...............................................................31

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
    648 F.2d 956 (5th Cir. 1981). ...................................................................52

*Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.,*
    320 F.3d 1205 (11th Cir. 2003). ......................................................... 42, 50

*Fritz v. Standard Sec. Life Ins. Co. of New York*,
    676 F.2d 1356 (11th Cir. 1982). ...............................................................24

*Hoefling v. City of Miami*,
    811 F.3d 1271 (11th Cir. 2016). ...............................................................24

*In re Jennifer Smith*,
    No. 24-12583 (11th Cir. 2024). ................................................................19

*Keyer v. Civil Serv. Comm'n of the City of N.Y.*,
    397 F. Supp. 1362 (E.D.N.Y. 1975). ............................................. 47, 48, 49

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006). ...............................................................20

*Kurtz v. Vickrey*,
    855 F.2d 723 (11th Cir. 1988). ........................................................... 34, 53

*Leigh v. Artis-Naples, Inc.*,
No. 2:22-CV-606-JLB-NPM, (M.D. Fla. Dec. 30, 2022). ............... 37, 38, 39

*Marshall v. Allen*,
984 F.2d 787 (7th Cir. 1993). ........................................................34

*McDonald's Corporation v. Robertson*,
147 F.3d 1301 (11th Cir. 1998). ............................................ 38, 39

*Middleton-Keirn v. Stone*,
655 F.2d 609 (5th Cir. 1981). ................................................. 37, 39

*Moss v. City of Pembroke Pines*,
782 F.3d 613 (11th Cir. 2015). .....................................................32

*Otto v. City of Boca Raton, Fla.*,
41 F.4th 1271 (11th Cir. 2022). ....................................................20

*Perry v. Sindermann*,
408 U.S. 59 (1972).........................................................................2

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*,
391 U.S. 563 (1968).................................................. 32, 33, 35, 36

*Pintando v. Miami-Dade Hous. Agency*,
501 F.3d 1241 (11th Cir. 2007). ...................................................24

*Presley v. Graham*,
936 F. Supp. 2d 1316 (M.D. Ala. 2013)........................................34

*Proctor & Gamble Def. Corp. v. Bean*,
146 F.2d 598 (5th Cir. 1945). .......................................................24

*Reyes v. FAMU*,
No. 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022)...........................14

*Riddle v. Cerro Wire & Cable Grp., Inc.*,
902 F.2d 918 (11th Cir. 1990). .....................................................51

*Roadway Exp., Inc. v. Donovan*,
603 F. Supp. 249 (N.D. Ga. 1985)....................................................53

*Roofing and Sheet Metal Services, Inc. v. LaQuinta Motor Inns, Inc.,*
689 F.2d 982 (11th Cir. 1982). ......................................................4

*Sampson v. Murray*,
415 U.S. 61 (1974)............................................................... 45, 46

*Saunders v. Duke,*
766 F.3d 1262 (11th Cir. 2014). ..................................... 28, 29, 31

*Schrank v. Bliss*,
412 F. Supp. 28 (M.D. Fla. 1976)..................................... 45, 46

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010). ....................................................20

*Spiegel v. City of Houston*,
636 F.2d 997 (5th Cir. 1981). ......................................................40

*Swain v. Junior*,
958 F.3d 1081 (11th Cir. 2020). ...................................................51

*Tindal v. Montgomery Cnty. Comm'n*,
32 F.3d 1535 (11th Cir. 1994). ............................................. passim

*United States v. Jefferson Cnty.*,
720 F.2d 1511 (11th Cir. 1983). ........................................... 37, 39

*Van Arsdel v. Texas A&M Univ.*,
628 F.2d 344 (5th Cir. 1980). ............................................. 41, 42

*Villano v. City of Boynton Beach*,
254 F.3d 1302 (11th Cir. 2001). ...................................................51

*Washington Cnty. v. Gunther,*
452 U.S. 161 (1981)..................................................................2

*Wu v. Thomas*,
 996 F.2d 271 (11th Cir. 1993). ......................................................37

*Yorktown Sys. Grp. Inc. v. Threat Tec LLC*,
 108 F.4th 1287 (11th Cir. 2024). ........................................... 44, 45

*Zisk v. The Charleston School of Law*,
 Case No. 2015-CP-1003661 (Charleston Cir. Ct. 2015). ...........................23

**STATUTES**

28 U.S.C. § 1441 ...........................................................................4

28 U.S.C. § 1331 ...........................................................................4

28 U.S.C. §1292 ............................................................................4

42 U.S.C. § 1983 ..........................................................................28

All Writs Act,
 28 U.S.C. § 1651............................................................................4

Equal Pay Act,
 29 U.S.C. § 206(d). ................................................................. passim

Fair Labor Standards Act,
 29 U.S.C. § 201 et seq. ......................................................... i, 2, 29

The Commercial Instruments and Maritime Liens Act ("CIMLA"),
 46 U.S.C. § 31301 et seq. ..............................................................25

Title VII of the Civil Rights Act of 1964,
 42 U.S.C. § 2000e et seq. ......................................................... passim

**RULES**

Eleventh Circuit Rule 26-1 ................................................................1

Eleventh Circuit Rule 28-1 ...............................................................55

Federal Rule of Appellate Procedure 32 ............................................ 54, 55

Federal Rule of Appellate Procedure 25 ..................................................55

Federal Rule of Civil Procedure 11 ............................................... 30, 35

Federal Rule of Appellate Procedure 26.1 .............................................1

Rules Regulating the Florida Bar 4-8.3 ..................................................47

Rules Regulating the Florida Bar 4-8.4 ..................................................47

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. I .......................................................... passim

U.S. Const. Amend. IV. ........................................................28

U.S. Const. Amend. XIV .......................................................2

# INTRODUCTION

Academic tenure is one of the highest honors that a faculty member can earn in one's professional career, and with this honor, an institution is making a general commitment to offer continued employment to the faculty member until his or her death or retirement. Unlike traditional employment, where an employee can be terminated for any reason that is not unlawful, academic tenure carries with it a higher standard and rigorous procedures for termination, commanding that institutions demonstrate "just cause" for terminating a tenured faculty member. Now imagine the scenario where a college professor earns tenure after teaching for six years continuously and producing substantial contributions to legal scholarship. The professor continues to teach for fourteen years after earning tenure. Then, the institution decided to terminate the tenured professor within a few weeks that the professor filed a civil rights lawsuit against the institution. However, the institution does not cite the lawsuit as the reason for the professor's termination because it cannot as a matter of law as that would amount to textbook retaliation.

Under this hypothetical, it is unquestionable that the institution's timing of its termination decision confirms that the tenured professor's termination is based on the substance of her lawsuit or her petitioning a court for redress. Appellee Florida Agricultural and Mechanical University ("FAMU" or "Appellee-FAMU") terminated a tenured, veteran professor, Professor Smith, merely twenty-two days

after learning she filed an equal pay lawsuit against the university. *See e.g., Perry v. Sindermann*, 408 U.S. 593, 595 (1972). Additionally, from the date FAMU issued its notice of intent to terminate Professor Smith through nearly a year of protracted litigation, FAMU has stated *seven* different reasons for her termination. Those ever-changing reasons crystallize that FAMU's stated reasons are subterfuge for Professor Smith's termination, just like in the hypothetical above.

What remains clear from the hypothetical and the case before this Court is that FAMU terminated Professor Smith for filing a third lawsuit against it, an Equal Pay lawsuit, which invoked the anti-retaliation protections of the First Amendment and the Fair Labor Standards Act ("FLSA")'s Equal Pay Act provisions. *See id.* ("Indeed, twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights."); *see also Washington Cnty. v. Gunther,* 452 U.S. 161 (1981) (discussing the broad remedial purpose of the Equal Pay Act). Professor Smith diligently sought reinstatement to restore the status quo ante. Rather than restore Professor Smith to her position in light of these patently different reasons advanced by the University, the district court erroneously concluded that Professor Smith failed to demonstrate irreparable harm and public interest factors did not support the preliminary relief requested. The district court's erroneous explanation for its conclusion was premised not on any

reason offered by either party. Instead, the Middle District Court relied entirely on a justification that Appellee-FAMU itself had previously deemed meritless, disregarded, and had not even advanced as one of the seven ever-changing explanations for Professor Smith's termination provided to the Court.

This Court should reverse the trial court.

## **JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because the Professor Smith appeals from an order refusing an injunction. The district court entered that order on August 30, 2024, Doc. 164, and Professor Smith timely filed her notice of appeal on September 3, 2024. Doc. 165. After Professor Smith filed her notice of appeal, the Middle District of Florida transferred the case to the Northern District of Florida. Doc. 178. Notwithstanding this transfer, this Court has jurisdiction over this case pursuant to the All Writs Act, 28 U.S.C. § 1651, which empowers the courts of appeals to issue extraordinary writs, such as mandamus and prohibition, in aid of their jurisdiction. *See Roofing and Sheet Metal Services, Inc. v. LaQuinta Motor Inns, Inc.,* 689 F.2d 982, 987 (11th Cir. 1982). The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in denying Plaintiff-Appellant's Time Sensitive Motion for Preliminary Injunction;

    A. Whether the district court erred by basing part of its decision on the initial pleading rather than the subsequently filed and court-accepted amended pleading when ruling on the Plaintiff-Appellant's Time-Sensitive Motion for Preliminary Injunction;

    B. Whether irreparable harm is presumed in cases involving the Equal Pay Act;

    C. Whether the district court erred in holding Plaintiff-Appellant failed to establish irreparable harm under the First Amendment;

    D. Whether the district court erred in holding Plaintiff-Appellant failed to establish sufficient irreparable harm from reputational injuries alleged and established on the record; and

II. Whether the district court erred in holding public interest factors did not support the relief requested in Plaintiff-Appellant's Time Sensitive Motion for Preliminary Injunction.

# STATEMENT OF THE CASE

## I.    Appellant Professor Smith's Background

After clerking for a judge on the Eleventh Circuit, Professor Jennifer Smith worked for a big law firm for ten years before teaching at Appellee-FAMU's College of Law in 2004. Doc. 151 at 6.[1] Consistently, Professor Smith as a tenured full professor, was evaluated as excellent in teaching, scholarship and service. Doc. 151 at 7-8. Her legal actions have led to significant and broad improvements in gender pay equity and promotions at the law school. Doc. 151 at 8-9.

## II.    Appellant Professor Smith's Previous Lawsuits for Equal Pay

In 2014, Professor Smith filed her first lawsuit against Appellee-FAMU [hereinafter, "*Smith I*"] alleging that the school discriminated against female law professors by paying them less than comparable male law professors. Doc. 151 at 8. In 2015, amid-*Smith I*, Appellee-FAMU recognized a gender inequity of up to $20,000 in its law faculty salaries in its Office of Institutional Research report. Doc. 151 at 8.

In 2015, after trial counsel surprisingly waived rebuttal, *Smith I* reached a jury verdict that found sex was not a motivating factor in the determination of Professor Smith's salary. Doc.17-7 at 2. In catalyst fashion, and as a result of her lawsuit,

[1] Several orders are "paperless" or "endorsed" and where referenced herein, the citation will be to the docket entry.

Appellee-FAMU made significant changes to faculty salaries in 2016 that created *inter alia* a lockstep salary structure. Doc. 151 at 9.

Appellee-FAMU's law school leadership reset mostly women's salaries and, in that process, Professor Smith was recommended to receive a salary of $138,000 (the same salary of her male comparator in *Smith I*), but that recommendation was ultimately reduced to $125,000. Doc. 17-7 at 3. Because of the incredulous nature of salary reset, Professor Smith filed her second lawsuit against Appellee-FAMU [hereinafter, "*Smith II*"]. Doc. 17-7 at 4. *Smith II* was resolved by an Eleventh Circuit panel affirming the trial court's summary judgment order in favor of FAMU, on grounds that Professor Smith's pay claims were simply carried forward from *Smith I* since Appellee-FAMU made no changes to the male comparator's or Professor Smith's salary that would suggest that the current disparity between them is based on sex in any way. Doc. 17-7 at 5-7.

### III. Background on the Underlying Pretext and Conspiracy

On August 9, 2021, Appellee-FAMU hired a less qualified male professor, Ewanrinareto "Areto" Imoukhuede, as a tenured full professor at the College of Law, in a similar position to the one then-held by Professor Smith. Doc. 151 at 9. The newly hired male received a salary significantly higher than Professor Smith's salary, in fact, the newly hired male made approximately $25,000 more than what would have been expected under the existing lockstep model. Doc. 151 at 9. Upon

discovering this pay disparity, Professor Smith emailed Appellee-FAMU's then-president, Dr. Larry Robinson, on May 9, 2022, expecting relief. Doc. 151 at 10-11.

Between June 28 and September 22, 2022, Professor Smith engaged in Appellee-FAMU's informal complaint process to report her concerns to its Equal Opportunity Program ("EOP"), to no avail. Doc. 151 at 11. Due to the failure of the informal resolution process for her EOP complaint, on October 18, 2022, Professor Smith filed a Charge of Discrimination with the U.S. EEOC under the Equal Pay Act (EPA). Doc. 151 at 11.

Around the same time that Professor Smith raised her EOP concerns, universities began noticing concerns about faculty safety across the nation, most of which were fueled by instances of increasingly aggressive students. Doc. 151 at 2-3.

Against this backdrop, Professor Smith faced her own safety concern on October 20, 2022 when an unknown and unusually enraged student intentionally disrupted Professor Smith's class. Doc. 151 at 11-12. That student was later identified as Michelle Wanamaker Sadiki ("MW"). Doc. 151 at 11-12. While Professor Smith's class was in progress, MW barged into the room and demanded that Professor Smith allow the student to sit and prepare for a class that was scheduled for later that morning. Doc. 151 at 11-12. The student's unprofessional and alarming behavior led Professor Smith to submit a written complaint by text

message to Associate Dean of Students Reginald Green immediately after the incident. Doc. 151 at 11-12. Later that evening, Green acknowledged the complaint and indicated that he would look into the matter. Doc. 151 at 15.

A week after MW disrupted Professor Smith's class, MW filed a complaint against Professor Smith, accusing the tenured professor of violence, assault, and bullying—allegations that were blatantly false on their face and that mischaracterized the encounter, but if believed, legally required Appellee-FAMU to take action immediately. Doc. 151 at 13, 16, 17. In that patently dubious student complaint, MW admitted to being aware that Professor Smith's class was in session, but MW was frustrated that she could not occupy Professor Smith's then-assigned classroom to wait for the next class. Doc. 151 at 12. Professor Smith did not learn of MW's complaint until late January 2024. Doc. 151 at 13, 16.

On November 1, 2022, Professor Smith followed up on her complaint against MW by visiting Associate Dean Green's office, and Green's assistant, Teresa Pissini, assured Professor Smith that Ms. Pissini would inform Green of Professor Smith's visit. Doc. 151 at 13. However, the fall semester ended on November 18, 2022 without any further communication from Associate Dean Green, leading Professor Smith to believe that FAMU had decided not to investigate the incident with MW. Doc. 151 at 14. Unbeknownst to Professor Smith, within days of learning of the student complaint, Associate Dean Green had been copied on an email from

then-Provost Maurice Edington to Defendant Latrecha Scott (FAMU EOP director) for her to "please review and take appropriate action," regarding the incident with MW. Doc. 151 at 14. Nevertheless, Appellee-FAMU did nothing, not even seek to preserve video evidence from the hallway where the encounter took place, Doc. 151 at 17, suggesting that FAMU never believed the student complaint was worthy of an investigation in the first place.

On January 26, 2023, nearly 100 days after Professor Smith initially reported the incident, Appellee-FAMU, through Defendant La'Tonya Baker, contacted Professor Smith to suddenly initiate an urgent investigation into the MW incident, and informed Professor Smith of her potential termination. Doc. 151 at 16. Unknowingly, Professor Smith was the sole focus of this investigation, despite Professor Smith having filed the first complaint. Doc. 151 at 16.

Baker informed Professor Smith that Green had violated FAMU regulations by failing to forward her complaint to the Compliance Department for investigation, Doc. 151 at 14-15, which was why Professor Smith's complaint was not being investigated. On February 1, 2023, Associate Dean Green admitted via email that he believed Professor Smith's written text message to be a complaint requiring an investigation. Doc. 151 at 15. However, in a subsequent undated statement (apparently sent after March 13, 2023), Green retracted from that position and contradicted himself by claiming that he did not consider Professor Smith's text to

be a formal complaint, and thus he had no obligation to investigate or forward the substance of the text to FAMU Compliance. Doc. 151 at 15, 20.

Professor Smith became concerned about FAMU's resurrection of MW's complaint, and the timing of the second-filed complaint by MW, suspecting it was related to Professor Smith's recent protected activity. Doc. 151 at 15-16. On the face of the student's complaint and its obvious falsities and inconsistencies, which, if believed, would have necessitated an immediate investigation under state and federal law and FAMU Regulations, Appellee-FAMU chose to proceed with an extensive four-month investigation of Professor Smith. Doc. 151 at 17.

On March 9, 2023, Professor Smith re-filed the complaint submitted to Associate Dean Green, this time through the Compliance hotline, to follow the procedure that Baker indicated that Green failed to follow. Doc. 151 at 15, 19. Professor Smith did so because Baker advised Professor Smith that her original complaint was not properly submitted by Associate Dean Green to Compliance per FAMU Regulations. Doc. 151 at 19. However, Compliance immediately deleted her re-submission. Doc. 151 at 19-20. As a result of the re-submission, on March 13, 2023, Compliance arranged a meeting with the law deans and Professor Smith concerning her re-filing, interpreting it as a new or "additional" complaint now that Associate Dean Green had withdrawn his statement that Professor Smith's text to him reporting the incident in October 2022 was a complaint, and thus empowering

Appellee-FAMU to re-label Professor Smith's resubmission as retaliation against MW. Doc. 151 at 20; 151-6 at 18. In the meeting held on March 23, 2023, Dean Keller indicated she knew little about the incident, while Associate Dean Markita Cooper sat virtually silent as if she knew nothing about the incident as well. Doc. 151 at 20-21.

On June 5, 2023, FAMU issued a report (the "June Report") from the Appellee-FAMU's January 2023 investigation. Doc. 151 at 17, 23. Appellee-FAMU's investigation ultimately concluded the student's complaint and the statements from the five witnesses were absolutely meritless. Doc. 151 at 17. Rather than discard the investigation, however, Appellee-FAMU used the investigation resulting from a patently dubious complaint as a pretext to discipline Professor Smith in retaliation for her protected activity, and thus, Appellee-FAMU manufactured a retaliation finding to create a false disciplinary record against Professor Smith. Doc. 151 at 17-18. Interestingly, however, Compliance recommended that then-law dean Keller and then-Interim Provost Watson take three actions. First, Compliance recommended that Keller and Watson "[r]eview this report and take any corrective actions deemed appropriate." Doc. 151-6 at 19. Dean Keller had already met with Professor Smith about the incident, and neither Keller nor Watson took any further action. Doc. 151 at 21; Doc. 86 at 12.

Second, Compliance recommended that Keller and Watson "[c]onsider if additional training is appropriate regarding civil discourse, conflict resolution, and professionalism in the practice of law for faculty and students." Doc. 151-6 at 19. No such training occurred. Doc. 86 at 12. Third, and most importantly, Compliance recommended that Keller and Watson "[***c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices***." Doc. 15 at 14-15 (emphasis added).

On June 12, 2023, Professor Smith responded, detailing the retaliatory actions she had experienced and requesting relief. Doc. 151 at 25. FAMU did not respond after it received Professor Smith's memorandum. Doc. 151 at 25.

On July 6, 2023, Appellee-FAMU's Compliance office authored a secret, supplemental report (the "Secret Report"), which was not shared with Professor Smith but was circulated among various FAMU officials, including FAMU EOP and staff involved in the initial salary investigation. Doc. 151 at 26. The Secret Report included descriptive communications that Professor Smith had voluntarily submitted in February 2023 during the investigation. Doc. 151 at 26. These communications, exchanged to identify the then-unknown student involved in the investigation, were anecdotally labeled as "gossip." Doc. 151 at 26. However, the Secret Report notably concluded that there were no violations of FAMU policies. Doc. 151 at 26.

Professor Smith continued to face troubling behavior from MW, leading Professor Smith to express concerns about her safety and MW's behavior in an October 5, 2023 memorandum to FAMU Compliance. Doc. 151 at 26-27. Professor Smith noted MW's unusual and concerning fixation on Professor Smith (who had never encountered MW before the October 2022 incident), and Professor Smith raised concerns about both her own safety and MW's mental well-being. Doc. 151 at 26-27. Appellee-FAMU did not respond to this memo. Doc. 151 at 27.

On October 17, 2023, Professor Smith filed in state court an equal pay lawsuit with an allegation of retaliation for the baseless investigation that FAMU carried out against her, but she did not attempt to serve FAMU for months later. Doc. 151 at 27-28. On November 13, 2023, Maritza Reyes, a then-FAMU law professor, filed a responsive paper in a separate case, *Reyes v. FAMU*, No. 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022). Doc. 151 at 28. This filing referenced Professor Smith's unserved state court complaint and informed Gray Robinson, P.A. (through attorneys Julie Zolty, Sarah Reiner, and Richard Mitchell), who were serving as FAMU's outside counsel and are now named defendants in Professor Smith's Corrected Second Amended Complaint ("CSAC"), about Professor Smith's lawsuit. Doc. 151 at 28. Gray Robinson subsequently notified Appellee-FAMU, and together they allegedly conspired to devise a plan and process to terminate Professor Smith in retaliation for filing a third lawsuit based on Equal Pay claims. Doc. 151 at 28-29.

Twenty-two days later on December 5, 2023, Appellee-FAMU notified Professor Smith of its intent to terminate her employment effective January 19, 2024, and it cited the June 5 report's finding of retaliation, mentioned the Secret Report that Professor Smith had never seen, and mentioned Professor Smith's October 5, 2023 memorandum outlining her safety concerns. Doc. 151 at 30. Professor Smith requested a conference pursuant to FAMU Regulations, which took place on January 11, 2024 before a three-member panel of lawyers handpicked by Provost Allyson Watson. Doc. 151 at 30, 32. The panel recommended that FAMU rescind its intent to terminate Professor Smith because there was **no evidence of retaliation**. Doc. 151 at 31-33.

Despite this recommendation, Appellee-FAMU untimely notified Professor Smith of the panel's report on January 23, 2024, when it rejected the recommendation and cited a new reason for her termination—the "totality of the circumstances." Doc. 151 at 32-34. Professor Smith pursued three internal appeals under FAMU's Regulations. Doc. 151 at 32-34. Step One affirmed her termination, and she still pursued a futile Step Two hearing.[2] Doc. 151 at 35-36, 41-42.

---

[2]     The decision (which upheld Professor Smith's termination) was issued after this appeal was filed, and since then, Professor Smith has filed her Step 3 internal appeal, which Professor Smith requested on September 21, 2024, and FAMU acknowledged by email from Associate Provost Reginald Perry on September 23, 2024. On November 7, 2024, Appellee-FAMU cited an internal university policy as the reason it will not afford her a step three hearing.

Since Professor Smith's initial termination notice, Appellee-FAMU has continued to change the reasons for her termination and still unable to articulate its definition of retaliation or how Professor Smith's conduct meets any definition of retaliation — because her conduct simply does not. Doc. 151 at 22, 36-40. Audaciously, Appellee-FAMU now relies on these contrived reasons of retaliation to distinguish this case from *Assaf v. University of Texas System*, 399 F. Supp. 1245, 1245-47 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds*, 435 U.S. 992 (1978) — a virtually identical case where a professor of "impeccable character" was granted a preliminary injunction – arguing that Professor Smith now lacks such an impeccable background due to the manufactured allegation of retaliation against her. Doc. 125 at 13. Even though Appellee-FAMU was unable to cite anything negative from Professor Smith's 20 years at the law school, it nevertheless argued the district court should not use *Assaf* as persuasive authority. Doc. 125 at 13. The district court accepted Appellee-FAMU's suggestion and distinguished *Assaf* on grounds that "injunctive relief was granted before the Plaintiff was terminated, and the court criticized the university's lack of transparency leading up to the hearing." Doc. 164 at 9 n.7.

## IV. Relevant District Court Proceedings

On March 4, 2024, this case was removed from state court to the Middle District of Florida (Orlando Division). Doc. 1. On March 6, 2024, Professor Smith

filed an emergency motion for a temporary restraining order ("TRO"), Doc. 6, denied by the district court on March 8, 2024. Doc. 10. In denying the TRO, the district court explicitly stated "it appears from the Motion that much of the harm that Plaintiff fears has already occurred." Doc. 10 at 5. On March 11, 2024, Professor Smith moved for a preliminary injunction, Doc. 11, later stricken by the district court due to technicalities on March 29, 2024. Doc. 34. On March 13, 2024, Appellee-FAMU filed an unopposed motion for an enlargement of time to file a "responsive pleading" to the complaint on or before March 29, 2024, Doc. 16, that was denied by the district court on March 15, 2024, Doc. 18, requiring the parties to fight over service for the next 79 days until May 31, 2024, when Appellee-FAMU voluntarily accepted service of process. Doc. 62.

On April 1, 2024, Professor Smith filed a second motion for preliminary injunction and requested a hearing, which remained pending without a hearing scheduled for 99 days. Docs. 37, 46. On May 20, 2024, Professor Smith filed a time-sensitive motion for extension of time to amend the complaint and add parties. Doc. 54. On May 31, 2024, because the district court did not rule by this deadline, Professor Smith re-filed her certification with the proposed amended complaint and requested that the district court instruct the clerk to docket her amended complaint. Doc. 65. Instead, the district court struck that with the proposed amended complaint. Doc. 71. On June 18, 2024, Professor Smith re-filed the motion for an extension of

time, attaching the proposed complaint. Doc. 72. The complaint notified the district court in a footnote: *"This pleading was updated from prior versions and since the initial complaint was filed in October 2023 based on Defendant FAMU's continued actions, intervening administrative hearings, and to ensure the accuracy of new facts and circumstances."* Doc. 72-1 at 3 n.3. On July 3, 2024, the Court granted Plaintiff's request to amend the First Amended Complaint after 25 days passed from when the motion was filed. Doc. 80. Professor Smith filed the SAC on July 8, 2024, Doc. 81, followed by the CSAC on July 9, 2024, because the paragraph numbering for each claim was misnumbered listing the incorporated paragraphs as one lower than it should have been. Doc. 84. Also, on July 9, 2024, the district court summarily mooted Professor Smith's second preliminary injunction, over her briefed objection, despite the fact that such motion was pending since April 1, 2024. Doc. 82. On July 10, 2024, the district court accepted the CSAC, Doc. 85, and Professor Smith filed her third motion for preliminary injunction relying on the CSAC. Doc. 86.

On July 24, 2024, the district court struck the SAC, Doc. 81, and CSAC, Doc. 84, because each differed from the first proposed second amended complaint over Professor Smith's briefed argument in opposition to striking. Doc. 132. On July 26, 2024, Professor Smith then renewed her motion seeking leave to amend and file the CSAC because Appellee-FAMU improvidently withheld its consent. Doc. 133. On August 2, 2024, the district court denied two of Professor Smith's discovery motions,

while her motion to amend her complaint was pending. Doc. 134 and 135. On August 12, 2024, Professor Smith filed a petition for writ of mandamus to this Court because the district court substantially and intentionally delayed Professor Smith's ability to prosecute her case including through its refusal to address the preliminary injunction. No. 24-12583 (11th Cir. 2024). On August 16, 2024, the Court granted Professor Smith's second motion to amend her complaint. Doc. 149. On August 18, 2024, Professor Smith re-filed the exact same CSAC that the third motion for preliminary injunction relied upon. Docs. 84, 151. On August 29, 2024, Appellee-FAMU moved for a more definite statement of the CSAC, Doc. 160, and to transfer venue. Doc. 161. On August 30, 2024, the district court denied Professor Smith's third motion for preliminary injunction without a hearing, prompting the instant appeal. Doc. 164.

On September 3, 2024, Professor Smith filed her notice of appeal of the district court's order on the preliminary injunction motion. Doc. 165. That same day, Professor Smith moved to recuse the district judge citing *inter alia* his erroneous application of the law and factual findings, and his ongoing beratements of Professor Smith and slaps on the wrist to Appellee-FAMU when it regularly and blatantly cited wrong law or procedure. Doc. 169. On September 6, 2024, the district court denied recusal. Doc. 175. On September 11, 2024, the district court granted Appellee-FAMU's motion to transfer venue to the Northern District of Florida. Doc. 178.

## STANDARD OF REVIEW

Generally, denials of preliminary injunctions are reviewed for abuse of discretion, *see Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010), findings of fact are reviewed for clear error and applications of the law are reviewed *de novo,* because such standards are "premised on the understanding that [a]pplication of an improper legal standard ... is never within a district court's discretion." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006). However, when cases involve "constitutional facts underlying possible violations of the freedom of speech," this Court will apply *de novo*, or plenary, review. *Otto v. City of Boca Raton, Fla.*, 41 F.4th 1271, 1273 (11th Cir. 2022).

## SUMMARY OF THE ARGUMENT

The district court's denial of a preliminary injunction should be reversed because Professor Smith has clearly demonstrated all four factors necessary for injunctive relief: 1) a substantial likelihood of success on the merits, 2) irreparable harm, 3) the balance of equities, and 4) the public interest factor. The district court analyzed two factors and ignored the "merged" standard to the others. Doc. 164.

First, Professor Smith is likely to succeed on the merits. The district court erred by relying on a superseded pleading for one issue in its analysis, which was legally nullified when it accepted her CSAC. As established by Eleventh Circuit precedent, an amended complaint supersedes the original complaint. By relying on

the First Amended Complaint ("FAC") to deny the preliminary injunction, the district court based its decision on a legally nullified document. This error was compounded by the district court's deliberate error in refusing to consider the Title VII and the Equal Pay Act (EPA) claims asserted in the CSAC because in the words of the district court " The First Amended Complaint does not include a Title VII claim[.]" Doc. 164 at 7.

Second, irreparable harm was patently established on the record below. The district court failed to adhere to this Court's precedent that ongoing violations of constitutional rights, such as those under the First Amendment, and violations of certain civil rights statutes constitute irreparable harm as a matter of law. Professor Smith demonstrated that her termination was in retaliation for protected speech and petitioning activity, which directly implicates her First Amendment rights. The content of that protected speech directly implicated Title VII and the Equal Pay Act, as it aimed to address and remedy ongoing unlawful pay disparities between men and women at the public law school. Moreover, irreparable harm is to be presumed in employment discrimination cases involving Title VII. The district court's refusal to afford this presumption was clear legal error.

Third, the balance of equities favors granting injunctive relief and merges with the public interest factor when the government is the defendant. Professor Smith has suffered significant harm to her professional reputation, career, and career

opportunities due to her unlawful termination. The district court incorrectly dismissed these harms as speculative or re-compensable through monetary damages. However, reputational damage in academia is particularly severe and cannot be easily remedied by monetary compensation alone.

Finally, granting injunctive relief is in the public interest. Reinstating Professor Smith would promote adherence to constitutional principles and federal anti-discrimination laws. The district court's conclusion that reinstatement would be contrary to public policy was based on the district court's own erroneous factual findings and a misapplication of legal standards. For these reasons, this Court should reverse the district court's order and grant the requested preliminary injunction.

## ARGUMENT

Professor Smith should have received the preliminary injunction she requested restoring the status quo ante because she satisfied all four factors: 1) a strong likelihood of success on her claims, 2) irreparable harm, 3) the balance of equities, 4) and the public interest factor, although the district court only addressed factors two and four. Indeed, state and Federal courts have reinstated tenured professors under similar conditions. *See Assaf v. University of Texas System*, 399 F. Supp. 1245, 1245–47 (S.D. Tex. 1975); *Amer. Ass'n of Coll. Professors v. Bloomfield Coll.*, 322 A.2d 846 (C.H. Div. 1974), *affirmed* 346 A.2d 615 (App. Div. 1975); *Zisk v. The Charleston School of Law*, Case No. 2015-CP-1003661

(Charleston Cir. Ct. 2015); Doc. 86-11. Those cases were correctly decided and demonstrate the grave error in the trial court's decision.

## I. THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE APPELLANT ESTABLISHED IRREPARABLE HARM.

### A. The District Court Erred by Relying on a Pleading that was Superseded to Deny Irreparable Harm While Relying on the Operative Pleading for the Remainder of the Decision.

The district court's decision to rely on nullified a pleading – the FAC – Doc. 1-1, was an egregious error that cannot be reconciled with this Court's precedent. The district court relied on this reasoning solely to justify its refusal to recognize its earlier determination that Professor Smith's harm had already occurred. An outcome that foreclosed what Professor Smith requested; restoring the parties to their last uncontested positions. However, the district court did not simply rely on the FAC in evaluating Professor Smith's motion, the court attempted to disguise its reliance thereupon by citing the CSAC—which was the operative complaint because it was accepted by the district court just ten days prior. *Compare* Doc. 155 ("In light of 151, Corrected Second Amended Complaint") *with* Doc. 151 *and* Doc. 164 at 5 ("Three weeks after Plaintiff sought leave to file the most recent version of the SAC, the Court granted the motion to amend and the operative SAC [that is CSAC] was filed on August 18, 2024."). This selective reliance on outdated information to determine irreparable harm while simultaneously depending on the most recent pleading for the rest of the ruling raises significant questions about the impartiality,

consistency, and fairness of the court's analysis. Because it is inconsistent with this Court's precedent, it must be reversed for two reasons: (1) any claims raised in the FAC are null and cannot be considered as a matter of law, and (2) the trial court failed to provide any explanation for how it evaluated the credibility of the allegations in the FAC, leaving this Court unable to effectively review its reasoning.

As a general rule in this Circuit, "an amended complaint supersedes the original complaint." *Proctor & Gamble Def. Corp. v. Bean*, 146 F.2d 598, 601 (5th Cir. 1945); *Fritz v. Standard Sec. Life Ins. Co. of New York*, 676 F.2d 1356, 1358 (11th Cir. 1982); *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006); *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). While Professor Smith is unaware of any circumstance when this Court has applied the general rule to the context of a preliminary injunction, this Court has however applied the general rule in contexts of motions to dismiss. *See Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016).

When factual findings are not made on a disputed record in cases of a preliminary injunction, a district court's ability to make factual findings is limited, much like its fact-finding ability when resolving a motion to dismiss. *See e.g., Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976) (on appeal from the denial of a preliminary injunction without hearing and finding that "[f]or purposes of our review, all of the

well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true."). This Court's holding  in *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006) is particularly important to illustrate the district court's error on this point.

In *Dresdner Bank*, an Italian ship catering company informally contracted to provide victuals and food and beverage management to a vessel owned by Royal Caribbean and Olympic World Cruises. 463 F.3d at 1212-14. The catering company and the cruise companies never formalized their agreement, and Olympic World ultimately filed bankruptcy before repaying the catering company for the goods received. *See id.* at 1214. While the catering company's original complaint against the cruise lines articulated a theory of recovery based on its maritime lien for necessaries under the Commercial Instruments and Maritime Liens Act ("CIMLA"), to avoid the argument that its theory was based on the informal contract, the catering company was granted leave to conform its pleadings to the evidence at trial. *See id.* at 1215. It was from this outcome, that the Court reiterated the broad proposition that any claims or theories articulated in a prior pleading are nullified by a party's filing and the court's acceptance of a subsequent pleading. *See id.* ("the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary. . . Even if [the] original complaint could be

construed to affirm the proposed contract, that pleading was wholly superseded by the amended complaint which proceeded under a different theory.").

Here, Professor Smith's case is controlled by *Dresdner Bank* because the district court expressly authorized her to file an amended pleading, just like the catering company, but then the district court based its erroneous irreparable harm decision on a since nullified pleading – FAC – because that nullified pleading did not have a Title VII claim therein, making it easy for the district court to deny irreparable harm. The district court expressly relied on the FAC when reaching the erroneous conclusion that Professor Smith failed to establish irreparable harm. *See* Doc. 164 at 7 ("the operative pleading was the First Amended Complaint"… "The First Amended Complaint does not include a Title VII claim, and the Plaintiff has not sought leave to amend the Motion for Preliminary Injunction to include the Title VII claim."). The district court also implicitly relied on the FAC by reciting facts from that pleading when reaching the erroneous conclusion that she failed to establish irreparable harm.[3] Doc. 164 at 7. The district court's reliance on the FAC triggered its first point of error because these allegations were nullified by Professor Smith's filing of the CSAC with the district court's permission in its August 16,

---

[3] While the district court may have cited the CSAC, as accepted by the court, the facts recited by the district court are not alleged in that pleading. Therefore, the incorrect citations demonstrate that the district court relied on a nullified pleading while purporting to cite the operative pleading.

2024 Order. Doc. 149. Oddly, the district court then relied on the CSAC for the remainder of the decision, even noting that the operative complaint was indeed the CSAC, not the FAC. Doc. 164 at 7. Erroneously, the district court states: "When the Plaintiff filed the instant Motion for Preliminary Injunction, the operative pleading was the First Amended Complaint." Doc. 164 at 7. But that is not true. Docs. 85; 86.

When the instant Motion for Preliminary Injunction was filed on July 10, 2024, the operative complaint was the CSAC, which the district court approved on July 10, 2024, in Doc. 85, stating: "[T]he Court hereby adopts 84 Corrected Second Amended Complaint [CSAC] as the operative complaint in this case. Signed by Judge Paul G. Byron on 7/10/2024." After Professor Smith filed the corrected pleading due to misnumbering, the district court struck that version of the CSAC, requiring her to file another motion to amend, Docs. 133 and 149, before the exact same pleading, Doc. 151, previously Doc. 84, could become the operative complaint as it did on August 18, 2024. Doc. 151.

After engaging Professor Smith in a series of procedural filings that delayed consideration of the preliminary injunction, the district court oddly replaced the operative complaint (CSAC) with the FAC only to address the issue of irreparable harm. This was glaring because, as the district court noted, the FAC omitted any Title VII allegations, and therefore, the district court's conclusion was that there was not irreparable harm as typically afforded in Title VII cases. That decision was error.

Indeed, *Dresdner Bank* compels reversal of the district court in this case because the FAC "was wholly superseded by the [corrected second] amended complaint which proceeded under a different theory[,]" Title VII as well as the EPA. *See Dresdner Bank*, 463 F.3d at 1215. Therefore, the district court must be reversed.

The second point of error occurred when the district court made factual determinations from the nullified FAC to support its decision without articulating any basis to allow for meaningful review. The district court accepted the credibility of a document outside the four corners of the complaint over Professor Smith's plausibly alleged dispute of those aversions without holding a hearing. This Circuit's precedent makes clear that a district court cannot do that. Specifically, in *Saunders v. Duke,* 766 F.3d 1262, 1270 (11th Cir. 2014), a *pro se* man filed a 42 U.S.C. § 1983 complaint against FDLE Agent George Duke and MBI Agents Thomas Matthews and Conrad Kilian, alleging inter alia that the agents violated the man's Fourth Amendment rights. Because Mr. Saunders attached the police report to his complaint, the district court granted the agents' motion to dismiss, finding that they were entitled to qualified immunity based on the report attached to the complaint. *Saunders*, 766 F.3d at 1265. This Court reversed that decision finding that "[w]here a civil rights plaintiff attaches a police report to his complaint and alleges that it is false, as Mr. Saunders did, the contents of the report cannot be considered as true for purposes of ruling on a motion to dismiss." *See id*.

In the present case, the district court parroted statements found to be unsubstantiated by FAMU in its investigative report, Doc. 151-6 at 19, attached to the CSAC, Doc. 151, and stated no basis on the record for why those statements were more believable or due more credence than Professor Smith's allegations challenging those statements as manufactured pretext and subterfuge to terminate her because of her protected activity under the First Amendment and Fair Labor Standards Act. *Saunders* counsels in favor of reversal because here, as Mr. Saunders did, Professor Smith challenges the investigative report and notices as false and subterfuge throughout her pleadings and specifically on the topic of the Appellee's alleged reason for her termination. *See* Doc. 151. Still somehow, the district court ignored the command from *Saunders* and instead made factual determinations on bitterly contested factual issues without a hearing.

Most egregiously, the district court manufactured its own reason for Professor Smith's termination that even Appellee-FAMU had already found meritless. Though judges have judicial immunity from acts taken in their official capacity, there was no harmless reason for the district court to deliberately misrepresent the facts of this case. Specifically, the district court stated: "While Plaintiff contests the student's version of the encounter giving rise to the decision to terminate her employment, the student's version—corroborated by five witnesses—led Defendant FAMU to terminate Plaintiff for improper conduct." Doc. 164 at 10. This is simply false,

unsupported by the record, and not even one of the reasons Appellee-FAMU

advanced for terminating Professor Smith. In fact, FAMU offered seven different

reasons:

> **Reason One**: The "substantiated finding of retaliation" via Provost-Appellee, Allyson Watson's Notice of Intent dated **December 5, 2023**. Doc. 151 at 36-40.

> **Reason Two**: The "totality of circumstances" via Provost-Appellee, Allyson Watson's Notice of Termination dated **January 23, 2024**. Doc. 151 at 36-40.

> **Reason Three**: "[Professor Smith's] unprofessional and inappropriate behavior towards students" via Provost-Appellee, Allyson Watson's Initial Declaration dated **March 25, 2024**. Doc. 151 at 36-40.

> **Reason Four**: Professor Smith's "was unprofessional and inappropriate with students regarding the confrontation between Plaintiff and the student from the original report, and that her rivalry with a fellow College of Law professor was being internalized by students and creating a distraction" via Appellee-FAMU's Response in Opposition to the First Motion for Preliminary Injunction dated **March 25, 2024**. Doc. 151 at 36-40.

> **Reason Five**: The "substantiated finding of retaliation documented in the investigative reports" via Provost-Appellee, Allyson Watson's Amended Declaration dated **April 11, 2024**.[4] Doc. 151 at 36-40.

> **Reason Six**: unprofessional, and inappropriate with at least one student, in addition to engaging in a disruptive "rivalry" with another law professor via Appellee-FAMU's Response to the Second Motion for Preliminary Injunction dated **April 12, 2024.** Doc. 151 at 36-40.

> **Reason Seven**: "Plaintiff's employment ended because she retaliated against a student for making a written complaint against her" via

---

[4] This declaration was amended only after Professor Smith served a Rule 11 letter on Appellee-FAMU.

Appellee-FAMU's Response to the Third Motion for Preliminary Injunction dated **July 22, 2024**. Doc. 151 at 36-40.

To further bolster the lack of credibility in the stated reasons, Appellee-FAMU found MW's and the five witnesses' accounts of the October 2022 incident to be absolutely meritless. Docs. 151 at 17-18, 21. A three-member panel consisting of independent reviewers selected by Appellee-FAMU also determined that the alleged retaliation claim, as manufactured by FAMU's Compliance Department against Professor Smith on behalf of the student, lacked merit. Docs. 151 at 32-33. At bottom, the district court had three options with regard to the investigative reports attached to the operative pleadings, 1) offer a reason for discounting the allegations pled, 2) hold a hearing to determine credibility, or 3) follow the command of *Saunders*. It did none of these options.

The district court, therefore, erred and must be reversed.

**B.     The District Court Erred by Failing to Consider the Harm Caused to Appellant's Ongoing Deprivation of Her Constitutional Speech and Petition Rights.**

"[A]n ongoing violation of the First Amendment constitutes an irreparable injury." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). In the employment context, "[a] state may not demote or discharge a public employee in retaliation for *protected* speech." *Tindal v. Montgomery Cnty. Comm'n*,

32 F.3d 1535, 1539 (11th Cir. 1994) (citation omitted).[5] Where an employee has demonstrated they suffered an adverse action such as termination within five months of having engaged in speech or conduct protected by the First Amendment, they have established a violation of the First Amendment only if the speech or conduct was "protected." *See id*. A public employee's speech is protected only if it meets the standard articulated in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). This Court reiterated the *Pickering* test as follows:

> First, we consider whether Plaintiff's speech was made as a citizen and whether it implicated "a matter of public concern." If this first threshold requirement is satisfied, we then weigh Plaintiff's First Amendment interests against the City's interest in regulating his speech to promote "the efficiency of the public services it performs through its employees. If his speech is so protected, the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in his termination . . . Because these final two issues, which address the causal link between Plaintiff's speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015) (internal citations omitted) Because the district court did not even address a single *Pickering* factor let alone even consider or explain why it did not consider Professor Smith's First Amendment theory of demonstrating irreparable harm, that failure is error.

---

[5]     While *Tindal* was reviewed from a summary judgment record, here, the district court's unexplained rejection of this theory as alleged in Professor Smith's motion is error.

Notwithstanding the district court's error, Professor Smith has satisfied the *Pickering* factors.

Indeed, *Tindal v. Montgomery County Commission* demonstrates exactly how Professor Smith's First Amendment rights to speech and petition were abridged, but the district court disregarded this theory entirely. 32 F.3d at 1535. The *Tindal* case involved a woman communications dispatcher's action against the Montgomery County Commission for retaliation, which was filed because she testified and submitted an affidavit against her supervisors in an earlier race and sex discrimination suit, and only five months after that conduct resulted in her termination for her refusal to submit timely to a psychiatric investigation. *See Tindal*, 32 F.3d at 1540. Applying the *Pickering* factors, the Court concluded Ms. Tindal satisfied each factor because (1) her speech took place in a public forum; (2) it also supported the discrimination and harassment claims of *other* individuals, not of Tindal herself; (3) there was no evidence indicating that Tindal's speech inhibited either her work or the work of the office; (4) Tindal has proffered evidence that would allow a reasonable trier of fact to conclude that Sheriff Butler terminated Tindal largely because of—if not entirely due to—her testimony against him; and (5) the record revealed that supervisor may have used Tindal's refusal as a pretext for terminating her. *See id.* at 1539-40.

In the present case, all five observations from *Tindal* are present here.[6] First, Professor Smith's speech and conduct – filing a lawsuit to remediate equal pay concerns for women faculty – was to a public forum as in *Tindal*. Second, Professor Smith's state court complaint sought to benefit all women faculty by calling out the government body's unlawful activity so that each woman could, if she so chooses, seek equal pay for herself or ride on the back of Professor Smith's complaint and have their salaries increased as before. *See, e.g.,* Doc. 151 at 10-11 ("The study was conducted … in response to recently raised concerns about potential salary inequities within the college."); Doc. 86 at 8; Doc. 1-1 at ¶ 16; *compare Presley v. Graham*, 936 F. Supp. 2d 1316 (M.D. Ala. 2013) (finding that a woman's speech concerning ongoing misconduct by a government actor was a matter of public concern) *with Kurtz v. Vickrey*, 855 F.2d 723, 729 (11th Cir. 1988) (comprehensively evaluating various instances of a tenured professor's speech and determining that the speech on misconduct by the public institution was a matter of public concern).[7]

---

[6]      In *Tindal*, this Court cited with approval *Marshall v. Allen*, 984 F.2d 787, 795 (7th Cir. 1993), which itself held that "the subject of this speech—sex discrimination in a public agency—was a topic of public interest."

[7]      To be clear, *Kurtz* is distinguishable from this case because the tenured professor in that case made random and personal complaints about public disclosure of salaries. Kurtz's random comments on salary were isolated and did not reach public concern. However, in the present case, Professor Smith's speech directed at salary involved misconduct by a public institution paying women less than men in violation of federal law.

Third, FAMU failed to offer any evidence that Professor Smith's state court complaint interfered with the law school's operation, just like the Montgomery County Commission failed to so tender in *Tindal*. Fourth, Professor Smith was terminated just twenty-two (22) days after she engaged in speech protected by the First Amendment which is a much shorter time period and even more clear depiction than the five-month period in *Tindal*. Fifth, Professor Smith has presented sufficient evidence showing that FAMU used the fabricated and weak retaliation claim as a pretext for her termination, as evidenced by FAMU's repeated changes to the stated reasons for her dismissal as was the case in *Tindal*.

In further support of the fifth *Pickering* factor, FAMU offered seven different reasons, even conflicting declarations and contrived reasons in its filings, for terminating Professor Smith including "inappropriate conduct with students" in an attempt to foreclose Professor Smith's argument here. Doc. 151 at 36-40. FAMU's attempt falls flat, however, because even if that reason were true, FAMU itself determined that conduct did not rise to the level of a policy violation in the Secret Report. Doc. 151 at 26. Even more telling, FAMU initially stated Professor Smith retaliated against one student, then altered to state she had inappropriate conduct with more than one student, but FAMU later retracted from that position and definitively stated only one student was involved in its discovery responses, Doc. 151 at 36-40, and after receiving a Rule 11 letter concerning Appellee-Watson's

initial declaration, *compare* Doc. 151-14 at ¶ 4 *with* Doc. 151-15 at ¶¶ 6, 15. *See also* Doc. 86 at 3. Therefore, FAMU could not use this conduct as a basis to terminate Professor Smith because a policy violation may satisfy "just cause" to terminate her tenure, but without one, there was no lawful basis for termination. Simply put, FAMU did not have a reason amounting to a policy violation to establish just cause aside from its own manufactured and dubious retaliation claim that reeks of illegality because of the nature in which it was concocted. As a final point, FAMU never addressed why its Compliance department recommended that Watson and Keller consider "if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices." The reason is clear - it affirms exactly what Defendant Baker told Professor Smith — that Associate Dean Green did not forward Professor Smith's text complaint to Compliance as FAMU Regulations require. However, if Professor Smith's written text to Associate Green was not a formal complaint to begin with, then such a recommendation would be irrelevant to this investigation. Doc. 151 at 15, 24. Such a recommendation clearly indicates that FAMU considered Professor Smith's text message to be a complaint and casts further doubt on the credibility of FAMU's stated reasons for her termination.

Thus, Professor Smith has demonstrated here and below that FAMU's stated reasons for her termination are pretextual, just like in *Tindal*. Because the *Pickering*

factors weigh in strong favor of Professor Smith and the district court engaged no assessment of these factors, it follows that Professor Smith established irreparable harm from the loss of her right to engage in protected speech. Accordingly, the district court must be reversed.

### C. The District Court Erred by Refusing to Afford Appellant the Presumption of Irreparable Harm in Title VII Cases.

The district court further compounded its errors by holding that Professor Smith was not entitled to the presumption of irreparable harm in Title VII cases. The district court knew this too, which is why it relied on Professor Smith's FAC as the operative complaint to circumvent binding precedent on this point. Doc. 164 at 7. It is well established in this Circuit that district "courts are to presume irreparable harm in Title VII cases." *Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. 1981); *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983); *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988); *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993). Moreover, "[a] prior panel decision of this Court is binding on subsequent panels and can be overturned only by the Court sitting en banc." *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

Here, the district court erroneously concluded Professor Smith was not entitled to the presumption of irreparable because a Title VII allegation was not in the FAC and *Leigh v. Artis-Naples, Inc.*, No. 2:22-CV-606-JLB-NPM, 2022 WL 18027780, at *17 (M.D. Fla. Dec. 30, 2022) suggests that prior panels have cast

doubt upon whether *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) is controlling authority. This conclusion is error for three reasons.

First, a subsequent panel cannot reverse a prior panel decision unless there is an *en banc* decision from the Court. *See Bonner*, 661 F.2d at 1209.

Second, *Leigh* was wrongly decided because it relies on *McDonald's Corporation v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) for the proposition that *Baker* has been limited. *See Leigh*, 2022 WL 18027780, at *17. As the district court in this case stated however, "context matters." Doc. 164 at 10. Reading *McDonald's Corporation v. Robertson* in context, that case involved a trademark infringement action involving a separate and distinguishable presumption of irreparable harm from a party's evidence on likelihood of confusion, as recognized in *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985). *See McDonald's Corporation v. Robertson*, 147 F.3d at 1314. In *McDonald's Corporation*, this Court refused to apply the *Baker* presumption of irreparable harm because *McDonald's Corporation* was not a Title VII case. *See id*.

The *Leigh* Court gravely erred because it confused the *Baker* presumption from Title VII cases with the *E. Remy Martin* presumption that applies in cases of trademark infringement, instructing that irreparable harm is generally presumed once the plaintiff demonstrates a likelihood of confusion resulting from the defendant's use of a similar mark. The district court below adopted *Leigh*'s error and

confused the presumptions as well. However, even if the *McDonald's Corporation* decision did limit *Baker,* then it limited the holding to employment contexts, such as the case before this Court.[8] Thus, the district court incorrectly applied the law as did the court in *Leigh*, and both courts must be reversed.

Third, as argued above, Professor Smith's CSAC was the operative pleading that included a Title VII count. On this basis alone, Professor Smith was entitled to the *Baker* presumption. However, even if the district court was correct to use the FAC, which it was not, Professor Smith had an Equal Pay Act (EPA) claim in that pleading triggering the *Baker* presumption. An EPA claim triggers the *Baker* presumption because this Court recognized in *E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1010 (11th Cir. 1989), that "a violation of Title VII is established a fortiori" when a plaintiff establishes a violation of the EPA. Thus, to determine whether the presumption applied in this case, the district court had to evaluate the likelihood of success of Professor Smith's EPA claim before denying her the presumption. Because the district court did not address the likelihood of success of her EPA claim, it erred and could not have reached the question of whether the *Baker* presumption applied.

---

[8] The *Leigh* decision also incorrectly purports to narrow the *Baker* presumption by concluding the presumption is only applicable to prevent ongoing retaliatory actions by an employer. Such a narrowing finds no support from the holding in *Baker* nor in its progenitors. *See Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. 1981); *United States v. Jefferson Cnty*, 720 F.2d 1511, 1520 (11th Cir. 1983.

For these reasons, the district court's irreparable harm assessment must be reversed.

**D.    The District Court Erred by Failing to Consider the Irreparable Injury caused to Appellant's Reputation.**

After erroneously concluding that Professor Smith was not entitled to the *Baker* presumption of irreparable harm, the district court multiplied its errors by concluding that she did not establish irreparable harm from any of her other injuries. The irreparable harm to Professor Smith transcends financial loss. The termination has damaged her academic standing, eroded her professional reputation, and created lasting barriers to future career opportunities. These injuries are unique to academia, where tenure is both a recognition of professional excellence and a safeguard against arbitrary dismissal. Without reinstatement, Professor Smith faces an insurmountable stigma that will hinder her ability to secure comparable positions, collaborate with peers, and continue her scholarship. Such reputational damage, compounded by the false allegations, cannot be remedied through monetary compensation alone.

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citation omitted). An example of an irreparable injury includes "the possibility of customers being permanently discouraged from patronizing one's business." *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981). Additionally, "[n]either a monetary award nor prevailing on the merits of the state

action could recompense" an ongoing deprivation of one's First Amendment rights. *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). This district court erred in three ways.

First, the district court erred by relying on *Van Arsdel v. Texas A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980) to concoct a bright-line rule that tenured faculty can never establish irreparable harm since reinstatement and back pay are available to a litigant who is successful at trial. *Van Arsdel* articulated no such rule, and even if it did, the case is factually inapposite to the present case because here, Professor Smith did not resign from her position, nor does FAMU have an unquestionable right to commence dismissal proceedings. Unlike the professor in *Van Arsdel*, Professor Smith alleged and offered evidence demonstrating that the complaint against her was patently false, and FAMU confirmed as much by determining none of the claims were substantiated. Doc. 151 at 17, 32-33.

To distinguish the present case even further from *Van Arsdel*, FAMU itself (1) manufactured a retaliation claim against Professor Smith; (2) investigated that claim; and, assuming for purposes of this point that Professor Smith retaliated against the student as FAMU claims, which she did not, (3) punished Professor Smith when she was forced to attend counseling with law school dean leadership. Doc. 151 at 20-21. Thus, FAMU acted as judge, juror, and executioner in the present case and that is unlike *Van Arsdel*, which involved a claim brought entirely by

another employee and that claim had independent merit. In sum, FAMU's discipline of Professor Smith was completed in March 2023, well before her notice of termination months later in December 2023. Doc. 151 at 20-21.

The district court's misapplication of *Van Arsdel* resulted in Professor Smith's second argument on this point, which is that the district court erred by concluding the reputational harm alleged was speculatory. Doc. 164 at 9. Professor Smith provided testimonial evidence demonstrating reputational injury causing a loss of repute within the academic community because law faculty are evaluated on "scholarship" and her termination and removal from campus foreclosed her ability to complete scheduled scholarship and that affected her reputation.[9] Doc. 86-1; Doc. 151 at 55. Professor Smith directed the district court to *Assaf v. University of Texas System*, 399 F. Supp. 1245, 1245–47 (S.D. Tex. 1975) which expressly considered and rejected the district court's conclusion that monetary damages could recompense the loss of a professorship. In *Assaf*, a second-year, non-tenured professor at the

---

[9]     Professor Smith also presented evidence that she was denied a similar job that she applied for during the pendency of the action below, and that she was previously on committees of leadership, which is the foundation/track for a deanship role. Doc. 86-19 at 2; Doc 151 at 11. Both of these facts are stated in her sworn affidavits attached as exhibits to the third motion for preliminary injunction, which the district court weighed and rejected without a hearing to determine credibility or otherwise explaining its reason for not assigning any controlling weight. This Court's precedence, therefore, compels reversal. *See e.g., Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1211 (11th Cir. 2003); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1538–39 (11th Cir. 1989).

University of Texas received abrupt notice that his appointment would be terminated. 399 F. Supp. at 1245-47. Dr. Assaf moved for and received a preliminary injunction to prevent the University of Texas from terminating him based on the University's alleged failure to follow its own Rules and Regulations on dismissal notifications. *See id.* The district court agreed with Dr. Assaf finding that:

> Here, there is much more than a temporary loss of income which the Sampson court admonishes to be insufficient to alone constitute irreparable injury. Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money. Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.

While *Assaf* involved a non-tenured science professor, a tenured law professorship surely demands "academic prestige and research resources which are a sheer necessity to an academician[.]" *See Assaf*, 399 F. Supp. at 1245-47. When the district court denied Professor Smith's request for a TRO, it recognized that her research abilities were cut off and that she was not permitted to enter the law school campus, not even to use the public law school library if she wanted to research. Doc.

10 at 30. Accordingly, the district court erred by refusing to consider, let alone address, the patent similarities between this case and *Assaf*.

Even if this Court were to find the district court was permitted to reject Professor Smith's reliance on *Assaf*, the district court must still be reversed because law professors shop their articles of scholarship to journals internationally and often select the highest prestige of journals to publish with and that competition bears an almost identical connection to subcontractors competing for contracts as seen in *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287 (11th Cir. 2024). In *Yorktown*, this Court affirmed a district court's finding of irreparable harm for subcontractors and listed the evidence to support that conclusion:

> The district court considered evidence that Yorktown has about ninety-five highly trained employees doing specialized work on the TRADOC contract, "including scientists and high-end military analysts." And it considered that those employees are not easily replaceable. Yorktown's CEO Bryan Dyer testified that it takes two to three months to find, vet, interview, and get approval to hire a senior military analyst. The day after Threat Tec's CEO Crawford sent the letter terminating the subcontract and attempting to terminate Yorktown's TRADOC work, government employees approached Yorktown employees and told them to go apply for their jobs on the Threat Tec website. Dyer testified that as a result Yorktown lost two highly skilled employees, which meant losing institutional knowledge and experience needed to bid on future government contracts.

*See id.* at 1296. This Court then explained that the subcontractors established irreparable harm because "[a]brupt termination of TRADOC work could affect an assessment of Yorktown's past performance, harming its reputation and impeding its

ability to compete for other government contracts in the future." *Id.* at 1297 (collecting cases to support this proposition).

Professor Smith established that she had a pending scholarship outstanding to a reputable journal (which ultimately she was unable to finish), and neither the district court nor Appellee-FAMU contradicted this fact. Thus, Professor Smith made a sufficient showing that her professional reputation required protection just like the subcontractors in *Yorktown* because it can hardly be doubted that an abrupt disconnection between a journal's staff and an author would surely result in that journal considering that disconnect in future instances where the author submits scholarship. The district court's failure to even consider this point, let alone allow the theory to be developed or debunked at a hearing, counsels in favor of reversing the district court.

Third, the district court erred by summarily rejecting Professor Smith's other harms as economic harms and therefore reparable harms. The district court simply got it wrong by concluding, albeit in a footnote, that each case cited by Professor Smith demonstrated harms that were re-compensable with monetary damages should she prevail. Doc. 164 at 9. For example, *Schrank v. Bliss*, 412 F. Supp. 28, 37 (M.D. Fla. 1976) discussed the requisite official stigmatization to clear the threshold of irreparable harm under the standard articulated in *Sampson v. Murray*, 415 U.S. 61 (1974). *Schrank,* however, involved more than school-house embarrassment present

in *Sampson;* it involved "official records, and the public dissemination through the press by defendant, charging plaintiff with insubordination, especially when coupled with the highly dubious validity of that charge, constitute a scandalizing stigma to plaintiff's professional stature." *Schrank v. Bliss*, 412 F. Supp. at 37. All of the same facts from *Schrank* are present in Professor Smith's case – there are **official records** charging her with a **patently dubious** charge of **misconduct** against a student and **public dissemination of the information;** FAMU's compliance and equal employment breached confidentiality between employees and recklessly handled her unlawful termination such that students enrolled in Professor Smith's courses were affected, non-parties were notified of the information, and more. *See id.;* Doc. 151 at 24-25. Because all of the facts from *Schrank* were present, Professor Smith's termination was "a scandalizing stigma to [her] professional stature." *Schrank v. Bliss*, 412 F. Supp. at 37. The district court so erred by concluding otherwise.

Next, the district court summarily rejected *Blaine v. N. Brevard Cnty. Hosp. Div.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018), finding as a matter of law that "[t]he termination of a tenured professor does not implicate counsel's license to practice law and earn a living." Doc. 164 at 9; Doc. 86 at 20-21, 23, 24. The district court erred by painting with too broad a brush because the case at bar does not involve an at-will termination of a tenured professor because it cannot; rather, it

involves a *for-cause* termination of a tenured professor specifically on grounds that she engaged in misconduct.

Indeed, Professor Smith cited Rules 4-8.3 and 4-8.4 of the Rules Regulating the Florida Bar because the misconduct that she was charged with is so egregious that if it were true, which it is not, by its definition alone, must be reported to the Florida Bar based on these rules. Doc. 86 at 22, 23. Neither the district court nor FAMU offered any evidence to contradict the applicability of these rules, and therefore, it stands to reason that the reportability of her for-cause termination mirrors the mandatory reporting and right to practice as in *Blaine*. *See Blaine*, 312 F. Supp. 3d at 1307. The district court so erred by concluding otherwise.

Finally, the district court erred when it summarily rejected *Keyer v. Civil Serv. Comm'n of the City of N.Y.*, 397 F. Supp. 1362 (E.D.N.Y. 1975), finding that Professor Smith, unlike the civil service employees in that case, was notified of the reason for her termination. Doc. 164 at 9. In *Keyer*, several civil service employees applied for the Special Patrolmen designation to which they were qualified, but their applications were summarily denied. *See* 397 F. Supp. at 1363-65. The New York federal court concluded that the employees did not have notice of the charges against them because "neither the employing agency nor the applicant is advised as to *information compiled* or afforded adequate opportunity to answer or explain whatever facts *or information may have been relied on to disapprove an*

*application*." *See id.* at 1369. The court in *Keyer* reached its conclusion regarding notice because an "applicant may later appeal and be heard in person, with the assistance of counsel or other representative, he does so again without access to the file and knowledge of the *basis for the adverse decision*." *See id.* (emphasis added).

The district court's misreading of *Keyer* demonstrates how manifest an error it was to reject Professor Smith's position. Here, as in *Keyer*, Professor Smith was deprived of the "information compiled*"* and the "opportunity to answer or explain whatever facts or information may have been relied on to disapprove*"* her termination because FAMU continued to change its reason for her termination as recounted in the facts and argued in Section I.B above. To further bolster Professor Smith's lack of notice similar to the employees in *Keyer*, FAMU's third reason cited "totality of the circumstances" as the basis, yet FAMU never provided Professor Smith with access to the entire file, including interviews, reports, and statements from students that were withheld unbeknownst to Professor Smith until the documents were ordered to be disclosed by the magistrate judge, and knowledge of the true *basis for the adverse decision.* Doc. 86-7 at 1. Moreover, "retaliation" is also undefined in any FAMU document such that Professor Smith to this day remains unaware, and FAMU remains able to unilaterally change its interpretation of the term to fit any situation it so desires. Doc. 151 at 22. And FAMU never did articulate how Professor Smith's conduct met a definition of "retaliation" because none of her

conduct could meet any definition of retaliation. Doc. 151 at 22. The *Keyer* court was correct in finding no notice and irreparable harm existed and that determination is equally applicable on the present facts. The district court here erred by concluding otherwise.

## II. THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE THE BALANCE OF HARMS OR PUBLIC INTEREST HAVE MERGED AND AS MERGED SUPPORT INJUNCTIVE RELIEF.

The district court erred by concluding that "the imposition of a mandatory injunction compelling Defendant FAMU to reinstate Plaintiff is contrary to public policy." Doc. 164 at 10. This conclusion is egregiously problematic for two reasons.

First, the district court stated that it was not considering "likelihood of success on the merits" but made factual findings by accepting certain statements from the record as more credible without a hearing or an explanation for why Professor Smith's allegations and arguments to the contrary were less credible. Those factual findings were (1) "This case is not only about the Plaintiff's speech in standing up for equal pay; it also involves termination based on a finding that the Plaintiff retaliated against a student." Doc. 164 at 10; (2) "While Plaintiff contests the student's version of the encounter giving rise to the decision to terminate her employment, the student's version—corroborated by five witnesses—led Defendant FAMU to terminate Plaintiff for improper conduct." Doc. 164 at 10; and (3) "Forcing Defendant FAMU to reinstate the Plaintiff also forces students enrolled at

FAMU to attend classes taught by the Plaintiff." Doc. 164 at 10.[10] These are all motive-based, factual determinations that must be supported by the record and required that the district court hold a hearing, *see Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1211 (11th Cir. 2003); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1538–39 (11th Cir. 1989), or explicitly state the reasons why it believed Professor Smith's allegations were less credible.

Moreover, this Court eliminated any confusion as to the proper method of adjudicating factual determinations in First Amendment retaliation cases in *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009). Specifically, the Court held "the standard that we are assuming applies in this case,

---

[10] Each of these facts is unsupported by the record. Professor Smith specifically alleged and offered evidence to support her theory that the "finding that Professor Smith retaliated against a student" was a pretextual subterfuge to terminate Professor Smith concocted by the university and not the student. Doc. 151 at 29; Doc. 80 citing Doc. 1-1 at ¶¶ 75-78 ("Plaintiff further contends that when Defendant learned of her unserved Complaint, it revived a stale investigation involving an encounter Plaintiff had with a disruptive student and used it as a pretext to terminate her." (*Id.* ¶¶ 75–78)). Also, the student encounter did not lead FAMU to terminate her, rather and by its own admission from its seven reasons, FAMU stated the precipice for her termination was *inter alia* the resubmission of her complaint against the student, but not the student's complaint that was ultimately determined to be unsubstantiated. Doc. 125 at 2. Finally, Professor Smith alleged three aspects of a professorship role – teaching, scholarship, and service – the district court grotesquely failed to even consider that carefully tailored injunctive relief restoring the status quo ante very well may have included permitting Professor Smith to continue her scholarship and service divorced from teaching because faculty often do other things than teach.

the School Board's motive . . . is a constitutional fact, 'a crucial fact' that determines the core issue of whether that removal violates the First Amendment." Accordingly, no matter which way the district court looked at this case, any determination as to FAMU's motive was a factual determination that could not be made under the guise of public interest factors.

Second, the district court exponentially amplified its error as to the public interest factor determination because it failed to apply binding precedent that, if properly applied, would have resulted in the opposite result. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). This Court has even held that "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Public interest is equally served when civil rights are involved. *See Villano v. City of Boynton Beach*, 254 F.3d 1302, 1306 (11th Cir. 2001) ("successful civil rights actions vindicate [the] public interest."). This Court has also recognized that "the overriding public interest in equal employment opportunity." *Riddle v. Cerro Wire & Cable Grp., Inc.*, 902 F.2d 918, 922 (11th Cir. 1990). The public interest is however disserved by permitting or allowing unconstitutional conduct to continue. *See e.g., Fla. Businessmen for Free Enter. v.*

*City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981)[11] ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional.").

In the present case, the district engaged in no competent assessment of the public interest factors and instead stamped the disputed allegations, from the investigative reports attached to the second amended complaint, with approval without a hearing or credibility determination. Doc. 164 at 10. The district court manufactured its own record. The district court stated: "Forcing Defendant FAMU to reinstate the Plaintiff also forces students enrolled at FAMU to attend classes taught by the Plaintiff. On the record before the Court, the imposition of a mandatory injunction compelling Defendant FAMU to reinstate Plaintiff is contrary to public policy." Doc. 164 at 10. However, had the district court had a hearing, it would have learned that the students graduated in May 2024, so they would not have been in Professor Smith's classes and indeed would also not have had to sign up for any as the only required course she taught was a first-year course, and they were upper-class students. Doc. 86-1 at 7-8. Thus, the public policy discussion is purely fictional and contrived.

---

[11] *Bonner,* 661 F.2d at 1209 (adopting as binding precedent all decisions of the former Fifth Circuit made before October 1, 1981).

Had the district court applied binding law cited above in this First Amendment hybrid case, it would have resulted in the district court properly concluding that the public interest factors as merged support Professor Smith's motion for preliminary injunction because, as recognized in *Assaf*:

> Of course, there is a highly important public interest in education and the educational process. The public has a right to except that faculty members who will directly or indirectly affect the education of their children shall be of impeccable character and have the highest credentials. An accompanying interest of at least equal importance is an interest that there be a fair determination that the educational system is not being deprived of the expertise of people of superior caliber for merely frivolous reasons not relevant to academic excellence. Until such a determination of the validity of termination has been made, then a presumption of competence and integrity which is an integral part of public confidence in public education mandates that a professor be retained.

*See Assaf*, 399 F. Supp. at 1251–52. Such a conclusion is supported by more recent district court cases from this Circuit as well. *See e.g., Roadway Exp., Inc. v. Donovan*, 603 F. Supp. 249, 253 (N.D. Ga. 1985). Professor Smith's Equal Pay lawsuit highlighted systemic gender pay disparities within a publicly funded institution, a matter of significant public interest. The lawsuit sought to promote accountability in the use of public funds and to ensure compliance with anti-discrimination laws. Courts have consistently recognized that issues involving equity and fairness in public employment are inherently matters of public concern. *See e.g., Kurtz v. Vickrey*, 855 F.2d 723, 729 (11th Cir. 1988) (evaluating public interest in the context of employee speech but finding that the employee's

"professions of concern about the university's budget, which are in one sense a matter of public interest[.]"). Furthermore, the lawsuit not only benefits Smith but also exposes institutional practices that may affect other faculty members, students, and taxpayers. This broad societal impact underscores the public nature of her speech. The district court here erred by concluding otherwise.

## <u>CONCLUSION</u>

This Court should reverse the district court and remand with instructions to enter a preliminary injunction restoring Professor Smith to her tenured position to restore the status quo ante.

<div style="margin-left: 50%;">

<u>/s/ Jennifer Smith</u>
Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy.,
Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023
(facsimile)
jensmithesq@aol.com
jensmithesq@yahoo.com (secondary)

</div>

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains no more than 13,000 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). This document also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using WORD in 14-point Times New Roman.

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 11th Cir. R. 28-1, I hereby certify that on November 12, 2024, I filed the foregoing document via the Court's CM/ECF system.

/s/ Jennifer Smith
Jennifer Smith, *pro se*