# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

JENNIFER SMITH,

*Plaintiff - Appellant,*

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON; DENISE D. WALLACE; LATONYA BAKER; LATRECHA SCOTT; RICA CALHOUN; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E. MITCHELL; AND SARAH REINER,

*Defendants - Appellees.*

## APPENDIX

On Appeal from The United States District Court for the Middle District of Florida, No. 6:24-cv-00457-PGB-RMN; and The United States District Court for the Northern District of Florida, No. 4:24-cv-00367-MW-MAF

Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy., Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023 (facsimile)
jensmithesq@aol.com
jensmithesq@yahoo.com (secondary)

Plaintiff - Appellant *pro se*

November 2024

# Index

**Tab**

**VOLUME 1**

District Court Docket Sheet ................................................................. A

Plaintiff's State Court Complaint (FAC) [2024-03-04] ......................................... 1-1

Order Denying TRO [2024-03-08] ......................................................... 10

831 Fed Appx 434 11th Circ 2020 [2024-03-13] ................................................ 17-7

Order Granting in Part Leave to File an Amended Complaint
[2024-07-03] ............................................................................. 80

Plaintiff's Amended Complaint (Stricken) [2024-07-09] ....................................... 84

Plaintiff's Motion for Preliminary Injunction [2024-07-10] .................................. 86

Plaintiff's Affidavit Smith Dec [2024-07-10] .................................................. 86-1

FAMU Regs [2024-07-10] ..................................................................... 86-2

**VOLUME 2**

Plaintiff's Corrected Second Amended Complaint 86-3 [2024-07-10] ............... 86-3

Three Lawyer Panel Decision [2024-07-10] ..................................................... 86-4

Affidavit Smith Supp Dec [2024-07-10] .......................................................... 86-5

Dec. 5 2023 Notice [2024-07-10] ................................................................ 86-6

Jan 23 2024 Notice [2024-07-10] ........................................................86-7

FAMU EEOC Res [2024-07-10] ........................................................86-8

Faculty Contract [2024-07-10] ........................................................86-9

FAMU Tenure Regs [2024-07-10] ...................................................86-10

Zisk Case [2024-07-10] ..................................................................86-11

Reyes Depo [2024-07-10] ...............................................................86-12

FAMU Resp to Plaintiff's Interrogatories [2024-07-10] ...................86-13

Affidavit Waston Dec #1 [2024-07-10] ...........................................86-14

Affidavit Waston Dec #2 [2024-07-10] ...........................................86-15

FAMU Position Statement to EEOC [2024-07-10] ..........................86-16

Def Resp to 1st P.I. [2024-07-10] ....................................................86-17

Def. Resp to 2nd P.I. [2024-07-10] .................................................86-18

**VOLUME 3**

Affidavit Smith Supp Amended Dec 86-19 [2024-07-10] ...............86-19

Text of Proposed Order [2024-07-10] .............................................86-20

Defendant's Response to P.I. [2024-07-22] .......................................125

Order Granting Renewed Motion to Amend Complaint [2024-08-16] ..............149

Plaintiff's Corrected Second Amended Complaint [2024-08-18] .......................151

FAMU EEOC Interr Resp [2024-08-18] ........................................... 151-1

FAMU COL Equity Study [2024-08-18] .......................................... 151-2

Plaintiff's Reserve Class Email [2024-08-18] .................................. 151-3

Pernell Depo [2024-08-18] ......................................................... 151-4

Associate Dean Green Emails [2024-08-18] ................................... 151-5

Dec. 5 2023 Notice [2024-08-18] ................................................. 151-6

Jan 23 2024 Notice [2024-08-18] ................................................. 151-7

Plaintiff's Fac Contract [2024-08-18] ........................................... 151-8

FAMU Fac Handbook [2024-08-18] .............................................. 151-9

FAMU Student Handbook [2024-08-18] ........................................ 151-10

**VOLUME 4**

Plaintiff's June 12 2023 memo [2024-08-18] ................................. 151-11

FAMU Salary Adjust [2024-08-18] .............................................. 151-12

FAMU Resp to Smith Interr [2024-08-18] .................................... 151-13

Provost Watson Dec #1 [2024-08-18] .......................................... 151-14

Provost Watson Dec #2 [2024-08-18] .......................................... 151-15

Reyes Depo [2024-08-18] .......................................................... 151-16

Bailey Email [2024-08-18] ......................................................... 151-17

FAMU EEOC Pos Statement [2024-08-18] .................................................... 151-18

Baker Emails [2024-08-18] ............................................................ 151-19

Baker Emails 2 [2024-08-18] ......................................................... 151-20

Smith Affidavit [2024-08-18] ........................................................ 151-21

Order Denying Motion for Preliminary Injunction [2024-08-30] ....................... 164

Notice of Appeal [2024-09-03] ............................................................ 165

Order Granting Motion to Transfer Venue [2024-09-11] .................................... 178

# A – District Court Docket Sheet

Query    Reports    Utilities    Help    Log Out

<span style="color:red">STAYED</span>

**U.S. District Court**
**Northern District of Florida (Tallahassee)**
**CIVIL DOCKET FOR CASE #: 4:24-cv-00367-MW-MAF**

SMITH v. FLORIDA AGRICULTURAL & MECHANICAL
UNIVERSITY BOARD OF TRUSTEES
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A
FITZPATRICK
Case in other court: Florida Middle, 6:24-cv-00457
Cause: 42:1983 Civil Rights Act

Date Filed: 09/12/2024
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**JENNIFER SMITH**                     represented by    **JENNIFER MARIE SMITH**
13506 SUMMERPORT VILLAGE
PARKWAY
SUITE 108
WINDERMERE, FL 34786
407-455-0712
Fax: 407-442-3023
Email: jensmithesq@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FLORIDA AGRICULTURAL &**          represented by    **MARIA A SANTORO**
**MECHANICAL UNIVERSITY**                             SNIFFEN & SPELLMAN PA -
**BOARD OF TRUSTEES**                                 TALLAHASSEE FL
123 N MONROE ST
TALLAHASSEE, FL 32301
850-205-1996
Email: msantoro@sniffenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JULIE MARIE ZOLTY**
GRAY ROBINSON PA - ORLANDO FL
301 E PINE ST
SUITE 1400
ORLANDO, FL 32801
407-204-3195

**APP 7**

Email: julie.zolty@gray-robinson.com
*TERMINATED: 07/18/2024*

**RICHARD E MITCHELL**
GRAYROBINSON PA - ORLANDO FL
301 E PINE ST STE 1400
ORLANDO, FL 32801
407-843-8880
Fax: 407-244-5690
Email: rick.mitchell@gray-robinson.com
*TERMINATED: 07/18/2024*

**Defendant**

**ALLYSON WATSON**
*INDIVIDUALLY AND IN HER OFFICIAL CAPACITY*

**Defendant**

**D DENISE WALLACE**
*INDIVIDUALLY AND IN HER OFFICIAL CAPACITY*

**Defendant**

**LATONYA BAKER**
*INDIVIDUALLY AND IN HER OFFICIAL CAPACITY*

**Defendant**

**LATRECHA SCOTT**
*INDIVIDUALLY AND IN HER OFFICIAL CAPACITY*

**Defendant**

**RICA CALHOUN**
*INDIVIDUALLY AND IN HER OFFICIAL CAPACITY*

**Defendant**

**GRAY ROBINSON P A**

**Defendant**

**JULIE ZOLTY**

**Defendant**

**RICHARD E MITCHELL**

**Defendant**

**SARAH REINER**

**APP 8**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/04/2024 | 1 | COMPLAINT and NOTICE OF REMOVAL from Circuit Court of the Ninth Judicial Circuit, case number 2023CA016035O filed in State Court on 10/17/2023. Filing fee $405, receipt number AFLMDC-21833302 filed by Florida Agricultural & Mechanical University Board of Trustees. (Attachments: # 1 State Court COMPLAINT, # 2 Exhibit Exs 1-2 to State Court Amended Complaint, # 3 Exhibit Exs 3-6 to State Court Amended Complaint, # 4 Exhibit Exs 7-11 to State Court Amended Complaint, # 5 State Court Docket Sheet, # 6 State Court Other Documents, # 7 Civil Cover Sheet) (Mitchell, Richard) (Chambers notified re: emergency filings in state court documents) Modified on 3/5/2024 (AJS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/04/2024) |
| 03/05/2024 | 2 | NEW CASE ASSIGNED to Judge Paul G. Byron and Magistrate Judge Embry J. Kidd. New case number: 6:24-cv-457-PGB-EJK. (AJS) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/05/2024) |
| 03/05/2024 | 3 | **INITIAL CASE ORDER re: Case Management and Deadlines. Signed by Judge Paul G. Byron on 3/5/2024. (KM)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/05/2024) |
| 03/05/2024 | 4 | **ORDER REFERRING CASE to assigned Magistrate Judge for Report and Recommendations. Signed by Judge Paul G. Byron on 3/5/2024. (KM)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/05/2024) |
| 03/06/2024 | 5 | **ORDER of recusal. Signed by Magistrate Judge Embry J. Kidd on 3/6/2024. (RMN)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/06/2024) |
| 03/06/2024 | 6 | Emergency MOTION for Temporary Restraining Order, and Memorandum of Law in Support of Temporary Restraining Order and Injunctive Relief by Jennifer Smith. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Proposed Order) (chambers notified)(ARL) Motions referred to Magistrate Judge Embry J. Kidd. [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/06/2024) |
| 03/06/2024 | 7 | Case Reassigned to Magistrate Judge Robert M. Norway. New case number: 6:24-cv-457-PGB-EJK. Magistrate Judge Embry J. Kidd no longer assigned to the case. Motion(s) REFERRED: 6 MOTION for Temporary Restraining Order. Motion(s) referred to Magistrate Judge Robert M. Norway. (RPB) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/06/2024) |
| 03/07/2024 | 8 | **STANDING ORDER ON DISCOVERY MOTIONS. Signed by Magistrate Judge Robert M. Norway on 3/7/2024. (JBS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/07/2024) |
| 03/08/2024 | 9 | NOTICE of Appearance by Jennifer M. Smith on behalf of Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/08/2024) |
| 03/08/2024 | 10 | **ORDER denying 6 Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Injunctive Relief. See Order for further details. Signed by Judge Paul G. Byron on 3/8/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/08/2024) |

**APP 9**

| | | |
|---|---|---|
| 03/11/2024 | 11 | STRICKEN PER ORDER SEE DE# 34 - MOTION for Preliminary Injunction by Jennifer Smith. (Attachments: # 1 Text of Proposed Order)(Smith, Jennifer) (Modified on 3/12/2024, chambers notified) (BGR). Modified text on 4/1/2024 (LAB). [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/11/2024) |
| 03/11/2024 | 12 | NOTICE of Appearance by Maria A. Santoro on behalf of Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/11/2024) |
| 03/12/2024 | 13 | NOTICE of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (LNR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/12/2024) |
| 03/12/2024 | 14 | NOTICE of Lead Counsel Designation by Maria A. Santoro on behalf of Florida Agricultural & Mechanical University Board of Trustees. Lead Counsel: Maria A. Santoro. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/12/2024) |
| 03/13/2024 | 15 | CORPORATE Disclosure Statement by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/13/2024) |
| 03/13/2024 | 16 | MOTION for Extension of Time to File Answer re 1 Notice of Removal *Amended Complaint* by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/13/2024) |
| 03/13/2024 | 17 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees *Request for Judicial Notice* (Attachments: # 1 Exhibit Verdict, # 2 Exhibit Order Denying Motion to Reconsider, # 3 Exhibit Order Denying Motion for New Trial, # 4 Exhibit 687 Fed Appx 888 11th Cir, # 5 Exhibit Order Denying Fourth Motion to Compel, # 6 Exhibit Order Granting Motion for Summary Judgment ND Fla, # 7 Exhibit 831 Fed Appx 434 11th Circ 2020, # 8 Exhibit Cert Denied USSCT)(Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/13/2024) |
| 03/15/2024 | 18 | **ORDER denying 16 Motion for Extension of Time to Answer. Signed by Magistrate Judge Robert M. Norway on 3/15/2024. (JBS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/15/2024) |
| 03/15/2024 | 19 | CORPORATE Disclosure Statement by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/15/2024) |
| 03/18/2024 | 20 | NOTICE of a related action per Local Rule 1.07(c) by Florida Agricultural & Mechanical University Board of Trustees. Related case(s): Yes re 3 Order (Santoro, Maria) Modified on 3/19/2024 to edit docket text (AJS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/18/2024) |
| 03/18/2024 | 21 | MOTION for Hearing re 17 Notice (Other) by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/18/2024) |
| 03/18/2024 | 22 | MOTION to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Answer by Florida Agricultural & Mechanical |

**APP 10**

| | | |
|---|---|---|
| | | University Board of Trustees. (Attachments: # 1 Exhibit Declaration of James Vaughan, # 2 Exhibit Declaration of Dr. D. Denise Wallace)(Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. Added MOTION to Set Aside Clerk Default, MOTION for Extension of Time to File Answer on 3/19/2024 (AJS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/18/2024) |
| 03/18/2024 | 23 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION for Preliminary Injunction by Florida Agricultural & Mechanical University Board of Trustees. (Zolty, Julie) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/18/2024) |
| 03/19/2024 | 24 | **ENDORSED ORDER granting 23 Unopposed Motion for Enlargement of Time to File Response to 11 Motion for Preliminary Injunction. Defendant shall respond to 11 Motion for Preliminary Injunction on or before March 25, 2024. Signed by Judge Paul G. Byron on 3/19/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/19/2024) |
| 03/22/2024 | 25 | **ENDORSED ORDER striking 21 Motion for Hearing and Memorandum of Law in Opposition to Defendant's Request for Judicial Notice. The aforementioned 21 Motion fails to comply with Local Rule 3.01(g)-(h). Specifically, the Motion fails to contain a 3.01(g) Certification and contains a request for a hearing in the same document as Plaintiff's response to 17 Request for Judicial Notice. On or before March 27, 2024, Plaintiff may file her response to 17 Request for Judicial Notice. Plaintiff may separately request a hearing as to 17 Request for Judicial Notice in a Motion that complies with Local Rule 3.01(g). Signed by Judge Paul G. Byron on 3/21/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/22/2024) |
| 03/25/2024 | 26 | RESPONSE re 17 Notice (Other) filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/25/2024) |
| 03/25/2024 | 27 | RESPONSE in Opposition re 11 MOTION for Preliminary Injunction *and Supporting Memorandum of Law* filed by Florida Agricultural & Mechanical University Board of Trustees. (Attachments: # 1 Exhibit A - Declaration of Provost Allyson Watson, # 2 Exhibit 1 to Exhibit A - Notice of Intent to Dismiss from Employment, # 3 Exhibit 2 to Exhibit A - Notice of Dismissal, # 4 Exhibit B - Jury Verdict, # 5 Exhibit C - Smith v. Florida Agricultural and Mechanical University Board of Trustees 687 Fed. App. 888, # 6 Exhibit D - Order Granting FAMU's MSJ, # 7 Exhibit E - Smith v Florida A And M University Board of Trustees 831 Fed. Appx. 434, # 8 Exhibit F - Notice from Pre-Determination Hearing, # 9 Exhibit G - State Court Order Denying Emergency TRO, # 10 Exhibit H - Preliminary Injunction Motion, # 11 Exhibit I - Smith Employment Contract, # 12 Exhibit J - Federal Court TRO, # 13 Exhibit K - Federal Court Order Denying TRO)(Zolty, Julie) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/25/2024) |
| 03/26/2024 | 28 | MOTION for Hearing re 11 MOTION for Preliminary Injunction by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/26/2024) |
| 03/26/2024 | 29 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees re 22 MOTION to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Response MOTION to Set Aside Clerk Default MOTION for Extension of Time to File Answer (Attachments: # 1 Exhibit |

**APP 11**

| | | |
|---|---|---|
| | | Amended Declaration of Dr. D. Denise Wallace)(Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/26/2024) |
| 03/26/2024 | 30 | (STRICKEN per 31 Order) RESPONSE to Motion re 22 MOTION to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Response MOTION to Set Aside Clerk Default MOTION for Extension of Time to File Answer filed by Jennifer Smith. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit) (Smith, Jennifer) (Modified on 3/29/2024, to edit text) (BGR). [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/26/2024) |
| 03/28/2024 | 31 | **ENDORSED ORDER striking 30 Application for Clerk's Default and Response in Opposition to Defendant's Motion to Quash Service of Process, Set Aside Clerk's Default and Renewed Motion for Enlargement of Time. The aforementioned 30 Application and Response fails to comply with Local Rule 3.01(a). Specifically, Plaintiff's request for a clerk's default is embedded in her 30 response to the Motion to Quash. On or before April 1, 2024, Plaintiff may file her response to 22 Motion to Quash. Plaintiff may separately file her request for a clerk's default in a motion that complies with Local Rule 3.01(a). Signed by Judge Paul G. Byron on 3/28/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/28/2024) |
| 03/28/2024 | 32 | RESPONSE to Motion re 22 MOTION to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Response MOTION to Set Aside Clerk Default MOTION for Extension of Time to File Answer filed by Jennifer Smith. (Attachments: # 1 Exhibit Employment matter email address, # 2 Exhibit Wallace Bar Profile, # 3 Exhibit Returned US Mail, # 4 Exhibit 2018 ROS, # 5 Exhibit 2024 ROS, # 6 Exhibit Kady Amended ROS, # 7 Exhibit OGC 11, # 8 Exhibit OGC 13, # 9 Exhibit Wallace Physical Address)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/28/2024) |
| 03/29/2024 | 33 | MOTION for Clerk's Default against Florida Agricultural & Mechanical University Board of Trustees by Jennifer Smith. (Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/29/2024) |
| 03/29/2024 | 34 | **ENDORSED ORDER striking 11 Motion for Preliminary Injunction. The aforementioned 11 Motion fails to comply with Local Rules 3.01(a) and 6.02(a). Specifically, the 11 Motion attempts to incorporate argument from a separate pleading and is therefore not in a single document. Such incorporation would also cause the 11 Motion to significantly exceed the page-limit for motions. The 11 Motion additionally fails to include as an attachment each paper on which the movant relies. Plaintiff is cautioned that continued violation(s) of the Local Rules may result in dismissal of the case without prejudice or in other appropriate sanctions. Signed by Judge Paul G. Byron on 3/29/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/29/2024) |
| 03/29/2024 | 35 | **ORDER denying 33 Motion for Clerk's Default. See Order for details. Signed by Magistrate Judge Robert M. Norway on 3/29/2024. (JBS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/29/2024) |

**APP 12**

| | | |
|---|---|---|
| 03/29/2024 | 36 | **ENDORSED ORDER finding as moot 28 Unopposed Motion for Evidentiary Hearing. See 34 Order. Signed by Judge Paul G. Byron on 3/29/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 03/29/2024) |
| 04/01/2024 | 37 | MOTION for Preliminary Injunction by Jennifer Smith. (Attachments: # 1 Exhibit Smith Dec, # 2 Exhibit Dec 5 2023 Notice, # 3 Exhibit Panel Decision, # 4 Exhibit FAMU Regs 10.204, # 5 Exhibit Smith Notice 2, # 6 Exhibit FAMU Reg 10.206, # 7 Exhibit Watson Dec, # 8 Exhibit FAMU EEOC Res, # 9 Exhibit Pernell Depo, # 10 Exhibit Smith Supp Dec, # 11 Exhibit Zisk Case, # 12 Exhibit FAMU Regs 10.120 10. 205, # 13 Exhibit Reyes Complaint, # 14 Exhibit State Complaint Oct 2023, # 15 Exhibit Amended Complaint, # 16 Text of Proposed Order Proposed Order)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/01/2024) |
| 04/04/2024 | 38 | MOTION for Extension of Time to File Case Management Report by Jennifer Smith. (Smith, Jennifer) Modified text on 4/4/2024 (GL). [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/04/2024) |
| 04/08/2024 | 39 | **ENDORSED ORDER denying without prejudice 38 Opposed Motion to Extend the Deadline to Submit a Uniform Case Management Report. The Court does not require a response to the aforementioned 38 Motion. The stated grounds are inadequate to justify the Court staying the imposition of all deadlines in the case. Signed by Judge Paul G. Byron on 4/8/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/08/2024) |
| 04/10/2024 | 40 | **REPORT AND RECOMMENDATIONS re 22 Motion to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Response. See Report for details. Signed by Magistrate Judge Robert M. Norway on 4/10/2024. (JBS)** (LDJ). [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/10/2024) |
| 04/11/2024 | 41 | NOTICE of a related action per Local Rule 1.07(c) by Jennifer Smith. Related case(s): Yes (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/11/2024) |
| 04/12/2024 | 42 | RESPONSE in Opposition re 37 MOTION for Preliminary Injunction filed by Florida Agricultural & Mechanical University Board of Trustees. (Attachments: # 1 Exhibit Doc 27 Motion for Preliminary Injunction 04012024, # 2 Exhibit Doc. 1-6 pp 77-79 and Doc. 10 Orders Denying, # 3 Exhibit Declaration of Allyson Watson, # 4 Exhibit 2014 Docket Leon County No. 2014CA2022, # 5 Exhibit Doc. 17 pp. 5-11 Verdict 14cv540 ND Fla., # 6 Exhibit Doc. 17 pp. 16-17 Opinion 687 Fed.Appx. 888, # 7 Exhibit 2018 Docket Leon County No. 2018CA1680, # 8 Exhibit Doc. 17 pp. 20-23 Order 2019 WL 12317725, # 9 Exhibit Doc. 17 pp. 24-31 Opinion 831 Fex.Appx 434, # 10 Exhibit Doc. 27-2 Letter 12052023, # 11 Exhibit Doc. 1-3 Exhibits to Amended Complaint, # 12 Exhibit Doc. 1-6 pp. 2-16 Complaint, # 13 Exhibit Doc. 1-1 First Amended Complaint, # 14 Exhibit Doc. 1.6 pp. 77-79 order 01312024, # 15 Exhibit Doc. 27-8 Panel Letter 01122023[sic], # 16 Exhibit Doc. 1-4, p. 1-2 Letter 01232024, # 17 Exhibit Doc. 10 Order 03082024, # 18 Exhibit Doc. 34 Order 03292024, # 19 Exhibit Doc. 1-4 p. 9 Employment Contract)(Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/12/2024) |
| 04/12/2024 | 43 | CASE MANAGEMENT REPORT. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/12/2024) |

**APP 13**

| 04/14/2024 | 44 | PROPOSED summons to be issued by Jennifer Smith. (Attachments: # 1 State Court COMPLAINT, # 2 Exhibit, # 3 Exhibit)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/14/2024) |
|---|---|---|
| 04/15/2024 | 45 | **CASE MANAGEMENT AND SCHEDULING ORDER: Amended Pleadings due by 5/31/2024. Joinder of Parties due by 5/31/2024. Discovery due by 11/4/2024. Dispositive motions due by 12/2/2024. Pretrial statement due by 3/17/2025. All other motions due by 3/24/2025. Plaintiff disclosure of expert report due by 9/3/2024. Defendant disclosure of expert report due by 10/1/2024. Final Pretrial Conference set for 4/15/2025 at 03:00 PM in Orlando Courtroom 4 B before Judge Paul G. Byron. Jury Trial set for the trial term commencing on 5/5/2025 at 09:00 AM in Orlando Courtroom 4 B before Judge Paul G. Byron. Conduct mediation hearing by 11/12/2024. Lead counsel to coordinate dates. Signed by Judge Paul G. Byron on 4/15/2024. (KM)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/15/2024) |
| 04/16/2024 | 46 | MOTION for Hearing re 37 MOTION for Preliminary Injunction by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/16/2024) |
| 04/23/2024 | 47 | OBJECTION re 40 REPORT AND RECOMMENDATIONS re 22 MOTION to Quash Service of Process, Set Aside Clerk's Default, and Renewed Motion for Enlargement of Time to File Response MOTION to Set Aside Clerk Default MOTION for Extension of Time to File Answer . (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/23/2024) |
| 04/26/2024 | 48 | RESPONSE to objections to 40 Report and Recommendations filed by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/26/2024) |
| 04/29/2024 | 49 | RESPONSE to Motion re 46 MOTION for Hearing re 37 MOTION for Preliminary Injunction filed by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 04/29/2024) |
| 05/06/2024 | 50 | **ORDER to show cause as to Jennifer Smith. Plaintiff has failed to comply with the Court's Order of April 15, 2024 directing Plaintiff to "contact opposing counsel and the mediator to reserve a conference date and [to] file a Notice with the Court within 14 days of this Order advising of the date." (Doc. 45, p. 3). Such notice was never filed with the Court. Therefore, it is ORDERED that Plaintiff shall SHOW CAUSE and file a response to said Order within fourteen (14) days from the date of this Order. Failure to comply with this Order may result in dismissal of the case without further notice or other appropriate sanctions. Signed by Judge Paul G. Byron on 5/6/2024. (KM)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/06/2024) |
| 05/06/2024 | 51 | RESPONSE TO ORDER TO SHOW CAUSE re 50 Order to show cause filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/06/2024) |
| 05/07/2024 | 52 | NOTICE of mediation conference/hearing to be held on August 22, 2024 before Linda Bond Edwards, Esq. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/07/2024) |

**APP 14**

| 05/09/2024 | 53 | **ORDER discharging 50 Order to Show Cause. See Order for further details. Signed by Judge Paul G. Byron on 5/9/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/09/2024) |
|---|---|---|
| 05/20/2024 | 54 | Time Sensitive MOTION for Extension of Time to Amend *Complaint and Add Parties* by Jennifer Smith. (Attachments: # 1 Exhibit Email 1, # 2 Email 2, # 3 Email 3, # 4 Email 4)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/20/2024) |
| 05/22/2024 | 55 | **ENDORSED ORDER re 54 Time Sensitive Opposed Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties. Defendant's response, if any, to the aforementioned 54 Motion shall be filed on or before May 28, 2024. Signed by Judge Paul G. Byron on 5/22/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/22/2024) |
| 05/22/2024 | 56 | Time Sensitive Opposed MOTION to Stay Discovery by Florida Agricultural & Mechanical University Board of Trustees. (Attachments: # 1 Exhibit A- Plaintiff's Discovery Requests)(Santoro, Maria) (Chambers notified)- Modified on 5/23/2024 to edit docket text (AJS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/22/2024) |
| 05/23/2024 | 57 | RESPONSE to Motion re 56 Time Sensitive MOTION to Stay Discovery filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/23/2024) |
| 05/23/2024 | 58 | Time Sensitive and Opposed MOTION to Expedite ruling on *Report and Recommendation* by Jennifer Smith. (Smith, Jennifer) (Chambers notified)- Modified on 5/23/2024 to edit docket text (AJS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/23/2024) |
| 05/28/2024 | 59 | RESPONSE to Motion re 54 Time Sensitive MOTION for Extension of Time to Amend Complaint and Add Parties filed by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/28/2024) |
| 05/29/2024 | 60 | **ORDER adopting 40 Report and Recommendations; granting in part and denying as moot in part 22 Motion to Quash Service of Process, Set Aside Clerk's Default and Renewed Motion for Enlargement of Time to File Response. Counsel for Defendant is ORDERED to advise the Court and Plaintiff on or before June 1, 2024, whether counsel will accept service of process for Defendant and file a response to the amended complaint on Defendant's behalf. If counsel declines to accept service on Defendant's behalf, then Plaintiff is DIRECTED to obtain an alias summons and serve Defendant as required by Federal Rule of Civil Procedure 4(c). Plaintiff is ORDERED to serve Defendant on or before June 28, 2024. Signed by Judge Paul G. Byron on 5/29/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/29/2024) |
| 05/29/2024 | 61 | **ENDORSED ORDER finding as moot 58 Time Sensitive and Opposed Motion to Expedite Ruling on 40 Report and Recommendation. See 60 Court Order. Signed by Judge Paul G. Byron on 5/29/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/29/2024) |

**APP 15**

| | | |
|---|---|---|
| 05/31/2024 | 62 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees *Voluntary Acceptance of Service of Process* (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/31/2024) |
| 05/31/2024 | 63 | MOTION to Dismiss First Amended Complaint *or In the Alternative, MOTION to Transfer Venue* by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria). Modified text and added event on 6/3/2024 (GL). [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/31/2024) |
| 05/31/2024 | 64 | MOTION to Dismiss for Failure to State a Claim by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/31/2024) |
| 05/31/2024 | 65 | STRICKEN per 71 Order; NOTICE by Jennifer Smith re 54 Time Sensitive MOTION for Extension of Time to Amend *Complaint and Add Parties of Filing Cert and Proposed SAC* (Attachments: # 1 Exhibit SAC, # 2 Exhibit Ex. 1 to SAC, # 3 Exhibit Ex. 2 to SAC, # 4 Exhibit Ex. 3 to SAC, # 5 Exhibit Ex. 4 to SAC, # 6 Exhibit Ex. 5 to SAC, # 7 Exhibit Ex. 6 to SAC, # 8 Exhibit Ex. 7 to SAC, # 9 Exhibit Ex. 8 to SAC, # 10 Exhibit Ex. 9 to SAC, # 11 Exhibit Ex. 10 to SAC, # 12 Exhibit Ex. 11 to SAC) (Smith, Jennifer) Modified on 6/14/2024 to edit docket text (JDR). [Transferred from Florida Middle on 9/12/2024.] (Entered: 05/31/2024) |
| 06/03/2024 | 66 | **ENDORSED ORDER. In light of 65 Notice of Filing Amended 3.01(g) Certificate and its exhibits, on or before June 13, 2024, Defendant may file an amended response to 54 Time Sensitive Opposed Motion for an Extension of Time and for Leave to File an Amended Complaint and Add Parties. Signed by Judge Paul G. Byron on 6/3/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/03/2024) |
| 06/04/2024 | 67 | **ORDER denying 56 Opposed Short Form Discovery Motion, wherein Defendant requests a stay of discovery or, alternatively, a protective Order as to [56-1] discovery requests. The Court sua sponte grants Defendant an extension of time for responding to the aforementioned discovery requests. Defendant shall respond to these discovery requests on or before July 1, 2024. See Order for further details. Signed by Judge Paul G. Byron on 6/4/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/04/2024) |
| 06/10/2024 | 68 | RESPONSE to Motion re 63 MOTION to Dismiss First Amended Complaint *or In the Alternative, to Transfer Venue* MOTION to Change Venue / Transfer Case filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/10/2024) |
| 06/10/2024 | 69 | MOTION to Strike 65 Notice (Other) *of Filing Amended 3.01G Certificate* by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/10/2024) |
| 06/12/2024 | 70 | RESPONSE in Opposition re 69 MOTION to Strike 65 Notice (Other) *of Filing Amended 3.01G Certificate* filed by Jennifer Smith. (Attachments: # 1 Exhibit 1 Middle Dist. Rules rationale, # 2 Exhibit 2 May 14 email, # 3 Exhibit 3 May 20 email, # 4 Exhibit 4 May 20 pt 2 email, # 5 Exhibit 5 May 22 email, # 6 Exhibit 6 May 29, # 7 Exhibit 7 May 30)(Smith, Jennifer) Modified on 6/13/2024 (CTR). [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/12/2024) |

**APP 16**

| | | |
|---|---|---|
| 06/13/2024 | 71 | **ORDER granting 69 Motion to Strike Plaintiff's Notice of Filing Amended 3.01(g) Certificate. Plaintiff's Notice of Filing Amended 3.01(g) Certificate 65 is hereby STRICKEN. Plaintiff may file an amended motion to amend the Complaint, consistent with the directives of this Order, on or before June 18, 2024. Defendant may file a response to Plaintiff's amended motion to amend the Complaint on or before June 21, 2024. See Order for further details. Signed by Judge Paul G. Byron on 6/13/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/13/2024) |
| 06/18/2024 | 72 | Amended MOTION for Extension of Time to Amend *Complaint and Add Parties* by Jennifer Smith. (Attachments: # 1 Exhibit SAC, # 2 Exhibit 1 to SAC, # 3 Exhibit 2 to SAC, # 4 Exhibit 3 to SAC, # 5 Exhibit 4 to SAC, # 6 Exhibit 5 to SAC, # 7 Exhibit 6 to SAC, # 8 Exhibit 7 to SAC, # 9 Exhibit 8 to SAC, # 10 Exhibit 9 to SAC, # 11 Exhibit 10 to SAC, # 12 Exhibit 11 to SAC, # 13 Exhibit 12 to SAC, # 14 Exhibit 13 to SAC, # 15 Exhibit 14 to SAC, # 16 Exhibit 15 to SAC)(Smith, Jennifer) Modified text on 6/19/2024 (JK). [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/18/2024) |
| 06/20/2024 | 73 | RESPONSE in Opposition re 64 MOTION to Dismiss for Failure to State a Claim filed by Jennifer Smith. (Attachments: # 1 Exhibit Smith Title, # 2 Exhibit FAMU Reg. 10.111, # 3 Exhibit FAMU Reg 2.012, # 4 Exhibit COL Student Handbook, # 5 Exhibit Emails with Green, # 6 Exhibit Def. Interrog Answers)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/20/2024) |
| 06/21/2024 | 74 | RESPONSE in Opposition re 72 Amended MOTION for Extension of Time to Amend *Complaint and Add Parties* filed by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/21/2024) |
| 06/26/2024 | 75 | **ENDORSED ORDER denying as moot 54 Time Sensitive Opposed Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties. See 72 Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties. Signed by Judge Paul G. Byron on 6/26/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 06/26/2024) |
| 07/01/2024 | 76 | MOTION for Protective Order by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/01/2024) |
| 07/01/2024 | 77 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees re 76 MOTION for Protective Order (Attachments: # 1Affidavit of Saundre Wilson, # 2Affidavit of Duan Yongheng)(Santoro, Maria). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/01/2024) |
| 07/01/2024 | 78 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees of Service of Discovery Responses (Santoro, Maria). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/01/2024) |
| 07/02/2024 | 79 | **ENDORSED ORDER denying without prejudice Defendant's 76 Motion for Protective Order. The Motion fails to comply with the 8 Standing Order on Discovery Motions, which requires the use of Short-Form Discovery Motions that do not exceed 500 words. All future discovery motions, including motions for** |

**APP 17**

| | | |
|---|---|---|
| | | protective order, must comply with the **8** Standing Order on Discovery Motions. **Signed by Magistrate Judge Robert M. Norway on 7/2/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/02/2024) |
| 07/03/2024 | 80 | **ORDER granting in part and denying in part 72 Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties. Plaintiff's request to amend the First Amended Complaint is GRANTED. The aforementioned 72 Motion is DENIED in all other respects. Plaintiff shall file Plaintiff's second amended complaint on or before July 8, 2024. See Order for further details. Signed by Judge Paul G. Byron on 7/3/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/03/2024) |
| 07/08/2024 | 81 | **\*\*STRICKEN per Order 132\*\*** AMENDED COMPLAINT *Complaint and Add Parties* against Florida Agricultural & Mechanical University Board of Trustees with Jury Demand. filed by Jennifer Smith. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Affidavit)(Smith, Jennifer) Modified on 7/25/2024 as to docket text (ARL). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/08/2024) |
| 07/09/2024 | 82 | **ENDORSED ORDER finding as moot 37 Motion for Preliminary Injunction; finding as moot 46 Motion for Oral Argument and Evidentiary Hearing; finding as moot 63 Motion to Dismiss or in the Alternative, to Transfer Venue; finding as moot 64 Motion to Dismiss First Amended Complaint with Prejudice. See 81 Second Amended Complaint. Signed by Judge Paul G. Byron on 7/9/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/09/2024) |
| 07/09/2024 | 83 | NOTICE of Scrivener's Error and Re-Filing of the Corrected Second Amended Complaint by Jennifer Smith > (Smith, Jennifer) Modified docket text on 7/10/2024 (JOS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/09/2024) |
| 07/09/2024 | 84 | **\*\*STRICKEN per Order 132\*\*** AMENDED COMPLAINT against All Defendants with Jury Demand. filed by Jennifer Smith. (Attachments: # 1 Exhibit FAMU EEOC Inter Responses, # 2 Exhibit COL Equity Study, # 3 Exhibit Reserve Class Email, # 4 Exhibit Pernell Depo, # 5 Exhibit Green Emails, # 6 Exhibit Dec. 5 2023 Notice, # 7 Exhibit Jan 23 2024 Notice, # 8 Exhibit Fac Contract, # 9 Exhibit Fac Handbook, # 10 Exhibit Student Handbook, # 11 Exhibit June 12 2023 memo, # 12 Exhibit Salary Adjust, # 13 Exhibit Univer Resp to Pl Inter, # 14 Exhibit Watson Dec #1, # 15 Exhibit Watson Dec #2, # 16 Exhibit Reyes Depo, # 17 Exhibit Bailey Email, # 18 Exhibit FAMU EEOC Pos Statement, # 19 Exhibit Baker Emails, # 20 Exhibit Baker Emails 2, # 21 Affidavit Smith Affidavit)(Smith, Jennifer) Modified on 7/25/2024 as to docket text (ARL). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/09/2024) |
| 07/10/2024 | 85 | **ENDORSED ORDER. In light of 83 Notice of Scrivener's Error and Re-Filing of the Corrected Second Amended Complaint, the Court hereby adopts 84 Corrected Second Amended Complaint as the operative complaint in this case. Signed by Judge Paul G. Byron on 7/10/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/10/2024) |
| 07/10/2024 | 86 | Time Sensitive MOTION for Preliminary Injunction by Jennifer Smith. (Attachments: # 1 Affidavit Smith Dec, # 2 Exhibit FAMU Regs, # 3 Exhibit Corrected SAC, # 4 Exhibit 3 lawyer panel, # 5 Affidavit Smith Supp Dec, # 6 Exhibit Dec. 5 2023 Notice, |

**APP 18**

| | | |
|---|---|---|
| | | # 7 Exhibit Jan 23 2024 Notice, # 8 Exhibit FAMU EEOC Res, # 9 Exhibit FAC Contract, # 10 Exhibit FAMU Regs, # 11 Exhibit Zisk Case, # 12 Exhibit Reyes Depo, # 13 Exhibit Univer Resp to PI Inter, # 14 Affidavit Waston Dec #1, # 15 Affidavit Watson Dec #2, # 16 Exhibit FAMU Position Statement to EEOC, # 17 Exhibit Def Resp to 1st P.I., # 18 Exhibit Def. Resp to 2nd P.I., # 19 Affidavit Smith Supp Amended Dec, # 20 Text of Proposed Order)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/10/2024) |
| 07/10/2024 | 87 | MOTION for Hearing re 86 Time Sensitive MOTION for Preliminary Injunction by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/10/2024) |
| 07/15/2024 | 88 | MOTION for Discovery *Motion to Pierce Attorney-Client Privilege* by Jennifer Smith. (Attachments: # 1 Exhibit Def Resp to PL RFA, # 2 Exhibit Def Res to PL RFP) (Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 89 | MOTION for Discovery *to Pierce FERPA* by Jennifer Smith. (Attachments: # 1 Exhibit Def Resp to PL RFA, # 2 Exhibit Def Resp to PL RFA, # 3 Exhibit Def Resp to RFP, # 4 Exhibit Def Amended RFA, # 5 Exhibit Def Amended to RFP, # 6 Exhibit Pl Objections, # 7 Exhibit Pl Second Objections)(Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 90 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 91 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 92 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 93 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) Modified on 7/16/2024 counsel notified to correct name (JDR). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 94 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 95 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 96 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 97 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/15/2024 | 98 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/15/2024) |
| 07/16/2024 | 99 | Opposed MOTION for Leave to Take Additional Depositions and Serve Additional Interrogatories by Jennifer Smith. (Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. Modified text on 7/16/2024 (BD). [Transferred from Florida |

| | | |
|---|---|---|
| | | Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 100 | SUMMONS issued as to Julie Zolty. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 101 | SUMMONS issued as to Allyson Watson. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 102 | SUMMONS issued as to Denise D. Wallace. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 103 | SUMMONS issued as to Gray Robinson, P.A.. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 104 | SUMMONS issued as to Latrecha Scott. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 105 | SUMMONS issued as to Latonya Baker. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 106 | SUMMONS issued as to Sarah Reiner. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 107 | SUMMONS issued as to Rica Calhoun. (JDR) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 108 | PROPOSED summons to be issued by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 109 | Opposed MOTION to Compel Responses from Defendant (FAMU) by Jennifer Smith. (Attachments: # 1 Exhibit Def Resp to PL RFA, # 2 Exhibit Def Resp to ROG, # 3 Exhibit Def Resp to RFP, # 4 Exhibit Def Amended RFA, # 5 Exhibit Def Amended to RFP, # 6 Exhibit Pl Objections, # 7 Exhibit Pl Second Objections)(Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. Modified text on 7/16/2024 (BD). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 110 | SUMMONS issued as to Richard E. Mitchell. (BD) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/16/2024 | 111 | NOTICE of hearing on motion re 99 Opposed MOTION for Leave to Take Additional Depositions and Serve Additional Interrogatories, 109 MOTION to Compel RESPONSES FROM DEFENDANT (FAMU) , 88 MOTION for Discovery *Motion to Pierce Attorney-Client Privilege*, 89 MOTION for Discovery *to Pierce FERPA*. Motion Hearing set for 7/23/2024 at 09:30 AM in Orlando Courtroom 3 C before Magistrate Judge Robert M. Norway. (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/16/2024) |
| 07/17/2024 | 112 | MOTION to Strike 81 Amended Complaint 84 Amended Complaint by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/17/2024) |

**APP 20**

| | | |
|---|---|---|
| 07/17/2024 | 113 | NOTICE by Florida Agricultural & Mechanical University Board of Trustees of Filing Affidavits in Support of Defendant's Motions for Protective Order (Attachments: # 1 Affidavit Affidavit of Saundre Wilson, # 2 Affidavit Affidavit of Duan Yongheng) (Santoro, Maria). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/17/2024) |
| 07/17/2024 | 114 | RESPONSE in Opposition re 112 MOTION to Strike 81 Amended Complaint 84 Amended Complaint filed by Jennifer Smith. (Attachments: # 1 Exhibit Compare Report Adobe, # 2 Exhibit Email)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/17/2024) |
| 07/17/2024 | 115 | NOTICE of supplemental authority re 114 Response in Opposition to Motion to Strike Second Amended Complaints by Jennifer Smith. (Smith, Jennifer). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/17/2024) |
| 07/18/2024 | 116 | MOTION for Protective Order Interrogatories by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 117 | MOTION for Protective Order Request for Admissions by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 118 | MOTION for Protective Order Request for Production by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 119 | Unopposed MOTION for Richard E. Mitchell, Julie Zolty, and the law firm of GrayRobinson, P.A. to Withdraw as Attorney by Florida Agricultural & Mechanical University Board of Trustees. (Zolty, Julie) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 120 | **ENDORSED ORDER granting 119 Motion to Withdraw. Attorney Richard E. Mitchell, Attorney Julie M. Zolty, and the law firm of GrayRobinson, P.A. are hereby withdrawn from the case. Signed by Magistrate Judge Robert M. Norway on 7/18/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 121 | NOTICE canceling Motions 88 , 89 , 99 , and 109 hearing scheduled for 7/23/2024. Hearing will be reset by separate notice. (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/18/2024 | 122 | NOTICE of hearing on motion re 99 Opposed MOTION for Leave to Take Additional Depositions and Serve Additional Interrogatories, 109 Opposed MOTION to Compel Responses from Defendant (FAMU), 88 MOTION for Discovery *Motion to Pierce Attorney-Client Privilege*, 116 MOTION for Protective Order *Interrogatories*, 89 MOTION for Discovery *to Pierce FERPA*, 118 MOTION for Protective Order *Request for Production*, 117 MOTION for Protective Order *Request for Admissions*. Motion Hearing set for 8/13/2024 at 09:30 AM in Orlando Courtroom 3 C before Magistrate |

**APP 21**

| | | |
|---|---|---|
| | | Judge Robert M. Norway. (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/18/2024) |
| 07/19/2024 | 123 | STRICKEN PER 124 ORDER. NOTICE Advising Court of Conflict and Filing Second Amended Order Setting Jury Trial and Pretrial Dates re 122 Notice of Hearing on Motion by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) Modified docket text on 7/22/2024 (JOS). Modified docket text on 7/22/2024 (JOS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/19/2024) |
| 07/22/2024 | 124 | **ENDORSED ORDER striking Defendant's 123 Notice Advising Court of Conflict, which the Court construes as a Notice of Unavailability. The Court does not permit filing notices of unavailability unless required by rule or law. A party may file a motion setting forth good cause to continue a hearing, if they wish to do so. Signed by Magistrate Judge Robert M. Norway on 7/22/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/22/2024) |
| 07/22/2024 | 125 | RESPONSE in Opposition re 86 Time Sensitive MOTION for Preliminary Injunction *and Supporting Memorandum* filed by Florida Agricultural & Mechanical University Board of Trustees. (Attachments: # 1 Exhibit 1- Doc. 86 - Pltf's MFPI and Supporting MOL, # 2 Exhibit 2- Doc. 86.6 - 12.05.23 Notice of Intent to Dismiss, # 3 Exhibit 3- Doc. 86.7 - 01.23.24 Notice of Dismissal, # 4 Exhibit 4- Doc. 86.4- 01.12.23 Letter P.B. Smith to Provost Watson, # 5 Exhibit 5- Doc. 85 - Endorsed Order Adopting Corrected Second Amended Complaint, # 6 Exhibit 6- Doc. 112 - Motion to Strike Second Amended Complaint, # 7 Exhibit 7- Doc. 84.2- COL Equity Study, # 8 Exhibit 8- Doc. 84.4 - Excerpt Pernell Deposition, # 9 Exhibit 9- Doc. 86.9 - Plaintiff's 08.07.23-05.10.24 Contract, # 10 Exhibit 10- Doc. 42.3 - Declaration of Allyson Watson, # 11 Exhibit 11- Composite Declarations)(Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/22/2024) |
| 07/22/2024 | 126 | Unopposed MOTION for Leave to File Other Document :OMNIBUS RESPONSE TO DEFENDANT FAMU'S MOTIONS FOR PROTECTIVE ORDER by Jennifer Smith. (Smith, Jennifer) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/22/2024) |
| 07/23/2024 | 127 | **ENDORSED ORDER denying Plaintiff's 126 Motion to File Omnibus Response. Signed by Magistrate Judge Robert M. Norway on 7/23/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/23/2024) |
| 07/23/2024 | 128 | RESPONSE in Opposition re 116 MOTION for Protective Order *Interrogatories* filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/23/2024) |
| 07/23/2024 | 129 | RESPONSE in Opposition re 117 MOTION for Protective Order *Request for Admissions* filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/23/2024) |
| 07/23/2024 | 130 | RESPONSE in Opposition re 118 MOTION for Protective Order *Request for Production* filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/23/2024) |
| 07/24/2024 | 131 | NOTICE of Failure to Respond to Discovery Motions by Jennifer Smith re 99 Opposed MOTION for Leave to Take Additional Depositions and Serve Additional Interrogatories, 109 Opposed MOTION to Compel Responses from Defendant |

| | | |
|---|---|---|
| | | (FAMU), <u>88</u> MOTION for Discovery, <u>89</u> MOTION for Discovery (Smith, Jennifer) Modified text on 7/24/2024 (JK). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/24/2024) |
| 07/24/2024 | <u>132</u> | **ORDER granting <u>112</u> Motion to Strike Second Amended Complaints. The Second Amended Complaint <u>81</u> and Corrected Second Amended Complaint <u>84</u> are hereby STRICKEN. On or before July 31, 2024, Plaintiff shall either: (1) file the proposed Second Amended Complaint that was attached to <u>72</u> Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties; or (2) file a renewed motion to amend the Amended Complaint seeking permission to file <u>84</u> Corrected Second Amended Complaint. Signed by Judge Paul G. Byron on 7/24/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/24/2024) |
| 07/26/2024 | <u>133</u> | Second MOTION to Amend *Complaint to File CSAC* by Jennifer Smith. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit 1 to SAC, # <u>3</u> Exhibit 2 to SAC, # <u>4</u> Exhibit 3 to SAC, # <u>5</u> Exhibit 4 to SAC, # <u>6</u> Exhibit 5 to SAC, # <u>7</u> Exhibit 6 to SAC, # <u>8</u> Exhibit 7 to SAC, # <u>9</u> Exhibit 8 to SAC, # <u>10</u> Exhibit 9 to SAC, # <u>11</u> Exhibit 10 to SAC, # <u>12</u> Exhibit 11 to SAC, # <u>13</u> Exhibit 12 to SAC, # <u>14</u> Exhibit 13 to SAC, # <u>15</u> Exhibit 14 to SAC, # <u>16</u> Exhibit 15 to SAC, # <u>17</u> Exhibit 16 to SAC, # <u>18</u> Exhibit 17 to SAC, # <u>19</u> Exhibit 18 to SAC, # <u>20</u> Exhibit 19 to SAC, # <u>21</u> Exhibit 20 to SAC, # <u>22</u> Exhibit 21 to SAC)(Smith, Jennifer) Modified text on 7/26/2024 (GL). [Transferred from Florida Middle on 9/12/2024.] (Entered: 07/26/2024) |
| 08/02/2024 | <u>134</u> | **ORDER denying without prejudice Plaintiff's <u>99</u> Opposed Short-Form Discovery Motion for Leave to Take Additional Depositions and Serve Additional Interrogatories. See Order for details. Signed by Magistrate Judge Robert M. Norway on 8/2/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/02/2024) |
| 08/02/2024 | <u>135</u> | **ORDER denying without prejudice Plaintiff's <u>109</u> Opposed Short-Form Discovery Motion to Compel Responses. See Order for details. Signed by Magistrate Judge Robert M. Norway on 7/25/2024. (MLS)** Modified docket text on 8/5/2024 (EVK). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/02/2024) |
| 08/02/2024 | <u>136</u> | RESPONSE to Motion re <u>133</u> Second MOTION to Amend *Complaint to File CSAC* filed by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/02/2024) |
| 08/09/2024 | <u>137</u> | Joint MOTION to Continue *Hearing* by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/09/2024) |
| 08/09/2024 | <u>138</u> | JOINT NOTICE Certifying Conferral by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) Modified on 8/9/2024 to edit docket text (JDR). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/09/2024) |
| 08/12/2024 | 139 | **ENDORSED ORDER denying <u>137</u> Joint Motion to Continue Hearing. Signed by Magistrate Judge Robert M. Norway on 8/12/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/12/2024) |

**APP 23**

| | | |
|---|---|---|
| 08/13/2024 | [140](#) | Minute Entry. In Person Proceedings held before Magistrate Judge Robert M. Norway: MOTION HEARING held on 8/13/2024 re [116](#) MOTION for Protective Order *Interrogatories* filed by Florida Agricultural & Mechanical University Board of Trustees, [88](#) MOTION for Discovery *Motion to Pierce Attorney-Client Privilege* filed by Jennifer Smith, [117](#) MOTION for Protective Order *Request for Admissions* filed by Florida Agricultural & Mechanical University Board of Trustees, [118](#) MOTION for Protective Order *Request for Production* filed by Florida Agricultural & Mechanical University Board of Trustees, [89](#) MOTION for Discovery *to Pierce FERPA* filed by Jennifer Smith. (Digital) (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/13/2024 | 142 | Entered in error. (Signed by Deputy Clerk) (RLK) Modified on 8/13/2024 (RLK). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/13/2024 | [143](#) | **ORDER granting in part and denying in part Plaintiff's [88](#) Motion to Pierce Attorney Client Privilege. See Order for details. Signed by Magistrate Judge Robert M. Norway on 8/13/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/13/2024 | [144](#) | **ORDER granting Plaintiff's [89](#) Motion to Pierce FERPA Confidentially. See Order for details. Signed by Magistrate Judge Robert M. Norway on 8/13/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/13/2024 | [145](#) | **ORDER granting in part and taking under advisement Defendant Florida Agricultural & Mechanical University Board of Trustees' [116](#) Motion for Protective Order; taking under advisement Defendant Florida Agricultural & Mechanical University Board of Trustees' [117](#) Motion for Protective Order; taking under advisement Defendant Florida Agricultural & Mechanical University Board of Trustees' [118](#) Motion for Protective Order. See Order for details. Signed by Magistrate Judge Robert M. Norway on 8/13/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/13/2024 | 146 | NOTICE of hearing on motion re [116](#) MOTION for Protective Order *Interrogatories*, [118](#) MOTION for Protective Order *Request for Production*, [117](#) MOTION for Protective Order *Request for Admissions*. Motion Hearing set for 8/20/2024 at 11:00 AM in Orlando Courtroom 3 C before Magistrate Judge Robert M. Norway. (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/13/2024) |
| 08/15/2024 | [147](#) | TRANSCRIPT of Discovery Motions Hearing held on 8/13/24 before Judge Robert M. Norway. Court Reporter/Transcriber: Suzanne L. Trimble, CRR, RPR, WA-CCR. Email address: trimblecourtreporter@outlook.com. Telephone number: 407.900.8775.

NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/5/2024. Redacted Transcript Deadline set for 9/16/2024. Release of Transcript Restriction set for 11/13/2024. (SLT) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/15/2024) |

**APP 24**

| | | |
|---|---|---|
| 08/15/2024 | 148 | NOTICE of Appearance by Teresa Ward on behalf of Florida Agricultural & Mechanical University Board of Trustees (Ward, Teresa) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/15/2024) |
| 08/16/2024 | 149 | **ORDER granting 133 Renewed Motion to Amend Complaint. Plaintiff shall file her second amended complaint on or before August 20, 2024. Plaintiff is instructed to file the exact version of the second amended complaint that was attached to the 133 Renewed Motion along with the exact same exhibits. See Order for further details. Signed by Judge Paul G. Byron on 8/16/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/16/2024) |
| 08/16/2024 | 150 | NOTICE by Jennifer Smith *of Conferral* (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/16/2024) |
| 08/18/2024 | 151 | AMENDED COMPLAINT against All Defendants with Jury Demand. filed by Jennifer Smith. (Attachments: # 1 Exhibit FAMU EEOC Interr Resp, # 2 Exhibit COL Equity Study, # 3 Exhibit Reserve Class Email, # 4 Exhibit Pernell Depo, # 5 Exhibit Green Emails, # 6 Exhibit Dec. 5 2023 Notice, # 7 Exhibit Jan 23 2024 Notice, # 8 Exhibit Fac Contract, # 9 Exhibit Fac Handbook, # 10 Exhibit Student Handbook, # 11 Exhibit June 12 2023 memo, # 12 Exhibit Salary Adjust, # 13 Exhibit FAMU Resp to Smith Interr, # 14 Exhibit Watson Dec #1, # 15 Exhibit Watson Dec #2, # 16 Exhibit Reyes Depo, # 17 Exhibit Bailey Email, # 18 Exhibit FAMU EEOC Pos Statement, # 19 Exhibit Baker Emails, # 20 Exhibit Baker Emails 2, # 21 Exhibit Smith Affidavit) (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/18/2024) |
| 08/19/2024 | 152 | NOTICE of Conferral by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) Modified docket text on 8/20/2024 (JOS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/19/2024) |
| 08/19/2024 | 153 | NOTICE of Conferral by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) Modified docket text on 8/20/2024 (JOS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/19/2024) |
| 08/19/2024 | 154 | NOTICE of Conferral by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) Modified docket text on 8/20/2024 (JOS). [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/19/2024) |
| 08/20/2024 | 155 | **ENDORSED ORDER. In light of 151 Corrected Second Amended Complaint, the Court sua sponte advises the parties that they are permitted to reschedule their mediation date within the deadline established for conducting mediation in the 45 Case Management and Scheduling Order. Should the parties choose to do so, Plaintiff shall file an amended notice of mediation on or before September 3, 2024. Signed by Judge Paul G. Byron on 8/20/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/20/2024) |
| 08/20/2024 | 156 | Minute Entry. In Person Proceedings held before Magistrate Judge Robert M. Norway: MOTION HEARING held on 8/20/2024 re 116 MOTION for Protective Order *Interrogatories* filed by Florida Agricultural & Mechanical University Board of Trustees, 118 MOTION for Protective Order *Request for Production* filed by Florida Agricultural & Mechanical University Board of Trustees. (Digital) (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/20/2024) |

| | | |
|---|---|---|
| 08/20/2024 | 159 | **ORDER granting in part and denying in part 116 Motion for Protective Order; taking under advisement 117 Motion for Protective Order; granting in part and taking under advisement 118 Motion for Protective Order. See Order for details. Signed by Magistrate Judge Robert M. Norway on 8/20/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/20/2024) |
| 08/29/2024 | 160 | MOTION for More Definite Statement by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) Motions referred to Magistrate Judge Robert M. Norway. [Transferred from Florida Middle on 9/12/2024.] Modified on 9/17/2024 (sjb). Modified on 9/23/2024 (sjb). (Entered: 08/29/2024) |
| 08/29/2024 | 161 | MOTION for Miscellaneous Relief, specifically Transfer Venue by Florida Agricultural & Mechanical University Board of Trustees. (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/29/2024) |
| 08/29/2024 | 162 | TRANSCRIPT of MOTION HEARING (Docs 116 and 118) held on AUGUST 20, 2024 before Judge ROBERT M. NORWAY. Court Reporter/Transcriber: SHARON A. MILLER. Email address: sharon_miller@flmd.uscourts.gov. Telephone number: 8133015041.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 9/19/2024. Redacted Transcript Deadline set for 9/30/2024. Release of Transcript Restriction set for 11/27/2024. (SAM) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/29/2024) |
| 08/30/2024 | 163 | NOTICE of hearing on motion re 118 MOTION for Protective Order *Request for Production*, 117 MOTION for Protective Order *Request for Admissions*. Motion Hearing set for 9/5/2024 at 10:00 AM in Orlando Courtroom 3 C before Magistrate Judge Robert M. Norway. If the parties intend to order a transcript, please notify the courtroom deputy before the hearing to have a court reporter present. (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/30/2024) |
| 08/30/2024 | 164 | **ORDER denying 86 Time-Sensitive Motion for Preliminary Injunction; denying 87 Motion for Oral Argument and Evidentiary Hearing. See Order for further details. Signed by Judge Paul G. Byron on 8/30/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 08/30/2024) |
| 09/03/2024 | 165 | NOTICE OF APPEAL as to 164 Order on Motion for Preliminary Injunction, Order on Motion for Hearing / Conference by Jennifer Smith. Filing fee $ 605, receipt number AFLMDC-22472566. (Attachments: # 1 Exhibit Court Order Doc 164)(Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
| 09/03/2024 | 166 | NOTICE of mediation conference/hearing to be held on N/A before Linda Bond Edwards, Esq.. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |

**APP 26**

| 09/03/2024 | 167 | RESPONSE in Opposition re 161 MOTION for Miscellaneous Relief, specifically Transfer Venue filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
|---|---|---|
| 09/03/2024 | 168 | RESPONSE in Opposition re 160 MOTION for More Definite Statement filed by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
| 09/03/2024 | 169 | MOTION for Recusal *of Judge Byron* by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
| 09/03/2024 | 170 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 165 Notice of Appeal,. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (RLK) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
| 09/03/2024 | 171 | NOTICE of compliance *with this Court's Orders (Doc. 143, 144, and 145) Regarding Answers to Plaintiff's First Interrogatories and First Request for Admissions* by Florida Agricultural & Mechanical University Board of Trustees (Santoro, Maria) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/03/2024) |
| 09/05/2024 | 172 | Minute Entry. In Person Proceedings held before Magistrate Judge Robert M. Norway: MOTION HEARING held on 9/5/2024 re 117 MOTION for Protective Order *Request for Admissions* filed by Florida Agricultural & Mechanical University Board of Trustees. Court Reporter: Koretta Stanford (LDJ) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/05/2024) |
| 09/05/2024 | 173 | **ORDER granting in part and denying in part 117 Motion for Protective Order; taking under advisement 118 Motion for Protective Order. See Order for details. Signed by Magistrate Judge Robert M. Norway on 9/5/2024. (MLS)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/05/2024) |
| 09/05/2024 | 174 | CERTIFICATE of compliance re 169 MOTION for Recusal *of Judge Byron* by Jennifer Smith. (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/05/2024) |
| 09/06/2024 | 175 | **ORDER denying 169 Motion for Recusal. See Order for further details. Signed by Judge Paul G. Byron on 9/6/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/06/2024) |
| 09/08/2024 | 176 | Time Sensitive MOTION to Stay *Case Pending Appeal* by Jennifer Smith. (Smith, Jennifer) Modified text on 9/9/2024 (KME). [Transferred from Florida Middle on 9/12/2024.] Modified on 9/18/2024 (sjb). (Entered: 09/08/2024) |
| 09/09/2024 | 177 | NOTICE of compliance re 176 Time Sensitive MOTION to Stay *CASE PENDING APPEAL* by Jennifer Smith (Smith, Jennifer) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/09/2024) |
| 09/11/2024 | 178 | **ORDER granting 161 Motion to Transfer Venue. The Clerk of Court is directed to transfer this case to the Northern District of Florida, Tallahassee Division, and to close the case. Signed by Judge Paul G. Byron on 9/11/2024. (REG)** [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/11/2024) |

**APP 27**

| 09/11/2024 | 179 | CASE ELECTRONICALLY TRANSFERRED to the Northern District of Florida. (RN) [Transferred from Florida Middle on 9/12/2024.] (Entered: 09/11/2024) |
|---|---|---|
| 09/12/2024 | 180 | Case electronically transferred in from District of Florida Middle; Case Number 6:24-cv-00457. (Entered: 09/12/2024) |
| 09/12/2024 | 181 | NOTICE *of Compliance With M.D. Court's Order Regarding Response to Plaintiff's First Request for Production* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES re 144 Order on Motion for Discovery (SANTORO, MARIA) (Entered: 09/12/2024) |
| 09/13/2024 | 182 | NOTICE *of Compliance with M.D. Court's Order Doc. 173 Regarding Response to Plaintiff's Request for Production No. 72* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES re 173 Order on Motion for Protective Order,,, (SANTORO, MARIA) (Entered: 09/13/2024) |
| 09/16/2024 | 183 | NOTICE *of Service of University's Response to Plaintiff's Second Request for Admissions* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES (SANTORO, MARIA) (Entered: 09/16/2024) |
| 09/16/2024 | 184 | NOTICE *of Service of University's Answers to Plaintiff's Second Interrogatories* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES (SANTORO, MARIA) (Entered: 09/16/2024) |
| 09/16/2024 | 185 | NOTICE *of Service of University's Response to Plaintiff's Second Request for Production* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES (SANTORO, MARIA) (Entered: 09/16/2024) |
| 09/17/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 181 Notice (Other), 185 Notice (Other), 180 Case Transferred In - District Transfer, 183 Notice (Other), 179 Case Transferred Out to Another District, 184 Notice (Other), 182 Notice (Other),. (sjb) (Entered: 09/17/2024) |
| 09/17/2024 | 186 | *** VACATED PER 192 ORDER *** ORDER - The Clerk of Court shall include Plaintiff's contact information on the docket. The parties have until October 4, 2024, to respond to this Order and point to a specific motion which remains pending at the time of transfer, and to outline their discovery needs and estimations of the time necessary to complete discovery. Defendant FAMU should file a response to Plaintiff's motion to stay this case, ECF No. 176 , if they oppose the motion, no later than September 25, 2024. The motion for a more definite statement, ECF No. 160 , is GRANTED. Plaintiff has until October 1, 2024, to file a "third amended complaint" which shall be no longer than 30 pages, in compliance with Federal Rule of Civil Procedure 8 and this Order. The Clerk of Court shall return this file upon receipt of Plaintiff's third amended complaint or no later than October 4, 2024. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 9/17/24. (sjb) Modified on 9/23/2024 (sjb). (Entered: 09/17/2024) |
| 09/17/2024 | | Set Deadlines/Hearings Notify Chambers on **10/4/2024**. Amended Pleadings due by **10/1/2024**. Response to Plaintiff's motion to stay this case Deadline - by **9/25/2024**. (Internal deadline for referral to judge if response not filed earlier: **10/4/2024**). (sjb) (Entered: 09/17/2024) |

**APP 28**

| 09/19/2024 | 187 | NOTICE *of Compliance With M.D. Court's Order and Supplemental Answer to Plaintiff's First Interrogatories* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES re 159 Order on Motion for Protective Order,,,,, (SANTORO, MARIA) (Entered: 09/19/2024) |
|---|---|---|
| 09/19/2024 | 188 | NOTICE *of Compliance With M.D. Court's Order and Second Amended Response to Plaintiff's First Requests for Production* by FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES re 159 Order on Motion for Protective Order,,,,, (SANTORO, MARIA) (Entered: 09/19/2024) |
| 09/20/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 187 Notice (Other), 188 Notice (Other),. (sjb) (Entered: 09/20/2024) |
| 09/20/2024 | 189 | NOTICE *OF FILING PLAINTIFFS SUPPLEMENTAL BRIEFING REGARDING PLAINTIFFS REQUEST FOR PRODUCTION 72* by JENNIFER SMITH re 159 Order on Motion for Protective Order,,,,, (Attachments: # 1 Exhibit Plaintiff's Response Motion for Protective RFP Supplemental Brief, # 2 Exhibit Notice of Filing Email) (SMITH, JENNIFER) (Entered: 09/20/2024) |
| 09/20/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 176 Time Sensitive MOTION to Stay *CASE PENDING APPEAL*. Referred to MARTIN A FITZPATRICK. (erl) (Entered: 09/20/2024) |
| 09/23/2024 | 190 | PLAINTIFF'S EMERGENCY OBJECTION TO ORDER NO. 186 AND MEMORANDUM OF LAW IN SUPPORT. (SMITH, JENNIFER) Modified to edit title on 9/23/2024 (rcb). (Entered: 09/23/2024) |
| 09/23/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 189 PLAINTIFF'S EMERGENCY OBJECTION TO ORDER NO. 186 AND MEMORANDUM OF LAW IN SUPPORT. (sjb) Modified to edit title on 9/23/2024 (rcb). (Entered: 09/23/2024) |
| 09/23/2024 | 191 | ORDER - The Clerk of Court shall immediately refer Plaintiff's emergency objection, ECF No. 190 , to the presiding District Judge. The Clerk of Court shall return this file upon receipt of Plaintiff's third amended complaint or no later than **10/4/2024**. Amended Pleadings due by **10/1/2024**. Miscellaneous Deadline - by **10/4/2024**. (Internal deadline for referral to judge if response not filed earlier: **9/25/2024**). Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 9/23/24. (sjb)(Clerk referred filing to district judge) (Entered: 09/23/2024) |
| 09/23/2024 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 190 Response/Reply (sjb) (Entered: 09/23/2024) |
| 09/23/2024 | 192 | ORDER ON APPEAL OF NON-FINAL ORDER - Accordingly, the Clerk shall VACATE the Magistrate Judge's order, ECF No. 186 . Plaintiff's request for oral argument included in her objections to the Magistrate Judge's order is DENIED as moot. Plaintiff's motion to stay, ECF No. 176 , is GRANTED. This case is STAYED pending resolution of Plaintiff's interlocutory appeal regarding Plaintiff's motion for preliminary injunction and Plaintiff's mandamus action before the Eleventh Circuit. |

**APP 29**

| | | |
|---|---|---|
| | | The Clerk shall TERMINATE the pending motion for more definite statement, ECF No. 160 , to be re-gaveled once the stay is lifted. Signed by CHIEF JUDGE MARK E WALKER on 9/23/24. (sjb) (Entered: 09/23/2024) |
| 10/09/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 191 Order ( No response or amended filing docketed) (sjb) (Entered: 10/09/2024) |
| 10/22/2024 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 191 Order(No amended filing filed) (sjb) (Entered: 10/22/2024) |
| 11/01/2024 | 193 | MOTION to Extend Time *TO SERVE UNSERVED DEFENDANTS* by JENNIFER SMITH. (SMITH, JENNIFER) (Entered: 11/01/2024) |
| 11/01/2024 | 194 | ORDER GRANTING MOTION TO EXTEND TIME TO SERVE UNSERVED DEFENDANTS - Accordingly, Plaintiff's motion, ECF No. 193 , is GRANTED. The deadline to serve any unserved Defendants is extended to 45 days after the stay in this case is lifted. Signed by CHIEF JUDGE MARK E WALKER on 11/1/24. (sjb) (Entered: 11/01/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/13/2024 08:06:33 | | | |
| **PACER Login:** | abakerattypelaw | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:24-cv-00367-MW-MAF |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |

# 1-1 - Plaintiff's State Court Complaint (FAC)

# 03/04/2024

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
CIRCUIT CIVIL


JENNIFER SMITH,

      Plaintiff,

                                          CASE NO.: 2023-CA-016035-O

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY BOARD OF
TRUSTEES,

      Defendant.

_____/


## FIRST AMENDED COMPLAINT

Plaintiff, Professor Jennifer Smith, sues Defendant, Florida Agricultural & Mechanical University Board of Trustees, and states:


## JURISDICTION AND VENUE

1.     This is an action for damages in excess of $50,000.00.

2.     Venue lies in Orange County because the cause of action accrued in Orange County, and Defendant conducts business by operating its law school and managing its employees within Orange County.


## ADMINISTRATIVE PREREQUISITES

3.     All conditions precedent to bringing this action have occurred.

## PARTIES

4.     Plaintiff, Jennifer Smith (hereinafter "Professor Smith") is a woman, citizen of the

United States, and a resident of Orange County, Florida, and has so resided at the times material hereto.

5.      Defendant, Florida Agricultural & Mechanical University Board of Trustees. (hereinafter "FAMU," "FAMUBOT," or "Defendant"), is a state university in the Florida university system.

6.      Defendant operates a main campus headquartered in Tallahassee, Florida that is commonly referred to as FAMU.

7.      Defendant also operates a law school located in Orlando, Florida that is known as the FAMU College of Law (where Professor Smith works).

## GENERAL ALLEGATIONS

8.      Professor Smith began working for the Defendant in May 2004 and her official start date was August 8, 2004.

9.      Professor Smith performed the duties of a law professor and was subject to the direction and control of Defendant.

10.     Professor Smith holds the professional title of "tenured Full professor", or "Professor of Law" and has held this title since 2016.

11.     On August 16, 2013, Professor Smith's immediate supervisor, then Dean Pernell, evaluated her as excellent in teaching, scholarship and service for the 2012-13 academic year.

12.     In May 2014, then Dean Pernell evaluated Professor Smith as excellent in teaching, scholarship and service for the 2013-14 academic year.

13.     College of Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported this lapse in evaluations to BOT members at a meeting with the faculty at the College of Law.

14.   In October 2014, Professor Smith sued Defendant for violations of the Equal Pay Act, Title VII of the Civil Rights Act, Title IX of the Education Amendments Act, and the Florida Civil Rights Act ("Smith I").

15.   On July 22, 2015, Smith I ended in favor of the Defendant and against Professor Smith.

16.   After the trial, a disgruntled witness told Professor Smith that the University had conducted a salary study showing women at the law school were grossly underpaid by tens of thousands. Through a public records request, Professor Smith obtained the study dated August 2015 and continued in court, ultimately forcing salary changes and promotions across the board for women faculty.[1]

17.   The "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," (hereinafter "FAMU Salary Equity Analysis", Ex. 1) prepared by Defendant's Office of Institutional Research found the following:

> Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (P. 3)

> The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (P. 10)

> Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (P. 13)

---

[1] Electronic discovery indicated that this date had been manipulated before producing the study to Professor Smith.

3

18.   In 2016, Defendant made five categories of salary adjustments ("2016 Schedule of Adjustments") consisting of (1) one-time salary adjustments to certain tenured full professors and associate professors based exclusively on rank, tenure status, and length of tenure ("Salary Structure"); (2) a university-wide 1% cost-of-living raise to all professors; (3) one percent lump-sum bonuses to law faculty who had not receive a promotion or other pay increase between January 1 and June 16, 2016; (4) nine percent salary increase to associate professors who were promoted to full professor before 2017; and (5) routine changes to professor salaries based on the addition or removal of administrative duties or shifts between a 9-month and 12-month schedule. (Ex. 2)

19.   Defendant acknowledged that one-time adjustments of up to $24,000 were needed for salary adjustments, and the baseline for tenured associate professors would be $120,000.00 and tenured full professors would be $140,000.00. (ex. 3)

20.   In July 2018, Professor Smith sued Defendant for a second time because she believed the 2016 Schedule of Adjustments violated the Equal Pay Act and Title VII ("Smith II") and the issue was unique.

21.   Smith II ended with the trial court awarding summary judgment to the Defendant, but the Court refused to award Defendant attorney's fees.

22.   On August 9, 2021, Defendant hired a male professor named Ewanrinareto "Areto" Imoukhuede ("Comparator") to perform a similar position to the position held by Professor Smith – tenured Full Professor.

23.   Professor Smith and Comparator performed and perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all faculty at the law school, irrespective of subject matter.  Pernell Deposition, p.40, ll. 4-25; pp.41-44; Pernell Deposition, p.41, ll. 3-25; p. 42, ll. 1-

4

**APP 35**

7; Pernell Deposition, pp.44-45, ll. 1-3.; Pernell Deposition, p.46, ll. 18-25 (Ex. 4).

24.     Despite performing substantially equal work, Professor Smith is paid nearly $25,000.00 less than Comparator for performing the same or similar job duties.

25.     The Comparator's pay is nearly $25,000.00 greater than the 2016 Salary Structure Defendant created.

26.     The increased pay that Comparator received and receives has not been based on superior skill, education, or experience or any other legitimate factor.

27.     The EPA, 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

28.     Defendant violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

29.     On May 9, 2022, Professor Smith wrote the president of the University, Dr. Larry Robinson, about the disparity in pay between her and Comparator.

30.     On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant's Equal Opportunity Program ("EOP").

31.     On September 22, 2022, Defendant's EOP department sent its investigative report to Professor Smith, denying any pay inequities without any rationale for paying Comparator more than Professor Smith.

32.     On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

33.     On December 12, 2022, Defendant submitted its position statement to the EEOC addressing Professor Smith's Charge of Discrimination.

34.     On January 10, 2023, Professor Smith submitted her rebuttal to the EEOC concerning Defendant's position statement on equal pay, indicated that Defendant admitted it underpaid Professor Smith.

35.     On January 26, 2023, Defendant surprised Professor Smith by initiating an investigation into Professor Smith of a stale student complaint against Professor Smith, which was filed nearly one hundred days earlier and was never mentioned to Professor Smith, and ignoring the complaint Professor Smith had filed against the student on the day of the incident.

36.     The facts, circumstances, and timeline concerning Professor Smith's Complaint and the earlier-filed student complaint are as follows:

      a.     On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

      b.     On October 20, 2022 at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an unidentified female student, later identified as MW, for intentionally disrupting Professor Smith's class.

      c.     Defendant never investigated Professor Smith's complaint that came two days after her charge was filed to the EEOC.

      d.     Professor Smith alleged that MW displayed deliberate, aggressive, and confrontational behavior, specifically described as "so rude" and "aggressively rude," by barging into a class session in which she was not enrolled, fully aware that the classroom was being used by Professor Smith, as evidenced by a crowd of over 40 students gathered in the hallway, respectfully awaiting the conclusion of the ongoing class.

      e.     The incident unfolded when MW entered the classroom through the back door and declared that her professor, Maritza Reyes ("Prof. Reyes") told MW that she needed to sit down to get ready for the next class starting at 10:30 am.

      f.     After being instructed to leave by Professor Smith, MW, now very irate, positioned herself outside the front door of the classroom to await a second opportunity to confront Professor Smith about Smith's use of the classroom.[2]

---

[2] Law Faculty can reserve classrooms for makeup courses, as ABA standard 311 requires that at least 64 of the required credit hours for the Juris Doctor degree must be earned "in courses that require attendance in regularly scheduled classroom sessions or direct faculty instruction." Students are free to enter law school classrooms during their assigned courses and prohibited from entering law school classrooms outside of their scheduled courses. For the purposes of

g.      Professor Smith never encountered MW before this occurrence at the law school and could not otherwise identify the student or even if she was really a student.

h.      Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW was a summer associate at the firm where Professor Smith had been a partner.

i.      On December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities:

Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.

Best,

Prof. Smith

MW did not respond and later alleged that she felt the email from Professor Smith was a threat.

j.      Professor Smith heard nothing else from Associate Dean Reginald Green, so she believed the issue was not to a level the Defendant felt needed to be investigated. According to Compliance, Associate Dean Green failed to send Professor Smith's complaint to Compliance. Associate Dean Green also failed to follow the Law School's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations. (Exs., 9, 10)

k.      On January 26, 2023, nearly 100 days after the incident, Professor Smith received emails from Compliance.

l.      Defendant contacted Professor Smith to begin an investigation into the MW incident.

m.      But even more surprising, Defendant's investigation made Professor Smith the target of the investigation, notwithstanding Associate Dean Green's assurance that he would look into the incident according to his email to her on the day of the incident. (Ex. 5)

n.      Also on January 26, 2023, Defendant notified Professor Smith that the

---

this paragraph, Professor Smith reserved the classroom on October 6, 2022 date. Therefore, MW was prohibited from entering the classroom at the time of Professor Smith's direct faculty instruction.

APP 38

outcome of the investigation could be her termination – an outcome that would also terminate Professor Smith's EEOC complaint. This was the first time that Professor Smith learned that a complaint had ever been filed against her by MW, including the severity of MW's allegations and the blatant and obvious falsities contained therein.

37.    Defendant carried on its investigation from January 26, 2023 until June 5, 2023.

38.    Defendant's sudden interest in reviving MW's complaint in lieu of Professor Smith's early filed complaint ultimately proved MW's assertions were meritless and the entire investigation was unwarranted.

39.    MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was.

40.    On February 15, 2023, Prof. Reyes sent an email to Professor Smith and Deans Keller and Cooper, providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Reyes stated:

> Last semester (fall 2022), you harassed a student in my evidence course after the student reminded you that I was about to start class in the classroom where you were conducting one-on-one sessions with students from your civil procedure course. You were not supposed to be in that classroom when the student reminded you that I was going to start class in a few minutes. You were assigned to teach civil procedure in the classroom next door, yet you chose to remain in the classroom where I was due to start teaching evidence to disrupt my class, which you did. You engaged in unprofessional, rude, and harassing behavior in full view of the students in your civil procedure course and my evidence course who were waiting in the hallway.

41.    Clearly, MW knew Professor Smith was in the classroom, which Professor Smith had reserved on October 6, 2022; MW deliberately disrupted [Professor Smith's] class; and MW was the admitted instigator both times she ambushed Professor Smith on October 20, 2022.

8

Professor Smith was in the adjacent classroom to teach civil procedure at 10:30 am, and thus Professor Smith could not have disrupted Prof. Reyes' class, which started at 10:30 am.

42.    Defendant's unwarranted and illogical investigation was conducted negligently, without any lawful purpose, and it was unduly and unreasonably delayed over 130 days from January 26, 2023, to June 5, 2023 to intentionally cause needless disruption to Professor Smith.

43.    As evidence of Defendant's negligence in carrying out the unwarranted and illogical investigation, Defendant failed to promptly investigate the incident or even request or preserve key surveillance video evidence for 104 days (from October 20, 2022 to January 31, 2023) to ensure key evidence that would have immediately exonerated Professor Smith no longer existed. Defendant failed to follow its own internal regulations, ergo the Code of Conduct; failed to investigate Professor Smith's complaint against the student; and intentionally disregarded evidence supporting Professor Smith's allegations of deliberately disruptive conduct by MW.

44.    Because Compliance informed Professor Smith that Associate Dean Green failed to follow University regulations and its code of conduct when he did not forward her complaint to Compliance or file it through the Compliance Hotline, Professor Smith re-filed her initial complaint, but this time through the Compliance Hotline on March 9, 2023.

45.    Compliance immediately deleted the complaint and wrote a memorandum instructing the deans to counsel Professor Smith about retaliation based on her now proper resubmission of the initial complaint.

46.    In addition to Associate Dean Green not following University regulations, Defendant did not follow its own procedures in several ways. First, University Code of Conduct 1.019 (20) states: *Investigation. Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through*

**APP 40**

*intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe.* Defendant did not take the complaint from Professor Smith or the student seriously because it delayed investigating either one for nearly 100 days.

47.    This investigation continued well beyond the duration of the spring semester, which is both unreasonable and caused Professor Smith significant distress and anxiety.

48.    On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the investigator via email to inquire about the progress of the investigation.

49.    In response, the investigator stated, "The investigation is still ongoing. You will be notified once the report has been completed."

50.    On June 5, 2023, Compliance emailed copies of a June 5, 2023 Investigative Report to the FAMU Board of Trustees, Executive Vice President & Chief Operating Officer, Vice President and General Counsel; Dean of the College of Law, Interim Provost, Vice President of Audit, Chief Human Resources Officer, Professor Smith, and the student.

51.    Following the investigation, Defendant falsely accused Professor Smith of retaliation to discredit Professor Smith's legitimate complaints against MW and protect Defendant from potential liability.

52.    Defendant recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report") after Defendant had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done albeit half-heartedly, thus duplicating the penalty for the same alleged retaliation.

53.    Professor Smith assumed the investigation ended as per La'Tonya Baker,

Compliance employee and preparer of the Investigative Report.

54.     Unbeknownst to Professor Smith, Defendant never closed or had re-opened the unwarranted and illogical investigation, then transformed it into a witch hunt to manufacture misconduct down the road – which is exactly what happened.

55.     Second, Defendant did not follow University Code of Conduct 1.019 (18b), which states: *"Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the University's Compliance and Ethics Hotline."*

56.     Defendant did not follow this procedure and then blamed Professor Smith when she properly re-filed the complaint.

57.     Third, Defendant did not follow University Code of Conduct 1.019 (20b), which states: *Confidentiality will be maintained to the extent legal and practicable, informing only those personnel who have a need to know such information.* Defendant also failed to maintain the confidentiality of the investigation, thereby exposing Professor Smith's protected activity or the details of her complaint to other employees, then falsely alleged another employee (the professor who MW said instructed her to interrupt the class) had filed a complaint against Professor Smith because of Defendant's breach of confidentiality.

58.     On February 16, 2023, Professor Smith sent a memorandum to Ms. Baker, providing details about MW's intention to disrupt my class and requested an investigation into MW's intentional and hostile conduct towards me. Professor Smith also highlighted her concerns about Prof. Reyes, believing Prof. Reyes (who Professor Smith had recommended to the University for hire knowing she was unable to perform adequately at the law firm but hoping Reyes would thrive in a different environment) to be a "danger to me and other faculty at this law school."

59.     Just four days later, on February 20, 2023, Professor Smith received an email from Ms. L. Scott of the Equal Opportunity Program (EOP) where Professor Smith had filed her equal pay complaint months before, notifying me that Professor Reyes had filed a complaint against Professor Smith. Not only was this a false allegation by EOP seems to have used this to entice Professor Smith to file a complaint against Reyes -- this incident revealed a breach of confidentiality, as it became apparent that EOP and Compliance were divulging information to Prof. Reyes and engaging in what appeared to be "selective investigations."

60.     On February 28, 2023, Professor Smith emailed General Counsel Denise Wallace about Prof. Reyes because Professor Smith was increasingly concerned about Professor Reyes' behavior and Professor Smith's own safety. Ms. Wallace never responded.

61.     After receiving the June 5, 2023 report, on June 12, 2023, Professor Smith sent a memorandum addressed to Rica Calhoun (Compliance), Denise Wallace (General Counsel), and Craig Reed (BOT), also copied to Allyson Waston (Provost) herein incorporated by reference about the retaliatory actions of the Defendant, and demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. (Ex. 11)

62.     Professor Smith never received a response from the Defendant regarding her memorandum nor any of her demands.

63.     On July 6, 2023, Compliance Officer Rica Calhoun emailed a "secret" supplemental report ("Secret Supplemental Report") to the unwarranted and illogical investigation.

64.     While the Secret Supplemental Report is dated July 6, 2023, it is evident the report

12

was created in response to Professor Smith's June 12, 2023 memorandum.

65.   Compliance emailed the Secret Supplemental Report to the Executive Vice President & Chief Operating Officer, Vice President and General Counsel; Dean of the College of Law, Provost, Vice President of Audit, Director of EOP, and Associate Vice President of Human Resources.

66.   Professor Smith was not copied on this correspondence.

67.   Additionally, EOP (where Professor Smith initially filed her equal pay complaint) was copied on this supplemental report though it had not previously been copied on the June 5, 2023 Investigative Report.

68.   Professor Smith assumed that the investigation ended with the June 5, 2023 Investigative Report from Compliance.

69.   Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

70.   On October 5, 2023, Professor Smith wrote a memorandum to Compliance and the General Counsel about MW's concerning the student's concerning behavior regarding the settled matter that occurred a year before.

71.   Professor Smith indicated continuing concerns about her personal safety with a student who seemed completely engrossed with Professor Smith for the entire year and that she believed she was obligated to report MW's conduct to the Florida Bar, but Professor Smith never reported the student's conduct.

72.   Drafting a memorandum and querying the responsibility to report disruptive student conduct to the Florida Bar is not retaliation.

73.   The University never responded to Professor Smith's memorandum dated October

5, 2023.

74.     On October 12, 2023, Professor Smith received a three percent performance-based increase, which is the highest any employee could receive.

75.     On November 13, 2023, another COL professor, Reyes, notified Defendant of Professor Smith's unserved complaint in Reyes's own federal court filing entitled "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike." *See Reyes v. FAMU BOT*, 6:22-cv-1525-WWB-DCI, 2023 WL 9283741, ECF No. 36 at 12  (M.D. Fla. 2022). Defendant, through that filing, learned Professor Smith had filed a state court complaint for equal pay and retaliation.

76.     Within a few weeks, the Defendant sent Professor Smith a Notice to Terminate on December 5, 2023. This was the first time she saw the July 6, 2023 "Secret" memorandum. (Ex. 6)

77.     The Defendant's conduct is blatant retaliation because the proposed discipline for Professor Smith's alleged misconduct based on a closed investigation is extreme, University regulations provide many other lesser options than termination, and none of her conduct the University points to can be considered an adverse action or retaliation against MW.

78.     Professor Smith received a notice of termination ostensibly for retaliation by 1) re-filing her complaint against a student in the proper channels, 2) sending descriptive texts/emails to another faculty member and former student about the October 20, 2022, incident and  provided to the University on February 9, 2023 in the investigation and 3) sending an October 5, 2023, memorandum to Defendant indicating her safety concern about MW who, for a year, seemed overly preoccupied with Professor Smith, who had never seen the student before the day of the incident in October 20, 2022. (Ex. 6)

**APP 45**

79.     According to FAMU Regulation 10.205, "The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an **employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students**." [Emphasis added]

80.     The Notice indicated appeal procedures available to Professor Smith and that the effective date of her termination would be January 19, 2024, if Defendant did not rescind the Notice of Termination.

81.     Professor Smith timely notified Defendant that she wanted to have a hearing, which took place on ZOOM on January 11, 2024, before three (3) panel members chosen by Defendant. The panel members were all lawyers: Bryan Smith, Associate VP for Student Affairs; Andrea Nelson, School of Business and Industry; and Patricia West, FAMU Developmental Research School. After the hearing, the panel produced a report dated January 12, 2024.

82.     The panel's report on January 12, 2024, unanimously recommended that Defendant rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university

15

**APP 46**

employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation** [emphasis added]. (Ex. 7)

83.     Of note, the panel/lawyers only addressed the allegation of the re-filing of the complaint because the other two allegations (texts/emails predating the student complaint or her knowledge of it, and the October 5, 2023, memorandum about her personal safety concerns) clearly cannot satisfy any definition of retaliation.

84.     According to Regulation 10.120(3): "After the conference is conducted, the employee **shall be notified**, by the President or President's designee of the University's decision (emphasis added)."

85.     According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee **shall be notified within five workdays prior to the date the action is effective** (emphasis added)."

86.     According to Regulation 10.120(1), Defendant shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) **The effective date of the University's proposed final action** (emphasis added)."

87.     The effective date of the proposed final action contained in Defendant's written notice to Professor Smith was listed as January 19, 2024.

88.     Defendant did not notify Professor Smith by January 18, 2024, of its intent to proceed with her termination.

89.     Given Defendant's inaction and refusal to timely respond to her email dated

**APP 47**

January 18, 2024, Professor Smith believed the Notice to Terminate had been withdrawn, waiving

its ability to terminate her via the reasons listed in the December 5, 2023 Notice to Terminate.

90.     On January 23, 2024, at 4:56 p.m., Professor Smith received an email with notice

of Defendant's intent to terminate her that stated:

> After reviewing all documentation and considering the totality of
> circumstances related to this matter, the University's decision to
> dismiss you from employment remains in effect. Pursuant to Florida
> A&M University Board of Trustees (University) Regulation 10.205,
> you are hereby notified that your current employment with the
> University will end at the close of business on Tuesday, January 30,
> 2024. You will remain on Administrative Leave with Pay until this
> date. In the interim, please refrain from reporting to work or visiting
> the area(s) related to your current work assignments unless otherwise
> notified by this Office. The reason for this employment action has been
> outlined in the "Notice of Intent to Dismiss from Employment"
> delivered to you on December 5, 2023.  (Ex. 7)

91.     To circumvent the notification timeframe outlined in FAMU Regulations, which

Defendant missed, Defendant changed the effective date of the proposed termination from January

19, 2024 (as indicated in the December 5, 2023 notice) to January 30, 2024 (the 10.120(4)

notification).

92.     Defendant then outlined the procedures that Professor Smith should follow to

appeal, again, Defendant's decision.

93.     Because Defendant has rejected the neutral predetermination hearing panel's

recommendation to rescind the Notice to Terminate, Professor Smith is convinced it would be

futile for her to proceed with any additional appeal process facilitated by Defendant when she

prevailed in the January 11, 2024, hearing.

94.     Defendant's decision to disregard the predetermination hearing panel's

recommendation demonstrates clear bias and lack of due process.

95.     After Professor Smith raised concerns about the pay disparity and expressed her

**APP 48**

intention to exercise her rights under the EPA, Defendant engaged in the aforementioned retaliatory actions against Professor Smith.

96.     Defendant's retaliation against Professor Smith includes the adverse employment actions as described above.

97.     Defendant's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3).

**COUNT I**
**DISCRIMINATION IN COMPENSATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206, <u>et seq</u>.**

98.     The Plaintiff realleges paragraphs 1 through 97.

99.     Plaintiff belongs to a protected class; she is female.

100.    Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator and were performed under the same or similar working conditions.

101.    During all relevant periods, Plaintiff received wages lower than the Comparator while performing the same or substantially more work than the Comparator.

102.    Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages performing the same or substantially more work than the Comparator.

103.    Defendant violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs.

**COUNT II**
**RETALIATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3)**

104.    The Plaintiff realleges paragraphs 1 through 97.

18

105.    Defendant's retaliatory actions against Plaintiff, as alleged herein, constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

106.    The retaliation described herein was based on Plaintiff's exercise of rights protected by law to resist and oppose gender discrimination and harassment and to participate in actions calculated to redress grievances.

107.    Defendant's false and manufactured justifications for its actions are pretext based on the implausibilities, inconsistencies, incoherencies, and contradictions alleged above. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

108.    As a result of Defendant's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled to damages and equitable relief, including attorney's fees and costs.

## COUNT III
## BREACH OF CONTRACT

109.    The Plaintiff realleges paragraphs 1 through 97.

110.    The Defendant operates the law school.

111.    The COL, Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, University Handbook, University Regulations and individual employment contracts.

112.    Defendant, though the above noted documents, has made clear and unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

113.    Plaintiff's employment letter (Ex. 8), together with the Faculty Handbook (attached

19

**APP 50**

in part, Ex. 9), University Handbook and University Regulations are what form Plaintiff's employment contract.

114.    Defendant has failed to meet its contractual obligations to Plaintiff. Defendant has allowed its employees to breach University regulations, breach confidentiality, and allege false allegations against Professor Smith to terminate her employment as a tenured full professor, thereby breaching her employment contract.

115.    Defendant terminated Plaintiff's employment when without "just cause", thereby breaching the employment contract.

116.    Through its actions and inactions, Defendant intentional, recklessly, and knowingly violated the provisions of the Faculty Handbook, University Handbook, University Regulations, and terms of Plaintiff's contract and her tenure.

117.    As a result of Defendant's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment.

118.    Plaintiff seeks actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant's wrongful breach of Plaintiff's employment contract.

**COUNT IV**
**FIRST AMENDMENT RETALIATION**
**UNITED STATES AND FLORIDA CONSTITUTIONS**

119.    The Plaintiff realleges paragraphs 1-97.

120.    By filing her state court complaint addressing issues of public concern that affect women nationwide, Plaintiff engaged in constitutionally protected activity. *See generally Adams*

**APP 51**

*by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 820 (11th Cir. 2022) (Lagoa, J., concurring) (explaining that women's rights are issues of general public concern – Title IX context); *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1555 (4th Cir. 1994) (recognizing women's rights as an issue of public concern).

121.   Following Plaintiff's engagement in the constitutionally protected activity, Defendant took an adverse employment action against Plaintiff by endeavoring to terminate her through the notice of termination.

122.   The adverse employment action was taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

123.   Defendant's conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

124.   Defendant's adverse employment actions against Plaintiff, in response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

125.   Plaintiff suffers and will suffer damages as a result of Defendant's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries.

## COUNT V
### VIOLATION OF PROCEDURAL DUE PROCESS
### 42 U.S.C. § 1983

126.   The Plaintiff realleges paragraphs 1-97.

127.   Plaintiff has a constitutionally protected interest in her employment as tenured full

APP 52

professor at the College of Law.

128.   Defendant is a state actor for purposes of this statute.

129.   Plaintiff was denied due process of law when Defendant violated its regulations concerning the contents of the December 5, 2023 notice, thereby denying Plaintiff proper notice.

130.   Plaintiff was denied due process of law when Defendant employed a biased decisionmaker – Allyson Watson – to the review or adopt the panel decision concerning Plaintiff's termination, which denies Plaintiff a fair opportunity to be heard.

131.   The due process violations are complete because Defendant has refused to provide Plaintiff due process, as her memorandums opposing unlawful activity and other communications have asked for due process to no avail.

132.   Any further appeal or administrative remedy would be futile or inadequate because Defendant has demonstrated its bias and has the authority to select who hears all further appeals.

133.   Defendant, through Allyson Watson, has demonstrated its process is tainted with bias and any outcome is predetermined to conclude against Professor Smith. *See, e.g., McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir. 1994) ("In the second scenario, the alleged bias is discovered after the proceeding has concluded; a contemporaneous objection therefore is impossible. Due process requires that the challenger have an opportunity to object to the alleged bias, and courts consequently have instituted procedures to address allegations of bias and to set aside bias-tainted outcomes. Typically, courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case.").

134.   Thus, Plaintiff will always be denied due process of law in any appeals scenario before Defendant as the decisionmaker.

135.   Plaintiff's only option for due process is judicial review and to set aside the Provost's decision to terminate Professor Smith.

## COUNT VI
### REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

136.   The Plaintiff realleged paragraphs 1-97.

137.   Defendant intends to terminate Plaintiff in violation of her tenure status because of her pursuit of equal pay.

138.   Plaintiff will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured.

139.   "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975).

140.   Monetary damages cannot provide sufficient relief or compensation to Plaintiff as the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career.

141.   Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

142.   Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant to honor her tenure status and employment contract, thus maintaining the

23

status quo until this matter is resolved and expedited discovery to determine whether Professor

Smith engaged in retaliation so that she can be reinstated as a part of the faculty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a)       An order granting preliminary and permanent injunctive relief;

b)       An order declaring that Defendant has violated the Equal Pay Act, including
retaliation provisions;

c)       An order removing any negative references to the October 20, 2022 incident from
Professor Smith's employment file;

d)       An award of unpaid wages and other compensation due to Plaintiff as a result of
Defendant's violation of the EPA, including interest;

e)       An order setting aside the Provost's Notices to Terminate Professor Smith;

f)       An order of reinstatement of her tenure, position and office;

g)       An award of punitive damages, special damages, actual damages and consequential
damages;

h)       Judgment against Defendant and for Plaintiff awarding compensatory damages on
all Counts for the Defendant's violations of law enumerated herein;

i)       Judgment against Defendant and for Plaintiff equalizing her salary with her male
counterpart, permanently enjoining Defendant from future violations of law enumerated herein
and remedying all benefits of which Plaintiff has been unlawfully deprived w enumerated herein;

j)       An award of liquidated damages in an amount equal to the unpaid wages and
compensation due to Plaintiff;

k)       Prejudgment interest;

l)      An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b);

and any other basis; and

m)      Any other relief, including equitable relief, this Court deems just and proper.

### Jury Demand

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Jennifer Smith*
Jennifer Smith
Florida Bar No. 964514
**Law Office of Jennifer Smith**
13506 Summerport Village Pkwy.
Suite 108
Windermere, FL 34786
407-455-0712
407-442-3023 (facsimile)
jensmithesq@aol.com

January 2024

25

**APP 56**

## VERIFICATION

Under penalty of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing, and that the facts alleged therein are true and correct to the best of my knowledge and belief. I understand that a false statement in this Verification will subject me to penalties of perjury.

_____
Jennifer Smith, Plaintiff

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this _29_ day of January, 2024, by Jennifer Smith, who is personally known to me ☒ or who has produced _Drivers License-FL_ as identification and who did take an oath.

Sworn to and subscribed before me this _29_ day of January _____, 2024.

_____
Notary Public

> Notary Public State of Florida
> Nathan S. Flashman
> My Commission GG 944349
> Expires 02/01/2024

26

**APP 57**

# 10 - Order Denying TRO

# 03/08/2024

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JENNIFER SMITH,**

                    **Plaintiff,**

**v.**                                      **Case No: 6:24-cv-457-PGB-RMN**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES,**

                    **Defendant.**
_____/

**<u>ORDER</u>**

This cause comes before the Court on Plaintiff Jennifer Smith's ("**Plaintiff**") Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Injunctive Relief (Doc. 6 (the "**Motion**")), filed March 6, 2024. [1], [2] Upon due consideration, Plaintiff's Motion is denied.

**I.    BACKGROUND**

This case, which was initiated less than five months ago, has already developed a complex procedural history. Plaintiff is a tenured professor at

---

[1]   Because the title of Plaintiff's Motion references injunctive relief, the Court clarifies that it construes Plaintiff's Motion as requesting only a temporary restraining order under Local Rule 6.01 and not a preliminary injunction under Local Rule 6.02. The Court construes the Motion in this manner because (1) a temporary restraining order is what Plaintiff specifically requests in the body of the Motion, and (2) Defendant has a right to respond to a motion for preliminary injunction, and thus, such a motion would not yet be ripe. *See* Local Rule 6.02(c).

[2]   The Court cautions Plaintiff that all future motions shall meet the requirements set forth in Local Rule 3.01, including the requirements regarding page limits, or they are subject to being stricken.

**APP 59**

Defendant Florida Agricultural & Mechanical University Board of Trustees' ("**Defendant**") College of Law. (Doc. 1-1, ¶¶ 8–10). This action began when Plaintiff sued Defendant in state court on October 17, 2023, under the Equal Pay Act ("**EPA**"), bringing claims for pay discrimination and for retaliation. (Doc. 1-6, pp. 1–16). Plaintiff did not serve this version of the Complaint upon Defendant. (*See* Doc. 1-1, ¶ 75). However, according to Plaintiff, Defendant learned of this filing on November 13, 2023, through litigation involving another one of its professors. (*Id.*). Then, on December 5, 2023, Defendant sent Plaintiff notice that it planned to terminate her employment. (*Id.* ¶ 76). Defendant's purported reason for terminating Plaintiff was based upon an investigation concerning a student complaint that arose from an encounter between Plaintiff and the student in October of 2022. (*Id.* ¶¶ 36, 76–77). Plaintiff, who believed this investigation had been closed, asserts this is a pretext and that Defendant seeks to terminate her based upon her suing Defendant under the EPA. (*Id.* ¶¶ 68, 95–97).

Accordingly, on January 29, 2024, Plaintiff filed her First Amended Complaint (Doc. 1-1) in the state court. This iteration of the Complaint adds allegations regarding the events that Plaintiff asserts have taken place since the filing of her initial Complaint, as described above, and contains claims for: (i) pay discrimination under the EPA, (ii) retaliation under the EPA, (iii) breach of her employment contract, (iv) First Amendment retaliation, and (v) violations of procedural due process under 42 U.S.C. § 1983, as well as (vi) a request for preliminary and permanent injunctive relief. (*See id.*).

On January 29, 2024, Plaintiff also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 1-6, pp. 26–29 (the "**State Court Motion**")) and an accompanying memorandum of law (Doc. 1-6, pp. 30–54). In the State Court Motion, Plaintiff asserted that Defendant had provided her notice that her termination would be effective the following day (January 30) and thus, Plaintiff sought an order preventing this termination from occurring. (*See id.* at pp. 26–29). The trial court denied Plaintiff's request, and its ruling is currently on appeal to the Sixth District Court of Appeal. (*See id.* at pp. 77–85).

Subsequently, on February 2, 2024, Defendant received a copy of the First Amended Complaint, and on March 4, 2024, Defendant removed this case to the instant Court.[3] (Doc. 1). Now, Plaintiff moves, on an emergency basis, for a temporary restraining order preventing Defendant from terminating her employment. (Doc. 6). Although Plaintiff asserts that she is still employed by Defendant despite its notice that it would terminate her on January 30, 2024, she also discloses that, on March 1, 2024, Defendant locked her out of her professional e-mail and removed her access to Defendant's personnel database. (*Id.* at pp. 1–3). Additionally, Plaintiff is not currently permitted on Defendant's campus and is unable to perform her duties as a professor. (*Id.* at pp. 3, 28). Plaintiff asserts that "it appears extremely likely that Defendant will attempt to act on an unlawful

---

[3] Defendant contests that service in this case was proper and asserts that a process server left the Summons and a copy of the First Amended Complaint with an administrative assistant who was not authorized to accept service on its behalf. (Doc. 1, p. 2).

APP 61

termination on Friday, March 8, 2024, should [Plaintiff] not receive her biweekly pay," and argues that she is entitled to a restraining order to prevent this from occurring. (*Id.* at p. 1).

## II.   STANDARD OF REVIEW

The standard for analyzing a motion for temporary restraining order where the opposing party has notice is the same as a motion for a preliminary injunction: Plaintiff must show (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable harm in the absence of a restraining order; (3) that the harm suffered by Plaintiff in the absence of a restraining order would exceed the harm suffered by Defendants if the restraining order issued; and (4) that a restraining order would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002); *Miccosukee Tribe of Indians of Fla. v. United* States, 571 F. Supp. 2d 1280, 1283 (S.D. Fla. 2008).

Further, temporary restraining orders are "extraordinary and drastic remed[ies] not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to *each* of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (emphasis added). Ultimately, issuing a temporary restraining order should be "the exception rather than the rule." *Siegel*, 234 F.3d at 1176.

APP 62

### III.   DISCUSSION

In the instant case, Plaintiff has not clearly established that, absent a restraining order, Plaintiff will suffer irreparable harm. *See Johnson & Johnson*, 299 F.3d at 1246–47. With regard to this requirement, Plaintiff urges that "[l]osing a tenured position—a role with significant job security and professional esteem—cannot ever fully be remedied with money." (Doc. 6 at p. 2). However, it appears from the Motion that much of the harm that Plaintiff fears has already occurred. She cannot access her professional e-mail or Defendant's personnel database, cannot teach, and is currently not even permitted to step foot on Defendant's premises. (*See id.* at pp. 3, 28). Indeed, the primary argument Plaintiff advances to justify the emergency nature of the Motion is her fear that Defendant will remove the only apparent remaining vestige of Plaintiff's employment by Defendant: her pay. (*See id.* at p. 1). Should this come to pass, Plaintiff has an adequate remedy available, in that she can seek monetary damages for the compensation that she has lost.

Moreover, the cases cited by Plaintiff as demonstrating the irreparable harm posed here are either clearly distinguishable from the instant case, do not stand for the proposition asserted, or both. (*See* Doc. 6, pp. 33–34). For example, Plaintiff notes that this case involves an alleged violation of her First Amendment rights, and cites *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006), for the proposition that such violations always cause irreparable harm. (Doc. 6, pp. 33–34). However, *KH Outdoor* is patently distinguishable from the case at bar, as

5

**APP 63**

it concerned a court's issuance of an injunction preventing a city from enforcing an ordinance that was actively suppressing protected speech through its regulation of billboards. *See* 458 F.3d at 1265. Here, Plaintiff alleges she used her free speech rights to file this matter in state court and Defendant is *retaliating* against her for doing so. (Doc. 1-1, ¶¶ 119–125). However, the act of retaliation that Plaintiff seeks to prevent in her Motion is monetary. (*See* Doc. 6, p. 1). As such, here, unlike in *KH Outdoor*, monetary damages can make Plaintiff whole. *See* 458 F.3d at 1265.

Plaintiff additionally argues that "irreparable harm is usually presumed in breach of contract actions arising under Florida law," citing to *Capraro v. Lanier Bus. Prods. Inc.*, 466 So. 2d 212 (Fla. 1985). (Doc. 6, p. 34). However, *Capraro*'s holding is far narrower than Plaintiff suggests, as the Court there held that irreparable harm is presumed in breach of contract cases *where the alleged breach concerned a covenant not to compete. See* 466 So. 2d at 213. If irreparable harm was presumed in every breach of contract case, the Court would be flooded with requests for temporary restraining orders and for preliminary injunctive relief in such cases, even where the damages were simply monetary.

Further, Plaintiff's Motion does not clearly establish that a restraining order would not disserve the public interest in this case. *See Johnson & Johnson*, 299 F.3d at 1246–47. Plaintiff essentially seeks to require Defendant to keep her on its payroll until such time as this litigation is concluded despite the fact that she is already unable to perform the primary functions of her job. (*See* Doc. 6, pp. 3, 28). The Court is not convinced that issuing such orders would represent good public

6

**APP 64**

policy under circumstances such as these, especially considering that, in cases where the employee does not prevail in the litigation, the employer may need to use the legal system to claw back the required payments.

Because the Court finds that Plaintiff has not clearly established two requirements for obtaining a temporary restraining order, it concludes that this "extraordinary and drastic" remedy is not warranted here. *Siegel*, 234 F.3d at 1176. Accordingly, the Court does not reach the remaining requirements for establishing entitlement to such relief or the issue of whether Plaintiff has established good cause for waiving a bond here.

## IV.   CONCLUSION

For the aforementioned reasons, Plaintiff's Emergency Motion and Memorandum of Law in Support of Temporary Restraining Order and Injunctive Relief (Doc. 6) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on March 8, 2024.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

**APP 65**

**17-7 - 831 Fed Appx 434 11th Circ 2020**

**03/13/2024**

Smith v. Florida A & M University Board of Trustees, 831 Fed.Appx. 434 (2020)

2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

831 Fed.Appx. 434
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

Jennifer SMITH, Plaintiff-Appellant,

v.

FLORIDA A & M UNIVERSITY BOARD
OF TRUSTEES, Defendant-Appellee.

No. 19-12560
|
Non-Argument Calendar
|
(October 8, 2020)

**Synopsis**

**Background:** Female law professor sued public university in state court, alleging violations of the Equal Pay Act, Title VII, the Florida Civil Rights Act (FCRA), and retaliation. After removal, professor and university filed cross-motions for summary judgment. The United States District Court for the Northern District of Florida, No. 4:18-cv-00409-RH-CAS, granted summary judgment to university and denied professor's motion to reconsider. Professor appealed.

**Holdings:** The Court of Appeals held that:

[1] professor failed to establish a prima facie case of Equal Pay Act violation based on pay disparity between herself and male colleague;

[2] professor's bald allegation that public university treated her adversely based on sex in violation of Title VII and FCRA was not supported by the evidence; and

[3] university's failure to adjust law professor's salary to $138,000 did not constitute an adverse action in retaliation for her protected activity.

Affirmed.

See also 687 Fed.Appx. 888.

**Defendant's Exhibit 7**

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (3)

[1]    **Labor and Employment** 👈 Disparity in pay
       **Res Judicata** 👈 Discrimination
       Female law professor failed to establish prima facie case of Equal Pay Act violation based on pay disparity between herself and male colleague in her second lawsuit against public university; professor's argument that the pay disparity between herself and male colleague at the time of her first lawsuit was discriminatory on the basis of sex was barred by collateral estoppel, and subsequent one-time pay adjustments made by university were applied evenhandedly to both men and women, did not affect professor's male colleague, and did not consider sex as a factor. Fair Labor Standards Act of 1938 § 6, 29 U.S.C.A. § 206(d)(1).

       4 Cases that cite this headnote

[2]    **Civil Rights** 👈 Compensation; comparable worth
       Female law professor's bald allegation that public university treated her adversely based on sex in violation of Title VII and Florida Civil Rights Act (FCRA) by not applying its alleged new salary formula to her was not supported by the evidence, and thus professor failed to state a prima facie case of discrimination; although professor was paid less than male colleague, she received a nearly $10,000 increase as party of university's one-time salary adjustment, an amount greater than any other associate professor and which resulted in a salary that was $5,000 greater than any other associate professor similarly affected by the adjustment, her male colleague was not given a salary adjustment, and his higher salary was not based on sex, as determined in earlier lawsuit brought by professor. Civil Rights Act of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1); Fla. Stat. Ann. § 760.10(1)(a).

**APP 67**

2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

[3]    **Civil Rights** 🔑 Public Employment

**Education** 🔑 Law school faculty

**Public Employment** 🔑 Exercise of Rights; Retaliation

Public university's failure to adjust law professor's salary to $138,000 did not constitute an adverse action in retaliation for the protected activity of professor's lawsuit against university alleging violations of the Equal Pay Act, Title VII, and the Florida Civil Rights Act (FCRA); $138,000 figure was merely a suggestion included in one of 10 drafts of a proposed one-time adjustment to faculty salaries, there was no evidence that the proposal for $138,000 was discarded for an improper reason, and draft of proposed adjustments did not entitle professor to a specific salary. Fair Labor Standards Act of 1938 § 15, 29 U.S.C.A. § 215(a)(3); Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3(a); Fla. Stat. Ann. § 760.10(7).

4 Cases that cite this headnote

**Attorneys and Law Firms**

*435 Stephen Michael Smith, Law Offices of Stephen M. Smith, New Orleans, LA, Jennifer M. Smith, Law Office of Jennifer Smith, Windermere, FL, for Plaintiff - Appellant

Maria A. Santoro, Dennis Jackson Martin & Fontela, PA, Tallahassee, FL, Teresa Cooper Ward, Teresa Cooper Ward, Attorney at Law, Tallahassee, FL, for Defendant - Appellee

Appeal from the United States District Court for the Northern District of Florida, D.C. Docket No. 4:18-cv-00409-RH-CAS

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, and BRANCH, Circuit Judges.

**Opinion**

PER CURIAM:

Jennifer Smith, a law professor, appeals the district court's grant of summary judgment in favor of her employer, the Board of Trustees at the Florida Agricultural and Mechanical

University ("FAMU"), on her claims of gender discrimination in pay and retaliation under the Equal Pay Act,[1] Title VII,[2] and the Florida Civil Rights Act ("FCRA").[3] This lawsuit is Smith's second one against FAMU for gender discrimination in pay. She brought the first one in 2014 based on her original salary. Smith's claims here, however, center on salary adjustments made by FAMU which applied generally to law professors and occurred *after* the verdict in Smith's first (and unsuccessful) lawsuit. On appeal, Smith asserts that the district court erred by applying collateral estoppel and granting summary judgment on each of her claims. After a full review of the record, we affirm.

I. Background

A. Smith's First Lawsuit

Smith was hired to work in FAMU's law school in 2004. In 2014, she filed a lawsuit against FAMU alleging that the school discriminated against female law professors by paying them less than comparable male law professors. At that time, Smith was an associate law professor with tenure. On July 22, 2015, after a trial, a jury found that, although Smith was paid less than several comparator male law professors, sex was not a motivating factor in the determination of Smith's original salary when she began in 2004 ("*Smith I*"). After judgment was entered on the verdict, Smith filed two motions for a new trial and a motion to set aside the judgments.

In August 2015, about two weeks after judgment was entered on the verdict, and unbeknownst to Smith at the time, FAMU finalized an internal pay-inequity study which concluded that, on average, female law professors were paid less than male law professors at FAMU Law. Not long after that, in early 2016, FAMU's law *436 school applied a one-time "salary adjustment" to about one third of the law school faculty. The one-time salary adjustment increased Smith's salary by roughly $10,000. FAMU also made four other changes to faculty salaries that were applied generally. Learning of the pay-inequity study, Smith then filed a motion to set aside the judgment, arguing that the school's one-time salary adjustment demonstrated that FAMU had thereby "been caught" committing "fraud on the court regarding [Smith's] salary inequity case." The district court denied Smith's motion to set aside the judgment. Smith appealed the jury verdict in FAMU's favor and the denials of her post-verdict motions to this Court. *Smith v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, 687

**Defendant's Exhibit 7**

**APP 68**

Case 4:24-cv-00367-MW-MAF    Document 17-7    Filed 03/13/24    Page 3 of 8
Smith v. Florida A & M University Board of Trustees, 831 Fed.Appx. 434 (2020)
2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

F. App'x. 888 (11th Cir. 2017) (per curiam). After considering both the 2015 pay-inequity study and FAMU's 2016 one-time salary adjustment, we affirmed, reasoning that

> FAMU's pay-inequity study was based entirely on publicly available data that Professor Smith drew upon in her presentation to the jury. Indeed, she persuaded the jury that she was paid less than comparable male professors. Nor are the remedial measures taken to correct the pay difference a confession that they were the product of gender bias.

*Smith*, 687 F. App'x. at 889.

### B. FAMU's Salary Changes

Because the changes to FAMU faculty salaries since *Smith I* mentioned above are relevant to this appeal, we pause to explain them in greater detail. The changes fell into one of five categories. First, as referenced above, the FAMU law school made a one-time salary adjustment in 2016 which brought all tenured full professors up to at least $140,000 and all tenured associate professors to at least $120,000. But the adjustment was not widespread: it affected only a dozen of FAMU's roughly 36 faculty members. Further, the adjustment applied with equal force to both males and females. According to one of the deans in charge of making the salary adjustment, changes were based exclusively on "rank, tenure status," and "length of time"—not "qualitative factors" such as "reputation, ... teaching effectiveness, or any other type of subjective criteria that might go into hiring somebody." Second, FAMU gave a university-wide 1% cost-of-living raise to all professors. Third, all FAMU law school professors who did not receive a promotion or other pay increase between January 1 and June 16, 2016 received a 1% lump-sum bonus. Fourth, associate professors who were promoted to full professor before 2017 received a standard salary increase of 9 percent.[4] Fifth, routine changes to professor salaries reflected the addition or removal of administrative duties or a shift between a 9-month and 12-month schedule.

Pursuant to FAMU's salary changes, Smith received a one-time salary adjustment from $115,278.63 to $125,000, putting her salary above the $120,000 mark for associate professors; a 1% cost-of-living raise; and, upon her subsequent promotion to full professor, a 9% pay increase.[5] She did not, however, receive a 1% lump sum bonus, as she had received a pay increase during the one-time adjustment. And she was not affected by routine administrative or shift changes. Smith's annual salary by the end of 2016 was $136,250.

Regarding the one-time salary adjustment in 2016, two more things are noteworthy. **\*437** First, there was an earlier draft of this proposal. On August 22, 2016, before the salary adjustments were finalized, the interim dean emailed FAMU officials with a draft of proposed salary adjustments in which Smith's salary was recommended to be increased to $138,000. This figure was very close to the actual salary of the highest paid male associate professor, Jeffrey Brown, who at that time was paid $138,330 and was not subject to the one-time salary adjustment. An associate dean of the law school who was closely involved in crafting that recommendation testified in his deposition that he (and other law school administrators with whom he had collaborated) had at first proposed the $138,000 figure in part because he was attempting at that time to bring all tenured associate professor salaries "a little closer" to Brown's salary. FAMU ultimately decided against raising all tenured associate professor salaries closer to Brown and instead chose to consider his salary as an "outlier." Accordingly, the 2016 one-time adjustment to Smith's salary as a tenured associate professor was instead set at $125,000, which was $5,000 greater than all other tenured associate professors other than Brown. The associate dean testified that Smith received $5,000 more than the other tenured associate professors in part because she had been tenured for a greater length of time, and because of "other factors."

The second noteworthy aspect of the 2016 one-time salary adjustment is FAMU's stated purpose in making it. One of the deans tasked with crafting the adjustment testified that correcting "gender disparity" simply "wasn't the project." In other words, he explained, "[he] didn't begin from the proposition that there was gender disparity." Rather, the adjustment was intended to address "[c]ompensation inequities," the "most obvious" of which was "salary inversion," that is, "when faculty of lower rank and tenure status earn more than faculty with higher rank and tenure status." Salary inversion at the law school "resulted from the State's inability to provide regular cost of living raises to present or current faculty, combined with new faculty

## Defendant's Exhibit 7

hiring under the economic conditions prevailing on the date of new hiring." And although "[t]here are high end 'outliers' in each category" of rank and tenure status, the one-time salary adjustment "does not attempt to make the level of compensation paid to outliers the norm." Along these lines, the one-time salary adjustment "does not adopt a prohibition against inversion," but rather, "[i]t merely implements a restart" for those salaries that had been affected by inversion in the past. That is to say, "[s]alary inversion may reoccur."

### C. Smith's 2016 EOP Complaint

In December 2016, Smith filed a complaint with FAMU's Office of Equal Opportunity Programs ("EOP"), alleging sex-based discrimination and retaliation in violation of FAMU regulations because the law school contemplated but declined to increase her salary to $138,000 during the 2016 one-time salary adjustment. She specifically alleged that FAMU had made the 2016 one-time salary adjustment "because [FAMU] found pay inequality based upon gender in its August 2015 [pay-inequity] study." She further claimed that she was suffering from sex discrimination based upon a salary differential between herself and Brown.

The EOP issued a report the ("2017 EOP Report") denying Smith's claims. Therein, the EOP refuted Smith's suggestion that the 2015 pay-inequity study concluded that all pay inequities were based upon gender, stating that "gender was not the sole or primary factor for any disparities in the August 2015 [pay-inequity] study." The EOP further found that there **\*438** is no evidence that any then-existing disparity between Brown's and Smith's salaries was "due to a discriminatory factor." The EOP reached this conclusion in part because

> Brown was offered a higher salary upon hire in 2009 than complainant was earning at the time. Brown had earned tenure at Northern Illinois University College of Law at the Associate Professor rank. He also had taught for 13 years in the United States, Bulgaria, Macedonia and the Russian Federation prior to coming to FAMU.

In other words, Brown "was paid upon hire according to his outstanding credentials at the time." By comparison,

**Defendant's Exhibit 7**

Smith "had limited teaching experience. She had served as a Faculty Lecturer for two weeks at Federal Publications and as a Faculty Instructor for a semester at the Center for Career Education (The George Washington University)." Thus, Smith's allegations were "unsubstantiated."

### D. Smith's Second Lawsuit

In July 2018, Smith filed the instant action against FAMU in Florida state court, and FAMU removed the case to federal court. She claimed that FAMU violated the Equal Pay Act because her current salary was lower than that of other full professor comparators who are male. Smith also claimed that FAMU violated Title VII and the FCRA because "actions" taken by FAMU with regard to pay discriminated against her on the basis of sex. Lastly, she claimed that FAMU retaliated against her "for her 2014 lawsuit" in violation of the Equal Pay Act, Title VII, and the FCRA because she "was negatively treated with regard to the salary increases." The parties eventually filed cross-motions for summary judgment.

The district court granted summary judgment to FAMU. The court first concluded that the _Smith I_ judgment, which was entered on July 22, 2015, collaterally estops Smith from asserting that her pay as of that date resulted from sex discrimination. The court then denied Smith's Equal Pay Act, Title VII, and FCRA discrimination claims. In doing so, the court concluded that any current disparity between Smith and her alleged comparators predated the _Smith I_ verdict or is explained by completely objective, nondiscriminatory factors. The district court also concluded that FAMU's decision to not raise Smith's salary to match "outliers" such as Brown was consistent with the way it treated other professors of like tenure and rank. Lastly, the district court denied Smith's retaliation claims because there was no affirmative evidence of retaliation in FAMU's post-_Smith I_ changes to Smith's pay, but rather, Smith's one-time adjustment to $125,000 could even be said to be "more generous" than the salary adjustments of some others. After being denied a motion to reconsider, Smith timely appealed.

### II. Standards of Review

We review a district court's grant of a motion for summary judgment de novo. _Smith v. Haynes P.C._, 940 F.3d 635, 642 (11th Cir. 2019). We construe the evidence in the light most favorable to the non-moving party, and we will affirm if we

**APP 70**

2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

find no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010).

We review the district court's decision to apply collateral estoppel *de novo* and its findings of fact supporting its determination on issue preclusion for clear error. *Quinn v. Monroe Cty.*, 330 F.3d 1320, 1328 (11th Cir. 2003). We may conclude that a district court's factual finding is clearly **\*439** erroneous when we possess the definite and firm conviction that a mistake has been committed. *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11th Cir. 2010).

### III. Discussion

#### A. Equal Pay Act Discrimination Claim

 [1]  Smith contends that the district court erred by granting summary judgment to FAMU on her Equal Pay Act claim because the pay disparity in *Smith I* was not carried forward, but rather, FAMU "reset" its salary formula through the 2016 one-time salary adjustment. And under FAMU's "new" salary formula, she avers, she should be but is not being paid the same as Professor Brown. We disagree. Even though FAMU's 2016 one-time adjustment "reset" *some* of its faculty member's salaries, the current pay disparity between Smith and Brown is clearly attributable to the preexisting and benign disparity between them from *Smith I.*

An employee establishes a *prima facie* case under the Equal Pay Act by showing that the employer paid differing wages to employees of opposite sexes for "equal work on jobs ... which require[ ] equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003). Once the employee has established a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the payments were made pursuant to:

> (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is

paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (emphasis in original). "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided *no basis* for the wage differential.' " *Steger*, 318 F.3d at 1078 (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995)). The employee may then rebut the employer's defense by putting forth evidence demonstrating that the employer's alternative bases for the pay disparity were pretextual or offered as a post-event justification for a sex-based differential. *Id.* A district court's factual finding that an employer has demonstrated that sex provided no basis for the pay disparity is reviewed for clear error. *Id.*

Smith cannot establish a *prima facie* case of pay discrimination under the Equal Pay Act. Because Smith is collaterally estopped from asserting that the pay disparity between herself and Brown at the time of the *Smith I* verdict was discriminatory on the basis of sex,[6] she may establish a *prima facie* case of discrimination in the **\*440** instant case only upon showing that the current disparity was not simply carried forward. She cannot meet this burden. FAMU has made no changes to Brown's or Smith's salary that would suggest that the current disparity between them is based on sex in any way. The 2016 one-time salary adjustment affected only a third of FAMU's faculty members—but not Brown's. And no evidence supports the notion that sex in any way contributed to that adjustment. Rather, the adjustment applied evenhandedly to both men *and* women. And the unequivocal testimony from those who engineered the one-time adjustment was that sex was never considered as a factor. Accordingly, we hold that Smith's Equal Pay Act claim fails.[7]

#### B. Title VII & FCRA Discrimination Claims

 [2]  Smith also cannot establish a *prima facie* case of sex-based discrimination under Title VII and the FCRA. On appeal, Smith contends that FAMU discriminated against her on the basis of sex by neglecting to apply its "new salary formula" to her during the 2016 one-time salary adjustment in order to bring her salary to $138,000.[8] We disagree.

**Defendant's Exhibit 7**

**APP 71**

2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). The FCRA makes it unlawful for employers to discriminate on the basis of sex. Fla. Stat. § 760.10(1)(a). [9] We review discrimination claims under Title VII and the FCRA that involve circumstantial evidence under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387, 1389–90 (11th Cir. 1998)). To establish a *prima facie* case under that framework, a plaintiff must show that she was a qualified member of a protected class and subjected to an "adverse employment action" in contrast to similarly situated employees outside of the protected class. *Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008). To demonstrate an adverse employment action, "an employee **\*441** must show a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir.2001). Importantly, "the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Here, Smith has not met her burden to show that FAMU committed any material adverse employment action against her since *Smith I*, and therefore she cannot establish a *prima facie* case of sex-based discrimination. Smith's bald allegation that FAMU did not apply its "new salary formula" to her during the 2016 one-time salary adjustment ignores the evidence. Smith received a nearly $10,000 increase— which resulted in a final salary that was $5,000 greater than any other associate professor who had similarly been affected by the adjustment. Smith's assertion that her salary should have been raised to $138,000 to match Brown falls flat because Brown was not affected by the one-time adjustment. No other associate professor—male or female—received a salary increase to match Brown's. And because the *Smith I* jury determined that the disparity between Brown and Smith's salaries at that time was not based on sex, FAMU was under no obligation to raise her salary to match his. Thus, as compared to every other associate professor who was affected by the one-time adjustment, Smith was not treated adversely. We therefore conclude that Smith's Title VII and FCRA claims necessarily fail.

**Defendant's Exhibit 7**

## C. Retaliation Claims

**[3]**  Smith maintains that the district court erred by finding that FAMU did not retaliate against her for litigating her case in *Smith I*. She contends that FAMU retaliated against her by neglecting to adjust her salary to the $138,000 initially considered by FAMU before it finalized the amounts for the 2016 one-time salary adjustment because such amount would have more closely approximated Brown's $138,330 salary. As with her discrimination claims, we disagree that this decision by FAMU constitutes a materially adverse action.

The Equal Pay Act provides that it is unlawful to "discriminate against any employee because such employee has filed any complaint." 29 U.S.C. § 215(a)(3). Likewise, Title VII and the FCRA also prohibit employers from retaliating against an employee because she has "opposed any ... unlawful employment practice." 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). Smith may establish her *prima facie* case of retaliation under all three statutes by proving (1) that she engaged in statutorily protected activity, (2) that she suffered a materially adverse action, and (3) that the adverse action was causally related to the protected activity. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 n.9 (11th Cir. 2018) (Equal Pay Act); *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (Title VII); *Alvarez*, 610 F.3d at 1268, 1271 (FCRA). "[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). Note that this is a "more liberal view of what constitutes an adverse employment action" than in the discrimination context. *Id.*; *see also id.* at n.14. We have recognized that "employer actions that 'deprived [the employee] of compensation which he otherwise would have earned clearly constitute adverse employment actions **\*442**  for purposes of Title VII [retaliation].' " *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (alteration in original) (quoting *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001)). Such deprivations can include denials of pay raises to which an employee is entitled. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds by White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345.

APP 72

Case 4:24-cv-00367-MW-MAF    Document 17-7    Filed 03/13/24    Page 7 of 8
Smith v. Florida A & M University Board of Trustees, 831 Fed.Appx. 434 (2020)
2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

Here, it is undisputed that Smith's involvement in her 2016 case constituted "protected activity." But like her discrimination claims, Smith cannot show that she suffered an adverse action as a result of that protected activity. The record is void of any evidence that she was entitled to receive the same salary as Brown after the jury in *Smith I* concluded that the salary discrepancy between them was not motivated by gender discrimination. Smith makes much of one of the proposed drafts of the 2016 one-time adjustment which would have put her at the $138,000 mark. But, as the district court noted at the hearing on the motion for summary judgment, this figure was merely a "suggestion" in the midst of a lengthy process and was ultimately discarded. FAMU cycled through over ten drafts of proposed changes to faculty salaries. To say that any one of those drafts entitled Smith to a specific salary would be absurd. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (stating plainly that the federal courts "do not sit as a super-personnel department that

re-examines an entity's business decisions." (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))). Further, there is no evidence that FAMU discarded the proposal for $138,000 for an improper reason. Smith therefore fails to show she suffered an adverse action and thus cannot make a *prima facie* case of retaliation.

### IV. Conclusion

Accordingly, we **AFFIRM** the district court's grant of summary judgment. We also **DENY** Smith's motion to supplement the record.

**All Citations**

831 Fed.Appx. 434, 2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

### Footnotes

1    29 U.S.C. § 206(d)(1).

2    42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a).

3    Fla. Stat. §§ 760.01(b) and 760.10.

4    Under a later union contract, the full-professor salary-promotion increase was set at 15 percent for those promoted in 2017 or after.

5    Smith was promoted to full professor effective August 8, 2016.

6    Collateral estoppel, often referred to as issue preclusion, "precludes the relitigation of an issue that has already been litigated and resolved in a prior proceeding." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998) (emphasis added). This type of preclusion differs from that imposed by the doctrine of *res judicata*, which bars the relitigation of entire claims. *Id. at 1359*. Here, the district court did not find, as Smith asserts it did, that her entire "gender pay claim was collaterally barred." Rather, the district court appropriately applied collateral estoppel to preclude her from challenging a specific factual issue decided by the jury in her 2014 trial: whether FAMU's disparate payment of salaries that occurred before the trial was motivated by gender discrimination. The district court nevertheless made clear that Smith was permitted to litigate the issue of whether any new action taken by FAMU after the resolution of *Smith I* was discriminatory.

7    Smith relies heavily upon *Board of Regents of University of Nebraska v. Dawes*, 522 F.2d 380 (8th Cir. 1975), to challenge the 2016 salary adjustment. *Dawes* is inapposite because there the university explicitly set out to overhaul its salary system by making adjustments based on sex. 522 F.2d at 381. Here, the evidence

## Defendant's Exhibit 7

**Smith v. Florida A & M University Board of Trustees, 831 Fed.Appx. 454 (2020)**

2020 Fair Empl.Prac.Cas. (BNA) 388,785, 384 Ed. Law Rep. 743

clearly shows that sex played no part in FAMU's 2016 one-time salary adjustment, or in any other change to faculty salaries since the verdict in _Smith I_.

8    Smith also contends that the 2017 EOP Report's statement that "gender was not the sole or primary factor for any disparities in the August 2015 study" is dispositive proof that FAMU discriminated against her on the basis of sex in violation of Title VII and the FCRA by paying her less than comparator Brown. This argument fails to appreciate the force of collateral estoppel. The 2015 pay-inequity study examined the exact same data the jury used to conclude that Smith's pay disparity was not based on gender. _See Smith_, 687 F. App'x at 889 ("FAMU's [pay-inequity] study was based entirely on publicly available data that Professor Smith drew upon in her presentation to the jury. Indeed, she persuaded the jury that she was paid less than comparable male professors."). Thus, regardless of how the EOP office characterized the 2015 pay-inequity study, that study simply cannot overcome the jury's finding in _Smith I_ that any pay differential between Brown and Smith at that time was not based on sex.

9    Florida's unlawful employment practices statute makes it unlawful for an employer to "discriminate against any individual with respect to compensation ... because of such individual's ... sex." Fla. Stat. § 760.10(1)(a).

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Defendant's Exhibit 7**

**APP 74**

**80 - Order Granting in Part Leave to File an Amended Complaint**

**07/03/2024**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**JENNIFER SMITH,**

                    **Plaintiff,**

**v.**                                    **Case No: 6:24-cv-457-PGB-RMN**

**FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,**

                    **Defendant.**
_____/

## ORDER

This cause comes before the Court on Plaintiff Jennifer Smith's ("**Plaintiff**") Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties (Doc. 72 (the "**Amended Motion to Amend**")). Defendant Florida Agricultural & Mechanical University ("**FAMU**") Board of Trustees ("**Defendant**") has responded in opposition (Doc. 74 (the "**Response**")). Upon consideration, the Motion is due to be granted in part and denied in part.

## I.     BACKGROUND

Plaintiff, then a tenured full professor at FAMU's law school, filed this action in state court on October 17, 2023. (*See* Doc. 1-1, ¶¶ 7–10; Doc. 1, pp. 1–2). On January 29, 2024, prior to service of the first Complaint on Defendant, Plaintiff filed an Amended Complaint (Doc. 1-1 (the "**FAC**")) in the state court. Defendant subsequently removed the action to the instant court. (Doc. 1).

**APP 76**

In the FAC, which remains operative at this time, Plaintiff alleges that she initially sued Defendant after learning she was being paid less than a male professor who performed substantially equal work to Plaintiff but had less experience than her. (*See* Doc. 1-1, ¶¶ 22–32). Plaintiff further contends that when Defendant learned of her unserved Complaint, it revived a stale investigation involving an encounter Plaintiff had with a disruptive student and used it as a pretext to terminate her. (*Id.* ¶¶ 75–78). Accordingly, in the FAC, Plaintiff brings six (6) counts against Defendant, asserting claims for: (1) discrimination in compensation under the Equal Pay Act ("**EPA**"); (2) retaliation under the EPA; (3) breach of contract; (4) First Amendment retaliation under the United States and Florida Constitutions; (5) violations of procedural due process under 42 U.S.C. § 1983; and (6) preliminary and permanent injunctive relief. (*See generally* Doc. 1-1).

On May 20, 2024, Plaintiff moved for leave to file a second amended complaint ("**SAC**") to assert additional claims against Defendant and add new parties to the suit (Doc. 54 (the "**First Motion to Amend**")). Therein, Plaintiff explained that the newly added claims "will significantly alter the pleadings to reflect information learned since amending her original complaint." (*Id.* at p. 4). The First Motion to Amend was filed prior to the deadline for amending the pleadings set forth in the Case Management and Scheduling Order (Doc. 45 (the "**CMSO**")), which has since expired on May 31, 2024. (*See* Doc. 45, p. 1; Doc. 54). However, in the First Motion to Amend, Plaintiff also requested an open-ended

**APP 77**

extension of time for filing the SAC until this Court rules on her pending motion for preliminary injunction, which Plaintiff "does not want to moot by amending the complaint." (Doc. 54, p. 1). The First Motion to Amend included a Local Rule 3.01(g) Certificate indicating that the requested relief was opposed. (*Id.* at pp. 6–7).

Defendant filed a response in opposition to the First Motion to Amend, arguing, *inter alia*, that the First Motion to Amend should be denied because it "fail[ed] to attach a proposed amended pleading, and fail[ed] to identify the proposed additional defendants and the substance of the claims against them." (Doc. 59, p. 2). Subsequently, Plaintiff filed a Notice of Filing Amended Local Rule 3.01(g) Certificate for the First Request to Amend (Doc. 65 (the "**Notice**")). Plaintiff attached to the Notice a copy of the proposed SAC and indicated that, despite providing the proposed pleading to Defendant, the First Motion to Amend remained opposed. (Docs. 65, 65-1).

Upon Defendant's request, the Court struck the Notice as an improper filing, but provided Plaintiff the opportunity to re-file an amended version of her First Motion to Amend which would be changed solely to add a copy of the proposed SAC as an exhibit. (Docs. 69, 71). Pursuant to the Court's directive, Plaintiff filed the Amended Motion to Amend, attaching the SAC as an exhibit. (Docs. 72, 72-1).

The proposed SAC adds a new count against Defendant under Title VII. (Doc. 72-1, pp. 42–43). It also adds eight (8) new defendants to the suit, including five (5) faculty members of FAMU (the "**FAMU faculty defendants**"), as well as

3

one (1) law firm and two (2) of its attorneys[1] (the "**law firm defendants**"). (*See* Doc. 72-1). The SAC alleges that each of the new defendants played a role in Plaintiff's retaliatory termination and brings counts against them for: (1) conspiracy to interfere with civil rights (law firm defendants); (2) failure to prevent conspiracy (law firm defendants), and (3) civil conspiracy (FAMU faculty defendants). (Doc. 72-1, pp. 43–48). The SAC also amends the facts Plaintiff has pled against the instant Defendant, both adding new allegations and omitting others. (*Compare* Doc. 1-1, ¶¶ 8–97 *with* Doc. 72-1, ¶¶ 16–148).

In its Response, Defendant primarily argues that Plaintiff's request to amend the FAC should be denied on grounds of futility. (*See* Doc. 74). To this end, Defendant applies the motion to dismiss standard to each count of the FAC, including the counts that predate the requested amendment.  (*Id.* at pp. 6–18).

## II. LEGAL STANDARD

"The decision whether to grant leave to amend a complaint is within the sole discretion of the district court." *Laurie v. Ala. Ct. of Crim. Appeals*, 256 F.3d 1266, 1274 (11th Cir. 2001). However, pursuant to Federal Rule of Civil Procedure 15, courts should "freely" grant parties leave to amend pleadings "when justice so requires." FED. R. CIV. P. 15(a)(2). "This standard of liberality is mandated absent any apparent reason to the contrary." *Gropp v. United Airlines, Inc.*, 847 F. Supp.

---

[1]    In the SAC, Plaintiff alleges that the law firm and attorneys had been notified by a different FAMU professor that Plaintiff had filed, but had not yet served, a lawsuit against Defendant. (*See* Doc. 72-1, ¶ 90). Plaintiff further avers that the law firm and attorneys informed FAMU's general counsel—whom Plaintiff also seeks to add as a defendant in this matter—of the unserved lawsuit and that they entered a "formal or informal agreement" with general counsel to carry out Plaintiff's alleged unlawful termination. (*Id.* ¶¶ 92–95).

APP 79

941, 945 (M.D. Fla. 1994); *see Laurie*, 256 F.3d at 1274. In fact, to deny a motion to amend the complaint, there must be a substantial reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *E.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laurie*, 256 F.3d at 1274.

Accordingly, the Eleventh Circuit has instructed that "district courts should generally exercise their discretion in favor of allowing amendments to reach the merits of the dispute." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021); *see also In re Engle Cases*, 767 F.3d 1082, 1108 (11th Cir. 2014) ("The thrust of Rule 15(a) is to allow parties to have their claims heard on the merits, and accordingly, district courts should liberally grant leave to amend when 'the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief.'" (quoting *Foman*, 371 U.S. at 182)).

## III.   DISCUSSION

The Court finds that denial of Plaintiff's request for leave to file the SAC is not warranted. Plaintiff has not acted with undue delay in seeking to amend the FAC. Plaintiff filed her initial request to do so prior to the CMSO's deadline for amending the pleadings. (*See* Doc. 45, p. 1; Doc. 54). Indeed, Plaintiff's Notice containing the proposed SAC as an exhibit was also filed before this deadline expired. (*See* Doc. 65). Although the Court ultimately directed Plaintiff to re-file

the same materials in a different form, Plaintiff did not act with undue delay in initially seeking to amend the FAC. (*See* Doc. 71).

Additionally, the Court finds no evidence that Plaintiff has acted in bad faith in seeking to amend the FAC. Moreover, this is only Plaintiff's second amendment to the pleadings. (*See* Doc. 1-1). Accordingly, Plaintiff has not failed to cure deficiencies in the allegations through amendments previously allowed. There is no apparent prejudice to Defendant in allowing the amendment. Further, the Court does not find that the claims Plaintiff seeks to add are futile. Instead, Defendant's arguments regarding the claims' lack of merit would be better addressed at the motion to dismiss stage, where the Court will have the benefit of briefing from both sides.

Consequently, Plaintiff's request to amend the pleadings is granted. However, Plaintiff's request for an indefinite extension of time for filing the SAC is denied. The Court will not delay the case for an indeterminate period of time so that it may rule on a request for preliminary injunction brought under a complaint that is now obsolete.

## IV.   CONCLUSION

Accordingly, it is **ORDERED** as follows:

1.   Plaintiff's Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties (Doc. 72) is **GRANTED IN PART** and **DENIED IN PART**.

**APP 81**

2. Plaintiff's request to amend the First Amended Complaint is **GRANTED**.

3. Plaintiff's Amended Motion for an Extension of Time, and for Leave to File an Amended Complaint and Add Parties (Doc. 72) is **DENIED** in all other respects.

4. Plaintiff shall file Plaintiff's second amended complaint on or before July 8, 2024.

**DONE AND ORDERED** in Orlando, Florida on July 3, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

7

**APP 82**

**84 - Plaintiff's Amended Complaint (Stricken)**

**07/09/2024**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JENNIFER SMITH,

     Plaintiff,

v.                                                    Case No. 6:24-cv-00457-PGB-RMN

FLORIDA A&M UNIVERSITY
BOARD OF TRUSTEES; ALLYSON
WATSON, individually and in her
official capacity; D. DENISE
WALLACE, individually and in her
official capacity; LATONYA
BAKER, individually and in her
official capacity; LATRECHA
SCOTT, individually and in her
official capacity; RICA CALHOUN,
individually and in her official
capacity; GRAY ROBINSON, P.A.;
JULIE ZOLTY; RICHARD E.
MITCHELL, and SARAH REINER,

     Defendants.

_____

## <u>CORRECTED SECOND AMENDED COMPLAINT</u>

     Plaintiff, Jennifer Smith ("Professor Smith"), makes the following allegations

against Defendants Florida Agricultural & Mechanical University Board of Trustees

("Defendant FAMU" or "FAMU"), Allyson Watson ("Defendant Watson"), D. Denise

Wallace ("Defendant Wallace"), Gray Robinson, P.A. ("Defendant Gray Robinson"),

Latrecha Scott ("Defendant Scott"), Rica Calhoun ("Defendant Calhoun"), Julie Zolty

("Defendant Zolty"), Sarah Reiner ("Defendant Reiner"), and Richard E. Mitchell

("Defendant Mitchell").

**APP 84**

## **INTRODUCTION**

Over the past decade, school violence against faculty has emerged as a growing concern, with numerous incidents highlighting the vulnerability of educators. Reports indicate a troubling increase in physical assaults, verbal threats, and acts of intimidation directed at teachers and administrative staff.[1] University professors are not exempted from the increasing number of violent acts, intimidation, harassment or threats that students have displayed in recent years.[2]

Amid these growing concerns, on October 20, 2022, an unprovoked and enraged student, then-unknown to Professor Smith, barged into Professor Smith's class in progress to demand that she be allowed to sit to prepare for another class scheduled later that morning. Professor Smith reported the then-unidentified student's conduct to Associate Dean of Students, Reginald Green. Instead of following FAMU Regulations

---

[1] Susan D. McMahon et al., *Violence Against Educators and School Personnel: Crisis During COVID* Technical Report, AMERICAN PSYCHOLOGICAL ASSOCIATION (2022), https://www.apa.org/education-career/k12/violence-educators-technical-report.pdf.

[2] Claudia Lampman, Women Faculty at Risk: U.S. Professors Report on their Experiences with Student Incivility, Bullying, Aggression, and Sexual Attention, 5 NASPA J. ABOUT WOMEN IN HIGHER EDUC. 184, 184 (2012) ("In this study of a random sample of 524 professors . . . from 100 colleges and universities across the United States, 91% reported at least one act of student incivility/bullying, 25% experienced at least one sexual behavior from a student, and 1–2% said a student had used or threatened them with violence in the past year."); Colleen Flaherty, *Shattered: A Professor's Murder at the University of Arizona, Apparently by a Former Student, Raises Urgent Concerns About Campus Safety. He Wasn't the First Professor Killed At Work, Either.*, INSIDE HIGHER ED (Oct. 12, 2022), https://www.insidehighered.com/news/2022/10/13/professors-murder-campus-raises-urgent-safety-questions (detailing several university professors who were killed by students); *see also* Thyrie Bland, *FSW Professor Granted Temporary Restraining Order Against Student*, NEWS-PRESS (Mar. 2, 2018), https://www.news-press.com/story/news/education/2018/03/02/fsw-professor-granted-temporary-restraining-order-against-student/389244002/; Nadine El-Bawab, *UNC Chapel Hill Professor Killed in Office was Shot 7 Times, Medical Examiner Says*, ABC NEWS (Oct. 6, 2023), https://abcnews.go.com/US/unc-chapel-hill-professor-killed-office-shot-7/story?id=103780698.

APP 85

and forwarding the reported complaint to FAMU's Compliance & Ethics department or investigating the complaint pursuant to the Florida A&M University College of Law's Student Code of Conduct, Associate Dean Green did nothing, not even preserve the video surveillance footage of the incident. Nearly 100 days passed since the student encounter, still FAMU had not acted. It was not until shortly after Professor Smith submitted a response to the U.S. Equal Employment Opportunity Commission's ("EEOC") investigation of equal pay allegations that FAMU initiated a retaliatory investigation targeting only Professor Smith for the student's intrusion. This employment discrimination and civil rights case was initially centered on a retaliatory investigation precipitated by Professor Smith's campaign for equal pay for women at the FAMU College of Law. Finding the enraged student's version of the classroom encounter completely baseless, FAMU independently manufactured a claim of retaliation to fabricate cause to terminate Professor Smith. This unlawful termination and blatant retaliation implicate several contractual and previously unpled civil rights issues transforming this case into a much more serious action, requiring judicial intervention.

Professor Smith asserts the following allegations upon information, belief, and investigation of counsel:

## JURISDICTION AND VENUE

1.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 1343. Jurisdiction is also based on federal questions under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the First and Fourteenth Amendments to the U.S. Constitution, and 42. U.S.C. § § 1983, 1985 and 1986.

2.     Venue is proper in this district under 28 U.S.C. § 1441 because Defendant FAMU removed from the Ninth Judicial Circuit Court in and for Orange County, and the Orlando Division of the Middle District of Florida is the "district court of the United States for the district and division embracing the place where such action [wa]s pending." Moreover, the locus of operative facts and many of the witnesses and parties are located or operate in this district consistent with the command of § 1391.

## ADMINISTRATIVE PREREQUISITES

3.     All conditions precedent to bringing this action have occurred.

## PARTIES

4.     Professor Smith is a woman, United States citizen, and resident of Orange County, Florida.

5.     Defendant FAMU is a state university within the Florida state university system headquartered in Tallahassee, Florida. Defendant FAMU operates a law school in Orlando, Florida (the "College of Law" or "COL").

6.     Defendant Watson is the Provost and Vice President for Academic Affairs

4

**APP 87**

at FAMU. Defendant Watson is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

7.     Defendant Wallace is the General Counsel of FAMU. Defendant Wallace is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

8.     Defendant Baker is the Director of Compliance and Chief Privacy Officer for FAMU. Defendant Baker is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

9.     Defendant Scott is the Director of Equal Opportunity Programs (EOP) for FAMU. Defendant Scott is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

10.     Defendant Calhoun is the Chief Compliance & Ethics officer for FAMU. Defendant Calhoun is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

11.     Defendants Watson, Wallace, Baker, Scott, and Calhoun are collectively referred to as the "University Employee Defendants."

5

12.    Defendant Mitchell is of counsel for Gray Robinson and serves as outside counsel to FAMU.

13.    Defendant Zolty is an associate attorney with Gray Robinson and serves as outside counsel to FAMU.

14.    Defendant Sarah Reiner is a partner with Gray Robinson and is outside counsel to FAMU.

15.    Defendant Gray Robinson is a Florida law firm that serves clients nationally from 15 offices across Florida and Washington, D.C.

16.    Defendants Mitchell, Zolty, Reiner and Gray Robinson are collectively referred to as the "Gray Robinson Defendants."

**GENERAL ALLEGATIONS**

17.    Professor Smith was employed by FAMU from 2004 up through and including at least April 2024 when she received monies from FAMU, and she had an exemplary record of service.

18.    In May 2004, Professor Smith started working voluntarily for Defendant FAMU at the COL based on a fulfilled promise by then-Dean Percy Luney that she would be paid in the future for her efforts in establishing the law clinics at the new law school. Her official start date as a law professor was August 8, 2004. (Ex. 21)

19.    Professor Smith performed the duties of a law professor, which include teaching, scholarship and service, and she was subject to the direction and control of

Defendant FAMU at all times relevant to this litigation. (Ex. 9)

20.    Defendant FAMU has neither changed the duties and responsibilities of law professors, nor the skill or expertise required of law professors from 2004 to date. Professors at the COL perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all professors at the law school, irrespective of subject matter.  (Exs. 4 (Pernell Depo), 9).

21.    Defendant FAMU does not use subject matter "specialists" to classify law professors or change job descriptions as Defendant FAMU had misrepresented to the EEOC on December 12, 2022 (Ex. 18, p. 6), but later admitted on May 5, 2023. (Ex. 1, p. 3)

22.    Defendant FAMU has neither employed nor maintained any logical or consistent approach in assigning law professors to teach courses.

23.    Professor Smith was a tenured full professor from 2016 until her unlawful, purported termination.

24.    On August 16, 2013, then Dean Pernell, Professor Smith's immediate supervisor, evaluated her in her duties as excellent in teaching, scholarship and service for the 2012-13 academic year. (Ex. 21)

25.    In May 2014 for the year 2013-14, then Dean Pernell evaluated Professor Smith in her duties as excellent in teaching, scholarship and service for the 2013-14

academic year. (Ex. 21)

26.    Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported that to BOT board members at a meeting with the faculty at the College of Law.

27.    In 2015 after Professor Smith sued for equal pay, Defendant FAMU recognized there was gender inequity of up to $20k in its law faculty salaries in "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," prepared by the Florida A&M University Office of Institutional Research (August 2015) (Ex. 2), which found that for tenured full professors:

> a)  Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (p. 3)
>
> b)  The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (p. 10)
>
> c)  Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (p. 13)

**APP 91**

## EQUAL PAY ALLEGATIONS

28.   In 2016, Defendant FAMU informally or formally created a "lockstep" salary structure whereby associate professors were set at a base salary of $120,000 and full professors were set at a base salary of $140,000, subject to nominal increases based on that person's year at the particular rank, tenure status, and years tenured. (Ex. 12)

29.   On August 9, 2021, Defendant FAMU hired Ewanrinareto "Areto" Imoukhuede ("Comparator"), a male professor to the same or similar position as Professor Smith – tenured full professor at the College of Law. Comparator has the same core and essential duties, which are teaching, scholarship and service. (Ex. 9, pp. 49, 52-53)

30.   Professor Smith and Comparator performed substantially equal work in terms of skill, effort, and responsibility, under similar working conditions as tenured law professors at the COL. (Ex. 4; Ex. 9, pp. 49, 52-53)

31.   Despite performing substantially equal work, Defendant FAMU paid Professor Smith nearly $25,000.00 less than Comparator for performing the same or similar job duties when Professor Smith has ten years more legal experience than Comparator.

32.   Comparator's pay at the time he was hired is about $25,000.00 greater than the 2016 "lockstep" structure.

33.   The increased pay that Comparator received and receives has not been

9

based on superior skill, education, or experience or any other legitimate factor.

34.    The Fair Labor Standards Act, as amended by the Equal Pay Act ("EPA"), 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

35.    Defendant FAMU has discriminated against Professor Smith on the basis of sex by paying her a lower wage rate than Comparator for equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions, in violation of the Equal Pay Act.

36.    Defendant FAMU violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

37.    As a result of Defendant FAMU's unlawful conduct, Professor Smith has suffered lost compensation and other damages, and is entitled to attorney's fees and costs.

## SPECIFIC ALLEGATIONS

38.    On May 9, 2022, Professor Smith emailed the president of FAMU, Dr. Larry Robinson, about the disparity in pay between her and Comparator. Given the history of litigation and the media attention it garnered,[3] resulting in FAMU's 2015

---

[3]Professor Files Gender-Discrimination Suit Against FAMU, https://www.tallahassee.com/story/news/local/2014/08/07/professor-files-suit-against-famu-college-of-law/13725423/.

salary Study (Ex. 2),[4] Professor Smith reasonably believed that notifying the FAMU President that women were still underpaid at the law school would invoke swift change.

39.     On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant FAMU's Equal Opportunity Program ("EOP").

40.     On September 22, 2022, Defendant FAMU's EOP department sent its investigative report to Professor Smith (2022-FAMU-F-05-005), denying any pay inequities without any rationale for paying the Comparator more than Professor Smith. From this point, Defendant FAMU and University Employee Defendants began a campaign of retaliatory acts based on Professor Smith's statutorily protected activity.

41.     On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

42.     October 20, 2022, at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an incensed, entitled and unidentified female student, later identified as Michelle Wanamaker ("MW"), whose is now known as Michelle Sadiki. Professor Smith regularly reported conduct violations to Green via text message because she chaired the Student Conduct & Disciplinary Committee for several years, and Green was a member of the Committee as Associate Dean of Students.

---

[4] "The study was conducted at the request of the university's Provost, and in response to recently raised concerns about potential salary inequities within the college." (Ex. 2, p. 2).

11

43.     Professor Smith reported, in a text message to Reginald Green immediately after the incident, that MW displayed deliberate, aggressive, and confrontational behavior toward Professor Smith. Professor Smith specifically described MW as "so rude" and "aggressively rude," because MW barged into an ongoing class session that she was not enrolled in, despite MW being fully aware that the classroom was in use by Professor Smith as there was  a crowd of over 40 students gathered in the hallway, respectfully waiting for permission to enter. MW confirmed she knew Professor Smith's class was in session when MW alleged in a facially baseless complaint she filed against Professor Smith a week later that stated:

> MW was "visibly and audibly upset about [her] inability to enter [the] class and adequately prepare for lecture… [MW] was anxious to enter [the] classroom… Professor Smith was on notice that **[students in the hallway] were anxiously awaiting entrance to prepare for our class**… [Professor Smith's] adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor [Maritza] Reyes' Evidence class.

(Ex. 6, p. 24) (emphasis added).

44.     Notwithstanding a hallway full of her classmates, MW deliberately and intentionally entered the classroom through the **back door** and declared that her professor told her that she needed to sit down to get ready for the next class starting at 10:30am.

45.     After being instructed to leave by Professor Smith, MW became even more furious and positioned herself outside the **front door** of the classroom, awaiting an

opportunity to re-confront Professor Smith about Professor Smith using the classroom, which Professor Smith had reserved a few weeks earlier for a make-up class. (Ex. 3) Professor Smith had never encountered or seen MW before this occurrence at the law school and had no idea who this unhinged person was. Yet a week after the incident and unbeknownst to Professor Smith, MW filed a complaint against Professor Smith in which MW blatantly and falsely mischaracterized her encounter with Professor Smith, shamelessly and recklessley distorting the truth so that MW would evade liability:

> I am utterly sickened and discouraged by this violent encounter within the walls of our law school Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence.

46.     On November 1, 2022, Professor Smith went to follow up on the October 20, 2022 complaint she filed against MW by visiting Associate Dean Green's office. Professor Smith was told by his assistant, Teresa Pissini, that Associate Dean Green was on vacation, so his assistant emailed Professor Smith acknowledging Professor Smith's visit and said that she would let Associate Dean Green know.

47.     Classes ended for the semester 17 days later on November 18, 2022.

48.     Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW

13

did not know that she was clerking for the firm where Professor Smith had been a partner. So, on December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities and job security with the firm:

> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor.  I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*
>
> *Best,*
>
> *Prof. Smith*

49.     MW did not respond and later she claimed Professor Smith's email was sent to intimidate her. (Ex. 6, p. 33)

50.     Professor Smith heard nothing else from Associate Dean Green, so she believed Defendant FAMU believed her complaint was not investigation-worthy. However, within days of learning of the complaint, Associate Dean Green had been copied on an email from then-Provost Maurice Edington to Defendant Scott (EOP) for her to "please review and take appropriate action." (Ex. 6, pp. 28-29). Despite specific and immediate obligations and procedures that state universities must follow when a student alleges violent behavior against a faculty member guided by state laws, federal laws, and university policies, Defendant FAMU did nothing for over three months.

51.     According to Defendant Baker, Associate Dean Green violated FAMU Regulations by failing to send Professor Smith's complaint to FAMU's Compliance

Department ("Compliance") to be investigated. (Ex. 5) Thus, the Compliance report dated June 5, 2023, recommended that Provost Watson and Dean Keller "[c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices." (Ex. 6, p. 36)

52.    Associate Dean Green also failed to follow the College of Law's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations, which he normally did when Professor Smith sent him texts or emails as chair of the Student Disciplinary & Conduct Committee. (Exs. 9, 10) To cover his violation of FAMU Regulations and COL Codes of Conduct, Associate Dean Green later changed his testimony in the middle of the Compliance investigation. Initially, Green stated, on the date of the incident, that he would "try and identify the student tomorrow… feel free to send me an email detailing the interaction … Thanks for the notification." (Ex. 5) Then acknowledged in an email to Professor Smith on February 1, 2023 that he indeed did consider her text about the incident a complaint requiring an investigation. (Ex. 5) "In a subsequent [undated but seems to be after March 13, 2023] statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint." (Ex. 6, pp. 28-29, 34)

53.    To Professor Smith's surprise and merely 16 days after she submitted her rebuttal to the EEOC concerning Defendant FAMU's position statement on equal pay, which admitted that Professor Smith was underpaid, Professor Smith learned that

Defendant FAMU had begun an investigation in which she was the subject of the investigation. (Exs. 19, 20)

54.   On January 26, 2023, nearly 100 days after Professor Smith initially reported the MW incident, Defendant FAMU contacted Professor Smith to begin an investigation into the MW incident because of Professor Smith's protected activity in seeking equal pay. But even more surprising, Defendant FAMU's investigation made Professor Smith the target, even though Defendant FAMU had assured Professor Smith it would look into the incident based on her complaint by text to Associate Dean Green.

55.   Defendant Baker was secretive about the details of the investigation, so Professor Smith emailed Defendant Wallace, FAMU's General Counsel. Finally, on January 27, 2023, Professor Smith first learned that the complaint filed against her was made by MW; that MW's claims of violations of university policy, if substantiated, were severe enough to warrant Professor Smith's termination; and that the allegations supporting those claims were blatantly and obviously false. Yet, Associate Dean Cooper received MW's complaint on October 25, 2022, knew of the atrocious allegations (involving claims of "hostile environment and fear", which Defendant FAMU as an educational institution must immediately address, but did not), and forwarded MW's complaint to EOP on October 26, 2022. On November 2, 2022, Cooper emailed MW to let her know that someone in EOP would reach out to her – one day after Professor Smith had gone to Associate Dean Green's office to further discuss her complaint against MW.

(Ex. 6, pp. 28-30) Still, Defendant FAMU had done nothing about the incident, which timing concerned Professor Smith. (Ex. 20)

56.    By suddenly reviving MW's stale and delayed complaint, Defendant FAMU failed to request or preserve key surveillance video evidence, delayed requesting the surveillance video for 104 days (from October 20, 2022 to January 31, 2023) to destroy key evidence that would have immediately exonerated Professor Smith, failed to follow its own Code of Conduct and Regulations and state and federal law requiring an investigation, failed to investigate Professor Smith's complaint against the student, and intentionally disregarded evidence supporting Professor Smith's allegations of deliberate hostile and disruptive conduct by MW. These failures demonstrate that the true motivation for the investigation was not the student's reported concern but rather to strike back at Professor Smith for her EEOC activity. Associate Dean Green's email confirms this because, despite the blatant falsities and implausibilities within the student complaint that, if Defendant FAMU believed, it was obligated to investigate immediately under state law, federal law and FAMU Regulations. FAMU nevertheless decided to proceed with a facially meritless complaint to use it as pretext to terminate Professor Smith, in retaliation for her protected activity.

57.    Defendant FAMU then carried on a clearly unwarranted investigation from January 26, 2023 until June 5, 2023, ultimately finding all of MW's allegations to be absolutely meritless. FAMU also independently manufactured a finding of retaliation,

which was subterfuge to create a false disciplinary record against Professor Smith and to punish her for again seeking equal pay.

58.     MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith, interrupted and disrupted her class, then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was or the cause of MW's unprovoked hostility.

59.     On February 15, 2023, another FAMU law professor, Maritza Reyes sent an email providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Professor Reyes stated that MW entered Professor Smith's class that day to "remind [Professor Smith] that [Reyes] was about to start class in the classroom where [Professor Smith was] conducting one-on-one sessions with students from [her] civil procedure course. [Professor Smith was] not supposed to be in that classroom where [Reyes] was going to start class in a few minutes. [Professor Smith was] assigned to teach civil procedure in the classroom next door, yet [she] chose to remain in the classroom where [Reyes] was due to start teaching evidence to disrupt [Reyes'] class, which [Professor Smith] did."

60.     It became clear from this email that MW knew Professor Smith was in the classroom; that MW deliberately disrupted [Professor Smith's] class (Ex. 6, p. 24); and that MW was the admitted instigator both times she ambushed Professor Smith on

October 20, 2022.

61.     Furthermore, Professor Smith was in her classroom next door to teach civil procedure at 10:30am, and thus could not have disrupted Professor Reyes' class, which started at 10:30am.

62.     Professor Reyes was late to class that day, so she could not have possibly observed the incident to write such a detailed email. Professor Smith had reserved the particular classroom through all the proper channels at the COL to use on October 20, 2022 until 10:30am. (Ex. 3)

63.     On February 20, 2023, Defendant Scott emailed Professor Smith to inform her that Professor Reyes filed a complaint against Professor Smith and that FAMU EOP was opening an investigation. Not only was that false, but Scott had requested Professor Reyes to file a complaint against Professor Smith, which Professor Reyes declined to do, and Defendant Scott encouraged Professor Smith to do the same against Professor Reyes.

64.     On March 9, 2023, Professor Smith re-filed her original complaint that she had initially texted to Associate Dean Green on October 20, 2022, but this time Professor Smith followed the process Green did not, and she submitted it via the Compliance hotline. Professor Smith did so because she was advised that her original complaint was not properly submitted by Associate Dean Green to Compliance per FAMU Regulations.

65.     On March 10, 2023, the Compliance department immediately deleted

Professor Smith's resubmission. Defendant Baker then emailed Professor Smith, stating that Compliance's report would include her statement about the October 20, 2022 incident in the ongoing investigation. However, Defendant Baker's email did not address Professor Smith's complaint reported on October 20, 2022, predating the student's complaint, and instead the student's complaint was the only focus of the investigation.

66.    On March 10, 2023, Professor Smith tried to gain clarity by email that Defendant FAMU would be investigating her October 20, 2022 complaint as well as MW's October 27, 2022 complaint.

67.    To date, Defendant FAMU has not investigated Professor Smith's October 20, 2022 complaint as it is completely ignored in the final reports and in the two notices of termination, despite the serious concerning allegations Professor Smith made against MW, a student.

68.    On March 13, 2023, Compliance wrote an email and asked the law school leadership to meet with Professor Smith concerning the March 9, 2023 re-submission of her complaint, which Compliance claimed was a new filing of a complaint. Surprisingly, this was the same time that Associate Dean Green submitted a statement that he never considered Professor Smith's October 20, 2022 text to him about the MW incident as a complaint, and he doubled down on this in a subsequent and undated statement.

69.    On March 23, 2023, Professor Smith, then-dean Deidre Keller, and Associate Dean Cooper had a short meeting sometime thereafter. During that meeting,

20

Keller expressed her confusion on what Compliance wanted, and Associate Dean Cooper sat quietly as though she knew nothing.

70.    The investigation was conducted with undue and unreasonable delay, and extended over 130 days from January 26, 2023 to June 5, 2023 to cause needless stress to Professor Smith.  The investigation found every allegation made by MW to be meritless.

71.    Following the investigation precipitated by Professor Smith's protected activity, Defendant FAMU then independently manufactured a retaliation finding against Professor Smith to discredit Professor Smith's legitimate complaints against MW, protect Defendant FAMU from potential liability, and retaliate against Professor Smith for her equal pay allegations, which is what was the trigger to revive the initial investigation.

72.    Then, Defendant FAMU recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report"). Defendant FAMU had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done; thus duplicating the penalty for the same alleged retaliation. But Professor Smith did not hear from the University again on this matter until December 5, 2023 when she was notified of her impending termination.

73.    Professor Smith did not receive anything tangible or written defining

**APP 104**

retaliation, and "retaliation" is not defined in any FAMU Regulations. When asked for the source of the definition of retaliation and how Professor Smith's actions identified in the December 5, 2023 Notice of Termination met that definition, FAMU revealed for the first time, in litigation and by way of discovery, that "[t]he University uses the ordinary meaning of the term and the letter speaks for itself." (Ex. 13, FAMU Interrogatory Answers May 23, 2024, #13) Defendant FAMU could not answer how Professor Smith's actions could have resulted in her termination under Defendant FAMU's undefined term, "retaliation," because her actions do not meet any definition of "retaliation," and her termination was pretext for her relentless pursuit of equal pay.

74.     On April 12, 2023, Professor Smith signed her next school term's employment contract listing the appointment dates from August 7, 2023 to May 10, 2024. (Ex. 8) However, and because Professor Smith has tenure, the signing of a contract is merely ceremonial as the contract itself provides that:

> This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated… Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

Thus, for tenure holding faculty as Professor Smith was, FAMU and Professor Smith had contractual obligations to follow FAMU Regulations, which provide for *inter alia*

tenure protections that established her annual entitlement to a renewed contract.

75.    On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the Defendant Baker via email to inquire about the progress of the investigation. In response, Defendant Baker stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of any complaint by Defendant FAMU for nearly 100 days further compounded the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, caused significant distress.

76.    On April 30, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

77.    On June 5, 2023, Compliance finally emailed the report from the investigation to Professor Smith. Professor Smith assumed the investigation ended at this time as per Defendant Baker. However, Defendant FAMU was still clandestinely dragging the investigation on and keeping the investigation open so that it could use this investigation pretextually against Professor Smith with post-hoc and manufactured misconduct down the road – which is exactly what happened and has prompted revisions to her pleadings.

78.    Defendant FAMU failed to follow its own procedures (Code of Conduct),

including FAMU Code of Conduct 1.019 (18b), which states: "Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the FAMU Compliance and Ethics Hotline." Defendant FAMU did not follow this then blamed Professor Smith. Professor Smith reported a complaint to a supervising dean, Associate Dean Green, on October 20, 2022. Pursuant to this regulation, he was responsible for reporting her complaint to Compliance. Instead, Associate Dean Green told Professor Smith he would investigate her complaint then later told Compliance that he did not take Professor Smith's complaint as a real complaint. Thus, when Professor Smith properly **re-filed** her original October 20, 2022 complaint to the Compliance hotline in March 2023, Defendant FAMU then accused Professor Smith of retaliating against the student for the filing of a **first-time** complaint in its June 5, 2023 report.[5]

79.     Furthermore, FAMU Regulations conflict with the COL's Student Code of Conduct, which was evidenced by the recommendation of the June 5, 2023 report (Ex. 6, p. 36), stating: "Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices."

80.     Defendant FAMU failed to maintain the confidentiality of the investigation,

---

[5] FAMU Regulations also provide faculty with rights to report violations of the University code of conduct. Defendant FAMU also violated this guarantee by failing to ever address Professor Smith's complaint against MW.

thereby exposing Professor Smith's protected activity and the details of her complaint to other employees including Professor Reyes. As further evidence of the breach or complete lack of confidentiality, Defendant Scott lied to Professor Smith by stating Professor Reyes had filed a complaint against Professor Smith. Defendant Scott did so because she was manufacturing a negative disciplinary record on Professor Smith and laying the foundation to say a "rivalry" existed amongst Professors Smith and Reyes to later use down the line and pretextually for Professor Smith's termination, which Defendant FAMU did as explained in more detail below.

81.    On June 12, 2023, Professor Smith sent a memorandum addressed to Defendant Calhoun (Compliance), Defendant Wallace (General Counsel), and Craig Reed (BOT) and copied to Defendant Waston (Provost) about the retaliatory actions of Defendant FAMU, and Professor Smith demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. Professor Smith never received a response from Defendant FAMU or the University Employee Defendants regarding her memorandum nor any of her demands. (Ex. 11)

82.    On June 13, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

APP 108

83.     Not even one month after supplementing her EEOC complaint, on July 6, 2023, Defendants Baker and Calhoun (Compliance) authored a "secret" supplemental report on the investigation and copied Defendant Scott (EOP), the person who Professor Smith had filed her informal equal pay complaint to in 2022. (Ex. 6, p. 37) The secret report also copied Defendant Watson, Defendant Wallace, and others. Defendants Baker and Calhoun did not send a copy to Professor Smith. Importantly, the secret report maintained only the independently manufactured finding of retaliation without finding any new violations of FAMU policy, though the FAMU departments purported to manufacture others by evaluating and considering other university policies, previously unconsidered, that existed at the time of the initial investigation, but the report ultimately concluded that nothing rose "to the level of a policy violation." (Ex. 6, p. 40)

84.     Professor Smith assumed that the investigation ended with the June 5, 2023 report from Compliance, but unbeknownst to her, Defendant FAMU and the University Employee Defendants were secretly engaged in a continual retaliation campaign against Professor Smith.

85.     Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

86.     On October 5, 2023, Professor Smith sent a memorandum to Compliance concerning MW's continued fixation on Professor Smith and relentless obsession with ruining Professor Smith's reputation. Professor Smith stated that she was "increasingly

26

uneasy about a student [MW] who remains severely fixated on an incident that transpired nearly a year ago. [MW], a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior of towards Professor Broussard (one my witnesses regarding the incident), who knew the student before the incident." (Ex. 6, p. 57) Professor Smith clarified that through the memo she "wish[ed] to formally express [her] concern regarding MW's persistent and unsettling behavior towards [Professor Smith]" citing post-March 2023 incidents of MW's fixation with Professor Smith. Professor Smith did not submit said concern through the hotline portal or any other reporting authority.

87.     While Professor Smith's October 5, 2023 memo indicated she believed she was obligated to report MW to The Florida Bar, Professor Smith neither indicated that she planned to nor that she had already followed through on the actions. (Ex. 6, p. 56)

88.     Neither Defendant FAMU nor the University Employee Defendants responded to the October 5 memo.

89.     On October 12, 2023, Defendant FAMU notified Professor Smith that she received "a three (3%) percent performance-based increase," which was the highest increase that any employee could receive.

90.     On October 17, 2023, Professor Smith filed her equal pay and retaliation

APP 110

complaint in state court, but she did not attempt to serve Defendant FAMU until 2024.

91.    On November 13, 2023, Professor Reyes, who had an active lawsuit against Defendant FAMU (*Reyes v. FAMU*, No.: 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022)), notified the Gray Defendants of Professor Smith's complaint in Professor Reyes' federal court filing entitled, "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike" on page 12.

92.    Defendants then began the process to terminate Professor Smith.

93.    Specifically, on or around November 13, 2023, the Gray Defendants contacted Defendant Wallace and informed her of Professor Smith's unserved lawsuit raising equal pay and constitutional rights violations. Defendant FAMU did not retain the Gray Defendants at this time.

94.    The Gray Defendants did not advise Defendant Wallace not to act in response to the information they had given her. Nor have they attempted to stop or mitigate Defendant Wallace's conduct.

95.    At all relevant times, the Gray Defendants were aware Professor Smith's unserved complaint concerned equal pay, women's rights, and constitutional rights issues.

96.    The Gray Defendants are seasoned lawyers and based on their skill, expertise, and experience knew or should have known that Defendant Wallace would

APP 111

act or in fact that she planned to act on the information told to her. Accordingly, the Gray Defendants and Defendant Wallace entered a formal or informal agreement to carry out Professor Smith's termination based on her equal pay lawsuit in violation of federal statutory and constitutional law.

97.     Sometime shortly after learning of Professor Smith's lawsuit, Defendant Wallace met separately or together with Defendants Watson, Scott, Calhoun, and Baker. During those meetings and communication, Defendant Wallace informally or formally spearheaded, encouraged, and commanded Defendant Watson and the remaining University Employee Defendants to support Professor Smith's termination.

98.     The University Employee Defendants each complied and independently agreed to carry out Defendant Wallace's plan for Professor Smith's termination.

99.     Specifically, Defendants Baker, Calhoun, and Scott gathered documents and submitted materials in support of Professor Smith's termination.

100.   Defendants Baker, Calhoun, and Scott also compiled and arranged materials to fabricate a rivalry between Professors Smith and Reyes, without realizing Professor Smith had recommended Professor Reyes to FAMU COL for hire in 2009, even knowing Reyes had underperformed in her short stint at the law firm where they both had worked years prior because Professor Smith believed Reyes may thrive in a different work environment.

101.   Defendant Watson specifically met with, continued to consult, and acted

alongside Defendants Baker, Calhoun, and Scott to serve as the cat's paw for Defendant Wallace from November 13, 2023 to date about Professor Smith's termination.

102.   Then, on December 5, 2023, Defendant Watson acted on Defendant Wallace's encouragement, command, or suggestion, and Watson emailed Professor Smith a notice of intent to terminate her that would become effective on January 19, 2024 and that provided limited procedures for a hearing/conference on January 11, 2024. (Ex. 6) Defendant FAMU through Defendant Watson emailed this notice to Professor Smith on December 5, 2023 based on an alleged memorandum she wrote on October 5, 2023, describing her continued personal safety concerns with a student who continued to demonstrate unsettling, irregular and suspect behavior toward Professor Smith, even though FAMU Defendant rewarded Professor Smith with the highest salary performance-based salary increase on October 12, 2023. Defendant FAMU's purported reason for terminating Professor Smith is a sham and subterfuge for the real reason – Professor Smith's protected conduct alleged herein.

103.   Defendant FAMU has not terminated any male law professor (such as Professors Ronald Griffin, Jeremy Levitt, Darryll Jones, Ewanrinareto "Areto" Imoukhuede) for similar or more severe violations of FAMU policies, specifically male professors are irregularly investigated; but when male law professors are investigated, the male professors have been found to have engaged in malfeasance/nonfeasance, including harassing women faculty, female students, and LGBTQIA-identifying

**APP 113**

students, being inappropriate with female staff, missing numerous classes and attending classes 20-30 minutes late, but no male faculty have been terminated for that conduct.

104.   Spring 2024 classes were set to start on January 8, 2024, so clearly Professor Smith was not expected to teach in the spring semester.

105.   At some point shortly between November 17, 2023 and December 5, 2023, Defendant Wallace met with the Gray Defendants to inform them of her decision to terminate Professor Smith. The Gray Defendants neither objected nor attempted to prevent said action.

106.   On December 12, 2023, Professor Smith noticed Defendant FAMU for a conference pursuant to Regulation 10.120 (3).

107.   Professor Smith also requested any all evidence against her. Defendant FAMU neither provided any additional documents nor withheld any on the basis of confidentiality or a privilege.

108.   Between December 12, 2023 and January 11, 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a conference including who to strategically place on that conference panel.

109.   The University Employee Defendants eventually settled on three employees, one of which served on the FAMU DRS board alongside Defendant Watson, with the informal or formal assistance, guidance, command or encouragement of

**APP 114**

Defendant Wallace.

110.   On January 11, 2024, a conference took place before a three (3) person panel selected by Provost Watson on ZOOM. The panel members were all lawyers: Bryan Smith, J.D., Associate VP for Student Affairs; Andrea Nelson, Esq., School of Business and Industry; and Patricia West, Esq., FAMU Developmental Research School.

111.   At the conclusion of the hearing, Associate Provost Dr. Reginald Perry, who was over the process, indicated that a report would be produced by close of business on January 12, 2024.

112.   The panel's report on January 12, 2024 recommended that Defendant FAMU rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough**

32

**deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**

In conclusion, the diligent efforts of our panel have now been completed.

(emphasis added)

113. However, Dr. Perry did not forward the report to Professor Smith because it did not conclude what any of the Defendants wanted it to conclude – uphold terminating Professor Smith. At some point between the conclusion of the conference on January 11, 2024, Defendant Watson consulted with Defendant Wallace to discuss terminating Professor Smith notwithstanding the conference panel's recommendation. Professor Smith would soon learn, albeit late and in violation of FAMU Regulations, that Provost Watson declined to accept the panel's well-reasoned, unanimous recommendation.

114. On Thursday, January 18, 2024, Professor Smith emailed Dr. Perry because she had not received any notice from FAMU thus far. According to Regulation 10.120(3): "After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision."

115. According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified within five workdays prior to the date the action is effective."

APP 116

116.   According to Regulation 10.120(1), the Defendant FAMU shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) The effective date of the University's proposed final action." This date of the proposed final action in the Defendant's written notice was listed as January 19, 2024.

117.   Defendant FAMU missed notifying Professor Smith by January 18, 2024 of its intent to proceed with her termination.

118.   At some point shortly between January 12, 2024 and January 23, 2024, Defendant Wallace met with the Gray Defendants to inform them of the decision to uphold Professor Smith's termination. The Gray Defendants neither objected nor attempted to prevent said action.

119.   On January 23, 2024 at 4:56 p.m., Professor Smith received an email with notice of Defendant FAMU's intent to terminate her, stating:

> After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023. (Ex. 7)

120.   To circumvent missing its notification timeframe by FAMU Regulations,

Defendant FAMU admits it changed the effective date of the proposed termination that was in the Notice of Intent to Dismiss from Employment from January 19, 2024 to January 30, 2024. The plain language of FAMU Regulations does not authorize the University to change the effective date.

121.    Defendant FAMU then outlined the procedures that Professor Smith should follow to appeal the decision.

122.    After Defendant FAMU ignored its panel's recommended finding that Professor Smith did not retaliate and that the termination notice should be rescinded, Professor Smith has and had no reason to believe that she will receive due process in any appeal process. Professor Smith nevertheless continued with her internal appeals so as not to have been considered to consent to the University's decision.

123.    On February 28, 2024, Professor Smith emailed her complaint and request for a Step One hearing pursuant to FAMU Regulation 10.206 to Dr. Perry .

124.    Soon after, Defendant Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step One hearing, including who to strategically select as the Step One Reviewer.

125.    Defendants Wallace and Watson agreed to place Antoneia Roe as the Step One Reviewer to influence and obtain their desired outcome based on Roe's employment history with General Counsel's office as counsel. Defendants Wallace and Watson therefore instructed Roe to contact Professor Smith via the FAMU email account

**APP 118**

belonging to Professor Smith that Defendant FAMU had shut down shortly prior.

126.   On March 13, 2024, Professor Smith inquired to Associate Provost Reginald Perry whether Defendant FAMU intended to move forward with a Step One hearing because she had not heard from Defendant FAMU since she submitted her Step One complaint.

127.   At 10:46am on March 13, 2024, Dr. Perry responded to Professor Smith indicating that Defendant FAMU intended to move forward with a Step One hearing.

128.   On many occasions between March 11, 2024 and April 12, 2024, the Gray Defendants reached out to, drafted, and consulted with Defendants Wallace and Watson concerning Professor Smith's termination, the status of any internal appeals, and the progress of same. Specifically, the Gray Defendants doctored Wallace's and Watson's declarations to mask the firm and attorneys' unlawful activity. Furthermore, the Gray Defendants argued inconsistent positions to Defendant Watson's declarations, indicating that Defendant Watson has only served as a puppet for Defendant Wallace and the Gray Defendant's unlawful agreement. Even at this point, not one Gray Defendant attempted to prevent or counsel Defendant Wallace against continuing with the unlawful termination.

129.   Specifically, the inconsistent reasons for Professor Smith's termination are:

　　a.   The initial notice from December 5, 2023 states:

　　　　The reason for this employment action is the **substantiated <u>finding of</u>**

36

**retaliation** documented in the FAMU Division of Audit and Compliance Investigative Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your **memo dated October 5, 2023**, also attached and incorporated in this Notice. (Ex. 6) (emphasis added)

b.  The Notice of Termination dated January 23, 2024, the University's reason for termination was: "After reviewing all documentation and considering the **totality of circumstances** related to this matter, the University's decision to dismiss you from employment remains in effect." This new rationale is inconsistent with the December 5, 2023 reasons, and FAMU Regulations require that any reasons be "specific." (Ex. 7) (emphasis added)

c.  However, on March 25, 2024, Provost Watson stated, under penalty of perjury in her initial declaration, that, "My decision to termination (sic) Ms. Smith's employment was based on **her unprofessional and inappropriate behavior towards students** as articulated in the **Investigative Reports.**" (Ex. 14 filed in Doc 27) (emphasis added)

**APP 120**

d. Then, on March 25, 2024, The Gray Defendants advanced their own more descriptive version of the above reason for termination in a court filing in "Defendant's Response In Opposition To Plaintiff's Motion For Preliminary Injunction And Supporting Memorandum," stating: "**Defendant's supplemental investigation also found that <u>Plaintiff was unprofessional and inappropriate with students</u> regarding the confrontation between Plaintiff and the student from the original report, and that her <u>rivalry with a fellow College of Law professor was being internalized by students and creating a distraction</u>.**" (Ex. 16, p. 11) **Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, <u>unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor</u>.**"[6] (emphasis added)

e. After Professor Smith served a Rule 11 sanctions motion to Gray Defendants on the FAMU Defendant because of the blatantly false first declaration signed by Provost Watson, on March 25, 2024, Provost Watson signed an amended declaration under penalty of perjury date

---

[6] Defense Counsel deposed Professor Reyes from 9:31am to 5:36 pm in May 2024 in her case against Defendant FAMU, and not once did Reyes mention any rivalry between Professor Smith. Instead, Professor Reyes discussed her "interactions with the co-workers" and testified to having issues with almost all the law faculty, and although Reyes repeatedly mentioned another woman faculty with whom she had additional issues, it was not Professor Smith.  (Ex. 16)

April 11, 2024, stating that, "My decision to terminate Ms. Smith's employment was based on the **substantiated finding of retaliation documented in the Investigative Reports**." (Ex. 15 filed in Doc. 42) (emphasis added)

f.  Next, on April 12, 2024, in "Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum," Gray Defendants, trying again to creatively beef up the original rationale for termination, stated allegations clearly inconsistent with the initial reasons for termination and Gray Defendants' original version, "**Plaintiff's employment ended because she retaliated against a student for making a written complaint against her**. … **Plaintiff then filed a retaliatory complaint against the student 'for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application**.'[7] *Id.* This was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* Defendant's supplemental investigation[8] also found that **Plaintiff was**

---

[7] This is written to appear that it is two separate acts, but that is false.
[8] This is the secret report of from dated July 6, 2023 that was intentionally never given to Plaintiff until she saw it in her termination notice in December 2023, but apparently the report was put in her employment file.

**unprofessional and inappropriate with students** regarding the confrontation between Plaintiff and the student from the original report, and that her **rivalry with a fellow College Law professor was being internalized by students and creating a distraction**."[9] "Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, **unprofessional, and inappropriate with at least one student**, in addition to engaging in a **disruptive 'rivalry'** with another law professor." (emphasis added)

130.   Defendant FAMU's inconsistent and ever-changing reasons and iterations for Professor Smith's termination demonstrate that it has no lawful reason for its conduct.

131.   On March 13, 2024 at 6:02pm, Antoneia Roe finally emailed Professor Smith's personal email with information concerning the Step One hearing to take place on March 15, 2024. March 15, 2024 was one day later than what is required by FAMU Regulation 10.206.

132.   Professor Smith again requested all documents, but only received the same documents already available in Defendant FAMU's notices for her termination. Specifically, on March 13, 2024, Antoneia Roe sent Professor Smith a dropbox link full of documents. Antoneia Roe did not indicate she withheld any documents on the basis

---

[9] See ftnt 6 above.

of confidentiality or a privilege.

133.   Professor Smith did not have time to research, find, and object to Antoneia Roe's selection as a reviewer until after the Step One hearing that took place on March 15, 2024.

134.   The Step One hearing lasted less than 8 minutes, and Antoneia Roe did not ask a single question because she already knew her assignment from the Defendants was to uphold Professor Smith's termination.

135.   On March 18, 2024, Professor Smith submitted a draft decision to Antoneia Roe, but that email went unanswered.

136.   Between March 15, 2024 and Antoneia Roe's decision, Defendants Watson, Wallace, Baker, Calhoun, and Scott met, spoke with, or otherwise consulted Antoneia Roe regarding Professor Smith's complaint.

137.   On April 14, 2024, Antoneia Roe emailed Professor Smith a copy of the five-page Step One decision indicating Professor Smith's termination would be upheld.

138.   On April 23, 2024, Professor Smith promptly filed an appeal of the Step One decision and requested a Step Two hearing.

139.   Between April 15, 2024 and May 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step Two hearing, including who to strategically select as the Step Two Reviewer.

140.   Defendants Wallace and Watson agreed to place Dr. Valencia Matthews as the Step Two Reviewer to influence and obtain their desired outcome based on Matthews' history with Defendant Watson on the Dean's Advisory Council and based on the fact that Matthews is now a direct report to Provost Watson. Overturning Professor Smith's termination requires Dean Matthews, among other things, to find that her immediate supervisor, Defendant Watson violated FAMU Regulations.

141.   On May 1, 2024, Reginald Perry notified Professor Smith that Dr. Valencia Matthews would be the Step Two reviewer.

142.   On May 2, 2024, Professor Smith objected to Dr. Matthews's selection because Dr. Matthews is a direct report to Defendant Watson.

143.   On May 3, 2024, Dr. Perry responded by email indicating that the Provost's Office would consult with the General Counsel: "The Office of the Provost will need to consult with the General Counsel to discuss your request. I will contact you again next week."

144.   On May 7, 2024, the U.S. Department of Justice issued Professor Smith a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964.

145.   On May 20, 2024, Dr. Perry emailed Professor Smith: "After further review, it has been determined that the University will move forward with the previously selected reviewer.   Therefore, Dean Matthews will be in contact with you to arrange for your Step Two meeting."

146.   On June 7, 2024, the Step Two hearing was scheduled with Dean Matthews in violation of FAMU Regulation 10.206, which required the Step Two hearing to be scheduled by May 8, 2024. It was scheduled for June 20, 2024, from 2-3pm; the hearing was held then on ZOOM, but no report has issued as of the date of the filing of this Second Amended Complaint. During the step-two meeting, Dr. Matthews consulted either Defendant Wallace or another University Employee Defendant about whether Professor Smith could have a representative give an opening, despite FAMU Regulation permitting same.

147.   After Professor Smith raised concerns about the pay disparity and expressed her intention to exercise her rights under the EPA, Defendant FAMU engaged in a campaign of retaliatory actions against Professor Smith and has continued to do so.

148.   Defendant FAMU's retaliation against Professor Smith includes the adverse employment actions as described above, including the baseless and one-sided investigation of the October 20, 2022 incident with MW, manufacturing conflicting allegations of misconduct to terminate Professor Smith, and ultimately terminating Professor Smith's employment. Since Professor Smith's termination (whenever the parties agree on a date), Defendant FAMU has withheld her salary and completely ignored her concerns about her salary disparities (Ex. 17), back dated her termination to her health insurance carrier so several healthcare claims submitted in the spring are no longer covered and are due and owing, failed to send her tax documents (even upon

request) that she could access as an employee, and eliminated her email access without changing the destination for email notifications about insurance coverage and claims.[10]

149.   Defendant FAMU's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3) and the other provisions of federal law as indicated below. Professor Smith is entitled to damages, attorney's fees and costs, and reinstatement to her tenured position as a law professor.

**COUNT I**
**DISCRIMINATION IN COMPENSATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206, *et seq*.,**
**AGAINST DEFENDANT FAMU**

150.   The Plaintiff realleges paragraphs 1 through 37.

151.   Plaintiff belongs to a protected class; she is female.

152.   Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator, also a tenured full professor, and were performed under the same or similar working conditions. (Exs. 4, 9)

153.   During all relevant periods, Plaintiff received wages lower than the

---

[10] Each action happened at various times, but usually and immediately after Professor Smith noted in a court document that she was still employed because these instances were still in place. Thus, it is highly credible that after this pleading is filed, Defendant FAMU will contact the insurance provider to have her university email replaced with her personal email address.

Comparator while performing the same or substantially more work than the Comparator.

154.   Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages because she performed the same or substantially more work than the Comparator and she has more experience than the Comparator. The pay disparity was not based on any legitimate factor such as seniority, merit, or a system measuring earnings by quantity or quality of production.

155.   Defendant FAMU violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs, as described below.

**COUNT II**
**RETALIATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3),**
**AGAINST DEFENDANT FAMU**

156.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

157.   Defendant FAMU's retaliatory actions against Plaintiff, as alleged herein, and by its employees acting under of color of law constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

158.   Plaintiff engaged in protected activity by:

a)  Writing to FAMU's president on May 9, 2022 about the pay disparity between her and the male comparator;

45

b) Filing an informal gender equity complaint with FAMU's Equal Opportunity Program on June 28, 2022;

c) Filing a Charge of Discrimination with the EEOC under the Equal Pay Act on October 18, 2022 and the subsequent responses/replies/rebuttals to the EEOC in its investigation; and

d) Filing the equal pay lawsuit in state court in October 2023.

After Professor Smith engaged in this protected activity, FAMU took adverse employment actions against her, including:

a) Initiating an unwarranted investigation against her on January 26, 2023, shortly after she submitted a rebuttal to FAMU's position statement on equal pay to the EEOC;

b) Failing to follow proper procedures in the investigation;

c) Issuing a notice of intent to terminate her employment on December 5, 2023;

d) Terminating her; and

e) Upholding the decision to terminate her employment on January 23, 2024, despite a panel's recommendation to rescind the termination.

159.   There is a causal connection between Professor Smith's protected activity and the adverse actions, as evidenced by the timing and sequence of events. The retaliation described herein was based on Plaintiff's exercise of rights protected by law, her resistance and opposition to gender discrimination and harassment and her right to

APP 129

participate in actions calculated to redress grievances. Plaintiff's resistance to unlawful activity was both objectively and subjectively reasonable based on the timing of the Defendants actions and the lack of transparency and fairness throughout the process as explained in more detail above.

160.   FAMU's stated reasons for the adverse actions are pretextual, as detailed above. As a result of Defendant FAMU's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled damages, including compensatory and punitive damages.

### COUNT III
### BREACH OF CONTRACT
### AGAINST DEFENDANT FAMU

161.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27, 42-43, 50, 54-59, 70-71, 73-74, 79-80, 86-93, 100,102, 112-121, and 130.

162.   Defendant FAMU operates the law school at 201 FAMU LAW Lane, Orlando FL 32801.

163.   Each employment contract entered between Plaintiff and Defendant FAMU stated some variation of "Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU." The contract also stated: "This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution

47

APP 130

and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated." Thus, the COL, the Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, Student Handbook, FAMU Handbook, and FAMU Regulations by way of the individual employment contracts.

164. Defendant FAMU, though the above noted documents, has made unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

165. Plaintiff's employment letter, together with the Faculty Handbook, FAMU Handbook and FAMU Regulations are what forms Plaintiff's employment contract.

166. Defendant FAMU has failed to meet its contractual obligations to Plaintiff because Defendant FAMU did not follow its own procedures as detailed above.

167. As a result of Defendant FAMU's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment and opportunities.

168. Plaintiff seeks damages, including actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant FAMU's wrongful

breach of Plaintiff's employment contract, as well as compensatory and punitive damages.

## COUNT IV
## FIRST AMENDMENT RETALIATION
## AGAINST DEFENDANT FAMU

169.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 53-57, 71, 90 through 149.

170.   By filing her EEOC and state court complaints for equal pay and speaking on issues of public concern, Plaintiff engaged in constitutionally protected activity. Specifically, it is well known that one litigant often serves as the catalyst for change in civil rights litigation.

171.   Following Plaintiff's engagement in the constitutionally protected activity, Defendant FAMU took adverse employment actions against Plaintiff.

172.   These adverse employment actions included baseless investigation of Plaintiff, manufacturing false claims to fire Plaintiff, fabricating their definition of just cause without due process of undefined terms, issuing a notice of termination against Plaintiff, and terminating her employment.

173.   These adverse employment actions were taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

174.   Defendant FAMU's adverse employment actions against Plaintiff, in

APP 132

response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

175.   Defendant FAMU could not and would not have made the decision to terminate Plaintiff but for her protected activity as evidenced by its inability to provide a clear reason for the adverse action(s) taken against her.

176.   Plaintiff has suffered damages as a result of Defendant FAMU's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries, as well as other compensatory damages and punitive damages.

## COUNT V
## REQUEST FOR PRELIMINARY AND
## PERMANENT INJUNCTIVE RELIEF
## AGAINST DEFENDANT FAMU

177.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 149.

178.   Defendant FAMU has terminated Plaintiff in violation of her tenure status, employment contract, and because of her pursuit of equal pay.

179.   Plaintiff has suffered and will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured. Furthermore, Plaintiff has already suffered considerably

irreparable harm as she has been unable to continue her functions as a legal academician to complete promised law review articles and book projects.

180.   "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975); *Zisk v. The Charleston School of Law* (2015).

181.   Monetary damages cannot provide sufficient relief or compensation to Plaintiff because the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career. Moreover, Plaintiff cannot be compensated for lost career advancement at the College of Law. *Assaf v. v. University of Texas System,* 399 F. Supp. 1245, 1251 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds*, 435 U.S. 992 (1978) ("Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician…. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money…. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.")

182.   Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

183.   Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant FAMU to honor her tenure status and employment contract thus restoring the status quo until this matter is resolved.

**COUNT VI**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**AS AMENDED, 42 U.S.C. §2000e et seq.**
**AGAINST DEFENDANT FAMU**

184.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 102 through 149.

185.   Plaintiff was employed by Defendant FAMU as a law professor from 2004 to 2024.

186.   On January 31, 2024, Defendant FAMU purported to terminate Plaintiff from her tenured law professor position for an alleged violation of FAMU policy.

187.   During the same 2004 to 2024 time period, male law professors working for Defendant FAMU committed similar or more serious violations of FAMU policy but were either never investigated or not terminated after a finding of having committed the violation.

188.   Defendant FAMU's stated reason for terminating Plaintiff was pretext for unlawful sex discrimination, as evidenced by many things including: the conflicting

APP 135

reasons Counsel has argued to this Court, the decisionmaker-Defendant Watson's conflicting two declarations, and the disparate treatment of Plaintiff compared to similarly situated male law professors who were not terminated for similar or more serious violations.

189.   Plaintiff's termination was motivated by her sex and was retaliation for her resistance and opposition to Defendant FAMU's unlawful compensation practices under the Equal Pay Act, which constitutes protected activity under Title VII.

190.   By the conduct described above, Defendant FAMU discriminated against Plaintiff on the basis of her sex and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., causing her to suffer damages, including compensatory and punitive damages.

**COUNT VII**
**42 U. S. C. § 1985(3) – CONSPIRACY TO INTERFERE**
**WITH CIVIL RIGHTS**
**AGAINST GRAY DEFENDANTS**

191.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

192.   The Gray Defendants and University Employee Defendants conspired to deprive Plaintiff of her constitutional rights to due process under the Due Process Clause of the U.S. Constitution and freedom against retaliation under the First Amendment, her

53

statutory right to freedom from discrimination under the EPA and Title VII, her statutory right to freedom from retaliation for exercising rights under the EPA, by agreeing to terminate Plaintiff's tenured employment in retaliation for her filing a lawsuit against Defendant FAMU citing EPA and constitutional claims as a woman professor.

193.   The Gray Defendants were not retained in this matter until 2024 and their representation of Defendant FAMU in one legal matter did not cover unrelated litigation.

194.   The purpose of the conspiracy was to deprive Plaintiff indirectly or directly of (1) equal privileges including her due process rights as a woman compared to men who have been accused of similar or more serious violations of FAMU policy and (2) equal protection under law as a woman. The conspiracy was motivated by a discriminatory animus against Plaintiff based on her gender and her engagement in protected activities, including her protected activity under the Equal Pay Act.

195.   The Gray Defendants' overt acts are detailed above but include their informing Defendant Wallace of Plaintiff's unserved lawsuit alleging EPA violations without any measure to ensure Wallace would not act upon that information. The Gray Defendants' notification caused the remaining Defendants to join in the conspiracy and engage in overt acts in furtherance of the conspiracy, including but not limited to:

> a. Defendants Wallace, Watson, Baker, Scott, and Calhoun met and communicated regularly to discuss and plan Plaintiff's termination in retaliation for her protected activities.

b. Defendants Wallace and Watson instructed other University Employee Defendants to gather and fabricate evidence to support false claims against Plaintiff.

c. Defendants Baker, Scott, and Calhoun prepared and submitted false reports and statements to justify Plaintiff's termination.

d. Gray Defendants advised and facilitated the unlawful actions of the University Employee Defendants, knowing the actions were in retaliation for Plaintiff's protected activities.

The Gray Defendants actions and inactions effectively established their role in the conspiracy as the advisers or consiglieres of the plan to terminate Plaintiff.

196. Defendant Wallace acted upon the Gray Defendants' information, and she informally or formally encouraged, suggested, commanded or facilitated Defendant Watson to terminate Plaintiff in light of the learned information about Plaintiff's lawsuit.

197. As a result of the conspiracy, Plaintiff was deprived of her constitutional rights, including her rights to equal protection and due process, as well as her right to be free from retaliation for exercising her First Amendment rights, and Plaintiff was wrongfully terminated, suffered and continues to suffer irreparable reputational damage, emotional distress, and other losses to her career as a legal academician, including loss of advancement and scholarship opportunities, compensatory and punitive damages.

**COUNT VIII**
**42 U.S.C. § 1986 – FAILURE TO PREVENT CONSPIRACY**
**AGAINST GRAY DEFENDANTS**

198.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

199.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

200.   Plaintiff did not attempt to serve the complaint until 2024.

201.   On or around November 13, 2023, Gray Defendants informed Defendant FAMU via Defendant Wallace about the filed but unserved equal pay state court complaint.

202.   Defendants, having knowledge of the complaint and the potential violation of Plaintiff's rights, conspired to terminate Plaintiff's employment to prevent her from pursuing her equal pay claim.

203.   On December 5, 2023, Plaintiff received a notice of intent to terminate her from her position at the COL, 22 days after the Gray Defendants learned of Plaintiff's equal pay state court complaint.

204.   Gray Defendants had the power to prevent the wrongful termination but neglected and or refused to do so.

**APP 139**

205.   Gray Defendants had knowledge of the conspiracy to violate Plaintiff's civil rights under 42 U.S.C. § 1985.

206.   The Gray Defendants knew or should have known that informing Defendant Wallace about Plaintiff's unserved equal pay complaint would likely result in retaliatory action against Plaintiff, given the ongoing pattern of retaliation alleged in this complaint and having worked with Defendant Wallace.

207.   Gray Defendants had the power to prevent the wrongful termination of Plaintiff. As legal counsel for Defendant FAMU, they had the professional responsibility and authority to:

    a. Advise Defendant Wallace and other FAMU officials against taking
     retaliatory action;

    b. Warn FAMU officials about the legal consequences of retaliating against Plaintiff;

    c.   Refuse   to   participate   in   or   facilitate   any   retaliatory   actions;

    d. Report any planned unlawful actions to appropriate authorities within FAMU or other preventative actions, but neglected or refused to do so.

208.   The Gray Defendants' failure to act was not mere negligence, but a willful disregard of their professional and ethical obligations as attorneys.

209.   As a direct result of the Gray Defendants' failure to prevent the conspiracy, Plaintiff suffered damages, including compensatory and punitive damages, loss of

57

tenure, loss of wages and benefits, damage to her professional reputation, emotional distress and loss of future career opportunities. The Gray Defendants' failure to act was in reckless disregard of Professor Smith's federally protected rights. As experienced attorneys, they knew or should have known that retaliating against an employee for filing an Equal Pay Act lawsuit violates federal law.

**COUNT IX**
**SECTION 1983 – CIVIL CONSPIRACY**
**AGAINST THE UNIVERSITY EMPLOYEE DEFENDANTS**

210.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

211.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

212.   Plaintiff did not attempt to serve the complaint until 2024.

213.   On or around November 13, 2023, Gray Defendants informed Defendant about the filed but unserved complaint.

214.   On December 5, 2023, Plaintiff received a notice of termination that she would be terminated from her position at Defendant FAMU, 22 days after the Gray Defendants learned of Plaintiff's state court complaint filing.

215.   University Employee Defendants' actions were taken under color of state law or outside the scope of their official duties and deprived Plaintiff of her rights,

58

privileges, or immunities secured by the Constitution and laws of the United States, including her right to free speech, equal protection, and due process under the Fourteenth Amendment.

216.   After Defendant Wallace learned of Plaintiff's unserved equal pay lawsuit she regularly and consistently communicated with, encouraged, commanded, suggested and or facilitated Defendants Watson, Baker, Calhoun, and Scott (collectively the University Employee Defendants) to reach an agreement to carry out Plaintiff's termination in retaliation for Smith's lawsuit asserting EPA, first amendment, and procedural due process claims.

217.   In addition to the acts mentioned above, Defendants Baker, Calhoun, and Scott specifically acted in furtherance of this conspiracy when they collected written documents from their respective department files, prepared statements, compiled evidence, manufactured evidence, created false narratives, breached confidentiality, falsely represented the end of the investigation, failed to follow FAMU Regulations and policy, shielded documents under the guise of privilege or confidentiality, met with Defendants Watson and Wallace to support the ultimate decision to terminate Plaintiff, and communicated with reviewers in the process of Plaintiff's internal appeals to influence or otherwise suggest she be terminated.

218.   In addition to the acts mentioned above, Defendant Watson specifically acted in furtherance of this conspiracy by terminating Plaintiff and upholding the

**APP 142**

termination after consistently consulting with Defendant Wallace; consulting Defendant Wallace on the predetermination conference panel members and biased Step One and Two reviewers; acting at the instruction of Defendant Watson, involving other FAMU employees and carrying out all other actions mentioned in the above paragraphs.

219.   The University Employee Defendants, acting under color of state law as officials and employees of FAMU, deprived Professor Smith of her clearly established constitutional rights, including: Her First Amendment right to free speech and to petition the government for redress of grievances, by retaliating against her for filing complaints about pay discrimination; Her Fourteenth Amendment right to equal protection of the laws, by intentionally discriminating against her on the basis of sex in pay and other employment actions; Her Fourteenth Amendment right to due process, by failing to follow established procedures in investigating complaints and terminating her employment.

220.   These University Employee Defendants also acted outside of the scope of their official duties and engaged in deliberate misconduct that violated clearly established rights to be free from retaliation and Plaintiff's constitutional rights by:

- Manufacturing false claims to fire Plaintiff

- Fabricating reasons for termination

- Manipulating internal processes to ensure her termination

- Conspiring to terminate Plaintiff for retaliatory reasons

60

- Deliberately manipulating evidence and processes to justify termination

- Lying to Plaintiff to create faculty controversy

- Failing to adhere to confidentiality

These actions were taken for purely personal reasons and were violations of FAMU

regulations, protocols and procedures.

221.   As a direct and proximate result of the University Employee Defendants'

actions, Plaintiff suffered damages, including loss of employment, lost wages and

benefits, emotional distress, and other compensatory damages as well as punitive

damages. These Defendants' conduct was willful, wanton, and in reckless disregard of

Professor Smith's clearly established constitutional rights, justifying an award of

punitive damages to deter such egregious misconduct in the future.

**COUNT X**
**DUE PROCESS IN VIOLATION OF THE**
**U.S. AND FLORIDA CONSTITUTIONS**
**AGAINST DEFENDANT FAMU**

222.   The Plaintiff realleges all relevant paragraphs including but not limited to

1 through 27 and 54-62, 67-70, 72-73,79-83, 90, 92, 102 through 149.

223.   Plaintiff had a constitutionally protected property interest in her continued

employment as a tenured law professor with FAMU.

224.   Defendant FAMU deprived Plaintiff of this property interest by terminating

her employment. FAMU's termination procedures, as outlined in Regulation 10.120 and

others, created a legitimate expectation of due process before termination.

225.   In effecting Plaintiff's termination, Defendant FAMU deprived Professor Smith of her due process rights and failed to provide Plaintiff with adequate procedural due process protections, by: a) Employing biased and partial internal complaint reviewers who acted as the cat's paw for Defendants Wallace and Watson, who themselves had knowledge of Plaintiff's pending Equal Pay Act lawsuit, rendering any internal appeal futile and violating Plaintiff's right to an impartial decisionmaker; b) Failing to provide Plaintiff with the definition of "retaliation" used as the basis for her termination, which was vague, arbitrarily applied, and prevented Plaintiff from conforming her conduct, in violation of due process notice requirements; c) Failing to follow its own policies and procedures regarding the timing and appeals process for challenging the termination decision; d) Failing to provide timely notice of their intent to proceed with termination; e) Changing the effective date of termination to circumvent the notification timeframe required by FAMU regulations; and f) Failing to provide Professor Smith with all evidence against her, despite her requests; and others as detailed above.

226.   Defendant FAMU's post-deprivation process was constitutionally inadequate to remedy the prejudicial pre-termination violations described above. These actions deprived Professor Smith of a meaningful opportunity to be heard and respond to the allegations against her before termination.

**APP 145**

227. The defendants' conduct was arbitrary, capricious, and motivated by retaliation for Professor Smith's protected activities rather than any legitimate reason. As a direct and proximate result of Defendant FAMU's failure to provide adequate procedural due process protections, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and professional standing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a) An order reinstating Plaintiff to her position as a tenured full law professor;

b) An order granting preliminary and permanent injunctive relief;

c) An order declaring that Defendant has violated the Equal Pay Act, including retaliation provisions;

d) An order declaring that Defendant FAMU has violated Title VII;

e) An order declaring that Defendant FAMU has violated the First Amendment and due process clause of the U.S. Constitution;

f) An order removing any negative references to the October 20, 2022 incident from Plaintiff's employment file;

g) An award of unpaid wages and other compensation due to Plaintiff as a result of Defendant's violation of the EPA, including interest;

**APP 146**

h) A declaration that the Gray Defendants' actions violated 42 U.S.C. §§ 1985(3) and 1986 and an award of compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

i) Judgment against the University Employee Defendants for compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

j) Punitive damages, special damages, actual damages and consequential damages;

k) Loss of future employment opportunities;

l) Front pay;

m) Judgment against Defendants and for Plaintiff awarding compensatory damages on all Counts for the Defendants' violations of law enumerated herein;

n) Judgment equalizing Plaintiff's salary with her male Comparator who was paid more for substantially equal work, and permanently enjoining Defendants from future violations of law enumerated herein and remedying all benefits of which Plaintiff has been unlawfully deprived (such as retirement contributions, insurance etc.) of as enumerated herein;

APP 147

o)  Restoring sick leave and other benefits;

p)  Compensatory damages in the amount of the full pay differential between Plaintiff's salary and the Comparator's salary for the period she was underpaid, representing the appropriate compensation for her 10 years' greater experience performing substantially equal work;

q)  An award of liquidated damages in an amount equal to the unpaid wages and compensation due to Plaintiff;

r)  Prejudgment interest and post-judgment interest;

s)  An award of reasonable attorneys' fees and costs pursuant to the statutory provisions referenced in the complaint, *e.g.:* Equal Pay Act, Title VII, § 1983, § 1985, and § 1986.

t)  Any other relief, including equitable relief, this Court deems just and proper.

**APP 148**

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.


Dated July <u>9</u>, 2024

      Respectfully submitted,

      <u>*/s/ Jennifer Smith*</u>
      Jennifer Smith
      Florida Bar No. 964514
      Law Office of Jennifer Smith
      13506 Summerport Village Pkwy.
      Suite 108
      Windermere, FL 34786
      407-455-0712
      407-442-3023 (f)
      jensmithesq@aol.com

**APP 149**

**86 – Plaintiff's Motion for Preliminary Injunction**

**07/10/2024**

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**JENNIFER SMITH,**

      **Plaintiff,**

                             **CASE NO: 6:24-cv-00457-PGB-RMN**

**FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES, et al.**

      **Defendants.**

_____/

**PLAINTIFF'S TIME-SENSITIVE MOTION FOR PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**

      Pursuant to Federal Rule of Civil Procedure 65 and Middle District of Florida

Local Rule 6.02, Plaintiff, Jennifer Smith ("Professor Smith") respectfully moves

this Court for a *third* time for a preliminary injunction that restores the status quo

ante –reinstating Professor Smith to her tenured position as a Full Professor – until

the merits of this case are decided. This constitutes a time sensitive matter because

the fall semester begins the first week of August 2024. Professor Smith has sought

injunctive relief for months – for a court to seriously consider this – and prays for a

ruling before the first week of August 2024.

This Court declared as moot Professor Smith's second motion for preliminary injunction on July 9, 2024, because Professor Smith filed a second amended complaint ("SAC") on July 8, 2024.[1] Professor Smith anticipated such a ruling, so she argued and submitted authority to show a mootness ruling is improvident because the same causes of actions prompting injunctive relief were in the then-operative pleading and the now-operative pleading and the parties had expended significant time and resources twice briefing the issue. *See American Airlines, Inc. v. Spada*, No. 1:23-cv-21844-CMA (S.D. Fla. Nov. 18, 2023).

## I.   RELEVANT BACKGROUND

1.   Professor Smith, a then-tenured full professor with a stellar employment history for twenty years as evidenced by student and dean evaluations at FAMU's law school (Exs. 1, 5, 19), filed this action in state court on October 17, 2023. (*See* Doc. 1-1, ¶¶ 7–10; Doc. 1, pp. 1–2). On January 29, 2024, before the first complaint was served on Defendant FAMU, Professor Smith filed an Amended Complaint (Doc. 1-1 (the "FAC")) in the state court. Defendant FAMU subsequently removed the action to the instant court.

---

[1] Professor Smith did not provide a deadline to amend because the Court had already left the second preliminary injunction – a request with some urgency – pending over 90 days, so she could not estimate what deadline would have satisfied the Court's timeline for addressing the matter.

2.      Professor Smith initially sued Defendant FAMU after learning she, and other women were being paid less than a male professor who performed substantially equal work to Plaintiff but had less experience than her. (Ex. 3, p. 9; Ex. 19).

3.      When Defendants learned of Professor Smith's unserved complaint, they revived a stale investigation involving an encounter Professor Smith had with a disruptive student and used it as a pretext to terminate Professor Smith 22 days later. (Ex. 3, pp. 21, 28; Ex.19)

4.      Professor Smith was entitled to certain protections pursuant to FAMU Regulations, including a pre-determination conference and three levels of internal appeals all before impartial reviewers. On January 11, 2024, the pre-determination panel chosen by Defendant FAMU found Professor Smith did not engage in retaliation, and it recommended she be reinstated. (Ex. 4, p. 3)

5.      Defendant FAMU disregarded the panel's decision, and instead Defendants have offered different, conflicting reasons for Professor Smith's termination, which clearly demonstrates pretext. The reasons:

     a.  "substantiated finding of retaliation" via Provost Watson's letter (Ex. 6);
     b.  "totality of circumstances" via Provost Watson's letter. (Ex. 7);
     c.  "her unprofessional and inappropriate behavior towards students" via Provost Watson's declaration (Ex. 14);
     d.  unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor via Defendant FAMU's Motion (Ex. 17);
     e.  finding of retaliation (after a Rule 11 was served) via Provost Watson's amended declaration (Ex. 15); and

APP 153

      f.  unprofessional, and inappropriate with at least one student, in addition to engaging in a disruptive "rivalry" with another law professor via Defendant FAMU's Motion (Ex. 18).  (*See also* Ex. 3, ¶ 129, Ex. 19)

6.    Since Professor Smith's first act of protected activity in May 2022, Defendant FAMU breached its contractual obligations to her and engaged in procedural due process violations by not following its own regulations. (Ex. 19) The breaches and process violations include, but are not limited to:

    a.  Failure to investigate reported student conduct violation (Ex. 3)
    b.  Failure to timely investigate and gather materials (Ex. 3)
    c.  Failure to maintain confidentiality of EOP complaint (Ex. 3)
    d.  Failure to define "retaliation" (Ex. 3)
    e.  Failure to meet timelines within Reg. 10.206 (Ex. 3)

7.    When Professor Smith asked Defendant FAMU to define retaliation and how her actions for termination met that definition, Defendant FAMU responded: "[t]he University uses the ordinary meaning of the term, and the letter speaks for itself." (Exs. 13, 19) Defendant FAMU has no definition of retaliation in its regulations and has failed to define the term as required by her Contract and FAMU Regulations if that term is the specified reason for termination. It is not.

8.    On March 15, 2024, one day after the mandatory deadline pursuant to FAMU Regulations, Defendant FAMU held Professor Smith's first internal, yet futile, appeal. (Ex. 3, pp. 35, 40-41, Ex. 19)

9.    On June 20, 2024, Professor Smith had her second internal, yet futile, appeal. (Ex. 3, pp. 42-43; Ex. 19) No report has issued yet. (Ex. 3, p. 43; Ex. 19)

10.    Professor Smith brings ten (10) counts against Defendant FAMU and newly added Defendants. However, for this motion for injunctive relief, she argues only five: (1) discrimination in compensation under the Equal Pay Act ("EPA"); (2) retaliation under the EPA; (3) breach of contract; (4) First Amendment retaliation; and (5) violations of procedural due process under 42 U.S.C. § 1983. (*See generally* Ex. 3)

## II.    LEGAL STANDARD

To obtain a preliminary injunction, Professor Smith must establish "that (1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *See Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). Irreparable harm has been presumed in employment discrimination cases, such as Title VII. *See Middleton-Keirn v. Stone*, 655 F.2d 609, 612 (5th Cir. 1981). "The third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020) (citation and internal quotations omitted).

According to *Callaway*,

> The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a

5

> meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. **If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties**, *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7 Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Id.* at 576.[2] (emphasis added) Because Professor Smith seeks restoration of the status quo ante, this is not a reconsideration of the TRO request.

## III.    ARGUMENT

Professor Smith is entitled to a preliminary injunction restoring her to the status quo ante as a tenured full professor teaching at the law school.

### A. Professor Smith Has Shown a Substantial Likelihood of Success on Her Claims

Professor Smith is only required to show that her success is merely "*likely* or probable, rather than *certain.*" *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). This factor is the most important, *see Gonzalez*, 978

---

[2] *Schrank v. Bliss*, 412 F. Supp. 28, 34 (M.D. Fla. 1976) ("In exceptional situations, however, where an irremediably deteriorating condition threatens to thwart the Court's ability to render a proper final judgment on the merits later, the Court must act to preserve or restore the vanishing **status quo ante**.") (emphasis added); *see, e.g.*, *Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the **status quo**. The Administrator, therefore, was entitled to seek a restoration of the status quo in this case.").

F.3d at 1271 n.12, thus Professor Smith addresses this element first.

### 1. *Equal Pay Act Claim*

Professor Smith is likely to succeed on all claims. The EPA follows a two-step framework. First, to establish a prima facie case a plaintiff must show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) (quoting 29 U.S.C. § 206(d)(1)). Second, if an EPA plaintiff establishes a prima facie case, "the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act:" (1) "a seniority system;" (2) "a merit system;" (3) "a system which measures earnings by quantity or quality of production;" or (4) "a differential based on any factor other than sex." *Brock v. Ga. Sw. Coll.*, 765 F.2d 1026, 1036 (11th Cir. 1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988). A defendant carries the burden to prove an affirmative defense, and where the defendant relies on the "factor other than sex" defense, the defendant has a heavy burden. *See Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358 (11th Cir. 2018).

Here, Defendant FAMU has already admitted that 1) Professor Smith's salary is "lagging" and "limited" allegedly due to her promotion history (Ex. 16) and 2)

**APP 157**

misrepresented that the male comparator's "salary is in line with the other professors teaching and specializing in that area" – Constitutional Law. (Ex. 5) Promotion history is not a reason for unequal pay. *Glenn v. General Motors Corp.*, 841 F.2d 1567 (11th Cir. 1988) ("prior salary alone cannot justify pay disparity."). The EPA is concerned with pay equality for the same job not a promotion history. *See Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020) (*en banc*) (discussing history of the EPA and its fourth defense).

To bolster this pretextual reason for the pay disparity, the most tenured and qualified is Professor Patricia Broussard (a woman), who earns significantly less than all men teaching Constitutional Law teaching. (Ex. 5) Defendant FAMU told the EEOC that the comparator earned more because he was a constitutional law specialist; Defendant FAMU's counsel retracted that to the EEOC. (Exs. 8, 16) Defendant FAMU's COL faculty handbook, as incorporated into the employment contracts, admits the tenured professor job requires substantially equal skill, effort, and responsibility, performed under similar working conditions within the same establishment. Because law professors can teach any course, as Professor Smith has during her employment, the title of a course being taught does not merit a higher salary. Therefore, because Professor Smith has established her prima facie case and negated head-on Defendant's proffered business reasons, thus she has shown a

likelihood of success on the merits of her first EPA claim. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) (discussing burdens).

### 2. *Equal Pay Act Retaliation*

Professor Smith is likely to succeed on her EPA retaliation claim. To prevail, a plaintiff must prove that "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). A plaintiff carries her burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

For purposes of this motion, Professor Smith engaged in protected activity when she filed a lawsuit to vindicate her pay allegations. *See Simpson v. State of Alabama Dep't of Hum. Res.*, 501 F. App'x 951, 954 (11th Cir. 2012). Plaintiff has suffered an adverse employment action through Defendant's notices of termination and the subsequent termination that came 22 days after the protected activity. *See Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (finding

that termination constitutes an adverse employment action) (quotation omitted).[3] Plaintiff is not an at-will employee, so Defendant FAMU cannot fire her as though she is – there must be "just cause" to terminate a tenured employee. (Ex. 2) Furthermore, Professor Smith was in a contract with Defendant FAMU that protected against unilateral terminations as discussed below. (Ex. 9)

Having satisfied her *prima facie* case, Professor Smith has established any reason proffered by Defendants is pretext. Defendants will argue the termination is based on "just cause." Such a position is illogical and unsupported by any evidence, especially given the lack of a definition of "retaliation" in its Regulations and numerous conflicting reasons for the rationale for Smith's termination. (Ex. 3, ¶129, Ex 19) There is no "just cause" and Defendant FAMU knows this because it has yet to define "retaliation" for Professor Smith or any university employee, even when it was asked to define the term. (Exs. 13, 19)

### 3. First Amendment Retaliation

Professor Smith is likely to succeed on her First Amendment retaliation claim. A plaintiff must show that "(1) [s]he engaged in protected activity, (2) [s]he suffered an adverse action, and (3) a causal connection exists between the protected activity

---

[3] At least one district court in this Circuit has recognized that a notice of intent to terminate constitutes an adverse employment action. *See Sorenson v. Delta Air Lines, Inc.*, No. 1:17-CV-00541-ELR, 2023 WL 5420953, at *18 (N.D. Ga. Mar. 31, 2023). Similarly, other circuits have similarly held that a notice of termination constitutes an adverse employment action. *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 301 (3d Cir. 2021) (surveying the circuits); *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 305–06 (2d Cir. 2017).

and the adverse action." *Warren v. DeSantis*, 90 F.4th 1115, 1127 (11th Cir. 2024) (citation omitted). A public employee engages in protected activity only if she can overcome the government-speech doctrine. A plaintiff can overcome the government-speech doctrine provides if:

> that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015).

Here, Professor Smith filed her complaint on October 17, 2023, to a public forum – Florida State Court. Her petition and the speech therein concerned matters of public concern because it alleged a practice of gender discrimination based on a continuous pay disparity by a government institution that would affect the public's trust in that institution. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.,* 57 F.4th 791, 820 (11th Cir. 2022) (Lagoa, J., concurring) (explaining that women's rights are issues of general public concern – Title IX context); *Presley v. Graham*, 936 F. Supp. 2d 1316 (M.D. Ala. 2013). When Defendants became aware of the complaint 22 days later, Defendants then unlawfully interfered with Professor Smith's freedom of speech and petition because Defendant FAMU retaliated against

11

**APP 161**

her by terminating her for engaging in this speech/petition. Additionally, Professor Smith's First Amendment interests outweigh the University's interest because Professor Smith has not taken any action to publicize or otherwise bring unnecessary attention to her filing, nor can it be stated that Smith's petition is interfering with College of Law or University operations. Silencing Professor Smith's concern would render a chilling blow to women across the country on pay equity. *See Oakes Farms Food & Distribution Servs., LLC v. Sch. Dist. Of Lee Cnty., Fla.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. 2021) (finding that termination would cause a chilling effect on speech). Lastly, "[t]he balance of equities tips in favor of [a] plaintiff's interest in preventing infringement of their First Amendment rights." *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009). Further, Defendant FAMU could not reach its decision in the absence of Professor Smith's protected conduct as is evident that months had passed, and Defendant FAMU had taken no action until Professor Smith filed suit. Finally, Defendants have changed their original rationale for Professor Smith's termination because the alleged retaliation excuse fails to hold up under the law (Doc. 84, ¶129), and thus, clearly, Defendants would not have reached the same decision in the absence of the protected speech.

### 4.   Breach of Contract

**APP 162**

Professor Smith is likely to succeed on her breach of contract claim. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted). Here, Professor Smith had an employment contract she signed on April 14, 2023, to end on May 10, 2024, and that contract was similar to all others she signed in previous years carrying an expectation and obligation of renewal because of her tenure.

Defendant FAMU breached Professor Smith's employment contract by violating its own regulations, (Exs. 2, 10, 19), when Defendants carried out a malicious investigation against Professor Smith and manufactured subterfuge to terminate Professor Smith. (Ex. 6) This breach is most analogous to doctors and physicians with medical privileges, who have been faced with nonrenewal of their staffing privileges at hospitals, Florida courts have routinely found that such an action amounted to a termination, or breach of contract, so injunctive relief issued. *Compare Spunberg v. Columbia/JFK Medical Center*, 1997 WL 868607, at *1-3 (Fla. Cir. Ct. Dec. 23, 1997) *with Shands at Lake Shore, Inc. v. Ferrero*, 898 So. 2d 1037, 1039 (Fla. 1st DCA 2005) and *Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So. 3d 915, 917 (Fla. 3d DCA 2010).

Florida courts have also regularly concluded that a hospital's alleged contractual breach of their Bylaws is sufficient to grant compensatory and injunctive relief. *See Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*, 497 So. 2d 1261, 1264 (Fla. 5th DCA 1986) (collecting cases). Moreover, courts in other States have found that tenured professors face similarly immeasurable and catastrophic injury from an unlawful termination – New Jersey and South Carolina courts have, and their decisions offer instructive value. *See Amer. Ass'n of Coll. Professors v. Bloomfield Coll.*, 322 A.2d 846 (C.H. Div. 1974), *affirmed* 346 A.2d 615 (App. Div. 1975) [hereinafter, "*AACP*" or "*AACP v. Bloomfield*"]; *Zisk v. The Charleston School of Law,* Case No. 2015-CP-1003661 (Charleston Cir. Ct. 2015) (Ex. 11). Professor Smith relies on *Zisk* and *AACP* to demonstrate that tenured professors – unlike probationary or non-civic public employees – may suffer incalculable loss and injury if they are terminated for improper or unjust reasons.

Similarly, here, Professor Smith has damages that are unquantifiable because her reputational loss, inability to teach law, inability to return to practice as partner, and overall professional losses are consistent with the harm suffered by the physicians in the cases mentioned above. Thus, Professor Smith has established a likelihood of success on this claim.

## 5.   *Violation of Procedural Due Process*

Professor Smith is likely to succeed on her procedural due process claim. The Florida and U.S. Constitutions both require "fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "When bringing a section 1983 claim alleging a denial of procedural due process, three elements must be shown: (1) a deprivation of a constitutionally-protected [] property interest; (2) state action; and (3) constitutionally-inadequate process." *Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 918 (Fla. 1st DCA 2009). A "tenured employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story" before a state or state agency may terminate an employee. *See McKinney*, 20 F.3d at 1561.

Here, Professor Smith has a property interest in her employment as a tenured law professor. Additionally, Defendant FAMU is an extension of the state, so state action is also satisfied. One case is truly instructive regarding the final element of inadequate process, and that case is *Spiegel v. University of South Florida*, 555 So.2d 428 (Fla 2d DCA 1989). In *Spiegel*, the court held that "[a] written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." 555 So.2d at 429 (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).

The court further found that "USF's attempt to terminate [Spiegel] as department chairman is so fatally defective that it is of no force or effect." *Spiegel*, 555 So.2d at 429.

Such is a similar case for Professor Smith. Pursuant to FAMU Regulations and her employment contract, Professor Smith was subject to an explicit tenure provision. Notwithstanding this provision, Defendant FAMU employed a biased decisionmaker who joined in on an unlawful conspiratorial agreement between a law firm and Defendant FAMU's general counsel; failed to follow its own Regulations to pretextually manufacture a claim of retaliation; failed to define the subject offense of "retaliation" to guard against arbitrary unilateral interpretation; selected biased internal appeal reviewers to deprive Professor Smith of meaningful appeals; and disregarded its Regulations on timing and procedure. (Exs. 3, 19) Like *Spiegel*, Defendant FAMU's procedural process was so fatally defective it should also have no force or effect, and Professor Smith, like *Spiegel*, should be immediately reinstated.

Defendants will likely argue Professor Smith has had the ability to appeal the decision through a separate complaint process likely to drag out for at least six months. The law does not support that. In *State Dept. of Health and Rehabilitative Services v. Artis*, 345 So.2d 1109, 1112 (Fla. 4th DCA1977), the court stated: "where pursuit of an administrative remedy would be of no avail, there is no adequate

remedy provided, and one is not required to follow that avenue for relief." *See also Southern Bell Telephone and Telegraph Co. v. Mobile America Corp., Inc.*, 291 So.2d 199 (Fla.1974). Accordingly, Professor Smith is likely to prevail on this claim as well.

### B. Professor Smith Has Established Irreparable Harm.

This Circuit has long recognized, as a general rule that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by **returning to the last uncontested status quo between the parties**, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *See Callaway*, 489 F.2d at 576. (internal citations omitted). As will be shown below, Professor Smith has demonstrated the irreparable harm that she is currently experiencing, cleared the precedential bar, and justifies the issuance of a preliminary injunction.

The Court's TRO ruling observed that Professor Smith's then-alleged harm, her campus removal and partial resource reduction, had already occurred. However, FAMU's subsequent actions have now severed nearly all remaining ties with the plaintiff, including insurance, payments, and academic resources. This complete severance demonstrates that the Court's initial assessment of potential irreparable harm has been fully realized, and monetary damages alone are insufficient to remedy

17

**APP 167**

the profound professional and personal losses suffered. Because Professor Smith is seeking a restoration of the *status quo ant*e, the Court's previous observation is not controlling. In fact, there are two ways to show irreparable harm in employment cases. Usually, irreparable harm is presumed in Title VII cases.[4] *Stone*, 655 F.2d at 612. However, a separate line of cases have required that an employee seeking a preliminary injunction make a showing of irreparable harm. Professor Smith believes her case mirrors the plaintiff in *Stone* but argues that she can show irreparable injury under *Sampson v. Murray,* 415 U.S. 61, 92 (1974) and its progeny as well.

    *Sampson* anticipated the extraordinary situation that Professor Smith is currently in. In *Sampson*, a probationary employee at the GSA was discharged four months into her job. She received a temporary restraining order (TRO) which was extended after a hearing until the Acting Commissioner testified about her dismissal. The D.C. Circuit upheld the TRO, prompting the Supreme Court to review the case, focusing on the trial court's authority to issue injunctive relief and its appropriate

---

[4] While *Stone* involved a Title VII claim and this case centers on an EPA claim, the distinction is essentially moot. Both claims are federal efforts to address workplace discrimination, indicating a similar legal foundation aimed at remedying inequality in employment. "In situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 200e *et seq.*, are satisfied, any violation of the Equal Pay Act is also a violation of title VII." 29 C.F.R. 1620.27(a). *See also Seldon v. Total Sys. Servs., Inc.,* 653 F. Supp. 2d 1349, 1377 (M.D. Ga. 2009) (holding that Title VII and EPA retaliation claims are evaluated the same way). Further, Professor Smith exhausted administrative remedies under her EPA claim just as she would be required to do under Title VII.

use. The Supreme Court vacated the TRO, citing a lack of irreparable harm, but it acknowledged exceptions in unusual discharge circumstances and clarifying that unusual cases justify a finding of irreparable injury sufficient for injunctive relief.

Notwithstanding the high bar that *Sampson* has placed on irreparable harm in employment cases, several employees have presented unique and distinctive facts sufficient to clear that high standard. These cases are so analogous to Professor Smith's case that preliminary relief must be granted to Professor Smith. The following cases are instructive.

First, a tenured position warrants the same or more protection than the non-tenured position in *Assaf v. v. University of Texas System*, in which Dr. Said A. Assaf, a nontenured faculty member in his second year at the University of Texas Health Science Center, received notice that his appointment would be terminated no later than September 1, 1975. 399 F. Supp. 1245, 1245-47 (S.D. Tex. 1975). Dr. Assaf moved for and received a preliminary injunction to prevent the University of Texas from terminating him based on the University's alleged failure to follow its own Rules and Regulations on dismissal notifications. The court made the following finding concerning irreparable harm:

> Here, there is much more than a temporary loss of income which the *Sampson* court admonishes to be insufficient to alone constitute irreparable injury. **Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences.** Clearly, money damages would be wholly inadequate to compensate plaintiff

19

for his loss of standing in the academic community. ***Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money.*** Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. ***If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions.*** Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.

*Id.* at 1251 (internal citations omitted)(emphasis added).

Second, a Jacksonville-based federal judge, the Honorable Charles Scott, distinguished *Sampson* in *Schrank v. Bliss,* 412 F. Supp. 28 (M.D. Fla. 1976). In *Schrank*, a well-performing, permanent deputy sheriff was denied due process after termination, causing irreparable harm. The court noted two main types of irreparable harm: first, a state-regulated system that ensures all future employers are informed of the plaintiff's termination, leading to actual and official stigmatization; second, official records accusing the deputy of insubordination, which unfairly tarnish his professional reputation as a law enforcement officer. The court intervened, issuing a preliminary injunction to prevent interference with his employment and reinstating him upon payment of a $250 bond.

Third, Judge Dalton distinguished *Sampson* in *Blaine v. N. Brevard Cnty. Hosp. Div.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018). In *Blaine*, seven well-regarded oncologists with impeccable track records of providing excellent patient care were denied reappointment, continued staff privileges, and the right to a

hearing; but they were offered an interview or appeal with members of the Board who voted to reject them. 312 F. Supp. 3d at 1298-1302. The oncologists moved for and received a preliminary injunction.

Fourth, in *Keyer v. Civil Service Commission of the City of New York*, 397 F. Supp. 1362 (E.D.N.Y. 1975) two permanent civil service employees were fired without being notified of the reasons or given a hearing, following the License Division's rejection of their 'Special Patrolman' designation. They had earned permanent status through rigorous evaluations and a probationary period, and they successfully obtained a preliminary injunction against their termination as the court found the plaintiffs had lost not only job security, health benefits, and pension contributions but also their expected career progression. The longer their absence, the higher the risk of missing out on promotions. Even if reinstated, the Court found, it would not compensate for lost advancement opportunities, and thus, immediate relief was necessary. *Id.* at 1370. The court lastly distinguished *Sampson* by framing the facts before it as "a total denial of due process which has had the effect of terminating permanent civil service employment and stigmatizing the plaintiffs in an occupation peculiarly susceptible to such a stigma." *Id.* at 1372.

Here, Professor Smith's purported termination is far from the traditional case explained in *Sampson*. Unlike the typical employee, she is a caretaker of her elderly, ill father; was terminated in violation of her employer's stated obligations under the

**APP 171**

contract and its own rules/regulations; lured to follow a sham appeals procedure; was given notice that she is or will be terminated then paid for a number of weeks after, was for a period retained in the public directory, and allowed access to company resources for a number of months until Defendants learned of her active complaint and retaliated again; has a termination based on clearly dubious charges alleging a violation of a legal concept (retaliation) and fails to meet the elements of the legal concept and unrelated to work performance; and has reporting implications to state licensing authorities under FL Bar Rule 4-8.3, 4-84. Nothing about Professor Smith's case is usual as contemplated in *Sampson*. Accordingly, Professor Smith has shown irreparable harm that cannot be remedied with monetary damages and that harm is her (1) "loss of repute within the academic community as well as a denial of access to research resources vitally necessary to a [legal] academician," *see Assaf*; (2) loss of her health insurance and all the other benefits attendant with her job, *see Keyer*; (3) loss of career advancement opportunities for deanships in the face of dubious allegations, *see Keyer & Schrank*; (4) loss of her ability to secure a similar job in this market; (5) loss of her constitutional right to due process from Defendant's failure to follow the rules and regulations it was required to as articulated in Professor Smith's annual contract and its own rules/regulations, *see Assaf*; (6) the potential for eviction, *see Schrank*; (7) significant damage to her reputation given her inability to complete scheduled scholarship, *see Assaf*; (8) loss of an

**APP 172**

unblemished disciplinary record and resulting reputational damage as a for-cause termination under obviously dubious allegations potentially reportable to the Florida Bar, *see Blaine*; (9) lastly her loss of pay as she is the sole caretaker for her father who, with a memory disorder, is not supposed to be removed to another living space, *see Schrank.*

### C. Public Interest Factors

As stated above, "[t]he third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez,* 978 F.3d at 1271. Terminating Professor Smith, who has a twenty-year stellar employment record of high evaluations by students and deans and a remarkable scholarship history, would be a disservice to the public interest as was seen in *Assaf*. (Ex. 1) There, the *Assaf* court found that the issuance of a preliminary injunction would indeed serve the public interest because:

> [T]here is a highly important public interest in education and the educational process. The public has a right to except (sic) that faculty members who will directly or indirectly affect the education of their children shall be of impeccable character and have the highest credentials. An accompanying interest of at least equal importance is an interest that there be a fair determination that the educational system is not being deprived of the expertise of people of superior caliber for merely frivolous reasons not relevant to academic excellence. Until such a determination of the validity of termination has been made, then a presumption of competence and integrity which is an integral part of public confidence in public education mandates that a professor be retained. In a broader sense, this court is saying that the public interest in the present context is best served by not terminating an individual until the due process prescribed has been complied with.

**APP 173**

*Id. at 1251-52; see also Blaine, Schrank, Callaway.*

Defendants have offered patently contradictory reasons for her termination, casting severe doubt on the pretextual reason offered for Professor Smith's termination. (Ex. 3, ¶129, Ex. 19) Not even alleged rivalry with another law professor has merit because that professor alleged and testified to tension with nearly all of the faculty at the College of Law and others, but nothing specifically with Professor Smith (Doc. 19), who was the one to recommend Reyes for a job at the COL. (Exs. 5, 12) Because no reason for Professor Smith's termination, her evidence of constitutional and statutory rights violations bolsters the principle that no public interest is served by keeping a decorated tenured professor away from her academician functions. Finally, injunctions protecting First Amendment freedoms are always in the public interest. *Frampton v. City of Baton Rouge*, Civil Action 21-CV-362-JWD-SDJ (M.D. La. Jan. 7, 2022).

### D. Bond

The "bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction." *Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005). "Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *See Complete Angler, LLC*, 607 F. Supp. 2d at 1335 (M.D. Fla. 2009). Professor Smith

24

**APP 174**

alleges she faces insurmountable losses professionally and personally and that her constitutional rights have been abridged. Thus, Professor Smith asks this Court to waive imposition of a bond in this instance. Defendants won't suffer damages.

## IV.   CONCLUSION

Professor Smith has clearly established the elements necessary for a preliminary injunction. Thus, Professor Smith requests that this Court grant the preliminary injunction by immediately reinstating Professor Smith to her tenured position during the pendency of the litigation, and notes that Defendant will not suffer any prejudice by this grant. Defendants' conduct is unlawful, so they suffer no legitimate harm from being enjoined from engaging in illegal activities.

Dated: July 10, 2024

Respectfully submitted,

*/s/ Jennifer Smith*
Jennifer Smith (FBN 964514) (*pro se*)
Law Office of Jennifer Smith
13506 Summerport Village Pkwy., Ste 108
Windermere, FL 34786
407-455-0712
jensmithesq@aol.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of July, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/ Jennifer Smith*

# 86-1 - Plaintiff's Affidavit Smith Dec

# 07/10/2024

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
CIRCUIT CIVIL**

JENNIFER SMITH,

    Plaintiff,

                                     CASE NO.:
                                     2023-CA-016035-O

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

    Defendant.

_____/

## DECLARATION OF JENNIFER SMITH

I, Jennifer Smith, being over the age of eighteen, make this declaration on personal knowledge of the following facts:

In 2004, I took a significant pay cut and left a secure place of employment after ten years at a big law firm to do something I thought would love, teaching. But not only would I be teaching, but I would be near the foundation of the start of a law school with a mission that resonated with me – to teach students from underserved communities. Although my formal start date at Florida A&M University College of Law was August 2004, I started in May 2004 without pay to create the student clinics at the law school. The then-dean rewarded my efforts with a monetary grant several months later. Teaching at FAMU COL allowed me to feel that I was continuing my "pro bono" efforts in helping the students and helping the students help the community in service in the clinics. I love teaching the students at the FAMU COL.

### Teaching and Student Mentorship

Having ascended to partnership at the law firm, I knew that I could work hard and earn



tenure. I have always been one of the most published of the COL faculty and one of the most advanced in learning new courses to teach our students. I have been proactive in integrating in the law school curriculum cutting-edge course topics that respond to emerging global and societal issues.

Significantly, I have proposed and taught several new courses that are billion-dollar industry courses or at the forefront of the legal landscape in law or society, such as Fashion Law; Marijuana Law & Policy; Intersectionality: Racism, Sexism, Classism, Colorism, Spiritualism & the Law; International Arbitration; Sneaker Law; and Comparative Analysis of Global Marijuana Laws, which have been well-received by students. These courses not only add to our curriculum's diversity but also place our institution at the forefront of emerging legal education trends.

I have also proposed and been working on the creation of Historic Preservation Law and a Survey of Electives Seminar, which would allow students an introduction to various niche areas of the law, such as Wine Law, Historic Preservation Law, Fashion Law, Marijuana Law, Natural Gas Law, International Business Arbitration, in one class. These innovative courses not only garner student interest but also position our law school as a forward-thinking institution. These courses not only enrich our curriculum but also foster a more diverse and inclusive learning environment. Personally, ensuring our students have access to a cutting-edge legal education also keeps me actively engaged in new learning subjects.

Beyond classroom teaching, I am deeply committed to mentoring students, offering guidance in academic pursuits, career choices, and professional development. This mentorship extends to supervising independent studies and guiding students in their research projects, discussing career opportunities, and connecting students with local lawyers in their areas of interest.

2

**APP 178**

<u>Scholarship</u>

My scholarly contributions are a testament to my commitment to advancing legal scholarship and continue to contribute significantly to the field of law. This year, I was excited about the forthcoming publication of my book, WORTH THE FIGHT: ADVANCING THE CAUSE OF EQUAL PAY. Additionally, my law review article, *AI-Powered Educational Equity: Leveraging ChatGPT for Inclusive Legal Education*, reflects my dedication to addressing contemporary legal challenges and promoting inclusive education. This article has already been accepted for publication in the Touro Law Journal of Race, Gender and Ethnicity for Winter 2024.

My recent publications include a new edition of A STUDENT ELECTRONIC DISCOVERY PRIMER AN ESSENTIAL COMPANION FOR CIVIL PROCEDURE COURSES, SECOND ED. (2023), which has been updated to reflect the latest developments in electronic discovery, including artificial intelligence. It serves as an essential guide for students navigating this increasingly important area of law. This is a companion book that I have used in my Civil Procedure (1L) class since the first edition in 2016.

In addition, *Colorism, Shades of Freedom* (S. Cal. Rev. L. & Soc. Just., Vol. 32) was published in 2023. In this law review article, I delve into the legal implications of colorism within the United States justice system, highlighting an often-overlooked aspect of racial and social justice. This article also includes a student essay within it to allow students to place significant writing credits on their resumes. Also, *Historically Black Colleges & Universities: A Model for American Education* (14 Fla. A&M U. L. Rev. 103) was published in 2021 and is a comprehensive law review article on HBCUs and Black history. I began this piece in 2016 and promised it to the FAMU Law Review when it was seeking articles for its journal. This piece reflects on the role of HBCUs in shaping American education, underscoring their significance and offering insights for

3

**APP 179**

educational reform.

Over the five-year span of the article's development, several students assisted me with the research, but one student was particularly helpful, and he is recognized as a co-author on the article to allow him to develop his book of scholarship. My work on petitions for certiorari to the United States Supreme Court drafted in 2018 and 2021, and a federal appellate brief drafted in 2019, not only reflects my engagement with pressing legal issues but also demonstrates my commitment to influencing national legal discourse. These writings involved civil rights (Section 1981 as well as an area of Civil Procedure that the federal courts are grappling with) and equal pay issues (Equal Pay Act). Issues like these enhance my teaching in Civil Procedure and other courses, as well as bring the University one step closer to racial and gender equality.

My legal scholarship stands as a beacon of influence and authority. My research and thought-provoking insights have not only captured the attention of peers but have also resonated profoundly within the highest echelons of the judicial system. My work has been cited by an array of prestigious courts, including state supreme and federal appellate and district courts, a testament to the practical impact and relevance of my scholarship. These citations are a clear indicator of the weight and significance my contributions hold in shaping legal discourse and practice. Furthermore, the recognition from fellow scholars and authoritative legal treatises underscores the depth, originality, and rigor of my work. My scholarship not only enriches the academic community but also actively informs and guides judicial reasoning, shaping the contours of legal precedent and policy.

<u>Service</u>

My service to the community through diverse yet interconnected activities reflects a commitment to leveraging my professional skills and personal passion for the betterment of

4

APP 180

society. These roles have allowed me to make significant contributions in areas of democratic participation, legal advocacy, educational development, and community empowerment, resulting in recognition as a "Community Star" from the African American Women's History Month Project, Inc. in 2020. I remain dedicated to continuing these efforts, aiming to make a lasting and positive impact on our COL, University and broader community.

I also created and funded (co-sponsoring with another COL professor) a $500 law review scholarship to encourage student engagement in research and publication of student scholarship. In addition, I donated $10,000 to the University in 2019 for a student emergency fund, but because the University/COL seemed not to be able to figure out how to advance these "emergency" funds to students, the money was given to another HBCU.

<u>Legal Battles</u>

**Equal Pay**

While leading in faculty publications, teaching excellence and service, I was also engaged in a decade-long battle against the University for equal pay. I have not only carved a path as a formidable law professor but also emerged as a trailblazer for gender equity in the legal profession. This relentless pursuit of justice transcended personal struggle, molding me into a professor who embodies resilience, integrity, and an unwavering commitment to fairness. In the classroom, these experiences have translated into a more nuanced and empathetic approach to teaching. My ability to interweave real-world legal battles with academic rigor has not only captivated students but also instilled in them a profound understanding of the law's transformative power.

By sharing my own public experiences of confronting systemic disparities, I hope to have illuminated the path for future lawyers, equipping them with the courage and moral compass to challenge injustices. Furthermore, my fight for equality has had a resounding impact on my

5

development as a legal educator. It has deepened my engagement with issues of social justice, workplace equity, and the complexities of legal advocacy. My teachings are now imbued with a richness and authenticity that only comes from lived experience, fostering an environment where critical thinking and social consciousness are not just encouraged but are deemed essential.

As a mentor, I have become an inspiring figure, whose journey resonates profoundly with students, particularly those who face or witness inequities. I have transformed the classroom into a crucible where the next generation of lawyers are not only educated but also galvanized to become agents of change. Significantly, my fight for equal pay has also contributed substantially to advancing gender equity in the law. My battle, which echoes the struggles of many women in academia and beyond, has raised critical awareness about gender-based pay disparities and systemic biases in the legal field.

My ultimate victory resulted in 1) individual salary increases for women up to $23,000, 2) closing the $20,000 pay gap between men and women holding the title of "associate dean" and 3) obtaining overdue promotions for women faculty is not just a personal triumph but a landmark achievement in the ongoing struggle for gender equality. Notwithstanding the equal pay battle, I have continued to be one of the few leaders in scholarship productivity and teaching excellence at the COL. That said, the battle for gender equality continues as the gender pay inequities remain fresh.

**FMLA**

In addition to the equal pay battles, I was compelled to file an FMLA (Family and Medical Leave Act) complaint against the University while on FMLA leave in the fall of 2021 because Dean Keller, Associate Dean Cooper, and the University general counsel were reassigning me on my return from a law professor from FMLA to work in the University general counsel's office,

6

specifically under the supervision of the University general counsel to perform legal tasks, and threatening my employment for failure to comply. This was in stark violation of FMLA provisions. The Department of Labor found the University in violation and required it to return leave hours to me, and this has yet to be confirmed as done.

<u>Performance</u>

Notwithstanding my legal battles with Defendant and its negative, retaliatory responses to me in return, I have continued to stand as a model of excellence for the University, the law school and the students.

My evaluations from the deans – only 3 in ten years even though the Faculty Handbook required evaluations annually – have been superior on a scale of 1-5 with 5 the highest.[1]

| Dean | Pernell 2012-13 | Pernell 2013-14 | Keller 2021-22[2] |
|---|---|---|---|
| Teaching Effectiveness | 5.0 | 5.0 | No rating but comments: "You are an active and engaged teacher and scholar." |
| Research | 5.0 | 4.8 | 4.8 |
| Service | 4.6 | 5.0 | 5.0 |
| Other Univ. Duties | 5.0 | 5.0 | 5.0 |

Similarly, my student evaluations have overall been superior. Some of the sample comments from the last few years in my courses are below.

**Civil Procedure (79 students-1Ls):** "Demands excellence from her students. Fair professor. She provides each student with the same opportunity as others. Professor Smith is the most hands on professor at FAMU, which helps us better understand the material and how it applies or does not apply in the legal field. Professor Smith is very intelligent and knows how to teach."

**Comparative Analysis of Global Marijuana Laws, Stetson Law School in the Hague, Netherlands:** "Professor Smith was phenomenal. Prof. Smith did a great job of providing material

---

[1] The evaluations for all faculty ended in 2014 when I filed a gender pay lawsuit, and the evaluations revealed that my male comparator was being paid more than I was, but he was not performing at the same high level of excellence as I was in teaching, scholarship, or service.

[2] Based on the standard universal meanings of 1-5 rating.

7

that was not biased and presented both perspectives for and against. Great professor in an area of law that is newer and constantly changing. This class was great."

**Remedies (12 students -2Ls/3Ls):** "One of, if not the best professor I have taken at FAMU Law. She asks a lot of us as students, I think this was the only class we actually were required to read the whole textbook. She assigned us an additional oral argument and memo assignment. Professor Smith was very helpful and creative in the ways that she taught this class. Her methods will indefinitely stick with me as I pursue my path in the law field. She was always willing to help students understand the material, but made sure that they understood that in order to be successful in her class, students must also do their part and come prepared. She holds her students to a high standard and I believe that is what helps them be successful."

**Fashion Law (9 students -2Ls/3Ls):** "Professor Jennifer Smith was very professional, engaging, knowledgeable on the subject area of Fashion Law and very helpful and informative with insight on writing upper-level writing papers and Seminar papers."

**Health Care Law (14 students -2Ls/3Ls):** "Truly enjoyed Professor Smith's course on Health Care Law. I now have a well-rounded understanding of HCL and I look forward to working in the Health Care Law field. I know what I have learned in class will help me in practice. Overall great professor & the course definitely was a good survey course for health care law."

**Civil Procedure (60 students -1Ls):** "Great class, well organized. Great Professor! Blessing to FAMU COLLEGE OF LAW. I have never in my collegiate experience had a professor like Jennifer Smith. She has to be tough because civil procedure is tough, she is very particular because courts will be particular. Professor Smith truly wants the best for her students and will do whatever it takes (zooms, office hours, emails) to ensure that students understand any misconceptions. I will never forget her and I will always remember what she taught me."

**Marijuana Law & Policy (16 students -2Ls/3Ls):** "The material in this course was very interesting! The controversial material made class discussions very engaging. The professor was knowledgeable and offered legals tips that we can use outside of the class. I feel like a better writer after taking this course."

**Civil Procedure (15 students, evening program-1Ls):** "Professor Smith was phenomenal. Her teaching method is highly engaging, and she does a great job communicating the various nuances of the material covered as it relates to the class examination, bar examination, and in practice. She also makes the class fun. I will look to take as many classes with Professor Smith as possible in the future. Being a part time student that works a demanding full time job, Professor Smith's skill at teaching and ability to make the class time enjoyable makes going through the grind a lot easier to deal with. This course was reading-heavy for sure! Professor Smith gave helpful examples and would go over any questions we had thoroughly to ensure our understanding."

My student evaluations estimated average score on the "overall rating of instructor" is below.

| Student Evaluations |
| --- |
| 4.31 |

Sadly, because of my excellence at my job as a law professor and my love for it, the only way to finally get rid of me would have to be a manufactured charge of misconduct to circumvent my tenure security. I have dealt with much in the way of nonsense at the COL, but my love for teaching and the unique mission of the law school allowed me to enjoy my job there, nonetheless. There is no money that can compensate me for my love of teaching or repair my professional reputation or resume.

As a tenured law professor at the COL, my work is not simply what I do – it is who I am. It is my contribution to the social order of this community and my source of great satisfaction, fulfillment, and accomplishment. I am the sole caretaker of my elderly father, who I cannot relocate because of his medical condition. Despite the heavy responsibility of caring for my father, teaching and serving the students at the COL allows me to do something that I love every single day. Terminating me for a manufactured "cause" that is pretext for retaliation would destroy my reputation, nullify my scholarship, breach my employment contract, penalize me for exercising my right to equal pay and the right to petition, and likely prevent me from ever teaching again.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE INFORMATION AND BELIEF.**

1/29/24
Date

Jennifer Smith

9

# 86-2 - FAMU Regs

# 07/10/2024

**Regulations of**
**Florida A&M University**



**10.120      Predetermination Procedures for Tenured and Permanent Status**
**Faculty and University Support Personnel System Employees.**

(1) Written Notice – Prior to the dismissal, suspension, or disciplinary reduction in pay of a tenured or permanent status employee, the University shall give the employee written notice as follows:

(a) The employee shall be given written notice of the proposed action and the reasons therefore. Such notice shall be sent by certified mail, return receipt requested, or delivered in person with written documentation of receipt obtained.

(b) The mailed notice shall be considered received by the employee even if refused or ignored.

(2) Contents of Notice – The notice shall be signed by the President or President's designee who makes the final decision regarding the proposed action. The notice shall include the following information:

(a) The effective date of the University's proposed final action;

(b) The specific charges or reasons for the action;

(c) A list of documents or written explanation on which the charges are based; and a statement that documents shall be available to the employee upon request;

(d) A statement that the employee may, within 10 days of receipt of the notice, submit a request in writing for a conference at which the employee may make an oral or written statement, or both, to the University to refute or explain the charges or reasons for the action; and the name and address of the person to whom the request for a conference shall be directed;

(e) A statement that the requested conference must be held prior to the proposed effective date of the action, at a time and place determined by the University, normally during regular business hours, and that the employee may bring a

**10.120      Predetermination Procedures for Tenured and Permanent Status**
**Faculty and University Support Personnel System Employees**

**Page 1 of 3**

**APP 187**

representative to advise and assist;

(f) A statement that the University desires to reduce the risk of error in taking the action against the employee and to avoid damaging the employee's reputation by untrue or erroneous charges, and therefore, the University is interested in receiving and considering the employee's response; and

(g) A copy of this rule shall be enclosed with the notice.

(3) Conference – The conference must be conducted by the designated representative(s) of the President as follows:

(a) The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted.

(b) The conference shall be informal and shall not be in the nature of an evidentiary hearing. The employee may bring a representative to advise and assist, but discovery, cross-examination and similar legal procedures are not permissible.

(c) The employee shall be permitted to submit relevant information, orally or in writing, or both, with the privilege being reserved to the University to give such information the weight it deems proper. If the employee chooses to make no response, the University will proceed on the basis of the best information it can obtain without such response.

(d) After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision.

(4) Decision – If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified as described in this rule within five workdays prior to the date the action is effective. USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of Board of Regents subsection 6C-5.950(4), F.A.C. If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance

10.120     **Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees**

**Page 2 of 3**

**APP 188**

procedures as provided in the applicable collective bargaining agreement may be used. Further, the University shall follow the provisions of Part VI of Chapter 112, F.S., Law Enforcement Officers' Bill of Rights, when Sworn Law Enforcement Personnel are involved.

(a) During the period between the first notice and the effective date of the action, one of the following options may be used by the University: retain the employee in the employee's usual duties; temporarily assign the employee to other duties; or place the employee on administrative leave with pay.

(5) Extraordinary Situations.

(a) In extraordinary situations, when the retention of a tenured or permanent status employee is likely to result in damage to property, or is likely to result in injury to the employee, a fellow employee, or some other person, the employee may be suspended or dismissed immediately upon written or oral notice to the employee of the charges giving rise to the suspension or dismissal.

(b) If an oral notice of suspension or dismissal is given to an employee, the University shall within 24 hours issue a written notice confirming the proposed action and the reason(s) therefore.

(c) In lieu of the action to suspend or dismiss the employee, the University may place the employee on administrative leave as described in subsection 6C-5.920(14), F.A.C.

(d) USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of subsection 6C-5.955(4), F.A.C.

(e) If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance procedures as provided in the applicable collective bargaining agreement may be used.

(f) Further, the University will follow provisions of Part VI of Chapter 112, F.S., Law Enforcement Officer's Bill of Rights, when sworn law enforcement personnel are involved.

*Specific Authority 1001.74, 1001.75 FS., History–New 6-27-96.*

**10.120       Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees**

**Page 3 of 3**

**APP 189**

**Regulations of**
**Florida A&M University**



**10.205      Disciplinary and Separation from Employment Actions for Faculty**
~~and Administrative and Professional Employees.~~

(1)      The provisions of this regulation~~rule~~ are supplemented by the respective collective bargaining agreement for the employees who are represented by a collective bargaining agent.

(2)      Faculty ~~or Administrative and Professional (A & P) employees~~ shall give one month notice of resignation from employment, if possible. An employee who resigns from employment shall not have any rights of appeal.

(3)      Nontenured or Nonpermanent Faculty ~~and A & P employees~~ whose appointments expire after receiving notice of nonrenewal or nonreappointment or whose appointment expires without the requirement of a written notice of nonreappointment may be separated without further notice.

(4)      An employee who is absent without approved leave for three or more consecutive workdays shall be considered to have abandoned the position. For employees governed by the Board of ~~Regents~~ Trustees and United Faculty of Florida (~~BOR/UFF~~) (BOT/UFF) Collective Bargaining Agreement, the relevant provisions of ~~Article 16~~ the Collective Bargaining Agreement shall apply for job abandonment.

(5)      The President or President's designee may discipline a Faculty ~~or A & P employee~~ for just cause in accordance with the provisions set forth herein. Counseling of any nature or degree shall not be considered disciplinary action.

(a) Just cause shall be defined as:

1. Incompetence; or

2. Misconduct.

(b) The President or President's designee may impose progressive discipline as applied to employees. The term "progressive discipline" as used in this regulation~~rule~~ means that the form of disciplinary action imposed against the

employee increases in extent or severity with each action taken. The discipline to be imposed against the employee under this paragraph may include a written reprimand, suspension or dismissal from employment with the University. The discipline that is imposed will depend upon the seriousness of the offense and any aggravating or mitigating circumstances.

(c) Written Reprimand – A written reprimand issued by the employee's supervisor is to warn the employee in writing of the specific conduct or performance standard that was violated and to place the employee on notice of the next level of discipline if the offense is repeated. The written reprimand shall be in a letter format from the supervisor to the employee. A copy of the written reprimand shall be placed in the employee's personnel file. The employee must be informed of the possible consequences if the offense is repeated or the performance fails to improve.

(d) Suspension – The President or President's designee may suspend the appointment of the employee during the term of the employment contract for just cause. The President or President's designee shall also determine whether the suspension shall be with or without pay, which will depend upon the seriousness of the offense and any aggravating or mitigating circumstances. The employee shall be given written notice of the suspension action by the President or President's designee specifying the reason(s) therefor. Following appropriate written notice, the employee may be reassigned by the President or President's designee depending upon the nature of the offense and any aggravating or mitigating circumstances.

(e) Suspension Pending Hearing – When the President or President's designee has reason to believe that the employee's presence on the job would adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students, the President or President's designee may immediately suspend the employee from the performance of duties, pending a hearing under the complaint procedure outlined in Regulation~~Rule 6C3-~~ 10.2~~0~~6.~~32, F.A.C.~~ The President or President's designee shall also determine whether the suspension shall be with or without pay in the manner outlined in

paragraph (4)(d) of this ~~regulation~~rule. If the employee has been suspended without pay and subsequently is reinstated as a result of the complaint procedure under ~~Regulation~~Rule  6C3-10.20632, ~~F.A.C.~~, the employee shall be reinstated with back pay.

(f) Dismissal – The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students. The employee shall be given written notice of the dismissal by the President or President's designee specifying the reason(s) therefore. The dismissal shall take effect at the time determined by the President or President's designee and as written in the notice of dismissal.

(g) The President or President's designee may impose other disciplinary action for just cause. The term "other disciplinary action" is defined as discipline incidental or in addition to a written reprimand or suspension. Examples of other disciplinary action may include a demotion, reduction in pay, removal of administrative duties or restitution. Any other disciplinary action imposed will occur simultaneously with a written reprimand or suspension. The other disciplinary action imposed will depend upon the nature of the offense and any aggravating or mitigating circumstances. Written notice of such disciplinary action, specifying the reason(s) therefor, shall be given to the employee by the President or President's designee.

(h) The effective date and hour of the disciplinary action shall be recorded in the written notice. Such notice shall be delivered or forwarded to the employee by certified mail with a return receipt requested, or when practicable the notice may be hand-delivered to the employee provided the delivery is certified in writing by the deliverer. The attempts prescribed above to notify the employee satisfy the requirement of notification, and failure of the employee to receive notification does not invalidate the disciplinary action nor its effective date. It is incumbent upon the University, however, to see that a continuing effort is made to effect notification.

(i) Within 30 days following the receipt of notice of disciplinary action, the employee may file a complaint in accordance with Regulation~~Rule 6C3~~ 10.2~~0~~6.5~~3~~2~~, F.A.C.~~

(6) Other Personal Services (OPS) employees without permanent status in any class may be separated from employment at any time without requirements of notice or reason and without rights of appeal.

*Specific Authority: 1001.74, 1001.75 FS. Law Implemented 110.205(2)(d), 1001.74, 1001.75 FS. History–New 6-3-01.*