CASE NO. 24-12823

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

JENNIFER SMITH,

*Plaintiff - Appellant,*

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON; DENISE D. WALLACE; LATONYA BAKER; LATRECHA SCOTT; RICA CALHOUN; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E. MITCHELL; AND SARAH REINER,

*Defendants - Appellees.*

## APPENDIX

On Appeal from The United States District Court for the Middle District of Florida, No. 6:24-cv-00457-PGB-RMN; and The United States District Court for the Northern District of Florida, No. 4:24-cv-00367-MW-MAF

Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy., Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023 (facsimile)
jensmithesq@aol.com
jensmithesq@yahoo.com (secondary)

Plaintiff - Appellant *pro se*

November 2024

**Volume 2 (of 4)**
**Pages 194–431**

APP 194

# Index

**Tab**

**VOLUME 2**

Plaintiff's Corrected Second Amended Complaint 86-3 [2024-07-10] ...............86-3

Three Lawyer Panel Decision [2024-07-10] ....................................................86-4

Affidavit Smith Supp Dec [2024-07-10] .........................................................86-5

Dec. 5 2023 Notice [2024-07-10] ....................................................................86-6

Jan 23 2024 Notice [2024-07-10] .....................................................................86-7

FAMU EEOC Res [2024-07-10] ......................................................................86-8

Faculty Contract [2024-07-10] .........................................................................86-9

FAMU Tenure Regs [2024-07-10] ..................................................................86-10

Zisk Case [2024-07-10] ..................................................................................86-11

Reyes Depo [2024-07-10] ...............................................................................86-12

FAMU Resp to Plaintiff's Interrogatories [2024-07-10] .................................86-13

Affidavit Waston Dec #1 [2024-07-10] ..........................................................86-14

Affidavit Waston Dec #2 [2024-07-10] ..........................................................86-15

FAMU Position Statement to EEOC [2024-07-10] .........................................86-16

Def Resp to 1st P.I. [2024-07-10] ...................................................................86-17

**APP 195**

Def. Resp to 2nd P.I. [2024-07-10] ....................................................................86-18

**APP 196**

# 86-3 - Plaintiff's Corrected Second Amended Complaint 86-3

# 07/10/2024

Case 6:24-cv-00457-PGB-RMN Document 84 Filed 07/09/24 Page 1 of 66 PageID 2661

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JENNIFER SMITH,

      Plaintiff,

v.

                                     Case No. 6:24-cv-00457-PGB-RMN

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON, individually and in her official capacity; D. DENISE WALLACE, individually and in her official capacity; LATONYA BAKER, individually and in her official capacity; LATRECHA SCOTT, individually and in her official capacity; RICA CALHOUN, individually and in her official capacity; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E. MITCHELL, and SARAH REINER,

      Defendants.

_____

## CORRECTED SECOND AMENDED COMPLAINT

Plaintiff, Jennifer Smith ("Professor Smith"), makes the following allegations against Defendants Florida Agricultural & Mechanical University Board of Trustees ("Defendant FAMU" or "FAMU"), Allyson Watson ("Defendant Watson"), D. Denise Wallace ("Defendant Wallace"), Gray Robinson, P.A. ("Defendant Gray Robinson"), Latrecha Scott ("Defendant Scott"), Rica Calhoun ("Defendant Calhoun"), Julie Zolty ("Defendant Zolty"), Sarah Reiner ("Defendant Reiner"), and Richard E. Mitchell ("Defendant Mitchell").

**APP 198**

**INTRODUCTION**

Over the past decade, school violence against faculty has emerged as a growing concern, with numerous incidents highlighting the vulnerability of educators. Reports indicate a troubling increase in physical assaults, verbal threats, and acts of intimidation directed at teachers and administrative staff.[1] University professors are not exempted from the increasing number of violent acts, intimidation, harassment or threats that students have displayed in recent years.[2]

Amid these growing concerns, on October 20, 2022, an unprovoked and enraged student, then-unknown to Professor Smith, barged into Professor Smith's class in progress to demand that she be allowed to sit to prepare for another class scheduled later that morning. Professor Smith reported the then-unidentified student's conduct to Associate Dean of Students, Reginald Green. Instead of following FAMU Regulations

---

[1] Susan D. McMahon et al., *Violence Against Educators and School Personnel: Crisis During COVID* Technical Report, AMERICAN PSYCHOLOGICAL ASSOCIATION (2022), https://www.apa.org/education-career/k12/violence-educators-technical-report.pdf.

[2] Claudia Lampman, Women Faculty at Risk: U.S. Professors Report on their Experiences with Student Incivility, Bullying, Aggression, and Sexual Attention, 5 NASPA J. ABOUT WOMEN IN HIGHER EDUC. 184, 184 (2012) ("In this study of a random sample of 524 professors . . . from 100 colleges and universities across the United States, 91% reported at least one act of student incivility/bullying, 25% experienced at least one sexual behavior from a student, and 1–2% said a student had used or threatened them with violence in the past year."); Colleen Flaherty, *Shattered: A Professor's Murder at the University of Arizona, Apparently by a Former Student, Raises Urgent Concerns About Campus Safety. He Wasn't the First Professor Killed At Work, Either.*, INSIDE HIGHER ED (Oct. 12, 2022), https://www.insidehighered.com/news/2022/10/13/professors-murder-campus-raises-urgent-safety-questions (detailing several university professors who were killed by students); *see also* Thyrie Bland, *FSW Professor Granted Temporary Restraining Order Against Student*, NEWS-PRESS (Mar. 2, 2018), https://www.news-press.com/story/news/education/2018/03/02/fsw-professor-granted-temporary-restraining-order-against-student/389244002/; Nadine El-Bawab, *UNC Chapel Hill Professor Killed in Office was Shot 7 Times, Medical Examiner Says*, ABC NEWS (Oct. 6, 2023), https://abcnews.go.com/US/unc-chapel-hill-professor-killed-office-shot-7/story?id=103780698.

**APP 199**

and forwarding the reported complaint to FAMU's Compliance & Ethics department or investigating the complaint pursuant to the Florida A&M University College of Law's Student Code of Conduct, Associate Dean Green did nothing, not even preserve the video surveillance footage of the incident. Nearly 100 days passed since the student encounter, still FAMU had not acted. It was not until shortly after Professor Smith submitted a response to the U.S. Equal Employment Opportunity Commission's ("EEOC") investigation of equal pay allegations that FAMU initiated a retaliatory investigation targeting only Professor Smith for the student's intrusion. This employment discrimination and civil rights case was initially centered on a retaliatory investigation precipitated by Professor Smith's campaign for equal pay for women at the FAMU College of Law. Finding the enraged student's version of the classroom encounter completely baseless, FAMU independently manufactured a claim of retaliation to fabricate cause to terminate Professor Smith. This unlawful termination and blatant retaliation implicate several contractual and previously unpled civil rights issues transforming this case into a much more serious action, requiring judicial intervention.

Professor Smith asserts the following allegations upon information, belief, and investigation of counsel:

**APP 200**

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 1343. Jurisdiction is also based on federal questions under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the First and Fourteenth Amendments to the U.S. Constitution, and 42. U.S.C. § § 1983, 1985 and 1986.

2.      Venue is proper in this district under 28 U.S.C. § 1441 because Defendant FAMU removed from the Ninth Judicial Circuit Court in and for Orange County, and the Orlando Division of the Middle District of Florida is the "district court of the United States for the district and division embracing the place where such action [wa]s pending." Moreover, the locus of operative facts and many of the witnesses and parties are located or operate in this district consistent with the command of § 1391.

## ADMINISTRATIVE PREREQUISITES

3.      All conditions precedent to bringing this action have occurred.

## PARTIES

4.      Professor Smith is a woman, United States citizen, and resident of Orange County, Florida.

5.      Defendant FAMU is a state university within the Florida state university system headquartered in Tallahassee, Florida. Defendant FAMU operates a law school in Orlando, Florida (the "College of Law" or "COL").

6.      Defendant Watson is the Provost and Vice President for Academic Affairs

4

at FAMU. Defendant Watson is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

7.    Defendant Wallace is the General Counsel of FAMU. Defendant Wallace is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

8.    Defendant Baker is the Director of Compliance and Chief Privacy Officer for FAMU. Defendant Baker is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

9.    Defendant Scott is the Director of Equal Opportunity Programs (EOP) for FAMU. Defendant Scott is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

10.    Defendant Calhoun is the Chief Compliance & Ethics officer for FAMU. Defendant Calhoun is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

11.    Defendants Watson, Wallace, Baker, Scott, and Calhoun are collectively referred to as the "University Employee Defendants."

12.    Defendant Mitchell is of counsel for Gray Robinson and serves as outside counsel to FAMU.

13.    Defendant Zolty is an associate attorney with Gray Robinson and serves as outside counsel to FAMU.

14.    Defendant Sarah Reiner is a partner with Gray Robinson and is outside counsel to FAMU.

15.    Defendant Gray Robinson is a Florida law firm that serves clients nationally from 15 offices across Florida and Washington, D.C.

16.    Defendants Mitchell, Zolty, Reiner and Gray Robinson are collectively referred to as the "Gray Robinson Defendants."

## **GENERAL ALLEGATIONS**

17.    Professor Smith was employed by FAMU from 2004 up through and including at least April 2024 when she received monies from FAMU, and she had an exemplary record of service.

18.    In May 2004, Professor Smith started working voluntarily for Defendant FAMU at the COL based on a fulfilled promise by then-Dean Percy Luney that she would be paid in the future for her efforts in establishing the law clinics at the new law school. Her official start date as a law professor was August 8, 2004. (Ex. 21)

19.    Professor Smith performed the duties of a law professor, which include teaching, scholarship and service, and she was subject to the direction and control of

6

APP 203

Defendant FAMU at all times relevant to this litigation. (Ex. 9)

20.    Defendant FAMU has neither changed the duties and responsibilities of law professors, nor the skill or expertise required of law professors from 2004 to date. Professors at the COL perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all professors at the law school, irrespective of subject matter.  (Exs. 4 (Pernell Depo), 9).

21.    Defendant FAMU does not use subject matter "specialists" to classify law professors or change job descriptions as Defendant FAMU had misrepresented to the EEOC on December 12, 2022 (Ex. 18, p. 6), but later admitted on May 5, 2023. (Ex. 1, p. 3)

22.    Defendant FAMU has neither employed nor maintained any logical or consistent approach in assigning law professors to teach courses.

23.    Professor Smith was a tenured full professor from 2016 until her unlawful, purported termination.

24.    On August 16, 2013, then Dean Pernell, Professor Smith's immediate supervisor, evaluated her in her duties as excellent in teaching, scholarship and service for the 2012-13 academic year. (Ex. 21)

25.    In May 2014 for the year 2013-14, then Dean Pernell evaluated Professor Smith in her duties as excellent in teaching, scholarship and service for the 2013-14

7

**APP 204**

academic year. (Ex. 21)

26.     Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported that to BOT board members at a meeting with the faculty at the College of Law.

27.     In 2015 after Professor Smith sued for equal pay, Defendant FAMU recognized there was gender inequity of up to $20k in its law faculty salaries in "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," prepared by the Florida A&M University Office of Institutional Research (August 2015) (Ex. 2), which found that for tenured full professors:

    a)  Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (p. 3)

    b)  The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (p. 10)

    c)  Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (p. 13)

**APP 205**

## EQUAL PAY ALLEGATIONS

28.    In 2016, Defendant FAMU informally or formally created a "lockstep" salary structure whereby associate professors were set at a base salary of $120,000 and full professors were set at a base salary of $140,000, subject to nominal increases based on that person's year at the particular rank, tenure status, and years tenured. (Ex. 12)

29.    On August 9, 2021, Defendant FAMU hired Ewanrinareto "Areto" Imoukhuede ("Comparator"), a male professor to the same or similar position as Professor Smith – tenured full professor at the College of Law. Comparator has the same core and essential duties, which are teaching, scholarship and service. (Ex. 9, pp. 49, 52-53)

30.    Professor Smith and Comparator performed substantially equal work in terms of skill, effort, and responsibility, under similar working conditions as tenured law professors at the COL. (Ex. 4; Ex. 9, pp. 49, 52-53)

31.    Despite performing substantially equal work, Defendant FAMU paid Professor Smith nearly $25,000.00 less than Comparator for performing the same or similar job duties when Professor Smith has ten years more legal experience than Comparator.

32.    Comparator's pay at the time he was hired is about $25,000.00 greater than the 2016 "lockstep" structure.

33.    The increased pay that Comparator received and receives has not been

9

APP 206

based on superior skill, education, or experience or any other legitimate factor.

34.     The Fair Labor Standards Act, as amended by the Equal Pay Act ("EPA"), 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

35.     Defendant FAMU has discriminated against Professor Smith on the basis of sex by paying her a lower wage rate than Comparator for equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions, in violation of the Equal Pay Act.

36.     Defendant FAMU violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

37.     As a result of Defendant FAMU's unlawful conduct, Professor Smith has suffered lost compensation and other damages, and is entitled to attorney's fees and costs.

### SPECIFIC ALLEGATIONS

38.     On May 9, 2022, Professor Smith emailed the president of FAMU, Dr. Larry Robinson, about the disparity in pay between her and Comparator. Given the history of litigation and the media attention it garnered,[3] resulting in FAMU's 2015

---

[3]Professor Files Gender-Discrimination Suit Against FAMU, https://www.tallahassee.com/story/news/local/2014/08/07/professor-files-suit-against-famu-college-of-law/13725423/.

Case 6:24-cv-00457-PGB-RMN-MAF  Document 84-3  Filed 07/09/24  Page 11 of 66  PageID 2671

salary Study (Ex. 2),[4] Professor Smith reasonably believed that notifying the FAMU President that women were still underpaid at the law school would invoke swift change.

39.    On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant FAMU's Equal Opportunity Program ("EOP").

40.    On September 22, 2022, Defendant FAMU's EOP department sent its investigative report to Professor Smith (2022-FAMU-F-05-005), denying any pay inequities without any rationale for paying the Comparator more than Professor Smith. From this point, Defendant FAMU and University Employee Defendants began a campaign of retaliatory acts based on Professor Smith's statutorily protected activity.

41.    On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

42.    October 20, 2022, at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an incensed, entitled and unidentified female student, later identified as Michelle Wanamaker ("MW"), whose is now known as Michelle Sadiki. Professor Smith regularly reported conduct violations to Green via text message because she chaired the Student Conduct & Disciplinary Committee for several years, and Green was a member of the Committee as Associate Dean of Students.

---

[4] "The study was conducted at the request of the university's Provost, and in response to recently raised concerns about potential salary inequities within the college." (Ex. 2, p. 2).

11

**APP 208**

43. Professor Smith reported, in a text message to Reginald Green immediately after the incident, that MW displayed deliberate, aggressive, and confrontational behavior toward Professor Smith. Professor Smith specifically described MW as "so rude" and "aggressively rude," because MW barged into an ongoing class session that she was not enrolled in, despite MW being fully aware that the classroom was in use by Professor Smith as there was a crowd of over 40 students gathered in the hallway, respectfully waiting for permission to enter. MW confirmed she knew Professor Smith's class was in session when MW alleged in a facially baseless complaint she filed against Professor Smith a week later that stated:

> MW was "visibly and audibly upset about [her] inability to enter [the] class and adequately prepare for lecture… [MW] was anxious to enter [the] classroom… Professor Smith was on notice that **[students in the hallway] were anxiously awaiting entrance to prepare for our class**… [Professor Smith's] adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor [Maritza] Reyes' Evidence class.

(Ex. 6, p. 24) (emphasis added).

44. Notwithstanding a hallway full of her classmates, MW deliberately and intentionally entered the classroom through the **back door** and declared that her professor told her that she needed to sit down to get ready for the next class starting at 10:30am.

45. After being instructed to leave by Professor Smith, MW became even more furious and positioned herself outside the **front door** of the classroom, awaiting an

12

**APP 209**

opportunity to re-confront Professor Smith about Professor Smith using the classroom, which Professor Smith had reserved a few weeks earlier for a make-up class. (Ex. 3) Professor Smith had never encountered or seen MW before this occurrence at the law school and had no idea who this unhinged person was. Yet a week after the incident and unbeknownst to Professor Smith, MW filed a complaint against Professor Smith in which MW blatantly and falsely mischaracterized her encounter with Professor Smith, shamelessly and recklessley distorting the truth so that MW would  evade liability:

> I am utterly sickened and discouraged by this violent encounter within the walls of our law school Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence.

46.     On November 1, 2022, Professor Smith went to follow up on the October 20, 2022 complaint she filed against MW by visiting Associate Dean Green's office. Professor Smith was told by his assistant, Teresa Pissini, that Associate Dean Green was on vacation, so his assistant emailed Professor Smith acknowledging Professor Smith's visit and said that she would let Associate Dean Green know.

47.     Classes ended for the semester 17 days later on November 18, 2022.

48.     Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW

APP 210

did not know that she was clerking for the firm where Professor Smith had been a partner. So, on December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities and job security with the firm:

> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor.  I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*
>
> *Best,*
>
> *Prof. Smith*

49.    MW did not respond and later she claimed Professor Smith's email was sent to intimidate her. (Ex. 6, p. 33)

50.    Professor Smith heard nothing else from Associate Dean Green, so she believed Defendant FAMU believed her complaint was not investigation-worthy. However, within days of learning of the complaint, Associate Dean Green had been copied on an email from then-Provost Maurice Edington to Defendant Scott (EOP) for her to "please review and take appropriate action." (Ex. 6, pp. 28-29). Despite specific and immediate obligations and procedures that state universities must follow when a student alleges violent behavior against a faculty member guided by state laws, federal laws, and university policies, Defendant FAMU did nothing for over three months.

51.    According to Defendant Baker, Associate Dean Green violated FAMU Regulations by failing to send Professor Smith's complaint to FAMU's Compliance

14

**APP 211**

Case 6:24-cv-00457-PGB-RMN Document 84 Filed 07/09/24 Page 15 of 65 PageID 2675

Department ("Compliance") to be investigated. (Ex. 5) Thus, the Compliance report dated June 5, 2023, recommended that Provost Watson and Dean Keller "[c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices." (Ex. 6, p. 36)

52. Associate Dean Green also failed to follow the College of Law's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations, which he normally did when Professor Smith sent him texts or emails as chair of the Student Disciplinary & Conduct Committee. (Exs. 9, 10) To cover his violation of FAMU Regulations and COL Codes of Conduct, Associate Dean Green later changed his testimony in the middle of the Compliance investigation. Initially, Green stated, on the date of the incident, that he would "try and identify the student tomorrow… feel free to send me an email detailing the interaction … Thanks for the notification." (Ex. 5) Then acknowledged in an email to Professor Smith on February 1, 2023 that he indeed did consider her text about the incident a complaint requiring an investigation. (Ex. 5) "In a subsequent [undated but seems to be after March 13, 2023] statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint." (Ex. 6, pp. 28-29, 34)

53. To Professor Smith's surprise and merely 16 days after she submitted her rebuttal to the EEOC concerning Defendant FAMU's position statement on equal pay, which admitted that Professor Smith was underpaid, Professor Smith learned that

Defendant FAMU had begun an investigation in which she was the subject of the investigation. (Exs. 19, 20)

54.    On January 26, 2023, nearly 100 days after Professor Smith initially reported the MW incident, Defendant FAMU contacted Professor Smith to begin an investigation into the MW incident because of Professor Smith's protected activity in seeking equal pay. But even more surprising, Defendant FAMU's investigation made Professor Smith the target, even though Defendant FAMU had assured Professor Smith it would look into the incident based on her complaint by text to Associate Dean Green.

55.    Defendant Baker was secretive about the details of the investigation, so Professor Smith emailed Defendant Wallace, FAMU's General Counsel. Finally, on January 27, 2023, Professor Smith first learned that the complaint filed against her was made by MW; that MW's claims of violations of university policy, if substantiated, were severe enough to warrant Professor Smith's termination; and that the allegations supporting those claims were blatantly and obviously false. Yet, Associate Dean Cooper received MW's complaint on October 25, 2022, knew of the atrocious allegations (involving claims of "hostile environment and fear", which Defendant FAMU as an educational institution must immediately address, but did not), and forwarded MW's complaint to EOP on October 26, 2022. On November 2, 2022, Cooper emailed MW to let her know that someone in EOP would reach out to her – one day after Professor Smith had gone to Associate Dean Green's office to further discuss her complaint against MW.

16

(Ex. 6, pp. 28-30) Still, Defendant FAMU had done nothing about the incident, which timing concerned Professor Smith. (Ex. 20)

56.    By suddenly reviving MW's stale and delayed complaint, Defendant FAMU failed to request or preserve key surveillance video evidence, delayed requesting the surveillance video for 104 days (from October 20, 2022 to January 31, 2023) to destroy key evidence that would have immediately exonerated Professor Smith, failed to follow its own Code of Conduct and Regulations and state and federal law requiring an investigation, failed to investigate Professor Smith's complaint against the student, and intentionally disregarded evidence supporting Professor Smith's allegations of deliberate hostile and disruptive conduct by MW. These failures demonstrate that the true motivation for the investigation was not the student's reported concern but rather to strike back at Professor Smith for her EEOC activity. Associate Dean Green's email confirms this because, despite the blatant falsities and implausibilities within the student complaint that, if Defendant FAMU believed, it was obligated to investigate immediately under state law, federal law and FAMU Regulations. FAMU nevertheless decided to proceed with a facially meritless complaint to use it as pretext to terminate Professor Smith, in retaliation for her protected activity.

57.    Defendant FAMU then carried on a clearly unwarranted investigation from January 26, 2023 until June 5, 2023, ultimately finding all of MW's allegations to be absolutely meritless. FAMU also independently manufactured a finding of retaliation,

17

Case 6:24-cv-00457-PGB-RMN    Document 84    Filed 07/09/24    Page 18 of 66 PageID 2678

which was subterfuge to create a false disciplinary record against Professor Smith and to punish her for again seeking equal pay.

58.    MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith, interrupted and disrupted her class, then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was or the cause of MW's unprovoked hostility.

59.    On February 15, 2023, another FAMU law professor, Maritza Reyes sent an email providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Professor Reyes stated that MW entered Professor Smith's class that day to "remind [Professor Smith] that [Reyes] was about to start class in the classroom where [Professor Smith was] conducting one-on-one sessions with students from [her] civil procedure course. [Professor Smith was] not supposed to be in that classroom where [Reyes] was going to start class in a few minutes. [Professor Smith was] assigned to teach civil procedure in the classroom next door, yet [she] chose to remain in the classroom where [Reyes] was due to start teaching evidence to disrupt [Reyes'] class, which [Professor Smith] did."

60.    It became clear from this email that MW knew Professor Smith was in the classroom; that MW deliberately disrupted [Professor Smith's] class (Ex. 6, p. 24); and that MW was the admitted instigator both times she ambushed Professor Smith on

18

**APP 215**

October 20, 2022.

61.    Furthermore, Professor Smith was in her classroom next door to teach civil procedure at 10:30am, and thus could not have disrupted Professor Reyes' class, which started at 10:30am.

62.    Professor Reyes was late to class that day, so she could not have possibly observed the incident to write such a detailed email. Professor Smith had reserved the particular classroom through all the proper channels at the COL to use on October 20, 2022 until 10:30am. (Ex. 3)

63.    On February 20, 2023, Defendant Scott emailed Professor Smith to inform her that Professor Reyes filed a complaint against Professor Smith and that FAMU EOP was opening an investigation. Not only was that false, but Scott had requested Professor Reyes to file a complaint against Professor Smith, which Professor Reyes declined to do, and Defendant Scott encouraged Professor Smith to do the same against Professor Reyes.

64.    On March 9, 2023, Professor Smith re-filed her original complaint that she had initially texted to Associate Dean Green on October 20, 2022, but this time Professor Smith followed the process Green did not, and she submitted it via the Compliance hotline. Professor Smith did so because she was advised that her original complaint was not properly submitted by Associate Dean Green to Compliance per FAMU Regulations.

65.    On March 10, 2023, the Compliance department immediately deleted

Professor Smith's resubmission. Defendant Baker then emailed Professor Smith, stating that Compliance's report would include her statement about the October 20, 2022 incident in the ongoing investigation. However, Defendant Baker's email did not address Professor Smith's complaint reported on October 20, 2022, predating the student's complaint, and instead the student's complaint was the only focus of the investigation.

66.    On March 10, 2023, Professor Smith tried to gain clarity by email that Defendant FAMU would be investigating her October 20, 2022 complaint as well as MW's October 27, 2022 complaint.

67.    To date, Defendant FAMU has not investigated Professor Smith's October 20, 2022 complaint as it is completely ignored in the final reports and in the two notices of termination, despite the serious concerning allegations Professor Smith made against MW, a student.

68.    On March 13, 2023, Compliance wrote an email and asked the law school leadership to meet with Professor Smith concerning the March 9, 2023 re-submission of her complaint, which Compliance claimed was a new filing of a complaint. Surprisingly, this was the same time that Associate Dean Green submitted a statement that he never considered Professor Smith's October 20, 2022 text to him about the MW incident as a complaint, and he doubled down on this in a subsequent and undated statement.

69.    On March 23, 2023, Professor Smith, then-dean Deidre Keller, and Associate Dean Cooper had a short meeting sometime thereafter. During that meeting,

Keller expressed her confusion on what Compliance wanted, and Associate Dean Cooper sat quietly as though she knew nothing.

70. The investigation was conducted with undue and unreasonable delay, and extended over 130 days from January 26, 2023 to June 5, 2023 to cause needless stress to Professor Smith. The investigation found every allegation made by MW to be meritless.

71. Following the investigation precipitated by Professor Smith's protected activity, Defendant FAMU then independently manufactured a retaliation finding against Professor Smith to discredit Professor Smith's legitimate complaints against MW, protect Defendant FAMU from potential liability, and retaliate against Professor Smith for her equal pay allegations, which is what was the trigger to revive the initial investigation.

72. Then, Defendant FAMU recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report"). Defendant FAMU had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done; thus duplicating the penalty for the same alleged retaliation. But Professor Smith did not hear from the University again on this matter until December 5, 2023 when she was notified of her impending termination.

73. Professor Smith did not receive anything tangible or written defining

21

APP 218

retaliation, and "retaliation" is not defined in any FAMU Regulations. When asked for the source of the definition of retaliation and how Professor Smith's actions identified in the December 5, 2023 Notice of Termination met that definition, FAMU revealed for the first time, in litigation and by way of discovery, that "[t]he University uses the ordinary meaning of the term and the letter speaks for itself." (Ex. 13, FAMU Interrogatory Answers May 23, 2024, #13) Defendant FAMU could not answer how Professor Smith's actions could have resulted in her termination under Defendant FAMU's undefined term, "retaliation," because her actions do not meet any definition of "retaliation," and her termination was pretext for her relentless pursuit of equal pay.

74.    On April 12, 2023, Professor Smith signed her next school term's employment contract listing the appointment dates from August 7, 2023 to May 10, 2024. (Ex. 8) However, and because Professor Smith has tenure, the signing of a contract is merely ceremonial as the contract itself provides that:

> This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated… Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

Thus, for tenure holding faculty as Professor Smith was, FAMU and Professor Smith had contractual obligations to follow FAMU Regulations, which provide for *inter alia*

22

**APP 219**

Case 6:24-cv-00457-RWM-MAF  Document 86-3  Filed 07/09/24  Page 27 of 65 PageID 2683

tenure protections that established her annual entitlement to a renewed contract.

75.    On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the Defendant Baker via email to inquire about the progress of the investigation. In response, Defendant Baker stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of any complaint by Defendant FAMU for nearly 100 days further compounded the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, caused significant distress.

76.    On April 30, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

77.    On June 5, 2023, Compliance finally emailed the report from the investigation to Professor Smith. Professor Smith assumed the investigation ended at this time as per Defendant Baker. However, Defendant FAMU was still clandestinely dragging the investigation on and keeping the investigation open so that it could use this investigation pretextually against Professor Smith with post-hoc and manufactured misconduct down the road – which is exactly what happened and has prompted revisions to her pleadings.

78.    Defendant FAMU failed to follow its own procedures (Code of Conduct),

23

**APP 220**

including FAMU Code of Conduct 1.019 (18b), which states: "Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the FAMU Compliance and Ethics Hotline." Defendant FAMU did not follow this then blamed Professor Smith. Professor Smith reported a complaint to a supervising dean, Associate Dean Green, on October 20, 2022. Pursuant to this regulation, he was responsible for reporting her complaint to Compliance. Instead, Associate Dean Green told Professor Smith he would investigate her complaint then later told Compliance that he did not take Professor Smith's complaint as a real complaint. Thus, when Professor Smith properly **re-filed** her original October 20, 2022 complaint to the Compliance hotline in March 2023, Defendant FAMU then accused Professor Smith of retaliating against the student for the filing of a **first-time** complaint in its June 5, 2023 report.[5]

79.    Furthermore, FAMU Regulations conflict with the COL's Student Code of Conduct, which was evidenced by the recommendation of the June 5, 2023 report (Ex. 6, p. 36), stating: "Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices."

80.    Defendant FAMU failed to maintain the confidentiality of the investigation,

---

[5] FAMU Regulations also provide faculty with rights to report violations of the University code of conduct. Defendant FAMU also violated this guarantee by failing to ever address Professor Smith's complaint against MW.

thereby exposing Professor Smith's protected activity and the details of her complaint to other employees including Professor Reyes. As further evidence of the breach or complete lack of confidentiality, Defendant Scott lied to Professor Smith by stating Professor Reyes had filed a complaint against Professor Smith. Defendant Scott did so because she was manufacturing a negative disciplinary record on Professor Smith and laying the foundation to say a "rivalry" existed amongst Professors Smith and Reyes to later use down the line and pretextually for Professor Smith's termination, which Defendant FAMU did as explained in more detail below.

81.     On June 12, 2023, Professor Smith sent a memorandum addressed to Defendant Calhoun (Compliance), Defendant Wallace (General Counsel), and Craig Reed (BOT) and copied to Defendant Waston (Provost) about the retaliatory actions of Defendant FAMU, and Professor Smith demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. Professor Smith never received a response from Defendant FAMU or the University Employee Defendants regarding her memorandum nor any of her demands. (Ex. 11)

82.     On June 13, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

83.    Not even one month after supplementing her EEOC complaint, on July 6, 2023, Defendants Baker and Calhoun (Compliance) authored a "secret" supplemental report on the investigation and copied Defendant Scott (EOP), the person who Professor Smith had filed her informal equal pay complaint to in 2022. (Ex. 6, p. 37) The secret report also copied Defendant Watson, Defendant Wallace, and others. Defendants Baker and Calhoun did not send a copy to Professor Smith. Importantly, the secret report maintained only the independently manufactured finding of retaliation without finding any new violations of FAMU policy, though the FAMU departments purported to manufacture others by evaluating and considering other university policies, previously unconsidered, that existed at the time of the initial investigation, but the report ultimately concluded that nothing rose "to the level of a policy violation." (Ex. 6, p. 40)

84.    Professor Smith assumed that the investigation ended with the June 5, 2023 report from Compliance, but unbeknownst to her, Defendant FAMU and the University Employee Defendants were secretly engaged in a continual retaliation campaign against Professor Smith.

85.    Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

86.    On October 5, 2023, Professor Smith sent a memorandum to Compliance concerning MW's continued fixation on Professor Smith and relentless obsession with ruining Professor Smith's reputation. Professor Smith stated that she was "increasingly

26

**APP 223**

uneasy about a student [MW] who remains severely fixated on an incident that transpired nearly a year ago. [MW], a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior of towards Professor Broussard (one my witnesses regarding the incident), who knew the student before the incident." (Ex. 6, p. 57) Professor Smith clarified that through the memo she "wish[ed] to formally express [her] concern regarding MW's persistent and unsettling behavior towards [Professor Smith]" citing post-March 2023 incidents of MW's fixation with Professor Smith. Professor Smith did not submit said concern through the hotline portal or any other reporting authority.

87.    While Professor Smith's October 5, 2023 memo indicated she believed she was obligated to report MW to The Florida Bar, Professor Smith neither indicated that she planned to nor that she had already followed through on the actions. (Ex. 6, p. 56)

88.    Neither Defendant FAMU nor the University Employee Defendants responded to the October 5 memo.

89.    On October 12, 2023, Defendant FAMU notified Professor Smith that she received "a three (3%) percent performance-based increase," which was the highest increase that any employee could receive.

90.    On October 17, 2023, Professor Smith filed her equal pay and retaliation

**APP 224**

complaint in state court, but she did not attempt to serve Defendant FAMU until 2024.

91.    On November 13, 2023, Professor Reyes, who had an active lawsuit against Defendant FAMU (*Reyes v. FAMU*, No.: 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022)), notified the Gray Defendants of Professor Smith's complaint in Professor Reyes' federal court filing entitled, "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike" on page 12.

92.    Defendants then began the process to terminate Professor Smith.

93.    Specifically, on or around November 13, 2023, the Gray Defendants contacted Defendant Wallace and informed her of Professor Smith's unserved lawsuit raising equal pay and constitutional rights violations. Defendant FAMU did not retain the Gray Defendants at this time.

94.    The Gray Defendants did not advise Defendant Wallace not to act in response to the information they had given her. Nor have they attempted to stop or mitigate Defendant Wallace's conduct.

95.    At all relevant times, the Gray Defendants were aware Professor Smith's unserved complaint concerned equal pay, women's rights, and constitutional rights issues.

96.    The Gray Defendants are seasoned lawyers and based on their skill, expertise, and experience knew or should have known that Defendant Wallace would

28

**APP 225**

act or in fact that she planned to act on the information told to her. Accordingly, the Gray Defendants and Defendant Wallace entered a formal or informal agreement to carry out Professor Smith's termination based on her equal pay lawsuit in violation of federal statutory and constitutional law.

97.    Sometime shortly after learning of Professor Smith's lawsuit, Defendant Wallace met separately or together with Defendants Watson, Scott, Calhoun, and Baker. During those meetings and communication, Defendant Wallace informally or formally spearheaded, encouraged, and commanded Defendant Watson and the remaining University Employee Defendants to support Professor Smith's termination.

98.    The University Employee Defendants each complied and independently agreed to carry out Defendant Wallace's plan for Professor Smith's termination.

99.    Specifically, Defendants Baker, Calhoun, and Scott gathered documents and submitted materials in support of Professor Smith's termination.

100.    Defendants Baker, Calhoun, and Scott also compiled and arranged materials to fabricate a rivalry between Professors Smith and Reyes, without realizing Professor Smith had recommended Professor Reyes to FAMU COL for hire in 2009, even knowing Reyes had underperformed in her short stint at the law firm where they both had worked years prior because Professor Smith believed Reyes may thrive in a different work environment.

101.    Defendant Watson specifically met with, continued to consult, and acted

29

alongside Defendants Baker, Calhoun, and Scott to serve as the cat's paw for Defendant Wallace from November 13, 2023 to date about Professor Smith's termination.

102. Then, on December 5, 2023, Defendant Watson acted on Defendant Wallace's encouragement, command, or suggestion, and Watson emailed Professor Smith a notice of intent to terminate her that would become effective on January 19, 2024 and that provided limited procedures for a hearing/conference on January 11, 2024. (Ex. 6) Defendant FAMU through Defendant Watson emailed this notice to Professor Smith on December 5, 2023 based on an alleged memorandum she wrote on October 5, 2023, describing her continued personal safety concerns with a student who continued to demonstrate unsettling, irregular and suspect behavior toward Professor Smith, even though FAMU Defendant rewarded Professor Smith with the highest salary performance-based salary increase on October 12, 2023. Defendant FAMU's purported reason for terminating Professor Smith is a sham and subterfuge for the real reason – Professor Smith's protected conduct alleged herein.

103. Defendant FAMU has not terminated any male law professor (such as Professors Ronald Griffin, Jeremy Levitt, Darryll Jones, Ewanrinareto "Areto" Imoukhuede) for similar or more severe violations of FAMU policies, specifically male professors are irregularly investigated; but when male law professors are investigated, the male professors have been found to have engaged in malfeasance/nonfeasance, including harassing women faculty, female students, and LGBTQIA-identifying

students, being inappropriate with female staff, missing numerous classes and attending classes 20-30 minutes late, but no male faculty have been terminated for that conduct.

104.   Spring 2024 classes were set to start on January 8, 2024, so clearly Professor Smith was not expected to teach in the spring semester.

105.   At some point shortly between November 17, 2023 and December 5, 2023, Defendant Wallace met with the Gray Defendants to inform them of her decision to terminate Professor Smith. The Gray Defendants neither objected nor attempted to prevent said action.

106.   On December 12, 2023, Professor Smith noticed Defendant FAMU for a conference pursuant to Regulation 10.120 (3).

107.   Professor Smith also requested any all evidence against her. Defendant FAMU neither provided any additional documents nor withheld any on the basis of confidentiality or a privilege.

108.   Between December 12, 2023 and January 11, 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a conference including who to strategically place on that conference panel.

109. The University Employee Defendants eventually settled on three employees, one of which served on the FAMU DRS board alongside Defendant Watson, with the informal or formal assistance, guidance, command or encouragement of

31

Defendant Wallace.

110. On January 11, 2024, a conference took place before a three (3) person panel selected by Provost Watson on ZOOM. The panel members were all lawyers: Bryan Smith, J.D., Associate VP for Student Affairs; Andrea Nelson, Esq., School of Business and Industry; and Patricia West, Esq., FAMU Developmental Research School.

111. At the conclusion of the hearing, Associate Provost Dr. Reginald Perry, who was over the process, indicated that a report would be produced by close of business on January 12, 2024.

112. The panel's report on January 12, 2024 recommended that Defendant FAMU rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough**

32

**APP 229**

> **deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**
>
> In conclusion, the diligent efforts of our panel have now been completed.

(emphasis added)

113.   However, Dr. Perry did not forward the report to Professor Smith because it did not conclude what any of the Defendants wanted it to conclude – uphold terminating Professor Smith. At some point between the conclusion of the conference on January 11, 2024, Defendant Watson consulted with Defendant Wallace to discuss terminating Professor Smith notwithstanding the conference panel's recommendation. Professor Smith would soon learn, albeit late and in violation of FAMU Regulations, that Provost Watson declined to accept the panel's well-reasoned, unanimous recommendation.

114.   On Thursday, January 18, 2024, Professor Smith emailed Dr. Perry because she had not received any notice from FAMU thus far. According to Regulation 10.120(3): "After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision."

115.   According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified within five workdays prior to the date the action is effective."

33

**APP 230**

116.   According to Regulation 10.120(1), the Defendant FAMU shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) The effective date of the University's proposed final action." This date of the proposed final action in the Defendant's written notice was listed as January 19, 2024.

117.   Defendant FAMU missed notifying Professor Smith by January 18, 2024 of its intent to proceed with her termination.

118.   At some point shortly between January 12, 2024 and January 23, 2024, Defendant Wallace met with the Gray Defendants to inform them of the decision to uphold Professor Smith's termination. The Gray Defendants neither objected nor attempted to prevent said action.

119.   On January 23, 2024 at 4:56 p.m., Professor Smith received an email with notice of Defendant FAMU's intent to terminate her, stating:

> After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023. (Ex. 7)

120.   To circumvent missing its notification timeframe by FAMU Regulations,

**APP 231**

Defendant FAMU admits it changed the effective date of the proposed termination that was in the Notice of Intent to Dismiss from Employment from January 19, 2024 to January 30, 2024. The plain language of FAMU Regulations does not authorize the University to change the effective date.

121.   Defendant FAMU then outlined the procedures that Professor Smith should follow to appeal the decision.

122.   After Defendant FAMU ignored its panel's recommended finding that Professor Smith did not retaliate and that the termination notice should be rescinded, Professor Smith has and had no reason to believe that she will receive due process in any appeal process. Professor Smith nevertheless continued with her internal appeals so as not to have been considered to consent to the University's decision.

123.   On February 28, 2024, Professor Smith emailed her complaint and request for a Step One hearing pursuant to FAMU Regulation 10.206 to Dr. Perry .

124.   Soon after, Defendant Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step One hearing, including who to strategically select as the Step One Reviewer.

125.   Defendants Wallace and Watson agreed to place Antoneia Roe as the Step One Reviewer to influence and obtain their desired outcome based on Roe's employment history with General Counsel's office as counsel. Defendants Wallace and Watson therefore instructed Roe to contact Professor Smith via the FAMU email account

35

belonging to Professor Smith that Defendant FAMU had shut down shortly prior.

126. On March 13, 2024, Professor Smith inquired to Associate Provost Reginald Perry whether Defendant FAMU intended to move forward with a Step One hearing because she had not heard from Defendant FAMU since she submitted her Step One complaint.

127. At 10:46am on March 13, 2024, Dr. Perry responded to Professor Smith indicating that Defendant FAMU intended to move forward with a Step One hearing.

128. On many occasions between March 11, 2024 and April 12, 2024, the Gray Defendants reached out to, drafted, and consulted with Defendants Wallace and Watson concerning Professor Smith's termination, the status of any internal appeals, and the progress of same. Specifically, the Gray Defendants doctored Wallace's and Watson's declarations to mask the firm and attorneys' unlawful activity. Furthermore, the Gray Defendants argued inconsistent positions to Defendant Watson's declarations, indicating that Defendant Watson has only served as a puppet for Defendant Wallace and the Gray Defendant's unlawful agreement. Even at this point, not one Gray Defendant attempted to prevent or counsel Defendant Wallace against continuing with the unlawful termination.

129. Specifically, the inconsistent reasons for Professor Smith's termination are:

   a. The initial notice from December 5, 2023 states:

   The reason for this employment action is the **substantiated <u>finding of</u>**

**retaliation** documented in the FAMU Division of Audit and Compliance Investigative Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your **memo dated October 5, 2023**, also attached and incorporated in this Notice. (Ex. 6) (emphasis added)

b.  The Notice of Termination dated January 23, 2024, the University's reason for termination was: "After reviewing all documentation and considering the **totality of circumstances** related to this matter, the University's decision to dismiss you from employment remains in effect." This new rationale is inconsistent with the December 5, 2023 reasons, and FAMU Regulations require that any reasons be "specific." (Ex. 7) (emphasis added)

c.  However, on March 25, 2024, Provost Watson stated, under penalty of perjury in her initial declaration, that, "My decision to termination (sic) Ms. Smith's employment was based on **her unprofessional and inappropriate behavior towards students as articulated in the Investigative Reports.**" (Ex. 14 filed in Doc 27) (emphasis added)

37

**APP 234**

    d. Then, on March 25, 2024, The Gray Defendants advanced their own more descriptive version of the above reason for termination in a court filing in "Defendant's Response In Opposition To Plaintiff's Motion For Preliminary Injunction And Supporting Memorandum," stating: "**Defendant's supplemental investigation also found that <u>Plaintiff was unprofessional and inappropriate with students</u> regarding the confrontation between Plaintiff and the student from the original report, and that her <u>rivalry with a fellow College of Law professor was being internalized by students and creating a distraction</u>**." (Ex. 16, p. 11) **Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, <u>unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor</u>.**[6] (emphasis added)

    e. After Professor Smith served a Rule 11 sanctions motion to Gray Defendants on the FAMU Defendant because of the blatantly false first declaration signed by Provost Watson, on March 25, 2024, Provost Watson signed an amended declaration under penalty of perjury date

---

[6] Defense Counsel deposed Professor Reyes from 9:31am to 5:36 pm in May 2024 in her case against Defendant FAMU, and not once did Reyes mention any rivalry between Professor Smith. Instead, Professor Reyes discussed her "interactions with the co-workers" and testified to having issues with almost all the law faculty, and although Reyes repeatedly mentioned another woman faculty with whom she had additional issues, it was not Professor Smith.  (Ex. 16)

38

April 11, 2024, stating that, "My decision to terminate Ms. Smith's employment was based on the **substantiated finding of retaliation documented in the Investigative Reports**." (Ex. 15 filed in Doc. 42) (emphasis added)

f. Next, on April 12, 2024, in "Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum," Gray Defendants, trying again to creatively beef up the original rationale for termination, stated allegations clearly inconsistent with the initial reasons for termination and Gray Defendants' original version, "**Plaintiff's employment ended because she retaliated against a student for making a written complaint against her**. … **Plaintiff then filed a retaliatory complaint against the student** 'for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application.'[7]** *Id.* This was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* Defendant's supplemental investigation[8] also found that **Plaintiff was**

---

[7] This is written to appear that it is two separate acts, but that is false.
[8] This is the secret report of from dated July 6, 2023 that was intentionally never given to Plaintiff until she saw it in her termination notice in December 2023, but apparently the report was put in her employment file.

39

**unprofessional and inappropriate with students** regarding the confrontation between Plaintiff and the student from the original report, and that her **rivalry with a fellow College Law professor was being internalized by students and creating a distraction**."[9] "Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, **unprofessional, and inappropriate with at least one student**, in addition to engaging in a **disruptive 'rivalry'** with another law professor." (emphasis added)

130.    Defendant FAMU's inconsistent and ever-changing reasons and iterations for Professor Smith's termination demonstrate that it has no lawful reason for its conduct.

131.    On March 13, 2024 at 6:02pm, Antoneia Roe finally emailed Professor Smith's personal email with information concerning the Step One hearing to take place on March 15, 2024. March 15, 2024 was one day later than what is required by FAMU Regulation 10.206.

132.    Professor Smith again requested all documents, but only received the same documents already available in Defendant FAMU's notices for her termination. Specifically, on March 13, 2024, Antoneia Roe sent Professor Smith a dropbox link full of documents. Antoneia Roe did not indicate she withheld any documents on the basis

---

[9] See ftnt 6 above.

40

Case 6:24-cv-00457-PGB-RMN-MAF  Document 84  Filed 07/09/24  Page 41 of 66  PageID 2701

of confidentiality or a privilege.

133.   Professor Smith did not have time to research, find, and object to Antoneia Roe's selection as a reviewer until after the Step One hearing that took place on March 15, 2024.

134.   The Step One hearing lasted less than 8 minutes, and Antoneia Roe did not ask a single question because she already knew her assignment from the Defendants was to uphold Professor Smith's termination.

135.   On March 18, 2024, Professor Smith submitted a draft decision to Antoneia Roe, but that email went unanswered.

136.   Between March 15, 2024 and Antoneia Roe's decision, Defendants Watson, Wallace, Baker, Calhoun, and Scott met, spoke with, or otherwise consulted Antoneia Roe regarding Professor Smith's complaint.

137.   On April 14, 2024, Antoneia Roe emailed Professor Smith a copy of the five-page Step One decision indicating Professor Smith's termination would be upheld.

138.   On April 23, 2024, Professor Smith promptly filed an appeal of the Step One decision and requested a Step Two hearing.

139.   Between April 15, 2024 and May 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step Two hearing, including who to strategically select as the Step Two Reviewer.

140.    Defendants Wallace and Watson agreed to place Dr. Valencia Matthews as the Step Two Reviewer to influence and obtain their desired outcome based on Matthews' history with Defendant Watson on the Dean's Advisory Council and based on the fact that Matthews is now a direct report to Provost Watson. Overturning Professor Smith's termination requires Dean Matthews, among other things, to find that her immediate supervisor, Defendant Watson violated FAMU Regulations.

141.    On May 1, 2024, Reginald Perry notified Professor Smith that Dr. Valencia Matthews would be the Step Two reviewer.

142.    On May 2, 2024, Professor Smith objected to Dr. Matthews's selection because Dr. Matthews is a direct report to Defendant Watson.

143.    On May 3, 2024, Dr. Perry responded by email indicating that the Provost's Office would consult with the General Counsel: "The Office of the Provost will need to consult with the General Counsel to discuss your request. I will contact you again next week."

144.    On May 7, 2024, the U.S. Department of Justice issued Professor Smith a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964.

145.    On May 20, 2024, Dr. Perry emailed Professor Smith: "After further review, it has been determined that the University will move forward with the previously selected reviewer.  Therefore, Dean Matthews will be in contact with you to arrange for your Step Two meeting."

42

APP 239

Case 6:24-cv-00457-RWM-MAF  Document 84  Filed 07/09/24  Page 43 of 64  PageID 2703

146.   On June 7, 2024, the Step Two hearing was scheduled with Dean Matthews in violation of FAMU Regulation 10.206, which required the Step Two hearing to be scheduled by May 8, 2024. It was scheduled for June 20, 2024, from 2-3pm; the hearing was held then on ZOOM, but no report has issued as of the date of the filing of this Second Amended Complaint. During the step-two meeting, Dr. Matthews consulted either Defendant Wallace or another University Employee Defendant about whether Professor Smith could have a representative give an opening, despite FAMU Regulation permitting same.

147.   After Professor Smith raised concerns about the pay disparity and expressed her intention to exercise her rights under the EPA, Defendant FAMU engaged in a campaign of retaliatory actions against Professor Smith and has continued to do so.

148.   Defendant FAMU's retaliation against Professor Smith includes the adverse employment actions as described above, including the baseless and one-sided investigation of the October 20, 2022 incident with MW, manufacturing conflicting allegations of misconduct to terminate Professor Smith, and ultimately terminating Professor Smith's employment. Since Professor Smith's termination (whenever the parties agree on a date), Defendant FAMU has withheld her salary and completely ignored her concerns about her salary disparities (Ex. 17), back dated her termination to her health insurance carrier so several healthcare claims submitted in the spring are no longer covered and are due and owing, failed to send her tax documents (even upon

43

**APP 240**

request) that she could access as an employee, and eliminated her email access without changing the destination for email notifications about insurance coverage and claims.[10]

149. Defendant FAMU's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3) and the other provisions of federal law as indicated below. Professor Smith is entitled to damages, attorney's fees and costs, and reinstatement to her tenured position as a law professor.

**COUNT I**
**DISCRIMINATION IN COMPENSATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206, *et seq*.,**
**<u>AGAINST DEFENDANT FAMU</u>**

150. The Plaintiff realleges paragraphs 1 through 37.

151. Plaintiff belongs to a protected class; she is female.

152. Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator, also a tenured full professor, and were performed under the same or similar working conditions. (Exs. 4, 9)

153. During all relevant periods, Plaintiff received wages lower than the

---

[10] Each action happened at various times, but usually and immediately after Professor Smith noted in a court document that she was still employed because these instances were still in place. Thus, it is highly credible that after this pleading is filed, Defendant FAMU will contact the insurance provider to have her university email replaced with her personal email address.

Comparator while performing the same or substantially more work than the Comparator.

154.    Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages because she performed the same or substantially more work than the Comparator and she has more experience than the Comparator. The pay disparity was not based on any legitimate factor such as seniority, merit, or a system measuring earnings by quantity or quality of production.

155.    Defendant FAMU violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs, as described below.

**COUNT II**
**RETALIATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3),**
**AGAINST DEFENDANT FAMU**

156.    The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

157.    Defendant FAMU's retaliatory actions against Plaintiff, as alleged herein, and by its employees acting under of color of law constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

158.    Plaintiff engaged in protected activity by:

a) Writing to FAMU's president on May 9, 2022 about the pay disparity between her and the male comparator;

b) Filing an informal gender equity complaint with FAMU's Equal Opportunity Program on June 28, 2022;

c) Filing a Charge of Discrimination with the EEOC under the Equal Pay Act on October 18, 2022 and the subsequent responses/replies/rebuttals to the EEOC in its investigation; and

d) Filing the equal pay lawsuit in state court in October 2023.

After Professor Smith engaged in this protected activity, FAMU took adverse employment actions against her, including:

a) Initiating an unwarranted investigation against her on January 26, 2023, shortly after she submitted a rebuttal to FAMU's position statement on equal pay to the EEOC;

 b) Failing to follow proper procedures in the investigation;

c) Issuing a notice of intent to terminate her employment on December 5, 2023;

d) Terminating her; and

e) Upholding the decision to terminate her employment on January 23, 2024, despite a panel's recommendation to rescind the termination.

159.   There is a causal connection between Professor Smith's protected activity and the adverse actions, as evidenced by the timing and sequence of events. The retaliation described herein was based on Plaintiff's exercise of rights protected by law, her resistance and opposition to gender discrimination and harassment and her right to

participate in actions calculated to redress grievances. Plaintiff's resistance to unlawful activity was both objectively and subjectively reasonable based on the timing of the Defendants actions and the lack of transparency and fairness throughout the process as explained in more detail above.

160.   FAMU's stated reasons for the adverse actions are pretextual, as detailed above. As a result of Defendant FAMU's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled damages, including compensatory and punitive damages.

**COUNT III**
**BREACH OF CONTRACT**
**AGAINST DEFENDANT FAMU**

161.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27, 42-43, 50, 54-59, 70-71, 73-74, 79-80, 86-93, 100,102, 112-121, and 130.

162.   Defendant FAMU operates the law school at 201 FAMU LAW Lane, Orlando FL 32801.

163.   Each employment contract entered between Plaintiff and Defendant FAMU stated some variation of "Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU." The contract also stated: "This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution

47

**APP 244**

and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated." Thus, the COL, the Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, Student Handbook, FAMU Handbook, and FAMU Regulations by way of the individual employment contracts.

164. Defendant FAMU, though the above noted documents, has made unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

165. Plaintiff's employment letter, together with the Faculty Handbook, FAMU Handbook and FAMU Regulations are what forms Plaintiff's employment contract.

166. Defendant FAMU has failed to meet its contractual obligations to Plaintiff because Defendant FAMU did not follow its own procedures as detailed above.

167. As a result of Defendant FAMU's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment and opportunities.

168. Plaintiff seeks damages, including actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant FAMU's wrongful

**APP 245**

breach of Plaintiff's employment contract, as well as compensatory and punitive damages.

## COUNT IV
## FIRST AMENDMENT RETALIATION
## <u>AGAINST DEFENDANT FAMU</u>

169.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 53-57, 71, 90 through 149.

170.   By filing her EEOC and state court complaints for equal pay and speaking on issues of public concern, Plaintiff engaged in constitutionally protected activity. Specifically, it is well known that one litigant often serves as the catalyst for change in civil rights litigation.

171.   Following Plaintiff's engagement in the constitutionally protected activity, Defendant FAMU took adverse employment actions against Plaintiff.

172.   These adverse employment actions included baseless investigation of Plaintiff, manufacturing false claims to fire Plaintiff, fabricating their definition of just cause without due process of undefined terms, issuing a notice of termination against Plaintiff, and terminating her employment.

173.   These adverse employment actions were taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

174.   Defendant FAMU's adverse employment actions against Plaintiff, in

response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

175.    Defendant FAMU could not and would not have made the decision to terminate Plaintiff but for her protected activity as evidenced by its inability to provide a clear reason for the adverse action(s) taken against her.

176.    Plaintiff has suffered damages as a result of Defendant FAMU's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries, as well as other compensatory damages and punitive damages.

**COUNT V**
**REQUEST FOR PRELIMINARY AND**
**PERMANENT INJUNCTIVE RELIEF**
**AGAINST DEFENDANT FAMU**

177.    The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 149.

178.    Defendant FAMU has terminated Plaintiff in violation of her tenure status, employment contract, and because of her pursuit of equal pay.

179.    Plaintiff has suffered and will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured. Furthermore, Plaintiff has already suffered considerably

50

**APP 247**

Case 6:24-cv-00457-RMN-MAF Document 84-3 Filed 07/09/24 Page 51 of 65 PageID 2711

irreparable harm as she has been unable to continue her functions as a legal academician to complete promised law review articles and book projects.

180.  "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975); *Zisk v. The Charleston School of Law* (2015).

181.  Monetary damages cannot provide sufficient relief or compensation to Plaintiff because the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career. Moreover, Plaintiff cannot be compensated for lost career advancement at the College of Law. *Assaf v. v. University of Texas System,* 399 F. Supp. 1245, 1251 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds*, 435 U.S. 992 (1978) ("Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician…. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money…. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.")

APP 248

Case 6:24-cv-00457-RMN-MAF Document 84 Filed 07/09/24 Page 52 of 65 PageID 2712

182. Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

183. Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant FAMU to honor her tenure status and employment contract thus restoring the status quo until this matter is resolved.

### COUNT VI
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### AS AMENDED, 42 U.S.C. §2000e et seq.
### <u>AGAINST DEFENDANT FAMU</u>

184. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 102 through 149.

185. Plaintiff was employed by Defendant FAMU as a law professor from 2004 to 2024.

186. On January 31, 2024, Defendant FAMU purported to terminate Plaintiff from her tenured law professor position for an alleged violation of FAMU policy.

187. During the same 2004 to 2024 time period, male law professors working for Defendant FAMU committed similar or more serious violations of FAMU policy but were either never investigated or not terminated after a finding of having committed the violation.

188. Defendant FAMU's stated reason for terminating Plaintiff was pretext for unlawful sex discrimination, as evidenced by many things including: the conflicting

52

**APP 249**

reasons Counsel has argued to this Court, the decisionmaker-Defendant Watson's conflicting two declarations, and the disparate treatment of Plaintiff compared to similarly situated male law professors who were not terminated for similar or more serious violations.

189.   Plaintiff's termination was motivated by her sex and was retaliation for her resistance and opposition to Defendant FAMU's unlawful compensation practices under the Equal Pay Act, which constitutes protected activity under Title VII.

190.   By the conduct described above, Defendant FAMU discriminated against Plaintiff on the basis of her sex and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., causing her to suffer damages, including compensatory and punitive damages.

**COUNT VII**
**42 U.S. C. § 1985(3) – CONSPIRACY TO INTERFERE**
**WITH CIVIL RIGHTS**
**AGAINST GRAY DEFENDANTS**

191.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

192.   The Gray Defendants and University Employee Defendants conspired to deprive Plaintiff of her constitutional rights to due process under the Due Process Clause of the U.S. Constitution and freedom against retaliation under the First Amendment, her

53

statutory right to freedom from discrimination under the EPA and Title VII, her statutory right to freedom from retaliation for exercising rights under the EPA, by agreeing to terminate Plaintiff's tenured employment in retaliation for her filing a lawsuit against Defendant FAMU citing EPA and constitutional claims as a woman professor.

193.    The Gray Defendants were not retained in this matter until 2024 and their representation of Defendant FAMU in one legal matter did not cover unrelated litigation.

194.    The purpose of the conspiracy was to deprive Plaintiff indirectly or directly of (1) equal privileges including her due process rights as a woman compared to men who have been accused of similar or more serious violations of FAMU policy and (2) equal protection under law as a woman. The conspiracy was motivated by a discriminatory animus against Plaintiff based on her gender and her engagement in protected activities, including her protected activity under the Equal Pay Act.

195.    The Gray Defendants' overt acts are detailed above but include their informing Defendant Wallace of Plaintiff's unserved lawsuit alleging EPA violations without any measure to ensure Wallace would not act upon that information. The Gray Defendants' notification caused the remaining Defendants to join in the conspiracy and engage in overt acts in furtherance of the conspiracy, including but not limited to:

> a. Defendants Wallace, Watson, Baker, Scott, and Calhoun met and communicated regularly to discuss and plan Plaintiff's termination in retaliation for her protected activities.

54

**APP 251**

b. Defendants Wallace and Watson instructed other University Employee Defendants to gather and fabricate evidence to support false claims against Plaintiff.

c. Defendants Baker, Scott, and Calhoun prepared and submitted false reports and statements to justify Plaintiff's termination.

d. Gray Defendants advised and facilitated the unlawful actions of the University Employee Defendants, knowing the actions were in retaliation for Plaintiff's protected activities.

The Gray Defendants actions and inactions effectively established their role in the conspiracy as the advisers or consiglieres of the plan to terminate Plaintiff.

196. Defendant Wallace acted upon the Gray Defendants' information, and she informally or formally encouraged, suggested, commanded or facilitated Defendant Watson to terminate Plaintiff in light of the learned information about Plaintiff's lawsuit.

197. As a result of the conspiracy, Plaintiff was deprived of her constitutional rights, including her rights to equal protection and due process, as well as her right to be free from retaliation for exercising her First Amendment rights, and Plaintiff was wrongfully terminated, suffered and continues to suffer irreparable reputational damage, emotional distress, and other losses to her career as a legal academician, including loss of advancement and scholarship opportunities, compensatory and punitive damages.

55

## COUNT VIII
## 42 U.S.C. § 1986 – FAILURE TO PREVENT CONSPIRACY
## AGAINST GRAY DEFENDANTS

198.  The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

199.  On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

200.  Plaintiff did not attempt to serve the complaint until 2024.

201.  On or around November 13, 2023, Gray Defendants informed Defendant FAMU via Defendant Wallace about the filed but unserved equal pay state court complaint.

202.  Defendants, having knowledge of the complaint and the potential violation of Plaintiff's rights, conspired to terminate Plaintiff's employment to prevent her from pursuing her equal pay claim.

203.  On December 5, 2023, Plaintiff received a notice of intent to terminate her from her position at the COL, 22 days after the Gray Defendants learned of Plaintiff's equal pay state court complaint.

204.  Gray Defendants had the power to prevent the wrongful termination but neglected and or refused to do so.

**APP 253**

205. Gray Defendants had knowledge of the conspiracy to violate Plaintiff's civil rights under 42 U.S.C. § 1985.

206. The Gray Defendants knew or should have known that informing Defendant Wallace about Plaintiff's unserved equal pay complaint would likely result in retaliatory action against Plaintiff, given the ongoing pattern of retaliation alleged in this complaint and having worked with Defendant Wallace.

207. Gray Defendants had the power to prevent the wrongful termination of Plaintiff. As legal counsel for Defendant FAMU, they had the professional responsibility and authority to:

> a. Advise Defendant Wallace and other FAMU officials against taking retaliatory action;
>
> b. Warn FAMU officials about the legal consequences of retaliating against Plaintiff;
>
> c. Refuse to participate in or facilitate any retaliatory actions;
>
> d. Report any planned unlawful actions to appropriate authorities within FAMU or other preventative actions, but neglected or refused to do so.

208. The Gray Defendants' failure to act was not mere negligence, but a willful disregard of their professional and ethical obligations as attorneys.

209. As a direct result of the Gray Defendants' failure to prevent the conspiracy, Plaintiff suffered damages, including compensatory and punitive damages, loss of

tenure, loss of wages and benefits, damage to her professional reputation, emotional distress and loss of future career opportunities. The Gray Defendants' failure to act was in reckless disregard of Professor Smith's federally protected rights. As experienced attorneys, they knew or should have known that retaliating against an employee for filing an Equal Pay Act lawsuit violates federal law.

**COUNT IX**
**SECTION 1983 – CIVIL CONSPIRACY**
**AGAINST THE UNIVERSITY EMPLOYEE DEFENDANTS**

210.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

211.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

212.   Plaintiff did not attempt to serve the complaint until 2024.

213.   On or around November 13, 2023, Gray Defendants informed Defendant about the filed but unserved complaint.

214.   On December 5, 2023, Plaintiff received a notice of termination that she would be terminated from her position at Defendant FAMU, 22 days after the Gray Defendants learned of Plaintiff's state court complaint filing.

215.   University Employee Defendants' actions were taken under color of state law or outside the scope of their official duties and deprived Plaintiff of her rights,

58

APP 255

privileges, or immunities secured by the Constitution and laws of the United States, including her right to free speech, equal protection, and due process under the Fourteenth Amendment.

216. After Defendant Wallace learned of Plaintiff's unserved equal pay lawsuit she regularly and consistently communicated with, encouraged, commanded, suggested and or facilitated Defendants Watson, Baker, Calhoun, and Scott (collectively the University Employee Defendants) to reach an agreement to carry out Plaintiff's termination in retaliation for Smith's lawsuit asserting EPA, first amendment, and procedural due process claims.

217. In addition to the acts mentioned above, Defendants Baker, Calhoun, and Scott specifically acted in furtherance of this conspiracy when they collected written documents from their respective department files, prepared statements, compiled evidence, manufactured evidence, created false narratives, breached confidentiality, falsely represented the end of the investigation, failed to follow FAMU Regulations and policy, shielded documents under the guise of privilege or confidentiality, met with Defendants Watson and Wallace to support the ultimate decision to terminate Plaintiff, and communicated with reviewers in the process of Plaintiff's internal appeals to influence or otherwise suggest she be terminated.

218. In addition to the acts mentioned above, Defendant Watson specifically acted in furtherance of this conspiracy by terminating Plaintiff and upholding the

59

**APP 256**

Case 6:24-cv-00457-RMN-MAF Document 84 Filed 07/09/24 Page 66 of 65 PageID 2720

termination after consistently consulting with Defendant Wallace; consulting Defendant Wallace on the predetermination conference panel members and biased Step One and Two reviewers; acting at the instruction of Defendant Watson, involving other FAMU employees and carrying out all other actions mentioned in the above paragraphs.

219.    The University Employee Defendants, acting under color of state law as officials and employees of FAMU, deprived Professor Smith of her clearly established constitutional rights, including: Her First Amendment right to free speech and to petition the government for redress of grievances, by retaliating against her for filing complaints about pay discrimination; Her Fourteenth Amendment right to equal protection of the laws, by intentionally discriminating against her on the basis of sex in pay and other employment actions; Her Fourteenth Amendment right to due process, by failing to follow established procedures in investigating complaints and terminating her employment.

220.    These University Employee Defendants also acted outside of the scope of their official duties and engaged in deliberate misconduct that violated clearly established rights to be free from retaliation and Plaintiff's constitutional rights by:

- Manufacturing false claims to fire Plaintiff

- Fabricating reasons for termination

- Manipulating internal processes to ensure her termination

- Conspiring to terminate Plaintiff for retaliatory reasons

60

**APP 257**

- Deliberately manipulating evidence and processes to justify termination

- Lying to Plaintiff to create faculty controversy

- Failing to adhere to confidentiality

These actions were taken for purely personal reasons and were violations of FAMU regulations, protocols and procedures.

221.   As a direct and proximate result of the University Employee Defendants' actions, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and other compensatory damages as well as punitive damages. These Defendants' conduct was willful, wanton, and in reckless disregard of Professor Smith's clearly established constitutional rights, justifying an award of punitive damages to deter such egregious misconduct in the future.

## COUNT X
## DUE PROCESS IN VIOLATION OF THE
## U.S. AND FLORIDA CONSTITUTIONS
## AGAINST DEFENDANT FAMU

222.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 54-62, 67-70, 72-73,79-83, 90, 92, 102 through 149.

223.   Plaintiff had a constitutionally protected property interest in her continued employment as a tenured law professor with FAMU.

224.   Defendant FAMU deprived Plaintiff of this property interest by terminating her employment. FAMU's termination procedures, as outlined in Regulation 10.120 and

APP 258

others, created a legitimate expectation of due process before termination.

225. In effecting Plaintiff's termination, Defendant FAMU deprived Professor Smith of her due process rights and failed to provide Plaintiff with adequate procedural due process protections, by: a) Employing biased and partial internal complaint reviewers who acted as the cat's paw for Defendants Wallace and Watson, who themselves had knowledge of Plaintiff's pending Equal Pay Act lawsuit, rendering any internal appeal futile and violating Plaintiff's right to an impartial decisionmaker; b) Failing to provide Plaintiff with the definition of "retaliation" used as the basis for her termination, which was vague, arbitrarily applied, and prevented Plaintiff from conforming her conduct, in violation of due process notice requirements; c) Failing to follow its own policies and procedures regarding the timing and appeals process for challenging the termination decision; d) Failing to provide timely notice of their intent to proceed with termination; e) Changing the effective date of termination to circumvent the notification timeframe required by FAMU regulations; and f) Failing to provide Professor Smith with all evidence against her, despite her requests; and others as detailed above.

226. Defendant FAMU's post-deprivation process was constitutionally inadequate to remedy the prejudicial pre-termination violations described above. These actions deprived Professor Smith of a meaningful opportunity to be heard and respond to the allegations against her before termination.

APP 259

227.   The defendants' conduct was arbitrary, capricious, and motivated by retaliation for Professor Smith's protected activities rather than any legitimate reason. As a direct and proximate result of Defendant FAMU's failure to provide adequate procedural due process protections, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and professional standing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

    a) An order reinstating Plaintiff to her position as a tenured full law professor;

    b) An order granting preliminary and permanent injunctive relief;

    c) An order declaring that Defendant has violated the Equal Pay Act, including retaliation provisions;

    d) An order declaring that Defendant FAMU has violated Title VII;

    e) An order declaring that Defendant FAMU has violated the First Amendment and due process clause of the U.S. Constitution;

    f) An order removing any negative references to the October 20, 2022 incident from Plaintiff's employment file;

    g) An award of unpaid wages and other compensation due to Plaintiff as a result of Defendant's violation of the EPA, including interest;

APP 260

h) A declaration that the Gray Defendants' actions violated 42 U.S.C. §§ 1985(3) and 1986 and an award of compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

i) Judgment against the University Employee Defendants for compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

j) Punitive damages, special damages, actual damages and consequential damages;

k) Loss of future employment opportunities;

l) Front pay;

m) Judgment against Defendants and for Plaintiff awarding compensatory damages on all Counts for the Defendants' violations of law enumerated herein;

n) Judgment equalizing Plaintiff's salary with her male Comparator who was paid more for substantially equal work, and permanently enjoining Defendants from future violations of law enumerated herein and remedying all benefits of which Plaintiff has been unlawfully deprived (such as retirement contributions, insurance etc.) of as enumerated herein;

64

APP 261

o) Restoring sick leave and other benefits;

p) Compensatory damages in the amount of the full pay differential between Plaintiff's salary and the Comparator's salary for the period she was underpaid, representing the appropriate compensation for her 10 years' greater experience performing substantially equal work;

q) An award of liquidated damages in an amount equal to the unpaid wages and compensation due to Plaintiff;

r) Prejudgment interest and post-judgment interest;

s) An award of reasonable attorneys' fees and costs pursuant to the statutory provisions referenced in the complaint, *e.g.:* Equal Pay Act, Title VII, § 1983, § 1985, and § 1986.

t) Any other relief, including equitable relief, this Court deems just and proper.

65

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.


Dated July 9, 2024

       Respectfully submitted,

       */s/ Jennifer Smith*
       Jennifer Smith
       Florida Bar No. 964514
       Law Office of Jennifer Smith
       13506 Summerport Village Pkwy.
       Suite 108
       Windermere, FL 34786
       407-455-0712
       407-442-3023 (f)
       jensmithesq@aol.com

# 86-4 - Three Lawyer Panel Decision

# 07/10/2024

**APP 264**



**Florida Agricultural and Mechanical University**

TALLAHASSEE, FLORIDA 32307-3100

<span style="color:red">**Personal and Confidential**</span>

January 12, 2023

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida Agricultural and Mechanical University
Tallahassee, FL 32307

Dear Provost Watson:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.

FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."

The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.

In conclusion, the diligent efforts of our panel have now been completed.

Sincerely,

Bryan F. Smith, J.D.
University Ombudsman and Associate Vice President for Student Affairs

Cc:    Dr. Reginald Perry, Interim Associate Provost for Academic Affairs
       Attorney Andrea Nelson, School of Business and Industry
       Attorney Patricia West, FAMU Developmental Research School

**APP 265**

# 86-5 - Affidavit Smith Supp Dec

# 07/10/2024

**APP 266**

Case 6:24-cv-00457-PGB-RMN    Document 87-10    Filed 04/01/24    Page 1 of 1    PageID 1009

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

     Plaintiff,

                                            CASE NO: 6:24-cv-00457-PGB-RMN

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

     Defendant.
_____/

## SUPPLEMENTAL DECLARATION OF JENNIFER SMITH

1.  I am Jennifer Smith. I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.  I began working for Defendant, Florida Agricultural & Mechanical University (FAMU), in May 2004, with an official start date of August 8, 2004, as a tenured track associate professor. I received a unanimous vote in April 2004 to join the faculty, which was not long after the College of Law re-opened, and thus, many of the initial employment contracts for law faculty were incorrect, including mine. My contract was corrected for me initially in 2005. (Ex. 1) I also received a grant of money in 2004 for the time I spent working unpaid from May-August

**APP 267**

Case 6:24-cv-00457-PGB-RMN-DAF Document 37-10 Filed 04/01/24 Page 2 of 2 PageID 1010

2004 to help start up the law clinics. (Ex. 2)

3. Since being hired, I performed the duties of a law professor and was subject to the direction and control of Defendant.

4. I am a tenured full professor and have been since 2016.

5. I was successfully advancing in an interview process for a position with another company until it learned of my issue with FAMU. All communications stopped from that point forward.

6. FAMU recently named an interim dean of the law school and given its unlawful abridgement of my rights, I could not have been considered for this position or other interim leadership positions at FAMU's law school.

7. I have a solo law firm, but no clients. I occasionally assist *pro bono* clients in need, but who are indigent.

8. I was paid well beyond the alleged termination date of January 30, 2024, and was listed as an employee on the FAMU website until March 20, 2024.

9. Professor Maritza Reyes was hired at FAMU with my recommendation. I knew Professor Reyes from working at the same law firm. Professor Reyes' employment there was short and unsuccessful. I knew that but believed that Professor Reyes may thrive in a different environment.

10. Professor Reyes filed a 92-page complaint in federal court against FAMU in August 2022 (6:22-cv-01525-WWB-DCI).

APP 268

11. Professor Reyes' complaints have been dismissed without prejudice twice.

12. Professor Reyes' Second Amended Complaint is pending and is facing another motion to dismiss.

13. On November 13, 2023, Professor Reyes filed her "Response To Defendant's Motion To Dismiss With Prejudice Plaintiff's Second Amended Complaint, Or In The Alternative, Motion To Strike," in which she mentioned my state court complaint that I had filed on October 17, 2023 but had not served on FAMU.

14. Professor Reyes' Second Amended Complaint is 96 pages with 303 paragraphs of allegations, dating back 15 years. In the complaint, she takes issue with numerous law faculty members of all races, national origins, and genders; law deans; staff members at the law school; and staff members and administrative personnel at FAMU's main campus in Tallahassee, including the FAMU president, provost and general counsel.

15. I reviewed SUS public materials. I am also aware that the faculty person with the most experience teaching Constitutional Law is Professor Patricia Broussard (F), who earns significantly less than all the male faculty. A summary of my findings are below:[1]

3

**APP 269**

| Name/Gender | Courses Taught | Title | Salary |
|---|---|---|---|
| Patricia Broussard (F) | Con. Law | Full Prof | $154,823 |
| Karen Consalo (F) | Con. Law | Asst Prof | $108, 150 |
| Comparator (M) | Con. Law | Full Prof | $167,272 |
| Jeremy Levitt (M) | Con. Law | Full Prof/Dist'd | $199,405 |
| LeRoy Pernell (M) | Con. Law | Full Prof | $189,283 |

16. Based on my work alongside Professor Broussard for nearly twenty years, I know Professor Broussard has been teaching Constitutional law for 19 years at the College of Law (at least once every semester). Professor Broussard writes on the subject matter and has been on the news and panels on Constitutional Law issues. Professor Broussard has submitted two United States Supreme Court briefs on Constitutional Law in *Shelby County v Holder* and *Gratz v. Bollinger*, given accolades by Eric Holder (former U.S. Attorney General), John Peyton, Esq., and John Due, Esq. for her work on Constitutional Law. Professor Broussard spoke to the State Department invited by Colin Powell to speak on Martin Luther King, Jr.'s birthday while teaching at Howard University School of Law on civil rights. Professor Broussard is constantly recognized as professor of the year at the College of Law, and she always has by far the most law students enrolled in her Constitutional Law classes than any of the male professors. Her student

4

evaluations consistently exceed those of her male colleagues.

18. My Comparator was hired in 2021. My Comparator was not initially on the spring 2023 schedule for Constitutional Law, but his placement to teach Constitutional Law came right as FAMU had to respond to my Equal Employment Opportunity Commission (EEOC) complaint, and his teaching of that course became FAMU's reason for his higher salary.

19. On March 18 and 20, 2024, I emailed Antoneia Roe, Esq. regarding my Step One Meeting and follow-up. Although she had responded to my emails before, she did not respond to my emails asking whether she received my email and documents.

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2024.

_Jennifer Smith_
Jennifer Smith

---

[1] State University System (SUS) of Florida Has a Right to Know, *available at* https://prod.flbog.net:4445/pls/apex/f?p=140:1:0:

5

APP 271

Case 6:22-cv-00457-PGB-RMN-IMAF-Document 87-10t 85led 04/01/07/410724ge Page 6 PageID 1014



# Florida Agricultural and Mechanical University

### COLLEGE OF LAW

*Excellence With Caring*

TELEPHONE: (407) 254-3268
FAX. (407) 254-3213

ONE NORTH ORANGE AVENUE
ORLANDO, FLORIDA 32801

MAILING ADDRESS:
P.O. BOX 3113
ORLANDO, FLORIDA 32802-3113

May 10, 2004



**PLAINTIFF'S
EXHIBIT**

_____

Ms. Jennifer Smith

Dear Ms. Smith:

This letter simply confirms the summary of our telephone conversations during April 2004. We are in the process of preparing the hiring package to forward to the Vice President for Academic Affairs and Provost Larry Robinson. This documentation, including your employment application and supporting materials, recommends that you be hired as an Associate Professor on tenure track by Florida A&M University College of Law for the 2004-05 academic year.

We are recommending a salary of $100,000 for a nine month contract as an Associate Professor on tenure track beginning in August 2004. You will be eligible for research grants or teaching contracts each summer.

I know that we had discussed a higher salary, but that salary is not possible within the framework of our current salary structure. I realize that this would be a deal breaker; the higher salary would be too disruptive to the collegiality of our faculty.

The College of Law is also recommending the payment for up to 15,000 pounds of moving expenses. The official employment contract must be issued by Vice President and Provost Robinson.

Sincerely,

Percy R. Luney, Jr.
Dean

PRLjr:phl

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 272**

# FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY
## RECOMMENDATION FOR FACULTY EMPLOYMENT

Position #~~####~~

✓ E&G    Grant – N/A

Date: July 27, 2005

From: COLLEGE/SCHOOL  College of Law  DIVISION  Academic Affairs

Name of Employee  Jennifer M. Smith    Social Security Number ~~####~~

Dare of Birth ~~####~~    Race  Black    Sex  Female

Home Address ~~####~~ Fl 32801    Home Phone ~~####~~ (CONFIDENTIAL)

Campus Mailing Address  One North Orange Avenue, Orlando, Florida 32801  Campus Phone  407-254-3268

Highest Degree  Juris Doctorate    Date of Degree  May 10, 1992

FTE 1.00    Position Title Visiting Assistant Professor Class Code 9003  Professional Rank Visiting Assistant Professor

Academic Discipline - Law    Tenured    Earning Tenure - X    Not Eligible for Tenure

Biweekly Salary Rate $1,875.00    Annual Salary Rate $12,000.000

Grant Number N/A    Grant Expiration Date N/A

Period of Appointment  May 09, 2005 – August 4, 2005    Type of Appointment: Summer 2005 – Scholarly Research Grant

Comptroller's Account Number  230100001

**Assigned Duties:**

| | | |
|---|---|---|
| Teaching | % | % of time will be devoted to Grant # _____ |
| Academic Advisement | % | % of time will be devoted to Grant # _____ |
| Public Service | % | Pay status (working) from _____ to _____ |
| Research | 1.00% | and from _____ to _____ Non-pay status |
| Administrative | % | (not working) from _____ to _____ and from |
| Other Inst. Effort | % | _____ to _____. This position is located in _____ county. |
| TOTAL | 1.00% | |

This individual (is/is not) employed ay another State agency.

## PERSONNEL/PAYROLL USE ONLY

No. Withholding Exp. _____    Marital Status _____    Retirement Code _____

Social Security _____
Yes / No    State Health Insurance _____
Yes / No    Pay Grade _____

SIGNATURE    DATE

Area Chairperson _____    _____

Division Director  *[signature]*    7/28/05

Contracts and Grants Officer _____    _____

Vice President for Academic Affairs _____    _____

AA:3/98

# FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY
## RECOMMENDATION FOR FACULTY EMPLOYMENT

Position #09055,

✓ E&G   Grant – N/A

Date:   August 16, 2005 - REVISED

From: COLLEGE/SCHOOL   College of Law   DIVISION   Academic Affairs

Name of Employee   Jennifer M. Smith   Social Security Number   ●●●●●●●●

Dare of Birth ●●●●●●●●   Race   Black   Sex   Female

Home Address ●●●●●●●● FL   Home Phone ●●●●●●●● (CONFIDENTIAL)

Campus Mailing Address   One North Orange Avenue, Orlando, Florida 32801   Campus Phone   407-254-3268

Highest Degree   Juris Doctorate   Date of Degree   May 10, 1992

FTE 1.00   Position Title Associate Professor Class Code 9002 Professional Rank Associate Professor

Academic Discipline - Law   Tenured   Earning Tenure - X   Not Eligible for Tenure

Biweekly Salary Rate $5,312.82   Annual Salary Rate $103,600.00

Grant Number N/A   Grant Expiration Date N/A

Period of Appointment   August 8, 2005 – May 6, 2006   Type of Appointment: Regular

Comptroller's Account Number   230200001

**Assigned Duties:**

Teaching   .66%   % of time will be devoted to Grant # _____

Academic Advisement   .08%   % of time will be devoted to Grant # _____

Public Service   .09%   Pay status (working) from _____ to _____

Research   .17%   and from _____ to _____ Non-pay status

Administrative   %   (not working) from _____ to _____ and from

Other Inst. Effort %   _____ to _____. This position is located in _____ county.

TOTAL   1.00%

This individual (is/is not) employed ay another State agency.

## PERSONNEL/PAYROLL USE ONLY

No. Withholding Exp. _____   Marital Status _____   Retirement Code _____

Social Security _____ Yes / No   State Health Insurance _____ Yes / No   Pay Grade _____

SIGNATURE   DATE

_____
Area Chairperson

_James M. Doyle_ (signature)
Interim Dean   8-22-05

_____
Contracts and Grants Officer

_____
Vice President for Academic Affairs

AA:3/98

**APP 274**

**JENNIFER.SMITH**

| | | | |
|---|---|---|---|
| **From:** | Lundy Langston [lundy.langston@famu.edu] | **Sent:** | Tue 11/23/2004 12:21 PM |
| **To:** | JENNIFER.SMITH | | |
| **Cc:** | | | |
| **Subject:** | RE: Summary provided to RPT Committee | | |
| **Attachments:** | | | |

Thanks.  Lundy


PLAINTIFF'S EXHIBIT
2

-----Original Message-----
**From:** JENNIFER.SMITH [mailto:JENNIFER.SMITH@famu.edu]
**Sent:** Monday, November 22, 2004 6:07 PM
**To:** LUNDY.LANGSTON
**Subject:** RE: Summary provided to RPT Committee


Lundy:  I just put a summary of the work in your inbox.  I am not sure how the money is defined (grant??).  Hope to do lunch soon.  Jen


Jennifer M. Smith

Associate Professor of Law

Florida A&M University College of Law

1 North Orange Avenue

Orlando, FL 32801

407-254-3256 (phone)

407-254-3243 (facsimile)

jennifer.smith@famu.edu

jensmithesq@aol.com

_____

**From:** Lundy Langston [mailto:lundy.langston@famu.edu]

**APP 275**

**Sent:** Mon 11/22/2004 2:04 PM
**To:** JENNIFER.SMITH
**Subject:** RE: Summary provided to RPT Committee

Please provide a summary of your work on the project. Thanks. Are you in? lundy

-----Original Message-----
**From:** JENNIFER.SMITH [mailto:JENNIFER.SMITH@famu.edu]
**Sent:** Monday, November 22, 2004 1:59 PM
**To:** DORANNE.RIGGIO
**Cc:** LUNDY.LANGSTON
**Subject:** RE: Summary provided to RPT Committee

Sorry. My contract began in August, but I did receive $10k for the summer for setting up the clinic and assisting in writing the HUD housing grant. Thanks.

Jennifer M. Smith

Associate Professor of Law

Florida A&M University College of Law

1 North Orange Avenue

Orlando, FL 32801

407-254-3256 (phone)

407-254-3243 (facsimile)

jennifer.smith@famu.edu

jensmithesq@aol.com

---

**From:** DORANNE.RIGGIO
**Sent:** Mon 11/22/2004 10:05 AM
**To:** JENNIFER.SMITH
**Cc:** LUNDY.LANGSTON
**Subject:** Summary provided to RPT Committee

APP 276

This email is sent at the request of Professor Langston:

This is in reference to the summary you provided to the RPT Committee.

Question #1 requires a response if you either received a summer grant/stipend or if your contract began prior to August 8th.

Please provide this information to me as soon as possible.

Thank you.

APP 277

# 86-6 - Dec. 5 2023 Notice

# 07/10/2024

Case 6:24-cv-00457-PGB-RMN Document 86-6 Filed 03/04/24/10/24 Page 75 of 58 PageID 67

Filing # 190765356 E-Filed 01/29/2024 04:07:31 PM



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

*Excellence With Caring*

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

December 5, 2023

**Via Hand Delivery by Process Server,
Electronic Mail to jennifer.smith@famu.edu, and
CERTIFIED MAIL-7020 ███████ 5973
Return Receipt Requested**

**Re:**  **CONFIDENTIAL**
**Notice of Intent to Dismiss from Employment**

**PLAINTIFF'S
EXHIBIT
6**

Jennifer M. Smith
███████████
███████████

Dear Professor Smith:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulations 1.019(21), 10.120, and 10.205, you are hereby notified of the University's intent to dismiss you from employment on January 19, 2024. You are placed on Administrative Leave with Pay, effective immediately, until the resolution of this process, in accordance with University Regulation 10.120. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. Regarding administering and grading your exams, arrangements have been made. Should you need access to your work area, please contact Deidre Keller, Dean of the College of Law, in advance for approval.

The reason for this employment action is the substantiated finding of retaliation documented in the FAMU Division of Audit and Compliance Investigation Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your memo dated October 5, 2023, also attached and incorporated in this Notice.

The University, therefore, proposes your termination from employment for just cause pursuant to University Regulations 10.205(5)(a) and 1.019(21). Evidence at any conference regarding your termination of employment may be used by the University to support its finding and all witnesses and evidence upon which the determination was based.

In accordance with University Regulation 10.120, you have ten (10) days – or until December 15, 2023 – from receipt of this Notice to submit a written request for a conference to provide an oral or written statement in response to this Notice. Your request for a conference may be provided to

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 279**

DocuSign Envelope ID: A44B2D58-F35D-465B-AFC5-870FF03CD582

Dr. Reginald Perry, Interim Associate Provost for Academic Affairs and Faculty. Late requests will not be considered. The conference will be held on January 11, 2024, at a time and place determined by the University. You are permitted to bring a representative to advise and assist you in the process, but discovery, cross-examination, and similar legal procedures are not permissible. Any documentation you intend to present during the conference should be submitted to Dr. Perry no later than January 8, 2024, at reginald.perry@famu.edu.

Pending a final determination in this matter, you are expected to refrain from any behavior that disrupts the University, violates any University regulations or policies, and/or misuses any University resources, whether in person or via electronic mail. You are also expected to maintain professionalism throughout this process pursuant to University Regulations.

Additionally, please call to arrange the return of all University equipment and property, which you may have in your possession or control, to Reginald Green, Associate Dean for Student Services and Administration at the College of Law, pending the final decision. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus must be returned to the University immediately.

The University desires to reduce the risk of error in taking this proposed action against you and to avoid damaging your reputation by untrue or erroneous charges. Therefore, the University is interested in receiving and considering your response in this matter.

Sincerely,

*Allyson Watson*

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

cc:     University Regulations 1.019, 10.120, 10.205
        Referenced documents- Reports and Memo

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 280**

**DocuSign**

## Certificate Of Completion

Envelope Id: A44B2D58F35D465BAFC5870FF03CD582
Subject: Complete with DocuSign: J.Smith 12.5.23 FINAL.docx
Source Envelope:
Document Pages: 2                          Signatures: 1
Certificate Pages: 1                       Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
Chardelyne Mercure
chardelyne.mercure@famu.edu
IP Address: 168.223.133.220

## Record Tracking

Status: Original
    12/5/2023 4:54:56 PM

Holder: Chardelyne Mercure
    chardelyne.mercure@famu.edu

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Allyson Watson<br>allyson.watson@famu.edu<br>Provost<br>Florida Agricultural and Mechanical University<br>Security Level: Email, Account Authentication (None) | *allyson watson*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 168.223.133.122 | Sent: 12/5/2023 4:55:30 PM<br>Viewed: 12/5/2023 4:59:03 PM<br>Signed: 12/5/2023 4:59:07 PM |
| Electronic Record and Signature Disclosure:<br>  Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Kentayvia Coates<br>kentayvia.coates@famu.edu<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/5/2023 4:59:07 PM |
| Electronic Record and Signature Disclosure:<br>  Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/5/2023 4:55:30 PM |
| Certified Delivered | Security Checked | 12/5/2023 4:59:03 PM |
| Signing Complete | Security Checked | 12/5/2023 4:59:07 PM |
| Completed | Security Checked | 12/5/2023 4:59:07 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**APP 281**



# Investigation Report
## *FAMU 2022-11-117*

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun



June 5, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The Office of Compliance and Ethics (OCE) concluded that allegation 1 related to disruptive conduct is **UNSUBSTANTIATED** and allegation 2 related to retaliation is **UNSUBSTANTIATED**. However, an additional finding of retaliation related to Professor Smith's subsequent actions is **SUBSTANTIATED**. If you need further information, please contact our office.

Best,

*Rica Calhoun*

Rica Calhoun

Copy to:
FAMU Board of Trustees
Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Interim Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Ella Kiselyuk, Associate Vice President, Chief Human Resources Officer
Jennifer Smith, Professor
Michelle Wanamaker, Student

**APP 283**

FAMU 2022-11-117

## Background

On October 27, 2022, The Office of Compliance and Ethics (OCE) received a referral via email from the Office of Equal Opportunity Programs (EOP) Director, Dr. Latrecha Scott. College of Law student, Michelle Wanamaker, reported her concern regarding a negative interaction she had with Professor Smith and believed that Professor Smith violated the University Code of Conduct by her behavior.

## Authority

**University Regulation 1.019 (3) and (21) (University Code of Conduct)**
**University Regulation 10.111 (Disruptive Conduct)**

## Purpose

To determine whether Professor Smith violated University policy regarding the allegation of employee misconduct.

## Standards

The investigation was conducted in compliance with the principles and standards in the *Standards for Complaint Investigations for the State University System of Florida, published by the Florida Board of Governors.* Those standards require that we plan and perform investigations to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions. We believe that the evidence provides a reasonable basis for our conclusions.

## Scope

To determine whether Professor Smith violated the University policy regarding allegations of misconduct, OCE utilized the following methodology:

- Reviewed the complaint
- Interviewed parties and witnesses
- Reviewed relevant documents

## Complainant Interview

On October 25, Ms. Wanamaker emailed Markita Cooper, Associate Dean of Academic Affairs, a narrative of events that took place on October 20, 2022, stating that she wanted to file a formal complaint again Professor Smith. The complaint included the following:

**APP 284**

FAMU 2022-11-117

"I would like to file a formal complaint against Professor Jennifer Smith. Today, in front of multiple students Jennifer Smith entered and remained in my personal space. While within 2-3 of my face, she reprimanded me, and insulted me multiple times. At approximately 10:25 AM, I entered our usual classroom for Evidence. Jennifer Smith was sitting at the desk in the front of the classroom. There were no students inside. One of my colleagues was in the doorway. Upon entering the room, I said to her, "Professor Smith, we have Evidence in this classroom, and we need to..." She interrupted me and said, "I know, AT 10:30." I then tried to explain that we needed to come inside to be prepared for class on time. She interrupted me again and repeated, "AT 10:30." She then gestured me to get out. The physical gesture was with her hand, akin to how one would "shoo" an animal away. I did not respond. I left the classroom and proceeded to wait in the hallway. The hallway was filled with students waiting to enter Evidence and 1L's waiting for Professor Smith. There were at least 40 students in the hallway. My colleagues were visibly and audibly upset about our inability to enter our class and adequately prepare for lecture. It is normal practice for our professor to expect us to begin our case briefs at the very start of class. Additionally, our professor has previously given us timed pop-quizzes that begin at our class start time. We were anxious to enter our classroom. While in that hallway, I noticed Professor Smith's classroom was completely empty. One of my colleagues reminded me that Professor Henslee completes his Torts course in that room sometime around 10:00 AM. Professor Smith was on notice that we were anxiously awaiting entrance to prepare for our class. Her adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor Reyes's Evidence class. At approximately 10:30 AM, she swung the door open. I was standing to the left of the door, leaning against the wall. She stepped towards me, blocking the door, and stopped directly in front of my face. She said, "don't ever do that again" in a stern, diminutive tone. I said, "excuse me?" While still inches from my face she repeated, "I had a make-up class. Don't' do that again!" Her tone was raised, and she was in a physically threatening position to my body. She had me backed against the wall with her body directly in front of mine. I was in shock and paralyzed with fear. As she stepped away from my face, I replied, "You are being unprofessional." She was in the motion of opening the door to the classroom adjacent to ours where she typically conducts her 10:30 class. She heard me say she was unprofessional, and she abruptly turned around and belted out, "YOU ARE UNPROFESSIONAL AND WILL NOT GO FAR!" I responded again with, "excuse me?" She then repeated, aloud in the hallway, "YOU WILL NOT GO FAR!" This traumatic event happened in the presence of 40-50 of my colleagues. Professor Smith's 1L Civil Procedure students were in the hallway, as well as my entire 2L Evidence class. After

**APP 285**

FAMU 2022-11-117

this exchange, multiple students approached me in shock. Many offered to support me and give their eye-witness account of this situation. Word began spreading immediately. I have been approached by multiple students offering support or asking what happened. I have received emails and phone calls regarding this event. This situation has me absolutely traumatized and dreading coming back to school at FAMU Law. I am a student leader on our campus who goes above and beyond to serve my colleagues and community with the upmost professionalism. I am the President of the Women's Law Caucus. I serve on the FAMU COL Student Leadership Committee. I am a Junior Editor on Law Review. I am the current Holland & Knight Scholar. I have organized and participated in countless events in support of our school. I am utterly sickened and discouraged by this violent encounter within the walls of our law school. Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence. Jennifer Smith's abusive behavior was in direct conflict with 6C3-1.019 University Code of Conduct. I would like to pursue this complaint to the maximum extent possible."

On November 15, 2022, Ms. Wanamaker provided five eyewitness statements from students that were present in the hallway during the interaction.

## Respondent Interview/Statement

### Jennifer Smith, College of Law Professor, February 1, 2023

Professor Smith denied the allegations, indicating that she "reviewed the relevant provisions that [OCE] cited, but none apply." Professor Smith explained that she was using another classroom for make u classes due to it being cancelled because of a hurricane. The following statement was provided via a February 7, 2023, memo sent the OCE:

*Substance of the Incident*

*On October 6, 2022, I reserved the subject classroom (Room 253) for October 20, 2022 for makeup classes, which were cancelled due to a hurricane (Exhs. G, J). The classroom is usually empty, and it is the classroom next to the one I was assigned for my 10:30am classes (Room 255) on M, T, TH.*

APP 286

FAMU 2022-11-117

On October 20, 2022, I was in the classroom for oral exams, which require students to come in one by one for no more than about 3 minutes. The students wait outside the classroom until the next student comes out until the exams are complete. Sometime in the middle of the oral exams, a student (not WM) entered, and I explained that I was having oral exams. The student left. Soon after, MW aggressively entered and interrupted my student doing her oral exam. I explained to MW that I am having oral exams, and she did not care and responded with indignation that her professor, Prof. Reyes, told students to make sure they are set up for class at 10:30am. She felt entitled to be in the classroom before her class began. I said it is far from 10:30 am, and I have the room reserved. I literally had to verbally demand she leave for her to get out. She was not pleased and expressed that. She had to know that the classroom was being used because students were in the hallway chatting about what was going on in the classroom, including my students who were scheduled for oral exams.

At about 10:29am on that day, I finished the exams and gathered my stuff to exit the classroom, which has two entrances/exits. When I opened the door, MW was standing right there waiting to come in the classroom. I said to her not to do that again (referring to her entering the classroom being used and being rude), and she passed by me as she got loud and rude and was so disrespectful; I was floored. I knew by her aggressiveness that she was likely from the New York/New Jersey area - she's from Philadelphia, I later learned. She walked all the way to I believe the last row being absolutely disrespectful. When she was at her seat in the back, I said from the front door something like: "With your attitude, you will not get far in law/life."

At 10:30am, I texted Associate Dean Green about the incident, indicating that the student was "aggressive rude," then went into my classroom (255) to teach my class. A student of mine who saw it, Jo'Anna Clayton, asked me if I wanted her to get me some water before I started teaching. I declined. Associate Dean Green emailed back that night, and I assumed he would handle it from there (Exh. E).

Students began talking about the incident to others. On October 31, 2022, Prof. Patricia Broussard told me that the student was MW, who is supposed to be interning for the same firm where I was a partner. Prof. Broussard said she was looking for MW as it related to the women's law group and she asked a student/friend of MW's, who relayed to Professor Broussard that MW was not feeling well and was remorseful, ashamed and embarrassed about HER OWN conduct regarding something that occurred. I made a note of it (Exh. H).

Then, again in December, Professor Broussard relayed that she was in the stall of the ladies' room when she overheard a few students discussing how badly MW felt because of her conduct regarding the incident. Again, MW was concerned about HER OWN behavior and was physically ill about her conduct towards me. It appeared to me that MW's concern was largely concerned because I was a former partner with the firm. I did not hear much about this after. I said to Prof. Broussard that perhaps I should send MW an email to let her know that I am not going to report this incident to the law firm or the bar, although I believe it was questionable as to whether I had reporting obligations to The Florida Bar about the incident. Prof. Broussard said that it would be great if I did send MW an email to give MW peace and show her how professionals act or respond in these cases. Prof. Broussard has regular contact with the MW, who never mentioned the incident to Prof. Broussard.

On December 18, 2023, I sent the following email to MW (Exh. I):

Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.

APP 287

FAMU 2022-11-117

Best,

Prof. Smith

MW did not respond. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail (Exhs. A, C). The first time I had any notice that I was ever the subject of an investigation regarding this incident was January 27, 2023, and with more details on February 1, 2023, yet apparently a complaint had been filed on October 27, 2022 - over 90 days before. The Dean's office made the unilateral decision to escalate the complaint without ever speaking to me, and I was never informed about the escalation of the student complaint orchestrated by the Dean's office nor was I informed that the complaint I filed a week before MW's was going to be ignored.

There are cameras in the hallway that should give some context of the incident.

Conclusion

I am not sure what I could have done to avoid this incident. I reserved the classroom, but even if not, students do not have the right to use the classrooms for study places, and they certainly do not have the right to use the classrooms being utilized by professors. Further, if a student walks in on a classroom, what response should he/she have but that he/she is sorry for the intrusion and depart quickly. This should never have been a "back and forth" argument with a student in the middle of another student's examination. I also should not have had to bump into or encounter the student as I was leaving the classroom. The student did not need to be at the door entrance, ready for battle as I exited.

I reported the immediately reported the incident of being confronted by an aggressive student, which Associate Dean Green indicated would be immediately handled. In reporting the incident, I assumed that the COL was handling it and would contact me as needed, but I certainly did not know that I was the alleged subject of an investigation at any point until over 90 days later. This is problematic and unprofessional.

I did not retaliate against the student; indeed, I sent her an email to give her peace about her behavior in the incident, which clearly she relayed to others. When I continued to hear how ashamed she was about her conduct, especially because I was a former partner at the firm she will be working soon, I gratuitously sent her an email to minimize her fears about relaying the incident to interfere with her career. I have emails and witnesses about the student remorse regarding her OWN conduct, not mine.

The chain of documents alone that I have provided already and am resubmitting with this memorandum support my position that I reserved the room, was confronted by a student and reported the incident immediately, documented the student's alleged conversations to others about her own disruptive conduct, and harbored no negativity or retaliatory motives by the email I sent to MW to give her peace about her disruptive conduct. Never in my 30 years as a lawyer have I ever been accused of any employee misconduct.

APP 288

FAMU 2022-11-117

Professor Smith provided the name of a student who was also present and could give additional details related to the incident. She also provided the text message that she sent to Associate Dean Reginald Green.




## Employee Witness Interviews

### Reginald Green, College of Law Associate Dean March 13, 2023
Dean Green provided the following written statement:

"On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text: "Hey...I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing. By the time I had identified who the student was, I was informed that the student had filed a grievance with Markita Cooper who was the Associate Dean for Academic Affairs. Per the Student Handbook, student petitions or grievances involving faculty should be forwarded to the Associate Dean for Academic Affairs. At the same time, I was notified that the complaint involved EOP issues (hostile environment and fear). Within days of learning of the complaint, I was copied on an email from then Provost Edington to Latrecha Scott who was Director of Equal Opportunity Programs and Labor Relations/Title IX. Provost Edington's instructions were for her to "please review and take appropriate

**APP 289**

FAMU 2022-11-117

action." At that time, without a written complaint from Professor Smith and an internal inquiry being conducted by Associate Dean Cooper and EOP, the process had ended for me. Even if Professor Smith had sent a formal accusation of a student code of conduct violation, it would have been impractical to conduct two separate investigations without interfering with the other. It is my belief that an EOP investigation superseded a conduct allegation. While investigating the EOP allegation, it would be impossible not to evaluate the student's conduct."

## Markita Cooper, Associate Dean for Academic Affairs and Law Professor February 6, 2023
Dean Cooper provided the following written statement:

"I received Ms. Wanamaker's email with the complaint attached on Tuesday, October 25, 2022. The email cc'd another faculty member, Professor Maritza Reyes. I responded to the email on Tuesday, October 25, acknowledging receipt of the complaint and advised Ms. Wanamaker that I would ask my assistant to contact her to set up an appointment. In this message, I noted that Ms. Wanamaker had copied Professor Reyes and advised her that because the complaint raised sensitive personnel issues, it would not be appropriate for me to include other faculty members on communications regarding the matter. Ms. Wanamaker responded with a thank you in an email on Tuesday, October 25.

On the afternoon of Wednesday, October 26, Professor Reyes sent an email to Ms. Wanamaker, apparently in response to Ms. Wanamaker's email submitting the complaint. The email began with Professor Reyes stating, "I have been waiting for Associate Dean Markita Cooper to respond to the complaint you submitted to her about the incident with Professor Jennifer Smith last Thursday...I wanted to give her the first opportunity to respond." I had responded, but did not include Professor Reyes in the response, as explained in the message to Ms. Wanamaker. The message from Professor Reyes also stated, among other points, that "I infer that, because you copied me in your email/complaint to Associate Dean Cooper, that you want me involved in this matter."

Concerned about the nature of the allegations in the complaint (including bullying, creating a hostile environment, and "abusive behavior in direct conflict with 6C3-1.019 University Code of Conduct") as well as having another faculty member involved in the discussions of the complaint and any attempts to informally resolve the matter at the College of Law level, I sought guidance from the University EOP Office. I forwarded the complaint and related emails that I had received from Ms. Wanamaker and Professor Reyes to Ms. Kimberly Ceaser, Ms. Latrecha Scott, and Ms. Letitia McClellan on the afternoon of Wednesday, October 26.

On the evening of Wednesday, October 26, 2022, Ms. Wanamaker sent an email, stating that she needed clarification before scheduling a meeting with me. She requested clarification as to whether she was to be afforded an advisor during the meeting. Her position was that she was "afforded the right to have an advisor present during hearings and proceedings related to various violations of the Student Handbook." (This complaint, however, did not involve a violation of the Student Handbook.)

7 | Page

**APP 290**

FAMU 2022-11-117

> After I forwarded the email messages to EOP, I was advised not to meet with Ms. Wanamaker, and that Ms. Ceaser would contact her and assist regarding the next steps in the process. On Wednesday, November 2, I sent an email to Ms. Wanamaker advising her that I had reached out to the University EOP Office. In this message, I also informed her that Ms. Ceaser was reaching out to her to assist with the next steps in the process."

## Patricia Broussard, College of Law Professor, February 1, 2023

On February 2, 2023, Professor Broussard acknowledged that she advised Professor Smith to reach out to Ms. Wanamaker. Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset about her actions. Professor Broussard said that she told Professor Smith that this was a way to show Ms. Wanamaker that she would not hurt her and how women could uplift one another.

# Student Witness Interviews

## Complainant Witnesses

The OCE spoke with four of the five students who confirmed the statement received from the Complainant was true and accurate. In summary, the students recalled hearing Professor Smith aggressively saying that "you won't go far" to Ms. Wannamaker in a loud tone and commented that it was unprofessional.

## Respondent Witness

On February 8, 2023, OCE spoke with the student that Professor Smith said could provide information. The student confirmed being present and outside of the classroom. The student recalled Ms. Wanamaker being next to her "with an attitude" and Professor Smith whispering to Ms. Wanamaker that her behavior was inappropriate; however, Ms. Wanamaker replied, screaming, that Professor Smith was being inappropriate. They both exchanged words, with Professor Smith telling Ms. Wanamaker that she would not go far. Ms. Wanamaker walked off stating that she was going to go tell Dean Cooper.

# Additional Documents Reviewed/Requested

## Video Footage

On January 31, 2023, the OCE requested video footage from room 253 on October 20, 2023, between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police. Chief Calloway reported that video footage was unavailable.

## Respondent Subsequent Memoranda

Professor Smith also provided subsequent memoranda on the following dates:
Memo #2 was received on February 9, 2023
Memo #3 was received on February 16, 2023.
Memo #4 was received on February 26, 2023.

**APP 291**

FAMU 2022-11-117

Memo #5 was received on February 27, 2023
Memo #6 was received on March 23, 2023

### Email from Ms. Smith to Ms. Wanamaker

On January 24, 2023, the Complainant stated that in December 2022, Professor Smith emailed her the following, in pertinent part:

> **From:** Smith,Jennifer<jennifer.smith@famu.edu>
> Sent: Sunday,December18,20227:16PM
> To: Wanamaker,Michelle<michelle1.wanamaker@famu.edu>
> Subject: FAMU COL
>
> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*
>
> *Best,*
>
> *Prof. Smith*

On February 1, 2023, Professor Smith stated that the only reason she emailed the Complainant was because Professor Broussard told her that she should, as Ms. Wanamaker felt badly about how she behaved. Professor Smith related that Professor Broussard told her that the Complainant felt bad about how she acted and was nervous because she (Professor Smith) was a former partner at Holland & Knight.

## Discussion

**Allegation 1: Professor Smith engaged in disruptive conduct by her behavior during an interaction with Complainant, in violation of University Regulations 10.111 and 1.019.**

University Regulation 10.111 establishes guidelines for employee relationships to set behavioral expectations for the University. Individuals engaged in disruptive conduct under the policy:

> [Disruptive Conduct is defined as] ...
> (1) Faculty, Administrative and Professional, and USPS employees who intentionally act to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the University shall be subject to appropriate disciplinary action by the University authorities...
>
> c. Interference with the freedom of movement of any employee or guest of the University;
> d. Deliberate impediment to or interference with the rights of others to enter, use, or leave any University facility, service, or scheduled activity, or in carrying out their normal functions or duties...

9 | P a g e

**APP 292**

FAMU 2022-11-117

The regulation provides a non-exhaustive list of examples of prohibited behavior. This expectation is reinforced by the University Code of Conduct (University Regulation 1.019), which sets standards for adherence to policy and regulation.

According to witness statements, Ms. Wanamaker and Professor Smith had a negative interaction when Ms. Wanamaker entered a classroom early for her regularly scheduled class, interrupting Ms. Smith's administration of an exam. Professor Smith booked that same class for make-up oral exams that ended immediately before Ms. Wanamaker's class began. Ms. Wanamaker argued that her class was starting soon and her professor wanted the class seated and ready for class. Professor Smith told Ms. Wanamaker to leave. The interaction picked up again when Professor Smith exited the classroom and Ms. Wanamaker was standing near the classroom door. During their conversation, Professor Smith stated that Ms. Wanamaker "would not go far." Ms. Wanamaker asked Professor Smith to repeat herself and Professor Smith loudly repeated that Ms. Wanamaker would not go far. Ms. Wanamaker then loudly responded that Professor Smith was inappropriate and unprofessional.

Based on the information available, Professor Smith's behavior did not interfere with Ms. Wanamaker's freedom of movement, her scheduled class, or obstruct university processes. Witness statements indicate that Ms. Wanamaker and Professor Smith were close during the confrontation, but Ms. Wanamaker had a path to walk away from the interaction, either further into the hallway or into the classroom. Witness statements indicate that Ms. Wanamaker actually walked back into her scheduled classroom and turned back around to say, "excuse me?" to Professor Smith, who repeated herself. Ms. Wanamaker's class also continued as scheduled.

While a witness stated that Professor Smith's behavior was startling and made them uncomfortable, the behavior did not rise to the level of restricting Ms. Wanamaker's freedom of movement or disrupting University processes. OCE is concerned about the tone of described interaction between a professor and student; however, the allegation is **UNSUBSTANTIATED.**

**Allegation 2: Professor Smith retaliated against Complainant after discovering that Complainant filed a complaint.**

University Regulation 1.019(21) regarding retaliation states,

"Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics-related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination. Retaliation against any

10 | P a g e

APP 293

FAMU 2022-11-117

individual for their actual or perceived involvement in an investigation is prohibited by the University."

Retaliation is established when an individual takes adverse action against another because of their participation in an investigation or opposing perceived violations of University policy or law. Such adverse action is actionable when it could reasonably deter an individual from engaging in such activity.

Ms. Wanamaker reported that Professor Smith's December 18th email was sent to intimidate her. According to witness and Respondent statements, Professor Smith's email to Ms. Wanamaker was sent at the behest of a colleague, who thought it would be helpful to make Ms. Wanamaker feel better. The motivation for Professor Smith's email indicates that the email was not sent with adverse intent.

The allegation is **UNSUBSTANTIATED**.

## Additional Finding

OCE became concerned with how Professor Smith responded after she was made aware that Ms. Wanamaker filed a complaint against her.

In response to the complaint, Professor Smith indicated that she filed a complaint with Reginald Green, Associate Dean for Student Services and Administration, on October 20, 2022:





APP 294

FAMU 2022-11-117

The College of Law Faculty Handbook states the following regarding faculty complaints against students:

> C. STUDENT MISCONDUCT
>
> *The Student Code of Academic Conduct is outlined in the Student Handbook. Faculty allegations of student misconduct not covered by the Student Code of Conduct should be referred to the Associate Dean for Student Services and Administration.*

In a subsequent statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint, reporting that:

> On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text:
>
> "Hey...I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom.
>
> I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing which is consistent with the Student Handbook.
>
> Had I received an email with details regarding any alleged misconduct, I would have forward[sic] that information to the Director of Student Affairs to complete a report.
>
> It is my belief that the text message above was not intended to be a formal complaint nor did it constitute a formal complaint as required by the Student Handbook. I think Professor Smith will agree with that contention, as she has served as the chair of the Student Disciplinary Committee in past academic years.

It is unreasonable that Professor Smith considered her text message to Associate Dean Green as a formal complaint of a student conduct violation. Professor Smith did not respond to Associate Dean Green's request for further information. Further, Professor Smith indicated in the same statement that she felt the issue was resolved after her December 18, 2022 email, noting that:

> "*MW did not respond [to my email]. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail.*"

As Professor Smith notes in Memorandum 1, during her interview with the OCE investigator on February 1, she emailed Associate Dean Green to ask "what happened to my complaint," referencing the email that she sent to him. Professor Smith included her email to Associate Dean Green, in which she asked:

APP 295

FAMU 2022-11-117

> *"Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this?"*

Professor Smith continued to send OCE supplemental memoranda restating her position and other concerns regarding the investigation and colleagues. Professor Smith submitted five supplemental memoranda to support her initial testimony.

On March 9, 2023, Professor Smith filed a complaint through the University's Compliance and Ethics Hotline, reporting that a student knowingly and intentionally disrupted her class on October 20, 2022. OCE advised Professor Smith on several occasions that the investigation would include her testimony regarding her account of the incident.

On March 10, 2023, OCE sent an email to Professor Smith reiterating that the issue would be addressed in the ongoing case FAMU 2022-11-117.

Professor Smith responded that

> *"...there is a difference in being the one who brings a charge and is the subject of a charge. So, these are not the same. The student needs to understand she was also the subject of an investigation, and I am not sure she will."*

On March 13, 2023, OCE sent a Notice regarding Non-Retaliation to Deidré Keller, Dean of the College of Law, to reinforce the University prohibition on retaliation with Professor Smith. In the notice, OCE stated that "...Filing a complaint for the purpose of making a student "understand she is also the subject of an investigation" is inappropriate."

The notice also reiterated the requirement that reports be made in good faith. The law deans met with Professor Smith. In response, Professor Smith submitted Memorandum #6 dated March 23, 2023. In this memorandum, Professor Smith goes on to clarify why it was important that Ms. Wanamaker know that she was a subject in a complaint:

> *"...It is necessary for the student to properly file her Bar application; otherwise, she will be accused of not being truthful about her law school experiences. I knew an investigation was being reviewed, but Ms. Baker informed me that I (not MW) was the subject of the investigation."*

Professor Smith's subsequent complaint on March 9, 2023, although she knew that an investigation was being reviewed, memorandum responses, and the timeline of events are concerning. Professor Smith did not follow up on her text message to Associate Dean Green about Ms. Wanamaker being "aggressive rude" or his request for additional information in October 2022, which contradicts her subsequent assertions that she filed a complaint and was under the impression that it was being handled. Professor Smith also stated that she felt the issue was resolved in December 2022.

Despite this, Professor Smith filed an additional complaint against Ms. Wanamaker with the Office of Compliance and Ethics after discovering that Ms. Wanamaker filed a complaint against her. Based on Professor Smith's statements, she filed this complaint for the purpose

**APP 296**

FAMU 2022-11-117

of ensuring that Ms. Wanamaker would report that she was the subject of an investigation on her bar application. Professor Smith's clarifying statement that she filed the complaint would prevent Ms. Wanamaker from being "accused of not being truthful about her law school experiences."

Based on the information available, the allegation is **SUBSTANTIATED.**

## Summary Conclusion

The allegation that Professor Smith violated University Regulation 10.111 and 1.019 related to disruptive conduct is **UNSUBSTANTIATED.**

The Complainant's allegation that Professor Smith violated the University Code of Conduct related to retaliation by sending the December 18, 2022 email is **UNSUBSTANTIATED.**

The additional finding of retaliation due to Professor Smith's subsequent action in filing an additional complaint against Ms. Wanamaker for the purpose of having Ms. Wanamaker report the complaint on her bar application, is **SUBSTANTIATED**.

## Additional Information and Recommendations

During the course of the investigation, OCE became aware of additional concerns which OCE will address directly with management. Additionally, the OCE recommends that Interim Provost and Vice President of Academic Affairs, Allyson Watson and College of Law Dean Deidré Keller:

- ♦ Review this report and take any corrective actions deemed appropriate.
- ♦ Consider if additional training is appropriate regarding civil discourse, conflict resolution, and professionalism in the practice of law for faculty and students.
- ♦ Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices.

**APP 297**



FLORIDA A&M UNIVERSITY
# OFFICE OF COMPLIANCE AND ETHICS

## Supplemental Report
### *FAMU 2022-11-117*

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun

Case 6:24-cv-00457-RMN-MAF Document 1-6 Filed 03/04/24 Page 25 Page ID 87



FLORIDA A&M UNIVERSITY
**OFFICE OF COMPLIANCE AND ETHICS**

July 6, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Supplemental Report, addressing additional concerns as a result of the investigation of employee misconduct regarding Ms. Jennifer Smith. If you need further information, please contact our office.

Best,

*Rica Calhoun*

Rica Calhoun

Copy to:

Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Dr. Latrecha Scott, Director, Office of Equal Opportunity Programs
Ella Kiselyuk, Associate Vice President, Human Resources

**APP 299**

FAMU 2022-11-117 Supplemental Report

# SUPPLEMENTAL REPORT

## Background

On June 5, 2023, The Office of Compliance and Ethics (OCE) released FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The (OCE) concluded that allegation 1 related to disruptive conduct is UNSUBSTANTIATED and allegation 2 related to retaliation is UNSUBSTANTIATED. An additional finding of retaliation related to Professor Smith's subsequent actions is SUBSTANTIATED. However, the OCE had additional concerns related to documentation reviewed during the course of the investigation.

## Document Review

On February 9, 2023, Professor Smith emailed "MEMO 2" with the following message:

> Hi again.
> I think these are the last of emails/texts on matter.
> Thx,
> JS

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:     Latonya Baker, FAMU Office of Compliance and Ethics
From: Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Second Memo on the Matter
Date:  February 9, 2023

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (⬛⬛⬛⬛⬛) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

Case 6:24-cv-00457-RMN-MAF Document 16-3 Filed 03/04/24 Page 20 of 23 PageID 89

FAMU 2022-11-117 Supplemental Report

## Discussion

The University outlines its values of accountability, inclusion, innovation, and integrity. This sentiment is echoed in regulation as well as collective bargaining agreements. For example, the UFF Collective Bargaining Agreement indicates that,

> "in addition to their assigned duties, faculty members have responsibilities arising from the nature of the educational process. Such responsibilities include, but are not limited to... respecting the confidential nature of the relationship between professor and student; adhering to one's proper role as teacher, researcher, intellectual mentor, and counselor; and conducting oneself in a collegial manner in all interactions."

In Professor Smith's message to Assistant Dean Reginald Green, she identified Michelle Wanamaker as "one of Reyes' students (Hispanic blonde)." The text messages between Professors Smith and Broussard and former student Professor Smith identified as Elliot Preston Jackson (c/o 2021) were concerning based on the nature of their discussion regarding current students. "Preston," as identified by Professor Smith, sent her a picture of Michelle Wanamaker and told her that "Michelle Wanamaker is the student who walked up on you." Preston then stated that Daniel Jefferson, a current 3L student, reported to him that

> "another student in [Professor Smith's] class saw everything and is supporting a complaint against you to Admin. That report is being fueled unofficially by Reyes."

The text message exchange continued with a discussion about information that Preston said came from current and former students. Professor is noted asking Preston if the student is "brown." Professor Smith then shared the picture of Michelle Wanamaker with Professor Broussard, discussing the situation with the student. Professor Smith also provided a "note to self," that stated:

> "...also heard Michelle being really nice to my blk women students and asking irrelevant questions...that's a big book you have...to try to start convo. I said did she speak before...they said sometimes here n there..."

While the text messages did not rise to the level of a policy violation, the OCE is concerned with the appropriateness and professionalism displayed by Professor Smith and others in the messages that she provided. The apparent undercurrent of race and the perceived rivalry between Professors' Reyes and Smith, internalized by students, is a distraction and out of step with the values reiterated in University commitments and regulations.

The expectation of privacy refers to an individual's reasonable belief that their personal information, activities, communications, and spaces will remain private and free from unwarranted intrusion or surveillance. While this incident did not violate Family

**APP 301**

FAMU 2022-11-117 Supplemental Report

Educational Rights and Privacy Act (FERPA), sharing a student's photograph for the non-educational purpose of gossip is wholly inappropriate. Additional general observations follow:

## Confidentiality and Privacy:

➢ Professors should respect the privacy and confidentiality of their current and former students. Personal information, academic records, or any other sensitive details should not be disclosed without the explicit consent of the individuals involved.

## Professional Boundaries:

➢ University faculty are bound by academic standards of professionalism and decorum, which encompasses a strong commitment to ethical conduct and integrity. College of Law faculty, as attorneys, are additionally bound by professional codes of conduct and ethical rules, which guide their behavior and ensure they act in the best interests of their clients while respecting legal and moral principles. Upholding ethical standards, fosters fairness and justice, and maintains the integrity of the profession.

➢ Faculty should be mindful of maintaining professional boundaries when discussing students with former students. They should avoid sharing personal opinions, making derogatory remarks, or engaging in gossip. The focus should be on constructive and objective discussions related to educational experiences or academic achievements.

➢ Faculty should ensure that discussions about students with former students serve a legitimate educational purpose. This may include seeking insights, feedback, or recommendations related to educational development or career opportunities. Discussions should be conducted in a professional and respectful manner.

# Recommendation

Deidré Keller, Dean of the College of Law, should review this supplemental report and take any action deemed appropriate, taking into consideration the recommendations outlined in FAMU 2022-11-117 Investigative Report.

APP 302

# Appendix A: Documentation

**APP 303**

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:    Latonya Baker, FAMU Office of Compliance and Ethics
From: Jennifer Smith, Professor of Law
Re:    October 2022 Incident, Second Memo on the Matter
Date:  February 9, 2023

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (704.891.4223) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

Case 6:24-cv-00457-PGB-RMN Document 17-2 Filed 03/04/24 Page 24 of 23 PageID 93

Thursday, October 20, 2022

Hey...I had a hurricane make up class in 253 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. Aggressive rude...like fight rude...i reported it.JS

10:41 AM

**APP 305**

Case Case 4:23-cv-10385-RMM Document 16 Filed 03/04/2410 Page 25 of 28 Page ID 94



Michelle Wanamaker is the student

Who walked up on you

10:26 PM

Repeated by: Daniel Jefferson

Daniel reports that another student in your class saw everything and is supporting a complaint against

**APP 307**

Case Case 1:24-cv-00065-RMNM Document 95-6 Filed 03/04/24 Page 27 of 30 PageID 96



**APP 308**

Case 6:24-cv-00457-RMN Document 16 Filed 03/04/2024 Page 35 PageID 97

Oct 21, 2022   10:32 PM

**Who is Daniel Jefferson**

10:33 PM

**Daniel is a student in 3L class**

**He is a friend of Tyran who does not like you. She never had you as a professor but they are on vendetta against you**

**APP 309**

Case 6:23-cv-00045-RMN Document 85 Filed 03/04/24 Page 29 of 32 PageID 98



Case 6:24-cv-00457-PGB-RMN   Document 1   Filed 03/04/24   Page 35   PageID 99



Case 4:24-cv-00457-RMW-MAF Document 86-6 Filed 03/04/04/19/24 Page 75 Page 100



Case 6:24-cr-00457-DGE-RMW Document 38-6 Filed 03/04/19 Page 75 PageID 101



**APP 313**

Case 4:00-45700-0-67-MW-MD-cu-Document-17-6-Filed 03/04/24/19/2de-52-age 756 P4 58D 102

4:42                                    🔋 🔇 📶 26% 🔋

‹   Ⓟ  Patricia Broussard  ⌄      ⋮

Oct 24, 2022

Green should have said she had no right to be inthere.in there.. heard her folk said i have supporters for my side...other students say she's loud and rude often

3:03 PM

**APP 314**

**RE: AD Green**

Pissini, Theresa <theresa.pissini@famu.edu>
Tue 11/1/2022 10:27 AM
To: Smith, Jennifer <jennifer.smith@famu.edu>

Good morning Professor Smith,

Not a problem. I did recognize you when you got close to me.

Theresa Pissini
Senior Administrative Assistant to the Associate Dean for Student Services and Administration
Florida Agricultural and Mechanical University
College of Law
201 Beggs Avenue
Orlando, Florida 32801
407.254.3205 Office
407.254.3214 Fax
theresa.pissini@famu.edu

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Tuesday, November 1, 2022 10:23 AM
**To:** Pissini, Theresa <theresa.pissini@famu.edu>
**Subject:** AD Green

GM. I forgot I had sunglasses and a mask on when I came to see AD Green. Sorry about that - I was probably unrecognizable.

**Jen Smith**
**Professor of Law**
**Florida A&M University College of Law**
**201 FAMU Law Lane**
**Orlando, Florida 32801**
**407.254.3256 Office**
**407.254.2456 Fax**
jennifer.smith@famu.edu
**https://profjensmith.com/about-me/**

APP 315

Just went to see green but he's off for the week. His secretary, teresa,, jumped up like she was blocking me. I took off my sunglasses...oh but I still had a mask on...she probably ain't know who I was...also heard Michelle being really nice to my blk women students and asking irrelevant questions...that's a big book you have...to try to start convo. I said did she speak before...they said sometimes here n there...

**APP 316**

# MEMORANDUM

To:     Rica Calhoun, FAMU Office of Compliance and Ethics
CC:     Denise Wallace, Esq., FAMU GC
From:   Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Ninth Memo on the Matter
Date:   October 5, 2023

---

A year ago, I experienced an unexpected confrontation with a law student, Michelle Wanamaker, whom I had not previously met. She entered through the side door of a classroom I had reserved weeks earlier, interrupting my ongoing oral exams to insist on preparing for her upcoming class. After asking her to leave, she then positioned herself outside the main entrance where she knew I would exit, awaiting another opportunity to confront me. Shocked about this stranger's hostility towards me, I immediately contacted Associate Dean Green, who promptly arrived, but by then my subsequent class was in session.

Although Dean Green had indicated there would be an investigation, it was not until 100 days later that I was approached for an interview by L. Baker from Compliance. Surprisingly, the investigation focused on a complaint filed by the student, one week after my own, and of which I was not informed. The subsequent 130-day investigation, spanning January to June, resulted in an incomplete report riddled with discrepancies, bias and oversight. While I was ultimately exonerated, this could have been expedited or non-existent had the University sought to retain the video evidence when the incident happened, but the University did not think the incident worthy of investigation in October.

In January, the University launched an investigation, which had my employment on the line. For reasons unbeknownst to me, my initial complaint I filed on the day of the incident was overlooked and subsequently deemed invalid. Thus, I re-submitted my complaint in March. Instead of addressing the issue, I was accused of potential retaliation in March for "re-filing the complaint" and spoken to by Deans Keller and Cooper about this potential retaliation, but they seemed unaware of what to say or do. Then, after the investigation was concluded in June, the report determined I had engaged in retaliation and re-assigned unspecified punishment to follow by the dean or provost.

In June 2023, I detailed these inconsistencies and duplicative punishment for the same "retaliation" in a memorandum addressed to Rica Calhoun (Compliance) and Denise Wallace (GC), but copied Craig Reed (BOT) on the email. To date, I have not received a response to my June 2023 memo. This confirms to me that the initial investigation was retaliatory.

On Monday (Oct. 2, 2023), during the provost's visit to the law school, associates of Wanamaker raised the October 2022 incident. They asserted I should have been dismissed, lamented the lack of any follow up, and expressed that students are uncertain about the procedure to lodge grievances against faculty. Yesterday (Oct. 4, 2023), while attending an event hosted by my previous firm (and where Wanamaker received a job offer because I never mentioned the incident), it became evident that Wanamaker has been disseminating a distorted and false narrative of the event, tarnishing my reputation to my former co-workers and within the legal community. Though I've refrained from defending myself outside the formal investigation, I am obligated to report this student's defamatory conduct and slander campaign to The Florida Bar for several reasons, including my personal safety:

- When law students in Florida apply for bar admission, they undergo a character and fitness review. This process evaluates an applicant's honesty, trustworthiness, and fitness to practice law. These factors comprise and applicant's moral character. Wanamaker has demonstrated (1) dishonesty based on her intentional mischaracterization of the events underlying the investigation; (2)

APP 317

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
October 5, 2023

untrustworthiness based on those mischaracterizations and contradictory evidence; (3) manipulation of the complaint process by leveling a meritless complaint; (4) bullying by knowingly interfering in my class by creating a threatening and hostile environment for me; and (5) lack of respect for process because she has initiated this campaign to target and attack my reputation. Misconduct during law school is relevant during this review. I do not believe that Wanamaker is fit for the practice of law. She is dishonest, unethical and a bully.

- We have our own policies or codes of conduct which dictate the actions that faculty members must take in response to student misbehavior. Some infractions require internal reporting, academic consequences, or even reporting to outside entities.

- Faculty members, like other professionals, have general ethical or professional obligations to report certain types of misconduct, especially if they believe that the misconduct suggests the student might be unfit to practice law or if there's a risk to others. The response may vary depending on the severity of the misconduct. While minor indiscretions might be handled internally, more serious violations, especially those involving dishonesty, integrity, or harm to others, might warrant notification to the Florida Bar or other authorities.

- On the bar application, students might be required to disclose certain types of misconduct or disciplinary actions taken against them during their academic career. Failing to disclose such information can be problematic if discovered later.

I am increasingly uneasy about a student who remains severely fixated on an incident that transpired nearly a year ago. Wanamaker, a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior towards Professor Broussard (one of my witnesses regarding the incident), who knew the student before the incident. Prior to this incident, I had no knowledge of the student, but she knew me and hated me (though never knowing me personally), apparently due to misleading information from Professor Reyes (who I recommended for hire at the law school even though her tenure at the firm where we both worked was short and problematic). It's troubling that a student would viciously confront and then attempt to jeopardize the career of a faculty member based on dubious information. Wanamaker's actions suggest emotional and psychological instability.

Through this memo, I wish to formally express my concern regarding Wanamaker's persistent and unsettling behavior towards me. I find myself perpetually on guard, unable to comprehend why a student, with whom I've had NO prior interactions, seems intent on targeting and harming me. The University's biased, unfounded, and retaliatory investigation continues to cause me harm.

2

**APP 318**

**Florida Agricultural and Mechanical University**
**Regulation**



## 1.019 University Code of Conduct.

As members of the Florida A&M University (University) community, all faculty, staff, students, members of the Board of Trustees, University officers and affiliates are responsible for sustaining the highest ethical standards of professional conduct and integrity for this institution, and for the broader community in which we function. We share responsibility for this institution and for its enterprises. The University's Strategic Plan outlines the core values we hold as essential to responsible professional behavior, which include: integrity, accountability, innovation, and inclusion. The ethical principles espoused by the Florida Code of Ethics for Public Officers and Employees in Chapter 112, Part III of the Florida Statutes (Code of Ethics), reinforce our commitment to the University's values. Adherence by trustees, officers, faculty, staff, student employees, contractors and others acting on behalf of the University, to the standards set forth in this Code of Conduct is an integral part of the University's goal of attracting quality students, faculty, and staff, while ensuring a safe and healthy environment for all members of the campus community. Further, the University supports and encourages a full and open discourse and the robust exchange of ideas and perspectives. While the University upholds these freedoms, the University will not permit speech, expression, or assembly that advocates lawlessness and/or violence, or restrains, disrupts, or interferes with activities of members of the University community, whether by physical force or intimidation. The Code of Conduct outlines behavioral standards for members of the University community and for those acting on behalf of the University.

**APP 319**

(1) *Applicability.* This Code of Conduct applies to the following members of the University community: a) faculty, staff, and students who are paid for working for the University; b) Board of Trustees; c) consultants, vendors and contractors and other individuals using University resources or facilities, or receiving funds administered by the University; and d) individuals who perform services for the University as volunteers and who assert an association with the University. Any reference to members of the University community as provided in this regulation shall refer to the above referenced persons.

(2) *Compliance with Laws and University Rules and Policies.* Per Section 1012.80, Florida Statutes, members of the University community shall comply with the applicable standards, policies, rules, regulations and state and federal laws that govern and guide their work. The University promotes ongoing and open communication at all levels of the institution. As such, administrators, supervisors and managers are responsible for supporting and monitoring compliance. Members of the University community have an obligation to report any behavior that they believe is unethical or in violation of state or federal law, regulations, or university policies. See Section 17 of this Regulation for reporting options.

(3) *Disruptive Conduct.* The University strives to maintain an environment in which members of the University community treat each other with dignity and respect. University Regulation 10.111 prohibits individuals from acting intentionally to impair, interfere with, or obstruct the orderly conduct, processes and functions of the University. This includes substantially disrupting a student's, employee's, or the University's performance, opportunities or benefits.

(4) *Conflicts of Interest and Commitment.* Faculty and staff of the University owe their primary professional allegiance to the University and its mission. The University has an obligation to internal and external stakeholders to use their

APP 320

resources responsibly and, where required, for designated purposes. Thus, all officers, faculty, principal investigators, staff, student employees and others acting on behalf of the University hold positions of trust, and the University expects them to carry out their responsibilities with the highest level of integrity and ethical behavior. Outside activities are defined as any employment or activities entered into in addition to an individual's employment at the University, that utilize the knowledge, skills, abilities or expertise the individual uses to carry out their University duties. Outside activities, including any interest, obligation, or relationship that could potentially be, or appear to be, in conflict with the interests of the University, including those of immediate family members, must be disclosed to the University immediately so it can be managed appropriately. Conflicts of interest can often be managed to eliminate the risk of damage to the University, but only if they are promptly disclosed.

Failure to disclose outside activities related to an actual, apparent, or possible conflict of interest or commitment is a violation of this Regulation, as well as other applicable conflict of interest policies (including University Regulations 6.002 and 10.122) and the Florida Code of Ethics.

(5) *Political Activities.* Employees with intentions to seek election to and hold public office must notify the President or President's designee of such intentions. The President or President's designee will determine whether the employee's candidacy for holding public office will interfere with the full and faithful discharge of the employee's duties, as outlined in the University Regulation 10.123 and Section 104.31, Florida Statutes.

(6) *External Communication on Behalf of the University.* Pursuant to the University Communications Policy, the Office of Communications is the official University representative to the media and is tasked with establishing and cultivating relationships with journalists, publications and broadcast networks/channels, as well as responding to media inquiries, issuing official statements and announcements and providing guidance and leadership to the University

APP 321

community about relevant media guidelines and best practices.

All University leaders, faculty, staff, partners, vendors and contractors must coordinate with the Office of Communications to develop and distribute news and information about the University and to participate in solicited and unsolicited media interviews or media events. Use of University logos and identity must be used in accordance with the University Style Guide and other applicable policies.

(7) *Contract Authority.* The acceptance of an agreement, including sponsored project funding, may create a legal obligation on the part of the University to comply with the terms and conditions of the agreement and applicable laws and regulations. Therefore, only individuals who have authority delegated by an appropriate University official are authorized to enter into agreements on behalf of the University. All agreements, understandings, and contracts must be reviewed by the Office of General Counsel before execution.

(8) *Confidentiality and Privacy.* The University community shall use confidential information acquired in the course of University business only for official or legal purposes, and not for personal or illegal advantage, during or after such affiliation. It is imperative that each community member complies with all state and federal laws, agreements with third parties, and University policies, regulations and procedures pertaining to the use, protection and disclosure of such information. Such policies apply even after the business relationship with the University ends.

(9) *Gifts and Entertainment.* Employees must abide by expectations outlined in University regulation, policy, and the Florida Code of Ethics regarding the solicitation or acceptance of anything of value from third parties. Members of the University community are prohibited from soliciting or accepting anything of value based on the understanding that their official position will be

influenced by such a gift. Employees identified as a financial disclosure reporting individual or procurement employee have additional restrictions from donors who are lobbyists, principals, political action committees or vendors doing business with the university.

(10) *Record Keeping.* Employees are expected to demonstrate a commitment to transparency in the retention and management of records that have sufficient administrative, legal, fiscal, or historical value pursuant to University policy, the Public Records Law (Chapter 119, Florida Statutes), and the general records schedule published by the Florida Department of State's Division of Library and Information Services (notably, schedules GS1-SL and GS5).

Records are defined as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of physical form or characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by an agency." Employees are prohibited from destroying documents in violation of law or policy, in response to, or in anticipation of, an investigation, audit, or litigation.

(11) *Proper Use and Protection of University Assets.* The University community will strive to preserve, protect and enhance the University's assets by making prudent and effective use of University resources and property and by accurately reporting its financial condition. All funds provided for research must be spent in ways consistent with funding requirements and incompliance with guidelines on allowable costs (i.e. 2 CFR Part 200 Subpart E).

(12) *Misuse of Public Position.* Employees may not use or attempt to use their official position or any property or resource within their trust to obtain special privilege, benefit, or exemption for themselves or others.

APP 323

(13) *Fraud.* As outlined in BOT Policy 2020-01, fraud occurs when an individual obtains something of value through willful misrepresentation, including, but not limited to, intentional misstatements or intentional omissions of amounts or disclosures in financial statements to deceive users of financial statements, theft of an entity's assets, bribery, or the use of one's position for personal enrichment through the deliberate misuse or misapplication of an

organization's resources. Fraud generally means an act of deception, bribery, forgery, extortion, theft, misappropriation, false representation, conspiracy, corruption, collusion, embezzlement, or intentional concealment or the omission of material facts. Members of the University community must mitigate the risk of fraud by fulfilling their duties honestly, while immediately reporting any observed or suspected irregularities to their immediate supervisor.

University employees, consultants, vendors, or persons doing business with FAMU who have knowledge of a fraud, misappropriation, or other impropriety shall immediately notify his/her supervisor and/or the Division of Audit.

(14) *Complaints may be made anonymously.* Acts of fraud, as well as the failure to report incidents in good-faith or suspected incidents of fraud, is a violation of this Regulation. Examples of fraud include, but are not limited to:
   a. Any dishonest or fraudulent act;
   b. Falsification of documents;
   c. Misappropriation of funds, supplies, or other assets;
     d. Impropriety in the handling or reporting of money or financial transactions;
     e. Destruction, removal, or inappropriate use of records, furniture, fixtures, and equipment; or,
   f. Any similar or related irregularity.

The Division of Audit has the primary responsibility for the investigation of all suspected fraudulent acts as defined above. The Division of Audit will issue reports to appropriate designated personnel detailing the findings.

**APP 324**

Case 6:24-cv-00457-PGB-RMN Document 86-6 Filed 03/04/24 Page 7 of 58 PageID 113

(15) *Health and Safety.* Members of the University community are expected to perform their duties in accordance with applicable health and safety laws, regulations, policies, and procedures. Members are also responsible for compliance with the health, safety, and risk management program and are required to immediately report workplace/campus injuries, illnesses, and unsafe conditions to the University Department of Environmental Health and Safety and the Office of Risk Manager.

(16) *Sustainability.* We are all responsible for the continued viability of Florida A&M University and our local and regional communities. The University is committed to operating in an environmentally responsible manner, from the procurement of services to the operation of offices and facilities, and other business activities. Members of the University community must comply with all applicable environmental laws and regulations as well as commitments to sustainable practices and environmental protection outlined by the University's Sustainability Institute.

(17) *Information Technology.* Pursuant to University Regulation 5.003 (Electronic Connectivity), members of the University community play a role in safeguarding information systems by adhering to established University controls and applicable law and policy. Members do not have an expectation of privacy in the use of University computers and systems. Cyber security and systems training are required of all employees before they are permitted access to these systems. Members are prohibited from using University computers or systems in furtherance of personal or political business.

Information Technology Services tracks software vulnerabilities and applies patches as soon as they become available. To that end, users of the University network shall not:

- Undermine the security or the integrity of computing systems or

**APP 325**

networks or attempt to gain unauthorized access;

- Use any computer program or device to intercept or decode passwords or similar access control information;

- Knowingly or intentionally transmit, download, or upload any material that contains viruses, trojan horses, worms, time bombs, cancelbots, phishing, or any other harmful programs;

- Transmit, download, or upload any material that contains software or other material protected by federal or state intellectual property laws unless the user owns or controls the rights thereto or has received all necessary consents; or

- Use FAMU electronic connectivity for the exchange of pirated software.

(18)    *Reporting Suspected Violations.*

a. Members of the University community are required to report violations of applicable University policy, government contracts, and grant requirements, as well as state and federal laws and regulations. Prompt reporting of possible violations is required as it gives the University the opportunity to investigate the matter and take corrective action where needed. Complainants may initially report their concerns through their normal management chain of command, beginning with one's immediate supervisor. If it is inappropriate to report to the immediate supervisor, (e.g., the suspected violation is by the manager or the complainant is generally uncomfortable), individuals may go to a higher level of management within the college, department, or report directly to the Office of Compliance and Ethics, Office of General Counsel, Division of Audit, the Office of Human Resources or the Office of Equal Opportunity Programs. Managerial and supervisory personnel must maintain an open-door policy and take proactive measures to assure their staff that the institution supports a culture that values ethical behavior and compliance.

b. Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the

APP 326

University's Compliance and Ethics Hotline. As appropriate, the Office of Compliance and Ethics coordinates with the Division of Audit, the Office of Human Resources, the Office of Equal Opportunity Programs and other relevant areas, both internal and external. Employees are not exempt from the consequences of wrongdoing by self-reporting, although self-reporting may be considered in the determination of an appropriate course of action.

c. Compliance and Ethics Hotline. Members of the University community may use the University Compliance and Ethics Hotline to report complaints of misconduct outlined in this Regulation. The Hotline allows reporting by phone or online, with an option for anonymous reporting.

d. Other Reporting Avenues. While the Office of Compliance and Ethics coordinates the Compliance and Ethics Hotline, violations may also be reported internally to the offices listed above. Externally, suspected violations of state and federal laws may be reported to the Florida Board of Governors' Office of Inspector General and Director of Compliance or the State of Florida Whistleblower's Hotline.

(19) *False Reports*. Submitting a report that is known to be false (made in bad faith) is a violation of this Regulation and will result in discipline up to and including potential termination from employment, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(20) *Investigation*. Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe. The primary investigator will provide appropriate updates to the parties.

a. Independence. Investigators are responsible for establishing and maintaining independence so that conclusions and recommendations are impartial in both fact and appearance. The investigator must consider

APP 327

organizational, personal, and external impairments that impact the investigators' ability to perform work impartially.

b. Confidentiality. Such reports may be made confidentially, and even anonymously. Confidentiality will be maintained to the extent legal and practicable, informing only those personnel who have a need to know such information.

c. Cooperation. All members of the University community are required to cooperate fully in any external or internal investigation. A copy of this Regulation will be provided to all employees.

d. Interference. The integrity of an audit, investigation, or administrative action is vital in ensuring a fair and equitable outcome for all parties involved. Members of the University community are prohibited from impeding any audit or investigation. Examples of interference includes, but is not limited to: disclosing information inappropriately, making false statements, failing to respond timely to requests for information or tampering with evidence.

e. Referral. Decisions to prosecute or refer the investigation results to the appropriate law enforcement and/or regulatory agencies for independent investigation will be made in conjunction with legal counsel and executive level leadership.

f. Investigative Reports. Despite the disposition, investigative activity will result in a written report. Reports shall be fair, objective, and present the results of investigation in a clear manner.

(21)  Retaliation. Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

APP 328

(22)    *Enforcement.* Members of the University community are responsible for annually completing mandatory compliance and ethics trainings, as well as maintaining compliance with law, regulation, policy, and making ethical decisions. Failure to follow the standards outlined serves as a violation of this Regulation, as well as the originating regulation/policy, if applicable. Members of the University community who violate this Regulation will be subject to personnel action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(23)    *Equal Opportunity.* It is the policy of Florida A&M University that each member of the University community is permitted to work or attend class in an environment free from any form of discrimination including race, religion, color, age, disability, sex, sexual harassment, sexual orientation, gender identity, gender expression, marital status, national origin, and veteran status as prohibited by State and Federal Statues. This commitment, identified in several regulations, including 10.103, applies to all areas affecting students, employees, applicants for admission and applicants for employment. It is also relevant to the University's selection of contractors, suppliers of goods and services and any employment conditions and practices.

*Specific Authority: Chapter 112, Part III, Florida Statutes; Section 7(c), Art. IX, Fla. Const., BOG Regulation 1.001. History–New 10-05; Amended 2-9-2020, 11-30-2022, 08-11-23.*

APP 329

Case 4:2045700367-RMW-MAF Document 1-3 Filed 03/04/24/19/24 Page 75 PageID 118

**Regulations of**
**Florida A&M University**



10.120      **Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees.**

(1) Written Notice – Prior to the dismissal, suspension, or disciplinary reduction in pay of a tenured or permanent status employee, the University shall give the employee written notice as follows:

(a) The employee shall be given written notice of the proposed action and the reasons therefore. Such notice shall be sent by certified mail, return receipt requested, or delivered in person with written documentation of receipt obtained.

(b) The mailed notice shall be considered received by the employee even if refused or ignored.

(2) Contents of Notice – The notice shall be signed by the President or President's designee who makes the final decision regarding the proposed action. The notice shall include the following information:

(a) The effective date of the University's proposed final action;

(b) The specific charges or reasons for the action;

(c) A list of documents or written explanation on which the charges are based; and a statement that documents shall be available to the employee upon request;

(d) A statement that the employee may, within 10 days of receipt of the notice, submit a request in writing for a conference at which the employee may make an oral or written statement, or both, to the University to refute or explain the charges or reasons for the action; and the name and address of the person to whom the request for a conference shall be directed;

(e) A statement that the requested conference must be held prior to the proposed effective date of the action, at a time and place determined by the University, normally during regular business hours, and that the employee may bring a

10.120      Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees

Page 1 of 3

APP 330

representative to advise and assist;

(f) A statement that the University desires to reduce the risk of error in taking the action against the employee and to avoid damaging the employee's reputation by untrue or erroneous charges, and therefore, the University is interested in receiving and considering the employee's response; and

(g) A copy of this rule shall be enclosed with the notice.

(3) Conference – The conference must be conducted by the designated representative(s) of the President as follows:

(a) The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted.

(b) The conference shall be informal and shall not be in the nature of an evidentiary hearing. The employee may bring a representative to advise and assist, but discovery, cross-examination and similar legal procedures are not permissible.

(c) The employee shall be permitted to submit relevant information, orally or in writing, or both, with the privilege being reserved to the University to give such information the weight it deems proper. If the employee chooses to make no response, the University will proceed on the basis of the best information it can obtain without such response.

(d) After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision.

(4) Decision – If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified as described in this rule within five workdays prior to the date the action is effective. USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of Board of Regents subsection 6C-5.950(4), F.A.C. If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance

10.120     Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees

Page 2 of 3

APP 331

procedures as provided in the applicable collective bargaining agreement may be used. Further, the University shall follow the provisions of Part VI of Chapter 112, F.S., Law Enforcement Officers' Bill of Rights, when Sworn Law Enforcement Personnel are involved.

(a) During the period between the first notice and the effective date of the action, one of the following options may be used by the University: retain the employee in the employee's usual duties; temporarily assign the employee to other duties; or place the employee on administrative leave with pay.

(5) Extraordinary Situations.

(a) In extraordinary situations, when the retention of a tenured or permanent status employee is likely to result in damage to property, or is likely to result in injury to the employee, a fellow employee, or some other person, the employee may be suspended or dismissed immediately upon written or oral notice to the employee of the charges giving rise to the suspension or dismissal.

(b) If an oral notice of suspension or dismissal is given to an employee, the University shall within 24 hours issue a written notice confirming the proposed action and the reason(s) therefore.

(c) In lieu of the action to suspend or dismiss the employee, the University may place the employee on administrative leave as described in subsection 6C-5.920(14), F.A.C.

(d) USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of subsection 6C-5.955(4), F.A.C.

(e) If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance procedures as provided in the applicable collective bargaining agreement may be used.

(f) Further, the University will follow provisions of Part VI of Chapter 112, F.S., Law Enforcement Officer's Bill of Rights, when sworn law enforcement personnel are involved.

*Specific Authority 1001.74, 1001.75 FS., History—New 6-27-96.*

10.120  **Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees**

**Page 3 of 3**

**APP 332**

Case 6:24-cv-00457-PGB-RMN-MDF Document 86 Filed 03/04/24 Page 75 PageID 121

**Regulations of**
**Florida A&M University**



10.205    Disciplinary and Separation from Employment Actions for Faculty
and Administrative and Professional Employees.

(1)    The provisions of this regulationrule are supplemented by the respective collective
bargaining agreement for the employees who are represented by a collective bargaining
agent.

(2)    Faculty or Administrative and Professional (A & P) employees shall give one month
notice of resignation from employment, if possible. An employee who resigns from
employment shall not have any rights of appeal.

(3)    Nontenured or Nonpermanent Faculty and A & P employees whose appointments
expire after receiving notice of nonrenewal or nonreappointment or whose appointment
expires without the requirement of a written notice of nonreappointment may be
separated without further notice.

(4)    An employee who is absent without approved leave for three or more consecutive
workdays shall be considered to have abandoned the position. For employees governed
by the Board of Regents Trustees and United Faculty of Florida (BOR/UFF) (BOT/UFF)
Collective Bargaining Agreement, the relevant provisions of Article 16 the Collective
Bargaining Agreement shall apply for job abandonment.

(5)    The President or President's designee may discipline a Faculty or A & P employee
for just cause in accordance with the provisions set forth herein. Counseling of any nature
or degree shall not be considered disciplinary action.

(a) Just cause shall be defined as:

1. Incompetence; or

2. Misconduct.

(b) The President or President's designee may impose progressive discipline as
applied to employees. The term "progressive discipline" as used in this
regulationrule means that the form of disciplinary action imposed against the

employee increases in extent or severity with each action taken. The discipline to be imposed against the employee under this paragraph may include a written reprimand, suspension or dismissal from employment with the University. The discipline that is imposed will depend upon the seriousness of the offense and any aggravating or mitigating circumstances.

(c) Written Reprimand – A written reprimand issued by the employee's supervisor is to warn the employee in writing of the specific conduct or performance standard that was violated and to place the employee on notice of the next level of discipline if the offense is repeated. The written reprimand shall be in a letter format from the supervisor to the employee. A copy of the written reprimand shall be placed in the employee's personnel file. The employee must be informed of the possible consequences if the offense is repeated or the performance fails to improve.

(d) Suspension – The President or President's designee may suspend the appointment of the employee during the term of the employment contract for just cause. The President or President's designee shall also determine whether the suspension shall be with or without pay, which will depend upon the seriousness of the offense and any aggravating or mitigating circumstances. The employee shall be given written notice of the suspension action by the President or President's designee specifying the reason(s) therefor. Following appropriate written notice, the employee may be reassigned by the President or President's designee depending upon the nature of the offense and any aggravating or mitigating circumstances.

(e) Suspension Pending Hearing – When the President or President's designee has reason to believe that the employee's presence on the job would adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students, the President or President's designee may immediately suspend the employee from the performance of duties, pending a hearing under the complaint procedure outlined in RegulationRule 6C3-10.206.32, F.A.C. The President or President's designee shall also determine whether the suspension shall be with or without pay in the manner outlined in

paragraph (4)(d) of this regulation~~rule~~. If the employee has been suspended without pay and subsequently is reinstated as a result of the complaint procedure under Regulation~~Rule 6C3~~-10.2~~0~~6~~32, F.A.C.~~, the employee shall be reinstated with back pay.

(f) Dismissal – The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students. The employee shall be given written notice of the dismissal by the President or President's designee specifying the reason(s) therefore. The dismissal shall take effect at the time determined by the President or President's designee and as written in the notice of dismissal.

(g) The President or President's designee may impose other disciplinary action for just cause. The term "other disciplinary action" is defined as discipline incidental or in addition to a written reprimand or suspension. Examples of other disciplinary action may include a demotion, reduction in pay, removal of administrative duties or restitution. Any other disciplinary action imposed will occur simultaneously with a written reprimand or suspension. The other disciplinary action imposed will depend upon the nature of the offense and any aggravating or mitigating circumstances. Written notice of such disciplinary action, specifying the reason(s) therefor, shall be given to the employee by the President or President's designee.

(h) The effective date and hour of the disciplinary action shall be recorded in the written notice. Such notice shall be delivered or forwarded to the employee by certified mail with a return receipt requested, or when practicable the notice may be hand-delivered to the employee provided the delivery is certified in writing by the deliverer. The attempts prescribed above to notify the employee satisfy the requirement of notification, and failure of the employee to receive notification does not invalidate the disciplinary action nor its effective date. It is incumbent upon the University, however, to see that a continuing effort is made to effect notification.

**APP 335**

(i) Within 30 days following the receipt of notice of disciplinary action, the employee may file a complaint in accordance with Regulation~~Rule 6C3-~~ 10.206.532~~, F.A.C.~~

(6) Other Personal Services (OPS) employees without permanent status in any class may be separated from employment at any time without requirements of notice or reason and without rights of appeal.

*Specific Authority: 1001.74, 1001.75 FS. Law Implemented 110.205(2)(d), 1001.74, 1001.75 FS. History–New 6-3-01.*

# 86-7 - Jan 23 2024 Notice

# 07/10/2024

DocuSign Envelope ID: D9934003-02A1-453D-9133-B40394DB1513

Case 6:24-cv-02045-PGB-RMN Document 4-7 Filed 05/04/24 Page 1 of 2 PageID 125

Filing # 190766097 E-Filed 01/29/2024 04:11:20 PM



# Florida Agricultural and Mechanical University

### TALLAHASSEE, FLORIDA 32307-3100

**Excellence With Caring**

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

January 23, 2024

**Electronic Mail to jennifer.smith@famu.edu,
and CERTIFIED MAIL** ███████ **5737 6000
Return Receipt Requested**

Re: **CONFIDENTIAL**
   **Notice of Dismissal of Employment**

Jennifer M. Smith
~~██████████████~~
~~██████████████~~



**PLAINTIFF'S EXHIBIT**

7

Dear Professor Smith:

After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023.

You may choose to appeal this employment action pursuant to University Regulation 10.206, which is attached for your review. Your request to appeal must be provided to Dr. Reginald Perry, Interim Associate Provost for Academic and Faculty Affairs, within 30 days after receipt of this Notice of Dismissal of Employment.

If you haven't already done so, please call to arrange the return of all University equipment and property which you may have in your possession or control to Reginald Green, Associate Dean for Student Services and Administration at the College of Law. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus should have already been returned to the University.

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 338**

DocuSign Envelope ID: D9934003-03A1-453D-9133-B42004DB1643

J. Smith
January 23, 2024
Page 2

In addition, you should contact Human Resources, Benefits and Leave Sections, regarding your insurance coverage options and any leave payments for which you are due, and finalize the exit interview process when applicable. You may also be required to file a final Financial Disclosure Form with the Florida Commission on Ethics within sixty (60) days after leaving employment, pursuant to Section 112.3145(1)(b) and (c), Florida Statutes. Failure to timely file this form may result in a fine. A copy of the form and mailing instructions are available from the website of the Florida Commission on Ethics at https://ethics.state.fl.us.

Sincerely,

*Allyson Watson*

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

Attachments:  University Regulation 10.206, Predetermination Conference Panel
              Recommendation

cc:    Deidre Keller, Dean, College of Law
       Reginald Green, Associate Dean, College of Law
       Terrisa Brown, Interim Assistant Vice President, Human Resources

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 339**



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

**Excellence With Caring**

**Personal and Confidential**

January 12, 2023

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida Agricultural and Mechanical University
Tallahassee, FL 32307

Dear Provost Watson:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.

FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."

The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.

In conclusion, the diligent efforts of our panel have now been completed.

Sincerely,

Bryan F. Smith, J.D.
University Ombudsman and Associate Vice President for Student Affairs

Cc:    Dr. Reginald Perry, Interim Associate Provost for Academic Affairs
       Attorney Andrea Nelson, School of Business and Industry
       Attorney Patricia West, FAMU Developmental Research School

**APP 340**

**Regulations of
Florida A&M University**



**10.206    Complaint Procedures for Tenured or Permanent Status Employees.**

(1) Purpose – The purpose of this regulation~~rule~~ is to promote a prompt and efficient procedure for the investigation and resolution of complaints filed by Faculty or Administrative and Professional employees of the University who have tenure or permanent status or who may file a complaint pursuant to Regulation 10.206.~~Rule 6C3 10.233, F.A.C.~~ The provisions of this regulation~~Rule~~ are not applicable to University Support Personnel System employees who may file a complaint pursuant to Regulation 10.303.~~Rule 6C3 10.338, F.A.C.~~

(2) All problems should be resolved, whenever possible, before the filing of a complaint and open communication is encouraged so that resort to the formal complaint procedure will not normally be necessary. Therefore, informal resolution of complaints is encouraged.

(3) Burden of Proof – The burden of proof shall be on the University in disciplinary complaints. In all other complaints, except disciplinary complaints, the burden of proof shall be on the complainant.

(4) Resort to Other Procedures – If prior to seeking resolution of a dispute by filing a complaint under this rule, a complainant seeks resolution of the matter in any other forum, administrative or judicial, the University shall have no obligation to entertain or proceed further with the matter pursuant to this rule. Further, SINCE IT IS NOT INTENDED THAT THE COMPLAINT PROCEDURE BE A DEVICE FOR APPELLATE REVIEW, the response of the President or President's designee to a recommended order of a presiding officer acting pursuant to Chapter 120, F.S., or to other individuals or groups having appropriate jurisdiction in any other procedure shall not be an act or omission giving rise to a complaint under this regulation~~rule~~.

(5) Time Limits – All time limits contained in this rule may be extended by mutual agreement of the parties. Upon failure of the University or its representative to provide a decision within the time limits provided in this rule, the complainant may appeal to the next appropriate step.

**APP 341**

Upon the failure of the complainant or counsel to file an appeal within the time limits provided in this rule, the complaint shall be deemed to have been resolved at the prior step.

(6) Definitions.

(a) The term "complaint" is the allegation by the employee that any condition affecting the employee's terms and conditions of employment is unjust, inequitable, or creates a problem. An employee shall not have the right to file a complaint concerning evaluations of performance, unless the employee alleges that the evaluation is based on factors other than performance.

(b) The term "complainant" shall mean the employee whose rights have been directly affected by an act or omission and who has filed a complaint.

(c) The term "days" shall mean calendar days.

(d) The term "counsel" shall mean a lawyer or other qualified representative.

(e) The term "presiding officer" shall mean the person, either a Division of Administrative Hearing (DOAH) hearing officer or the President or President's designee, who conducts a hearing under the Formal Procedure below.

(f) The term "party" shall mean the University or the complainant.

(g) The term "substantial interest" shall mean an act or omission involving tenure, termination, suspension, or other discipline for just cause, nonrenewal of employment contract, salary and layoff.

(7) Step One – All complaints shall be filed with the person designated by the President or President's designee as Step One Representative for the unit of the University, in which the complainant performs the complainant's duties, within 30 days following the act or omission giving rise thereto, or the date on which the complainant knew or reasonably should have known of such act or omission if that date is later. The complainant may, in the written complaint which is filed, request the postponement of any action in processing the complaint formally for a period of up to 30 days, during which period efforts to resolve the complaint informally shall be made. Upon the complainant's written request, an additional 30-day extension should be liberally granted unless to do so would impede resolution of the complaint. Upon the request, the Step One representative shall, during such postponement period(s) arrange an informal conference between the appropriate administrator and complainant. The complainant may at any time terminate a postponement period by giving written notice to the Step One Representative that the complainant wishes to proceed with the

Step One meeting provided for below. If the initial postponement period, or any extension thereof, expires without such written notice, the complaint shall be deemed informally resolved to the complainant's satisfaction and need not be processed further. The Step One Representative shall conduct a meeting no sooner than seven and no later than 15 days following (1) receipt of the complaint if no postponement is requested, or (2) receipt of written notice that the complainant wishes to proceed with the Step One meeting. In advance of the Step One meeting, the complainant shall have the right upon request to a copy of any identifiable documents relevant to the complaint. At the Step One meeting, the complainant shall have the right to present any evidence in support of the complaint. The Step One Representative shall issue a written decision, stating the reasons therefore, within 30 days following the conclusion of the meeting. In the event the decision at Step One refers to documents not requested or presented by the complainant, copies of such documents shall be attached to the decision.

(8) Step Two – If the complaint is not satisfactorily resolved at Step One, the complainant may file a written request for review with the appropriate Vice President or representative within 30 days following receipt of the Step One decision. The appropriate Vice President or representative and the complainant shall schedule a meeting for the purpose of reviewing the matter no sooner than seven and no later than 15 days following receipt of the request for review. The meeting shall afford the complainant or counsel an opportunity to present written and/or oral evidence opposing the University's act or omission including a written statement challenging the grounds upon which such act or omission is justified. If the issue involves a substantial interest of the complainant, the complainant may use the provisions of Step Three below. If the issue does not involve a substantial interest of the complainant, the Step Two decision shall be final and binding. The Step Two decision shall be in writing and be issued within 90 days of the meeting. The record of the Step Two meeting shall only consist of:

(a) The notice of the University's act or omission, and the grounds therefor:

(b) Evidence received or considered;

(c) All written statements submitted by parties to the complaint and by any other persons;

(d) A complete record of any ex parte communication made relative to the complaint, along with the disposition thereof; and If after the Step Two decision has been issued, and the complaint is not related to a substantial interest, no further review of the

complaint is required. However, if the complaint is related to a substantial interest and the complaint has not been resolved to the satisfaction of the complainant, the complainant may, within 30 days of the receipt of the Step Two decision, file a request for a hearing pursuant to Step Three below, which is written to comply with the requirements of Section 120.57(1), F.S.

(9) Step Three: Formal Procedure – Either the President of the University or President's designee, or a hearing officer assigned by the Division of Administrative Hearings (DOAH) shall conduct the hearing at this step. If the University elects to use a DOAH hearing officer, it shall notify the Division within 10 days of the receipt of the request for the hearing. A notice of the hearing shall be sent to all parties at least 14 days before it is to take place. The notice shall include: (1) A statement of time, place, and nature of the hearing; (2) A statement of the legal authority and jurisdiction under which the hearing is to be held; (3) A reference to the particular section(s) of the statutes and rules involved; (4) A short and plain statement of the matters asserted by the University and by all parties of record at the time notice is given. If any party is unable to state the matters in sufficient detail at the time the initial notice is given, the notice may be limited to a statement of the issues involved, and thereafter, upon timely written application, a more definite and detailed statement shall be furnished not less than three days prior to the date set for the hearing.

(a) Rights of the parties under the Formal Procedure:

1. To respond to allegations and evidence;

2. To present evidence and argument on all issues;

3. To conduct cross-examination and submit rebuttal evidence;

4. To submit proposed findings of facts and orders;

5. To be represented by counsel;

6. To file exceptions to any order or hearing officer's recommended order.

(b) The University shall accurately and completely preserve all testimony in the proceedings before the President or DOAH hearing officer and, upon the request of any party of the complaint, shall make full or partial transcript available at no more than actual cost.

(c) After a hearing conducted under this subsection, the presiding officer shall submit a recommended order to all parties. Each party shall have 10 days in which to submit written exceptions to the recommended order. The University may adopt the

recommended order in the final order or may reject or modify the findings therein, except that the findings of fact of a DOAH hearing officer may be modified or rejected only after a review of the complete record and must be accompanied by a statement that such findings were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential evidence or that the proceedings on which the findings were based did not comply with essential requirements of law.

(d) The record for purposes of Step Three shall consist only of:

1. All notices, pleadings, motions, and intermediate rulings;

2. Evidence received or considered;

3. A statement of matters officially recognized;

4. Questions and proffers of proof and objections and rulings thereon;

5. Proposed findings and exceptions;

6. Any decision, opinion, proposed or recommended order, or report by the presiding officer;

7. All staff memoranda or data submitted to the hearing officer during the hearing or prior to its disposition, after notice of the submission to all parties, except communications by advisory staff as permitted under Section 120.66(1), F.S., if such communications are public records;

8. All matters placed on the record after an ex parte communication made to DOAH hearing officer pursuant to Section 120.66(2), F.S.; and

9. The official transcript.

(e) The final order shall be issued within 90 days of the final date on which written exceptions to the recommended order must be received by the University. The final order shall be in writing and include separately stated findings of fact and conclusions of law.

*Specific Authority 1001.74, 1001.75 FS. Law Implemented 1001.74, 1001.75 FS. History-New 6-27-96.*

# 86-8 - FAMU EEOC Res

# 07/10/2024

# DENNIS, JACKSON, MARTIN & FONTELA, P.A.

### PROFESSIONAL ASSOCIATION
### ATTORNEYS AND COUNSELORS AT LAW

Craig A. Dennis *
Rogelio J. Fontela
William T. Jackson
Jessica E. Keeler
William Peter Martin ‡
C. Todd Owen
Tiffany Rohan-Williams
Maria A. Santoro *

*Of Counsel*
Teresa C. Ward

‡ Board Certified as a Civil Trial Lawyer by the Bar
* Certified as a Circuit Mediator by the Supreme Court of Florida

Cathy E. McMullian
Firm Administrator

Robin B. Campbell
Jessica H. Gallmon
Nikki W. Garrett, FRP
Jennifer C. Kjellerup, ACP, FRP
Julia Lunt
Jessica N. Mauer
Hester H. Pennington
Dina Sadeq
Karen Weimer
Legal Assistants

**TALLAHASSEE**
1591 SUMMIT LAKE DRIVE, SUITE 200
TALLAHASSEE, FLORIDA 32317
(850) 422-3345
FAX (850) 422-1325

**JACKSONVILLE**
1300 RIVERPLACE BOULEVARD, SUITE 101
JACKSONVILLE, FL 32256
(904) 683-6686
FAX (904) 619-1369

**REPLY TO TALLAHASSEE**

May 5, 2023

VIA Email: Kelly.Collins.McMurry@eeoc.gov

Kelly Collins-McMurry
Federal Investigator
U.S. Equal Employment Opportunity Commission
Miami District Office
100 S.E. 2nd St., Suite 1500
Miami, Florida 33131

RE: Jennifer Smith v. Florida A&M University College of Law
    EEOC Charge No.: 510-2023-00072

Ms. Collins-McMurry:

In response to your Request for Information and Documentation on April 27, 2023, the University and College of Law would respond as follows:

1. Provide a copy of the position description and pay scale for Full Professor in the College of Law during the relevant period.

    **RESPONSE: There are no position descriptions or pay scales for professors. Each salary is individually negotiated based upon the accomplishments and specialty of each candidate and the needs of the College of Law. Applications for professors at the law school are advertised. Attached is the announcement that was approved by the Faculty Recruitment Committee and Dean of the Law School. This**

**APP 347**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Response to April 27, 2023 Request for Information and Documentation
May 5, 2023
Page 2 of 4

announcement was published, and Professor Areto Imoukhuede (comparator) submitted his application in response. [Exhibit A].

2.  Provide a list of ALL Full Professors in the College of Law during the relevant period. Include their name, gender, dates of employment, complete salary history, and resume, if not already provided.

    **RESPONSE: Refer to attached outline of FAMU College of Law Full Professors for 2021 to the present, including gender, date of hire, and salary. [Exhibit B]. Included are the resumes of Patricia A. Broussard, Ann Marie Cavazos, Ronald C. Griffin, William D. Henslee, Areto Imoukhuede, Darryll K. Jones, Deidré A. Keller, Lundy R. Langston, Leroy Pernell, Rhonda Reaves, Omar Saleem, and Jennifer Smith. [Exhibit C].**

3.  Supply a statement or documents that describe how your organization determined an individual employee's salary or wage for the Full Professor's job classification during the relevant period, i.e., identify what factors were considered.

    **RESPONSE: The College of Law has a Faculty Recruitment Committee (FRC) that initially makes the recommendation as to the rank of the incoming applicant to the law school, Assistant, Associate or Full Professor. The need for any professor is based upon accreditation standards, core and specialty courses, and the overall need to improve the Bar passage rate of students, among other factors.**

    **The recruitment committee vets each applicant. In addition, each faculty member has the opportunity to participate in the interview process for each applicant and, in accordance with the provisions of the College's Faculty Handbook, to vote upon each applicant's candidacy. The recruitment committee recommends to the Faculty applicants who are determined most acceptable for hiring, tenure and rank. The faculty then votes on that recommendation and advances candidate(s) for the Dean's consideration.**

**APP 348**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Response to April 27, 2023 Request for Information and Documentation
May 5, 2023
Page 3 of 4

**The Dean will consider the experience of the applicant, the years of teaching, the needs of the College of Law, the scholarship done by the applicant and presentations made, whether regionally or nationally.**

4.  Provide:

    a.    all documents reflecting the minimum and maximum rates of pay for each position;

    b.    all documents reflecting the effect of seniority on pay rates, and

    c.    all documents reflecting the effect of merit increases or evaluations in the pay rates.

    **RESPONSE: The above statements (a, b, and c) are not applicable to the College of Law since no such designations exist or are used by the University.**

5.  Provide a complete list of all Full Professors in the College of Law who are "constitutional law specialists." Include their name, gender, dates of employment, complete salary history, and resume, if not already provided.

    **RESPONSE: There is no term or classification for "constitutional law specialist" at the College of Law. This term was used by the attorney representing the College of Law in the position statement as her own descriptive term to explain the need of the College of Law at the time the vacancy was announced and filled.**

6.  Provide the analysis or criteria used to classify Full Professors as a "constitutional law specialist."

    **RESPONSE: There is no term or classification for "constitutional law specialist" at the College of Law. This term was used by the attorney representing the College of Law in the position statement as her own descriptive term.**

**APP 349**

**APP 350**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Response to April 27, 2023 Request for Information and Documentation
May 5, 2023
Page 4 of 4

7. Provide a copy of the male comparator's Spring 2023 teaching schedule, to include all courses taught. Indicate the date he was assigned to teach each course.

   **RESPONSE: Refer to the College of Law Class Enrollment Report for Spring Semester 2023 dated February 20, 2023, with the Claimant and Comparator's courses highlighted. [ Exhibit D].**

Should you have any questions regarding this response to the request for information, or the documents produced herein, please do not hesitate to contact me.

Very truly yours,

Maria A. Santoro

MAS/mjl
Enclosures

# 86-9 - Faculty Contract

# 07/10/2024

APP 351

## FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES
## FACULTY (NON-UNIT)
## EMPLOYMENT CONTRACT

*HGB.*

This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the regulations, policies and procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated. The performance of any obligations by FAMU under this Employment Contract shall be subject to and contingent upon the availability of funds appropriated by the Florida Legislature or appropriate funding agency. Neither this employment contract nor any action or commitment taken pursuant to it, is final or binding upon the parties until, and unless, the signature of the University President or President's designee, as approving authority and the signature of the Employee have been affixed and the employment contract has been returned to the appropriate authority as specified herein.

Employee Name: **Jennifer M Smith**
Position Title: Professor
Position: 19255000
Appt. Status: Regular
Division: Academic Affairs
Dept. Name: College Of Law - Instruction
Pay Dept.: 230200
Ann. Salary Rate:  $140,012.50
Tenure Status: Tenured

Employee ID: ~~[redacted]~~
Class Code: 9001
FTE: 1
Budgeted Wks: 40
College/Sch: College of Law
Admin. Code: 99 No Administrative Function
Work Dept.: 230200
Bi-wkly Rate:  $7,000.62
Amount Required:  $140,012.50


**PLAINTIFF'S EXHIBIT 8**

Appointment Dates: August 07, 2023 to May 10, 2024

Special Conditions: _____

Employment will cease on the date indicated and no further notice of cessation of employment is required for the following categories of employees:

(1)Employees holding visiting appointments; (2) those appointed for less than one academic year; or (3) those with less than five years of continuous service who are on soft money.

Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

All outside employment activities; financial interests and other conflicts of interest under the provisions of FAMU Regulation 10.122 and 10.110 or FAMU Policy No. 2005.14 of the agreement must be reported on the Outside Employment/Conflict of Interest Activities form and/or statement of Financial Interest form as appropriate.

This Employment Contract supersedes any and all prior agreements, contracts, understandings, and communications between the Employee and FAMU, whether written or oral, expressed or implied, relating to the subject matter of this Employment Contract and is intended as a complete and final expression of the terms of the Employment Contract between FAMU and the Employee and shall not be changed or subject to change orally.

This offer of employment will be withdrawn and not processed for payroll if this employment contract is not signed and returned to the appropriate authority within twenty (20) days from the date of offer.

_____
**Signature of President/Provost/Vice President**

*Jennifer Smith*
_____
**Signature of Employee**

4/12/2023
**Date of Signature**

4/14/2023
_____
**Date of Signature**

**Employee's best contact number:** (  ) ___ - ___

VPAA: 2016-March-8

**APP 352**

# 86-10 - FAMU Tenure Regs

# 07/10/2024

**Regulations of**
**Florida A&M University**



**10.204        Faculty Tenure.**

(1)    Tenure may be granted to faculty employees as herein provided.  This regulation is supplemented by the Board of Trustees/United Faculty of Florida (BOT/UFF) Collective Bargaining Agreement for those employees who are members of the faculty collective bargaining unit.

(2) Definition of Tenure.

(a)  Preamble – Institutions of  higher education are conducted for the common good. The  common  good  depends  upon  the  unfettered  search  for  truth  and  its  free exposition.  Academic freedom and tenure exist in order that society may have the benefit of honest judgment and independent criticism.  The meaning of tenure in the academic  community  in  the  United  States  is  simply  a  guarantee  of  annual reappointment for faculty employees until voluntary resignation, retirement, removal for  just  cause,  or  layoff  in  accordance  with  standards  specified  by  University Regulation 10.113 and the BOT/UFF Collective Bargaining Agreement, and standards as  outlined  in  this  chapter.    Tenure  assures  the  faculty  employee  security  of employment and immunity from reprisals or threats due to an intellectual position or belief which may be unpopular.  Tenure shall be in an academic department/unit.

(b)  Criteria for Tenure – The criteria for faculty tenure shall require evidence of highly competent teaching and research and other scholarly activities, services, and contributions to the University and to society.  Faculty employees considered for tenure normally shall hold the terminal degree, the President and Vice President for Academic Affairs may consider the following factors: (1) professional experiences; (2) work experiences; (3) demonstrated contributions to the teaching discipline; (4) technical  and  performance  competencies;  (5)  records  of  publications;  (6)

**APP 354**

certifications; and (7) exceptional scholarly or creative activities.    The term "appropriate academic field" as used in this regulation means the faculty employee's teaching discipline or a closely related discipline.    Additional criteria shall be established by the college/school.    Nomination of a faculty employee for tenure shall signify that the President is satisfied the candidate will continue to make significant professional contributions to the university and to society.

(c)    Tenure in the State University System – A faculty employee who has been granted tenure by the BOT shall have the status of permanent member of the faculty and be in the continuing employment of the University until he or she:

1.  Resigns;

2.  Retires;

3.  Is dismissed for just cause under the provision of University regulations or the BOT/UFF Collective Bargaining Agreement;

4.  Is discontinued pursuant to the layoff provisions in Regulation 10.113 and BOT/UFF Collective Bargaining Agreement; or

5.  Dies

(3)  Tenure-earning Appointments.

(a) Faculty appointments to the ranks of assistant professor, associate professor, and professor, which appointments do not include the appointment status modifiers of joint, acting, adjunct, provisional, visiting, research, clinical, courtesy, honorary affiliate or phased retirement are tenure-earning.    Appointments which include the appointment status modifiers multi-year, joint, provisional, visiting, research, clinical or affiliate may or may not earn time toward tenure, as determined by the President or President's designee at the time of appointment.    Employees with appointment status modifiers of joint, provisional, visiting, research, clinical or affiliate will be notified in writing at time of appointment of the tenure-earning status of the position.    In the event, the position is not designated as a tenure earning position, the time in the non-tenure earning position may be counted toward tenure-earning  eligibility upon being appointed to a tenure-earning position.

(b)    If a Faculty employee is initially appointed to the rank of instructor or to a position including an appointment status modifier determined by the University not

**APP 355**

to be tenure-earning, and is subsequently appointed to a tenure-earning position, all or a portion of the Faculty employee's prior service in such a non-tenure-earning position may be counted toward time required for tenure, provided the President or President's designee specifically agrees in writing to credit such service.

(4)  Eligibility for Tenure Nomination.

(a)  Only those Faculty employees serving in tenure-earning positions as described in paragraph (3)(a), above, are eligible to be recommended for tenure at the University.

(b)  Except for Faculty employees who by virtue of prior service credited at the time of their appointment, are eligible for consideration earlier, a decision whether to nominate a Faculty employee for tenure shall normally be made during the sixth year  of continuous full-time service, or equivalent part-time service, in a tenure-earning position.  The word "normally" as used in this regulation takes cognizance of the fact that an employee may satisfy the requirements for tenure in his/her department or equivalent unit after 4 or 5 years of continuous full-time service, or equivalent part-time service.  It also implies that an employee's tenure earning eligibility may be deferred for a certain period.  An employee's written request for early tenure consideration is subject to the University's written agreement. Continuous employment for the purpose of tenure-earning eligibility consideration for full-time service shall mean employment during at least 39 weeks of any 12-month period.  Continuous employment for the purpose of tenure-earning eligibility consideration for part-time service shall mean employment during at least one semester of any 12-month period.  Part-time service of an employed at least one full semester in any 12-

month  period  shall  be  accumulated.   For  example,  two  semesters  of  half-time service  shall  be  considered  one-half  year  of  service  for  purposes  of  tenure eligibility.

(c)  The number of years of previous tenure-earning service at other institutions of higher education which the President or President's designee may agree to approve as credit toward a Faculty employee's eligibility time for tenure shall be agreed upon in writing at the time of employment, subject to the following restrictions for

service at other than SUS institutions:  the President or President's designee may approve credit for not more than two years of tenure-earning service for a Faculty employee hired as an assistant professor, not more than three years for a Faculty employee hired as an associate professor, and not more than four years for a Faculty employee hired as a professor.  All prior SUS tenure-earning service shall be credited toward the time required for tenure unless otherwise agreed at the time of employment.

(d)  Time spent by a Faculty employee under joint appointment or exchange within or  without the SUS on a duly established personnel exchange program of the University or on a special assignment for the benefit of the University or for the SUS shall be counted toward the time for fulfillment of eligibility for tenure.  In all such cases, the faculty employee shall be so informed in writing at the time leave is granted.

(e)  Time spent on uncompensated leave shall not be credited as time earned toward tenure, except by agreement of the Faculty employee and the President or President's designee.  In deciding whether to credit uncompensated leave toward tenure eligibility, the President or President's designee shall consider the relevance of the employee's activity while on such leave to the employee's professional development and to the employee's field of employment, the benefits, if any, accrue to the University by virtue of placing the employee on such leave, and other appropriate factors.  Time spent on compensated leave shall be credited as       time earned toward tenure, unless the Faculty employee and the President or President's designee agree in writing that such leave is not to be credited.

(5)  Granting of Tenure.

(a) By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure.

(b) Upon nomination by the President, and approval by the BOT, tenure shall be granted.  The effective date of tenure shall be acted upon with careful consideration being given to the qualifications of the faculty employee, including evaluation by

colleagues and the immediate supervisor.  In making judgments pertaining to the decision to award tenure, evaluation of research and other creative activities by qualified scholars in pertinent disciplines both within and outside the University should be sought. When one of the duties of the faculty employee being nominated is teaching, the quality of the faculty employee's teaching shall be gauged by the standards outlined in this regulation, the BOT/UFF Collective Bargaining Agreement, as well as Regulation 10.119 which governs faculty evaluation and the approved criteria of the appropriate academic department/unit.

(c)  With sufficient justification, an employee may be nominated by the President, and approved by the BOT for tenure at the time of initial appointment or prior to the fifth year of tenure earning service.  The President or President's designee shall consider the recommendation of the department or equivalent unit prior to making his/her tenure nomination.

(6)  Transfer of Tenure-Transfer of tenure of faculty serving in bargaining unit positions is governed by the BOT/UFF Collectively Bargaining Agreement.  Tenure is not automatically transferable within the University; however, the tenure of a faculty employee may be transferred in accordance with University regulations upon the nomination by the President and approval by the BOT.

(7)  Standards for Maintaining Tenure of Faculty Employees.  An employee with tenure who is appointed to an Administrative and Professional position shall retain tenure in the academic position and in the academic department/unit where granted and not in the position.

(8)  Duration of Tenure – A tenure faculty member retains this status as long as he/she is employed in any appropriate academic unit of the University.

*Specific Authority: 1001.74 and 1001.75, FS; 120.53(1)(a) FS; and relevant collective bargaining agreements.  History–New 1; Formerly Rule 6C3-10.136; Technical Amendment 2/28/22 (formatting).*

**APP 358**

# 86-11 - Zisk Case

# 07/10/2024

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | FOR THE NINTH JUDICIAL CIRCUIT |
| | ) | |
| | ) | |
| NANCY L. ZISK, | ) | Case No.: 2015-CP-10-03661 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING PRELIMINARY |
| THE CHARLESTON SCHOOL | ) | INJUNCTION |
| OF LAW, LLC; and GEORGE C. | ) | |
| KOSKO and ROBERT S. CARR, | ) | |
| both in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This matter came before me for hearing on July 29, 2015, on the motion of Plaintiff Nancy L. Zisk for a preliminary injunction. Professor Zisk appeared with her attorney, Capers G. Barr, III of the Charleston Bar. The Defendants appeared through their counsel, Caroline W. Cleveland and Bob J. Conley. The parties submitted, and the Court reviewed and considered, all filings including, but not limited to, Plaintiff's verified Complaint, several affidavits, numerous documents, and the parties' respective legal memorandum. After reading the briefs of the parties and hearing their oral arguments, and having taken the matter under advisement, the Court informed the parties of its decision to order the preliminary injunction. A second hearing was held before me on August 3, 2015 to consider the matter of bond. The same parties and attorneys appeared before me on August 3, 2015, and argued their positions about bond.

For the reasons and on the grounds hereafter found, the Court orders that the Charleston School of Law, LLC (hereinafter referred to as the "Charleston School of

1

APP 360

Law") is preliminarily and temporarily enjoined and restrained from terminating or non-renewing the tenure and employment of Nancy L. Zisk as full professor of law at Charleston School of Law, pending a hearing on the merits of this case.

**Findings of Fact.**

Based on the review of the facts in the record, including the verified complaint and affidavits, the Court makes the following findings of fact:

1.      Nancy L. Zisk was a practicing employment lawyer and adjunct professor of law in Washington, D.C. when, in 2004, she agreed to become one of the founding professors of law at the then-beginning Charleston School of Law. She was initially engaged as a "tenure track" professor of law, and Professor Zisk and her family relocated to Charleston.

2.      The Charleston School of Law was a successful academic venture.

3.      "Tenure" is an accepted academic status recognized at Charleston School of Law, whereby faculty members, after successful completion of probationary service, are granted a status of "continuous employment", with annual agreements that articulate the financial terms of their continued employment for each succeeding year.

4.      The status of tenure at Charleston School of Law is awarded following a process that is described in the Faculty Handbook, and which includes evaluation in the areas of teaching competence, service to the school and community, scholarship, and collegiality. In each annual signed agreement between Professor Zisk and Charleston School of Law, the terms of the Faculty Handbook are incorporated.

5.      Professor Zisk was awarded tenure in 2009. In 2011 she was named as a "full professor of law." The criteria for promotion to full professor of law are rigorous.

2

**APP 361**

6.     Professor Zisk served as Associate Dean for Academic Affairs from 2006 through 2008, and she has annually taught courses in torts, equity and equitable remedies and employment discrimination.

7.     At Charleston School of Law the Faculty Handbook provides that tenure may be terminated for "serious cause, financial exigency, or the discontinuance of a program of instruction not mandated by financial exigency." No further definition is given of "financial exigency", nor is a process or standard described in the Faculty Handbook for terminating a tenured professor on that ground.

8.     On August 7, 2014 the Defendants proposed to the Charleston School of Law faculty to add a new Section 8.3 to the Faculty Handbook, which proposed to provide that the Board of Directors could declare "financial exigency" in their discretion and could terminate tenured faculty on 15 days notice. Plaintiff and other tenured faculty members objected to the proposed amendment, asserting that it would constitute elimination of tenure. On August 12, 2014 the Dean of the School informed faculty that the proposed amendment had been withdrawn. Thereafter, Plaintiff and the Defendant Charleston School of Law signed their annual agreement for the academic year 2014-2015.

9.     Plaintiff openly opposed a pending transaction between the Defendant Charleston School of Law, the Defendants Kosko and Carr, and an outside party, Infilaw, for the sale of the law school. On May 15, 2015 Plaintiff signed a public letter opposing the transaction. A year earlier, on May 16 and May 19, 2014 she had appeared and had spoken at public hearings in opposition to the transaction.

3

RMOA3

**APP 362**

10.    On May 22, 2015 Plaintiff received a memorandum from the "active LLC members", who are the Defendants Kosko and Carr, informing her that she was terminated because of a financial exigency that had been declared five months earlier, in December 2014. She was informed that her termination was "based on her high salary". Six other tenured law professors received the same memorandum of termination.

11.    Although the Defendants offered to Plaintiff an opportunity to appeal, when she requested documents to support their claim of financial exigency, and to describe the criteria by which she was selected for termination, her request was denied. No documents were produced by the Defendants.

12.    Plaintiff nevertheless pursued her appeal in writing. Her appeal was denied. Thereafter the within lawsuit was filed.

## Conclusions of Law.

The purpose of a preliminary injunction is "to preserve the status quo ante and to prevent irreparable harm to the party requesting it. *Compton v. South Carolina Department of Corrections,* 392 S.C. 361, 366 (2011). The party requesting the preliminary injunction must both allege facts sufficient to state a cause of action for an injunction and demonstrate that relief is reasonably needed to preserve the parties' rights during litigation. *Id.* Thus the party seeking a preliminary injunction must establish "that without such relief she will suffer irreparable harm, that she has a likelihood of success on the merits, and that there is no adequate remedy at law". *Poynter Investments, Inc. vs. Century Builders of Piedmont, Inc.,* 387S.C.583, 586-87, 694 S.E.2d 15, 17 (2010).

4

**APP 363**

**Discussion.**

A.      Irreparable harm.      The Court concludes that Plaintiff will suffer irreparable harm if preliminary injunctive relief is not granted. The irreparable harm, here, is related to the concept of tenure, and to the impossibility of calculating its loss; and also to the fact that Plaintiff's vocation as a professor of law is not easily replicable.

The Charleston School of Law Faculty Handbook adopts tenure as a status of "continuous employment", but the Handbook does not define "financial exigency", nor does it describe a procedure or standards for termination of a tenured faculty member because of financial exigency. Although no South Carolina decisions have discussed academic tenure or termination of tenure for financial exigency, other courts have discussed those concepts. The Court finds those decisions to be persuasive.

In the case of *Krotkoff v. Goucher College*, 585 F.2d 675, 682 (4th Cir. 1978) the Fourth Circuit Court of Appeals decided a case involving the dismissal of a tenured professor at a private college in Maryland because of financial exigency. The case is instructive because of its discussion about the academic status of tenure, and the extent to which the "national academic community's understanding of tenure" may inform the interpretation of a contract between a private university and a tenured professor. In *Krotkoff* the contract contained no provision for termination of the professor because of financial exigency. The Fourth Circuit Court of Appeals adopted a "national academic community standard", citing a decision from the District of Columbia Court of Appeals:

> "The *Krotkoff-Goucher* contract must be interpreted consistently with the understanding of the academic community about tenure and financial exigency. Although Judge McGowen

5

APP 364

addressed a different factual situation in *Greene vs, Howard University, 134 U.S.App.D.C. 81, 88, 412 F.2d. 1128, 1135 (1969),* his comments are appropriate here: 'Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.' " 585 F.2d at 680.

Citing a decision from the New Jersey Court of Appeals, the *Krotkoff* Court further held:

"Courts have properly emphasized that dismissals of tenured professors for financial reasons must be demonstrably bona fide. Otherwise, college administrators could use financial exigency to subvert academic freedom. The leading case on this aspect of tenure is *American Association of College Professors vs. Bloomfield College, 129 N.J. Super. 249, 322 A.2d 846 (C.H. Div. 1974), affirmed, 136 N.J. Super. 442, 346 A.2d 615 (app. Div. 1975).* There, the court concluded that Bloomfield College used its genuine financial difficulties as a subterfuge to achieve its goal of abolishing tenure at the institution. Since Bloomfield acted in bad faith, the court ordered it to reinstate the tenured teachers that it had dismissed." *Kratkoff, supra* 585 F.2d at 681.

In the *Bloomfield College* case, the New Jersey Appeals Court affirmed a Trial Court Order of specific performance, returning the terminated professor to his teaching position. As for the college's argument that money damages could be awarded in lieu of restoration, the *Bloomfield* court said:

"In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching

6



APP 365

> profession, it is evident that the remedy of damages at law would not be complete or adequate. See opinion below, 129 N.J. supra 273 et. seq., 322 A.2d 846; *Fleischer vs. James Drugstores, 1 N.J. 138, 62 A.2d 383 (1948); Mantell vs. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 55 A.2d 250 (1947);* Pomeroy's Equity Jurisprudence (5th Edition 1941), Section 1401." 346 A.2d at 618.

In the same sense, money damages for Professor Zisk's loss of tenure cannot be reasonably calculated. I further conclude that the Court of Appeal's decisions in the cases of *Levine vs. Spartanburg Regional Services District, Inc.,* 367 S.C. 458, 626 S.E.2d 38 (Ct.App. 2005) and *Peek vs. Spartanburg Regional Health Care System,* 367 S.C. 450, 626 S.E.2d 34 (Ct.App. 2005) are supportive. In those cases the Plaintiffs were anesthesiologists who were threatened with loss of their hospital admissions privileges; losses that were not easily calculable, nor replicable. In the same sense, here, Professor Zisk's threatened loss of a tenured, full professorship of law is neither calculable nor replicable.

B.    <u>The likelihood of success on the merits.</u>

A Plaintiff is not required to prove an absolute legal right when seeking a preliminary injunction, but must present a reasonable question as to the existence of such right. When a court is requested to issue a temporary injunction it may consider the merits of a case to the extent necessary to determine whether a temporary injunction is appropriate. Once a *prima facie* showing has been made entitling the Plaintiff to injunctive relief, a temporary injunction will be granted without regard to the ultimate determination of the case on the merits. *AJG Holdings, LLC, et. al. vs. Dunn,* 382 S.C. 43, 674 S.E.2d 505 (Ct.App. 2009); *Helsel vs. City of North Myrtle Beach,* 307 S.C. 29,

7

**APP 366**

413 S.E.2d 824 (S.Ct. 1992), *citing Columbia Broadcasting System, Inc. vs. Custom Recording Co., Inc.,* 258 S.C. 465, 471-72, 189 S.E.2d 305, 308(1972).

The burden is on the Defendant Charleston School of Law to prove the requisite "financial exigency". "Where a party seeks to avoid a contract obligation by reason of the happening of an event or condition stipulated in a contract, the burden of establishing the occurrence of the condition rests upon the party asserting it." *AAUP vs. Bloomfield College, supra,* 346 A.2d. at 615. In accord, *Begnal vs. North Idaho College,* 538 F.2d 243, 249 (9th Cir. 1976); *Pace vs. Hymas,* 726 P.2d 693, 697-98 (Idaho 1986). See also *Martin vs. Southern Railway,* 240 S.C. 460, 126 S.E.2d 365; *Smith vs. Ashmore,* 184 S.C. 316, 192 S.E.2d 565 (1937); and *Griswald vs. Texas Co.,* 163 S.C.156, 161 S.E. 409 (1931).

Simply stated, Plaintiff's causes of action for breach of contract are based on, *inter alia*, the allegations that the claimed financial exigency was not "demonstrably *bona fide*", and neither were the reasons for her termination "demonstrably *bona fide*". The factual allegations of the verified Complaint form the basis for the Court's *prima facie* findings set forth above. Together, they state the requisite *prima facie* showing of Plaintiff's case for breach of contract, from which a "likelihood of success on the merits" may be concluded.

C.    Inadequate remedy at law.

I have previously concluded that irreparable harm will result without the granting of preliminary injunction, and that the calculation of money damages for loss of a contract of continuous employment is not reasonably accomplished, thereby also concluding that Plaintiff has no adequate remedy at law.



In addition to those conclusions, the aspirational loss to this particular Plaintiff, as made out in her affidavit, cannot be ignored. In light of these conclusions, injunctive relief must be granted.

D.    Bond.

As for the matter of bond, Rule 65(c) of the South Carolina Rules of Civil Procedure requires that the granting of a preliminary injunction be secured by the posting of a reasonable bond. In the case of a preliminary injunction, the purpose of bond is to cover only damages before a permanent injunction is issued; and only those damages that are directly attributable to the injunction itself. *Chambron vs. Lost Colony Home Owner's Association,* 317 S.C. 43, 451 S.E.2d. 410 (Ct.App. 1994); *Hyler vs. Wheeler,* 240 S.C. 386, 126 S.E.2d. 173 (1962).

Defendants submitted two affidavits as to financial matters. However, the only specific financial amount entered into the record of this case is stated in the annual contract between Plaintiff and the Defendant Charleston School of Law, wherein her annual salary for academic year 2014-2015 was agreed to be $129,388.02. Anticipating that it could be as long as 24 months before a final resolution of this case can be decided, I find and conclude that a bond in the sum of $500,000.00 is appropriate in this case.

Conclusion.

Professor Zisk is entitled to a preliminary injunction. As concluded above, she is likely to succeed on her breach of contract claims and would incur irreparable harm if the Charleston School of Law is not immediately enjoined from terminating her employment and her tenure; that is to say "non-renewing" it.

It is therefore,

9

**APP 368**

ORDERED that the Defendant Charleston School of Law is preliminarily and temporarily prohibited, restrained, and enjoined from terminating or "non-renewing" the employment of Plaintiff Nancy L. Zisk as a tenured full professor at law at the Charleston School of Law, and her employment is hereby reinstated until this matter can be heard on its full merits; and it is further,

ORDERED, that this preliminary injunction is effective upon the posting of a bond of $500,000.00 by Plaintiff, with good and sufficient sureties; and it is further,

ORDERED, if Plaintiff does not post the required bond on or before the tenth day following entry of this Order, Defendant Charleston School of Law is not required to assign her to teach any course(s) during the fall 2015 semester, to avoid disruption of student schedules and assigned course instructors, even though Defendant is required to fully reinstate Plaintiff's employment and tenure, as noted above; and it is further,

ORDERED, if Plaintiff does not post the required bond on or before August 31, 2015, this Order is void.

IT IS SO ORDERED.

R. Markley Dennis, Jr.
Presiding Judge

Charleston, South Carolina
August 10 , 2015

RMOT/10

10

APP 369

# 86-12 - Reyes Depo

# 07/10/2024

APP 370

Case 6:22-cv-01525-WWB-EJK   Document 75-3   Filed 07/02/24   Page 361 PageID 778

Maritza Reyes
May 24, 2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:   6:22-cv-1525-WWB-EJK

MARITZA REYES,

        Plaintiff,

v.

THE FLORIDA AGRICULTURAL AND
MECHANICAL UNIVERSITY BOARD
OF TRUSTEES,

        Defendant.
_____/

VIDEO-RECORDED DEPOSITION OF

MARITZA REYES

Friday, May 24, 2024

9:31 a.m. - 5:36 p.m.

Location:  GrayRobinson, PA
301 East Pine Street
Suite 1400
Orlando, Florida 32801

Stenographically reported by
Leah S. Cooney, RPR, FPR

Job No.:  362459

APP 371

Case 6:22cv04525cw0367CVWDMAFneDoc75n8erFil6-127/02i24 07/10/2284 Rdt3353 PageID 1011

Maritza Reyes
May 24, 2024

Page 234

situations where I have, you know -- that's part of the hostile work environment.  Are we still talking about that?

Q.   I'm asking you generally about your interactions with the co-workers.

A.   There have been situations where I have had negative interactions as part of committee work too.

Q.   But right now what I'm talking about is just your daily interactions when you run into people in the hallway or you initiate a conversation as you sit and small talk or something.

Have -- have you experienced any discrimination with respect to the conversations that you've engaged in?

A.   I don't -- I didn't seek out conversations -- and by the way, it's from a period of 2009 until we're talking about 2024 before I was dismissed.

So and there were some situations, like, for example, with Jeremy Levitt when I first got there.  He made comments to me that were discriminatory.  Darryll Jones made comments to me, discriminatory.  So I avoided small talk with them or I avoided having conversations with them.

Q.   Okay.

A.   I also avoided having conversations with people

APP 372

# 86-13 - FAMU Resp to Plaintiff's Interrogatories

# 07/10/2024

**APP 373**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIA
ORLANDO DIVISION


JENNIFER SMITH,

      Plaintiff,

v.                                              CASE NO.: 6:24-cv-00457-PGB-RMN

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

      Defendant.

_____/

## FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

COMES NOW the Defendant, FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES, hereinafter referenced as ("The University,") by and through its undersigned counsel, and pursuant to Rule 33, Fed. R. Civ. P., hereby responds to Plaintiff's First Set of Interrogatories to Defendant.

### General Objections

The University objects to all discovery requests and files herewith its Time Sensitive Opposed Short Form Discovery Motion requesting a protective order that this discovery not be answered and seeking a stay of discovery [Doc. 56].

**APP 374**

12. List all personnel involved in the compensation decisions for the Plaintiff and her male comparator, specifying their understanding and interpretation of the factors other than sex used to justify pay differences and provide.[sic]

**ANSWER: Objection. The question is incomplete, requires speculation to respond, the male comparator is not defined, and the relevant time period is not defined.**

13. Identify the source of the University's definition of retaliation and explain how the allegations of retaliation in the December 5, 2023 Notice of Termination to Professor Smith met that definition.

**ANSWER: The University uses the ordinary meaning of the term and the letter speaks for itself.**

14. Explain the employer contributions for the pension yearly since 2018 and health insurance contributions each year.

**ANSWER: Objection. The question is irrelevant and not likely to lead to admissible evidence.**

15. Explain the impact, if any, of Professor Smith's promotion history on her salary.

**ANSWER: This issue was addressed in detail in the University's motions for summary judgment filed in Smith v. FAMU, Case No. 4:14-cv-540-RH/CAS and Smith v. FAMU, Case No. 4:18-cv-409-RH-CAS.**

# 86-14 - Affidavit Waston Dec #1

# 07/10/2024

DocuSign Envelope ID: 1516D205-3F55-4732-9CB7-503D57AB645A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JENNIFER SMITH,**

      **Plaintiff,**

**v.**                            **Case No: 6:24-cv-457-PGB-RMN**

**THE FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES,**

      **Defendant.**

_____/

## DECLARATION OF PROVOST ALLYSON WATSON

1.     My name is Dr. Allyson Watson and I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.     I serve as Provost and Vice President for Academic Affairs for the Florida Agricultural and Mechanical University (FAMU).

3.     Jennifer Smith was employed as a visiting professor for the College of Law on August 8, 2004.

4.     I received the Office of Compliance and Ethics' Investigative Reports 2022-11-117 and Supplemental Report 2022-11-117 regarding Jennifer Smith's retaliatory conduct toward a student and inappropriate and unprofessional conduct

Page 1 of 3

**APP 377**

DocuSign Envelope ID: 1516D205-3EE5-4733-9CB7-503D57AB645A

towards students. The Reports sustained some of these allegations against Ms. Smith. A true and correct copy of the Reports are attached to the Notice of Intent to Dismiss from Employment, which is hereto as **Exhibit 1**.

5.      My decision to termination Ms. Smith's employment was based on her unprofessional and inappropriate behavior towards students as articulated in the Investigative Reports.

6.      On December 5, 2023, I sent a Notice of Intent to Dismiss from Employment to Ms. Smith, which advised her of her rights and process under University Regulation 10.120. A true and correct copy of the Notice and the attachments to that Notice, attached hereto as **Exhibit 1**.

7.      Ms. Smith convened a panel on January 11, 2024 that recommended I rescind my Notice of Intent to Dismiss, however given the gravity of the situation, I declined to take their recommendation and moved forward with issuing a Notice of Dismissal from Employment.

8.      The Notice of Dismissal of Employment was issued on January 23, 2024 and sent to Ms. Smith via email and certified mail, return receipt requested. A true and correct copy of the Notice of Dismissal is attached hereto as **Exhibit 2**.

9.      As stated in this Notice, Smith's employment with FAMU ended at the close of business on Tuesday, January 30, 2023.

APP 378

DocuSign Envelope ID: 1516D205-3EE5-4733-9CB7-503D57AB645A

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct.

Executed on March <u>25</u>, 2024.

*Allyson Watson*
Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida A&M University

Page 3 of 3

**APP 379**

# 86-15 - Affidavit Waston Dec #2

# 07/10/2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

    Plaintiff,

v.

Case No: 6:24-cv-457-PGB-RMN

THE FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

    Defendant.

_____/

## AMENDED DECLARATION OF PROVOST ALLYSON WATSON

1. My name is Dr. Allyson Watson and I am over the age of eighteen (18) years of age.

2. This is an Amended Declaration to clarify and replace the Declaration of the undersigned filed in support of Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction submitted to this Court on March 25, 2024.

3. I make this Declaration upon my own personal knowledge and belief.

4. I serve as Provost and Vice President for Academic Affairs for the Florida Agricultural and Mechanical University (FAMU).

Page 1 of 3

APP 381

5.      Jennifer Smith was employed as a visiting professor for the College of Law on August 8, 2004.

6.      I received the Office of Compliance and Ethics' Investigative Reports 2022-11-117 and Supplemental Report 2022-11-117 regarding Jennifer Smith's retaliatory conduct toward a student. The Report substantiates one allegation of misconduct made against Ms. Smith.

7.      My decision to terminate Ms. Smith's employment was based on the substantiated finding of retaliation documented in the Investigative Reports.

8.      On December 5, 2023, I sent a Notice of Intent to Dismiss from Employment to Ms. Smith, which advised her of her rights and process under University Regulation 10.120.

9.      Pursuant to University Regulations, Ms. Smith requested a conference, which was convened at her request and met on January 11, 2024.  The panel that facilitated the conference recommended that I rescind my Notice of Intent to Dismiss.

10.      Given the disruption caused by Ms. Smith's behavior at the College of Law, I declined to take their recommendation and issued a Notice of Dismissal from Employment to Ms. Smith.

11.      I issued the Notice of Dismissal of Employment on January 23, 2024 and sent it to Ms. Smith via email and certified mail, Return Receipt requested.

Page 2 of 3

**APP 382**

12.    As stated in the Notice of Dismissal, Ms. Smith's employment with FAMU ended at the close of business on Tuesday, January 30, 2023.

13.    Ms. Smith was paid beyond the termination date by mistake. The overpayment will be deducted from any additional paid benefits due to Ms. Smith upon reconciliation of said benefits.

14.    The College of Law Faculty website retained a profile for Ms. Smith after her termination date due to the workload of the webmaster, and not because Ms. Smith was still employed at the University.

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2024.

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida A&M University

Page 3 of 3

**APP 383**

# 86-16 - FAMU Position

# Statement to EEOC

# 07/10/2024

**APP 384**

# DENNIS, JACKSON, MARTIN & FONTELA, P.A.

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

Craig A. Dennis *
Rogelio J. Fontela
William T. Jackson
Jessica E. Keeler
William Peter Martin ‡
C. Todd Owen
Tiffany Rohan-Williams
Maria A. Santoro *

*Of Counsel*
Teresa C. Ward

‡ Board Certified as a Civil Trial Lawyer
by the Bar
* Certified as a Circuit Mediator by the
Supreme Court of Florida

**TALLAHASSEE**
1591 SUMMIT LAKE DRIVE, SUITE 200
TALLAHASSEE, FLORIDA 32317
(850) 422-3345
FAX (850) 422-1325

**JACKSONVILLE**
1300 RIVERPLACE BOULEVARD, SUITE 101
JACKSONVILLE, FL 32256
(904) 683-6686
FAX (904) 619-1369

Cathy E. McMullian
Firm Administrator

Robin B. Campbell
Jessica H. Gallmon
Nikki W. Garrett, FRP
Jennifer C. Kjellerup, ACP, FRP
Julia Lunt
Jessica N. Mauer
Hester H. Pennington
Dina Sadeq
Karen Weimer
Legal Assistants

REPLY TO TALLAHASSEE
December 12, 2022

VIA Email: Kelly.Collins.McMurry@eeoc.gov

Kelly Collins-McMurry
Federal Investigator
U.S. Equal Employment Opportunity Commission
Miami District Office
100 S.E. 2nd St., Suite 1500
Miami, Florida 33131

RE: Jennifer Smith v. Florida A&M University College of Law
    EEOC Charge No.: 510-2023-00072

Ms. Collins-McMurry:

On behalf of the University, enclosed is the Position Statement and supporting documents regarding the above referenced Charge filed by Jennifer Smith. The Position Statement has been uploaded to the EEOC portal.

Should you have any questions, please do not hesitate to contact my office.

Very truly yours,

Maria A. Santoro

MAS/mjl
Enclosures

**APP 385**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072

**Position Statement**

The undersigned counsel for the Florida Agricultural and Mechanical University Board of Trustees ("University"), submits this letter and accompanying documents as the position statement to the above-referenced employment charge of discrimination ("Charge").

The current position statement is provided to the Equal Employment Opportunity Commission ("Commission") solely for the investigation of the instant charge and with the understanding that this matter will remain confidential and will not be disclosed for any other purpose, except as provided for by law.

Further, this position statement is not intended to raise all legal theories and/or defenses which the University may ultimately raise in this matter. The University also reserves the right to alter, amend or supplement this statement if new or additional information is alleged or discovered or for other reasons.

### 1. Respondent - Florida Agricultural & Mechanical University

Pursuant to Article IX, Section 7(d), of the Florida Constitution, and the Florida Board of Governors Regulation 1.001, Florida Agricultural and Mechanical University Board of Trustees is a public body corporate and constitutionally created to oversee an institution of higher education and learning.

The University serves approximately 10,000 students and is dedicated to their academic progress as well as the advancement of knowledge, resolution of complex issues and productive empowerment of citizens and communities throughout the nation and world. As the public employer, the University employs approximately 2,329 full-time employees, who are primarily located on its main campus in Tallahassee.

### 2. Position Summary

The University, having independently investigated the allegations of the Charging Party, Jennifer Smith ("Smith") internally, wholly denies that Smith has been subjected to any unlawful employment practice based upon her gender, and further denies that she was denied equal pay based on her sex.

**APP 386**

Accordingly, the Commission should issue a no cause determination in this matter.

### 3. Facts Summary

Smith was hired in 2004 at the College of Law as a non-tenured earning Visiting Assistant Professor. Smith's Offer/Appointment Letter and her first contract of employment showing her rank and salary is attached as [Exhibit 1]. Her initial salary was $100,000 for a nine-month teaching contract. *Id.*

Professor Smith subsequently claimed that her negotiated position upon hire was associate professor and not assistant professor. That is not supported by the records maintained at the University, attached [Exhibit 2]. Although the evidence did not support Smith's claim[1] and after much discourse, the University reclassified[2] Smith as an Associate Professor at her initial salary.[3] Her "promotion" did not carry with it the raise in salary that would have occurred had the University's promotion process been used. Smith did not go through the proper procedure for the promotion. Further, Smith did not assert that her negotiated salary was incorrect. Accordingly, the University did not adjust her negotiated salary as Smith did not follow University procedure.[4] As a result, though she has received all percentage increases to which she has been entitled, and all lump sums to which she has been entitled, Smith's salary has lagged behind other professors at the University.

Prior to Smith filing the lawsuits referred to in this position statement, Smith filed an internal complaint with the Office of Equal Opportunity Programs. The investigation revealed that Smith's salary inequity complaint (based on sex) was unsubstantiated, refer to [Exhibit 3].

---

[1] Smith based her claim that she was hired as an "associate" professor because of a clerical error which listed her as an associate and not an "assistant" professor. However, Smith's title and rank in all previous communications with FAMU had her rank as "assistant" professor,

[2] Professor Smith did not go through the established promotional process but instead was reclassified based on her claims and the clerical error.

[3] University ranking is as follows: Assistant Professor, Associate Professor, and Full Professor. In addition, there is tenure earning and tenured. Faculty Handbook pp. 40-44. *See*, http://www.famu.edu/facultysenate/Faculty%20Handbook%20%20-%20%20Spring%202008.pdf. An instructor does not fall within the scholarly ranks of professors.

[4] Generally, when a tenured-earning faculty member is promoted through the promotion/tenure process, a salary increase is associated with the granting of the promotion. However, since Smith claimed she was hired as an associate, and she did not subject herself to the promotion process, a salary increase did not occur as her salary remained based on her negotiations.

**APP 387**

Smith sued the University in 2014 in federal court, and the jury determined that Smith suffered no discrimination when she was hired in 2004, and that her salary was behind others at the University for other reasons:

> Professor Jennifer Smith sued her employer, Florida A&M University ("FAMU"), alleging pay inequity, sex discrimination, and retaliation. She claimed that FAMU discriminated against its female law professors by paying them less than comparable male law professors and retaliated against her when she voiced opposition. The district court denied summary judgment, and the case went to trial. The jury found FAMU not liable on any of Professor Smith's claims. While the jury found that Professor Smith was paid less than comparable male professors, it was persuaded that the difference was for reasons other than her sex.

*Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 687 Fed. Appx. 888 (11th Cir. 2017). [Exhibit 4].

In 2016, Smith filed another EEOC charge, and another lawsuit against the University, which resulted in another judgment in favor of the University and another appeal affirming that judgment:

> Jennifer Smith, a law professor, appeals the district court's grant of summary judgment in favor of her employer, the Board of Trustees at the Florida Agricultural and Mechanical University ("FAMU"), on her claims of gender discrimination in pay and retaliation under the Equal Pay Act,1 Title VII,2 and the Florida Civil Rights Act ("FCRA").3 This lawsuit is Smith's second one against FAMU for gender discrimination in pay. She brought the first one in 2014 based on her original salary. Smith's claims here, however, center on salary adjustments made by FAMU which applied generally to law professors and occurred after the verdict in Smith's first (and unsuccessful) lawsuit. On appeal, Smith asserts that the district court erred by applying collateral estoppel and granting summary judgment on each of her claims. After a full review of the record, we affirm.

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 435 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021). [Exhibit 5].

The University attaches these cases, Exhibits 4 & 5, to this Position Statement for the convenience of the Commission.

Smith now claims another comparator, but the result is the same. This issue has been litigated by two trial courts, two appeal courts, and the result has been affirmed that Smith was not discriminated based on sex. Smith was promoted to associate professor over a dozen years ago summarily by way of paperwork. As a result, she did not receive the pay raise that the promotion process would have afforded her, and her salary has remained proportionate ever since. Smith reached out to the Interim Provost at the time and argued that her contract was incorrect because she was hired as an associate professor. The Interim Provost signed the change, thinking it had been a mistake. [Exhibit 6]. As a Visiting/Assistant professor, Smith was limited in the number of academic years she could stay without promotion. Ergo, Smith was more concerned at that time about her ability to stay employed at FAMU. There was also the possibility that if she went through the promotion process, she would not have been supported by her colleagues or the Dean at the law school.

### 4.  Legal Analysis

#### a.  The Equal Pay Act

"An employee establishes a prima facie case under the Equal Pay Act by showing that the employer paid differing wages to employees of opposite sexes for 'equal work on jobs ... which require[ ] equal skill, effort, and responsibility, and which are performed under similar working conditions.' 29 U.S.C. § 206(d)(1); *see Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003)." *Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021)

A burden-shifting framework is applied to analyze EPA claims. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994).

Once the employee has established a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the payments were made pursuant to:

(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. 29 U.S.C. § 206(d)(1) (emphasis in original). "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided no basis for the wage differential.' " *Steger*, 318 F.3d at 1078 (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995).

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021).

> "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided no basis for the wage differential.'"

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021).

"The employee may then rebut the employer's defense by putting forth evidence demonstrating that the employer's alternative bases for the pay disparity were pretextual or offered as a post-event justification for a sex-based differential." *Id.*

Applying the law to these facts, it is clear that Smith has produced nothing to show she actually performs the same work. Smith and Areto Imoukhuede are filling completely different needs for the University. Thus, while Smith alleges that she is paid less than the newly hired comparator professor she rests her assumption on that she and the new professor perform substantially similar jobs. This is an issue of fact that Smith carries the burden in order to show a prima facie case. *Equal Employment*

**APP 390**

*Opportunity Comm'n v. Univ. of Miami*, 19-23131-CIV, 2021 WL 4459683, at *9 (S.D. Fla. Sept. 29, 2021).

In fact, they do not perform substantially similar jobs. Areto Imoukhuede is a Constitutional Law specialist. His CV shows a concentration in that area. [Exhibit 7 – CV]. The College of Law requires 6 hours of Constitutional Law of its students. The net effect is that there are 9 hours of Constitutional Law being taught every semester. The faculty of the College of Law interviewed three candidates to fill the additional need for a professor to teach Constitutional Law. The faculty only approved one candidate, Areto Imoukhuede. [Exhibit 8]. The College of Law has other professors already teaching Constitutional Law. Smith does not teach Constitutional Law and her publication and service history are not concentrated in that area. [Exhibit 9]. Thus, Smith has not provided facts to support her allegations and so her prima facie case fails.

Even assuming a prima facie case, which is not conceded, the University may dispel it by articulating "any factor other than sex" for the disparity. The "factors other than sex" for the pay disparity are, in short: A) that Smith was not promoted to associate professor through regular channels, leaving her continuing salary lower, and B) that the University needed a Constitutional Law professor because of the workload in that area. Imoukhuede has concentrated his efforts in a specialty – Constitutional Law. His salary is in line with the other professors teaching and specializing in that area. These are not contrived reasons and the decision to offer that salary to Imoukhuede had nothing to do with his gender. The University "may consider factors such as the "'unique characteristics of the job; ... an individual's experience, training, or ability; or ... special exigent circumstances connected with the business.'" [citation omitted]. *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003). The unique characteristics of the job and the new professor's unique specialty were the legitimate reasons for his salary offer.

## 5. Conclusion

Based on the evidence and documentation provided in this Position Statement, the University shows that it did not discriminate against Professor Smith by hiring Areto Imoukhuede at a higher salary than Smith's. Smith's lack of going through proper procedures for a promotion limited her salary for the future. The University needed a Constitutional Law professor to teach its required curriculum and therefore Smith and the new male professor are not performing substantially similar jobs. Further,

**APP 391**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page **7** of **7**

the University offers legitimate business reasons in that the College of Law faculty interviewed three candidates and approved only one, while the need for a specialized professor was immediate.

The University would request that this Commission terminate its investigation as to the charge with findings that the University has complied with all applicable laws and that it is within the Commission's jurisdiction to investigate and make a determination of no cause and the dismissal of this charge.

## 6.  Exhibits

| | |
|---|---|
| 1 | 07/29/2004 Offer Letter and 08/02/2004 Employment Contract |
| 2 | Smith employment status at University 2008 |
| 3 | EOP investigation and report 2012 |
| 4 | Smith v FAMU 2017 case – written opinion |
| 5 | Smith v FAMU 202 case – written opinion |
| 6 | Smith Promotion to Associate paperwork approved only by Interim Provost Austin |
| 7 | Areto Imoukhuede CV |
| 8 | Excerpts Faculty handbook and Faculty meeting Feb 17, 2021, approving only Professor Imoukhuede for hire |
| 9 | Course schedules 2021-2022 |

**APP 392**

# 86-17 - Def Resp to 1st P.I.

# 07/10/2024

Case 6:24-cv-00457-PGB-RMN Document 86-10 Filed 03/26/24 Page 1 of 17 PageID 525

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JENNIFER SMITH,**

        **Plaintiff,**                    **CASE NO.:  6:24-cv-457-PGB-RMN**

**v.**

**THE FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY BOARD**
**OF TRUSTEES,**

        **Defendant.**

                                   /

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**

Defendant, THE FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES ("Defendant" or "FAMU"), by and through its undersigned counsel and pursuant to Local Rule 6.02 and Rule 65, *Federal Rule of Civil Procedure*, hereby responds to Plaintiff, JENNIFER SMITH's ("Plaintiff") Motion for Preliminary Injunction [ECF No. 11] (the "Preliminary Injunction Motion") and states:

## I.    INTRODUCTION

Plaintiff, for the third time, brings this request for injunctive relief with no factual or evidentiary basis and asks for relief to which she is not entitled. Plaintiff's Motion fails for two reasons. First, the Preliminary Injunction Motion should be stricken from the record because it fails to satisfy the procedural requirements set out under Local Rules 3.01 and 6.02. Plaintiff violated the Local Rules by incorporating

1

fourteen (14) pages of argument from a prior motion and circumventing the page limit prescribed in Local Rule 3.01(a), without seeking leave from this Court. In addition, Plaintiff fails to attach or cite to any evidentiary record that she relies on, in violation of Local Rule 6.02. Due to Plaintiff's failure to satisfy the procedural requirements as prescribed by the Local Rules, Defendant is severely prejudiced by the lack of verifiable factual information in support of her Motion. Defendant therefore respectfully requests that this Court require Plaintiff's strict compliance with Local Rules 3.01 and 6.02, and strike Plaintiff's Motion for failure to comply therewith, or alternatively deny Plaintiff's Motion on those grounds.

Second, Plaintiff's Preliminary Injunction Motion fails to meet the high standard required for entry of a preliminary injunction. Plaintiff has not met the elements to establish she is entitled to reinstatement as she cannot show that she is likely to succeed on the merits of any of her claims, nor that she has any irreparable harm that cannot be cured by backpay or other damages. Further, Plaintiff requests that this Court enjoin her "impending termination", however, Plaintiff's termination was effective January 30, 2024. The only equitable relief the Court could provide is reinstatement. However, reinstatement at this juncture would be futile as this Court would be reinstating Plaintiff at the end of the current semester and with less than seven weeks from the end of her contract term. Accordingly, Plaintiff's Preliminary Injunction Motion should be denied.

2

**APP 395**

## II.   STATEMENT OF FACTS

Plaintiff's employment with FAMU began on August 8, 2004 as a law professor for the College of Law. *See* Declaration of Provost Allyson Watson, attached as "**Exhibit A.**" In October 2014, Plaintiff sued FAMU for violations of the Equal Pay Act, Title VII of the Civil Rights Act, Title IX of the Education Amendments Act, and the Florida Civil Rights Act. Plaintiff's case was adjudicated at a jury trial which found in favor of FAMU. *See* Verdict from *Smith v. Florida Agricultural & Mechanical University Board of Trustees,* Case No. 4:14-cv-540-RH-CAS (N.D. Fla. July 22, 2015) attached as "**Exhibit B.**" The jury found that even though FAMU paid another male professor of equal skill, under the same working conditions, a higher salary than Plaintiff, the difference in compensation was caused by factors other than gender. *Id.* This judgment was affirmed on appeal. *See Smith v. Florida Agricultural & Mechanical University Board of Trustees,* 687 Fed. App'x 888 (11th Cir. 2017) attached as "**Exhibit C.**"

In July 2018, Plaintiff sued FAMU, again, for violation of the Equal Pay Act. Plaintiff's second case also ended in favor of FAMU, this time on summary judgment. *See Smith v. Florida Agricultural & Mechanical University Board of Trustees,* Case No. 4:18-cv-409-RH-CAS (N.D. Fla. June 2, 2019) attached as "**Exhibit D.**" In that case, the court held that although FAMU made some changes to the pay structure since Plaintiff's prior case, none of these changes affected Plaintiff, nor were the changes motivated by gender. *Id.* at \*3.  This case was also affirmed on appeal by the Eleventh Circuit. *See Smith v. Florida Agricultural & Mechanical University Board of Trustees,* 831 Fed. App'x 434 (11th Cir. 2020) attached as "**Exhibit E.**"

3

**APP 396**

On December 5, 2023, FAMU sent Plaintiff a Notice of Intent to Dismiss from Employment ("Intent to Dismiss"), informing her of her rights as a tenured professor and that her employment would be ending. *See* Intent to Dismiss attached to Ex. A as "**Exhibit 1.**" On December 12, 2023, Plaintiff exercised her rights by opting to have a conference pursuant to FAMU's Regulation 10.120, which was held on January 11, 2024. *See* Letter to Provost Watson attached as "**Exhibit F.**" While the panel at the conference made a recommendation to rescind the Intent to Dismiss, the Provost, who had ultimately decision-making authority, decided to move forward with Plaintiff's termination. *See* Notice of Dismissal attached Ex. A as "**Exhibit 2.**" On January 23, 2024, FAMU informed Plaintiff of its decision to move forward and terminate her employment on January 30, 2024. *Id.* Plaintiff's termination was effective January 30, 2024. *Id.*

While this was occurring, on October 17, 2023, Plaintiff filed a complaint in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida. *See* ECF No. 1-6. Prior to serving the Defendant, Plaintiff filed her First Amended Compliant in state court on January 29, 2024, alleging claims under the Equal Pay Act of 1963, 42 U.S.C. § 1983 for First Amendment Retaliation and Violation of her Procedural Due Process, and for breach of contract. *See* ECF No. 1-1. The same day, Plaintiff filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("State Court TRO"), which was denied by the state court on January 31, 2024

because Plaintiff's termination already occurred by the time the state court received the motion[1]. *See* Order Denying State Court TRO attached as "**Exhibit G.**"

Defendant removed this case to the United States District Court, Middle District of Florida Orlando Division on March 4, 2024. *See* ECF No. 1. Two days later, Plaintiff refiled her Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief in this Court ("Federal Court TRO"), which was again denied. *See* ECF Nos. 6, 10, Plaintiff's Federal Court TRO and this Court's Order Denying the Federal Court TRO are attached as "**Exhibit J**" and "**Exhibit K**", respectively. This time, Plaintiff's Federal Court TRO was denied because she failed to meet her burden of establishing that she would suffer irreparable harm absent the injunctive relief. *See* Ex. K, at 5-7. Now, for a third time, Plaintiff files her Preliminary Injunction Motion requesting the Court enjoin what she has represented as her impending termination or order reinstatement, if the termination is carried out. *See* ECF No. 11, at 1, which is attached as "**Exhibit H.**"

## III.   MEMORANDUM OF LAW

### a.  STANDARD OF REVIEW

The Court is authorized to enter a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. To prevail on its request for injunctive relief, Plaintiff must demonstrate the following four elements: (1) a substantial likelihood of success

---

[1] Plaintiff has appealed the Order Denying State Court TRO to the Sixth District Court of Appeal, but that court has declined to her the appeal given Defendant's Notice of Removal to this Court. *See* Order by the Court, *Smith v. Florida Agricultural & Mechanical University Board of Trustees*, 6D24-0233 (Fla. 6th DCA March 20, 2024)

5

on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (4) an injunction would not disserve the public interest. *Johnson & Johnson Vision Care. Inc. v. 1-800 Contacts. Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002). A preliminary injunction is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014).

### b. ARGUMENT

#### i. Plaintiff's Preliminary Injunction Motion Fails to Meet the Requirements under the Local Rules.

While Plaintiff must satisfy the four elements to prevail on her injunctive relief, she must also comply with the requirements of the Local Rules for the United States District Court for the Middle District of Florida. *Wicked Grips LLC v. Badaan*, 2021 WL 4710488 at *2 (M.D. Fla. Oct. 8, 2021) (*citing Squitieri v. Nocco*, 2019 WL 4671095 at *3 (M.D. Fla. July 18, 2019)) ("The party seeking a preliminary injunction must 'fully comply with [these] procedural requirements.'").

First, Plaintiff's Motion is subject to the formatting requirements under Local Rule 3.01(a), which provides that a motion "must include—in a single document no longer than twenty-five pages inclusive of all parts." M.D. Fla. Loc. R. 3.01(a). If a party wishes to file a longer motion, they must seek leave from the court to do so in a motion not to exceed three pages. *Id.* Instead, Plaintiff filed a twenty (20) page

6

Preliminary Injunction Motion, *see* Ex. H, and then incorporates fourteen (14) pages of her Federal Court TRO, *see id.* at 19 ("Professor Smith reincorporated and renews her arguments concerning the remaining preliminary injunction elements from her motion for temporary restraining order, as if stated herein. (Doc. 6-1)"), making her motion span over two documents and thirty-four (34) pages. Here, Plaintiff's Motion violates Local Rule 3.01(a) by incorporating arguments from another document and exceeding the page limit, without seeking leave from the Court. Failure to comply with the requirements of Local Rule 3.01(a) constitutes proper grounds for striking the noncompliant motion. *See Voter Verified, Inc. v. Premier Election Sols., Inc.*, 2010 WL 1049793 at *2 (M.D. Fla. Mar. 22, 2010) (affirming Magistrate Judge's order striking motion that failed to comply with the requirements of Local Rule 3.01(a)).

Plaintiff also failed to comply with the requirements of Local Rule 6.02, which requires the movant to "include as an attachment each paper on which the movant relies." M.D. Fla. Loc. R. 6.02(a)(2). Although Plaintiff mostly relies on her own conclusory, unsworn statements, she cites to her Amended Complaint and the eleven (11) exhibits to her Amended Complaint, which are not attached to her Motion or rarely even cited to throughout her Motion. *See e.g.* Ex. H, at ¶¶ 4, 6, 11, 12. In addition, Plaintiff refers to her email communications with Defendant that are not in the record. *See id.* at ¶¶ 5, 8, 10, 13. Despite Plaintiff's reliance on these items to form the basis of Plaintiff's Preliminary Injunction Motion, Plaintiff fails to attach these documents or cite to the record.

**APP 400**

Indeed, this is not the first time that Plaintiff has failed to abide by this Court's Local Rules, and her blatant disregard should not be countenanced by this Court. *See* ECF No. 25 (striking Plaintiff's Motion for Hearing for failure to comply with Local Rule 3.01(g)). Accordingly, Defendant respectfully requests the Court strike Plaintiff's Motion for failure to comply with the Local Rules or alternatively deny Plaintiff's Motion on these grounds.

### ii. Plaintiff Has Not Met Her Burden for Obtaining Preliminary Injunctive Relief.

As a threshold matter, Plaintiff requests this Court enjoin the Defendant from "carrying out its threatened or impending termination or reinstatement if so." *See* Ex. H, at 1. The evidence shows, Plaintiff's employment was terminated effective January 30, 2024, via Provost Watson's January 23, 2023 Notice of Dismissal. *See* Ex. A, at Ex. 2. Plaintiff even attached this Notice of Dismissal as Exhibit 7 to her Amended Complaint. *See* ECF No. 1-4, at 1. The Notice provides that her employment "will end at the close of business on Tuesday, January 30, 2024" and Plaintiff's termination was effective as of January 30, 2024. *Id.* This was further acknowledged in the state court's January 31, 2024 Order Denying Plaintiff's State Court TRO. *See* Ex. G. In that order, the state court denied Plaintiff's State Court TRO because by the time the Motion was received by the court, Plaintiff's termination was already effective on January 30, 2024. *Id.*

Plaintiff mistakenly believes, and misleads this Court into believing, that she is still employed by Defendant. It is utterly unclear why Plaintiff thinks that she is still

8

**APP 401**

employed by Defendant, given that she received this Notice of Dismissal and she admits in her Preliminary Injunction Motion that she is no longer being paid by Defendant, she no longer has access to her email address or research resources, she has not been notified that she will teach in the Summer or Fall semesters, and she is no longer allowed on campus. *See* Ex. H, at ¶¶ 4, 11, 14, 15, 16.

Nothing in the facts have changed that necessitate the re-filing of Plaintiff's Preliminary Injunction Motion since it was first denied in state court on January 31, 2024. Yet, Plaintiff still has not met her burden to obtain such drastic relief from this Court.

### 1. Plaintiff has not established a likelihood of success on the merits.

Plaintiff's Preliminary Injunction Motion does not address this element; instead, she incorporates this argument from her Federal Court TRO, a motion that has already been denied by this Court. Regardless, Plaintiff has not demonstrated a likelihood of success on the merits for any of her claims. The first count of her Amended Complaint under the Equal Pay Act for discrimination in compensation is not addressed in either Plaintiff's Federal Court TRO or her Preliminary Injunction Motion. *See* Exs. H, J. Notwithstanding, Plaintiff is unlikely to prevail on this claim. This is Plaintiff's third attempt at making an Equal Pay Act claim against FAMU. *See* Exs. B-E. Plaintiff's first claim for equal pay against FAMU was made in 2015. Plaintiff was given a full and fair trial, after which a jury returned a verdict for FAMU, finding that while Plaintiff was paid less than at least one other male professor, with

substantially equal skill performing work under the same conditions, the difference in compensation was caused by factors other than gender. *See* Ex. B.

Plaintiff's second claim against FAMU for equal pay came in 2018. In that case, FAMU obtained an order granting summary judgment in its favor, and the court held, again, there was no evidence that gender was a factor in Plaintiff's pay since the prior case's jury verdict. *See* Ex. D. Like the prior two cases, Plaintiff here has not set forth any evidence that FAMU has changed its pay structure since her last lawsuit against FAMU, or that any changes to Plaintiff's pay were because of gender. Accordingly, Plaintiff is unlikely to prevail on the merits in her third case against FAMU.

As for Plaintiff's Equal Pay Act and First Amendment Retaliation claims, Plaintiff has not shown that she is likely to succeed on the merits for either claim because Defendant has a legitimate, non-discriminatory reason to end her employment, which had nothing to do with her protected activity. *See* Ex. A, at Ex. 1. FAMU's burden here is "exceedingly light." *Weston-Brown v. Bank of Am. Corp.*, 167 F. App'x 76, 80 (11th Cir. 2006). "The employer need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Id.* "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (citations omitted).

Plaintiff's employment ended because she retaliated against a student for making a written complaint against Plaintiff. *See* Ex. A, at ¶¶ 5,7. Plaintiff filed a

10

**APP 403**

complaint against the student "for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application." Ex. A, at Ex. 1, 13-14. This reason was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *See* Ex. A, at Ex. 1. Defendant's supplemental investigation also found that Plaintiff was unprofessional and inappropriate with students regarding the confrontation between Plaintiff and the student from the original report, and that her rivalry with a fellow College of Law professor was being internalized by students and creating a distraction. *Id.* Defendant would have made the same decision to end Plaintiff's employment, regardless of Plaintiff's alleged protected activities. *See* Ex. A. Plaintiff has not set forth any evidence to disprove Defendant's legitimate, non-discriminatory reason and cannot establish pretext. Therefore, she has not shown that she is likely to prevail on the merits of her Equal Pay Act and First Amendment retaliation claims.

As for Plaintiff's breach of contract claim, Plaintiff is also unlikely to succeed on the merits because she fails to state a claim. Plaintiff argues that Defendant breached her one-page employment contract for employment from August 7, 2023 to May 10, 2024, by terminating her without just cause. *See* employment contract attached as "**Exhibit I.**" More specifically, Plaintiff argues Defendant breached the contract by violating its own regulations when it "carried out a malicious investigation against Professor Smith and manufactured subterfuge for the intended termination." Ex. J, at 29-31. However, Defendant followed Regulation 10.120, which provides for the predetermination procedures for tenured faculty, as described in detail below and

11

**APP 404**

had just cause for the reasons articled in Defendant's retaliation argument above. *See* Ex. A, at Ex. 1. Accordingly, without being able to state a claim for relief, Plaintiff is not likely to succeed on the merits of her breach of contract claim.

Finally, Plaintiff also argues that she is substantially likely to succeed on the merits of her procedural due process claim because she alleges, without any record evidence or citations to support, that the decisionmaker was bias and refused to follow the panel's recommendation to rescind her Intent to Dismiss, thereby denying her a fair opportunity to be heard. Plaintiff's due process claims stems from Defendant's alleged failure to abide by Regulation 10.120. Regulation 10.120 provides that the employee will receive written notice, prior to dismissal and that such written notice shall contain: (1) the date of the proposed action, (2) reasons for the action, (3) documents which the charges are based, (4) a statement allowing for the employee to request a conference, prior to the proposed date of the action, (5) a statement that FAMU desires to reduce the risk of error and wants to consider the employee's response, and (6) a copy of Regulation 10.120. *Id.* Plaintiff's December 5, 2023 Intent to Dismiss contains all of these elements. *See id.*

Regulation 10.120 also provides for a conference, which will then "make a recommendation to affirm or alter the disciplinary action." *Id.* Plaintiff had her three-person impartial panel on January 11, 2024. *See* Ex. F. Per the Regulation, the panel's determination is a "recommendation" to the final decision-maker, who makes the final determination as to whether it will proceed with the proposed disciplinary action, which is exactly what occurred here. *Id.;* Ex. A, at Ex. 1. The panel recommended the

Provost rescind the Intent to Dismiss, but the decision-maker ultimately decided to carry out the termination, for just cause as articulated and substantiated by the Investigative Reports. *See* Ex. F; Ex. A, at Ex. 1. The Defendant provided Plaintiff her process under the Regulation and complied with all its obligations prior to termination. Just because Plaintiff did not achieve her desired final outcome does not mean that she was not provided with the proper process that she was entitled to receive. Accordingly, Plaintiff has not demonstrated or cited to any evidence in the record that shows the Defendant provided her with a constitutionally inadequate process and therefore is unlikely to succeed on the merits.

### 2.  Plaintiff has failed to clearly establish irreparable harm.

In light of the Court's March 8, 2024 Order, Plaintiff's Preliminary Injunction Motion now argues that under *Middleton-Keirn v. Stone*, 655 F.2d 609 (1981), the element of irreparable injury should be presumed. However, Plaintiff's reliance on this case is misplaced. First, *Stone* alleged violation of Title VII of the Civil Rights Act ("Title VII"), which requires the exhaustion of administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff does not bring any claims under Title VII. Her claims are brought through the Equal Pay Act, a state law breach of contract claim, and 42 U.S.C. § 1983 for violations of her constitution rights. None of these claims have the same administrative exhaustion requirement that Title VII requires. Yet, Plaintiff argues that *Stone* should apply because like Title VII, the Equal Pay Act is a federal statute aimed to remedy workplace discrimination.

Plaintiff does not cite to a single case to support this proposition. Rather, she cites to cases seeking preliminary injunctive relief under 42 U.S.C. § 1983 for procedural due process violations, which all analyze the irreparable harm element. *See Schrank v. Bliss,* 412 F. Supp. 28 (M.D. Fla. 1976); *Blaine v. N. Brevard Cnty. Hosp. Div.,* 312 F. Supp. 3d 1295 (M.D. Fla. 2018); *Keyer v. Civil Serv. Comm'n of the City of New York,* 397 F. Supp. 1362 (E.D.N.Y. 1975). Therefore, Plaintiff is not relieved of her burden to show irreparable harm for a preliminary injunction.

Despite her lengthy briefing on the matter, Plaintiff still fails to establish that she will suffer irreparable harm absent an injunction. *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 465 (M.D. Fla. 2022) (stating that failure to show a substantial likelihood of irreparable injury, standing alone, would make preliminary injunctive relief improper). Plaintiff's allegations that she has lost her pay and health benefits are not irreparable given that she has other employment through her private law practice, the Law Office of Jennifer Smith. Further this Court has already ordered that loss of compensation has an adequate remedy available in the form of monetary damages. *See* Ex. K, at 5. The possibility that adequate compensatory or other corrective relief may be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. *Sampson*, 415 U.S. 90.

The Court was also correct in its prior ruling that many of these alleged harms have already occurred. Again, Plaintiff's alleged reputational damages and loss of repute within the academic community cannot be cured by reinstatement nearly two months after her termination. Her other alleged harms such as career advancement,

**APP 407**

ability to secure a job in this market, and potential for eviction are all too speculative to constitute irreparable harm. *Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*, No. 6:19-cv-1711-ORL-78EJK, 2019 WL 7423546, at *3 (M.D. Fla. Oct. 15, 2019) (denying motion for preliminary injunction where plaintiff only presented "speculative and unproven risks of reputational harm to establish irreparable harm). There is nothing in Plaintiff's Declaration that establishes these forms of irreparable harm are imminent, nor is there any other evidence in the record to support such a finding. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("As we have emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'") (citations omitted); *Blue-Grace Logistics LLC*, 340 F.R.D. at 465.

Like the Court previously noted, Plaintiff's cases are distinguishable from the instant case. For example, *Canal Authority of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974), is not an employment case. The plaintiff there sought to enjoin the termination of a canal project to prevent downdraw of a lake created by part of the project. And only one of Plaintiff's cases, *Assaf v. Univ. of Texas System,* 399 F. Supp. 1245 (S.D. Tex. 1975), concern a plaintiff requesting reinstatement on a preliminary injunction in the field of higher education, but this case is only persuasive authority, and not binding on this Court. Plaintiff cites to *Blaine v. N. Brevard Cnty. Hosp. Div.,* 312 F. Supp. 3d 1295 (M.D. Fla. 2018)*,* in support of the proposition that reporting termination to the state licensing board is irreparable harm. But unlike the oncologists in that case, Plaintiff's for-cause termination as a professor is not a reportable incident to the Florida Bar as

15

the oncologists' terminations were to the National Practitioner Data Bank in *Blaine*. Since Plaintiff still has not met her burden to show irreparable harm, her request for reinstatement as preliminary injunctive relief should be denied.

### 3.  Balance of Interest of Public Interest

To meet her burden on the public interest factors, Plaintiff argues that terminating her employment would be a disservice to the students. However, the Investigative Reports make clear that unlike the plaintiff in *Assaf*, Plaintiff is not an educator of "impeccable character," rather, she was found to be retaliatory, unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor. *See* Ex. A, at Ex. 1. Reinstating Plaintiff would not be good public policy. Accordingly, Plaintiff fails to carry her burden to obtain the "extraordinary and drastic" relief she seeks in her Preliminary Injunction Motion.

## IV.  CONCLUSION

Defendant, THE FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES, respectfully requests this Honorable Court to render an Order denying Plaintiff's Motion and granting any other relief this Court deems just and proper.

Respectfully submitted March 25, 2024.

| | |
|---|---|
| */s/ Julie M. Zolty* | */s/ Maria A. Santoro* |
| **Richard E. Mitchell, Esq.** | **Maria A. Santoro, Esq.** |
| Florida Bar No: 0168092 | Florida Bar Number: 0654809 |
| rick.mitchell@gray-robinson.com | msantoro@sniffenlaw.com |
| maryann.hamby@gray-robinson.com | jlunt@sniffenlaw.com |
| **Julie M. Zolty, Esq.** | tward@sniffenlaw.com |
| Florida Bar No: 1036454 | **SNIFFEN & SPELLMAN, P.A.** |

**APP 409**

julie.zolty@gray-robinson.com
chantal.mccoy@gray-robinson.com
**GRAYROBINSON, P.A.**
301 East Pine Street, Suite 1400
Post Office Box 3068 (3208-3068)
Orlando, Florida 32801
(407) 843-8880 Telephone
(407) 244-5690 Facsimile

123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Defendant FAMU*

*Counsel for Defendant FAMU*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of March, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/ Julie M. Zolty*
**Julie M. Zolty, Esq.**
Florida Bar No: 1036454
*Counsel for Defendant FAMU*

17

**APP 410**

# 86-18 - Def. Resp to 2nd P.I.

# 07/10/2024

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JENNIFER SMITH,**

      **Plaintiff,**                    Cᴀsᴇ Nᴏ.:  **6:24-cv-457-PGB-RMN**

v.

**THE FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY BOARD**
**OF TRUSTEES,**

      **Defendant.**

_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION AND SUPPORTING**
**MEMORANDUM**

Defendant, The Florida Agricultural & Mechanical University Board of Trustees ("Defendant" or "FAMU"), pursuant to Fed. R. Civ. P. 65 and Middle District Local Rules 3.01 and 6.02, by and through its undersigned counsel hereby responds to Plaintiff, Jennifer Smith's ("Plaintiff") Motion for Preliminary Injunction dated April 1, 2024 [Exhibit 1: Doc. 37] ("the Motion") and states:

**I.    Introduction**

Plaintiff, for the fourth time, brings a request for injunctive relief in the form of reinstatement to employment with no new factual or evidentiary bases. She is not entitled to relief. [Exhibit 2: Orders at Doc. 1-6 pp. 77-79, 10; Exhibit 17: Doc. 34].

The Motion fails to meet the high standard required for entry of a preliminary

**APP 412**

injunction.  Plaintiff has not met the elements to establish she is likely to succeed on the merits of any of her claims nor that she will suffer irreparable harm.

Plaintiff's termination of employment was effective January 30, 2024.  The only equitable relief this Court could provide is reinstatement, which, at this juncture, would be futile since Plaintiff's current employment contract ends by its own terms on May 10, 2024.  Accordingly, Plaintiff's Preliminary Injunction Motion should be denied.

## II.    Statement of Facts

Plaintiff was employed as a tenured, full professor at Florida A&M University College of Law.  Her employment was terminated for just cause effective January 30, 3024.  [Exhibit 3: Declaration of Allyson Watson, Ph.D., Provost].

Plaintiff was hired on August 8, 2004, as a visiting professor for the University's College of Law.  *Id.*  In October 2014, Plaintiff sued FAMU in Leon County, Florida, for violations of the Equal Pay Act, Title VII of the Civil Rights Act, Title IX of the Education Amendments Act, and the Florida Civil Rights Act. [Exhibit 4: Docket for Leon County Circuit Court Case No. 2104 CA 2022].  The case was removed to the Northern District of Florida and tried before a jury of twelve.  The jury found Plaintiff was paid less than some comparable males but for reasons other than gender.  *See* Verdict from *Smith v. Florida Agricultural & Mechanical University Board of Trustees,* Case No. 4:14-cv-540-RH-CAS (N.D.

**APP 413**

Case 6:24-cv-00457-PGB-RMN Document 42 Filed 04/12/2024 Page 3 of 20 PageID 1212

Fla. July 22, 2015). [Exhibit 5: Verdict at Doc. 17, pp. 5-11]. This judgment was affirmed on appeal. *Smith v. Florida Agricultural & Mechanical University Board of Trustees,* 687 Fed. App'x 888 (11th Cir. 2017). [Exhibit 6: Opinion at Doc. 17, pp. 16-17].

In July 2018, Plaintiff sued FAMU again in Leon County for violation of the Equal Pay Act. [Exhibit 7: Docket for Leon County Circuit Case No. 2018 CA 1680]. The case was again removed to the Northern District of Florida. Plaintiff's second case also ended in favor of FAMU, this time on summary judgment. *Smith v. Florida Agricultural & Mechanical University Board of Trustees,* Case No. 4:18-cv-409-RH-CAS (N.D. Fla. June 2, 2019). [Exhibit 8: Order at Doc. 17, pp. 20-23]. The Northern District held that although FAMU had made some changes to the pay structure since Plaintiff's prior case, none of these changes affected Plaintiff negatively, nor were the changes motivated by gender. *Id.* at *3. This finding was also affirmed on appeal by the Eleventh Circuit. *Smith v. Florida Agricultural & Mechanical University Board of Trustees,* 831 Fed. App'x 434 (11th Cir. 2020). [Exhibit 9: Opinion at Doc. 17, pp. 24-31].

On October 27, 2022, the FAMU Office of Ethics and Compliance ("OEC") received a referral from the Office of Equal Opportunity Programs that a College of Law student had lodged a complaint of employee misconduct against Plaintiff. [Exhibit 10: December 5, 2023 letter at Doc. 27-2, p. 6].

On June 5, 2023, after investigation, the OEC reported to the President of the University that "a finding of retaliation to Professor Smith's subsequent actions is **<u>SUBSTANTIATED</u>**."  [Emphasis in original] [Exhibit 10: December 5, 2023 letter at Doc. 27-2, p. 5].  The OEC also determined that Smith did not follow up on a previous complaint she had made about the student until after she learned of the student's complaint.  The OEC noted that Smith's March 9, 2023 complaint against the student was lodged "for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application."  [Exhibit 11: Doc. 1-3, pp. 35-36].  In its supplemental opinion, the OEC voiced concern about the "appropriateness and professionalism displayed by Professor Smith," and that "the perceived rivalry between Professors Reyes and Smith, internalized by students, is a distraction and out of step with the values reiterated in University commitments and regulations."  [Exhibit 11: Doc. 1-3, p. 40].  The Dean was notified to "take any action deemed appropriate. . ."  [Exhibit 11:  Doc. 1-3, p. 41].

On October 17, 2023, Plaintiff filed a complaint in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida.  [Exhibit 12: Complaint at Doc. 1-6, pp. 2-16].  Prior to serving the Defendant, Plaintiff filed her First Amended Compliant on January 29, 2024, alleging claims under the Equal Pay Act of 1963, 42 U.S.C. § 1983 for first amendment retaliation and violation of procedural due process rights, and for breach of contract.  [Exhibit 13: First Amended Complaint at

**APP 415**

Doc. 1-1].   The same day, Plaintiff filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("State Court TRO"), which was denied by the state court on January 31, 2024.  The court reasoned that Plaintiff's termination occurred prior to the state court's receipt of the motion.[1]  [Exhibit 14: State Court TRO Order at Doc. 1-6 pp. 77-79].

On December 5, 2023, FAMU sent Plaintiff a Notice of Intent to Dismiss from Employment ("Intent to Dismiss"), informing her of her rights as a tenured professor and that her employment would be ending for cause, as a result of the OEC finding. [Exhibit 10: December 5, 2023 letter at Doc. 27-2].  On December 12, 2023, Plaintiff exercised her rights by opting to have a conference pursuant to FAMU's Regulation 10.120, which was held on January 11, 2024.  [Exhibit 15: Conference Panel letter of January 12, 2023[sic] at Doc. 27-8].

While the conference panel recommended rescission of the Intent to Dismiss, the Provost, who had ultimately decision-making authority, decided to move forward with Plaintiff's termination.  [Exhibit 3: Amended Declaration of Allyson Watson; Exhibit 16: January 23, 2024 letter at Doc. 1-4 pp. 1-2].  On January 23, 2024, FAMU informed Plaintiff of its decision . [Exhibit 16: January 23, 2024 letter at

---

[1] Plaintiff has appealed the Order Denying State Court TRO to the Sixth District Court of Appeal, but that court has administratively stayed the appeal given Defendant's Notice of Removal to this Court. *See* Order by the Court, *Smith v. Florida Agricultural & Mechanical University Board of Trustees*, 6D24-0233 (Fla. 6th DCA March 20, 2024).

Doc. 1-4 pp. 1-2]. Plaintiff's termination was effective January 30, 2024. *Id.*

Defendant removed this case to the United States District Court, Middle District of Florida Orlando Division on March 4, 2024. [Doc. 1 - Notice of Removal]. Two days later, Plaintiff refiled her Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief in this Court ("Federal Court TRO"), which was again denied. [Exhibit 17: Order at Doc. 10]. Plaintiff's Federal Court TRO was denied because she failed to meet her burden of establishing that she would suffer irreparable harm absent the injunctive relief.

Plaintiff next filed a Motion for Preliminary Injunction and Supporting Memorandum on March 11, 2024. [Doc. 11 – Motion for Preliminary Injunction]. This Court struck this Motion for failure to comply with the Local Rules. [Exhibit 18: Order at Doc. 34].

Plaintiff filed a second Motion for Preliminary Injunction, her fourth motion for injunctive relief, on April 1, 2024. [Exhibit 1: Doc. 37].

## III.    Memorandum of Law

### A.    Standard of Review

The Court is authorized to enter a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. To prevail on its request for injunctive relief, Plaintiff must demonstrate the following four elements: (1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in

the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (4) an injunction would not disserve the public interest. *Johnson & Johnson Vision Care. Inc. v. 1-800 Contacts. Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002). A preliminary injunction is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014). The Eleventh Circuit reviews a "district court's denial of a preliminary injunction for an abuse of discretion, reviewing factual findings for clear error and legal conclusions *de novo*." *Barcelona v. Parish*, 750 Fed. App'x. 841, 844 (11th Cir. 2018).

### B. Argument

Plaintiff has not met her burden for obtaining relief. She has not shown a substantial likelihood of success on the merits. First, Plaintiff's exhibits to the First Amended Complaint demonstrate that she has failed to plead a cause of action for which relief may be granted, and therefore cannot establish a likelihood of success on the merits of her case. Second, the Eleventh Circuit has determined that loss of employment is not irreparable harm. Third, Plaintiff's damages, if any, are monetary in nature, as this Court has recognized. Fourth, Plaintiff's termination was effected in response to a substantiated finding of wrongdoing after investigation. Fifth,

FAMU afforded all the procedural due process to which Plaintiff is entitled, and last, the public interest would not be served by Plaintiff's reinstatement. As a result, Plaintiff's Motion should be denied.

### 1.    Plaintiff has not established a likelihood of success on the merits.

Plaintiff's Motion does not establish a likelihood of success on the merits. First, Plaintiff is unlikely to prevail on her Equal Pay Claim. She simply alleges that she and her chosen comparator have the same job title. This is insufficient and conclusory. Smith provides not a single primary job duty for her own position, nor does she allege any specific duties performed by her comparator. Instead, Smith pleads the bare language of the statute and rests on her own conclusion in paragraphs 22 and 23 that she and her comparator perform the same work under similar conditions. She bases her conclusions on a deposition from 2015 from another case which cannot and does not address the current position and responsibilities of Plaintiff vis à vis her comparator. [Exhibit 11: Exhibits to Amended Complaint at Doc. 1-3, pp. 5-15]. "Conclusory and 'formulaic recitations of the elements' of an EPA claim is insufficient to state a claim." *Arafat v. School Bd. of Broward Cnty.*, 549 Fed. App'x. 872 (11th Cir. 2103) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 at 678 (2009)).

> "The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989). "The *prima facie* case... focuses solely on the primary duties of each job, not duties that

are incidental or insubstantial." [citation omitted] "Although job titles [and job descriptions] are entitled to some weight in this evaluation, 'the controlling factor under the Equal Pay Act is job content' - the actual duties that the respective employees are called upon to perform."

*Jackson v. City of Cape Coral*, Case No: 2:22-cv-408-JES-NPM, 2024 WL 382392, at *4 (M.D. Fla. Feb. 1, 2024).

Additionally, this is Plaintiff's third attempt at making an Equal Pay Act claim against FAMU, barring it on the grounds of judicial estoppel. Plaintiff's first claim for equal pay against FAMU was made in 2015. Plaintiff was given a full and fair trial, after which a jury returned a verdict for FAMU, finding that while Plaintiff was paid less than at least one other male professor with substantially equal skill performing work under the same conditions, the difference in compensation was caused by factors other than gender. [Exhibit 5: Verdict at Doc. 17, pp. 5-11].

Plaintiff's second claim against FAMU for equal pay came in 2018. In that case, FAMU obtained an order granting summary judgment in its favor, and the court held, again, there was no evidence that gender was a factor in Plaintiff's pay since the prior case's jury verdict. [Exhibit 8: Order Granting Summary Judgment at Doc. 17, pp. 20-23]. Like the prior two cases, Plaintiff here has not set forth any evidence that FAMU has changed its pay structure since her last lawsuit against FAMU, or that any changes to Plaintiff's pay were because of gender. Accordingly, Plaintiff is unlikely to prevail on the merits in her third case against FAMU.

As for Plaintiff's Equal Pay Act and First Amendment Retaliation claims, Plaintiff has not shown that she is likely to succeed on the merits for either claim because Defendant has a legitimate, non-discriminatory reason to end her employment, which had nothing to do with her protected activity. FAMU's burden here is "exceedingly light." *Weston-Brown v. Bank of Am. Corp.*, 167 Fed. App'x 76, 80 (11th Cir. 2006). "The employer need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Id.* "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (citations omitted).

Plaintiff's employment ended because she retaliated against a student for making a written complaint against her. [Exhibit 10: Letter at Doc. 27-2]. Plaintiff then filed a retaliatory complaint against the student "for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application." *Id.* This was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* Defendant's supplemental investigation also found that Plaintiff was unprofessional and inappropriate with students regarding the confrontation between Plaintiff and the student from the original report, and that her rivalry with a fellow College of

Law professor was being internalized by students and creating a distraction. *Id.* at p. 23. Defendant would have made the same decision, regardless of Plaintiff's alleged protected activities.

Plaintiff has not presented any evidence to disprove Defendant's legitimate, non-discriminatory reason and cannot establish pretext because she cannot show that the proffered reasons are a lie. *Brooks v. Cnty Comm's of Jefferson Cnty, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). "If the employer offers a legitimate reason, the plaintiff must then establish that the proffered reason was pretextual. *Id.* at 1343." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018). Plaintiff cannot show and does not allege that the documents she presented to this Court are inaccurate or deceptive. More significantly, as Plaintiff herself alleges, she has sued the University numerous times and for various claims over her twenty-year career at FAMU. She has thereby kept open the option of claiming retaliation at any time of her choosing. The University has never retaliated against Plaintiff over the past twenty years, and it has not done so now.

As for Plaintiff's breach of contract claim, Plaintiff is also unlikely to succeed on the merits because she fails to state a claim. The relevant employment contract is supplied as Exhibit 8 to the First Amended Complaint. [Exhibit 19: Employment Contract at Doc. 1-4, p. 9]. It reveals on its face that the employee is subject to

Case 6:24-cv-00857-RMN-MAF Document 42 Filed 04/12/24 Page 12 of 20 PageID 1221

University Regulations, and that the Employment Contract is the complete contract between the University and the Employee.

> In order to state a claim for breach of contract under Florida law, Plaintiff must allege: (1) a valid contract, (2) a material breach, and (3) damages, as well as Plaintiffs performance of its obligations under the contract or a legal excuse for its nonperformance.

*APR Energy, LLC*, 653 F. Supp. 2d 1227, 1232 (M.D. Fla. 2009).

Plaintiff argues that Defendant breached her employment contract by violating its own regulations when it "carried out a malicious investigation against Professor Smith and manufactured subterfuge for the intended termination." [Exhibit 1 – Doc. 37 p. 12]. However, Defendant followed the mandates in Regulation 10.120 afforded to tenured faculty, as described in detail herein, and had just cause for its action as articulated above. [Exhibit 3]. Accordingly, without being able to state a claim for relief, Plaintiff is not likely to succeed on the merits of her breach of contract claim.

Finally, Plaintiff also argues that she is substantially likely to succeed on the merits of her procedural due process claim. She alleges, without any record evidence or citations in support, that the decisionmaker was biased and refused to follow the panel's recommendation to rescind her Intent to Dismiss, thereby denying her a fair opportunity to be heard. "Typically, courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case*." McKinney v. Pate*, 20 F.3d 1550, 1562 (11th

Page **12** of **20**

**APP 423**

Cir. 1994). And, without a demonstration of prejudice, "the challenger's allegations are discounted." *Id.* "A demonstration that the decisionmaker was biased, however, is not tantamount to a demonstration that there has been a denial of procedural due process." *Id*. Smith's burden is to show that the University itself held a bias against her in order to show a deprivation of procedural due process. *Id.* at 1563. Smith has presented nothing to show bias on the part of the Provost or the University.

Plaintiff's due process claims stem from Defendant's alleged failure to abide by Regulation 10.120, but FAMU followed the Regulation. Regulation 10.120 provides that the employee will receive written notice prior to dismissal and that such written notice shall contain: (1) the date of the proposed action, (2) reasons for the action, (3) documents which the charges are based, (4) a statement allowing for the employee to request a conference, prior to the proposed date of the action, (5) a statement that FAMU desires to reduce the risk of error and wants to consider the employee's response, and (6) a copy of Regulation 10.120. Plaintiff's December 5, 2023 Intent to Dismiss contains all of these elements. [Exhibit 10: December 5, 2023, letter and attachments at Doc. 27-2].

Regulation 10.120 also provides for a conference, which will then "make a recommendation to affirm or alter the disciplinary action." *Id*. at p. 52. Plaintiff had her three-person impartial panel on January 11, 2024. [Exhibit 15]. Per the Regulation, the panel makes a "recommendation" to the final decision-maker, who

makes the final determination as to whether it will proceed with the proposed disciplinary action. That is exactly what occurred here. *Id*. The panel recommended the Provost rescind the Intent to Dismiss, but the decision-maker ultimately decided to carry out the termination for just cause as articulated in and substantiated by the Investigative Reports. The Defendant provided Plaintiff due process under the Regulation and complied with all its obligations prior to termination. Just because Plaintiff did not achieve her desired final outcome does not mean that she was not provided with the proper process that she was entitled to receive. Accordingly, Plaintiff has not demonstrated cause or cited any evidence that shows the Defendant provided her with a constitutionally inadequate process. She is therefore unlikely to succeed on the merits of her due process violation claims.

### 2.    Plaintiff has failed to clearly establish irreparable harm.

Plaintiff's Preliminary Injunction Motion argues that under *Middleton-Keirn v. Stone*, 655 F.2d 609 (1981), the element of irreparable injury should be presumed. However, Plaintiff's reliance on this case is misplaced. First, *Stone* alleged violation of Title VII of the Civil Rights Act ("Title VII"), which requires the exhaustion of administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff does not bring any claims under Title VII. Her claims are violation of the Equal Pay Act, a state law breach of contract claim, and a claim under 42 U.S.C. § 1983 for violations of her constitution rights. None of these claims

have the same administrative exhaustion requirement that Title VII requires. Yet, Plaintiff argues that *Stone* should apply because like Title VII, the Equal Pay Act is a federal statute aimed to remedy workplace discrimination.

Plaintiff does not cite a single case to support this proposition. Rather, she cites cases addressing preliminary injunctive relief under 42 U.S.C. § 1983 for procedural due process violations, which all analyze the irreparable harm element. *See Schrank v. Bliss,* 412 F. Supp. 28 (M.D. Fla. 1976); *Blaine v. N. Brevard Cnty. Hosp. Div.,* 312 F. Supp. 3d 1295 (M.D. Fla. 2018); *Keyer v. Civil Serv. Comm'n of the City of New York,* 397 F. Supp. 1362 (E.D.N.Y. 1975). Plaintiff is not relieved of her burden to show irreparable harm in her own case for a preliminary injunction.

Despite her lengthy briefing on the matter, Plaintiff still fails to establish that she will suffer irreparable harm absent an injunction. *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 465 (M.D. Fla. 2022) (stating that failure to show a substantial likelihood of irreparable injury, standing alone, would make preliminary injunctive relief improper). Plaintiff's allegations that she has lost her pay and health benefits are not irreparable given that she has other employment through her private law practice, the Law Office of Jennifer Smith. Further, this Court has already found that loss of compensation has an adequate remedy available in the form of monetary damages. [Exhibit 17: Doc. 10 at p. 5]. The possibility that adequate compensatory or other corrective relief may be available at a later date, in the ordinary course of

litigation, weighs heavily against a claim of irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Courts in the Eleventh Circuit have generally found that loss of employment is not considered an irreparable injury because it is fully compensable by monetary damages. *Leigh v. Artis-Naples, Inc.*, 2022 WL 18027780, at *19 (M.D. Fla. 2022).

The Court was also correct in its prior ruling that many of these alleged harms have already occurred. Again, Plaintiff's alleged loss of repute within the academic community cannot be cured by reinstatement months after her termination. Her other alleged harms such as career advancement, ability to secure a job in this market, and a parent in need of care are all too speculative to constitute irreparable harm. *Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*, No. 6:19-cv-1711-ORL-78EJK, 2019 WL 7423546, at *3 (M.D. Fla. Oct. 15, 2019) (denying motion for preliminary injunction where plaintiff only presented "speculative and unproven risks of reputational harm to establish irreparable harm"). There is nothing in Plaintiff's Declaration that establishes these forms of irreparable harm are imminent, nor is there any other evidence in the record to support such a finding. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("As we have emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'") (citations omitted); *Blue-Grace Logistics LLC*, 340 F.R.D. at 465.

Case 6:24-cv-00457-PGB-RMN   Document 42   Filed 04/12/24   Page 17 of 20 PageID 1226

As the Court previously noted, Plaintiff's cases are distinguishable from the instant case. For example, *Canal Authority of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974), is not an employment case. The plaintiff there sought to enjoin the termination of a canal project to prevent downdraw of a lake created by part of the project. And only one of Plaintiff's cases, *Assaf v. Univ. of Texas System,* 399 F. Supp. 1245 (S.D. Tex. 1975), supports a plaintiff successfully gaining reinstatement on a preliminary injunction in the field of higher education. *Assaf* is not binding on this Court and in any event, the injunction was vacated in *University of Texas System v. Assaf.*, 98 S.Ct. 1642, 1643 (U.S. 1978).

Plaintiff cites *Blaine v. N. Brevard Cnty. Hosp. Div.,* 312 F. Supp. 3d 1295 (M.D. Fla. 2018)*,* in support of the proposition that reporting termination to the state licensing board is irreparable harm. But unlike the oncologists in that case, Plaintiff's for-cause termination as a professor is not a reportable incident to the Florida Bar as the oncologists' terminations were to the National Practitioner Data Bank. Since Plaintiff still has not met her burden to show irreparable harm, her request for reinstatement as preliminary injunctive relief should be denied.

### 3.     Plaintiff has not shown disservice to the public interest.

To meet her burden on the public interest factors, Plaintiff argues that terminating her employment would be a disservice to the students and her elderly father. Plaintiff's personal burdens are lamentable but immaterial to the Motion and

APP 428

speculative.  Moreover, the Investigative Reports make clear that unlike the plaintiff in *Assaf*, Plaintiff is not an educator of "impeccable character," rather, she was found to be retaliatory, unprofessional, and inappropriate with at least one student, in addition to engaging in a disruptive "rivalry" with another law professor.  [Exhibit 10: Doc. 27-2].  Reinstating Plaintiff would not be good public policy.  Accordingly, Plaintiff fails to carry her burden to obtain the "extraordinary and drastic" relief she seeks in her Preliminary Injunction Motion.

### C.    Conclusion

Plaintiff has not met the elements required to satisfy any justification for a preliminary injunction.  She has not established a likelihood of success on the merits of the underlying case, she has not shown she will suffer irreparable harm, nor that an injunction will serve the public interest.  Reinstatement under the most recent contract of employment is nearly a moot point in any event, given that the semester is nearly over and Plaintiff's contract expires in a few short weeks.  Accordingly, Plaintiff's Preliminary Injunction Motion [Doc. 37] should be denied.

WHEREFORE, Defendant, The Florida Agricultural & Mechanical University Board of Trustees, respectfully requests this Honorable Court to render an Order denying Plaintiff's Motion for Preliminary Injunction and granting any other relief this Court deems just and proper.

Respectfully submitted April 12, 2024.

/s/ Maria A. Santoro
**Maria A. Santoro, Esq.**
Florida Bar Number: 0654809
msantoro@sniffenlaw.com
jlunt@sniffenlaw.com
tward@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

and

**Richard E. Mitchell, Esq.**
Florida Bar No: 0168092
rick.mitchell@gray-robinson.com
maryann.hamby@gray-robinson.com
**Julie M. Zolty, Esq.**
Florida Bar No: 1036454
julie.zolty@gray-robinson.com
chantal.mccoy@gray-robinson.com
**GRAYROBINSON, P.A.**
301 East Pine Street, Suite 1400
Post Office Box 3068 (3208-3068)
Orlando, Florida 32801
(407) 843-8880 Telephone
(407) 244-5690 Facsimile

*Counsel for Defendant FAMU*

**APP 430**

Case 6:23-cv-00367-RMN-MAP Document 42 Filed 04/12/24 Page 20 of 20 PageID 1229

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of April, 2024, I electronically

filed the foregoing with the Clerk of the Court by using the CM/DKT. system, which

will send a notice of electronic filing to all registered users.

*/s/ Maria A. Santoro*
**Maria A. Santoro, Esq.**
Florida Bar Number: 0654809
*Counsel for Defendant FAMU*

**APP 431**