CASE NO. 24-12823

IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH
CIRCUIT

JENNIFER SMITH,

*Plaintiff - Appellant,*

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON;
DENISE D. WALLACE; LATONYA BAKER; LATRECHA SCOTT; RICA
CALHOUN; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E.
MITCHELL; AND SARAH REINER,

*Defendants - Appellees.*

**APPENDIX**

On Appeal from The United States District Court for the Middle District of
Florida, No. 6:24-cv-00457-PGB-RMN; and The United States District Court for
the Northern District of Florida, No. 4:24-cv-00367-MW-MAF

Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy., Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023 (facsimile)
jensmithesq@aol.com
jensmithesq@yahoo.com (secondary)

Plaintiff - Appellant *pro se*

November 2024

**Volume 3 (of 4)**
**Pages 432–665**

# Index

**Tab**

**VOLUME 3**

Affidavit Smith Supp Amended Dec 86-19 [2024-07-10] ...............................86-19

Text of Proposed Order [2024-07-10] .........................................................86-20

Defendant's Response to P.I. [2024-07-22] ........................................... 125

Order Granting Renewed Motion to Amend Complaint [2024-08-16] ............... 149

Plaintiff's Corrected Second Amended Complaint [2024-08-18] ........................ 151

FAMU EEOC Interr Resp [2024-08-18] .........................................................151-1

FAMU COL Equity Study [2024-08-18] .........................................................151-2

Plaintiff's Reserve Class Email [2024-08-18] ....................................................151-3

Pernell Depo [2024-08-18] .............................................................................151-4

Associate Dean Green Emails [2024-08-18] ...................................................151-5

Dec. 5 2023 Notice [2024-08-18] ...................................................................151-6

Jan 23 2024 Notice [2024-08-18] ...................................................................151-7

Plaintiff's Fac Contract [2024-08-18] ...............................................................151-8

FAMU Fac Handbook [2024-08-18] ...............................................................151-9

FAMU Student Handbook [2024-08-18] .......................................................151-10

# 86-19 - Affidavit Smith Supp Amended Dec 86-19

## 07/10/2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

     Plaintiff,

                                  **CASE NO: 6:24-cv-00457-PGB-RMN**

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

     Defendant.

_____/

**SUPPLEMENTAL AMENDED DECLARATION OF JENNIFER SMITH**

1.     I am Jennifer Smith. I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.     I began working for Defendant, Florida Agricultural & Mechanical University (FAMU), in May 2004, with an official start date of August 8, 2004, as a tenured track associate professor.  I received a unanimous vote in April 2004 to join the faculty.

3.     Since being hired, I performed the duties of a law professor (teaching research and service) and was subject to the direction and control of FAMU.

4.     I am a tenured full professor and have been since 2016.

5.     I initially sued Defendant FAMU after learning I, and other women

**APP 435**

were being paid less than a male professor who performed substantially equal work to me but had less experience than I do.

6.     When Defendants learned of my unserved complaint filed in October 2023, they revived a stale investigation involving an encounter I had with a disruptive student, Michelle Wanamaker Sadiki, and used it as a pretext to terminate me 22 days later.

7.     I was successfully advancing in an interview in December 2023 - January 2024 process for a position with another company until it learned of my issue with FAMU. All communications stopped from that point forward.

8.     I have a solo law firm, but no clients. I occasionally assist *pro bono* clients in need, but who are indigent. I was approached to assist a potential client with a Financial Industry Regulatory Authority (FINRA) matter regarding jurisdiction in April 2024. I considered taking the matter but for my own case taking most of my time, so I declined in June 2024 for that reason.

9.     Since my termination (whenever the parties agree on a date), Defendant FAMU has withheld my salary and completely ignored my concerns about my salary disparities/gap, back dated my termination to my health insurance carrier so several healthcare claims submitted in the spring are no longer covered and are due and owing, failed to send my tax documents (even upon request) that I could access as an employee, and eliminated my email access without changing the destination for

2

**APP 436**

email notifications about insurance coverage and claims. Each action happened at various times, but usually and immediately after I noted in a court document that I was still employed because these instances/benefits were still in place.

10.    The reasons for my termination have changed several times since the initial termination letter dated December 5, 2023, making it difficult to defend. However, even after minor discovery, Defendants have been unable to articulate how the definition of retaliation for which I was fired or how any of my actions, even the numerous ones they created, meet any definition of retaliation. When I asked Defendant FAMU to define retaliation and how my actions for termination met that definition, Defendant FAMU responded: "[t]he University uses the ordinary meaning of the term and the letter speaks for itself." (Doc. 84, ¶129; Doc. 84-13)

11.    I read Professor Maritza Reyes entire deposition given in May 2024. She does not indicate any rivalry with me even when asked about faculty conflicts at the law school.

12.    Defendant FAMU violated state and federal law, as well as its own regulations, when I reported the October 20, 2022, incident on the same day, and the student reported it a week later. Despite the concerning claims made by me or the reckless claims made by the student against me, which FAMU ultimately found to be completely meritless, FAMU delayed nearly 100 days before initiating an investigation into the incident. This delay constituted retaliation against me for my

3

APP 437

equal pay lawsuit and violated numerous state and federal laws that require educational institutions to report and immediately handle such incidents.

13.    Defendant FAMU breached its contractual obligations to me in many ways, including:

- Failure to investigate reported student conduct violation
- Failure to timely investigate and gather materials
- Failure to maintain confidentiality of EOP complaint
- Failure to define "retaliation"
- Failure to meet timelines within Reg. 10.206

14.    On March 15, 2024, one day after the mandatory deadline pursuant to FAMU Regulations, Defendant FAMU held my first internal, yet futile, appeal, which upheld my termination. The hearing officer is employed at FAMU and previously worked in the FAMU General Counsel's office.

15.    On June 20, 2024, I had my second internal, yet futile, appeal. No report has issued yet. The hearing officer is a direct report to Provost Watson, whose own declarations are conflicting as to why I was terminated.

16.    If I do not participate in this appeals process, then I accept that last act of FAMU toward me – termination.

17.    I was using my health insurance through May 2024, then it appears that FAMU went back to inform the insurance company that I was no longer employed since January 30, 2024, and now those initially covered claims are due and owing.

18.    I emailed Associate Provost Reginald Perry and Mr. Herb Bailey

4

**APP 438**

(Associate Vice President, Provost's Office) about my deferred pay that I get in the summers. His response on June 24, 2024 was:

*Please see below the breakdown of the payout for the 9 over 12 deferred payment:*

| | |
|---|---|
| *Amount paid into the program:* | *$6,500.00 (September 2023 thru February 2024)* |
| *Amount overpaid to employee:* | *($3,971.52) (Pay date 2/09/24)* |
| *Amount overpaid to employee:* | *($1,269.11) (Pay date 2/23/24)* |
| *Balance due from Program:* | *$1,269.37 (Paid on 4/24/24)* |

*The total amount has been paid out for the 9 over 12 program to Ms. Smith. If there are any questions, please feel free to call me.*

19.     I emailed them right away on the same day: "Please send me an official financial breakdown from December to present. I don't accept this or understand it. Also send my 1099…. Including sick leave etc." I have never heard back from anyone on my pay and benefits.

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct. Executed on July 10, 2024.



Jennifer Smith

5

# 86-20 - Text of Proposed Order

## 07/10/2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

    Plaintiff,

                               CASE NO: 6:24-cv-00457-PGB-RMN

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES, et al.

    Defendants.
_____/

## ORDER GRANTING PRELIMNARY INJUNCTION

This action came on for hearing on plaintiff's motion for a preliminary injunction filed on July 10, 2024. At the close of the hearing the Court orally entered a preliminary injunction. This order making findings of fact and conclusions of law is issued in connection therewith.

FINDINGS OF FACT

1. This action was brought by Jennifer Smith, plaintiff (Professor Smith) under (1) discrimination in compensation under the Equal Pay Act ("EPA"); (2) retaliation under the EPA; (3) breach of contract; (4) First Amendment retaliation under the United States and Florida Constitutions; (5) violations of procedural due process under 42 U.S.C. § 1983; (6-7) conspiracy under 42

**APP 441**

U.S.C. §1985, and §1986; (8) preliminary and permanent injunctive relief; (9) Title VII and (10) Due Process under the U.S. and Florida Constitutions.

2. The Defendants are: Florida Agricultural & Mechanical University Board of Trustees ("Defendant FAMU" or "FAMU"), Allyson Watson ("Defendant Watson"), D. Denise Wallace ("Defendant Wallace"), Gray Robinson, P.A. ("Defendant Gray Robinson"), Latrecha Scott ("Defendant Scott"), Rica Calhoun ("Defendant Calhoun"), Julie Zolty ("Defendant Zolty"), Sarah Reiner ("Defendant Reiner"), and Richard E. Mitchell ("Defendant Mitchell").

3. For twenty years, Professor Smith was a tenured, full professor at the Florida A&M University College of Law with a stellar employment history.

4. Professor Smith has a long history of suing Defendant FAMU for equal pay.

5. From 2004 through December 4, 2023, Professor Smith regularly worked onsite at Defendant FAMU's law campus in Orlando, Florida.

6. On October 17, 2023, Professor Smith filed an equal pay case in state court against Defendant FAMU.

7. Twenty-two after Professor Smith filed her equal pay case in state court, on December 5, 2023, Defendant FAMU notified Professor Smith by email that she was to be terminated on January 19, 2024, but had a right to a hearing because she was tenured.

2

8. On January 11, 2024, Defendant FAMU held a hearing before a 3-member panel of lawyers chosen by the Defendant FAMU.

9. The panel unanimously recommended that Defendant FAMU rescind the notice of termination against Professor Smith.

10. Pursuant to FAMU regulations, Defendant FAMU had to notify Professor Smith by January 18, 2024 if it intended to proceed with her termination. It did not.

11. FAMU finally properly notified Professor Smith by certified mail on January 29, 2024, with a new termination date of January 30, 2024, having rejected the 3-member panel's recommendation.

12. Professor Smith filed a TRO to prevent her termination in state court, which was denied because the judge wrongly believed Professor Smith had been terminated. Professor Smith filed a notice of appeal to the state appellate court.

13. Defendant FAMU filed a notice of removal to this Court.

14. Professor Smith filed a TRO, which this Court summarily denied.

15. On March 11, 2024, Professor Smith filed a preliminary injunction (Doc. 11), which this Court struck on March 29, 204 due to page limits (Doc 34).

16. On April 1, 2024 (Doc. 37), Professor Smith filed her second motion for a preliminary injunction. Then, she filed a Second Amended Complaint on July

3

**APP 443**

8, 2024 (Doc . 81), which was re-filed on July 9, 2024 as "corrected." (Doc. 84)

17. On July 9, 2024, the Court entered an order finding as moot the second preliminary injunction. (Doc. 37)

18. On July 10, 2024, Professor Smith re-filed her third preliminary injunction as time-sensitive because of the University class schedule.

CONCLUSIONS OF LAW

This matter comes before the Court on Professor Smith's Motion for a Preliminary Injunction. Having considered the motion, supporting documents, and any opposition thereto, the Court finds and orders as follows:

1. This Court has jurisdiction over the parties and subject matter of this case pursuant to 28 U.S.C. § 1331 and 1343. Jurisdiction is also based on federal questions under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the First and Fourteenth Amendments to the U.S. Constitution, and 42. U.S.C. § § 1983, 1985 and 1986.

2. Professor Smith has demonstrated a likelihood of success on the merits.

3. Until reinstated to the job which she held prior to termination, Professor Smith was suffering, and would have continued to suffer, irreparable harm in the absence of preliminary relief.

4. The balance of equities tips in Professor Smith 's favor.

**APP 444**

APP 445

5. An injunction is in the public interest.

6. The reinstatement of Professor Smith is to her former position as a tenured full professor at the COL pending the Court's resolution of this matter.

Accordingly, it is hereby ordered that the preliminary injunction is granted. Defendant FAMU is ordered to reinstate Professor Smith to her former position of a tenured full professor at the College of Law, with all the responsibilities and duties which were formerly assigned to that position. Defendants are hereby enjoined pendente lite from preventing, interfering with, or otherwise altering the employment of Professor Smith as a tenured full professor, as it existed before December 5, 2023. It is further ordered that Defendant FAMU convey to Professor Smith the pay which she would otherwise have received from the date of January 30, 2024, until her reinstatement on _____. All back pay shall be at _____ per cent interest. No bond shall be required. This Order shall take place immediately.

Dated: July _____, 2024

_____
Judge Byron

# 125 - Defendant's Response to P.I.

## 07/22/2024

**APP 446**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JENNIFER SMITH,

        Plaintiff,                  CASE NO.:  **6:24-cv-457-PGB-RMN**

v.

THE FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY BOARD
OF TRUSTEES,

        Defendant.

                                   /

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S TIME SENSITIVE MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

Defendant, The Florida Agricultural & Mechanical University Board of Trustees ("University"), pursuant to Fed. R. Civ. P. 65 and Fla. M.D. Loc. R. 6.02, by and through its undersigned counsel, hereby responds to Plaintiff's Motion for Preliminary Injunction dated July 10, 2024 [Ex. 1 - Doc. 86] and states:

### I.   Introduction

Plaintiff's Motion fails overall to meet the high standard required for entry of a preliminary injunction.  Plaintiff has not pleaded the elements of her alleged causes of action sufficiently to establish she is likely to succeed on the merits of any claims.  Plaintiff has not shown irreparable harm.  The relief requested is also outweighed by potential harm to the University and its students.

**APP 447**

Plaintiff's termination of employment was effective January 30, 2024.  Plaintiff seeks reinstatement.  The Provost has declared that she made her decision to terminate Plaintiff "given the disruption caused by Ms. Smith's behavior at the College of Law," and a substantiated finding of misconduct. [Ex. 2 - Doc. 86-6].  Any presumption of irreparable harm is dispelled by this declaration.  In fact, harm is threatened to *the University* and its students by reinstatement of the plaintiff.  *Id.*

## II.   Facts

Plaintiff was a tenured, full professor at Florida A&M University College of Law until her employment was terminated by the Provost of the University for just cause effective January 30, 3024. [Ex. 3 - Doc. 86-7].

The legitimate business reason for the termination was a substantiated finding that Plaintiff had retaliated against a student in violation of University Regulation 1.019(21). [Ex. 2 - Doc. 86-6, p. 1].

The issue began with a student complaint against the plaintiff.  On October 27, 2022, the University Office of Compliance and Ethics ("OCE") received a referral from the Office of Equal Opportunity Programs that a College of Law student had lodged a complaint of employee misconduct against Plaintiff.  [Ex. 2 - Doc. 86-6, p. 6].

The OCE investigated and interviewed the plaintiff in February of 2023. [Ex. 2 – Doc. 86-6, p. 8]. On March 9, 2023, Plaintiff in turn lodged a complaint against the student. *Id.* at p. 18.  On June 5, 2023, after investigation, the OCE reported to the President of the University that "a finding of retaliation to Professor Smith's

subsequent actions is **SUBSTANTIATED**." [Emphasis in original][Ex. 2 - Doc. 86-6, pp. 5, 22]. The OCE also determined that Smith could not claim her October 2022 "charge" via text against the same student was ignored. *Id.* at p. 18. The OCE found that Plaintiff did not follow up on the text until after she learned of the student's complaint against Plaintiff.   *Id.* The OCE found that Plaintiff's March 9, 2023 complaint against the student was lodged "for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application."  [Ex. 2 - Doc. 86-6, pp. 18 - 19].

In its supplemental opinion sent to the University President on July 6, 2023, the OCE voiced concern about the "appropriateness and professionalism displayed by Professor Smith," and that "the perceived rivalry between Professors Reyes and Smith, internalized by students, is a distraction and out of step with the values reiterated in University commitments and regulations." [Ex. 2 - Doc. 86-6, pp. 21-23].  The Dean was advised to "take any action deemed appropriate. . ." [Ex. 2 - Doc. 86-6, p. 24].

On December 5, 2023, the University Provost sent a Notice of Intent to Dismiss from Employment, informing Plaintiff that her employment would be ending for cause as a result of the OCE finding and informing her of her rights as a tenured professor. [Ex. 2 - Doc. 86-6].  On December 12, 2023, Plaintiff exercised her rights by opting to have a panel review pursuant to University Regulation 10.120. It was held on January 11, 2024. [Ex. 4 - Doc. 86-4].

The review panel recommended rescission of the Intent to Dismiss. *Id.*  The Provost, who has ultimately decision-making authority, moved forward with

Plaintiff's termination. [Exs. 2, 3 - Docs. 86-6, 86-7].  On January 23, 2024, the Provost informed Plaintiff of the University's final decision.  Plaintiff's termination was effective January 30, 2024. *Id.*

III.  **Memorandum of Law**

A.  **Standard of Review**

To prevail on its request for injunctive relief, Plaintiff must demonstrate the following four elements: (1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (4) an injunction would not disserve the public interest. *Johnson & Johnson Vision Care. Inc. v. 1-800 Contacts. Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002).  A preliminary injunction is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014).  The Eleventh Circuit reviews a "district court's denial of a preliminary injunction for an abuse of discretion, reviewing factual findings for clear error and legal conclusions *de novo*." *Barcelona v. Parish*, 750 Fed.Appx. 841, 844 (11th Cir. 2018).

B.  **Argument**

Plaintiff has not met her burden for obtaining relief.  She has not shown a substantial likelihood of success on the merits.  First, Plaintiff's exhibits to the First

Amended Complaint demonstrate that she has failed to plead a cause of action for which relief may be granted.  Second, the Eleventh Circuit has determined that loss of employment is not irreparable harm.  Third, even if the Title VII claim raised by the plaintiff creates a presumption of irreparable harm, that presumption has been dispelled.  Fourth, Plaintiff's damages, if any, are monetary in nature.  Fifth, Plaintiff's termination was an action taken in response to a substantiated finding of wrongdoing after investigation.  Sixth, the University afforded Plaintiff all the procedural due process to which she is entitled.  Seventh, the individual defendants are all immune from suit.  Eighth, Plaintiff failed to give proper notice pursuant to statute.  Ninth, the potential harm to the University outweighs the benefit to the plaintiff of reinstatement, and last, the public interest would not be served by granting the relief requests.  As a result, Plaintiff's Motion should be denied.

**1.    Plaintiff has not established a likelihood of success on the merits.**

Plaintiff's Motion does not establish a likelihood of success on the merits. Plaintiff's Corrected Second Amended Complaint has been accepted by the Court (to date) as the operative pleading. [Ex. 5 - Doc. 85].  It is another shotgun pleading, violative of Fed. R. Civ. P. 8, 10, and 13.  It was also an amended pleading filed without leave of court. Fed. R. Civ. P. 15. [Ex. 6 - Doc. 112].

Second, Plaintiff is unlikely to prevail on her Equal Pay Claim.  Plaintiff's Corrected Second Amended Complaint again pleads the bare language of the statute as in all versions of her complaints, referring to a deposition from 2015 from another case which cannot and does not address the current position and responsibilities of

**APP 451**

Plaintiff vis à vis her comparator. [Exs. 7, 8 - Docs. 84-2, 84-4].  "Conclusory and 'formulaic recitations of the elements' of an EPA claim is insufficient to state a claim." *Arafat v. School Bd. of Broward Cnty.*, 549 Fed. App'x. 872 (11th Cir. 2103) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 at 678 (2009)).

The individual University employees are immune from suit in the exercise of their discretionary employment functions.  "The doctrine of qualified immunity arises from the need to afford public officials some measure of protection from personal liability in their performance of discretionary duties."  *Sims v. Metropolitan Dade Cnty.*, 972 F.2d 1230, 1235 (C.A.11 (Fla.), 1992).  So are the Gray Robinson defendants. *Chance v. Cook*, 50 F.4th 48, 51 (11th Cir. 2022); *Payne v. Seminole Electric Cooperative, Inc.*, 2021 WL 3017392 (Fla. M.D. Feb. 2, 2021).

Furthermore, Plaintiff failed to give the requisite notice required under Florida law prior to suing the individual University employee defendants in their official capacities.  §768.28 Fla. Stat.

All retaliation claims can be dispelled by the facts that the plaintiff herself provided – she was terminated for cause and was afforded due process in recognition of her tenured status. [Exs. 2, 3 - Docs. 86-6, 86-7].  Defendant had a legitimate, non-discriminatory reason to end Plaintiff's employment, which had nothing to do with her protected activity. The University's burden here is "exceedingly light." *Weston-Brown v. Bank of Am. Corp.*, 167 F. App'x 76, 80 (11th Cir. 2006).  "The employer need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Id.*  "An employer may fire an employee for

**APP 452**

a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (citations omitted).

Plaintiff's employment ended because she retaliated against a student for making a written complaint against her. [Exs. 2, 3 - Docs. 86-6, 86-7]. Plaintiff then filed a retaliatory complaint against the student "for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application." *Id.* This was fully investigated and substantiated by the University's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* The supplemental investigation found that Plaintiff was unprofessional and inappropriate with students regarding the confrontation between Plaintiff and the student from the original report, and that her rivalry with a fellow College of Law professor was being internalized by students and creating a distraction. *Id.* at p. 23.

Plaintiff submitted most of these documents. She cannot establish pretext because she cannot show that the proffered reasons, which are found in the exhibits, are a lie. *Brooks v. Cnty Comm's of Jefferson Cnty, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). "If the employer offers a legitimate reason, the plaintiff must then establish that the proffered reason was pretextual. *Id.* at 1343." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018). More significantly, as Plaintiff herself alleges, she has sued the University numerous times and for various claims over her twenty-year career. She has thereby kept open the option of claiming retaliation at any time of her

choosing.  The University has never retaliated against Plaintiff over the past twenty years, and it has not done so now.

Plaintiff is also unlikely to succeed on the merits of her breach of contract claim. The relevant employment contract is supplied by the plaintiff. [Ex. 9 - Doc. 86-9]. It reveals on its face that the employee is subject to University Regulations, and that the Employment Contract is the complete contract between the University and the Employee.

> In order to state a claim for breach of contract under Florida law, Plaintiff must allege: (1) a valid contract, (2) a material breach, and (3) damages, as well as Plaintiffs performance of its obligations under the contract or a legal excuse for its nonperformance.

*APR Energy, LLC*, 653 F. Supp. 2d 1227, 1232 (M.D. Fla. 2009).

Plaintiff argues that Defendant breached her employment contract by violating its own regulations, citing *Spunberg v. Columbia/JFK Medical Center*, 1997 WL 868607, at *1-3 (Fla. Cir. Ct. Dec. 23, 1997), a circuit court case where there was no employment contract at all, so the court turned to the by-laws of the employer; *Lake Shore, Inc. v. Ferrero*, 898 So.2d 1037, 1038 (Fla. 1st DCA 2005), where the preliminary injunction was reversed on appeal; and *Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So.3d 915, 916 (Fla. 3d DCA 2010); where the order *denying* an emergency motion for preliminary injunction was affirmed.  Florida courts do not routinely enforce internal regulations as contracts when there is a valid employment contract. [Ex. 1 - Doc. 86, p. 13].

Plaintiff breached the contract herself by violating University regulations.  [Ex. 2 – Doc. 86-6].  Defendant followed the mandates in Regulation 10.120 afforded to tenured faculty, as described in detail in the plaintiff's exhibits and had just cause for its action as articulated above.  Accordingly, without being able to state a claim for relief, Plaintiff is not likely to succeed on the merits of her breach of contract claim.

Plaintiff is likewise unlikely to succeed on the merits of her procedural due process claim.  Plaintiff's own exhibits again show that the University followed the rules.  Regulation 10.120 provides that the employee will receive written notice prior to dismissal and that such written notice shall contain: (1) the date of the proposed action, (2) reasons for the action, (3) documents which the charges are based, (4) a statement allowing for the employee to request a conference, prior to the proposed date of the action, (5) a statement that the University desires to reduce the risk of error and wants to consider the employee's response, and (6) a copy of Regulation 10.120.

Regulation 10.120 also provides for a conference, which will then "make a **recommendation** to affirm or alter the disciplinary action." *Id*. at p. 52.  [Emphasis added].  Plaintiff had her three-person impartial panel on January 11, 2024. [Ex. 4 - Doc. 86-4].  Per the Regulation, the panel makes a "recommendation" to the final decision-maker, who makes the final determination as to whether it will proceed with the proposed disciplinary action.  That is exactly what occurred. *Id*  The panel recommended that the Provost rescind the Intent to Dismiss, but the decision-maker, Provost Allyson Watson, ultimately decided to carry out the termination for just cause as articulated in and substantiated by the Investigative Reports.  The December 5, 2023

Intent to Dismiss contains the proper elements. [Ex. 2 - Doc. 86-6]. *Laskar v. Peterson,* 771 F.3d 1291, 1299 (11th Cir. 2014). Just because Plaintiff did not achieve her desired outcome does not mean that she was not afforded due process. Accordingly, Plaintiff has not demonstrated cause or cited any evidence that shows the Defendant provided her with a constitutionally inadequate process. She is therefore unlikely to succeed on the merits of her due process violation claims.

Plaintiff's Title VII claim is defective. Plaintiff identifies no similarly situated employee. "To establish discrimination in discipline, Plaintiff must show these things: '1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline.' *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000)." *Nicholas v. Board of Trustees of University of Alabama*, 251 Fed.Appx. 637, 642, 2007 WL 3023209, at *3 (11th Cir. 2007).

Plaintiff's section 1983 conspiracy claim is also defective. "[T]he university and its officials are considered as constituting a single legal entity which cannot conspire with itself." *Chambliss v. Foote*, 421 F. Supp. 12, 15 (D.C. La. 1976).

### 2. Plaintiff has failed to establish irreparable harm.

Plaintiff has now added a Title VII claim. However, Title VII only allows this court to presume irreparable harm in certain circumstances, and the University has addressed and overcome that presumption. *Leigh v. Artis-Naples, Inc.*, 2022 WL 18027780, at *3 (M.D. Fla. Dec. 30, 2022). "My decision to terminate Ms. Smith's employment was based on the substantiated finding of retaliation documented in the

**APP 456**

Investigative Reports."  Declaration of Allyson Watson, Provost. [Ex. 10 - Doc. 42-3].  The quotes the plaintiff presents on pages 3 and 4 of her motion are cumulative, not contradictory. [Ex. 1 - Doc. 86, pp. 3-4].  Plaintiff claims the University has no definition for "retaliation" and failed to define it for her. [Ex. 1 - Doc. 86, p. 7].  The plaintiff's exhibits prove that she was notified of the applicable University Regulation in the initial letter discharging her.  [Ex. 2 - Doc. 86-6].  The definition may also be found on the internet by searching for "FAMU regulations."  The definition is not arbitrary, conflicting, nor secret. [Ex. 2 - Doc. 86-6, p. 50].  Plaintiff did not need to ask for it in discovery.

Plaintiff's losses, entitlement to which is not conceded, are monetary.  Courts in the Eleventh Circuit have generally found that loss of employment is not considered an irreparable injury, being fully compensable by monetary damages. *Leigh, at 19.*

Plaintiff's alleged loss of repute within the academic community cannot be cured by reinstatement months after her termination.  Her other alleged harms such as career advancement, ability to secure a job in this market, and a parent in need of care are all too speculative to constitute irreparable harm. *Oviedo Med. Ctr., LLC v. Adventis Health Sys./Sunbelt, Inc.*, No. 6:19-cv-1711-ORL-78EJK, 2019 WL 7423546, at *3 (M.D. Fla. Oct. 15, 2019) (denying motion for preliminary injunction where plaintiff only presented "speculative and unproven risks of reputational harm to establish irreparable harm").  There is nothing in Plaintiff's Declaration (which remains unchanged from January) that establishes irreparable harm are imminent, nor is there any other evidence in the record to support such a finding. [Ex. 11 - Docs. 1-6, p. 55,

37-1, 86-1].  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("As we have emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'") (citations omitted); *Blue-Grace Logistics LLC*, 340 F.R.D. at 465.

In addition, loss of income and benefits, access to research resources or damage to reputation "fall short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." *Storves v. Island Water Association, Inc.*, 2010 WL 11622686, at *4 (M.D. Fla. Nov. 3, 2010).

Plaintiff cites *Assaf v. Univ. of Texas System,* 399 F. Supp. 1245 (S.D. Tex. 1975), to support a plaintiff successfully gaining reinstatement on a preliminary injunction in the field of higher education.  However, the injunction was vacated.  *University of Texas System v. Assaf.*, 98 S.Ct. 1642 (U.S. 1978) and is not persuasive.

Plaintiff cites *Blaine v. N. Brevard Cnty. Hosp. Div.,* 312 F. Supp. 3d 1295 (M.D. Fla. 2018)*.*  But unlike the oncologists in that case, Plaintiff's for-cause termination as a professor is not a reportable incident to the Florida Bar as the oncologists' terminations were to the National Practitioner Data Bank.  Since Plaintiff still has not met her burden to show irreparable harm, her request for reinstatement as preliminary injunctive relief should be denied.

### 3.    Plaintiff has not shown disservice to the public interest.

To meet her burden on the public interest factors, Plaintiff argues that terminating her employment would be a disservice to the students and her elderly father.  Plaintiff's personal burdens are lamentable but immaterial to the Motion and

speculative. Moreover, the Investigative Reports make clear that unlike the plaintiff in *Assaf*, Plaintiff is not an educator of "impeccable character," rather, she was found to be retaliatory, unprofessional, and inappropriate with at least one student, in addition to engaging in a disruptive "rivalry" with another law professor. [Ex. 2 - Doc. 86-6]. Reinstating Plaintiff would not be good public policy. Accordingly, Plaintiff fails to carry her burden to obtain the "extraordinary and drastic" relief she seeks in her Preliminary Injunction Motion.

### C.    Conclusion

Plaintiff has not met the elements required to satisfy any justification for a preliminary injunction. Plaintiff has not established a likelihood of success on the merits of the underlying case and she has not shown she will suffer irreparable harm, nor that an injunction will serve the public interest. Reinstatement would also be unfair and harmful to the University. Accordingly, Plaintiff's Preliminary Injunction Motion should be denied.

WHEREFORE, Defendant, Florida Agricultural & Mechanical University Board of Trustees, respectfully requests this Honorable Court to render an Order denying Plaintiff's Motion for Preliminary Injunction and granting any other relief this Court deems just and proper.

> */s/ Maria A. Santoro*
> **Maria A. Santoro, Esq.**
> Florida Bar Number: 0654809
> **SNIFFEN & SPELLMAN, P.A.**
> *Counsel for Defendant Board of Trustees,*
> *Florida A&M University*

**APP 459**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22d day of July, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/DKT. system, which will send a notice of electronic filing to all registered users.

/s/ *Maria A. Santoro*
**Maria A. Santoro, Esq.**
Florida Bar Number: 0654809
msantoro@sniffenlaw.com
jlunt@sniffenlaw.com
tward@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004
*Counsel for Defendant Board of Trustees, Florida A&M University*

**APP 460**

# 149 - Order Granting Renewed Motion to Amend Complaint

## 08/16/2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

       **Plaintiff,**

v.                        **Case No: 6:24-cv-457-PGB-RMN**

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

       **Defendant.**

_____/

## ORDER

This cause comes before the Court upon Plaintiff Jennifer Smith's ("**Plaintiff**") Renewed Motion to Amend Complaint (Doc. 133 (the "**Renewed Motion**")). Defendant Florida Agricultural & Mechanical University ("**FAMU**") Board of Trustees ("**Defendant**") has filed a response in opposition (Doc. 136 (the "**Response**")). Upon careful consideration, the Renewed Motion is due to be granted.

## I.    BACKGROUND[1]

This case arises out of Plaintiff's allegations that Defendant engaged in gender discrimination in compensating Plaintiff—who was a tenured law professor

---

[1] The Court provides an abbreviated synopsis of both the Plaintiff's allegations and the lengthy procedural history involved in Plaintiff's requests to amend the operative Amended Complaint (Doc. 1-1 ("**FAC**")). Despite Plaintiff's representations to the contrary in the Renewed Motion, the Court strives to act with efficiency in resolving the issues before it. (*See* Doc. 133). Moreover, the Court's involvement in trying to advance this matter is unrivaled among the cases on this Court's docket. Yet Plaintiff appears to persist in the faulty belief that, on any given day, this is the sole matter that demands the Court's time and attention.

**APP 462**

at FAMU—in violation of the Equal Protection Act ("**EPA**"). (*See* Doc. 1-1). Plaintiff additionally claims that Defendant wrongfully terminated Plaintiff after learning she had sued Defendant under the EPA. (*See id.*).

On June 18, 2024, Plaintiff moved for the Court's leave to file a second amended complaint (Doc. 72 (the "**Amended Motion to Amend**")). Plaintiff attached the proposed second amended complaint (Doc. 72-1 through Doc. 72-16 (the "**proposed SAC**")) to the Amended Motion to Amend for the Court's consideration. (*Id.*). On July 3, 2024, the Court granted Plaintiff leave to file the proposed SAC.[2] (Doc. 80). However, on July 8, 2024, Plaintiff filed a second amended complaint that differed in significant respects from the proposed SAC. (*See* Doc. 81). The next day, Plaintiff filed a "corrected" second amended complaint, which also differed significantly from the proposed SAC. (*See* Doc. 84 (the "**altered SAC**"); *see also* Doc. 84-1 through Doc. 84-21 (exhibits to the altered SAC)).

Ultimately, upon Defendant's request, the Court struck both versions of the second amended complaint that were filed by Plaintiff, finding they had been filed without the Court's leave. (Doc. 132 (the "**Order Striking the SACs**")). However, the Court gave Plaintiff the option of (1) filing the proposed SAC; or (2) filing a renewed motion seeking leave to file the altered SAC. (*Id.*). Plaintiff has chosen the

---

[2] The Court notes that the Amended Motion to Amend was filed after the deadline for amending the pleadings as set forth in the Case Management and Scheduling Order ("**CMSO**"). (Doc. 45, p. 1; Doc. 72). However, Plaintiff had timely filed the first version of this motion and the Amended Motion to Amend was filed as a result of a Court Order. (Docs. 54, 65, 71). Accordingly, the Court treated the Amended Motion to Amend as a timely request to amend the pleadings when ruling thereupon. (Doc. 80).

**APP 463**

latter course, and in the Renewed Motion, seeks leave to file the altered SAC as the operative complaint in this case. (Doc. 133).[3] The Renewed Motion was filed nearly two (2) months after the expiration of the deadline for amending the pleadings as set forth in the CMSO. (Doc. 45, p. 1; Doc. 72; Doc. 133).

## II.   LEGAL STANDARD

When a motion for leave to amend the pleadings is filed after the deadline established by the Court in the CMSO, the movant must first show good cause for the belated request under Federal Rule of Civil Procedure 16(b)(4). *Romero v. Drummond Co.*, 552 F.3d 1303, 1318–19 (11th Cir. 2008) (citing *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)). "To establish good cause, the [movant] must have been diligent." *See id*. at 1319; *see also Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (citation omitted) (noting the good cause standard "precludes modification [of the CMSO] unless the schedule cannot be met despite the diligence of the party seeking the extension.").

---

[3] Because Plaintiff never filed the proposed SAC after the Court granted her Amended Motion to Amend, it never became the operative pleading in this case. (Docs. 81, 84, 132). Nevertheless, in the instant Order, the Court addresses only the *additional, untimely* amendments that Plaintiff made to the proposed SAC, resulting in the altered SAC. There are a myriad of reasons for this choice, including: (1) the Court has already approved of Plaintiff filing the proposed SAC by Court Order; (2) the Court considered that the request to make the amendments contained within the proposed SAC were timely made; (3) in the Order Striking the SACs, the Court did not offer Plaintiff the option of filing the proposed SAC as the operative pleading before moving to amend to file the altered SAC; (4) neither of the parties appear to anticipate a return to the FAC in their briefing on Plaintiff's Renewed Motion; and (5) for the sake of simplicity, given the complex procedural history of Plaintiff's attempts to amend in this case. In any event, under the circumstances, the Court finds good cause for allowing Plaintiff to file the altered SAC in its entirety. (Docs. 80, 132; *see* Docs. 133, 136); FED. R. CIV. P. 16(b)(4).

**APP 464**

Once the movant has established good cause, the Court must consider if the amendment is proper under Federal Rule of Civil Procedure 15. *Romero*, 552 F.3d at 1318–19 (citing *Sosa*, 133 F.3d at 1418). Under Rule 15, the Court shall "freely" grant leave to the parties to amend their pleadings "when justice so requires." FED. R. CIV. P. 15(a)(2). "This standard of liberality is mandated absent any apparent reason to the contrary." *Gropp v. United Airlines, Inc.*, 847 F. Supp. 941, 945 (M.D. Fla. 1994); *see Laurie v. Ala. Ct. of Crim. Appeals*, 256 F.3d 1266, 1274 (11th Cir. 2001). In fact, to deny a motion to amend the complaint, there must be a substantial reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *E.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Laurie*, 256 F.3d at 1274.

## III.   DISCUSSION

Through the Renewed Motion, Plaintiff seeks to add a new party Defendant, Sarah Reiner ("**Ms. Reiner**"), to the case.[4] (*See* Doc. 133-1). She also seeks to add substantial detail regarding Plaintiff's alleged encounter with a disruptive student

---

[4] The proposed SAC had added as party Defendants two attorneys and their law firm (the "**Defendant law firm**") (collectively, the "**law firm Defendants**"), asserting their alleged involvement in Plaintiff's wrongful termination. (Doc. 72-1, ¶¶ 12–15, 190–205). Therein, Plaintiff included two (2) counts against the law firm Defendants: one (1) for conspiracy to interfere with civil rights and another for failure to prevent conspiracy (the "**conspiracy counts**"). (*Id*. ¶¶ 190–205). In the altered SAC, Plaintiff maintains her conspiracy counts against the law firm Defendants. (*See* Doc. 133-1, ¶¶ 191–209). However, Plaintiff newly alleges that Ms. Reiner, who is a partner of the Defendant law firm, is also liable under the conspiracy counts. (*See id*., ¶¶ 14, 16, 191–209).

4

**APP 465**

(the "**student encounter**") and Defendant's investigation regarding the student encounter, which lie at the heart of Plaintiff's claims in this case.[5] (*See e.g.*, *id.* ¶¶ 43, 45, 50–52, 55, 74). Further, the parties seemingly agree that the changes made in the altered SAC cure deficiencies within the proposed SAC. (Doc. 112, pp. 7–8; Doc. 114, pp. 3–4).

In the Renewed Motion, Plaintiff raises a host of arguments in support of good cause for the untimely request to amend. (*See* Doc. 133). Of those arguments, one is worthy of discussion.[6] (*See id.* at p. 9). Plaintiff represents that, after she filed her Amended Motion to Amend with the attached proposed SAC:

> Plaintiff became aware of new facts and a new party with involvement in the allegations of the [altered] SAC. New documents and information had also been unearthed from Plaintiff and Defendant FAMU's interactions in discovery in her case, the proceedings in another case against FAMU brought by another law professor, and Plaintiff's own investigation of the foregoing.

(*Id.* (citation omitted)). Defendant advances two (2) primary arguments in response. (*See* Doc. 136). First, Defendant argues that, in her Renewed Motion, Plaintiff fails to expressly seek a modification of the CMSO's deadlines for amending the pleadings. (*Id.* at p. 4). Second, Defendant argues that Plaintiff has

---

[5]   Plaintiff alleges that the student encounter led to an investigation that Defendant later used as a pretext for terminating her employment. (*E.g.*, Doc. 1-1, ¶¶ 36–77).

[6]   Much of Plaintiff's Renewed Motion is dedicated to venting disagreement with the Court's Order Striking the SACs, which has no bearing on the Renewed Motion, and indeed, would not be appropriate even in the context of a request for reconsideration of that Order. (*See* Doc. 133, pp. 10–11; 14–16); *Madura v. BAC Home Loans Servicing L.P.*, No. 8:11-cv-2511, 2013 WL 4055851, at *2 (M.D. Fla. Aug. 12, 2013) (citation omitted) (explaining that it is wholly inappropriate in a motion for reconsideration to "vent dissatisfaction with the Court's reasoning.").

5

not met the good cause standard because she has not been diligent. (*Id.* at p. 5). To this point, Defendant contends that "failure to comply with a Court's Orders demonstrates a lack of diligence in itself." (*Id.*).

After careful consideration, the Court finds good cause to permit Plaintiff to file the requested amendment despite the expiration of the deadline for doing so. *See* FED. R. CIV. P. 16(b)(4). First, Plaintiff represents that she requests to amend her allegations based upon relevant information she recently obtained through her discovery efforts and her personal investigation in this case. (Doc. 133, p. 9). Essentially, Plaintiff argues that she obtained the information underlying her requested amendment through her diligence. (*See id.*). Defendant fails to meaningfully challenge this point. (*See* Doc. 136). For example, Defendant does not argue that Plaintiff has long known about the information underlying the requested amendment or, conversely, that Plaintiff should have discovered this information sooner. (*See id.*). Instead, Defendant appears to advance a good cause standard that could never be met. (*See id.* at p. 5). The good cause standard that requires an evaluation of a plaintiff's diligence only applies to amendments requested after the deadline for amending has expired. *See* FED. R. CIV. P. 16(b)(4). Yet, Defendant urges that a plaintiff who fails to meet that deadline is *de facto* not diligent. (*See* Doc. 136, p. 5).

However, as Defendant notes in its Response, "[d]iligence means that a party has worked earnestly, steadily, energetically and conscientiously to accomplish their goal." (*Id.* at p. 6 (quoting *Freedman v. Suntrust Banks, Inc.*, No.

6

**APP 467**

6:15-cv-1657-Orl-41TBS, 2016 WL 3196464, at *6 (M.D. Fla. June 9, 2016)). The filings in this case suggest that Plaintiff has been vigorous in her pursuit of discovery. (*See, e.g.*, Doc. 88 (Plaintiff's motion to pierce attorney-client privilege); Doc. 89 (Plaintiff's motion to pierce FERPA confidentiality); Doc. 99 (Plaintiff's motion to take additional depositions and serve additional interrogatories); Doc. 109 (Plaintiff's motion to compel responses to discovery)). This suggests Plaintiff's diligence and supports the notion that there is good cause to extend the CMSO's deadline for amending the pleadings. *See* FED. R. CIV. P. 16(b)(4); *Romero*, 552 F.3d at 1318–19.

Further, Defendant's argument that Plaintiff has not requested an extension of the CMSO's deadline for amending the pleadings also fails. (Doc. 136, p. 4). First, the Renewed Motion does reference that Plaintiff seeks such an extension, albeit in a cursory manner. (*See* Doc. 133, pp. 11, 13, 17). More importantly, Plaintiff correctly cites to the good cause standard, which applies to untimely requests to amend the pleadings. (*Id.* at. pp. 2, 8). Thus, as a result of the foregoing, the Court finds good cause to extend the deadline for amending the pleadings. *See* FED. R. CIV. P. 16(b)(4); *Romero*, 552 F.3d at 1318–19.

The Court additionally finds that Plaintiff's amendment should be permitted under Rule 15's liberal pleading standard. *See* FED. R. CIV. P. 15(a)(2). Simply put, there is no apparent, substantial reason why the amendment should be forbidden. *See Gropp*, 847 F. Supp. at 945; *Foman*, 371 U.S. at 182; *Laurie*, 256 F.3d at 1274. Indeed, Defendant does not raise any arguments to the contrary, and instead relies

**APP 468**

entirely on its argument that Plaintiff has not established good cause. (*See* Doc. 136, p. 6). As a result, Plaintiff's Renewed Motion will be granted.[7]

## IV.   CONCLUSION

Accordingly, it is **ORDERED** as follows:

1.   Plaintiff's Renewed Motion to Amend Complaint (Doc. 133) is **GRANTED**.

2.   Plaintiff shall file her second amended complaint on or before August 20, 2024. Plaintiff is instructed to file *the exact version of the second amended complaint* that was attached to the Renewed Motion to Amend Complaint along with the *exact same exhibits*. (Doc. 133; Doc. 133-1 through Doc. 133-22).

**DONE AND ORDERED** in Orlando, Florida on August 16, 2024.

---

[7] Plaintiff gratuitously asserts in the Renewed Motion that she has "cautioned the Court to avoid delays" and that granting her pending motion for preliminary injunction "is an obvious and straightforward decision, but we have not even been able to reach that." (Doc. 133, p. 16, 16 n.6; *see* Doc. 86). Before concluding, the Court briefly addresses these remarks. A motion for preliminary injunction is an "extraordinary and drastic remedy" that requires the Court to carefully analyze a plaintiff's claims to determine whether the plaintiff has clearly established a likelihood of success on the merits. *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002). The Court found it improvident to address Plaintiff's motion for preliminary injunction—despite Plaintiff labelling it as time-sensitive—until it is clear which of the *five (5) versions* of the allegations that Plaintiff has submitted in this case would ultimately be the operative pleading. (*See* Docs. 1-1, 65-1, 72-1, 81, 84; *see also* Doc. 86). Thus, any perceived delay in the Court ruling on Plaintiff's motion for preliminary injunction is directly attributable to Plaintiff's choices about how to proceed in this matter. (*See, e.g.*, Docs. 37, 54, 65, 71, 72, 80, 81, 82, 84, 86, 132, 133). The Court notes that, following Plaintiff's filing of her amended pleadings pursuant to the instant Order, her motion for preliminary injunction will be ruled upon in due course, with the proviso that the Court has other important matters pending that will have been ready for review long before that motion. (*See* Doc. 86).

APP 469

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

**APP 470**

# 151 - Plaintiff's Corrected Second Amended Complaint

## 08/18/2024

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

JENNIFER SMITH,

     Plaintiff,

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON, individually and in her official capacity; D. DENISE WALLACE, individually and in her official capacity; LATONYA BAKER, individually and in her official capacity; LATRECHA SCOTT, individually and in her official capacity; RICA CALHOUN, individually and in her official capacity; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E. MITCHELL, and SARAH REINER,

     Defendants.

_____

Case No. 6:24-cv-00457-PGB-RMN

## CORRECTED SECOND AMENDED COMPLAINT

Plaintiff, Jennifer Smith ("Professor Smith"), makes the following allegations against Defendants Florida Agricultural & Mechanical University Board of Trustees ("Defendant FAMU" or "FAMU"), Allyson Watson ("Defendant Watson"), D. Denise Wallace ("Defendant Wallace"), Gray Robinson, P.A. ("Defendant Gray Robinson"), Latrecha Scott ("Defendant Scott"), Rica Calhoun ("Defendant Calhoun"), Julie Zolty ("Defendant Zolty"), Sarah Reiner ("Defendant Reiner"), and Richard E. Mitchell ("Defendant Mitchell").

**APP 472**

## **INTRODUCTION**

Over the past decade, school violence against faculty has emerged as a growing concern, with numerous incidents highlighting the vulnerability of educators. Reports indicate a troubling increase in physical assaults, verbal threats, and acts of intimidation directed at teachers and administrative staff.[1] University professors are not exempted from the increasing number of violent acts, intimidation, harassment or threats that students have displayed in recent years.[2]

Amid these growing concerns, on October 20, 2022, an unprovoked and enraged student, then-unknown to Professor Smith, barged into Professor Smith's class in progress to demand that she be allowed to sit to prepare for another class scheduled later that morning. Professor Smith reported the then-unidentified student's conduct to Associate Dean of Students, Reginald Green. Instead of following FAMU Regulations

---

[1] Susan D. McMahon et al., *Violence Against Educators and School Personnel: Crisis During COVID* Technical Report, AMERICAN PSYCHOLOGICAL ASSOCIATION (2022), https://www.apa.org/education-career/k12/violence-educators-technical-report.pdf.

[2] Claudia Lampman, Women Faculty at Risk: U.S. Professors Report on their Experiences with Student Incivility, Bullying, Aggression, and Sexual Attention, 5 NASPA J. ABOUT WOMEN IN HIGHER EDUC. 184, 184 (2012) ("In this study of a random sample of 524 professors . . . from 100 colleges and universities across the United States, 91% reported at least one act of student incivility/bullying, 25% experienced at least one sexual behavior from a student, and 1–2% said a student had used or threatened them with violence in the past year."); Colleen Flaherty, *Shattered: A Professor's Murder at the University of Arizona, Apparently by a Former Student, Raises Urgent Concerns About Campus Safety. He Wasn't the First Professor Killed At Work, Either.*, INSIDE HIGHER ED (Oct. 12, 2022), https://www.insidehighered.com/news/2022/10/13/professors-murder-campus-raises-urgent-safety-questions (detailing several university professors who were killed by students); *see also* Thyrie Bland, *FSW Professor Granted Temporary Restraining Order Against Student*, NEWS-PRESS (Mar. 2, 2018), https://www.news-press.com/story/news/education/2018/03/02/fsw-professor-granted-temporary-restraining-order-against-student/389244002/; Nadine El-Bawab, *UNC Chapel Hill Professor Killed in Office was Shot 7 Times, Medical Examiner Says*, ABC NEWS (Oct. 6, 2023), https://abcnews.go.com/US/unc-chapel-hill-professor-killed-office-shot-7/story?id=103780698.

and forwarding the reported complaint to FAMU's Compliance & Ethics department or investigating the complaint pursuant to the Florida A&M University College of Law's Student Code of Conduct, Associate Dean Green did nothing, not even preserve the video surveillance footage of the incident. Nearly 100 days passed since the student encounter, still FAMU had not acted. It was not until shortly after Professor Smith submitted a response to the U.S. Equal Employment Opportunity Commission's ("EEOC") investigation of equal pay allegations that FAMU initiated a retaliatory investigation targeting only Professor Smith for the student's intrusion. This employment discrimination and civil rights case was initially centered on a retaliatory investigation precipitated by Professor Smith's campaign for equal pay for women at the FAMU College of Law. Finding the enraged student's version of the classroom encounter completely baseless, FAMU independently manufactured a claim of retaliation to fabricate cause to terminate Professor Smith. This unlawful termination and blatant retaliation implicate several contractual and previously unpled civil rights issues transforming this case into a much more serious action, requiring judicial intervention.

Professor Smith asserts the following allegations upon information, belief, and investigation of counsel:

3

**APP 474**

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 1343. Jurisdiction is also based on federal questions under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the First and Fourteenth Amendments to the U.S. Constitution, and 42. U.S.C. § § 1983, 1985 and 1986.

2.      Venue is proper in this district under 28 U.S.C. § 1441 because Defendant FAMU removed from the Ninth Judicial Circuit Court in and for Orange County, and the Orlando Division of the Middle District of Florida is the "district court of the United States for the district and division embracing the place where such action [wa]s pending." Moreover, the locus of operative facts and many of the witnesses and parties are located or operate in this district consistent with the command of § 1391.

## ADMINISTRATIVE PREREQUISITES

3.      All conditions precedent to bringing this action have occurred.

## PARTIES

4.      Professor Smith is a woman, United States citizen, and resident of Orange County, Florida.

5.      Defendant FAMU is a state university within the Florida state university system headquartered in Tallahassee, Florida. Defendant FAMU operates a law school in Orlando, Florida (the "College of Law" or "COL").

6.      Defendant Watson is the Provost and Vice President for Academic Affairs

4

**APP 475**

at FAMU. Defendant Watson is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

7. Defendant Wallace is the General Counsel of FAMU. Defendant Wallace is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

8. Defendant Baker is the Director of Compliance and Chief Privacy Officer for FAMU. Defendant Baker is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

9. Defendant Scott is the Director of Equal Opportunity Programs (EOP) for FAMU. Defendant Scott is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

10. Defendant Calhoun is the Chief Compliance & Ethics officer for FAMU. Defendant Calhoun is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

11. Defendants Watson, Wallace, Baker, Scott, and Calhoun are collectively referred to as the "University Employee Defendants."

APP 476

12. Defendant Mitchell is of counsel for Gray Robinson and serves as outside counsel to FAMU.

13. Defendant Zolty is an associate attorney with Gray Robinson and serves as outside counsel to FAMU.

14. Defendant Sarah Reiner is a partner with Gray Robinson and is outside counsel to FAMU.

15. Defendant Gray Robinson is a Florida law firm that serves clients nationally from 15 offices across Florida and Washington, D.C.

16. Defendants Mitchell, Zolty, Reiner and Gray Robinson are collectively referred to as the "Gray Robinson Defendants."

## GENERAL ALLEGATIONS

17. Professor Smith was employed by FAMU from 2004 up through and including at least April 2024 when she received monies from FAMU, and she had an exemplary record of service.

18. In May 2004, Professor Smith started working voluntarily for Defendant FAMU at the COL based on a fulfilled promise by then-Dean Percy Luney that she would be paid in the future for her efforts in establishing the law clinics at the new law school. Her official start date as a law professor was August 8, 2004. (Ex. 21)

19. Professor Smith performed the duties of a law professor, which include teaching, scholarship and service, and she was subject to the direction and control of

6

**APP 477**

Defendant FAMU at all times relevant to this litigation. (Ex. 9)

20.    Defendant FAMU has neither changed the duties and responsibilities of law professors, nor the skill or expertise required of law professors from 2004 to date. Professors at the COL perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all professors at the law school, irrespective of subject matter.  (Exs. 4 (Pernell Depo), 9).

21.    Defendant FAMU does not use subject matter "specialists" to classify law professors or change job descriptions as Defendant FAMU had misrepresented to the EEOC on December 12, 2022 (Ex. 18, p. 6), but later admitted on May 5, 2023. (Ex. 1, p. 3)

22.    Defendant FAMU has neither employed nor maintained any logical or consistent approach in assigning law professors to teach courses.

23.    Professor Smith was a tenured full professor from 2016 until her unlawful, purported termination.

24.    On August 16, 2013, then Dean Pernell, Professor Smith's immediate supervisor, evaluated her in her duties as excellent in teaching, scholarship and service for the 2012-13 academic year. (Ex. 21)

25.    In May 2014 for the year 2013-14, then Dean Pernell evaluated Professor Smith in her duties as excellent in teaching, scholarship and service for the 2013-14

7

academic year. (Ex. 21)

26.    Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported that to BOT board members at a meeting with the faculty at the College of Law.

27.    In 2015 after Professor Smith sued for equal pay, Defendant FAMU recognized there was gender inequity of up to $20k in its law faculty salaries in "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," prepared by the Florida A&M University Office of Institutional Research (August 2015) (Ex. 2), which found that for tenured full professors:

    a)  Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (p. 3)

    b)  The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (p. 10)

    c)  Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (p. 13)

8

**APP 479**

**EQUAL PAY ALLEGATIONS**

28. In 2016, Defendant FAMU informally or formally created a "lockstep" salary structure whereby associate professors were set at a base salary of $120,000 and full professors were set at a base salary of $140,000, subject to nominal increases based on that person's year at the particular rank, tenure status, and years tenured. (Ex. 12)

29. On August 9, 2021, Defendant FAMU hired Ewanrinareto "Areto" Imoukhuede ("Comparator"), a male professor to the same or similar position as Professor Smith – tenured full professor at the College of Law. Comparator has the same core and essential duties, which are teaching, scholarship and service. (Ex. 9, pp. 49, 52-53)

30. Professor Smith and Comparator performed substantially equal work in terms of skill, effort, and responsibility, under similar working conditions as tenured law professors at the COL. (Ex. 4; Ex. 9, pp. 49, 52-53)

31. Despite performing substantially equal work, Defendant FAMU paid Professor Smith nearly $25,000.00 less than Comparator for performing the same or similar job duties when Professor Smith has ten years more legal experience than Comparator.

32. Comparator's pay at the time he was hired is about $25,000.00 greater than the 2016 "lockstep" structure.

33. The increased pay that Comparator received and receives has not been

9

APP 480

based on superior skill, education, or experience or any other legitimate factor.

34.     The Fair Labor Standards Act, as amended by the Equal Pay Act ("EPA"), 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

35.     Defendant FAMU has discriminated against Professor Smith on the basis of sex by paying her a lower wage rate than Comparator for equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions, in violation of the Equal Pay Act.

36.     Defendant FAMU violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

37.     As a result of Defendant FAMU's unlawful conduct, Professor Smith has suffered lost compensation and other damages, and is entitled to attorney's fees and costs.

## SPECIFIC ALLEGATIONS

38.     On May 9, 2022, Professor Smith emailed the president of FAMU, Dr. Larry Robinson, about the disparity in pay between her and Comparator. Given the history of litigation and the media attention it garnered,[3] resulting in FAMU's 2015

---

[3]Professor Files Gender-Discrimination Suit Against FAMU, https://www.tallahassee.com/story/news/local/2014/08/07/professor-files-suit-against-famu-college-of-law/13725423/.

salary Study (Ex. 2),[4] Professor Smith reasonably believed that notifying the FAMU President that women were still underpaid at the law school would invoke swift change.

39.     On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant FAMU's Equal Opportunity Program ("EOP").

40.     On September 22, 2022, Defendant FAMU's EOP department sent its investigative report to Professor Smith (2022-FAMU-F-05-005), denying any pay inequities without any rationale for paying the Comparator more than Professor Smith. From this point, Defendant FAMU and University Employee Defendants began a campaign of retaliatory acts based on Professor Smith's statutorily protected activity.

41.     On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

42.     October 20, 2022, at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an incensed, entitled and unidentified female student, later identified as Michelle Wanamaker ("MW"), whose is now known as Michelle Sadiki. Professor Smith regularly reported conduct violations to Green via text message because she chaired the Student Conduct & Disciplinary Committee for several years, and Green was a member of the Committee as Associate Dean of Students.

---

[4] "The study was conducted at the request of the university's Provost, and in response to recently raised concerns about potential salary inequities within the college." (Ex. 2, p. 2).

43.     Professor Smith reported, in a text message to Reginald Green immediately after the incident, that MW displayed deliberate, aggressive, and confrontational behavior toward Professor Smith. Professor Smith specifically described MW as "so rude" and "aggressively rude," because MW barged into an ongoing class session that she was not enrolled in, despite MW being fully aware that the classroom was in use by Professor Smith as there was  a crowd of over 40 students gathered in the hallway, respectfully waiting for permission to enter. MW confirmed she knew Professor Smith's class was in session when MW alleged in a facially baseless complaint she filed against Professor Smith a week later that stated:

> MW was "visibly and audibly upset about [her] inability to enter [the] class and adequately prepare for lecture… [MW] was anxious to enter [the] classroom… Professor Smith was on notice that **[students in the hallway] were anxiously awaiting entrance to prepare for our class**… [Professor Smith's] adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor [Maritza] Reyes' Evidence class.

(Ex. 6, p. 24) (emphasis added).

44.     Notwithstanding a hallway full of her classmates, MW deliberately and intentionally entered the classroom through the **back door** and declared that her professor told her that she needed to sit down to get ready for the next class starting at 10:30am.

45.      After being instructed to leave by Professor Smith, MW became even more furious and positioned herself outside the **front door** of the classroom, awaiting an

**APP 483**

opportunity to re-confront Professor Smith about Professor Smith using the classroom, which Professor Smith had reserved a few weeks earlier for a make-up class. (Ex. 3) Professor Smith had never encountered or seen MW before this occurrence at the law school and had no idea who this unhinged person was. Yet a week after the incident and unbeknownst to Professor Smith, MW filed a complaint against Professor Smith in which MW blatantly and falsely mischaracterized her encounter with Professor Smith, shamelessly and recklessley distorting the truth so that MW would evade liability:

> I am utterly sickened and discouraged by this violent encounter within the walls of our law school Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence.

46. On November 1, 2022, Professor Smith went to follow up on the October 20, 2022 complaint she filed against MW by visiting Associate Dean Green's office. Professor Smith was told by his assistant, Teresa Pissini, that Associate Dean Green was on vacation, so his assistant emailed Professor Smith acknowledging Professor Smith's visit and said that she would let Associate Dean Green know.

47. Classes ended for the semester 17 days later on November 18, 2022.

48. Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW

13

**APP 484**

did not know that she was clerking for the firm where Professor Smith had been a partner. So, on December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities and job security with the firm:

*Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*

*Best,*

*Prof. Smith*

49.     MW did not respond and later she claimed Professor Smith's email was sent to intimidate her. (Ex. 6, p. 33)

50.     Professor Smith heard nothing else from Associate Dean Green, so she believed Defendant FAMU believed her complaint was not investigation-worthy. However, within days of learning of the complaint, Associate Dean Green had been copied on an email from then-Provost Maurice Edington to Defendant Scott (EOP) for her to "please review and take appropriate action." (Ex. 6, pp. 28-29). Despite specific and immediate obligations and procedures that state universities must follow when a student alleges violent behavior against a faculty member guided by state laws, federal laws, and university policies, Defendant FAMU did nothing for over three months.

51.     According to Defendant Baker, Associate Dean Green violated FAMU Regulations by failing to send Professor Smith's complaint to FAMU's Compliance

14

**APP 485**

Department ("Compliance") to be investigated. (Ex. 5) Thus, the Compliance report dated June 5, 2023, recommended that Provost Watson and Dean Keller "[c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices." (Ex. 6, p. 36)

52. Associate Dean Green also failed to follow the College of Law's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations, which he normally did when Professor Smith sent him texts or emails as chair of the Student Disciplinary & Conduct Committee. (Exs. 9, 10) To cover his violation of FAMU Regulations and COL Codes of Conduct, Associate Dean Green later changed his testimony in the middle of the Compliance investigation. Initially, Green stated, on the date of the incident, that he would "try and identify the student tomorrow… feel free to send me an email detailing the interaction … Thanks for the notification." (Ex. 5) Then acknowledged in an email to Professor Smith on February 1, 2023 that he indeed did consider her text about the incident a complaint requiring an investigation. (Ex. 5) "In a subsequent [undated but seems to be after March 13, 2023] statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint." (Ex. 6, pp. 28-29, 34)

53. To Professor Smith's surprise and merely 16 days after she submitted her rebuttal to the EEOC concerning Defendant FAMU's position statement on equal pay, which admitted that Professor Smith was underpaid, Professor Smith learned that

APP 486

Defendant FAMU had begun an investigation in which she was the subject of the investigation. (Exs. 19, 20)

54.     On January 26, 2023, nearly 100 days after Professor Smith initially reported the MW incident, Defendant FAMU contacted Professor Smith to begin an investigation into the MW incident because of Professor Smith's protected activity in seeking equal pay. But even more surprising, Defendant FAMU's investigation made Professor Smith the target, even though Defendant FAMU had assured Professor Smith it would look into the incident based on her complaint by text to Associate Dean Green.

55.     Defendant Baker was secretive about the details of the investigation, so Professor Smith emailed Defendant Wallace, FAMU's General Counsel. Finally, on January 27, 2023, Professor Smith first learned that the complaint filed against her was made by MW; that MW's claims of violations of university policy, if substantiated, were severe enough to warrant Professor Smith's termination; and that the allegations supporting those claims were blatantly and obviously false. Yet, Associate Dean Cooper received MW's complaint on October 25, 2022, knew of the atrocious allegations (involving claims of "hostile environment and fear", which Defendant FAMU as an educational institution must immediately address, but did not), and forwarded MW's complaint to EOP on October 26, 2022. On November 2, 2022, Cooper emailed MW to let her know that someone in EOP would reach out to her – one day after Professor Smith had gone to Associate Dean Green's office to further discuss her complaint against MW.

16

**APP 487**

(Ex. 6, pp. 28-30) Still, Defendant FAMU had done nothing about the incident, which timing concerned Professor Smith. (Ex. 20)

56.     By suddenly reviving MW's stale and delayed complaint, Defendant FAMU failed to request or preserve key surveillance video evidence, delayed requesting the surveillance video for 104 days (from October 20, 2022 to January 31, 2023) to destroy key evidence that would have immediately exonerated Professor Smith, failed to follow its own Code of Conduct and Regulations and state and federal law requiring an investigation, failed to investigate Professor Smith's complaint against the student, and intentionally disregarded evidence supporting Professor Smith's allegations of deliberate hostile and disruptive conduct by MW. These failures demonstrate that the true motivation for the investigation was not the student's reported concern but rather to strike back at Professor Smith for her EEOC activity. Associate Dean Green's email confirms this because, despite the blatant falsities and implausibilities within the student complaint that, if Defendant FAMU believed, it was obligated to investigate immediately under state law, federal law and FAMU Regulations. FAMU nevertheless decided to proceed with a facially meritless complaint to use it as pretext to terminate Professor Smith, in retaliation for her protected activity.

57.     Defendant FAMU then carried on a clearly unwarranted investigation from January 26, 2023 until June 5, 2023, ultimately finding all of MW's allegations to be absolutely meritless. FAMU also independently manufactured a finding of retaliation,

which was subterfuge to create a false disciplinary record against Professor Smith and to punish her for again seeking equal pay.

58. MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith, interrupted and disrupted her class, then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was or the cause of MW's unprovoked hostility.

59. On February 15, 2023, another FAMU law professor, Maritza Reyes sent an email providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Professor Reyes stated that MW entered Professor Smith's class that day to "remind [Professor Smith] that [Reyes] was about to start class in the classroom where [Professor Smith was] conducting one-on-one sessions with students from [her] civil procedure course. [Professor Smith was] not supposed to be in that classroom where [Reyes] was going to start class in a few minutes. [Professor Smith was] assigned to teach civil procedure in the classroom next door, yet [she] chose to remain in the classroom where [Reyes] was due to start teaching evidence to disrupt [Reyes'] class, which [Professor Smith] did."

60. It became clear from this email that MW knew Professor Smith was in the classroom; that MW deliberately disrupted [Professor Smith's] class (Ex. 6, p. 24); and that MW was the admitted instigator both times she ambushed Professor Smith on

18

**APP 489**

October 20, 2022.

61.     Furthermore, Professor Smith was in her classroom next door to teach civil procedure at 10:30am, and thus could not have disrupted Professor Reyes' class, which started at 10:30am.

62.     Professor Reyes was late to class that day, so she could not have possibly observed the incident to write such a detailed email. Professor Smith had reserved the particular classroom through all the proper channels at the COL to use on October 20, 2022 until 10:30am. (Ex. 3)

63.     On February 20, 2023, Defendant Scott emailed Professor Smith to inform her that Professor Reyes filed a complaint against Professor Smith and that FAMU EOP was opening an investigation. Not only was that false, but Scott had requested Professor Reyes to file a complaint against Professor Smith, which Professor Reyes declined to do, and Defendant Scott encouraged Professor Smith to do the same against Professor Reyes.

64.     On March 9, 2023, Professor Smith re-filed her original complaint that she had initially texted to Associate Dean Green on October 20, 2022, but this time Professor Smith followed the process Green did not, and she submitted it via the Compliance hotline. Professor Smith did so because she was advised that her original complaint was not properly submitted by Associate Dean Green to Compliance per FAMU Regulations.

65.     On March 10, 2023, the Compliance department immediately deleted

Professor Smith's resubmission. Defendant Baker then emailed Professor Smith, stating that Compliance's report would include her statement about the October 20, 2022 incident in the ongoing investigation. However, Defendant Baker's email did not address Professor Smith's complaint reported on October 20, 2022, predating the student's complaint, and instead the student's complaint was the only focus of the investigation.

66.     On March 10, 2023, Professor Smith tried to gain clarity by email that Defendant FAMU would be investigating her October 20, 2022 complaint as well as MW's October 27, 2022 complaint.

67.     To date, Defendant FAMU has not investigated Professor Smith's October 20, 2022 complaint as it is completely ignored in the final reports and in the two notices of termination, despite the serious concerning allegations Professor Smith made against MW, a student.

68.     On March 13, 2023, Compliance wrote an email and asked the law school leadership to meet with Professor Smith concerning the March 9, 2023 re-submission of her complaint, which Compliance claimed was a new filing of a complaint. Surprisingly, this was the same time that Associate Dean Green submitted a statement that he never considered Professor Smith's October 20, 2022 text to him about the MW incident as a complaint, and he doubled down on this in a subsequent and undated statement.

69.     On March 23, 2023, Professor Smith, then-dean Deidre Keller, and Associate Dean Cooper had a short meeting sometime thereafter. During that meeting,

20

Keller expressed her confusion on what Compliance wanted, and Associate Dean Cooper sat quietly as though she knew nothing.

70. The investigation was conducted with undue and unreasonable delay, and extended over 130 days from January 26, 2023 to June 5, 2023 to cause needless stress to Professor Smith. The investigation found every allegation made by MW to be meritless.

71. Following the investigation precipitated by Professor Smith's protected activity, Defendant FAMU then independently manufactured a retaliation finding against Professor Smith to discredit Professor Smith's legitimate complaints against MW, protect Defendant FAMU from potential liability, and retaliate against Professor Smith for her equal pay allegations, which is what was the trigger to revive the initial investigation.

72. Then, Defendant FAMU recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report"). Defendant FAMU had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done; thus duplicating the penalty for the same alleged retaliation. But Professor Smith did not hear from the University again on this matter until December 5, 2023 when she was notified of her impending termination.

73. Professor Smith did not receive anything tangible or written defining

21

**APP 492**

retaliation, and "retaliation" is not defined in any FAMU Regulations. When asked for the source of the definition of retaliation and how Professor Smith's actions identified in the December 5, 2023 Notice of Termination met that definition, FAMU revealed for the first time, in litigation and by way of discovery, that "[t]he University uses the ordinary meaning of the term and the letter speaks for itself." (Ex. 13, FAMU Interrogatory Answers May 23, 2024, #13) Defendant FAMU could not answer how Professor Smith's actions could have resulted in her termination under Defendant FAMU's undefined term, "retaliation," because her actions do not meet any definition of "retaliation," and her termination was pretext for her relentless pursuit of equal pay.

74.     On April 12, 2023, Professor Smith signed her next school term's employment contract listing the appointment dates from August 7, 2023 to May 10, 2024. (Ex. 8) However, and because Professor Smith has tenure, the signing of a contract is merely ceremonial as the contract itself provides that:

> This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated… Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

Thus, for tenure holding faculty as Professor Smith was, FAMU and Professor Smith had contractual obligations to follow FAMU Regulations, which provide for *inter alia*

22

**APP 493**

tenure protections that established her annual entitlement to a renewed contract.

75. On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the Defendant Baker via email to inquire about the progress of the investigation. In response, Defendant Baker stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of any complaint by Defendant FAMU for nearly 100 days further compounded the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, caused significant distress.

76. On April 30, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

77. On June 5, 2023, Compliance finally emailed the report from the investigation to Professor Smith. Professor Smith assumed the investigation ended at this time as per Defendant Baker. However, Defendant FAMU was still clandestinely dragging the investigation on and keeping the investigation open so that it could use this investigation pretextually against Professor Smith with post-hoc and manufactured misconduct down the road – which is exactly what happened and has prompted revisions to her pleadings.

78. Defendant FAMU failed to follow its own procedures (Code of Conduct),

23

APP 494

including FAMU Code of Conduct 1.019 (18b), which states: "Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the FAMU Compliance and Ethics Hotline." Defendant FAMU did not follow this then blamed Professor Smith. Professor Smith reported a complaint to a supervising dean, Associate Dean Green, on October 20, 2022. Pursuant to this regulation, he was responsible for reporting her complaint to Compliance. Instead, Associate Dean Green told Professor Smith he would investigate her complaint then later told Compliance that he did not take Professor Smith's complaint as a real complaint. Thus, when Professor Smith properly **re-filed** her original October 20, 2022 complaint to the Compliance hotline in March 2023, Defendant FAMU then accused Professor Smith of retaliating against the student for the filing of a **first-time** complaint in its June 5, 2023 report.[5]

79.     Furthermore, FAMU Regulations conflict with the COL's Student Code of Conduct, which was evidenced by the recommendation of the June 5, 2023 report (Ex. 6, p. 36), stating: "Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices."

80.     Defendant FAMU failed to maintain the confidentiality of the investigation,

---

[5] FAMU Regulations also provide faculty with rights to report violations of the University code of conduct. Defendant FAMU also violated this guarantee by failing to ever address Professor Smith's complaint against MW.

24

thereby exposing Professor Smith's protected activity and the details of her complaint to other employees including Professor Reyes. As further evidence of the breach or complete lack of confidentiality, Defendant Scott lied to Professor Smith by stating Professor Reyes had filed a complaint against Professor Smith. Defendant Scott did so because she was manufacturing a negative disciplinary record on Professor Smith and laying the foundation to say a "rivalry" existed amongst Professors Smith and Reyes to later use down the line and pretextually for Professor Smith's termination, which Defendant FAMU did as explained in more detail below.

81. On June 12, 2023, Professor Smith sent a memorandum addressed to Defendant Calhoun (Compliance), Defendant Wallace (General Counsel), and Craig Reed (BOT) and copied to Defendant Waston (Provost) about the retaliatory actions of Defendant FAMU, and Professor Smith demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. Professor Smith never received a response from Defendant FAMU or the University Employee Defendants regarding her memorandum nor any of her demands. (Ex. 11)

82. On June 13, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

25

**APP 496**

83.     Not even one month after supplementing her EEOC complaint, on July 6, 2023, Defendants Baker and Calhoun (Compliance) authored a "secret" supplemental report on the investigation and copied Defendant Scott (EOP), the person who Professor Smith had filed her informal equal pay complaint to in 2022. (Ex. 6, p. 37) The secret report also copied Defendant Watson, Defendant Wallace, and others. Defendants Baker and Calhoun did not send a copy to Professor Smith. Importantly, the secret report maintained only the independently manufactured finding of retaliation without finding any new violations of FAMU policy, though the FAMU departments purported to manufacture others by evaluating and considering other university policies, previously unconsidered, that existed at the time of the initial investigation, but the report ultimately concluded that nothing rose "to the level of a policy violation." (Ex. 6, p. 40)

84.     Professor Smith assumed that the investigation ended with the June 5, 2023 report from Compliance, but unbeknownst to her, Defendant FAMU and the University Employee Defendants were secretly engaged in a continual retaliation campaign against Professor Smith.

85.     Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

86.     On October 5, 2023, Professor Smith sent a memorandum to Compliance concerning MW's continued fixation on Professor Smith and relentless obsession with ruining Professor Smith's reputation. Professor Smith stated that she was "increasingly

26

**APP 497**

uneasy about a student [MW] who remains severely fixated on an incident that transpired nearly a year ago. [MW], a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior of towards Professor Broussard (one my witnesses regarding the incident), who knew the student before the incident." (Ex. 6, p. 57) Professor Smith clarified that through the memo she "wish[ed] to formally express [her] concern regarding MW's persistent and unsettling behavior towards [Professor Smith]" citing post-March 2023 incidents of MW's fixation with Professor Smith. Professor Smith did not submit said concern through the hotline portal or any other reporting authority.

87.     While Professor Smith's October 5, 2023 memo indicated she believed she was obligated to report MW to The Florida Bar, Professor Smith neither indicated that she planned to nor that she had already followed through on the actions. (Ex. 6, p. 56)

88.     Neither Defendant FAMU nor the University Employee Defendants responded to the October 5 memo.

89.     On October 12, 2023, Defendant FAMU notified Professor Smith that she received "a three (3%) percent performance-based increase," which was the highest increase that any employee could receive.

90.     On October 17, 2023, Professor Smith filed her equal pay and retaliation

complaint in state court, but she did not attempt to serve Defendant FAMU until 2024.

91.     On November 13, 2023, Professor Reyes, who had an active lawsuit against Defendant FAMU (*Reyes v. FAMU*, No.: 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022)), notified the Gray Defendants of Professor Smith's complaint in Professor Reyes' federal court filing entitled, "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike" on page 12.

92.     Defendants then began the process to terminate Professor Smith.

93.     Specifically, on or around November 13, 2023, the Gray Defendants contacted Defendant Wallace and informed her of Professor Smith's unserved lawsuit raising equal pay and constitutional rights violations. Defendant FAMU did not retain the Gray Defendants at this time.

94.     The Gray Defendants did not advise Defendant Wallace not to act in response to the information they had given her. Nor have they attempted to stop or mitigate Defendant Wallace's conduct.

95.     At all relevant times, the Gray Defendants were aware Professor Smith's unserved complaint concerned equal pay, women's rights, and constitutional rights issues.

96.     The Gray Defendants are seasoned lawyers and based on their skill, expertise, and experience knew or should have known that Defendant Wallace would

**APP 499**

act or in fact that she planned to act on the information told to her. Accordingly, the Gray Defendants and Defendant Wallace entered a formal or informal agreement to carry out Professor Smith's termination based on her equal pay lawsuit in violation of federal statutory and constitutional law.

97.    Sometime shortly after learning of Professor Smith's lawsuit, Defendant Wallace met separately or together with Defendants Watson, Scott, Calhoun, and Baker. During those meetings and communication, Defendant Wallace informally or formally spearheaded, encouraged, and commanded Defendant Watson and the remaining University Employee Defendants to support Professor Smith's termination.

98.    The University Employee Defendants each complied and independently agreed to carry out Defendant Wallace's plan for Professor Smith's termination.

99.    Specifically, Defendants Baker, Calhoun, and Scott gathered documents and submitted materials in support of Professor Smith's termination.

100.    Defendants Baker, Calhoun, and Scott also compiled and arranged materials to fabricate a rivalry between Professors Smith and Reyes, without realizing Professor Smith had recommended Professor Reyes to FAMU COL for hire in 2009, even knowing Reyes had underperformed in her short stint at the law firm where they both had worked years prior because Professor Smith believed Reyes may thrive in a different work environment.

101.    Defendant Watson specifically met with, continued to consult, and acted

29

APP 500

alongside Defendants Baker, Calhoun, and Scott to serve as the cat's paw for Defendant Wallace from November 13, 2023 to date about Professor Smith's termination.

102. Then, on December 5, 2023, Defendant Watson acted on Defendant Wallace's encouragement, command, or suggestion, and Watson emailed Professor Smith a notice of intent to terminate her that would become effective on January 19, 2024 and that provided limited procedures for a hearing/conference on January 11, 2024. (Ex. 6) Defendant FAMU through Defendant Watson emailed this notice to Professor Smith on December 5, 2023 based on an alleged memorandum she wrote on October 5, 2023, describing her continued personal safety concerns with a student who continued to demonstrate unsettling, irregular and suspect behavior toward Professor Smith, even though FAMU Defendant rewarded Professor Smith with the highest salary performance-based salary increase on October 12, 2023. Defendant FAMU's purported reason for terminating Professor Smith is a sham and subterfuge for the real reason – Professor Smith's protected conduct alleged herein.

103. Defendant FAMU has not terminated any male law professor (such as Professors Ronald Griffin, Jeremy Levitt, Darryll Jones, Ewanrinareto "Areto" Imoukhuede) for similar or more severe violations of FAMU policies, specifically male professors are irregularly investigated; but when male law professors are investigated, the male professors have been found to have engaged in malfeasance/nonfeasance, including harassing women faculty, female students, and LGBTQIA-identifying

30

**APP 501**

students, being inappropriate with female staff, missing numerous classes and attending classes 20-30 minutes late, but no male faculty have been terminated for that conduct.

104. Spring 2024 classes were set to start on January 8, 2024, so clearly Professor Smith was not expected to teach in the spring semester.

105. At some point shortly between November 17, 2023 and December 5, 2023, Defendant Wallace met with the Gray Defendants to inform them of her decision to terminate Professor Smith. The Gray Defendants neither objected nor attempted to prevent said action.

106. On December 12, 2023, Professor Smith noticed Defendant FAMU for a conference pursuant to Regulation 10.120 (3).

107. Professor Smith also requested any all evidence against her. Defendant FAMU neither provided any additional documents nor withheld any on the basis of confidentiality or a privilege.

108. Between December 12, 2023 and January 11, 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a conference including who to strategically place on that conference panel.

109. The University Employee Defendants eventually settled on three employees, one of which served on the FAMU DRS board alongside Defendant Watson, with the informal or formal assistance, guidance, command or encouragement of

31

Defendant Wallace.

110. On January 11, 2024, a conference took place before a three (3) person panel selected by Provost Watson on ZOOM. The panel members were all lawyers: Bryan Smith, J.D., Associate VP for Student Affairs; Andrea Nelson, Esq., School of Business and Industry; and Patricia West, Esq., FAMU Developmental Research School.

111. At the conclusion of the hearing, Associate Provost Dr. Reginald Perry, who was over the process, indicated that a report would be produced by close of business on January 12, 2024.

112. The panel's report on January 12, 2024 recommended that Defendant FAMU rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough**

32

**APP 503**

**deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**

In conclusion, the diligent efforts of our panel have now been completed.

(emphasis added)

113. However, Dr. Perry did not forward the report to Professor Smith because it did not conclude what any of the Defendants wanted it to conclude – uphold terminating Professor Smith. At some point between the conclusion of the conference on January 11, 2024, Defendant Watson consulted with Defendant Wallace to discuss terminating Professor Smith notwithstanding the conference panel's recommendation. Professor Smith would soon learn, albeit late and in violation of FAMU Regulations, that Provost Watson declined to accept the panel's well-reasoned, unanimous recommendation.

114. On Thursday, January 18, 2024, Professor Smith emailed Dr. Perry because she had not received any notice from FAMU thus far. According to Regulation 10.120(3): "After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision."

115. According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified within five workdays prior to the date the action is effective."

33

**APP 504**

116. According to Regulation 10.120(1), the Defendant FAMU shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) The effective date of the University's proposed final action." This date of the proposed final action in the Defendant's written notice was listed as January 19, 2024.

117. Defendant FAMU missed notifying Professor Smith by January 18, 2024 of its intent to proceed with her termination.

118. At some point shortly between January 12, 2024 and January 23, 2024, Defendant Wallace met with the Gray Defendants to inform them of the decision to uphold Professor Smith's termination. The Gray Defendants neither objected nor attempted to prevent said action.

119. On January 23, 2024 at 4:56 p.m., Professor Smith received an email with notice of Defendant FAMU's intent to terminate her, stating:

> After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023. (Ex. 7)

120. To circumvent missing its notification timeframe by FAMU Regulations,

34

Defendant FAMU admits it changed the effective date of the proposed termination that was in the Notice of Intent to Dismiss from Employment from January 19, 2024 to January 30, 2024. The plain language of FAMU Regulations does not authorize the University to change the effective date.

121. Defendant FAMU then outlined the procedures that Professor Smith should follow to appeal the decision.

122. After Defendant FAMU ignored its panel's recommended finding that Professor Smith did not retaliate and that the termination notice should be rescinded, Professor Smith has and had no reason to believe that she will receive due process in any appeal process. Professor Smith nevertheless continued with her internal appeals so as not to have been considered to consent to the University's decision.

123. On February 28, 2024, Professor Smith emailed her complaint and request for a Step One hearing pursuant to FAMU Regulation 10.206 to Dr. Perry .

124. Soon after, Defendant Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step One hearing, including who to strategically select as the Step One Reviewer.

125. Defendants Wallace and Watson agreed to place Antoneia Roe as the Step One Reviewer to influence and obtain their desired outcome based on Roe's employment history with General Counsel's office as counsel. Defendants Wallace and Watson therefore instructed Roe to contact Professor Smith via the FAMU email account

35

belonging to Professor Smith that Defendant FAMU had shut down shortly prior.

126. On March 13, 2024, Professor Smith inquired to Associate Provost Reginald Perry whether Defendant FAMU intended to move forward with a Step One hearing because she had not heard from Defendant FAMU since she submitted her Step One complaint.

127. At 10:46am on March 13, 2024, Dr. Perry responded to Professor Smith indicating that Defendant FAMU intended to move forward with a Step One hearing.

128. On many occasions between March 11, 2024 and April 12, 2024, the Gray Defendants reached out to, drafted, and consulted with Defendants Wallace and Watson concerning Professor Smith's termination, the status of any internal appeals, and the progress of same. Specifically, the Gray Defendants doctored Wallace's and Watson's declarations to mask the firm and attorneys' unlawful activity. Furthermore, the Gray Defendants argued inconsistent positions to Defendant Watson's declarations, indicating that Defendant Watson has only served as a puppet for Defendant Wallace and the Gray Defendant's unlawful agreement. Even at this point, not one Gray Defendant attempted to prevent or counsel Defendant Wallace against continuing with the unlawful termination.

129. Specifically, the inconsistent reasons for Professor Smith's termination are:

    a. The initial notice from December 5, 2023 states:

        The reason for this employment action is the **substantiated <u>finding of</u>**

36

**retaliation** documented in the FAMU Division of Audit and Compliance Investigative Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your **memo dated October 5, 2023**, also attached and incorporated in this Notice. (Ex. 6) (emphasis added)

b. The Notice of Termination dated January 23, 2024, the University's reason for termination was: "After reviewing all documentation and considering the **totality of circumstances** related to this matter, the University's decision to dismiss you from employment remains in effect." This new rationale is inconsistent with the December 5, 2023 reasons, and FAMU Regulations require that any reasons be "specific." (Ex. 7) (emphasis added)

c. However, on March 25, 2024, Provost Watson stated, under penalty of perjury in her initial declaration, that, "My decision to termination (sic) Ms. Smith's employment was based on her **unprofessional and inappropriate behavior towards students** as articulated in the **Investigative Reports.**" (Ex. 14 filed in Doc 27) (emphasis added)

37

d. Then, on March 25, 2024, The Gray Defendants advanced their own more descriptive version of the above reason for termination in a court filing in "Defendant's Response In Opposition To Plaintiff's Motion For Preliminary Injunction And Supporting Memorandum," stating: "**Defendant's supplemental investigation also found that <u>Plaintiff was unprofessional and inappropriate with students</u> regarding the confrontation between Plaintiff and the student from the original report, and that her <u>rivalry with a fellow College of Law professor was being internalized by students and creating a distraction</u>.**" (Ex. 16, p. 11) **Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, <u>unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor</u>.**[6] (emphasis added)

e. After Professor Smith served a Rule 11 sanctions motion to Gray Defendants on the FAMU Defendant because of the blatantly false first declaration signed by Provost Watson, on March 25, 2024, Provost Watson signed an amended declaration under penalty of perjury date

---

[6] Defense Counsel deposed Professor Reyes from 9:31am to 5:36 pm in May 2024 in her case against Defendant FAMU, and not once did Reyes mention any rivalry between Professor Smith. Instead, Professor Reyes discussed her "interactions with the co-workers" and testified to having issues with almost all the law faculty, and although Reyes repeatedly mentioned another woman faculty with whom she had additional issues, it was not Professor Smith. (Ex. 16)

38

April 11, 2024, stating that, "My decision to terminate Ms. Smith's employment was based on the **substantiated <u>finding of retaliation documented in the Investigative Reports</u>**." (Ex. 15 filed in Doc. 42) (emphasis added)

f. Next, on April 12, 2024, in "Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum," Gray Defendants, trying again to creatively beef up the original rationale for termination, stated allegations clearly inconsistent with the initial reasons for termination and Gray Defendants' original version, "**Plaintiff's employment ended because she <u>retaliated against a student</u> for making a written complaint against her**. … **<u>Plaintiff then filed a retaliatory complaint against the student</u> 'for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application**.'[7] *Id.* This was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* Defendant's supplemental investigation[8] also found that **Plaintiff was**

---

[7] This is written to appear that it is two separate acts, but that is false.

[8] This is the secret report of from dated July 6, 2023 that was intentionally never given to Plaintiff until she saw it in her termination notice in December 2023, but apparently the report was put in her employment file.

**APP 510**

**unprofessional and inappropriate with students** regarding the confrontation between Plaintiff and the student from the original report, and that her **rivalry with a fellow College Law professor was being internalized by students and creating a distraction**."[9] "Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, **unprofessional, and inappropriate with at least one student,** in addition to engaging in a **disruptive 'rivalry'** with another law professor." (emphasis added)

130.  Defendant FAMU's inconsistent and ever-changing reasons and iterations for Professor Smith's termination demonstrate that it has no lawful reason for its conduct.

131.  On March 13, 2024 at 6:02pm, Antoneia Roe finally emailed Professor Smith's personal email with information concerning the Step One hearing to take place on March 15, 2024. March 15, 2024 was one day later than what is required by FAMU Regulation 10.206.

132.  Professor Smith again requested all documents, but only received the same documents already available in Defendant FAMU's notices for her termination. Specifically, on March 13, 2024, Antoneia Roe sent Professor Smith a dropbox link full of documents. Antoneia Roe did not indicate she withheld any documents on the basis

---

[9] See ftnt 6 above.

40

of confidentiality or a privilege.

133. Professor Smith did not have time to research, find, and object to Antoneia Roe's selection as a reviewer until after the Step One hearing that took place on March 15, 2024.

134. The Step One hearing lasted less than 8 minutes, and Antoneia Roe did not ask a single question because she already knew her assignment from the Defendants was to uphold Professor Smith's termination.

135. On March 18, 2024, Professor Smith submitted a draft decision to Antoneia Roe, but that email went unanswered.

136. Between March 15, 2024 and Antoneia Roe's decision, Defendants Watson, Wallace, Baker, Calhoun, and Scott met, spoke with, or otherwise consulted Antoneia Roe regarding Professor Smith's complaint.

137. On April 14, 2024, Antoneia Roe emailed Professor Smith a copy of the five-page Step One decision indicating Professor Smith's termination would be upheld.

138. On April 23, 2024, Professor Smith promptly filed an appeal of the Step One decision and requested a Step Two hearing.

139. Between April 15, 2024 and May 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step Two hearing, including who to strategically select as the Step Two Reviewer.

140. Defendants Wallace and Watson agreed to place Dr. Valencia Matthews as the Step Two Reviewer to influence and obtain their desired outcome based on Matthews' history with Defendant Watson on the Dean's Advisory Council and based on the fact that Matthews is now a direct report to Provost Watson. Overturning Professor Smith's termination requires Dean Matthews, among other things, to find that her immediate supervisor, Defendant Watson violated FAMU Regulations.

141. On May 1, 2024, Reginald Perry notified Professor Smith that Dr. Valencia Matthews would be the Step Two reviewer.

142. On May 2, 2024, Professor Smith objected to Dr. Matthews's selection because Dr. Matthews is a direct report to Defendant Watson.

143. On May 3, 2024, Dr. Perry responded by email indicating that the Provost's Office would consult with the General Counsel: "The Office of the Provost will need to consult with the General Counsel to discuss your request. I will contact you again next week."

144. On May 7, 2024, the U.S. Department of Justice issued Professor Smith a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964.

145. On May 20, 2024, Dr. Perry emailed Professor Smith: "After further review, it has been determined that the University will move forward with the previously selected reviewer. Therefore, Dean Matthews will be in contact with you to arrange for your Step Two meeting."

42

146.   On June 7, 2024, the Step Two hearing was scheduled with Dean Matthews in violation of FAMU Regulation 10.206, which required the Step Two hearing to be scheduled by May 8, 2024. It was scheduled for June 20, 2024, from 2-3pm; the hearing was held then on ZOOM, but no report has issued as of the date of the filing of this Second Amended Complaint. During the step-two meeting, Dr. Matthews consulted either Defendant Wallace or another University Employee Defendant about whether Professor Smith could have a representative give an opening, despite FAMU Regulation permitting same.

147.   After Professor Smith raised concerns about the pay disparity and expressed her intention to exercise her rights under the EPA, Defendant FAMU engaged in a campaign of retaliatory actions against Professor Smith and has continued to do so.

148.   Defendant FAMU's retaliation against Professor Smith includes the adverse employment actions as described above, including the baseless and one-sided investigation of the October 20, 2022 incident with MW, manufacturing conflicting allegations of misconduct to terminate Professor Smith, and ultimately terminating Professor Smith's employment. Since Professor Smith's termination (whenever the parties agree on a date), Defendant FAMU has withheld her salary and completely ignored her concerns about her salary disparities (Ex. 17), back dated her termination to her health insurance carrier so several healthcare claims submitted in the spring are no longer covered and are due and owing, failed to send her tax documents (even upon

43

**APP 514**

request) that she could access as an employee, and eliminated her email access without changing the destination for email notifications about insurance coverage and claims.[10]

149. Defendant FAMU's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3) and the other provisions of federal law as indicated below. Professor Smith is entitled to damages, attorney's fees and costs, and reinstatement to her tenured position as a law professor.

### COUNT I
### DISCRIMINATION IN COMPENSATION
### EQUAL PAY ACT OF 1963, AS INCORPORATED INTO
### THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206, *et seq.*,
### AGAINST DEFENDANT FAMU

150. The Plaintiff realleges paragraphs 1 through 37.

151. Plaintiff belongs to a protected class; she is female.

152. Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator, also a tenured full professor, and were performed under the same or similar working conditions. (Exs. 4, 9)

153. During all relevant periods, Plaintiff received wages lower than the

---

[10] Each action happened at various times, but usually and immediately after Professor Smith noted in a court document that she was still employed because these instances were still in place. Thus, it is highly credible that after this pleading is filed, Defendant FAMU will contact the insurance provider to have her university email replaced with her personal email address.

44

Comparator while performing the same or substantially more work than the Comparator.

154.   Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages because she performed the same or substantially more work than the Comparator and she has more experience than the Comparator. The pay disparity was not based on any legitimate factor such as seniority, merit, or a system measuring earnings by quantity or quality of production.

155.   Defendant FAMU violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs, as described below.

## COUNT II
## RETALIATION
## EQUAL PAY ACT OF 1963, AS INCORPORATED INTO
## THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3),
## AGAINST DEFENDANT FAMU

156.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

157.   Defendant FAMU's retaliatory actions against Plaintiff, as alleged herein, and by its employees acting under of color of law constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

158.   Plaintiff engaged in protected activity by:

a)  Writing to FAMU's president on May 9, 2022 about the pay disparity between her and the male comparator;

**APP 516**

b) Filing an informal gender equity complaint with FAMU's Equal Opportunity Program on June 28, 2022;

c) Filing a Charge of Discrimination with the EEOC under the Equal Pay Act on October 18, 2022 and the subsequent responses/replies/rebuttals to the EEOC in its investigation; and

d) Filing the equal pay lawsuit in state court in October 2023.

After Professor Smith engaged in this protected activity, FAMU took adverse employment actions against her, including:

a) Initiating an unwarranted investigation against her on January 26, 2023, shortly after she submitted a rebuttal to FAMU's position statement on equal pay to the EEOC;

b) Failing to follow proper procedures in the investigation;

c) Issuing a notice of intent to terminate her employment on December 5, 2023;

d) Terminating her; and

e) Upholding the decision to terminate her employment on January 23, 2024, despite a panel's recommendation to rescind the termination.

159.    There is a causal connection between Professor Smith's protected activity and the adverse actions, as evidenced by the timing and sequence of events. The retaliation described herein was based on Plaintiff's exercise of rights protected by law, her resistance and opposition to gender discrimination and harassment and her right to

46

participate in actions calculated to redress grievances. Plaintiff's resistance to unlawful activity was both objectively and subjectively reasonable based on the timing of the Defendants actions and the lack of transparency and fairness throughout the process as explained in more detail above.

160. FAMU's stated reasons for the adverse actions are pretextual, as detailed above. As a result of Defendant FAMU's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled damages, including compensatory and punitive damages.

## COUNT III
## BREACH OF CONTRACT
## AGAINST DEFENDANT FAMU

161. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27, 42-43, 50, 54-59, 70-71, 73-74, 79-80, 86-93, 100,102, 112-121, and 130.

162. Defendant FAMU operates the law school at 201 FAMU LAW Lane, Orlando FL 32801.

163. Each employment contract entered between Plaintiff and Defendant FAMU stated some variation of "Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU." The contract also stated: "This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution

47

and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated." Thus, the COL, the Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, Student Handbook, FAMU Handbook, and FAMU Regulations by way of the individual employment contracts.

164. Defendant FAMU, though the above noted documents, has made unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

165. Plaintiff's employment letter, together with the Faculty Handbook, FAMU Handbook and FAMU Regulations are what forms Plaintiff's employment contract.

166. Defendant FAMU has failed to meet its contractual obligations to Plaintiff because Defendant FAMU did not follow its own procedures as detailed above.

167. As a result of Defendant FAMU's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment and opportunities.

168. Plaintiff seeks damages, including actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant FAMU's wrongful

APP 519

breach of Plaintiff's employment contract, as well as compensatory and punitive damages.

## COUNT IV
## FIRST AMENDMENT RETALIATION
## AGAINST DEFENDANT FAMU

169. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 53-57, 71, 90 through 149.

170. By filing her EEOC and state court complaints for equal pay and speaking on issues of public concern, Plaintiff engaged in constitutionally protected activity. Specifically, it is well known that one litigant often serves as the catalyst for change in civil rights litigation.

171. Following Plaintiff's engagement in the constitutionally protected activity, Defendant FAMU took adverse employment actions against Plaintiff.

172. These adverse employment actions included baseless investigation of Plaintiff, manufacturing false claims to fire Plaintiff, fabricating their definition of just cause without due process of undefined terms, issuing a notice of termination against Plaintiff, and terminating her employment.

173. These adverse employment actions were taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

174. Defendant FAMU's adverse employment actions against Plaintiff, in

49

APP 520

response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

175. Defendant FAMU could not and would not have made the decision to terminate Plaintiff but for her protected activity as evidenced by its inability to provide a clear reason for the adverse action(s) taken against her.

176. Plaintiff has suffered damages as a result of Defendant FAMU's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries, as well as other compensatory damages and punitive damages.

**COUNT V**
**REQUEST FOR PRELIMINARY AND**
**PERMANENT INJUNCTIVE RELIEF**
**AGAINST DEFENDANT FAMU**

177. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 149.

178. Defendant FAMU has terminated Plaintiff in violation of her tenure status, employment contract, and because of her pursuit of equal pay.

179. Plaintiff has suffered and will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured. Furthermore, Plaintiff has already suffered considerably

irreparable harm as she has been unable to continue her functions as a legal academician to complete promised law review articles and book projects.

180. "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975); *Zisk v. The Charleston School of Law* (2015).

181. Monetary damages cannot provide sufficient relief or compensation to Plaintiff because the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career. Moreover, Plaintiff cannot be compensated for lost career advancement at the College of Law. *Assaf v. v. University of Texas System,* 399 F. Supp. 1245, 1251 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds*, 435 U.S. 992 (1978) ("Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician…. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money…. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.")

51

182.  Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

183.  Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant FAMU to honor her tenure status and employment contract thus restoring the status quo until this matter is resolved.

## COUNT VI
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
## AS AMENDED, 42 U.S.C. §2000e et seq.
## AGAINST DEFENDANT FAMU

184.  The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 102 through 149.

185.  Plaintiff was employed by Defendant FAMU as a law professor from 2004 to 2024.

186.  On January 31, 2024, Defendant FAMU purported to terminate Plaintiff from her tenured law professor position for an alleged violation of FAMU policy.

187.  During the same 2004 to 2024 time period, male law professors working for Defendant FAMU committed similar or more serious violations of FAMU policy but were either never investigated or not terminated after a finding of having committed the violation.

188.  Defendant FAMU's stated reason for terminating Plaintiff was pretext for unlawful sex discrimination, as evidenced by many things including: the conflicting

52

reasons Counsel has argued to this Court, the decisionmaker-Defendant Watson's conflicting two declarations, and the disparate treatment of Plaintiff compared to similarly situated male law professors who were not terminated for similar or more serious violations.

189. Plaintiff's termination was motivated by her sex and was retaliation for her resistance and opposition to Defendant FAMU's unlawful compensation practices under the Equal Pay Act, which constitutes protected activity under Title VII.

190. By the conduct described above, Defendant FAMU discriminated against Plaintiff on the basis of her sex and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., causing her to suffer damages, including compensatory and punitive damages.

## COUNT VII
### 42 U.S. C. § 1985(3) – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### AGAINST GRAY DEFENDANTS

191. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

192. The Gray Defendants and University Employee Defendants conspired to deprive Plaintiff of her constitutional rights to due process under the Due Process Clause of the U.S. Constitution and freedom against retaliation under the First Amendment, her

statutory right to freedom from discrimination under the EPA and Title VII, her statutory right to freedom from retaliation for exercising rights under the EPA, by agreeing to terminate Plaintiff's tenured employment in retaliation for her filing a lawsuit against Defendant FAMU citing EPA and constitutional claims as a woman professor.

193. The Gray Defendants were not retained in this matter until 2024 and their representation of Defendant FAMU in one legal matter did not cover unrelated litigation.

194. The purpose of the conspiracy was to deprive Plaintiff indirectly or directly of (1) equal privileges including her due process rights as a woman compared to men who have been accused of similar or more serious violations of FAMU policy and (2) equal protection under law as a woman. The conspiracy was motivated by a discriminatory animus against Plaintiff based on her gender and her engagement in protected activities, including her protected activity under the Equal Pay Act.

195. The Gray Defendants' overt acts are detailed above but include their informing Defendant Wallace of Plaintiff's unserved lawsuit alleging EPA violations without any measure to ensure Wallace would not act upon that information. The Gray Defendants' notification caused the remaining Defendants to join in the conspiracy and engage in overt acts in furtherance of the conspiracy, including but not limited to:

> a. Defendants Wallace, Watson, Baker, Scott, and Calhoun met and communicated regularly to discuss and plan Plaintiff's termination in retaliation for her protected activities.

54

**APP 525**

b. Defendants Wallace and Watson instructed other University Employee Defendants to gather and fabricate evidence to support false claims against Plaintiff.

c. Defendants Baker, Scott, and Calhoun prepared and submitted false reports and statements to justify Plaintiff's termination.

d. Gray Defendants advised and facilitated the unlawful actions of the University Employee Defendants, knowing the actions were in retaliation for Plaintiff's protected activities.

The Gray Defendants actions and inactions effectively established their role in the conspiracy as the advisers or consiglieres of the plan to terminate Plaintiff.

196. Defendant Wallace acted upon the Gray Defendants' information, and she informally or formally encouraged, suggested, commanded or facilitated Defendant Watson to terminate Plaintiff in light of the learned information about Plaintiff's lawsuit.

197. As a result of the conspiracy, Plaintiff was deprived of her constitutional rights, including her rights to equal protection and due process, as well as her right to be free from retaliation for exercising her First Amendment rights, and Plaintiff was wrongfully terminated, suffered and continues to suffer irreparable reputational damage, emotional distress, and other losses to her career as a legal academician, including loss of advancement and scholarship opportunities, compensatory and punitive damages.

55

**COUNT VIII**
**42 U.S.C. § 1986 – FAILURE TO PREVENT CONSPIRACY**
**AGAINST GRAY DEFENDANTS**

198.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 90 through 149.

199.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

200.   Plaintiff did not attempt to serve the complaint until 2024.

201.   On or around November 13, 2023, Gray Defendants informed Defendant FAMU via Defendant Wallace about the filed but unserved equal pay state court complaint.

202.   Defendants, having knowledge of the complaint and the potential violation of Plaintiff's rights, conspired to terminate Plaintiff's employment to prevent her from pursuing her equal pay claim.

203.   On December 5, 2023, Plaintiff received a notice of intent to terminate her from her position at the COL, 22 days after the Gray Defendants learned of Plaintiff's equal pay state court complaint.

204.   Gray Defendants had the power to prevent the wrongful termination but neglected and or refused to do so.

56

**APP 527**

205. Gray Defendants had knowledge of the conspiracy to violate Plaintiff's civil rights under 42 U.S.C. § 1985.

206. The Gray Defendants knew or should have known that informing Defendant Wallace about Plaintiff's unserved equal pay complaint would likely result in retaliatory action against Plaintiff, given the ongoing pattern of retaliation alleged in this complaint and having worked with Defendant Wallace.

207. Gray Defendants had the power to prevent the wrongful termination of Plaintiff. As legal counsel for Defendant FAMU, they had the professional responsibility and authority to:

> a. Advise Defendant Wallace and other FAMU officials against taking retaliatory action;
>
> b. Warn FAMU officials about the legal consequences of retaliating against Plaintiff;
>
> c. Refuse to participate in or facilitate any retaliatory actions;
>
> d. Report any planned unlawful actions to appropriate authorities within FAMU or other preventative actions, but neglected or refused to do so.

208. The Gray Defendants' failure to act was not mere negligence, but a willful disregard of their professional and ethical obligations as attorneys.

209. As a direct result of the Gray Defendants' failure to prevent the conspiracy, Plaintiff suffered damages, including compensatory and punitive damages, loss of

57

APP 528

tenure, loss of wages and benefits, damage to her professional reputation, emotional distress and loss of future career opportunities. The Gray Defendants' failure to act was in reckless disregard of Professor Smith's federally protected rights. As experienced attorneys, they knew or should have known that retaliating against an employee for filing an Equal Pay Act lawsuit violates federal law.

## COUNT IX
## SECTION 1983 – CIVIL CONSPIRACY
## AGAINST THE UNIVERSITY EMPLOYEE DEFENDANTS

210. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 38 through 149.

211. On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

212. Plaintiff did not attempt to serve the complaint until 2024.

213. On or around November 13, 2023, Gray Defendants informed Defendant about the filed but unserved complaint.

214. On December 5, 2023, Plaintiff received a notice of termination that she would be terminated from her position at Defendant FAMU, 22 days after the Gray Defendants learned of Plaintiff's state court complaint filing.

215. University Employee Defendants' actions were taken under color of state law or outside the scope of their official duties and deprived Plaintiff of her rights,

58

privileges, or immunities secured by the Constitution and laws of the United States, including her right to free speech, equal protection, and due process under the Fourteenth Amendment.

216. After Defendant Wallace learned of Plaintiff's unserved equal pay lawsuit she regularly and consistently communicated with, encouraged, commanded, suggested and or facilitated Defendants Watson, Baker, Calhoun, and Scott (collectively the University Employee Defendants) to reach an agreement to carry out Plaintiff's termination in retaliation for Smith's lawsuit asserting EPA, first amendment, and procedural due process claims.

217. In addition to the acts mentioned above, Defendants Baker, Calhoun, and Scott specifically acted in furtherance of this conspiracy when they collected written documents from their respective department files, prepared statements, compiled evidence, manufactured evidence, created false narratives, breached confidentiality, falsely represented the end of the investigation, failed to follow FAMU Regulations and policy, shielded documents under the guise of privilege or confidentiality, met with Defendants Watson and Wallace to support the ultimate decision to terminate Plaintiff, and communicated with reviewers in the process of Plaintiff's internal appeals to influence or otherwise suggest she be terminated.

218. In addition to the acts mentioned above, Defendant Watson specifically acted in furtherance of this conspiracy by terminating Plaintiff and upholding the

APP 530

termination after consistently consulting with Defendant Wallace; consulting Defendant Wallace on the predetermination conference panel members and biased Step One and Two reviewers; acting at the instruction of Defendant Watson, involving other FAMU employees and carrying out all other actions mentioned in the above paragraphs.

219. The University Employee Defendants, acting under color of state law as officials and employees of FAMU, deprived Professor Smith of her clearly established constitutional rights, including: Her First Amendment right to free speech and to petition the government for redress of grievances, by retaliating against her for filing complaints about pay discrimination; Her Fourteenth Amendment right to equal protection of the laws, by intentionally discriminating against her on the basis of sex in pay and other employment actions; Her Fourteenth Amendment right to due process, by failing to follow established procedures in investigating complaints and terminating her employment.

220. These University Employee Defendants also acted outside of the scope of their official duties and engaged in deliberate misconduct that violated clearly established rights to be free from retaliation and Plaintiff's constitutional rights by:

- Manufacturing false claims to fire Plaintiff

- Fabricating reasons for termination

- Manipulating internal processes to ensure her termination

- Conspiring to terminate Plaintiff for retaliatory reasons

60

- Deliberately manipulating evidence and processes to justify termination

- Lying to Plaintiff to create faculty controversy

- Failing to adhere to confidentiality

These actions were taken for purely personal reasons and were violations of FAMU regulations, protocols and procedures.

221. As a direct and proximate result of the University Employee Defendants' actions, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and other compensatory damages as well as punitive damages. These Defendants' conduct was willful, wanton, and in reckless disregard of Professor Smith's clearly established constitutional rights, justifying an award of punitive damages to deter such egregious misconduct in the future.

**COUNT X**
**DUE PROCESS IN VIOLATION OF THE**
**U.S. AND FLORIDA CONSTITUTIONS**
**AGAINST DEFENDANT FAMU**

222. The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 27 and 54-62, 67-70, 72-73,79-83, 90, 92, 102 through 149.

223. Plaintiff had a constitutionally protected property interest in her continued employment as a tenured law professor with FAMU.

224. Defendant FAMU deprived Plaintiff of this property interest by terminating her employment. FAMU's termination procedures, as outlined in Regulation 10.120 and

61

others, created a legitimate expectation of due process before termination.

225. In effecting Plaintiff's termination, Defendant FAMU deprived Professor Smith of her due process rights and failed to provide Plaintiff with adequate procedural due process protections, by: a) Employing biased and partial internal complaint reviewers who acted as the cat's paw for Defendants Wallace and Watson, who themselves had knowledge of Plaintiff's pending Equal Pay Act lawsuit, rendering any internal appeal futile and violating Plaintiff's right to an impartial decisionmaker; b) Failing to provide Plaintiff with the definition of "retaliation" used as the basis for her termination, which was vague, arbitrarily applied, and prevented Plaintiff from conforming her conduct, in violation of due process notice requirements; c) Failing to follow its own policies and procedures regarding the timing and appeals process for challenging the termination decision; d) Failing to provide timely notice of their intent to proceed with termination; e) Changing the effective date of termination to circumvent the notification timeframe required by FAMU regulations; and f) Failing to provide Professor Smith with all evidence against her, despite her requests; and others as detailed above.

226. Defendant FAMU's post-deprivation process was constitutionally inadequate to remedy the prejudicial pre-termination violations described above. These actions deprived Professor Smith of a meaningful opportunity to be heard and respond to the allegations against her before termination.

227. The defendants' conduct was arbitrary, capricious, and motivated by retaliation for Professor Smith's protected activities rather than any legitimate reason. As a direct and proximate result of Defendant FAMU's failure to provide adequate procedural due process protections, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and professional standing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a) An order reinstating Plaintiff to her position as a tenured full law professor;

b) An order granting preliminary and permanent injunctive relief;

c) An order declaring that Defendant has violated the Equal Pay Act, including retaliation provisions;

d) An order declaring that Defendant FAMU has violated Title VII;

e) An order declaring that Defendant FAMU has violated the First Amendment and due process clause of the U.S. Constitution;

f) An order removing any negative references to the October 20, 2022 incident from Plaintiff's employment file;

g) An award of unpaid wages and other compensation due to Plaintiff as a result of Defendant's violation of the EPA, including interest;

63

APP 534

h) A declaration that the Gray Defendants' actions violated 42 U.S.C. §§ 1985(3) and 1986 and an award of compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

i) Judgment against the University Employee Defendants for compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

j) Punitive damages, special damages, actual damages and consequential damages;

k) Loss of future employment opportunities;

l) Front pay;

m) Judgment against Defendants and for Plaintiff awarding compensatory damages on all Counts for the Defendants' violations of law enumerated herein;

n) Judgment equalizing Plaintiff's salary with her male Comparator who was paid more for substantially equal work, and permanently enjoining Defendants from future violations of law enumerated herein and remedying all benefits of which Plaintiff has been unlawfully deprived (such as retirement contributions, insurance etc.) of as enumerated herein;

APP 535

o) Restoring sick leave and other benefits;

p) Compensatory damages in the amount of the full pay differential between Plaintiff's salary and the Comparator's salary for the period she was underpaid, representing the appropriate compensation for her 10 years' greater experience performing substantially equal work;

q) An award of liquidated damages in an amount equal to the unpaid wages and compensation due to Plaintiff;

r) Prejudgment interest and post-judgment interest;

s) An award of reasonable attorneys' fees and costs pursuant to the statutory provisions referenced in the complaint, *e.g.:* Equal Pay Act, Title VII, § 1983, § 1985, and § 1986.

t) Any other relief, including equitable relief, this Court deems just and proper.

65

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.


Dated July 9, 2024

      Respectfully submitted,

      */s/ Jennifer Smith*
      Jennifer Smith
      Florida Bar No. 964514
      Law Office of Jennifer Smith
      13506 Summerport Village Pkwy.
      Suite 108
      Windermere, FL 34786
      407-455-0712
      407-442-3023 (f)
      jensmithesq@aol.com

**APP 537**

# 151-1 - FAMU EEOC Interr Resp

## 08/18/2024

APP 538

## DENNIS, JACKSON, MARTIN & FONTELA, P.A.

Craig A. Dennis *
Rogelio J. Fontela
William T. Jackson
Jessica E. Keeler
William Peter Martin ‡
C. Todd Owen
Tiffany Rohan-Williams
Maria A. Santoro *

*Of Counsel*
Teresa C. Ward

‡ Board Certified as a Civil Trial Lawyer
by the Bar
* Certified as a Circuit Mediator by the
Supreme Court of Florida

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

**TALLAHASSEE**
1591 SUMMIT LAKE DRIVE, SUITE 200
TALLAHASSEE, FLORIDA 32317
(850) 422-3345
FAX (850) 422-1325

**JACKSONVILLE**
1300 RIVERPLACE BOULEVARD, SUITE 101
JACKSONVILLE, FL 32256
(904) 683-6686
FAX (904) 619-1369

Cathy E. McMullian
Firm Administrator

Robin B. Campbell
Jessica H. Gallmon
Nikki W. Garrett, FRP
Jennifer C. Kjellerup, ACP, FRP
Julia Lunt
Jessica N. Mauer
Hester H. Pennington
Dina Sadeq
Karen Weimer
Legal Assistants

**REPLY TO TALLAHASSEE**

May 5, 2023

VIA Email: Kelly.Collins.McMurry@eeoc.gov

Kelly Collins-McMurry
Federal Investigator
U.S. Equal Employment Opportunity Commission
Miami District Office
100 S.E. 2nd St., Suite 1500
Miami, Florida 33131

RE: Jennifer Smith v. Florida A&M University College of Law
EEOC Charge No.: 510-2023-00072

Ms. Collins-McMurry:

In response to your Request for Information and Documentation on April 27, 2023, the University and College of Law would respond as follows:

1.  Provide a copy of the position description and pay scale for Full Professor in the College of Law during the relevant period.

    **RESPONSE: There are no position descriptions or pay scales for professors. Each salary is individually negotiated based upon the accomplishments and specialty of each candidate and the needs of the College of Law. Applications for professors at the law school are advertised. Attached is the announcement that was approved by the Faculty Recruitment Committee and Dean of the Law School. This**

**APP 539**

announcement was published, and Professor Areto Imoukhuede (comparator) submitted his application in response. [Exhibit A].

2. Provide a list of ALL Full Professors in the College of Law during the relevant period. Include their name, gender, dates of employment, complete salary history, and resume, if not already provided.

   **RESPONSE: Refer to attached outline of FAMU College of Law Full Professors for 2021 to the present, including gender, date of hire, and salary. [Exhibit B]. Included are the resumes of Patricia A. Broussard, Ann Marie Cavazos, Ronald C. Griffin, William D. Henslee, Areto Imoukhuede, Darryll K. Jones, Deidré A. Keller, Lundy R. Langston, Leroy Pernell, Rhonda Reaves, Omar Saleem, and Jennifer Smith. [Exhibit C].**

3. Supply a statement or documents that describe how your organization determined an individual employee's salary or wage for the Full Professor's job classification during the relevant period, i.e., identify what factors were considered.

   **RESPONSE: The College of Law has a Faculty Recruitment Committee (FRC) that initially makes the recommendation as to the rank of the incoming applicant to the law school, Assistant, Associate or Full Professor. The need for any professor is based upon accreditation standards, core and specialty courses, and the overall need to improve the Bar passage rate of students, among other factors.**

   **The recruitment committee vets each applicant. In addition, each faculty member has the opportunity to participate in the interview process for each applicant and, in accordance with the provisions of the College's Faculty Handbook, to vote upon each applicant's candidacy. The recruitment committee recommends to the Faculty applicants who are determined most acceptable for hiring, tenure and rank. The faculty then votes on that recommendation and advances candidate(s) for the Dean's consideration.**

**APP 540**

**The Dean will consider the experience of the applicant, the years of teaching, the needs of the College of Law, the scholarship done by the applicant and presentations made, whether regionally or nationally.**

4. Provide:

   a. all documents reflecting the minimum and maximum rates of pay for each position;

   b. all documents reflecting the effect of seniority on pay rates, and

   c. all documents reflecting the effect of merit increases or evaluations in the pay rates.

   **RESPONSE: The above statements (a, b, and c) are not applicable to the College of Law since no such designations exist or are used by the University.**

5. Provide a complete list of all Full Professors in the College of Law who are "constitutional law specialists." Include their name, gender, dates of employment, complete salary history, and resume, if not already provided.

   **RESPONSE: There is no term or classification for "constitutional law specialist" at the College of Law. This term was used by the attorney representing the College of Law in the position statement as her own descriptive term to explain the need of the College of Law at the time the vacancy was announced and filled.**

6. Provide the analysis or criteria used to classify Full Professors as a "constitutional law specialist."

   **RESPONSE: There is no term or classification for "constitutional law specialist" at the College of Law. This term was used by the attorney representing the College of Law in the position statement as her own descriptive term.**

**APP 541**

7.  Provide a copy of the male comparator's Spring 2023 teaching schedule, to include all courses taught. Indicate the date he was assigned to teach each course.

    **RESPONSE: Refer to the College of Law Class Enrollment Report for Spring Semester 2023 dated February 20, 2023, with the Claimant and Comparator's courses highlighted. [ Exhibit D].**

Should you have any questions regarding this response to the request for information, or the documents produced herein, please do not hesitate to contact me.

Very truly yours,

Maria A. Santoro

MAS/mjl
Enclosures

**APP 542**

# 151-2 – FAMU COL Equity Study

## 08/18/2024

APP 543

**An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law**

*Prepared by the Florida A&M University Office of Institutional Research*

*August 2015*

APP 544

**Introduction**

This report presents the findings from an analysis of instructional faculty salaries within the Florida Agricultural and Mechanical University (FAMU) College of Law. The study was conducted at the request of the university's Provost, and in response to recently raised concerns about potential salary inequities within the college. This study is not intended to advise on potential salary inequities relating to any specific individual instructional faculty member within the College of Law. Rather, its purpose is to provide insights into potential macro level disparities that may be contributed to by a number of factors. Moreover, it is important to note that salary outliers at either end of the pay spectrum do not necessarily imply systemic discrimination as an array of internal and external factors may contribute to variations in salaries. Some of these factors cannot be modeled, and determinations about their potential impacts require a more in-depth qualitative analysis. These include factors such as faculty performance, prior professional experience and prior salary history, among others (University of Louisville, 2014).

The remainder of this study is organized as follows. In Section 1 we present an overview of instructional faculty and salaries within the College of Law. This is followed in Section 2 by a description of the methodological approach and data used in the statistical analysis. Empirical results from the statistical analysis are presented in Section 3. Finally, in Section 4 we provide a summary of findings and potential next steps that may be helpful to both the university and College of Law's leadership teams in identifying and remedying potential inequities.

**Section 1: Overview of FAMU 2014-15 College of Law Instructional Faculty and Average Salaries**

The study sample for this analysis was comprised of all full-time instructional faculty who were employed in the College of Law during the 2014-2015 academic year. The university's official employee data file reports that forty-two (42) instructional faculty were employed in the FAMU College of Law during the 2014-15 academic year. Table 1 provides a breakdown of all College of Law instructional faculty by rank and gender for the specified time period.

| Table 1: 2014-15 College of Law Instructional Faculty by Rank and Gender | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Rank** | **# Female** | **% All COL Inst. Faculty** | **% of Rank** | **#Male** | **% All COL Inst. Faculty** | **% of Rank** | **Total** |
| **Professor** | 5 | 11.90% | 35.71% | 9 | 21.43% | 64.29% | 14 |
| **Assoc. Professor** | 10 | 23.81% | 71.43% | 4 | 9.52% | 28.57% | 14 |
| **Assistant Professor** | 0 | 0.00% | 0.00% | 1 | 2.38% | 100.00% | 1 |
| **Instructor** | 10 | 23.81% | 76.92% | 3 | 7.14% | 23.08% | 13 |
| **Total** | **25** | 59.52% | 59.52% | **17** | 40.48% | 40.48% | **42** |

**APP 545**

Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. However, the median salary for male College of Law faculty at the rank of Professor exceeded the female median by a smaller margin of $5,008.

| Table 2: College of Law Average and Median Salary by Rank (2014) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rank | Male | | | Female | | | All | | |
| | # | Average Salary | Median Salary | # | Average Salary | Median Salary | # | Average Salary | Median Salary |
| Professor | 9 | $ 158,085 | $ 151,847 | 5 | $ 140,394 | $ 146,839 | 14 | $ 151,766 | $ 150,087 |
| Assoc. Professor | 4 | $ 117,777 | $ 112,685 | 10 | $ 109,142 | $ 109,510 | 14 | $ 111,609 | $ 109,556 |
| Asst. Professor | 1 | $ 99,880 | $ 99,880 | 0 | - | - | 1 | $ 99,880 | $ 99,880 |
| Instructor | 3 | $ 75,518 | $ 79,280 | 10 | $ 78,088 | $ 81,000 | 13 | $ 77,495 | $ 81,000 |

The average salary for male Associate Professors exceeded that of female Associate Professors in the college by $8,635. In a pattern similar to that observed at the Professor rank, while the median salary for male Associate Professors exceeded that of female Associate Professors in the College of Law during the 2014-15 academic year, at $3,175 the margin was smaller than the margin between the average salaries.

During the 2014-15 academic year only one instructional faculty member in the College of Law held the rank of Assistant Professor. As such, there is no basis for gender-based comparisons at this rank. It is, however, worth noting that the number of instructional faculty at the rank of Assistant Professor has declined dramatically from ten (10) during the 2010-11 academic year to just one (1) during the 2014-15 academic year.

With respect to full-time instructional faculty in the College of Law at the Instructor rank, the average salary for women exceeded that of males by $2,570. The margin of difference for median salaries was smaller, however, with the median salary of female instructors in the College of Law exceeding that of males by $1,720.

When assessing salary equity, comparisons based on average salaries are likely to be influenced by outliers as greater weight may be given to salaries at the lower and higher extremes. Comparisons based on median values are less prone to the effects of extreme values and may provide a more accurate basis for comparing salaries.

The following series of charts provide some historical perspective on trends in average salaries for the College of Law instructional faculty. As Chart 1 shows, while average salaries for male and female College of Law faculty holding the Professor rank were relatively close during the 2009-2010 academic year, the following years were characterized by growth in the average salaries of male professors, and relative stasis in the averages for females at that rank.

3

**APP 546**



Chart 2 below shows that average salaries for male College of Law instructional faculty at the Associate Professor rank have historically been higher than the average salaries of their female counterparts. The gap between the average salaries of male and female faculty at the Associate Professor rank appears to have narrowed some in the 2014-15 academic year.



APP 547

Chart 3 below displays the historical trend in average salaries at the Assistant Professor rank. In 2011 the number of assistant professors in the College of Law decreased to 4 from 10 the previous year. This reduction appears to be attributable in part to the attrition of one (1) one instructional faculty member at that rank, and the promotion of five (5) others to the rank of Associate Professor. Three (3) of the five promoted faculty were female. Each of the faculty promoted from Assistant Professor to Associate Professor experienced salary increases of approximately 9%.



Chart 4 provides a historical snapshot on average salaries for male and female instructional faculty at the Instructor rank in the College of Law. While the chart shows that the average salaries for female faculty have historically been higher than those of males, these differences appear to have decreased in recent years.



While these data are suggestive of gender-based disparities in salaries for instructional faculty at the Professor and Associate Professor ranks within the College of Law, they provide only a basis for inference and empirical exploration for potential contributions of gender and other factors to such disparities. The remainder of this analysis is dedicated to detailing and discussing findings from the OIR's empirical investigation into factors that might influence salaries within the FAMU College of Law.

**Section 2: Methodology**

The study sample for this analysis was comprised of full-time, tenure and non-tenure earning instructional faculty within the College of Law during the 2014-2015 academic year. The College of Law Dean was excluded from the analysis due to the typically higher administrative responsibilities and lower teaching loads associated with that position, and because academic Deans are excluded for the purpose of reporting instructional faculty to the American Association of University Professors (AAUP) and other organizations which collect information on instructional faculty. Instructional faculty holding administrative titles of Associate Dean, however, were included in the analysis because they are commonly included in reporting instructional faculty (i.e. AAUP). Because the study analyses potential disparities within rank, Assistant Professors were also excluded since only one faculty member held that rank during the study observation period.

Multiple regression is the most commonly used statistical technique for analyzing faculty salary equity. While an array of predictors can be used, the most commonly used predictive variables in such models include: years of experience (years since terminal degree); seniority (years at the institutional), education level (highest degree earned) and discipline (Emory University Office of Institutional Research, 2002); Other independent variables used in faculty equity studies may include gender, race, administrative positions, and tenure status (University of Louisville Office of Institutional Research, 2014).

Due to the small sample size, a series of stepwise multiple regression models were run. Unlike a standard multiple regression model where all variables would be entered into a model (and formal hypotheses for the effects of each variable would be posited), the focus of a stepwise regression model is predicting the effects of the best combination of predictors on the dependent variable.

In a stepwise multiple regression model, predictor variables are entered into the model one at a time based on their estimated magnitude of contribution to the prediction equation. Additional variables are added only to the extent that they attain a level of statistical significance within the model. The addition of variables ends when no additional variables add anything of statistical significance the regression equation. Accordingly, there is a potential that not all independent variables listed in the regression command will be included in the final estimation equation.

For the current study, salary and demographic data for instructional faculty within the College of Law were extracted from the university's official fall 2014 employee data file. Since

6

**APP 549**

there was only one (1) instructional faculty member in the College of Law at the rank of Assistant Professor, that rank was excluded from the analysis. Accordingly, only data for full-time instructional faculty carrying the ranks of Professor, Associate Professor and Instructor were included for model estimation purposes. The resulting study sample included fourteen (14) College of Law instructional faculty at the Professor rank, fourteen (14) instructional faculty at the Associate Professor rank and thirteen (13) instructional faculty carrying the rank of Instructor.

Four models were run to estimate the effects of various variables on salary equity within the College of Law. The first model estimated the effects of a series of independent variables on College of Law tenure-earning instructional faculty salaries. This included faculty at both the Professor and Associate Professor ranks. Again, because there was only one instructional faculty member in the College of Law at the Assistant Professor, relationships between the selected independent variables and salary could not be modeled. Additionally, because publication productivity may be an important factor in determining salaries for faculty at the Professor and Associate Professor ranks, and because data on the publication productivity of Instructors were not available, Instructors were excluded from this model.

The remaining three models estimated the effects of a series of independent variables on salaries within each rank (Professor, Associate Professor and Instructor) individually. Descriptions of the models' dependent and independent variables follow below:

### *Dependent Variable:*

The dependent variable used in each of the models was the annual salary for each faculty member. The salaries for all ranked instructional faculty whose annual contracts were for durations other than nine (9) months were converted to nine-month equivalent salaries in accordance with the methodology endorsed and used by the American Association of University Professors (AAUP).

### *Independent Variables*:

The following is a listing and description of independent variables used in each of the multiple regression models.

1. **Gender:** The analysis uses a dichotomous dummy variable coded with a value of "1" for female and "0" for male faculty;
2. **Years in Rank:** This is a continuous variable captures the total number of years that a faculty member has held his/her current rank;
3. **Years Since Hire:** This is a continuous variable which captures the amount of time that an individual has been employed by the university;
4. **Years since Highest Degree:** This continuous variable which indicates the amount of time since the attainment of highest degree is used as a proxy for professional experience;
5. **Years Tenured:** This variable is a continuous measure which accounts for the amount of time that a faculty member has been tenured. For

7

**APP 550**

faculty members in the study that have not yet earned tenure, the value for this metric is 0.

6. **Rank:** Dummy variable identifying College of Law instructional faculty members as either "Professor" or "Associate Professor." **This variable is used in Model 1 only**, and "Professors" serves as the comparison group for analysis purposes.

7. **Administrative Role:** Dummy variable identifying College of Law instructional faculty serving in administrative capacities (e.g. Associate Deans). The variable was coded "0" if the faculty member did not serve in such a capacity and "1" if they did.

8. **Number of Publications:** Continuous variable measuring the number of publications since the year 2000.

## Section 3: Empirical Results

### Model 1: Joint Model for Tenure Earning Faculty (Professors and Assoc. Professors)

Summary statistics for each of the continuous variables used in Model 1: Professor and Associate Professor are presented in Table 4a.

| Table 4a: College of Law Salary Equity Study Sample (2014-15) | | | | | |
|---|---|---|---|---|---|
| **Variable** | **Obs** | **Mean** | **Std. Dev.** | **Min** | **Max** |
| Salary (2014-15) | 28 | 131,688 | 26,352 | 86,727 | 187,430 |
| Years Since Degree | 28 | 23.61 | 9.88 | 4.00 | 45.00 |
| Years in Rank | 28 | 3.92 | 2.91 | 0.03 | 8.97 |
| Years Tenured | 28 | 3.83 | 4.44 | 0.00 | 13.03 |
| Years Since Hire | 28 | 7.43 | 3.66 | 0.03 | 13.05 |
| Publications | 28 | 6.57 | 5.46 | 0.00 | 20.00 |

1. Includes Instructional Faculty at Professor and Assoc. Professor Ranks only;

2. Excludes College of Law Dean

Table 4b presents regression coefficients for Model 1 (Professors and Associate Professors). Independent variables in the model with significance levels of .1 or lower ($P < .1$) are denoted in Table 4b with asterisks as noted. The model suggests that rank, years in rank and number of publications played significant roles in determining salaries. Not surprisingly, rank influenced instructional faculty salaries within the College of Law with the model estimating that instructional faculty at the Associate Professor rank earned on average $30,304 less than full Professors in the college ($P < .01$).[1] Years in rank had a positive effect with each additional year within rank accounting for on average for approximately $1,853 in additional salary when controlling for other factors ($P < .1$). The number of publications also appears to have had a positive effect with each unit increase in the number of publications accounting for $1,487 when controlling for other factors ($P < .05$). With respect to gender, the model found that on average

---

[1] Assistant professors were excluded due to the fact that only one full-time instructional faculty member in the College of Law held that rank during the 2014-15 academic year. Instructors were not included as data on their publications were not available and accordingly could not be incorporated into the model.

8

being male accounted for $8,626 in higher salary when compared to females. The difference was not, however, statistically significant in the model.

**Table 4b: Model Results (College of Law: Professor and Assoc. Professor)**

| VARIABLES | (1) Salary |
|---|---|
| Rank | -30304*** |
| | (6182) |
| Publications | 1487** |
| | (595.1) |
| Years In Rank | 1853* |
| | (1025) |
| Male | 8626 |
| | (6454) |
| Constant | 156106*** |
| | (13668) |
| | |
| Observations | 28 |
| R-squared | 0.747 |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

Predicted salaries were computed for each individual within the sample. Average predicted values were then calculated by rank and gender. Chart 3 shows the average residuals (average actual minus average predicted salary) by rank and gender for College of Law faculty included in Model 1. The chart shows that at the Professor rank female faculty in the College of law tended to be paid less than the predicted average, while on average male faculty at that rank appeared to be paid over the predicted average The residuals suggested an inverse trend at the Associate Professor rank where women on average were paid over the predicted value while men were on average paid below the expected value.



**Model 2: Professors Only**

9

**Table 5a** presents summary statistics for Model 2: Professors Only.

| Table 5a: Model 2 Summary Statistics: College of Law Salary Equity Study Professor Sub-sample (2014-15) | | | | | |
|---|---|---|---|---|---|
| **Variable** | **Obs** | **Mean** | **Std. Dev.** | **Min** | **Max** |
| **Salary (2014-15)** | 14 | 151,766 | 21,249 | 118,000 | 187,430 |
| **Years Since Degree** | 14 | 26.50 | 11.54 | 4.00 | 45.00 |
| **Years in Rank** | 14 | 4.60 | 3.05 | 0.03 | 8.02 |
| **Years Tenured** | 14 | 6.59 | 4.73 | 0.00 | 13.03 |
| **Years Since Hire** | 14 | 8.07 | 4.10 | 0.03 | 13.05 |
| **Publications** | 14 | 8.00 | 6.48 | 0.00 | 20.00 |

1. Excludes College of Law Dean

Results from the Professors Only regression model appear in Table 5b below. The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues (P < .01). While males outnumbered females by a margin of more than two-to-one at the Professor rank during the analysis observation period, this finding was unlikely a by-product of frequency alone and may have resulted from a number of factors that could not be observed using the available data.

**Table 5b: Model Results (College of Law: Professors)**

| VARIABLES | (1) Salary |
|---|---|
| Years Since Degree | 670.2 |
|  | (444.5) |
| Years Since Hire | -4568** |
|  | (1641) |
| Male | 20199* |
|  | (9277) |
| Years Tenured | 4044** |
|  | (1316) |
| Constant | 131229*** |
|  | (12803) |
|  |  |
| Observations | 14 |
| R-squared | 0.618 |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

The number of years tenured also appears to be a significant predictor of salaries at the Professor rank in the College of Law, with each additional year since tenure attainment on average accounting for $4,044 in additional salary (P < .05) when controlling for other factors. The number of years since degree attainment also appeared to have been a significant predictor for salaries at this rank with each additional year since degree attainment accounting for approximately $670 in additional salary. Finally, the stepwise regression model estimated an inverse relationship between salary and years since hire. The model estimates that each additional year since hire accounted for approximately $4,568 less in salary. This finding is likely due to lower salaries offered to instructional faculty during the college's early years coupled with more modest salary increases over time.

10

*Model 3: Associate Professor Model*

Summary statistics for and Model 3: Associate Professors, are presented in Table 6a.

| Table 6a: Model 3 Summary Statistics: College of Law Salary Equity Study Assoc. Professor Sub-sample (2014-15) | | | | | |
|---|---|---|---|---|---|
| **Variable** | **Obs** | **Mean** | **Std. Dev.** | **Min** | **Max** |
| **Salary (2014-15)** | 14 | 111,609 | 11,066 | 86,727 | 136,960 |
| **Years Since Degree** | 14 | 20.71 | 7.18 | 6.00 | 31.00 |
| **Years in Rank** | 14 | 3.24 | 2.70 | 0.03 | 8.97 |
| **Years Tenured** | 14 | 1.08 | 1.50 | 0.00 | 4.02 |
| **Years Since Hire** | 14 | 6.79 | 3.17 | 1.02 | 11.13 |
| **Publications** | 14 | 5.14 | 3.93 | 0.00 | 13.00 |

Statistical results for the Associate Professors model are presented in Table 6b below. With respect to Associate Professors in the College of Law, Model 3 finds that when controlling for other factors included in the model, on average salaries for male instructional faculty were $5,395 greater than that of their female counterparts. However, the difference was not statistically. Following a trend similar to those observed in Models 1 and 2, the number of years since earning tenure appeared to have had a positive effect on salaries. For the Associate Professor sub-sample, each additional year since tenure attainment translated to $3,423 more in annual salary (P < .01).

**Table 6b: Model Results (College of Law:  Associate Professor)**

| VARIABLES | (1) Salary |
|---|---|
| Years Since Degree | 476.4* |
|  | (235.1) |
| Years Since Hire | -1641** |
|  | (660.0) |
| Years In Rank | 956.3 |
|  | (589.2) |
| Years Tenured | 3423*** |
|  | (919.5) |
| Administrator | -30668*** |
|  | (6929) |
| Male | 5395 |
|  | (3672) |
| Constant | 106731*** |
|  | (6121) |
| | |
| Observations | 14 |
| R-squared | 0.912 |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

11

While the number of years since tenure had a positive effect in the model, the number of years since hire had a negative effect on salaries for Associate Professors in the College of Law (P < .1). Each unit increase in the number of years since being hired at FAMU equated to $1,641 less in salary when controlling for other factors (P < .05). As was the case for Assistant Professors, the inverse relationship between time since hire and salary at Associate Professor level may have been, in part, due to more recently recruited faculty being recruited at higher initial salaries while longer-term faculty who started at lower rates may have experienced more constrained salary growth. The number of years since degree attainment appears to have had a significant positive effect on salaries at the Associate Professor rank with each additional year since degree attainment accounting for approximately $476 in additional salary (P < .1).

The significant negative effect relating to the effects of administrative assignments was most likely a by-product of the model's small sample size and the fact that only one observation in the sub-sample held any type of administrative assignment during the observation period.

### Model 4: Instructors Model

Model 4 which included College of Law instructional faculty at the Instructor rank. Three variables included in the Professors and Associate Professors, Professors only and Associate Professors only models were excluded from the Instructors model. First, the number of years since tenure attainment was excluded from the stepwise model as faculty at the instructor rank are not tenure eligible. The second variable excluded from the model was the number of publications produced due to the lack of data for this metric. Finally, due to the fact that no College of Law faculty at the Instructor rank had any administrative duties within the College, the dummy indicator for this predictor was also excluded. Summary statistics for the variables included in the Instructors stepwise regression model are presented in Table 7a.

| Table 7a: Model 4 Summary Statistics: College of Law Salary Equity Study Instructors Sub-sample (2014-15) | | | | | |
|---|---|---|---|---|---|
| **Variable** | **Obs** | **Mean** | **Std. Dev.** | **Min** | **Max** |
| **Salary (2014-15)** | 13 | 77,494 | 8,474 | 65,455 | 89,580 |
| **Years Since Degree** | 13 | 15.62 | 6.85 | 5.00 | 32.00 |
| **Years in Rank** | 13 | 3.08 | 2.46 | 0.03 | 8.02 |
| **Years Since Hire** | 13 | 3.74 | 2.22 | .19 | 8.02 |

Only one of the four variables included in the Instructors Only stepwise regression model achieved significance. The model estimated a positive and significant relationship between years since hire and average salaries at the Instructor rank with each additional year since hire accounting for approximately $2,062 in additional salary. The positive effect of this variable in the Instructors Only model is likely attributable to the average smaller number of years since hire for instructional faculty at this rank.

12

**APP 555**

| VARIABLES | (1)<br>Salary |
|---|---|
| Years Since Hire | 2062* |
| | (968.3) |
| Constant | 69779*** |
| | (4170) |
| | |
| Observations | 13 |
| R-squared | 0.292 |

Standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

**Conclusion and Recommendations:**

Model 1 (Professors and Associate Professors) suggests that gender, years tenured, and rank played significant roles in determining salaries. With respect to gender, the model found that when controlling for other factors, on average female faculty in the study sample earned less than their male counterparts. The number of years since tenure attainment was positively correlated with salaries at this rank. At the same time, the number of years since hire was negatively correlated. This is likely attributable to lower initial salaries for longer serving faculty coupled with modest salary increases over time. Unsurprisingly, the model found higher salaries on average for Professors when compared to instructional faculty at the Associate Professor rank.

Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. Notwithstanding these findings, the extent to which gender alone explains these differences is unclear. While the data and findings resulting from this analysis suggest that gender-based salary disparities exist within the College of Law at the Professor rank, a more in-depth qualitative analysis examining additional factors that could not be modeled due to sample size or data availability in university data files is recommended.

Model 3 (Associates Professors) finds that on average females earn less than their male counterparts. The difference is not, however, statistically significant in the model. The number of years since hire does appear to be an important factor for explaining salary disparities at this rank. Lower hiring salaries coupled with modest salary increases over time for longer serving faculty at this rank is the likely explanation for this pattern. It may also be mediated by the number of years since earning tenure.

The Instructors Only Model (Model 4) suggests that the number of years since hire appears to be the most important factor in determining salaries at the Instructor Rank. While female instructional faculty members at the Instructor rank have historically had higher average salaries than their male counterparts, gender does not appear to be a significant predictor of salaries at the Instructor rank.

The consistent findings relating to the positive effects of tenure on faculty salaries are not surprising. Tenure attainment suggests that a faculty member has satisfied a number of academic and professional demands. It is also worth noting that this metric may have masked the influences of other factors such as years in rank and years since degree due to the small sample size. Given the quantitative limitations imposed by a small sample size, and the limited amount of data available in official university data files, the OIR recommends that the College of Law

13

APP 556

engage in a qualitative assessment factors that have historically contributed to initial salary offers, as well as to pay increases for faculty within the college.

It is worth noting that four instructional faculty in the study sample were hired after the College of Law attained accreditation in 2009. This included two instructional faculty at the rank of Professor (one male and one female), and two at the Associate Professor rank (one male and one female). In each case, salaries for newly hired male faculty exceeded those of female hires. Again, these variations may be due to effects that could not be modeled in the current analysis. In any case, an in-depth analysis accounting for variations in faculty productivity and workloads, prior professional experience, pre-hire salary history, publication productivity, instruction quality and community service among others may provide additional context for understanding differences in FAMU College of Law instructional faculty salaries.

**APP 557**

## References

1. Emory University Office of Institutional Research (2001). An Analysis of Faculty Gender Equity Issues at Emory University. Prepared for the PCSW Faculty Concerns Committee.

2. University of Louisville Office of Institutional Research (2014). Using Hierarchical Linear Modeling (HLM) to Determine Faculty Salary Outliers. *Presented at the AIR Annual Forum, Orlando, FL, May 27-30 2014.*

**APP 558**

# 151-3 - Plaintiff's Reserve Class Email

## 08/18/2024

**APP 559**

Case 6:24-cv-00457-PGB-RMN Document 15-3 Filed 07/09/24 Page 1 of 2 PageID 2746

## Fw: Make-up class email

From:   Smith, Jennifer (jennifer.smith@famu.edu)

To:      jensmithesq@aol.com

Date:   Thursday, January 4, 2024 at 03:19 PM EST

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Tuesday, October 4, 2022 1:44 PM
**To:** Martinez, Juliana <juliana.martinez@famu.edu>
**Subject:** Re: Make-up class email

This is confusing because we had to submit our make up days. Mine are Oct 6, 13, 20 at 9am.

Thanks! Jen Smith

---

**From:** Martinez, Juliana <juliana.martinez@famu.edu>
**Sent:** Tuesday, October 4, 2022 1:18 PM
**To:** COL_Faculty <COL_Faculty@famu.edu>; COL_Staff <COL_Staff@famu.edu>; Cagle, Clinton D. <clinton.cagle@famu.edu>; Dubois, Eric H. <eric.dubois@famu.edu>; DuBois, Eric <ctjued1@ocnjcc.org>; Mandelbaum, Samuel R. <samuel.mandelbaum@famu.edu>; hoya595@yahoo.com <hoya595@yahoo.com>; ctjutn1@ocnjcc.org <ctjutn1@ocnjcc.org>; Poitier, Valencia N. <valencia.poitier@famu.edu>; Robinson Nickerson, Stacy N. <stacy.nickerson@famu.edu>; snrobinsonlaw@gmail.com <snrobinsonlaw@gmail.com>; Whitehead, Reginald <reginald.whitehead@famu.edu>; Whitehead, Reginald <ctjurw1@ocnjcc.org>; Woody, Carlos L. <carlos.woody@famu.edu>; Young, Andre T. <andre.young@famu.edu>; atyoung@younglawfl.com <atyoung@younglawfl.com>; la.groover@groover.law <la.groover@groover.law>; Tarlika <tarlikanuneznavarro@gmail.com>
**Subject:** Make-up class email

### This message is being sent on behalf of Dean Cooper

Dear Colleagues:

As we all know, the College of Law was closed from Wednesday, September 28 through Monday, October 3 in order to prioritize the safety and well-being of the community. Now that classes are back in session, we would like to remind everyone that the College's Academic Calendar provides for make-up days at the end of the semester:

> *Reading Period*
> *The reading period is subject to change in the event inclement weather or other extraordinary conditions occur during the semester and necessitate the addition of make-up days at the end of the semester. Students should not make travel plans during the reading period.*

Consequently, the College of Law is designating the following make-up days for the closures of Wednesday through Friday, September 28 through 30:

| Closure Day | Make-up Day |
|---|---|

**APP 560**

| Wednesday, September 28 | Wednesday, November 16 |
|---|---|
| Thursday, September 29 | Thursday, November 17 |
| Friday, September 30 | Friday, November 18 |

The College is not designating a specific make-up day for Monday, October 3 classes, so that we do not extend class meetings into the Thanksgiving week. For Monday classes, please develop a make-up plan that works for you and your class. If you teach a Monday day class, please complete this form. For Monday evening courses, please complete this form.

As you make your plans, please note that the class schedule has additional minutes built in beyond the minimum set by ABA Standard 310. Faculty members who have not already utilized the additional minutes for make-up purposes may factor this into their make-up plans. The additional minutes are as follows:
- 1 credit – 30 minutes
- 2 credits – 60 minutes
- 3 credits – 90 minutes
- 4 credits – 120 minutes

We hope everyone continues to be safe and recover well from any impacts of the storm.

Kind regards,

*Markita D. Cooper*
Associate Dean for Academic Affairs
and Professor of Law
Florida A&M University College of Law
201 FAMU Law Lane
Orlando, Florida 32801
Office: 407.254.3201
Mobile: 407.902.6329
Email: markita.cooper@famu.edu
Pronouns: she/her/hers
Tell us how we're doing!

APP 561

151-4 - Pernell Depo

08/18/2024

APP 562

Case Case 4:14-cv-00540-RH-CAS Document 35 Filed 05/19/20 Page 1 of 16

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.: 4:14-cv-00540-RH-CS

JENNIFER SMITH,

Plaintiff,

vs.

FLORIDA AGRICULTURAL & MECHANICAL
UNIVERSITY BOARD OF TRUSTEES,

Defendant.

* * * * * * * * * * * * *

DEPOSITION OF
Leroy Pernell

Taken on Behalf of the Plaintiff

DATE: April 7, 2015

TIME: 9:00 a.m.

PLACE: Milestone Reporting Company
100 East Pine Street, Suite 308
Orlando, Florida

REPORTED BY: Karen Allen-Lewin,
Court Reporter, Notary Public

PLAINTIFF'S
EXHIBIT
4

400 North Ashley Drive, Suite 2600
TAMPA, FL 33602

100 East Pine Street, Suite 308
ORLANDO, FL 32801
CORPORATE

4651 Salisbury Road, 4th Floor
JACKSONVILLE, FL 32256

**APP 563**

BY MR. JOHNSON:

Q. I hate those talking documents. Let me just ask a couple of things about the job duties of the faculty members. Is there -- assuming that you have a person who is simply a faculty member, who is not doing some administrative duties in addition to being a faculty member, is there a job description for what that job is supposed to do?

A. I believe that there would have been a description at the time of hire. I don't know exactly how that description reads as to their particular positions and the position number that they're under. But typically persons hiring in the position with the position number and there's a job description with that position number.

Q. I guess what I wanted to know is if you have an ordinary faculty member, they are doing teaching, they're doing research and they're doing service, those three things, right?

A. They are doing those three things, yes.

Q. As part of the teaching they're also maybe holding office hours and counseling students?

A. Yes, that would be common.

Q. That would be part of the teaching, wouldn't it?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

APP 564

Case 6:04-cv-00457-PCF-DAB Document 64-8 Filed 07/04/09 Page 2 of 153 PageID 2750

A. That would be part of the responsibility certainly.

Q. So is there anything that would take a different kind of skill, effort or responsibility for professor A to do her job than professor B?

MS. SANTORO: Object to the form.

A. I'm not sure I follow.

BY MR. JOHNSON:

Q. Aren't they pretty much cookie cutter jobs except that you're teaching a different course?

MS. SANTORO: Object to the form.

Q. You're serving on different committee, you're writing an article for a different journal?

MS. SANTORO: Object to the form.

A. I would not adopt the concept of cookie cutter. No, I wouldn't call them cookie cutter.

BY MR. JOHNSON:

Q. Then if somebody is teaching civil procedure and somebody else is teaching common law one, is there anything that would cause a pay differential because of that distinction?

A. No, there is not.

Q. I just used an example that came to mind. Is there any other course, whether it be evidence, whether it be tax, whether it be gratuitous transfer,



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**APP 565**

Case 6:13-cv-00425-BMW Document 14 Filed 07/01/23 Page 4 of 25 PageID 2751

anything that's more complicated that somebody is teaching that would cause a pay differential versus a professor who is teaching some other class?

MS. SANTORO: Object to the form.

A. I think if I understand the question the answer would be, no, that I do not believe that pay is linked to the subject matter of instruction.

BY MR. JOHNSON:

Q. And are the teaching loads, leaving aside whether somebody teaches summer or not, but the teaching loads during the main semesters, are they meant to be equal?

A. There is an expectation that a tenured track faculty member would carry a teaching load of a minimum 12 semester hours. There are variations on that.

Q. And is there anything in that load differential, those variations, that would be a basis for a difference in salary?

A. Not to my knowledge.

Q. Are faculty members expected to bear a roughly equivalent load of committee service and other kinds of service?

A. Yes, they are.

Q. In terms of publication, is there a pay



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 6:15-cv-00538-BJD-WWD Document 1-1 Filed 08/24/15 Page 39 of 45 PageID 2752

differential based on either the quantity or the quality of the scholarly output?

A. My hesitancy in answering that, I'm trying to understand the question. Is that certainly the scholarly output could have an impact on their promotion and tenure, which as a consequence could have impact on their salary.

Q. That's something different. I'm talking about within the same rank, that would be something to come later as you get promoted and you get that bump. Associate professor A, associate professor B, associate professor A is maybe getting out a few more articles and they're going to Harvard or Yale or something; and associate professor B is not getting out quite as many and they're going to some lesser journal; is that a basis for a pay differential?

MS. SANTORO: Object to the form.

A. Not as I've experienced at Florida A&M and not to the base salary. It might impact summer research grants, other supplemental compensation, but not as salaries have been determined by the university. I do not know any of those factors being part of the university formula set forth for determining salaries.

- - - - - -


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

**APP 567**

BY MR. JOHNSON:

Q. What about -- do faculty have pretty equal responsibility to the university, to the students?

A. Again, I'm not quite sure. You said equal responsibility?

Q. You hire a faculty member and that person has certain responsibilities, maybe it's the responsibilities that we talked about, responsibilities for serving on committees, responsibility for doing some scholarship, responsible for teaching, responsible or counseling students, obviously responsible for showing up on time, for doing the minimum level of work, for being informed, for participating in things; is there any kind of differential, leaving aside administrative work, between teaching faculty member A and teaching faculty member B, they have the same responsibility, do they not?

MS. SANTORO: Object to the form.

MR. JOHNSON: I can see why.

A. My problem is you kind of have a couple questions in different ones. If I understand what the intent of the question is that I don't -- I guess the short answer is, I don't know of the expected responsibilities of professors in the same rank and



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**APP 568**

any differences that there may be. I don't know of that being part of any university calculation in terms of salary.

**BY MR. JOHNSON:**

Q. And even after you move up a notch from associate to full professor, I mean basically you're still doing the same job as you were doing yesterday, aren't you, except that maybe you're passing on the promotion of others?

A. It's difficult to answer that question because it's somewhat broad. And I'd have to say that as one advances up the ranks, certainly the expectations from that person in terms of the quality in which they do their work may very well change and that's what's a part of what's built in the promotion and tenure process.

Q. But isn't that a double-edged sword though, that certainly there is a whole body of literature that talks about people become full professor and rest on their laurels?

MS. SANTORO: Object to the form.

A. Is that a question?

**BY MR. JOHNSON:**

Q. Yes.

A. What's the question?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**APP 569**

Case 6:14-cv-00066-PGB-MDT Document 6-1 Filed 05/08/25 Page 83 of 178 PageID 2755

Q.  Isn't there a body of literature, a body of wisdom that says people become a tenured full professor and they rest on their laurels, they become dead wood?

MS. SANTORO:  Object to the form.

A.  I can't concur with that categorical statement.

BY MR. JOHNSON:

Q.  Not that everybody does, just it's not unknown that there's some full professors take it easy?

MS. SANTORO:  Object to the form.

A.  I suppose that there are certainly instances that one can find throughout the academy in which there are full professors who do not perform as well as other full professors.

BY MR. JOHNSON:

Q.  Working conditions, is all your work there in that building, in the same building, do all your professors teach in the same building?

MS. SANTORO:  Physical location?

MR. JOHNSON:  Yes.

A.  As a general rule all courses are scheduled in that building.  There may be instances where there may be special assignments where someone is teaching



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**APP 570**

Case 6:23-cv-00557-PGB-MWN Document 44 Filed 07/09/23 Page 93 of 179 PageID 2726

professor was denied because she lacked a sufficient number of scholarly publications. Is that the true reason, to the best of your knowledge?

A. I believe that is correct, to the best of my knowledge.

Q. Looking at these things, would it be fair to say that 2013 is a purely quantitative statement?

MS. SANTORO: Object to the form.

A. Well, it certainly talks about a sufficient number, but it also talks about the publication being scholarly, which would be qualitative.

BY MR. JOHNSON:

Q. Well, it says number of scholarly publications, so are you saying that that's an assessment of the nature of the publications as well as the number of them?

A. I believe that was reflected in the report from the committee.

Q. Number 6, it asks please state all the reasons that plaintiff was paid a lesser salary than her male colleagues of associate professor rank. And it says salaries are negotiated at the time of initial hire. Dean Leroy Pernell was not involved in any matter with the initial salary or hiring of plaintiff as she was hired prior to his tenure as dean of the

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

APP 571

Case 6:14-cv-00640-CEB-RW-NDGC Document 4-1 Filed 05/19/15 Page 15 of 16 Page ID 2757

College of Law. A number of factors are considered regarding the hiring of and compensation paid to new faculty, including but not limited to, demands of the hiring market existing at the time of hire and as indicated at competing institutions and/or dictated by the salary already being earned by the potential hire, the need of the College of Law to fill a particular position as well as professional/academic/administrative experience, areas of expertise and history of publication. Other practical concerns include the amount of funds available and if the candidate negotiates the offered salary.

So this touches back on something that we talked about a little earlier. We asked this question and I was looking for an answer that said something like Jeffrey Brown is paid more because he has X years of experience and he'd written Y number of articles and Yale Law School offered him a huge pay increase and we had to match it. I was looking for something that had those kind of answers. And what we got here was basically a general list of criteria that may have affected the starting salaries. I'm wondering where can I go, who can I ask, how can I find out what was going on in the mind of the hiring authorities to pay


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Case 6:04-cv-00540-RH-CAS Document 39-2 Filed 05/19/15 Page 17 of 17 PageID 2758

Jeffrey Brown more starting salary?

A. I cannot answer that other than I think the response that you indicated here in number 6 speaks to the factors that would have been considered.

Q. It speaks to the factors, but I mean it doesn't apply those factors to the particular individuals that are the comparators. I mean here's my difficulty, is that I've got a claim here that says that she's paid, Jennifer Smith, is paid less because she's a woman. And FAMU is saying, oh, no, that's not why, there are other reasons why. And I say, okay, what are the other reasons? And nobody -- I want to know who I can question about that, where am I going to get those facts?

A. I don't know if I can answer that question for you. I can indicate these are the factors that are considered. But I mean I don't know anyone else I would refer you to.

Q. Do you know Mr. Luney?

A. Are you referring to Percy Luney the prior dean?

Q. Yes.

A. I do know him.

Q. Do you know where he is?

A. I do not know where he is currently.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**APP 573**

# 151-5 - Associate Dean Green Emails

# 08/18/2024

APP 574

Re: Makeup Class

**Green, Reginald M. <reginald.green@famu.edu>**
Wed 2/1/2023 3:41 PM
To: Smith, Jennifer <jennifer.smith@famu.edu>

Jen,

The process was to meet with the student and discuss the misconduct allegation. Before I could meet the student, she had already filed her complaint which raised EOP issues. As a result, since the matter involved a faculty member, she sent her complaint to Cooper. To my knowledge afterward a determination was made to send the matter to EOP. We could not conduct two separate investigations without interfering with the other. An EOP investigation supersedes a conduct allegation.

Sincerely,


RMG

---

**Reginald M. Green, J.D.**
**Associate Dean for Student Services and Administration**
Florida Agricultural and Mechanical University
College of Law
201 Beggs Avenue
Orlando, Florida 32801
407.254.3205 Office
407.254.3214 Fax
reginald.green@famu.edu
Service Feedback - Tell us how we're doing!
Feeling Stress - Visit wellconnectbysrs.com

Follow us on Social Media - [facebook.com/famulaw]FACEBOOK | [twitter.com/FAMULaw]TWITTER | [instagram.com/famulaw]INSTAGRAM | LINKEDIN

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Wednesday, February 1, 2023 2:48 PM
**To:** Green, Reginald M. <reginald.green@famu.edu>
**Subject:** Re: Makeup Class

Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this? Compliance said you did not follow procedures.

Jen Smith

---

**From:** Green, Reginald M. <reginald.green@famu.edu>
**Sent:** Thursday, October 20, 2022 8:46 PM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Subject:** Makeup Class



PLAINTIFF'S EXHIBIT
5

APP 575

Jen,

I will try and identify the student tomorrow. Please feel free to send me an email detailing the interaction.

Thanks for the notification.

Sincerely,

Reginald Green

_____

Reginald M. Green
Associate Dean for Student Services and Administration
Florida Agricultural and Mechanical University
College of Law
201 Beggs Avenue
Orlando, Florida 32801
407.254.3205 Office
407.254.3214 Fax
reginald.green@famu.edu
Service Feedback - Tell us how we're doing!
Feeling Stress - Visit wellconnectbysrs.com

**APP 576**

**151-6 - Dec. 5 2023 Notice**

**08/18/2024**

APP 577



# Florida Agricultural and Mechanical University

### TALLAHASSEE, FLORIDA 32307-3100

*Excellence With Caring*

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

December 5, 2023

**Via Hand Delivery by Process Server,
Electronic Mail to jennifer.smith@famu.edu, and
CERTIFIED MAIL-7020 ████████ 5973
Return Receipt Requested**

Re:    **CONFIDENTIAL**
       **Notice of Intent to Dismiss from Employment**

> **PLAINTIFF'S EXHIBIT**
> 6

Jennifer M. Smith
████████████
████████████

Dear Professor Smith:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulations 1.019(21), 10.120, and 10.205, you are hereby notified of the University's intent to dismiss you from employment on January 19, 2024. You are placed on Administrative Leave with Pay, effective immediately, until the resolution of this process, in accordance with University Regulation 10.120. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. Regarding administering and grading your exams, arrangements have been made. Should you need access to your work area, please contact Deidre Keller, Dean of the College of Law, in advance for approval.

The reason for this employment action is the substantiated finding of retaliation documented in the FAMU Division of Audit and Compliance Investigation Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your memo dated October 5, 2023, also attached and incorporated in this Notice.

The University, therefore, proposes your termination from employment for just cause pursuant to University Regulations 10.205(5)(a) and 1.019(21). Evidence at any conference regarding your termination of employment may be used by the University to support its finding and all witnesses and evidence upon which the determination was based.

In accordance with University Regulation 10.120, you have ten (10) days – or until December 15, 2023 – from receipt of this Notice to submit a written request for a conference to provide an oral or written statement in response to this Notice. Your request for a conference may be provided to

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 578**

DocuSign Envelope ID: A44B2D58-F35D-465B-AFC5-870FF03CD582

Dr. Reginald Perry, Interim Associate Provost for Academic Affairs and Faculty. Late requests will not be considered. The conference will be held on January 11, 2024, at a time and place determined by the University. You are permitted to bring a representative to advise and assist you in the process, but discovery, cross-examination, and similar legal procedures are not permissible. Any documentation you intend to present during the conference should be submitted to Dr. Perry no later than January 8, 2024, at reginald.perry@famu.edu.

Pending a final determination in this matter, you are expected to refrain from any behavior that disrupts the University, violates any University regulations or policies, and/or misuses any University resources, whether in person or via electronic mail. You are also expected to maintain professionalism throughout this process pursuant to University Regulations.

Additionally, please call to arrange the return of all University equipment and property, which you may have in your possession or control, to Reginald Green, Associate Dean for Student Services and Administration at the College of Law, pending the final decision. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus must be returned to the University immediately.

The University desires to reduce the risk of error in taking this proposed action against you and to avoid damaging your reputation by untrue or erroneous charges. Therefore, the University is interested in receiving and considering your response in this matter.

Sincerely,

*Allyson Watson*

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

cc:     University Regulations 1.019, 10.120, 10.205
        Referenced documents- Reports and Memo

**APP 579**

**DocuSign**

## Certificate Of Completion

Envelope Id: A44B2D58F35D465BAFC5870FF03CD582
Subject: Complete with DocuSign: J.Smith 12.5.23 FINAL.docx
Source Envelope:
Document Pages: 2
Certificate Pages: 1
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Signatures: 1
Initials: 0

Status: Completed

Envelope Originator:
Chardelyne Mercure
chardelyne.mercure@famu.edu
IP Address: 168.223.133.220

## Record Tracking

Status: Original
   12/5/2023 4:54:56 PM

Holder: Chardelyne Mercure
   chardelyne.mercure@famu.edu

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Allyson Watson<br>allyson.watson@famu.edu<br>Provost<br>Florida Agricultural and Mechanical University<br>Security Level: Email, Account Authentication (None) | *allyson watson*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 168.223.133.122 | Sent: 12/5/2023 4:55:30 PM<br>Viewed: 12/5/2023 4:59:03 PM<br>Signed: 12/5/2023 4:59:07 PM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Kentayvia Coates<br>kentayvia.coates@famu.edu<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/5/2023 4:59:07 PM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/5/2023 4:55:30 PM |
| Certified Delivered | Security Checked | 12/5/2023 4:59:03 PM |
| Signing Complete | Security Checked | 12/5/2023 4:59:07 PM |
| Completed | Security Checked | 12/5/2023 4:59:07 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**APP 580**

Case 6:24-cv-00457-JSS-RMN Document 61-6 Filed 07/09/24 Page 23 of 34 PageID 2704



# FLORIDA A&M UNIVERSITY OFFICE OF COMPLIANCE AND ETHICS

## Investigation Report
### *FAMU 2022-11-117*

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun

**APP 581**



June 5, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The Office of Compliance and Ethics (OCE) concluded that allegation 1 related to disruptive conduct is **UNSUBSTANTIATED** and allegation 2 related to retaliation is **UNSUBSTANTIATED**. However, an additional finding of retaliation related to Professor Smith's subsequent actions is **SUBSTANTIATED**. If you need further information, please contact our office.

Best,

Rica Calhoun

Rica Calhoun

Copy to:
FAMU Board of Trustees
Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Interim Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Ella Kiselyuk, Associate Vice President, Chief Human Resources Officer
Jennifer Smith, Professor
Michelle Wanamaker, Student

**APP 582**

Case 6:24-cv-00457-JSS-RMN Document 61-6 Filed 07/09/24 Page 23 of 85 PageID 2726

## Background

On October 27, 2022, The Office of Compliance and Ethics (OCE) received a referral via email from the Office of Equal Opportunity Programs (EOP) Director, Dr. Latrecha Scott. College of Law student, Michelle Wanamaker, reported her concern regarding a negative interaction she had with Professor Smith and believed that Professor Smith violated the University Code of Conduct by her behavior.

## Authority

**University Regulation 1.019 (3) and (21) (University Code of Conduct)**
**University Regulation 10.111 (Disruptive Conduct)**

## Purpose

To determine whether Professor Smith violated University policy regarding the allegation of employee misconduct.

## Standards

The investigation was conducted in compliance with the principles and standards in the *Standards for Complaint Investigations for the State University System of Florida, published by the Florida Board of Governors.* Those standards require that we plan and perform investigations to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions. We believe that the evidence provides a reasonable basis for our conclusions.

## Scope

To determine whether Professor Smith violated the University policy regarding allegations of misconduct, OCE utilized the following methodology:

- Reviewed the complaint
- Interviewed parties and witnesses
- Reviewed relevant documents

## Complainant Interview

On October 25, Ms. Wanamaker emailed Markita Cooper, Associate Dean of Academic Affairs, a narrative of events that took place on October 20, 2022, stating that she wanted to file a formal complaint again Professor Smith. The complaint included the following:

APP 583

*"I would like to file a formal complaint against Professor Jennifer Smith. Today, in front of multiple students Jennifer Smith entered and remained in my personal space. While within 2-3 of my face, she reprimanded me, and insulted me multiple times. At approximately 10:25 AM, I entered our usual classroom for Evidence. Jennifer Smith was sitting at the desk in the front of the classroom. There were no students inside. One of my colleagues was in the doorway. Upon entering the room, I said to her, "Professor Smith, we have Evidence in this classroom, and we need to…" She interrupted me and said, "I know, AT 10:30." I then tried to explain that we needed to come inside to be prepared for class on time. She interrupted me again and repeated, "AT 10:30." She then gestured me to get out. The physical gesture was with her hand, akin to how one would "shoo" an animal away. I did not respond. I left the classroom and proceeded to wait in the hallway. The hallway was filled with students waiting to enter Evidence and 1L's waiting for Professor Smith. There were at least 40 students in the hallway. My colleagues were visibly and audibly upset about our inability to enter our class and adequately prepare for lecture. It is normal practice for our professor to expect us to begin our case briefs at the very start of class. Additionally, our professor has previously given us timed pop-quizzes that begin at our class start time. We were anxious to enter our classroom. While in that hallway, I noticed Professor Smith's classroom was completely empty. One of my colleagues reminded me that Professor Henslee completes his Torts course in that room sometime around 10:00 AM. Professor Smith was on notice that we were anxiously awaiting entrance to prepare for our class. Her adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor Reyes's Evidence class. At approximately 10:30 AM, she swung the door open. I was standing to the left of the door, leaning against the wall. She stepped towards me, blocking the door, and stopped directly in front of my face. She said, "don't ever do that again" in a stern, diminutive tone. I said, "excuse me?" While still inches from my face she repeated, "I had a make-up class. Don't' do that again!" Her tone was raised, and she was in a physically threatening position to my body. She had me backed against the wall with her body directly in front of mine. I was in shock and paralyzed with fear. As she stepped away from my face, I replied, "You are being unprofessional." She was in the motion of opening the door to the classroom adjacent to ours where she typically conducts her 10:30 class. She heard me say she was unprofessional, and she abruptly turned around and belted out, "YOU ARE UNPROFESSIONAL AND WILL NOT GO FAR!" I responded again with, "excuse me?" She then repeated, aloud in the hallway, "YOU WILL NOT GO FAR!" This traumatic event happened in the presence of 40-50 of my colleagues. Professor Smith's 1L Civil Procedure students were in the hallway, as well as my entire 2L Evidence class. After*

2 | P a g e

**APP 584**

Case 6:24-cv-00457-JSS-RMN Document 14-6 Filed 07/09/24 Page 25 of 33 PageID 2768

*this exchange, multiple students approached me in shock. Many offered to support me and give their eye-witness account of this situation. Word began spreading immediately. I have been approached by multiple students offering support or asking what happened. I have received emails and phone calls regarding this event. This situation has me absolutely traumatized and dreading coming back to school at FAMU Law. I am a student leader on our campus who goes above and beyond to serve my colleagues and community with the upmost professionalism. I am the President of the Women's Law Caucus. I serve on the FAMU COL Student Leadership Committee. I am a Junior Editor on Law Review. I am the current Holland & Knight Scholar. I have organized and participated in countless events in support of our school. I am utterly sickened and discouraged by this violent encounter within the walls of our law school. Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence. Jennifer Smith's abusive behavior was in direct conflict with 6C3-1.019 University Code of Conduct. I would like to pursue this complaint to the maximum extent possible."*

On November 15, 2022, Ms. Wanamaker provided five eyewitness statements from students that were present in the hallway during the interaction.

## Respondent Interview/Statement

### Jennifer Smith, College of Law Professor, February 1, 2023

Professor Smith denied the allegations, indicating that she "reviewed the relevant provisions that [OCE] cited, but none apply." Professor Smith explained that she was using another classroom for make u classes due to it being cancelled because of a hurricane. The following statement was provided via a February 7, 2023, memo sent the OCE:

*Substance of the Incident*

*On October 6, 2022, I reserved the subject classroom (Room 253) for October 20, 2022 for makeup classes, which were cancelled due to a hurricane (Exhs. G, J). The classroom is usually empty, and it is the classroom next to the one I was assigned for my 10:30am classes (Room 255) on M, T, TH.*

APP 585

Case 6:24-cv-00457-PGB-RMN Document 116 Filed 07/09/24 Page 25 of 89 PageID 2769

On October 20, 2022, I was in the classroom for oral exams, which require students to come in one by one for no more than about 3 minutes. The students wait outside the classroom until the next student comes out until the exams are complete. Sometime in the middle of the oral exams, a student (not WM) entered, and I explained that I was having oral exams. The student left. Soon after, MW aggressively entered and interrupted my student doing her oral exam. I explained to MW that I am having oral exams, and she did not care and responded with indignation that her professor, Prof. Reyes, told students to make sure they are set up for class at 10:30am. She felt entitled to be in the classroom before her class began. I said it is far from 10:30 am, and I have the room reserved. I literally had to verbally demand she leave for her to get out. She was not pleased and expressed that. She had to know that the classroom was being used because students were in the hallway chatting about what was going on in the classroom, including my students who were scheduled for oral exams.

At about 10:29am on that day, I finished the exams and gathered my stuff to exit the classroom, which has two entrances/exits. When I opened the door, MW was standing right there waiting to come in the classroom. I said to her not to do that again (referring to her entering the classroom being used and being rude), and she passed by me as she got loud and rude and was so disrespectful; I was floored. I knew by her aggressiveness that she was likely from the New York/New Jersey area - she's from Philadelphia, I later learned. She walked all the way to I believe the last row being absolutely disrespectful. When she was at her seat in the back, I said from the front door something like: "With your attitude, you will not get far in law/life."

At 10:30am, I texted Associate Dean Green about the incident, indicating that the student was "aggressive rude," then went into my classroom (255) to teach my class. A student of mine who saw it, Jo'Anna Clayton, asked me if I wanted her to get me some water before I started teaching. I declined. Associate Dean Green emailed back that night, and I assumed he would handle it from there (Exh. E).

Students began talking about the incident to others. On October 31, 2022, Prof. Patricia Broussard told me that the student was MW, who is supposed to be interning for the same firm where I was a partner. Prof. Broussard said she was looking for MW as it related to the women's law group and she asked a student/friend of MW's, who relayed to Professor Broussard that MW was not feeling well and was remorseful, ashamed and embarrassed about HER OWN conduct regarding something that occurred. I made a note of it (Exh. H).

Then, again in December, Professor Broussard relayed that she was in the stall of the ladies' room when she overheard a few students discussing how badly MW felt because of her conduct regarding the incident. Again, MW was concerned about HER OWN behavior and was physically ill about her conduct towards me. It appeared to me that MW's concern was largely concerned because I was a former partner with the firm. I did not hear much about this after. I said to Prof. Broussard that perhaps I should send MW an email to let her know that I am not going to report this incident to the law firm or the bar, although I believe it was questionable as to whether I had reporting obligations to The Florida Bar about the incident. Prof. Broussard said that it would be great if I did send MW an email to give MW peace and show her how professionals act or respond in these cases. Prof. Broussard has regular contact with the MW, who never mentioned the incident to Prof. Broussard.

On December 18, 2023, I sent the following email to MW (Exh. I):

Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.

APP 586

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 127 of 540 PageID 2760

*Best,*

*Prof. Smith*

*MW did not respond. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail (Exhs. A, C). The first time I had any notice that I was ever the subject of an investigation regarding this incident was January 27, 2023, and with more details on February 1, 2023, yet apparently a complaint had been filed on October 27, 2022 - over 90 days before. The Dean's office made the unilateral decision to escalate the complaint without ever speaking to me, and I was never informed about the escalation of the student complaint orchestrated by the Dean's office nor was I informed that the complaint I filed a week before MW's was going to be ignored.*

*There are cameras in the hallway that should give some context of the incident.*

*Conclusion*

*I am not sure what I could have done to avoid this incident. I reserved the classroom, but even if not, students do not have the right to use the classrooms for study places, and they certainly do not have the right to use the classrooms being utilized by professors. Further, if a student walks in on a classroom, what response should he/she have but that he/she is sorry for the intrusion and depart quickly. This should never have been a "back and forth" argument with a student in the middle of another student's examination. I also should not have had to bump into or encounter the student as I was leaving the classroom. The student did not need to be at the door entrance, ready for battle as I exited.*

*I reported the immediately reported the incident of being confronted by an aggressive student, which Associate Dean Green indicated would be immediately handled. In reporting the incident, I assumed that the COL was handling it and would contact me as needed, but I certainly did not know that I was the alleged subject of an investigation at any point until over 90 days later. This is problematic and unprofessional.*

*I did not retaliate against the student; indeed, I sent her an email to give her peace about her behavior in the incident, which clearly she relayed to others. When I continued to hear how ashamed she was about her conduct, especially because I was a former partner at the firm she will be working soon, I gratuitously sent her an email to minimize her fears about relaying the incident to interfere with her career. I have emails and witnesses about the student remorse regarding her OWN conduct, not mine.*

*The chain of documents alone that I have provided already and am resubmitting with this memorandum support my position that I reserved the room, was confronted by a student and reported the incident immediately, documented the student's alleged conversations to others about her own disruptive conduct, and harbored no negativity or retaliatory motives by the email I sent to MW to give her peace about her disruptive conduct. Never in my 30 years as a lawyer have I ever been accused of any employee misconduct.*

APP 587

Professor Smith provided the name of a student who was also present and could give additional details related to the incident. She also provided the text message that she sent to Associate Dean Reginald Green.




## Employee Witness Interviews

### Reginald Green, College of Law Associate Dean March 13, 2023

Dean Green provided the following written statement:

"On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text: "Hey…I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing. By the time I had identified who the student was, I was informed that the student had filed a grievance with Markita Cooper who was the Associate Dean for Academic Affairs. Per the Student Handbook, student petitions or grievances involving faculty should be forwarded to the Associate Dean for Academic Affairs. At the same time, I was notified that the complaint involved EOP issues (hostile environment and fear). Within days of learning of the complaint, I was copied on an email from then Provost Edington to Latrecha Scott who was Director of Equal Opportunity Programs and Labor Relations/Title IX. Provost Edington's instructions were for her to "please review and take appropriate

APP 588

action." At that time, without a written complaint from Professor Smith and an internal inquiry being conducted by Associate Dean Cooper and EOP, the process had ended for me. Even if Professor Smith had sent a formal accusation of a student code of conduct violation, it would have been impractical to conduct two separate investigations without interfering with the other. It is my belief that an EOP investigation superseded a conduct allegation. While investigating the EOP allegation, it would be impossible not to evaluate the student's conduct."

**Markita Cooper, Associate Dean for Academic Affairs and Law Professor February 6, 2023**
Dean Cooper provided the following written statement:

"I received Ms. Wanamaker's email with the complaint attached on Tuesday, October 25, 2022. The email cc'd another faculty member, Professor Maritza Reyes. I responded to the email on Tuesday, October 25, acknowledging receipt of the complaint and advised Ms. Wanamaker that I would ask my assistant to contact her to set up an appointment. In this message, I noted that Ms. Wanamaker had copied Professor Reyes and advised her that because the complaint raised sensitive personnel issues, it would not be appropriate for me to include other faculty members on communications regarding the matter. Ms. Wanamaker responded with a thank you in an email on Tuesday, October 25.

On the afternoon of Wednesday, October 26, Professor Reyes sent an email to Ms. Wanamaker, apparently in response to Ms. Wanamaker's email submitting the complaint. The email began with Professor Reyes stating, "I have been waiting for Associate Dean Markita Cooper to respond to the complaint you submitted to her about the incident with Professor Jennifer Smith last Thursday...I wanted to give her the first opportunity to respond." I had responded, but did not include Professor Reyes in the response, as explained in the message to Ms. Wanamaker. The message from Professor Reyes also stated, among other points, that "I infer that, because you copied me in your email/complaint to Associate Dean Cooper, that you want me involved in this matter."

Concerned about the nature of the allegations in the complaint (including bullying, creating a hostile environment, and "abusive behavior in direct conflict with 6C3-1.019 University Code of Conduct") as well as having another faculty member involved in the discussions of the complaint and any attempts to informally resolve the matter at the College of Law level, I sought guidance from the University EOP Office. I forwarded the complaint and related emails that I had received from Ms. Wanamaker and Professor Reyes to Ms. Kimberly Ceaser, Ms. Latrecha Scott, and Ms. Letitia McClellan on the afternoon of Wednesday, October 26.

On the evening of Wednesday, October 26, 2022, Ms. Wanamaker sent an email, stating that she needed clarification before scheduling a meeting with me. She requested clarification as to whether she was to be afforded an advisor during the meeting. Her position was that she was "afforded the right to have an advisor present during hearings and proceedings related to various violations of the Student Handbook." (This complaint, however, did not involve a violation of the Student Handbook.)

APP 589

FAMU 2022-11-117

> After I forwarded the email messages to EOP, I was advised not to meet with Ms. Wanamaker, and that Ms. Ceaser would contact her and assist regarding the next steps in the process. On Wednesday, November 2, I sent an email to Ms. Wanamaker advising her that I had reached out to the University EOP Office. In this message, I also informed her that Ms. Ceaser was reaching out to her to assist with the next steps in the process."

### Patricia Broussard, College of Law Professor, February 1, 2023

On February 2, 2023, Professor Broussard acknowledged that she advised Professor Smith to reach out to Ms. Wanamaker. Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset about her actions. Professor Broussard said that she told Professor Smith that this was a way to show Ms. Wanamaker that she would not hurt her and how women could uplift one another.

## Student Witness Interviews

### Complainant Witnesses

The OCE spoke with four of the five students who confirmed the statement received from the Complainant was true and accurate. In summary, the students recalled hearing Professor Smith aggressively saying that "you won't go far" to Ms. Wannamaker in a loud tone and commented that it was unprofessional.

### Respondent Witness

On February 8, 2023, OCE spoke with the student that Professor Smith said could provide information. The student confirmed being present and outside of the classroom. The student recalled Ms. Wanamaker being next to her "with an attitude" and Professor Smith whispering to Ms. Wanamaker that her behavior was inappropriate; however, Ms. Wanamaker replied, screaming, that Professor Smith was being inappropriate. They both exchanged words, with Professor Smith telling Ms. Wanamaker that she would not go far. Ms. Wanamaker walked off stating that she was going to go tell Dean Cooper.

## Additional Documents Reviewed/Requested

### Video Footage

On January 31, 2023, the OCE requested video footage from room 253 on October 20, 2023, between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police. Chief Calloway reported that video footage was unavailable.

### Respondent Subsequent Memoranda

Professor Smith also provided subsequent memoranda on the following dates:
Memo #2 was received on February 9, 2023
Memo #3 was received on February 16, 2023.
Memo #4 was received on February 26, 2023.

APP 590

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 14 of 57 PageID 2074

Memo #5 was received on February 27, 2023
Memo #6 was received on March 23, 2023

### Email from Ms. Smith to Ms. Wanamaker

On January 24, 2023, the Complainant stated that in December 2022, Professor Smith emailed her the following, in pertinent part:

---

**From:** Smith,Jennifer<jennifer.smith@famu.edu>
Sent: Sunday,December18,20227:16PM
To: Wanamaker,Michelle<michelle1.wanamaker@famu.edu>
Subject: FAMU COL

*Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*

*Best,*

*Prof. Smith*

---

On February 1, 2023, Professor Smith stated that the only reason she emailed the Complainant was because Professor Broussard told her that she should, as Ms. Wanamaker felt badly about how she behaved. Professor Smith related that Professor Broussard told her that the Complainant felt bad about how she acted and was nervous because she (Professor Smith) was a former partner at Holland & Knight.

## Discussion

**Allegation 1: Professor Smith engaged in disruptive conduct by her behavior during an interaction with Complainant, in violation of University Regulations 10.111 and 1.019.**

University Regulation 10.111 establishes guidelines for employee relationships to set behavioral expectations for the University. Individuals engaged in disruptive conduct under the policy:

*[Disruptive Conduct is defined as]...*
*(1) Faculty, Administrative and Professional, and USPS employees who intentionally act to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the University shall be subject to appropriate disciplinary action by the University authorities...*

> *c. Interference with the freedom of movement of any employee or guest of the University;*
> *d. Deliberate impediment to or interference with the rights of others to enter, use, or leave any University facility, service, or scheduled activity, or in carrying out their normal functions or duties...*

APP 591

The regulation provides a non-exhaustive list of examples of prohibited behavior. This expectation is reinforced by the University Code of Conduct (University Regulation 1.019), which sets standards for adherence to policy and regulation.

According to witness statements, Ms. Wanamaker and Professor Smith had a negative interaction when Ms. Wanamaker entered a classroom early for her regularly scheduled class, interrupting Ms. Smith's administration of an exam. Professor Smith booked that same class for make-up oral exams that ended immediately before Ms. Wanamaker's class began. Ms. Wanamaker argued that her class was starting soon and her professor wanted the class seated and ready for class. Professor Smith told Ms. Wanamaker to leave. The interaction picked up again when Professor Smith exited the classroom and Ms. Wanamaker was standing near the classroom door. During their conversation, Professor Smith stated that Ms. Wanamaker "would not go far." Ms. Wanamaker asked Professor Smith to repeat herself and Professor Smith loudly repeated that Ms. Wanamaker would not go far. Ms. Wanamaker then loudly responded that Professor Smith was inappropriate and unprofessional.

Based on the information available, Professor Smith's behavior did not interfere with Ms. Wanamaker's freedom of movement, her scheduled class, or obstruct university processes. Witness statements indicate that Ms. Wanamaker and Professor Smith were close during the confrontation, but Ms. Wanamaker had a path to walk away from the interaction, either further into the hallway or into the classroom. Witness statements indicate that Ms. Wanamaker actually walked back into her scheduled classroom and turned back around to say, "excuse me?" to Professor Smith, who repeated herself. Ms. Wanamaker's class also continued as scheduled.

While a witness stated that Professor Smith's behavior was startling and made them uncomfortable, the behavior did not rise to the level of restricting Ms. Wanamaker's freedom of movement or disrupting University processes. OCE is concerned about the tone of described interaction between a professor and student; however, the allegation is **UNSUBSTANTIATED.**

### Allegation 2: Professor Smith retaliated against Complainant after discovering that Complainant filed a complaint.

University Regulation 1.019(21) regarding retaliation states,

> "Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics-related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination. Retaliation against any

APP 592

FAMU 2022-11-117

individual for their actual or perceived involvement in an investigation is prohibited by the University."

Retaliation is established when an individual takes adverse action against another because of their participation in an investigation or opposing perceived violations of University policy or law. Such adverse action is actionable when it could reasonably deter an individual from engaging in such activity.

Ms. Wanamaker reported that Professor Smith's December 18th email was sent to intimidate her. According to witness and Respondent statements, Professor Smith's email to Ms. Wanamaker was sent at the behest of a colleague, who thought it would be helpful to make Ms. Wanamaker feel better. The motivation for Professor Smith's email indicates that the email was not sent with adverse intent.

The allegation is **UNSUBSTANTIATED**.

## Additional Finding

OCE became concerned with how Professor Smith responded after she was made aware that Ms. Wanamaker filed a complaint against her.

In response to the complaint, Professor Smith indicated that she filed a complaint with Reginald Green, Associate Dean for Student Services and Administration, on October 20, 2022:





**APP 593**

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 17 of 57 PageID 237

The College of Law Faculty Handbook states the following regarding faculty complaints against students:

> C. STUDENT MISCONDUCT
>
> The Student Code of Academic Conduct is outlined in the Student Handbook. Faculty allegations of student misconduct not covered by the Student Code of Conduct should be referred to the Associate Dean for Student Services and Administration.

In a subsequent statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint, reporting that:

> On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text:
>
> "Hey...I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom.
>
> I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing which is consistent with the Student Handbook.
>
> Had I received an email with details regarding any alleged misconduct, I would have forward[sic] that information to the Director of Student Affairs to complete a report.
>
> It is my belief that the text message above was not intended to be a formal complaint nor did it constitute a formal complaint as required by the Student Handbook. I think Professor Smith will agree with that contention, as she has served as the chair of the Student Disciplinary Committee in past academic years.

It is unreasonable that Professor Smith considered her text message to Associate Dean Green as a formal complaint of a student conduct violation. Professor Smith did not respond to Associate Dean Green's request for further information. Further, Professor Smith indicated in the same statement that she felt the issue was resolved after her December 18, 2022 email, noting that:

> "MW did not respond [to my email]. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail."

As Professor Smith notes in Memorandum 1, during her interview with the OCE investigator on February 1, she emailed Associate Dean Green to ask "what happened to my complaint," referencing the email that she sent to him. Professor Smith included her email to Associate Dean Green, in which she asked:

APP 594

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 13 of 54 PageID 2478

> *"Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this?"*

Professor Smith continued to send OCE supplemental memoranda restating her position and other concerns regarding the investigation and colleagues. Professor Smith submitted five supplemental memoranda to support her initial testimony.

On March 9, 2023, Professor Smith filed a complaint through the University's Compliance and Ethics Hotline, reporting that a student knowingly and intentionally disrupted her class on October 20, 2022. OCE advised Professor Smith on several occasions that the investigation would include her testimony regarding her account of the incident.

On March 10, 2023, OCE sent an email to Professor Smith reiterating that the issue would be addressed in the ongoing case FAMU 2022-11-117.

Professor Smith responded that

> *"...there is a difference in being the one who brings a charge and is the subject of a charge. So, these are not the same. The student needs to understand she was also the subject of an investigation, and I am not sure she will."*

On March 13, 2023, OCE sent a Notice regarding Non-Retaliation to Deidré Keller, Dean of the College of Law, to reinforce the University prohibition on retaliation with Professor Smith. In the notice, OCE stated that "...Filing a complaint for the purpose of making a student "understand she is also the subject of an investigation" is inappropriate."

The notice also reiterated the requirement that reports be made in good faith. The law deans met with Professor Smith. In response, Professor Smith submitted Memorandum #6 dated March 23, 2023. In this memorandum, Professor Smith goes on to clarify why it was important that Ms. Wanamaker know that she was a subject in a complaint:

> *"...It is necessary for the student to properly file her Bar application; otherwise, she will be accused of not being truthful about her law school experiences. I knew an investigation was being reviewed, but Ms. Baker informed me that I (not MW) was the subject of the investigation."*

Professor Smith's subsequent complaint on March 9, 2023, although she knew that an investigation was being reviewed, memorandum responses, and the timeline of events are concerning. Professor Smith did not follow up on her text message to Associate Dean Green about Ms. Wanamaker being "aggressive rude" or his request for additional information in October 2022, which contradicts her subsequent assertions that she filed a complaint and was under the impression that it was being handled. Professor Smith also stated that she felt the issue was resolved in December 2022.

Despite this, Professor Smith filed an additional complaint against Ms. Wanamaker with the Office of Compliance and Ethics after discovering that Ms. Wanamaker filed a complaint against her. Based on Professor Smith's statements, she filed this complaint for the purpose

13 | P a g e

APP 595

of ensuring that Ms. Wanamaker would report that she was the subject of an investigation on her bar application. Professor Smith's clarifying statement that she filed the complaint would prevent Ms. Wanamaker from being "accused of not being truthful about her law school experiences."

Based on the information available, the allegation is **SUBSTANTIATED.**

## Summary Conclusion

The allegation that Professor Smith violated University Regulation 10.111 and 1.019 related to disruptive conduct is **UNSUBSTANTIATED.**

The Complainant's allegation that Professor Smith violated the University Code of Conduct related to retaliation by sending the December 18, 2022 email is **UNSUBSTANTIATED.**

The additional finding of retaliation due to Professor Smith's subsequent action in filing an additional complaint against Ms. Wanamaker for the purpose of having Ms. Wanamaker report the complaint on her bar application, is **SUBSTANTIATED.**

## Additional Information and Recommendations

During the course of the investigation, OCE became aware of additional concerns which OCE will address directly with management. Additionally, the OCE recommends that Interim Provost and Vice President of Academic Affairs, Allyson Watson and College of Law Dean Deidré Keller:

♦ Review this report and take any corrective actions deemed appropriate.
♦ Consider if additional training is appropriate regarding civil discourse, conflict resolution, and professionalism in the practice of law for faculty and students.
♦ Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices.

APP 596

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 29 of 52 PageID 2730



FLORIDA A&M UNIVERSITY
# OFFICE OF COMPLIANCE AND ETHICS

## Supplemental Report
### *FAMU 2022-11-117*

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun

Case 6:24-cv-00457-PGB-RMN Document 44-6 Filed 03/04/23 Page 2 of 525 PageID 2781



July 6, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Supplemental Report, addressing additional concerns as a result of the investigation of employee misconduct regarding Ms. Jennifer Smith. If you need further information, please contact our office.

Best,

*Rica Calhoun*

Rica Calhoun

Copy to:

Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Dr. Latrecha Scott, Director, Office of Equal Opportunity Programs
Ella Kiselyuk, Associate Vice President, Human Resources

**APP 598**

# SUPPLEMENTAL REPORT

## Background

On June 5, 2023, The Office of Compliance and Ethics (OCE) released FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The (OCE) concluded that allegation 1 related to disruptive conduct is UNSUBSTANTIATED and allegation 2 related to retaliation is UNSUBSTANTIATED. An additional finding of retaliation related to Professor Smith's subsequent actions is SUBSTANTIATED. However, the OCE had additional concerns related to documentation reviewed during the course of the investigation.

## Document Review

On February 9, 2023, Professor Smith emailed "MEMO 2" with the following message:

> Hi again.
> I think these are the last of emails/texts on matter.
> Thx,
> JS

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:     Latonya Baker, FAMU Office of Compliance and Ethics
From: Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Second Memo on the Matter
Date:  February 9, 2023

---

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (████████████) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

---

APP 599

Case 6:24-cv-00457-PGB-RMN Document 46 Filed 07/09/24 Page 29 of 57 PageID 2783

## Discussion

The University outlines its values of accountability, inclusion, innovation, and integrity. This sentiment is echoed in regulation as well as collective bargaining agreements. For example, the UFF Collective Bargaining Agreement indicates that,

> "in addition to their assigned duties, faculty members have responsibilities arising from the nature of the educational process. Such responsibilities include, but are not limited to… respecting the confidential nature of the relationship between professor and student; adhering to one's proper role as teacher, researcher, intellectual mentor, and counselor; and conducting oneself in a collegial manner in all interactions."

In Professor Smith's message to Assistant Dean Reginald Green, she identified Michelle Wanamaker as "one of Reyes' students (Hispanic blonde)." The text messages between Professors Smith and Broussard and former student Professor Smith identified as Elliot Preston Jackson (c/o 2021) were concerning based on the nature of their discussion regarding current students. "Preston," as identified by Professor Smith, sent her a picture of Michelle Wanamaker and told her that "Michelle Wanamaker is the student who walked up on you." Preston then stated that Daniel Jefferson, a current 3L student, reported to him that

> "another student in [Professor Smith's] class saw everything and is supporting a complaint against you to Admin. That report is being fueled unofficially by Reyes."

The text message exchange continued with a discussion about information that Preston said came from current and former students. Professor is noted asking Preston if the student is "brown." Professor Smith then shared the picture of Michelle Wanamaker with Professor Broussard, discussing the situation with the student. Professor Smith also provided a "note to self," that stated:

> "…also heard Michelle being really nice to my blk women students and asking irrelevant questions…that's a big book you have…to try to start convo. I said did she speak before…they said sometimes here n there…"

While the text messages did not rise to the level of a policy violation, the OCE is concerned with the appropriateness and professionalism displayed by Professor Smith and others in the messages that she provided. The apparent undercurrent of race and the perceived rivalry between Professors' Reyes and Smith, internalized by students, is a distraction and out of step with the values reiterated in University commitments and regulations.

The expectation of privacy refers to an individual's reasonable belief that their personal information, activities, communications, and spaces will remain private and free from unwarranted intrusion or surveillance. While this incident did not violate Family

Case 6:21-cv-04045-RBD-NDM Document 44-6 Filed 07/09/23 Page 24 of 54 PageID 2784

Educational Rights and Privacy Act (FERPA), sharing a student's photograph for the non-educational purpose of gossip is wholly inappropriate. Additional general observations follow:

### Confidentiality and Privacy:

➢ Professors should respect the privacy and confidentiality of their current and former students. Personal information, academic records, or any other sensitive details should not be disclosed without the explicit consent of the individuals involved.

### Professional Boundaries:

➢ University faculty are bound by academic standards of professionalism and decorum, which encompasses a strong commitment to ethical conduct and integrity. College of Law faculty, as attorneys, are additionally bound by professional codes of conduct and ethical rules, which guide their behavior and ensure they act in the best interests of their clients while respecting legal and moral principles. Upholding ethical standards, fosters fairness and justice, and maintains the integrity of the profession.

➢ Faculty should be mindful of maintaining professional boundaries when discussing students with former students. They should avoid sharing personal opinions, making derogatory remarks, or engaging in gossip. The focus should be on constructive and objective discussions related to educational experiences or academic achievements.

➢ Faculty should ensure that discussions about students with former students serve a legitimate educational purpose. This may include seeking insights, feedback, or recommendations related to educational development or career opportunities. Discussions should be conducted in a professional and respectful manner.

## Recommendation

Deidré Keller, Dean of the College of Law, should review this supplemental report and take any action deemed appropriate, taking into consideration the recommendations outlined in FAMU 2022-11-117 Investigative Report.

**APP 601**



# Appendix A: Documentation

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:     Latonya Baker, FAMU Office of Compliance and Ethics
From: Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Second Memo on the Matter
Date:  February 9, 2023

---

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (704.891.4223) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

**APP 603**

Case 6:24-cv-00457-JDK-JDL Document 44-6 Filed 07/04/24 Page 2 of 5 PageID #737

Thursday, October 20, 2022

Hey...I had a hurricane make up class in 253 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. Aggressive rude...like fight rude...i reported it.JS

10:41 AM

**APP 604**

Case 6:24-cv-00457-JDK Document 46-1 Filed 07/08/24 Page 25 of 58 PageID 2738



APP 605

Case 6:20-cv-01790-WWB-RMN Document 64-1 Filed 03/04/22 Page 29 of 54 PageID 2739

Michelle Wanamaker is the student

Who walked up on you

10:26 PM

Repeated by: Daniel Jefferson

Daniel reports that another student in your class saw everything and is supporting a

APP 606

Case 6:24-cv-01957-PGB-RMN   Document 63   Filed 07/04/25   Page 39 of 58   PageID 2790



Case 6:24-cv-00457-PGB-RMN Document 46-3 Filed 07/09/24 Page 39 of 51 PageID 2791

Oct 21, 2022   10:32 PM

**Who is Daniel Jefferson**

10:33 PM

**Daniel is a student in 3L class**

**He is a friend of Tyran who does not like you. She never had you as a professor but they are on vendetta against you**

**APP 608**

Case 6:24-cv-01057-GCB-RMN Document 63 Filed 07/04/23 Page 3 of 5 PageID 2792





Case 6:22-cv-01057-DCJ-DJA Document 61 Filed 07/09/23 Page 52 of 584 PageID 2094

**APP 611**

Case 6:21-cv-00057-DLB-DLB Doc #: 151-6 Filed: 07/02/28 Page: 59 of 85 PageID #: 2095



Case 6:24-cv-00087-DCJ-CBW Document 81-6 Filed 07/08/25 Page 38 of 58 PageID 2096



4:42

Patricia Broussard

Oct 24, 2022

Green should have said she had no right to be inthere.in there.. heard her folk said i have supporters for my side...other students say she's loud and rude often

3:03 PM

**APP 613**

**RE: AD Green**

**Pissini, Theresa** <theresa.pissini@famu.edu>
Tue 11/1/2022 10:27 AM
To: Smith, Jennifer <jennifer.smith@famu.edu>

Good morning Professor Smith,

Not a problem. I did recognize you when you got close to me.

Theresa Pissini
Senior Administrative Assistant to the Associate Dean for Student Services and Administration
Florida Agricultural and Mechanical University
College of Law
201 Beggs Avenue
Orlando, Florida 32801
407.254.3205 Office
407.254.3214 Fax
theresa.pissini@famu.edu

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Tuesday, November 1, 2022 10:23 AM
**To:** Pissini, Theresa <theresa.pissini@famu.edu>
**Subject:** AD Green

GM. I forgot I had sunglasses and a mask on when I came to see AD Green. Sorry about that - I was probably unrecognizable.

**Jen Smith**
**Professor of Law**
**Florida A&M University College of Law**
**201 FAMU Law Lane**
**Orlando, Florida 32801**
**407.254.3256 Office**
**407.254.2456 Fax**
jennifer.smith@famu.edu
**https://profjensmith.com/about-me/**

APP 614

Just went to see green but he's off for the week. His secretary, teresa,, jumped up like she was blocking me. I took off my sunglasses...oh but I still had a mask on...she probably ain't know who I was...also heard Michelle being really nice to my blk women students and asking irrelevant questions...that's a big book you have...to try to start convo. I said did she speak before...they said sometimes here n there...

APP 615

Case 6:24-cv-00457-PGB-RMN Document 84-6 Filed 07/09/24 Page 59 of 589 PageID 2099

# MEMORANDUM

To:     Rica Calhoun, FAMU Office of Compliance and Ethics
CC:     Denise Wallace, Esq., FAMU GC
From:   Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Ninth Memo on the Matter
Date:   October 5, 2023

A year ago, I experienced an unexpected confrontation with a law student, Michelle Wanamaker, whom I had not previously met. She entered through the side door of a classroom I had reserved weeks earlier, interrupting my ongoing oral exams to insist on preparing for her upcoming class. After asking her to leave, she then positioned herself outside the main entrance where she knew I would exit, awaiting another opportunity to confront me. Shocked about this stranger's hostility towards me, I immediately contacted Associate Dean Green, who promptly arrived, but by then my subsequent class was in session.

Although Dean Green had indicated there would be an investigation, it was not until 100 days later that I was approached for an interview by L. Baker from Compliance. Surprisingly, the investigation focused on a complaint filed by the student, one week after my own, and of which I was not informed. The subsequent 130-day investigation, spanning January to June, resulted in an incomplete report riddled with discrepancies, bias and oversight. While I was ultimately exonerated, this could have been expedited or non-existent had the University sought to retain the video evidence when the incident happened, but the University did not think the incident worthy of investigation in October.

In January, the University launched an investigation, which had my employment on the line. For reasons unbeknownst to me, my initial complaint I filed on the day of the incident was overlooked and subsequently deemed invalid. Thus, I re-submitted my complaint in March. Instead of addressing the issue, I was accused of potential retaliation in March for "re-filing the complaint" and spoken to by Deans Keller and Cooper about this potential retaliation, but they seemed unaware of what to say or do. Then, after the investigation was concluded in June, the report determined I had engaged in retaliation and re-assigned unspecified punishment to follow by the dean or provost.

In June 2023, I detailed these inconsistencies and duplicative punishment for the same "retaliation" in a memorandum addressed to Rica Calhoun (Compliance) and Denise Wallace (GC), but copied Craig Reed (BOT) on the email. To date, I have not received a response to my June 2023 memo. This confirms to me that the initial investigation was retaliatory.

On Monday (Oct. 2, 2023), during the provost's visit to the law school, associates of Wanamaker raised the October 2022 incident. They asserted I should have been dismissed, lamented the lack of any follow up, and expressed that students are uncertain about the procedure to lodge grievances against faculty. Yesterday (Oct. 4, 2023), while attending an event hosted by my previous firm (and where Wanamaker received a job offer because I never mentioned the incident), it became evident that Wanamaker has been disseminating a distorted and false narrative of the event, tarnishing my reputation to my former co-workers and within the legal community. Though I've refrained from defending myself outside the formal investigation, I am obligated to report this student's defamatory conduct and slander campaign to The Florida Bar for several reasons, including my personal safety:

- When law students in Florida apply for bar admission, they undergo a character and fitness review. This process evaluates an applicant's honesty, trustworthiness, and fitness to practice law. These factors comprise and applicant's moral character. Wanamaker has demonstrated (1) dishonesty based on her intentional mischaracterization of the events underlying the investigation; (2)

APP 616

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
October 5, 2023

untrustworthiness based on those mischaracterizations and contradictory evidence; (3) manipulation of the complaint process by leveling a meritless complaint; (4) bullying by knowingly interfering in my class by creating a threatening and hostile environment for me; and (5) lack of respect for process because she has initiated this campaign to target and attack my reputation. Misconduct during law school is relevant during this review. I do not believe that Wanamaker is fit for the practice of law. She is dishonest, unethical and a bully.

- We have our own policies or codes of conduct which dictate the actions that faculty members must take in response to student misbehavior. Some infractions require internal reporting, academic consequences, or even reporting to outside entities.

- Faculty members, like other professionals, have general ethical or professional obligations to report certain types of misconduct, especially if they believe that the misconduct suggests the student might be unfit to practice law or if there's a risk to others. The response may vary depending on the severity of the misconduct. While minor indiscretions might be handled internally, more serious violations, especially those involving dishonesty, integrity, or harm to others, might warrant notification to the Florida Bar or other authorities.

- On the bar application, students might be required to disclose certain types of misconduct or disciplinary actions taken against them during their academic career. Failing to disclose such information can be problematic if discovered later.

I am increasingly uneasy about a student who remains severely fixated on an incident that transpired nearly a year ago. Wanamaker, a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior towards Professor Broussard (one of my witnesses regarding the incident), who knew the student before the incident. Prior to this incident, I had no knowledge of the student, but she knew me and hated me (though never knowing me personally), apparently due to misleading information from Professor Reyes (who I recommended for hire at the law school even though her tenure at the firm where we both worked was short and problematic). It's troubling that a student would viciously confront and then attempt to jeopardize the career of a faculty member based on dubious information. Wanamaker's actions suggest emotional and psychological instability.

Through this memo, I wish to formally express my concern regarding Wanamaker's persistent and unsettling behavior towards me. I find myself perpetually on guard, unable to comprehend why a student, with whom I've had NO prior interactions, seems intent on targeting and harming me. The University's biased, unfounded, and retaliatory investigation continues to cause me harm.

2

**APP 617**

## Florida Agricultural and Mechanical University
### Regulation



## 1.019 University Code of Conduct.

As members of the Florida A&M University (University) community, all faculty, staff, students, members of the Board of Trustees, University officers and affiliates are responsible for sustaining the highest ethical standards of professional conduct and integrity for this institution, and for the broader community in which we function. We share responsibility for this institution and for its enterprises. The University's Strategic Plan outlines the core values we hold as essential to responsible professional behavior, which include: integrity, accountability, innovation, and inclusion. The ethical principles espoused by the Florida Code of Ethics for Public Officers and Employees in Chapter 112, Part III of the Florida Statutes (Code of Ethics), reinforce our commitment to the University's values. Adherence by trustees, officers, faculty, staff, student employees, contractors and others acting on behalf of the University, to the standards set forth in this Code of Conduct is an integral part of the University's goal of attracting quality students, faculty, and staff, while ensuring a safe and healthy environment for all members of the campus community. Further, the University supports and encourages a full and open discourse and the robust exchange of ideas and perspectives. While the University upholds these freedoms, the University will not permit speech, expression, or assembly that advocates lawlessness and/or violence, or restrains, disrupts, or interferes with activities of members of the University community, whether by physical force or intimidation. The Code of Conduct outlines behavioral standards for members of the University community and for those acting on behalf of the University.

APP 618

(1) *Applicability.* This Code of Conduct applies to the following members of the University community: a) faculty, staff, and students who are paid for working for the University; b) Board of Trustees; c) consultants, vendors and contractors and other individuals using University resources or facilities, or receiving funds administered by the University; and d) individuals who perform services for the University as volunteers and who assert an association with the University. Any reference to members of the University community as provided in this regulation shall refer to the above referenced persons.

(2) *Compliance with Laws and University Rules and Policies.* Per Section 1012.80, Florida Statutes, members of the University community shall comply with the applicable standards, policies, rules, regulations and state and federal laws that govern and guide their work. The University promotes ongoing and open communication at all levels of the institution. As such, administrators, supervisors and managers are responsible for supporting and monitoring compliance. Members of the University community have an obligation to report any behavior that they believe is unethical or in violation of state or federal law, regulations, or university policies. See Section 17 of this Regulation for reporting options.

(3) *Disruptive Conduct.* The University strives to maintain an environment in which members of the University community treat each other with dignity and respect. University Regulation 10.111 prohibits individuals from acting intentionally to impair, interfere with, or obstruct the orderly conduct, processes and functions of the University. This includes substantially disrupting a student's, employee's, or the University's performance, opportunities or benefits.

(4) *Conflicts of Interest and Commitment.* Faculty and staff of the University owe their primary professional allegiance to the University and its mission. The University has an obligation to internal and external stakeholders to use their

**APP 619**

resources responsibly and, where required, for designated purposes. Thus, all officers, faculty, principal investigators, staff, student employees and others acting on behalf of the University hold positions of trust, and the University expects them to carry out their responsibilities with the highest level of integrity and ethical behavior. Outside activities are defined as any employment or activities entered into in addition to an individual's employment at the University, that utilize the knowledge, skills, abilities or expertise the individual uses to carry out their University duties. Outside activities, including any interest, obligation, or relationship that could potentially be, or appear to be, in conflict with the interests of the University, including those of immediate family members, must be disclosed to the University immediately so it can be managed appropriately. Conflicts of interest can often be managed to eliminate the risk of damage to the University, but only if they are promptly disclosed.

Failure to disclose outside activities related to an actual, apparent, or possible conflict of interest or commitment is a violation of this Regulation, as well as other applicable conflict of interest policies (including University Regulations 6.002 and 10.122) and the Florida Code of Ethics.

(5) *Political Activities.* Employees with intentions to seek election to and hold public office must notify the President or President's designee of such intentions. The President or President's designee will determine whether the employee's candidacy for holding public office will interfere with the full and faithful discharge of the employee's duties, as outlined in the University Regulation 10.123 and Section 104.31, Florida Statutes.

(6) *External Communication on Behalf of the University.* Pursuant to the University Communications Policy, the Office of Communications is the official University representative to the media and is tasked with establishing and cultivating relationships with journalists, publications and broadcast networks/channels, as well as responding to media inquiries, issuing official statements and announcements and providing guidance and leadership to the University

APP 620

community about relevant media guidelines and best practices.

All University leaders, faculty, staff, partners, vendors and contractors must coordinate with the Office of Communications to develop and distribute news and information about the University and to participate in solicited and unsolicited media interviews or media events. Use of University logos and identity must be used in accordance with the University Style Guide and other applicable policies.

(7) *Contract Authority*. The acceptance of an agreement, including sponsored project funding, may create a legal obligation on the part of the University to comply with the terms and conditions of the agreement and applicable laws and regulations. Therefore, only individuals who have authority delegated by an appropriate University official are authorized to enter into agreements on behalf of the University. All agreements, understandings, and contracts must be reviewed by the Office of General Counsel before execution.

(8) *Confidentiality and Privacy*. The University community shall use confidential information acquired in the course of University business only for official or legal purposes, and not for personal or illegal advantage, during or after such affiliation. It is imperative that each community member complies with all state and federal laws, agreements with third parties, and University policies, regulations and procedures pertaining to the use, protection and disclosure of such information. Such policies apply even after the business relationship with the University ends.

(9) *Gifts and Entertainment*. Employees must abide by expectations outlined in University regulation, policy, and the Florida Code of Ethics regarding the solicitation or acceptance of anything of value from third parties. Members of the University community are prohibited from soliciting or accepting anything of value based on the understanding that their official position will be

APP 621

Case 6:21-cv-00057-PGB-RMN Document 81-6 Filed 07/09/23 Page 62 of 585 PageID 2805

influenced by such a gift. Employees identified as a financial disclosure reporting individual or procurement employee have additional restrictions from donors who are lobbyists, principals, political action committees or vendors doing business with the university.

(10) *Record Keeping*. Employees are expected to demonstrate a commitment to transparency in the retention and management of records that have sufficient administrative, legal, fiscal, or historical value pursuant to University policy, the Public Records Law (Chapter 119, Florida Statutes), and the general records schedule published by the Florida Department of State's Division of Library and Information Services (notably, schedules GS1-SL and GS5).

Records are defined as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of physical form or characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by an agency." Employees are prohibited from destroying documents in violation of law or policy, in response to, or in anticipation of, an investigation, audit, or litigation.

(11) *Proper Use and Protection of University Assets*. The University community will strive to preserve, protect and enhance the University's assets by making prudent and effective use of University resources and property and by accurately reporting its financial condition. All funds provided for research must be spent in ways consistent with funding requirements and incompliance with guidelines on allowable costs (i.e. 2 CFR Part 200 Subpart E).

(12) *Misuse of Public Position*. Employees may not use or attempt to use their official position or any property or resource within their trust to obtain special privilege, benefit, or exemption for themselves or others.

APP 622

Case 6:24-cv-00457-PGB-RMN Document 81-6 Filed 07/09/24 Page 48 of 536 PageID 2806

(13) *Fraud.* As outlined in BOT Policy 2020-01, fraud occurs when an individual obtains something of value through willful misrepresentation, including, but not limited to, intentional misstatements or intentional omissions of amounts or disclosures in financial statements to deceive users of financial statements, theft of an entity's assets, bribery, or the use of one's position for personal enrichment through the deliberate misuse or misapplication of an

organization's resources. Fraud generally means an act of deception, bribery, forgery, extortion, theft, misappropriation, false representation, conspiracy, corruption, collusion, embezzlement, or intentional concealment or the omission of material facts. Members of the University community must mitigate the risk of fraud by fulfilling their duties honestly, while immediately reporting any observed or suspected irregularities to their immediate supervisor.

University employees, consultants, vendors, or persons doing business with FAMU who have knowledge of a fraud, misappropriation, or other impropriety shall immediately notify his/her supervisor and/or the Division of Audit.

(14) *Complaints may be made anonymously.* Acts of fraud, as well as the failure to report incidents in good-faith or suspected incidents of fraud, is a violation of this Regulation. Examples of fraud include, but are not limited to:
   a. Any dishonest or fraudulent act;
   b. Falsification of documents;
   c. Misappropriation of funds, supplies, or other assets;
      d. Impropriety in the handling or reporting of money or financial transactions;
      e. Destruction, removal, or inappropriate use of records, furniture, fixtures, and equipment; or,
   f. Any similar or related irregularity.

The Division of Audit has the primary responsibility for the investigation of all suspected fraudulent acts as defined above. The Division of Audit will issue reports to appropriate designated personnel detailing the findings.

APP 623

(15)  *Health and Safety.* Members of the University community are expected to perform their duties in accordance with applicable health and safety laws, regulations, policies, and procedures. Members are also responsible for compliance with the health, safety, and risk management program and are required to immediately report workplace/campus injuries, illnesses, and unsafe conditions to the University Department of Environmental Health and Safety and the Office of Risk Manager.

(16)  *Sustainability.* We are all responsible for the continued viability of Florida A&M University and our local and regional communities. The University is committed to operating in an environmentally responsible manner, from the procurement of services to the operation of offices and facilities, and other business activities. Members of the University community must comply with all applicable environmental laws and regulations as well as commitments to sustainable practices and environmental protection outlined by the University's Sustainability Institute.

(17)  *Information Technology.* Pursuant to University Regulation 5.003 (Electronic Connectivity), members of the University community play a role in safeguarding information systems by adhering to established University controls and applicable law and policy. Members do not have an expectation of privacy in the use of University computers and systems. Cyber security and systems training are required of all employees before they are permitted access to these systems. Members are prohibited from using University computers or systems in furtherance of personal or political business.

Information Technology Services tracks software vulnerabilities and applies patches as soon as they become available. To that end, users of the University network shall not:

- Undermine the security or the integrity of computing systems or

1.019 University Code of Conduct
Page 7 of 11

APP 624

networks or attempt to gain unauthorized access;

- Use any computer program or device to intercept or decode passwords or similar access control information;

- Knowingly or intentionally transmit, download, or upload any material that contains viruses, trojan horses, worms, time bombs, cancelbots, phishing, or any other harmful programs;

- Transmit, download, or upload any material that contains software or other material protected by federal or state intellectual property laws unless the user owns or controls the rights thereto or has received all necessary consents; or

- Use FAMU electronic connectivity for the exchange of pirated software.

(18)    Reporting Suspected Violations.

a. Members of the University community are required to report violations of applicable University policy, government contracts, and grant requirements, as well as state and federal laws and regulations. Prompt reporting of possible violations is required as it gives the University the opportunity to investigate the matter and take corrective action where needed. Complainants may initially report their concerns through their normal management chain of command, beginning with one's immediate supervisor. If it is inappropriate to report to the immediate supervisor, (e.g., the suspected violation is by the manager or the complainant is generally uncomfortable), individuals may go to a higher level of management within the college, department, or report directly to the Office of Compliance and Ethics, Office of General Counsel, Division of Audit, the Office of Human Resources or the Office of Equal Opportunity Programs. Managerial and supervisory personnel must maintain an open-door policy and take proactive measures to assure their staff that the institution supports a culture that values ethical behavior and compliance.

b. Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the

1.019 University Code of Conduct
Page **8** of **11**

APP 625

University's Compliance and Ethics Hotline. As appropriate, the Office of Compliance and Ethics coordinates with the Division of Audit, the Office of Human Resources, the Office of Equal Opportunity Programs and other relevant areas, both internal and external. Employees are not exempt from the consequences of wrongdoing by self-reporting, although self-reporting may be considered in the determination of an appropriate course of action.

c. Compliance and Ethics Hotline. Members of the University community may use the University Compliance and Ethics Hotline to report complaints of misconduct outlined in this Regulation. The Hotline allows reporting by phone or online, with an option for anonymous reporting.

d. Other Reporting Avenues. While the Office of Compliance and Ethics coordinates the Compliance and Ethics Hotline, violations may also be reported internally to the offices listed above. Externally, suspected violations of state and federal laws may be reported to the Florida Board of Governors' Office of Inspector General and Director of Compliance or the State of Florida Whistleblower's Hotline.

(19) *False Reports.* Submitting a report that is known to be false (made in bad faith) is a violation of this Regulation and will result in discipline up to and including potential termination from employment, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(20) *Investigation.* Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe. The primary investigator will provide appropriate updates to the parties.

a. Independence. Investigators are responsible for establishing and maintaining independence so that conclusions and recommendations are impartial in both fact and appearance. The investigator must consider

APP 626

organizational, personal, and external impairments that impact the investigators' ability to perform work impartially.

b. Confidentiality. Such reports may be made confidentially, and even anonymously. Confidentiality will be maintained to the extent legal and practicable, informing only those personnel who have a need to know such information.

c. Cooperation. All members of the University community are required to cooperate fully in any external or internal investigation. A copy of this Regulation will be provided to all employees.

d. Interference. The integrity of an audit, investigation, or administrative action is vital in ensuring a fair and equitable outcome for all parties involved. Members of the University community are prohibited from impeding any audit or investigation. Examples of interference includes, but is not limited to: disclosing information inappropriately, making false statements, failing to respond timely to requests for information or tampering with evidence.

e. Referral. Decisions to prosecute or refer the investigation results to the appropriate law enforcement and/or regulatory agencies for independent investigation will be made in conjunction with legal counsel and executive level leadership.

f. Investigative Reports. Despite the disposition, investigative activity will result in a written report. Reports shall be fair, objective, and present the results of investigation in a clear manner.

(21) *Retaliation.* Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

1.019 University Code of Conduct
Page **10** of **11**

APP 627

(22) *Enforcement.* Members of the University community are responsible for annually completing mandatory compliance and ethics trainings, as well as maintaining compliance with law, regulation, policy, and making ethical decisions. Failure to follow the standards outlined serves as a violation of this Regulation, as well as the originating regulation/policy, if applicable. Members of the University community who violate this Regulation will be subject to personnel action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(23) *Equal Opportunity.* It is the policy of Florida A&M University that each member of the University community is permitted to work or attend class in an environment free from any form of discrimination including race, religion, color, age, disability, sex, sexual harassment, sexual orientation, gender identity, gender expression, marital status, national origin, and veteran status as prohibited by State and Federal Statues. This commitment, identified in several regulations, including 10.103, applies to all areas affecting students, employees, applicants for admission and applicants for employment. It is also relevant to the University's selection of contractors, suppliers of goods and services and any employment conditions and practices.

*Specific Authority: Chapter 112, Part III, Florida Statutes; Section 7(c), Art. IX, Fla. Const., BOG Regulation 1.001. History–New 10-05; Amended 2-9-2020, 11-30-2022, 08-11-23.*

APP 628

Case 6:21-cv-00057-DEED-RMN Document 146 Filed 07/09/24 Page 52 of 55 PageID 2882

**Regulations of**
**Florida A&M University**



**10.120      Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees.**

(1) Written Notice – Prior to the dismissal, suspension, or disciplinary reduction in pay of a tenured or permanent status employee, the University shall give the employee written notice as follows:

(a) The employee shall be given written notice of the proposed action and the reasons therefore. Such notice shall be sent by certified mail, return receipt requested, or delivered in person with written documentation of receipt obtained.

(b) The mailed notice shall be considered received by the employee even if refused or ignored.

(2) Contents of Notice – The notice shall be signed by the President or President's designee who makes the final decision regarding the proposed action. The notice shall include the following information:

(a) The effective date of the University's proposed final action;

(b) The specific charges or reasons for the action;

(c) A list of documents or written explanation on which the charges are based; and a statement that documents shall be available to the employee upon request;

(d) A statement that the employee may, within 10 days of receipt of the notice, submit a request in writing for a conference at which the employee may make an oral or written statement, or both, to the University to refute or explain the charges or reasons for the action; and the name and address of the person to whom the request for a conference shall be directed;

(e) A statement that the requested conference must be held prior to the proposed effective date of the action, at a time and place determined by the University, normally during regular business hours, and that the employee may bring a

**10.120      Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees**

Page 1 of 3

APP 629

representative to advise and assist;

(f) A statement that the University desires to reduce the risk of error in taking the action against the employee and to avoid damaging the employee's reputation by untrue or erroneous charges, and therefore, the University is interested in receiving and considering the employee's response; and

(g) A copy of this rule shall be enclosed with the notice.

(3) Conference – The conference must be conducted by the designated representative(s) of the President as follows:

(a) The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted.

(b) The conference shall be informal and shall not be in the nature of an evidentiary hearing. The employee may bring a representative to advise and assist, but discovery, cross-examination and similar legal procedures are not permissible.

(c) The employee shall be permitted to submit relevant information, orally or in writing, or both, with the privilege being reserved to the University to give such information the weight it deems proper. If the employee chooses to make no response, the University will proceed on the basis of the best information it can obtain without such response.

(d) After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision.

(4) Decision – If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified as described in this rule within five workdays prior to the date the action is effective. USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of Board of Regents subsection 6C-5.950(4), F.A.C. If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance

10.120       Predetermination Procedures for Tenured and Permanent Status
             Faculty and University Support Personnel System Employees

Page 2 of 3

APP 630

Case 6:21-cv-00055-PGB-RMN Document 64-6 Filed 03/09/23 Page 32 of 34 PageID 2204

procedures as provided in the applicable collective bargaining agreement may be used. Further, the University shall follow the provisions of Part VI of Chapter 112, F.S., Law Enforcement Officers' Bill of Rights, when Sworn Law Enforcement Personnel are involved.

(a) During the period between the first notice and the effective date of the action, one of the following options may be used by the University: retain the employee in the employee's usual duties; temporarily assign the employee to other duties; or place the employee on administrative leave with pay.

(5) Extraordinary Situations.

(a) In extraordinary situations, when the retention of a tenured or permanent status employee is likely to result in damage to property, or is likely to result in injury to the employee, a fellow employee, or some other person, the employee may be suspended or dismissed immediately upon written or oral notice to the employee of the charges giving rise to the suspension or dismissal.

(b) If an oral notice of suspension or dismissal is given to an employee, the University shall within 24 hours issue a written notice confirming the proposed action and the reason(s) therefore.

(c) In lieu of the action to suspend or dismiss the employee, the University may place the employee on administrative leave as described in subsection 6C-5.920(14), F.A.C.

(d) USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of subsection 6C-5.955(4), F.A.C.

(e) If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance procedures as provided in the applicable collective bargaining agreement may be used.

(f) Further, the University will follow provisions of Part VI of Chapter 112, F.S., Law Enforcement Officer's Bill of Rights, when sworn law enforcement personnel are involved.

*Specific Authority 1001.74, 1001.75 FS., History–New 6-27-96.*

**10.120     Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees**

Page 3 of 3

APP 631

Case 6:21-cv-00057-RBD-DCI Document 84-6 Filed 07/08/24 Page 52 of 385 PageID 2215

**Regulations of**
**Florida A&M University**



10.205      Disciplinary and Separation from Employment Actions for Faculty
            and Administrative and Professional Employees.

(1)      The provisions of this regulationrule are supplemented by the respective collective
bargaining agreement for the employees who are represented by a collective bargaining
agent.

(2)      Faculty or Administrative and Professional (A & P) employees shall give one month
notice of resignation from employment, if possible. An employee who resigns from
employment shall not have any rights of appeal.

(3)      Nontenured or Nonpermanent Faculty and A & P employees whose appointments
expire after receiving notice of nonrenewal or nonreappointment or whose appointment
expires without the requirement of a written notice of nonreappointment may be
separated without further notice.

(4)      An employee who is absent without approved leave for three or more consecutive
workdays shall be considered to have abandoned the position. For employees governed
by the Board of Regents Trustees and United Faculty of Florida (BOR/UFF) (BOT/UFF)
Collective Bargaining Agreement, the relevant provisions of Article 16 the Collective
Bargaining Agreement shall apply for job abandonment.

(5)      The President or President's designee may discipline a Faculty or A & P employee
for just cause in accordance with the provisions set forth herein. Counseling of any nature
or degree shall not be considered disciplinary action.

(a) Just cause shall be defined as:

1. Incompetence; or

2. Misconduct.

(b) The President or President's designee may impose progressive discipline as
applied to employees. The term "progressive discipline" as used in this
regulationrule means that the form of disciplinary action imposed against the

**APP 632**

employee increases in extent or severity with each action taken. The discipline to be imposed against the employee under this paragraph may include a written reprimand, suspension or dismissal from employment with the University. The discipline that is imposed will depend upon the seriousness of the offense and any aggravating or mitigating circumstances.

(c) Written Reprimand – A written reprimand issued by the employee's supervisor is to warn the employee in writing of the specific conduct or performance standard that was violated and to place the employee on notice of the next level of discipline if the offense is repeated. The written reprimand shall be in a letter format from the supervisor to the employee. A copy of the written reprimand shall be placed in the employee's personnel file. The employee must be informed of the possible consequences if the offense is repeated or the performance fails to improve.

(d) Suspension – The President or President's designee may suspend the appointment of the employee during the term of the employment contract for just cause. The President or President's designee shall also determine whether the suspension shall be with or without pay, which will depend upon the seriousness of the offense and any aggravating or mitigating circumstances. The employee shall be given written notice of the suspension action by the President or President's designee specifying the reason(s) therefor. Following appropriate written notice, the employee may be reassigned by the President or President's designee depending upon the nature of the offense and any aggravating or mitigating circumstances.

(e) Suspension Pending Hearing – When the President or President's designee has reason to believe that the employee's presence on the job would adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students, the President or President's designee may immediately suspend the employee from the performance of duties, pending a hearing under the complaint procedure outlined in RegulationRule 6C3-10.206.32, F.A.C. The President or President's designee shall also determine whether the suspension shall be with or without pay in the manner outlined in

APP 633

paragraph (4)(d) of this regulation~~rule~~. If the employee has been suspended without pay and subsequently is reinstated as a result of the complaint procedure under Regulation~~Rule 6C3~~-10.20~~632~~06~~, F.A.C.~~, the employee shall be reinstated with back pay.

(f) Dismissal – The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students. The employee shall be given written notice of the dismissal by the President or President's designee specifying the reason(s) therefore. The dismissal shall take effect at the time determined by the President or President's designee and as written in the notice of dismissal.

(g) The President or President's designee may impose other disciplinary action for just cause. The term "other disciplinary action" is defined as discipline incidental or in addition to a written reprimand or suspension. Examples of other disciplinary action may include a demotion, reduction in pay, removal of administrative duties or restitution. Any other disciplinary action imposed will occur simultaneously with a written reprimand or suspension. The other disciplinary action imposed will depend upon the nature of the offense and any aggravating or mitigating circumstances. Written notice of such disciplinary action, specifying the reason(s) therefor, shall be given to the employee by the President or President's designee.

(h) The effective date and hour of the disciplinary action shall be recorded in the written notice. Such notice shall be delivered or forwarded to the employee by certified mail with a return receipt requested, or when practicable the notice may be hand-delivered to the employee provided the delivery is certified in writing by the deliverer. The attempts prescribed above to notify the employee satisfy the requirement of notification, and failure of the employee to receive notification does not invalidate the disciplinary action nor its effective date. It is incumbent upon the University, however, to see that a continuing effort is made to effect notification.

APP 634

(i) Within 30 days following the receipt of notice of disciplinary action, the employee may file a complaint in accordance with Regulation~~Rule 6C3-10.206.~~532, ~~F.A.C.~~

(6) Other Personal Services (OPS) employees without permanent status in any class may be separated from employment at any time without requirements of notice or reason and without rights of appeal.

*Specific Authority: 1001.74, 1001.75 FS. Law Implemented 110.205(2)(d), 1001.74, 1001.75 FS. History–New 6-3-01.*

**APP 635**

**151-7 - Jan 23 2024 Notice**

**08/18/2024**

APP 636

DocuSign Envelope ID: D9934003-02A1-453D-9133-B40394DB1513

Filing # 190766097 E-Filed 01/29/2024 04:11:20 PM



# Florida Agricultural and Mechanical University

### TALLAHASSEE, FLORIDA 32307-3100

*Excellence With Caring*

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

January 23, 2024

**Electronic Mail to jennifer.smith@famu.edu,**
**and CERTIFIED MAIL** ██████████ **5737 6000**
**Return Receipt Requested**

Re:   **CONFIDENTIAL**
      **Notice of Dismissal of Employment**

Jennifer M. Smith
████████████████
████████████████



**PLAINTIFF'S EXHIBIT**

7

Dear Professor Smith:

After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023.

You may choose to appeal this employment action pursuant to University Regulation 10.206, which is attached for your review. Your request to appeal must be provided to Dr. Reginald Perry, Interim Associate Provost for Academic and Faculty Affairs, within 30 days after receipt of this Notice of Dismissal of Employment.

If you haven't already done so, please call to arrange the return of all University equipment and property which you may have in your possession or control to Reginald Green, Associate Dean for Student Services and Administration at the College of Law. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus should have already been returned to the University.

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 637**

J. Smith
January 23, 2024
Page 2

In addition, you should contact Human Resources, Benefits and Leave Sections, regarding your insurance coverage options and any leave payments for which you are due, and finalize the exit interview process when applicable. You may also be required to file a final Financial Disclosure Form with the Florida Commission on Ethics within sixty (60) days after leaving employment, pursuant to Section 112.3145(1)(b) and (c), Florida Statutes. Failure to timely file this form may result in a fine. A copy of the form and mailing instructions are available from the website of the Florida Commission on Ethics at https://ethics.state.fl.us.

Sincerely,

Allyson Watson

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

Attachments:  University Regulation 10.206, Predetermination Conference Panel
Recommendation

cc:    Deidre Keller, Dean, College of Law
Reginald Green, Associate Dean, College of Law
Terrisa Brown, Interim Assistant Vice President, Human Resources

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

**APP 638**



**Florida Agricultural and Mechanical University**

TALLAHASSEE, FLORIDA 32307-3100

Excellence With Caring

<u>**Personal and Confidential**</u>

January 12, 2023

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida Agricultural and Mechanical University
Tallahassee, FL 32307

Dear Provost Watson:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.

FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."

The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.

In conclusion, the diligent efforts of our panel have now been completed.

Sincerely,

Bryan F. Smith, J.D.
University Ombudsman and Associate Vice President for Student Affairs

Cc:     Dr. Reginald Perry, Interim Associate Provost for Academic Affairs
        Attorney Andrea Nelson, School of Business and Industry
        Attorney Patricia West, FAMU Developmental Research School

**APP 639**

**Regulations of**
**Florida A&M University**



### 10.206 Complaint Procedures for Tenured or Permanent Status Employees.

(1) Purpose – The purpose of this regulation~~rule~~ is to promote a prompt and efficient procedure for the investigation and resolution of complaints filed by Faculty or Administrative and Professional employees of the University who have tenure or permanent status or who may file a complaint pursuant to Regulation 10.206.~~Rule 6C3-10.233, F.A.C.~~ The provisions of this regulation~~Rule~~ are not applicable to University Support Personnel System employees who may file a complaint pursuant to Regulation 10.303.~~Rule 6C3-10.338, F.A.C.~~

(2) All problems should be resolved, whenever possible, before the filing of a complaint and open communication is encouraged so that resort to the formal complaint procedure will not normally be necessary. Therefore, informal resolution of complaints is encouraged.

(3) Burden of Proof – The burden of proof shall be on the University in disciplinary complaints. In all other complaints, except disciplinary complaints, the burden of proof shall be on the complainant.

(4) Resort to Other Procedures – If prior to seeking resolution of a dispute by filing a complaint under this rule, a complainant seeks resolution of the matter in any other forum, administrative or judicial, the University shall have no obligation to entertain or proceed further with the matter pursuant to this rule. Further, SINCE IT IS NOT INTENDED THAT THE COMPLAINT PROCEDURE BE A DEVICE FOR APPELLATE REVIEW, the response of the President or President's designee to a recommended order of a presiding officer acting pursuant to Chapter 120, F.S., or to other individuals or groups having appropriate jurisdiction in any other procedure shall not be an act or omission giving rise to a complaint under this regulation~~rule~~.

(5) Time Limits – All time limits contained in this rule may be extended by mutual agreement of the parties. Upon failure of the University or its representative to provide a decision within the time limits provided in this rule, the complainant may appeal to the next appropriate step.

Upon the failure of the complainant or counsel to file an appeal within the time limits provided in this rule, the complaint shall be deemed to have been resolved at the prior step.

(6) Definitions.

(a) The term "complaint" is the allegation by the employee that any condition affecting the employee's terms and conditions of employment is unjust, inequitable, or creates a problem. An employee shall not have the right to file a complaint concerning evaluations of performance, unless the employee alleges that the evaluation is based on factors other than performance.

(b) The term "complainant" shall mean the employee whose rights have been directly affected by an act or omission and who has filed a complaint.

(c) The term "days" shall mean calendar days.

(d) The term "counsel" shall mean a lawyer or other qualified representative.

(e) The term "presiding officer" shall mean the person, either a Division of Administrative Hearing (DOAH) hearing officer or the President or President's designee, who conducts a hearing under the Formal Procedure below.

(f) The term "party" shall mean the University or the complainant.

(g) The term "substantial interest" shall mean an act or omission involving tenure, termination, suspension, or other discipline for just cause, nonrenewal of employment contract, salary and layoff.

(7) Step One – All complaints shall be filed with the person designated by the President or President's designee as Step One Representative for the unit of the University, in which the complainant performs the complainant's duties, within 30 days following the act or omission giving rise thereto, or the date on which the complainant knew or reasonably should have known of such act or omission if that date is later. The complainant may, in the written complaint which is filed, request the postponement of any action in processing the complaint formally for a period of up to 30 days, during which period efforts to resolve the complaint informally shall be made. Upon the complainant's written request, an additional 30-day extension should be liberally granted unless to do so would impede resolution of the complaint. Upon the request, the Step One representative shall, during such postponement period(s) arrange an informal conference between the appropriate administrator and complainant. The complainant may at any time terminate a postponement period by giving written notice to the Step One Representative that the complainant wishes to proceed with the

Step One meeting provided for below. If the initial postponement period, or any extension thereof, expires without such written notice, the complaint shall be deemed informally resolved to the complainant's satisfaction and need not be processed further. The Step One Representative shall conduct a meeting no sooner than seven and no later than 15 days following (1) receipt of the complaint if no postponement is requested, or (2) receipt of written notice that the complainant wishes to proceed with the Step One meeting. In advance of the Step One meeting, the complainant shall have the right upon request to a copy of any identifiable documents relevant to the complaint. At the Step One meeting, the complainant shall have the right to present any evidence in support of the complaint. The Step One Representative shall issue a written decision, stating the reasons therefore, within 30 days following the conclusion of the meeting. In the event the decision at Step One refers to documents not requested or presented by the complainant, copies of such documents shall be attached to the decision.

(8) Step Two – If the complaint is not satisfactorily resolved at Step One, the complainant may file a written request for review with the appropriate Vice President or representative within 30 days following receipt of the Step One decision. The appropriate Vice President or representative and the complainant shall schedule a meeting for the purpose of reviewing the matter no sooner than seven and no later than 15 days following receipt of the request for review. The meeting shall afford the complainant or counsel an opportunity to present written and/or oral evidence opposing the University's act or omission including a written statement challenging the grounds upon which such act or omission is justified. If the issue involves a substantial interest of the complainant, the complainant may use the provisions of Step Three below. If the issue does not involve a substantial interest of the complainant, the Step Two decision shall be final and binding. The Step Two decision shall be in writing and be issued within 90 days of the meeting. The record of the Step Two meeting shall only consist of:

(a) The notice of the University's act or omission, and the grounds therefor:

(b) Evidence received or considered;

(c) All written statements submitted by parties to the complaint and by any other persons;

(d) A complete record of any ex parte communication made relative to the complaint, along with the disposition thereof; and If after the Step Two decision has been issued, and the complaint is not related to a substantial interest, no further review of the

complaint is required. However, if the complaint is related to a substantial interest and the complaint has not been resolved to the satisfaction of the complainant, the complainant may, within 30 days of the receipt of the Step Two decision, file a request for a hearing pursuant to Step Three below, which is written to comply with the requirements of Section 120.57(1), F.S.

(9) Step Three: Formal Procedure – Either the President of the University or President's designee, or a hearing officer assigned by the Division of Administrative Hearings (DOAH) shall conduct the hearing at this step. If the University elects to use a DOAH hearing officer, it shall notify the Division within 10 days of the receipt of the request for the hearing. A notice of the hearing shall be sent to all parties at least 14 days before it is to take place. The notice shall include: (1) A statement of time, place, and nature of the hearing; (2) A statement of the legal authority and jurisdiction under which the hearing is to be held; (3) A reference to the particular section(s) of the statutes and rules involved; (4) A short and plain statement of the matters asserted by the University and by all parties of record at the time notice is given. If any party is unable to state the matters in sufficient detail at the time the initial notice is given, the notice may be limited to a statement of the issues involved, and thereafter, upon timely written application, a more definite and detailed statement shall be furnished not less than three days prior to the date set for the hearing.

(a) Rights of the parties under the Formal Procedure:

1. To respond to allegations and evidence;

2. To present evidence and argument on all issues;

3. To conduct cross-examination and submit rebuttal evidence;

4. To submit proposed findings of facts and orders;

5. To be represented by counsel;

6. To file exceptions to any order or hearing officer's recommended order.

(b) The University shall accurately and completely preserve all testimony in the proceedings before the President or DOAH hearing officer and, upon the request of any party of the complaint, shall make full or partial transcript available at no more than actual cost.

(c) After a hearing conducted under this subsection, the presiding officer shall submit a recommended order to all parties. Each party shall have 10 days in which to submit written exceptions to the recommended order. The University may adopt the

APP 643

recommended order in the final order or may reject or modify the findings therein, except that the findings of fact of a DOAH hearing officer may be modified or rejected only after a review of the complete record and must be accompanied by a statement that such findings were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential evidence or that the proceedings on which the findings were based did not comply with essential requirements of law.

(d) The record for purposes of Step Three shall consist only of:

1. All notices, pleadings, motions, and intermediate rulings;

2. Evidence received or considered;

3. A statement of matters officially recognized;

4. Questions and proffers of proof and objections and rulings thereon;

5. Proposed findings and exceptions;

6. Any decision, opinion, proposed or recommended order, or report by the presiding officer;

7. All staff memoranda or data submitted to the hearing officer during the hearing or prior to its disposition, after notice of the submission to all parties, except communications by advisory staff as permitted under Section 120.66(1), F.S., if such communications are public records;

8. All matters placed on the record after an ex parte communication made to DOAH hearing officer pursuant to Section 120.66(2), F.S.; and

9. The official transcript.

(e) The final order shall be issued within 90 days of the final date on which written exceptions to the recommended order must be received by the University. The final order shall be in writing and include separately stated findings of fact and conclusions of law.

*Specific Authority 1001.74, 1001.75 FS. Law Implemented 1001.74, 1001.75 FS. History-New 6-27-96.*

**APP 644**

# 151-8 - Plaintiff's Fac Contract

# 08/18/2024

**APP 645**

**FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES**

**FACULTY (NON-UNIT)**

**EMPLOYMENT CONTRACT**

MGB.

This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the regulations, policies and procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated. The performance of any obligations by FAMU under this Employment Contract shall be subject to and contingent upon the availability of funds appropriated by the Florida Legislature or appropriate funding agency. Neither this employment contract nor any action or commitment taken pursuant to it, is final or binding upon the parties until, and unless, the signature of the University President or President's designee, as approving authority and the signature of the Employee have been affixed and the employment contract has been returned to the appropriate authority as specified herein.

Employee Name: **Jennifer M Smith**
Position Title: Professor
Position: 19255000
Appt. Status: Regular
Division: Academic Affairs
Dept. Name: College Of Law - Instruction
Pay Dept.: 230200
Ann. Salary Rate: $140,012.50
Tenure Status: Tenured

Employee ID: ~~XXXXXXX~~
Class Code: 9001
FTE: 1
Budgeted Wks: 40
College/Sch: College of Law
Admin. Code: 99 No Administrative Function
Work Dept.: 230200
Bi-wkly Rate: $7,000.62
Amount Required: $140,012.50



PLAINTIFF'S
EXHIBIT
8

Appointment Dates: August 07, 2023 to May 10, 2024

Special Conditions: _____

Employment will cease on the date indicated and no further notice of cessation of employment is required for the following categories of employees:

(1)Employees holding visiting appointments; (2) those appointed for less than one academic year; or (3) those with less than five years of continuous service who are on soft money.

Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

All outside employment activities; financial interests and other conflicts of interest under the provisions of FAMU Regulation 10.122 and 10.110 or FAMU Policy No. 2005.14 of the agreement must be reported on the Outside Employment/Conflict of Interest Activities form and/or statement of Financial Interest form as appropriate.

This Employment Contract supersedes any and all prior agreements, contracts, understandings, and communications between the Employee and FAMU, whether written or oral, expressed or implied, relating to the subject matter of this Employment Contract and is intended as a complete and final expression of the terms of the Employment Contract between FAMU and the Employee and shall not be changed or subject to change orally.

This offer of employment will be withdrawn and not processed for payroll if this employment contract is not signed and returned to the appropriate authority within twenty (20) days from the date of offer.

_____
**Signature of President/Provost/Vice President**

*Jennifer Smith*
_____
**Signature of Employee**

4/12/2023
_____
**Date of Signature**

4/14/2023
_____
**Date of Signature**

**Employee's best contact number:** ( XXX ) XXX - XXXX

VPAA: 2016-March-8

**APP 646**

# 151-9 - FAMU Fac Handbook

## 08/18/2024

APP 647



# FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY COLLEGE OF LAW FACULTY HANDBOOK



PLAINTIFF'S
EXHIBIT
9

**APP 648**

## PREFACE

Approved January 3, 2020 by

Dr. Maurice Edington, Provost and Vice President for Academic Affairs

Effective Date January 8, 2020

(Original Approved November 7, 2003)

## RESERVATION OF UNIVERSITY'S RIGHTS

This Faculty Handbook is intended only to provide information for the guidance of Florida Agricultural and Mechanical University College of Law ("COL"). The information is subject to change, and the COL reserves the right to depart without notice from any policy or procedure referred to in this Handbook. This Handbook is not intended to and should not be regarded as a contract between the COL and any faculty member or other person. Policies and regulations referring to students are contained in the Student Handbook.

## ABA ACCREDITATION

The Dean of the COL is fully informed as to the Standards and Rules of Procedure for the Approval of Law Schools by the American Bar Association. The Administration and the Dean are determined to devote all necessary resources and in other respects to take all necessary steps to present a program of legal education that will maintain accreditation by the American Bar Association.

## UNIVERSITY APPROVAL

The information, procedure, and rules contained herein are subject to approval by the University President or the Provost and Vice President for Academic Affairs.

**APP 649**

- Provide a process to receive reports from each of the student organizations.

14. Student Conduct Disciplinary Committee

This committee is responsible for processing non-academic misconduct. The committee shall be comprised of three faculty members; and student members, serving for one year and elected by the student body or appointed by the SBA president; and the Associate Dean for Student Services & Administration. This committee's responsibilities include, but are not limited to, the following:

- Ensure fair and orderly proceedings regarding allegations of student misconduct;
- Provide policy, procedures, and guidance on student disciplinary issues;
- Enforce the Student Code of Conduct; and
- Report regularly to the faculty, and as otherwise required.

15. Committee Reports

All committees shall report regularly to the faculty and submit a written report to the faculty at least once each semester. One comprehensive report shall be submitted at the end of each academic year. Any committee files and notes shall be submitted to the incoming chairs of faculty committees at the beginning of each academic year.

16. Committee Appointments

- The Dean will annually appoint the membership of all standing committees, after giving each faculty member an opportunity to express a preference for assignment. Only tenured, full-time faculty members may be appointed to the Retention, Promotion and Tenure Committee. The Dean must appoint at least three (3) faculty members to each committee and should attempt to appoint at least five (5) faculty members.
- The faculty will elect members of any committee involving review of the Dean's performance.
- The Dean will appoint committee chairs from the full-time faculty. However, the Dean Search Committee, and any committee involving review of the Dean's performance, will select their own chairs.
- Students may sit on faculty committees, except the Admissions Committee; Budget Committee; the Retention, Promotion, and Tenure

APP 650

Case 6:23-cv-00046-CEM-RMN Document 40-1 Filed 00/00/00 Page 13 of 22 PageID 2837

## C.   STUDENT MISCONDUCT

The Student Code of Academic Conduct is outlined in the Student Handbook. Faculty allegations of student misconduct not covered by the Student Code of Conduct should be referred to the Associate Dean for Student Services and Administration.

APP 651

# VIII. STANDARDS FOR FACULTY

## A. PROFESSOR

The rank of Professor is to be accorded to persons who have achieved excellence in teaching, scholarship and research, and service. Scholarship sufficient to evidence such excellence should include substantial publication, such as publication of articles of high quality in recognized professional journals, or the substantial equivalent, as in publishing books. For a publication to be considered substantial, it must be a minimum of 12,000 words in length. The rank should normally be reserved for persons with at least seven (7) years of full-time teaching experience and at least five (5) years in rank as an Associate Professor.

## B. ASSOCIATE PROFESSOR

The rank of Associate Professor is to be accorded to persons who have substantially demonstrated high quality in teaching, scholarship & research, and service. Scholarship sufficient to evidence such excellence should include publication of articles of high quality in recognized professional journals or the substantial equivalent. For a publication to qualify as a publication sufficient for promotion, it must be a minimum of 12,000 words in length. The rank should normally be reserved for persons having at least three (3) years of full-time teaching experience and at least (3) three years in rank as an Assistant Professor.

## C. ASSISTANT PROFESSOR

The rank of Assistant Professor is the entry-level rank for members of the faculty of the COL. It is to be accorded to persons holding the LL.B. or J.D. degree with an excellent academic record and offering evidence of potential for accomplishment and promise of achievement in teaching, scholarship and research, and service.

## D. DISTINGUISHED PROFESSOR

The rank of Distinguished Professor of Law is to be accorded persons of substantial and acknowledged accomplishments and excellence such as Judges, Legislators, Practitioners, Scholars, Diplomats, Government Officers of legal callings, and former full professors of law at FAMU or full professors at other ABA accredited law schools, who teach on a full-time basis. This rank is not one subject to consideration for promotion or tenure.

## E. INSTRUCTOR FACULTY

Instructor faculty members are comprised of instructional, non-tenured, and non-tenure earning faculty members.

**APP 652**

Case 6:21-cv-00457-GCB-RMN Document 440-15 Filed 09/09/22 Page 16 of 278 Page ID 2839

## IX. STANDARDS OF TEACHING, SCHOLARSHIP AND RESEARCH, AND SERVICE

The COL Standards of Teaching, Scholarship and Research, and Service are applicable to the following groups: tenured faculty members, tenure earning faculty members and distinguished professors.

### A. TEACHING

Teaching effectiveness includes effectiveness in presenting knowledge, information, and ideas by means or methods such as lecture, discussion, assignment and recitation, demonstration, simulation courses, law clinics, and field placements. Each faculty member will be evaluated and the evaluation shall include consideration of effectiveness in imparting knowledge and skills, effectiveness in stimulating students' critical thinking and/or creative abilities, the development or revision of curriculum and course structure, and adherence to accepted standards of professional behavior in meeting responsibilities to students.

The evaluator may consider class notes, syllabi, student exams and assignments, and any other materials relevant to the faculty member's teaching assignment. The teaching evaluation must consider any relevant materials submitted by the faculty member, including the results of peer evaluations of teaching, and may not be based solely on student evaluations when this additional information has been made available to the evaluator.

### Effective teaching is usually correlated with the following traits:

- command of the subject matter
- familiarity with advances and developments in the areas taught
- ability to organize materials and present them with force and logic
- ability to capture the students' attention
- ability to arouse curiosity in the students toward further and more independent learning
- ability to stimulate students in creative work
- ability to prepare a sound and effective examination or other instruments to measure student comprehension and achievement
- sound judgment in grading, and maintaining a high standard of achievement and fairness

**APP 653**

Case 6:21-cv-00457-ADA-DTG Document 440 Filed 09/09/22 Page 17 of 82 PageID 2830

## B. RESEARCH AND SCHOLARSHIP

Appraisal of accomplishment in research and scholarship shall be based on a close reading of published articles or works and obtaining the professional opinions and independent review of recognized authorities in the field of the published articles or works. Articles must be a minimum of 12,000 words in length. A commitment must be demonstrated to original research and legal scholarship and must result in a demonstrated ability to produce and publish scholarly work of high quality. The ability to critically analyze, synthesize, and expound sophisticated factual and legal subjects shall be shown. Participation on panels, in conferences, lectureships, preparation of statutes and codes, book reviews, and other evidence of scholastic commitment and recognized ability shall be considered and weighed as such works may merit.

## C. SERVICE

Each faculty member is expected to render substantial service, apart from teaching (as herein defined) to the COL, University, profession, community and/or state, without remuneration. Service may encompass any manner of contribution of one's professional knowledge and skills to the improvement of the COL, the University, the law, government, the administration of justice, or the legal profession. Among the kinds of service that may be considered are the following:

- advising student organizations
  serving on special law school committees (in addition to the general service on standing committees on which all faculty members are expected to serve as a part of general governance)
- serving on University committees
- serving on committees or projects of a Bar Association and other professional groups
- organizing or participating in symposia or other academically oriented events at the College or at other higher education institutions
- participating in law-oriented community activities
- participating in continuing legal education programs
- providing pro-bono legal work
  assisting governmental units, public officials, and public interest oriented Non-Government Organizations (NGOs)

APP 654

the legal profession, or the community in matters that touch on the law. Factors employed to determine sufficient service are outlined on page 53.

## E. STANDARDS FOR TENURE

1. Scholarship: By the time a candidate is considered for tenure, he/she must personally produce, since joining the faculty, a record of scholarship that contains, at a minimum, three (3) substantial and analytical scholarly works of high quality. If the candidate was a lateral hire and had credit for at least one article, then he/she must personally produce, since joining the faculty, a record of scholarship that contains, at a minimum, two (2) substantial and analytical scholarly works of high quality.

For the purposes of this standard, a "substantial" scholarly work is normally equivalent to a major law review article. The entire body of scholarship should be of sufficient length, scope, and quality to demonstrate (a) that the candidate has the capacity to produce high-quality work as previously described, and (b) that the candidate will continue to produce published scholarship throughout his/her academic career.

Absent extraordinary circumstances, in measuring production of scholarly works for tenure, it is expected that by the time the candidate is considered for tenure by the faculty, at least two (2) of the candidate's scholarly works must be completely published. The additional scholarly work (for a total of at least three (3)) must be published or have a contract for publication when the application is submitted. Scholarly work will be reviewed internally and externally.

2. Teaching: Faculty members shall be highly effective teachers as measured by the standards for effective teaching set forth on page 52.

3. Service: Faculty members shall have engaged in a consistent pattern of service to the COL, the University, profession, community and/or state, without remuneration consistent with the standards set forth on page 53.

4. Tenure in the University: A faculty employee who has been granted tenure by the BOT shall have the status of permanent member of the faculty and be on the continuing employment of the University until he/she:

- Resigns
- Retires
- Dies

APP 655

# 151-10 - FAMU Student Handbook

# 08/18/2024

Case 6:24-cv-00457-PGB-RMN Document 40 Filed 07/09/24 Page 1 of 2 PageID 2836



# STUDENT HANDBOOK 2022-2023

Florida Agricultural and Mechanical University College of Law

**PLAINTIFF'S EXHIBIT**
10

FAMU COLLEGE OF LAW

Case 6:20-cv-00457-PGB-RMN Document 40 Filed 03/09/22 Page 2 of 2 PageID 287



# Florida A&M University College of Law

This Handbook supersedes all preceding Handbooks and any other documents or provisions relating to provisions contained within unless specifically authorized or exempted by the Dean of the College of Law.

All students are responsible for knowing and adhering to the guidelines and regulations contained in this Handbook.

Revised July 2022

# STUDENT CODE OF CONDUCT

## Introduction

The College of Law recognizes its obligation to Florida A&M University and to the legal profession as a whole to ensure that the degree of Juris Doctor (J.D.) is conferred not only to those who successfully complete our program of legal education but to those who fully and completely meet the standards of academic achievement, integrity, and professionalism.

Students at the College of Law are members of both the law school community and the larger University community. The College of Law adopts as its Honor Code the University's Code of Conduct now and as might be later amended. As such, the University's Student Code of Conduct shall govern all academic and non-academic misconduct that are not expressly addressed or covered by the College of Law Student Handbook.

All students should review and be knowledgeable about FAMU Regulation 2.012 – 2.013. University Student Code of Conduct before beginning classes. Entering students will be asked to sign statements saying that they have read, understand, and will abide by the Student Code of Conduct of the Florida A&M University and the Rules and Regulations.

Matriculation in the College of Law constitutes de facto acceptance of this Code of Conduct and the policies and procedures involved in administering the Code of Conduct. A copy of each student's signed Student Code of Conduct Agreement will be retained in his or her permanent educational record.

## Implementation of the Code

The College of Law is principally responsible for implementing and administering this Code of Conduct and is responsible for:

* gathering relevant evidence,
* meeting with the accused student(s),
* presenting the matter to the Student Disciplinary Committee (SDC), and * ensuring that the student complies with the decisions of the Committee.

To facilitate the process, the University has made the following designations: Associate Dean for

Student Services and Administration – Conduct Officer

Director of Student of Affairs – Conduct Officer

Law School Dean – Appellate Hearing Officer

APP 659

## Regulation of Florida A&M University – 2.012 Student Code of Conduct

(1)  The Student Code of Conduct ("Code") applies the principles and freedoms found in University Regulation 2.013, Due Process, Other Rights, and Responsibilities, by promoting responsible freedom for all students. This Code seeks to apply the principle of responsible freedom as it guides the conduct of Florida A&M University ("University") students. The responsibility to know and abide by the Code ultimately lies with the student. The Student Code of Conduct supersedes all other means of disciplining or removing students for behaviors prohibited by the University.

(2)  As members of the University community, students enjoy the rights and privileges that accrue to such membership including, but not limited to, academic freedom and participation in the decision- making processes of the University. Additionally, students are subject to the obligations and duties that accompany this membership and are responsible for compliance with the requirements of law and University regulations, policies, and procedures. It is incumbent upon members of the University community to notify the appropriate student conduct body or officials of a violation of this Regulation, to encourage all to comply with them, and assist in their enforcement by providing relevant information as witnesses when called upon to do so. Accordingly, all purported violations of the Code shall be referred to the University Conduct Officer (Director of Student Conduct and Conflict Resolution). Students, faculty, staff, stakeholders, or other individuals with knowledge, may report violations of the Code, in writing, to the Office of Student Conduct and Conflict Resolution.

(3)  The University has zero tolerance for a violation of any provisions of the Code, as well as the Anti- Hazing Regulation 2.028 and Alcoholic Beverages Regulation 3.021. "Zero tolerance" means that given the factual circumstances of the purported violation, the charged student may be removed from University Housing and receive a penalty up to suspension or expulsion from the University.

(4)  Due process protections, in accordance with University Regulation 2.013, will be appropriately accorded the charged student.

(5)  Information Briefing. If the Conduct Officer or his/her designee believes after a review of the purported violations that the information has merit, the student will be issued, in writing, an Administrative Request to Appear at an information briefing before the Conduct Officer or his/her designee. At the information briefing, the Conduct Officer or his /her designee will explain to the student the elements of due process that will be afforded.

  (a)  University conduct proceedings may be instituted against a student charged with a violation of the law that is also a violation of the Code. The University reserves the right to proceed under the Code with a hearing and the possible imposition of a sanction prior to, concurrent with, or subsequent to civil litigation, criminal arrest, and/or criminal prosecution.

**APP 660**

(b)     With the exception of extenuating circumstances, the University will proceed with an alleged violation of the Code prior to any final disposition of the Courts.

(c)     Determinations made or sanctions imposed under the Code shall not be subject to change because criminal or civil charges arising out of the same facts giving rise to violation of University rules and regulations were dismissed, reduced, or resolved in favor of or against the charged student.

(d)     Any admission of guilt, responsibility or statement against the student's interest made by a student at off-campus proceedings shall be conclusive for University purposes.

(e)     A verdict of guilty, a plea of guilty, a plea of no contest *(nolo contendere)* or similar plea in a court of law by a charged student will operate as a conclusive finding that the student is "Responsible" for the purpose of student conduct proceedings.

(f)     Prior to the issuance of the outcome letter, the University may amend the violation(s) based on information obtained through an outside proceeding when that information is relevant to activity adversely affecting the University community.

(g)     The University will cooperate fully with law enforcement agencies in any criminal prosecution to the extent permitted by law.

(h)     The University conduct proceedings are closed to the public.

## Jurisdiction

(6)    **Jurisdiction.** Discipline may be imposed for offenses against the Code occurring at any of the following locations or activities:

(a)     University campus;

(b)     University owned or controlled property;

(c)     University premises, including, but not limited to, fraternities, sororities, and organizations' property;

(d)     Activities sponsored by the University wherever they may occur;

(e)     Activities officially approved by the University that are conducted by University certified organizations wherever they may occur; or

(f)     Activities occurring off campus, including non-university related activities.

## Definitions

(7)    **Definitions.**

(a)     <u>Business Day</u> - A day of normal business operation as designated by the University.

(b)     <u>Charged Student</u> – The student charged with violations of this Code.

**APP 661**

(c) <u>Club and/or Organization</u> - Any number of students who have complied with the University requirements for certification. The term "club or organization" also will refer to student.

(d) <u>Complainant</u> - An individual who reportedly experienced gender-based misconduct regardless of whether the individual participates in the disclosure or review of that report by the University at any point.

(e) <u>Educational sanctions</u> – Work assignments, essays, presentations, or other related educational assignments.

(f) <u>Expulsion</u> – A student shall be deprived of his/her opportunity to re-enter the University. The student is permanently separated from the University.

(g) <u>Faculty member</u> - Any person hired by the University to conduct classroom instruction and/or research activities or who is otherwise considered by the University to be a member of its faculty.

(h) <u>Hearing body</u> - Any person or persons who have been authorized by the University to determine whether a student has violated the Code and to recommend sanctions that may be imposed when a Code violation has been committed.

(i) <u>Judicial hold</u> - This prevents the student from conducting business at the University (i.e. any form of registration or obtaining transcripts).

(j) <u>Mediation</u> - The process in which all parties voluntarily agree to meet with an impartial mediator to communicate their concerns and needs to each other and to reach their own agreement on the resolution of the case. The participants are responsible for keeping their agreement or renegotiating if necessary. In the event the participants do not agree to mediate or mediate but do not reach a full and final resolution, the case will be referred back for conduct action. Breach of a mediated agreement may result in a follow up mediation session or the matter may be referred back through the conduct process.

(k) <u>Mediator</u> – Any neutral member of the University community who has been trained in conflict resolution to assist parties in reaching a mutual agreement to resolve their differences. The Mediator shall not have personal connections with either party or have prior knowledge of the disagreement.

(l) <u>Not Responsible</u> - The charged student has not been found Responsible or did not accept Responsibility for the alleged violation(s) of a provision(s) of the Code.

(m) <u>Preponderance of Evidence</u> - The information presented supports the finding that it is more likely than not that the violation occurred.

(n) <u>Probation</u> – An indication that the student's conduct violated the Code and requires the withdrawal of special privileges, participation in inter-collegiate activities, and other activities including, but not limited to, band participation. Special privileges mean the student may not be elected to office or represent the University in any other capacity during the period of probation. If the student is holding an office, he/she must vacate the office for the term of probation. The penalty of probation may also include a specified monetary fine from $100.00 to $350.00.

APP 662

(o) <u>Reporter</u> – Any person who submits a report alleging that a student has violated this Code.

(p) <u>Reprimand</u> – A formal rebuke and official recognition by letter to the student of misconduct as charged by the University. The reprimand may be written or oral.

(q) <u>Respondent</u> – A student who is reported to have engaged in gender-based misconduct. The term may also include an individual whose identity is unknown and there is reason to believe that they may be a student, or the Complainant or Reporter is a student.

(r) <u>Responsible</u> - The charged student has been found Responsible or accepted Responsibility for violating a provision(s) of the Code.

(s) <u>Restitution</u> – Compensation for loss, or damage to University property. This may be in the form of monetary or material replacement.

(t) <u>Sanction</u> - A penalty imposed upon a student after the student has admitted that he/she is Responsible or has been determined Responsible by the Conduct Officer or a hearing body for violating a provision(s) of the Code.

(u) <u>Student</u> - Any person admitted, enrolled, or registered for study at the University. This includes persons not officially registered or enrolled for a particular term but who are eligible to enroll or are associated with the University because he/she has not completed a course or program. The term "student" will also refer to student clubs and organizations.

(v) <u>Suspension</u> – Separation of the student from the University for a definite period of time. The duration of the period of suspension shall not exceed five years and shall be in direct proportion to the degree of seriousness attached to the misconduct. Readmission for suspensions exceeding one (1) year is conditioned upon the recommendation of an ad hoc review board appointed by the President or Vice President for Student Affairs.

(w) <u>University</u> - The Florida A&M University whose main campus is located in Tallahassee, Florida and any of its satellite or branch campuses.

(x) <u>University/Community service</u> – Specified areas of service for the benefit of the community or the University allocated to the student.

(y) <u>University official</u> - Any person employed by the University performing his/her assigned employment responsibilities.

(z) <u>University premises</u> - All buildings, land, facilities, and any other property owned, leased, operated, controlled or supervised by the University.

(aa) <u>University sponsored activity</u> - Any activity on or off campus which is initiated, aided, authorized or supervised by the University.

(bb) The word "Can" is used in the permissive sense.

(cc) The word "May" is used in the permissive sense.

**APP 663**

(dd)   The word "Shall" is used in the imperative sense.

(ee)   The word "Will" is used in the imperative sense.

(ff)   All definitions not included in this Code are in accordance with definitions found in the Merriam-Webster's dictionary located in the Office of Student Conduct and Conflict Resolution.

## Violations

(8)   **Violations.**

(a)   Academic Dishonesty:

1.   *Cheating*: using, attempting to use or giving unauthorized information or material in any academic endeavor. Cheating includes, but is not limited to, unauthorized possession and/or use of an examination, course related materials, cheat sheets, study aids or other information in an academic exercise; communication to another through written, visual, electronic or oral means; submitting the same academic work for credit more than once without the express written permission of the instructor; use of any materials or resources a faculty member has notified the student or class are prohibited.

2.   *Plagiarism* may be specifically defined for the purposes of any course by the school, institute, or college involved. Unless otherwise defined, plagiarism shall include, but is not limited to, failure of the student to use another's work without any indication of the source and in so doing, conveying or attempting to convey that the work is the student's own; submitting a document or assignment in whole or in part that is identical or substantially identical to a document or assignment not written by the student; allowing another person to compose or rewrite an assignment or document.

3.   A student who assists in any of the academic dishonesty violations mentioned above shall be considered equally as responsible as the student who accepts such assistance.

4.   When the University's schools, colleges or institutes choose to internally address academic dishonesty violations, students should consult with the academic dean, director or program coordinator in the respective school, college, or institute for procedural information.

5.   The penalties for academic dishonesty violations may include: reprimand, reduction of grade; denial of academic credit; invalidation of university credit or of the degree based upon such credit; probation; suspension; or expulsion. In addition to any other penalties that may be imposed, the individual or student may be denied admission or further registration, and the University may invalidate academic credit for work done by a student and may invalidate or revoke the degree based upon such credit if it is determined that the student has made false, fraudulent, or incomplete statements in the application, residence affidavit, or

APP 664

accompanying documents or statements in connection with, or supplemental to, the application for admission to or graduation from the University.

(b)   Alcoholic Beverages: The violation of alcoholic beverages is defined as noted in FAMU Regulation 3.021.

(c)   Conspiracy: Assisting or attempting to assist another in any act(s) that violate(s) the Student Code of Conduct.

(d)   Criminal Conviction: The student convicted of a criminal offense by an off- campus court of competent jurisdiction may be subject to sanctions by the University.

(e)   Demonstrations/Riots: Participating in an on-campus or off-campus demonstration, riot, or activity that disrupts or obstructs the normal operations of the University and/or infringes upon the rights of other members of the University community; leading or inciting others to disrupt scheduled and/or normal activities within any campus building or area.

(f)   Destruction of property: Defacement, damage, misuse or destruction of University property or services, or the private property of another. In addition to being subject to conduct action, students or student organizations responsible for such damage may be financially liable.

(g)   Disorderly Conduct: Behavior that disturbs the peace or undermines public safety, such as causing a disturbance or being unruly.

(h)   Disruptive Behavior: Disruption of a class, curricular or University activity; obstruction of the free flow of pedestrian or vehicular traffic on University premises; interference with the rights of others to carry out their activities or duties at, or on behalf of the University; interference with the freedom of movement of any member or guest of the University; interference with the academic freedom and freedom of speech of any member or guest of the University; or any other act that impairs, interferes with or obstructs the mission, purposes, academic atmosphere, operations, processes, orderly conduct and/or functions of the University or the rights of other members of the University community.

(i)   Drugs: Use, possession, manufacture, cultivation, distribution or sale of illegal drugs and/or controlled substances is prohibited. Illegal drugs include, but is not limited to, synthetic drugs or other substances that will alter a student's mental state (e.g. glue, nitrous oxide, paint, etc.); drug paraphernalia; possession, use, sale or distribution of prescription medication not issued to the student.

(j)   Extortion: The act or practice of obtaining something or compelling some action by force, coercion, intimidation or threat is prohibited.

(k)   Gambling: Participating, or play, in an unlawful game of chance for money or for anything of value on University premises, or at an affair sponsored by a student or student organization; to unlawfully sell, buy, barter or dispose of a ticket, or any interest in a scheme of chance by whatever name on University premises or at any affair

APP 665