CASE NO. 24-12823

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

JENNIFER SMITH,

*Plaintiff - Appellant,*

v.

FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES; ALLYSON WATSON; DENISE D. WALLACE; LATONYA BAKER; LATRECHA SCOTT; RICA CALHOUN; GRAY ROBINSON, P.A.; JULIE ZOLTY; RICHARD E. MITCHELL; AND SARAH REINER,

*Defendants - Appellees.*

## APPENDIX

On Appeal from The United States District Court for the Middle District of Florida, No. 6:24-cv-00457-PGB-RMN; and The United States District Court for the Northern District of Florida, No. 4:24-cv-00367-MW-MAF

Jennifer Smith
Florida Bar No. 964514 (*pro se*)
LAW OFFICE OF JENNIFER SMITH
13506 Summerport Village Pkwy., Suite 108
Windermere, FL 34786
407-455-0712 (phone); 407-442-3023 (facsimile)
jensmithesq@aol.com
jensmithesq@yahoo.com (secondary)

Plaintiff - Appellant *pro se*

November 2024

**Volume 4 (of 4)**
**Pages 666–764**                                                   **APP 666**

# Index

**Tab**

**VOLUME 4**

Plaintiff's June 12 2023 memo [2024-08-18] ..................................................... 151-11

FAMU Salary Adjust [2024-08-18] ............................................................ 151-12

FAMU Resp to Smith Interr [2024-08-18] ....................................................... 151-13

Provost Watson Dec #1 [2024-08-18] ......................................................... 151-14

Provost Watson Dec #2 [2024-08-18] ......................................................... 151-15

Reyes Depo [2024-08-18] .................................................................. 151-16

Bailey Email [2024-08-18] ................................................................. 151-17

FAMU EEOC Pos Statement [2024-08-18] ...................................................... 151-18

Baker Emails [2024-08-18] ................................................................. 151-19

Baker Emails 2 [2024-08-18] ............................................................... 151-20

Smith Affidavit [2024-08-18] .............................................................. 151-21

Order Denying Motion for Preliminary Injunction [2024-08-30] ....................... 164

Notice of Appeal [2024-09-03] ........................................................... 165

Order Granting Motion to Transfer Venue [2024-09-11] ................................. 178

# 151-11 - Plaintiff's June 12 2023 memo

# 08/18/2024

**APP 668**

# MEMORANDUM

To:    Rica Calhoun, FAMU Office of Compliance and Ethics
CC:    Denise Wallace, Esq., FAMU General Counsel
        Craig Reed, FAMU Board of Trustees, Audit and Compliance Committee Chair
From: Jennifer Smith, Professor of Law
Re:    October 2022 Incident, Eighth Memo on the Matter (Investigative Report 2022-11-117)
Date:  June 12, 2023

I am in receipt of the University's investigative report 2022-11-117 emailed to me on June 5, 2023 ("Report") by Rica Calhoun, Chief Compliance and Ethics Officer of FAMU Office of Ethics and Compliance ("Compliance"). The Report found all Michelle Wanamaker's (law student) allegations to be meritless, but found Professor Smith retaliated against the student and recommended the imposition of undescribed punishment against Professor Smith. Professor Smith demands: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against the student (admitted instigator), and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein.

The University waited nearly 100 days to start the investigation; failed to preserve or destroyed the video evidence; prolonged the investigation for over four months with no real evidence of any wrongdoing by Professor Smith; ignored and dismissed the two complaints Professor Smith filed against the student; and decided seven months after the incident to re-characterize Professor Smith's initial complaint as "not a real complaint" to cover itself and accuse Professor Smith of retaliation when all the actions surrounding the complaint were in the manner the University would handle a "real" complaint. This Report is an embarrassment to the University, shows retaliation against Professor Smith for her equal pay lawsuit, and shows the negligence by the University personnel from the day of the incident until the issuance of this report, June 5, 2023.

## Undated Report

At the outset, it is immediately worth noting the University has omitted a specific date in the Report. This omission raises concerns about the transparency and integrity of such a significant document. The assigned Report number, 2022-11-117, suggests that it was issued in November 2022, even though the investigation did not commence until January 26, 2023—98 days after the incident—and the investigation was not completed until June 5, 2023—228 days after the incident. The University's omission of a date from the Report appears to be a deliberate attempt to do two things. First, to downplay or hide the University's own negligence regarding the investigation, and second to obscure the retaliatory timing of the investigation because of Professor Smith's pursuit of equal pay.

The University's failure to date the Report undermines the crucial element of timing, which is vital in establishing a case of retaliation. By intentionally omitting the date, the University has attempted to obfuscate the sequence of its actions in comparison to Professor Smith's equal pay filings, potentially impeding Professor Smith's ability to substantiate claims of retaliation for seeking equal pay. Such actions can be construed as both unethical and illegal, as they seek to undermine Professor Smith's efforts to assert her rights and pursue equal treatment.

PLAINTIFF'S EXHIBIT
11

APP 669

Case 6:24-cv-00457-PGB-RMN Document 11-4 Filed 07/09/24 Page 2 of 12 PageID 2846

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Furthermore, the University's apparent intention to penalize Professor Smith for asserting her civil rights represents a clear act of retaliation, in direct violation of Federal and state laws. Such retaliatory behavior not only undermines the principles of fairness and justice but also disregards the legal protections afforded to individuals fighting for equality and non-discrimination.

The University's failure to date the Report, coupled with the University's punitive actions against Professor Smith, raises serious concerns about transparency, ethical conduct, and compliance with the law. If that is the University's practice, it needs to be changed immediately.

## Issues with the Report

This Report and the associated investigation have presented the following troubling facts:

1. **Retaliation against Professor Smith**: The investigation uncovers clear evidence of retaliation against Professor Smith due to her advocacy for equal pay and assertion of her civil rights. This retaliatory behavior undermines the principles of fairness and equality within the University.

2. **University's negligence and prejudicial conduct**: The Report sheds light on the University's own negligence in fulfilling its duties, particularly in preserving crucial evidence and conducting a timely investigation. This negligence deliberately prejudices Professor Smith, impairing her ability to mount an effective defense. Such actions undermine the integrity of the investigation process.

3. **Inconsistencies, bias, and harassment**: The Report reveals numerous inconsistencies, which indicate biased treatment and harassment of Professor Smith. These inconsistencies not only reflect a lack of impartiality but also expose the University's incompetence in conducting a thorough and unbiased investigation.

These findings raise serious concerns about the University's commitment to fair treatment and due process, and its ability to uphold its responsibilities in an unbiased and competent manner.

## Relief Requested

Professor Smith demands the following:

1. **Immediate rescission of the Report from her file**: Professor Smith seeks the prompt removal of the Report from her file, recognizing the negative impact it may have on her professional reputation. This action is crucial to address any potential harm caused by the Report's presence.

2. **Immediate investigation of the reported Code of Conduct violations against the student, Michelle Wanamaker ("MW")**: Professor Smith requests an immediate investigation into her initial complaint, which she filed on October 20, 2022, the date of the incident, and re-filed in March 2023, which included additional new evidence indicating the student's intent to disrupt Professor Smith's class. This investigation is necessary to ensure a fair assessment of the situation and to address any potential misconduct by the student.

2

APP 670

Case 6:24-cv-00457-PGB-RMN Document 84-4 Filed 07/09/24 Page 9 of 43 PageID 2837

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

## I.    RETALIATION AGAINST PROFESSOR SMITH

The evidence contained in this file provides a clear indication that the University is engaging in prohibited retaliation against Professor Smith in response to her advocacy for equal pay. The sequence of events is as follows:

Professor Smith initiated her most recent equal pay activity by filing an Equal Opportunity Program ("EOP") Complaint with the University on June 28, 2022. In November 2022 (2022-FAMU-F-05-005), the University responded by stating that no equal pay discrimination was found.

On October 20, 2022, just two days after filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Professor Smith reported a Code of Conduct violation to Associate Dean of Students Reginald Green via text at exactly 10:30 am. The complaint was against MW, a 2L law student, whom Professor Smith accused of being "so rude" and "aggressively rude" towards her. This incident occurred while Professor Smith was conducting oral mid-terms in a classroom, which Professor Smith had reserved on October 6, 2022 through Dean Green's office. Professor Smith was holding instruction on this date as a makeup class due to the Hurricane to ensure her course complied with ABA Standard 310.[1] Upon receiving Professor Smith's text, Dean Green immediately went to the location of the incident but found that Professor Smith was teaching her next class that started at 10:30am, and MW was under the instruction of Professor Reyes in an adjacent classroom.

Later that evening on October 20, 2022, at 8:46 pm, Dean Green emailed Professor Smith acknowledging her complaint, assuring her that he would identify the student involved, requesting any additional details she could provide, and expressing gratitude for her notification. Unfortunately, Professor Smith did not receive any further communication from Dean Green. Consequently, Professor Smith visited Dean Green's office on November 1, 2022, only to discover that he was on vacation, and his secretary promised that Dean Green would reach out to Professor Smith. However, Dean Green did not reach out to Professor Smith, and classes concluded less than two weeks later, even though in October, he was copied on an email from Provost Edington that appropriate action should be taken on this issue.

It became apparent that students were discussing the incident with others. On October 31, 2022, Professor Patricia Broussard informed me that the student involved in the incident was MW, who happened to be interning at the same law firm where Professor Smith was a partner. Professor Broussard mentioned that she was searching for MW in relation to the Women's Law Group, and in her conversation with a student/friend of MW's, it was conveyed that MW was feeling unwell and experiencing remorse, shame, and embarrassment for her own behavior in the incident on October 20, 2022 and was not aware that Professor Smith had been a partner at the firm where MW was interning.

---

[1] Professor Smith is most likely the only professor who even properly reserved classrooms to make up hurricane classes.

3

Case 6:24-cv-00457-PGB-RMN Document 41-1 Filed 07/09/24 Page 30 of 48 PageID 2848

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Then again, in December 2022, Professor Broussard informed Professor Smith of an incident that occurred in the ladies' room. While in a restroom stall, Professor Broussard overheard a discussion among a few students expressing concern for MW and how badly she felt due to her own conduct in relation to the incident. MW appeared to be particularly concerned because of Professor Smith's association with the law firm. After this incident, there was not much further discussion about it. Professor Smith mentioned to Professor Broussard that Professor Smith contemplated sending MW an email to reassure her that Professor Smith had no intention of reporting the incident to the law firm or the bar, although Professor Smith acknowledged she may have reporting obligations to The Florida Bar. Professor Broussard suggested that if Professor Smith sent MW an email it would be a positive gesture, providing MW with peace of mind and demonstrating how professionals handle such situations. Professor Broussard maintains regular contact with MW, who never mentioned the incident to Professor Broussard.

On December 18, 2022, Professor Smith sent the following email to MW:

> Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.
>
> Best,
>
> Prof. Smith

MW did not respond. Professor Smith believed the issue was over until she received emails from Ms. Baker on January 26, 2023 and January 27, 2023, requesting an interview concerning the October 20, 2022 incident. The first time Professor Smith had any notice that she was ever the subject of an investigation regarding this incident was January 27, 2023, and with more details on February 1, 2023, yet apparently a complaint had been filed on October 27, 2022 – over 90 days before. It was not until February 1, 2023 that Professor Smith learned from Dean Green that the Dean's office made the unilateral decision to escalate the student complaint without ever speaking to Professor Smith, and she was never informed about the escalation of the student complaint orchestrated by the Dean's office, nor was she informed that the complaint she filed a week before MW's was going to be ignored.

MW's complaint was emailed to Associate Dean Markita Cooper on October 25, 2022. The Complaint was formally referred to the Office of Compliance and Ethics ("OCE") on October 27, 2022. MW waited five days to make her complaint and therein MW intentionally omits "Professor" in several of MW's references to Professor Smith. MW's complaint contains one line of particular importance – "Jennifer Smith was knowingly interfering with our ability to be prepared for Professor Reyes's Evidence class." This is not even possible because students are supposed to prepare before class and are instructed not to use empty classrooms for personal study. No other student in MW's evidence class reported any issue with a makeup class occurring to administration. MW's delay, the content of the Complaint, and lack of other complaints would suggest it was filed at someone else's direction. Interestingly, MW's Complaint also omits: (i) any

4

APP 672

Case 6:24-cv-00457-PGB-RMN Document 41-1 Filed 07/09/24 Page 5 of 15 PageID 2859

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

reference to her performance in class on October 20, 2022 or (ii) whether she consulted with any faculty or staff about the incident. Any retaliation here was by MW, who filed her complaint because she learned I am the professor who worked at Holland & Knight for nearly 11 years and was a partner.

On February 1, 2022, Professor Smith emailed Dean Green:

> Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this? Compliance said you did not follow procedures.

Dean Green responded that day:

> The process was to meet with the student and discuss the misconduct allegation. Before I could meet the student, she had already filed her complaint which raised EOP issues. As a result, since the matter involved a faculty member, she sent her complaint to [Associate Dean] Cooper. To my knowledge afterward a determination was made to send the matter to EOP. We could not conduct two separate investigations without interfering with the other. An EOP investigation supersedes a conduct allegation.

To protect themselves, both the University and Dean Green are now asserting that my October 20, 2022 complaint against MW, which I communicated in writing via text message to Dean Green, was not actually a complaint. This contradictory stance directly conflicts with Dean Green's actions and the previous position taken by both the University and Dean Green. More importantly, it reveals the University key employees' willingness to be dishonest.

On February 15, 2023, Professor Reyes sent an email to Professor Smith and the deans that shed light on the incident from October 20, 2022. The email stated:

> Last semester (fall 2022), you harassed a student in my evidence course after the student **reminded** you that I was about to start class in the classroom where you were conducting one-on-one sessions with students from your civil procedure course. You were not supposed to be in that classroom when the student **reminded** you that I was going to start class in a few minutes. You were assigned to teach civil procedure in the classroom next door, yet you chose to remain in the classroom where I was due to start teaching evidence to disrupt my class, which you did. You engaged in unprofessional, rude, and harassing behavior in full view of the students in your civil procedure course and my evidence course who were waiting in the hallway (emphasis added).

5

**APP 673**

Case 6:24-cv-00457-PGB-RMN Document 41-1 Filed 07/09/24 Page 22 of 96 PageID 2860

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

The language used by Professor Maritza Reyes is strikingly similar to MW's complaint.[2] On February 16, 2023, Professor Smith sent a memorandum to Ms. Baker, providing details about MW's intention to disrupt my class and expressing my request for an investigation into MW's intentional and hostile conduct towards me. Additionally, Professor Smith highlighted her concerns about Professor Reyes, believing Professor Reyes to be a "danger to me and other faculty at this law school."

Just four days later, on February 20, 2023, Professor Smith received an email from Ms. L. Scott of the Equal Opportunity Program (EOP), notifying Professor Smith that Professor Reyes had filed a complaint against Professor Smith. This incident revealed a breach of confidentiality, as it became apparent that EOP and Compliance were divulging information to Professor Reyes and engaging in what appeared to be "selective investigations." It was clear that they were willing to investigate complaints made against Professor Smith but failed to address the complaints Professor Smith had reported. Additionally, Professor Smith had previously reached out to the FAMU General Counsel's office via email on January 19, 2023, with the subject line "Prof. Reyes," requesting a call, but unfortunately, Professor Smith's communication was ignored. It is worth noting that none of this favorable information supporting Professor Smith's claims was mentioned in the Report.

Then, on March 9, 2023, I re-reported my concerns about MW. However, this time I chose to use Compliance's online form instead of contacting Dean Green. Unfortunately, immediately after submitting my complaint, Compliance disabled the link that allowed complainants to follow up on investigations, effectively dismissing my complaint without proper consideration. On March 10, 2023, Ms. Baker emailed Professor Smith the following:

> The Office of Complainace (sic) and Ethics (OCE) recieved (sic) your complaint filed on yesterday. Please note that FAMU-2022-11-117 has already been assigned for this incident and you were given the opportunity to interview and provide statements. As previously stated, your statement and account of the incident will be included in 2022-11-117 report.

Professor Smith believed she had reporting obligations to The Florida Bar and students do as well.[3] Professor Smith responded:

> There is a difference in being the one who brings a charge and is the subject of a charge. So, these are not the same. The student needs to

---

[2] Professor Reyes, who Professor Smith recommended for hire even knowing Reyes' problematic and brief job history at the law firm where they both worked some 20 years ago, has filed over 10 meritless complaints against women faculty and staff at the COL. She is now using students as her weapon to continue her harassment.

[3] Applicants for admission to the Florida bar must truthfully answer question 9a. on the Application, which states: "Have you ever been accused of a violation of an honor code or student conduct code, warned, placed on academic, scholastic or disciplinary probation, suspended, requested or advised to discontinue your studies, dropped, expelled or requested to resign or otherwise subjected to discipline by any college, law school or other post-secondary institution? If yes, provide a complete statement of the circumstances surrounding each such occurrence, including the name and address of the institution and the date thereof."

APP 674

Case 6:24-cv-00457-PGB-RMN   Document 41   Filed 07/09/24   Page 37 of 48 PageID 2851

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

understand she was also the subject of an investigation, and I am not sure she will.

Professor Smith took action in re-reporting her October 20, 2022, complaint because if students fail to report such actions to The Florida Bar, it may result in the Bar considering the students to have provided false information, potentially leading to delays in obtaining their Bar card.

Then, on March 13, 2023, Professor Smith was summoned to the law deans' office, where she was subjected to a "reprimand" or "warning" regarding potential retaliation against MW due to her re-filing of the complaint on March 9, 2023. During this meeting, Dean Keller and Associate Dean Cooper presented Professor Smith with a memorandum accusing her of engaging in potential retaliation. In response to these allegations, Professor Smith promptly prepared a memorandum in which she outlined in detail how her decision to re-file the complaint against MW could not possibly be considered as an act of retaliation.

Equally troubling is the fact that Dean Green asserted that a Compliance complaint could not be investigated concurrently with Professor Smith's complaint. However, the University's decision to investigate a student's report of a potential Compliance violation, filed a week after Professor Smith's earlier report (dated October 20, 2022) regarding a potential Code of Conduct violation, is left unexplained by Compliance. Furthermore, Dean Green **now** contends that he never regarded Professor Smith's text message complaint as a formal "complaint" at all. These contradictions raise concerns about the consistency and fairness of the University's approach to handling complaints. Dean Green appears to not understand the distinctions between EOP and Compliance.

Additionally, it is disconcerting that the University waited 98 days to initiate the investigation into the incident that occurred on October 20, 2022. This delay is compounded by the failure to preserve the video evidence, which could have promptly vindicated Professor Smith and demonstrated MW's violation of University policies. Such actions, or lack thereof, call into question the University's commitment to timely and thorough investigations, as well as its responsibility to preserve crucial evidence.

Considering *Babb v. Sec'y, Dep't of Veterans Affs*, 992 F.3d 1193 (11th Cir. 2021), it is evident that Professor Smith's activities involving the EEOC and EOP played a role in the University's decision to take adverse action against her. This connection cements the University's retaliation against Professor Smith because of Professor Smith's engagement in protected activities related to her pursuit for equal pay. In light of these circumstances, Professor Smith unequivocally demands that the University immediately rescind the Investigative Report.

## II.     UNIVERSITY'S NEGLIGENCE & FAILURE TO PRESERVE EVIDENCE

### A. Failure of the University to Preserve Key Evidence

Professor Smith was interviewed on ZOOM by Ms. Baker about the October 20, 2022 incident. Professor Smith informed Ms. Baker that there should be videos of this incident. On February 7, 2022, Professor Smith sent a memorandum to Ms. Baker, again indicating that there should be videos of this incident. The Report Professor Smith received on June 5, 2023 stated:

7

APP 675

Case 6:24-cv-00457-PGB-RMN Document 41-11 Filed 10/09/24 Page 3 of 18 PageID 2882

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

> On January 31, 2023, the OCE requested video footage from room 253 on October 20, 2023, between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police. Chief Calloway reported that video footage was unavailable.

The absence of the video footage is deeply concerning. According to the Report, MW collected statements from her fellow classmates regarding the incident, obtaining a total of five statements out of the 40-50 students present in the hallway. Surprisingly, while MW's statement was shown to her witnesses, Compliance refused to provide MW's statement to Professor Smith. It wasn't until June 5, 2023, when Professor Smith reviewed the Report, that she became aware of the content of MW's statement. This lack of access to the statement not only placed Professor Smith at a disadvantage but also unfairly benefited MW, whose witnesses who were able to view it. Professor Smith was left unaware of the specific false claims made by MW, making it difficult for her to provide a counterargument. The availability of the video footage would have resolved the uncertainties surrounding the incident, providing a clear picture of what actually transpired.

It is perplexing that the hallway video footage was not requested promptly in October 2022 or even on November 15, 2022, when MW submitted the eyewitness statements from students she claims were present during the interaction. The delay of three months raises questions as to why the videos were not requested earlier, perhaps suggesting that they could potentially support Professor Smith's position. Moreover, Professor Smith has no knowledge regarding whether the student statements were provided by individuals who were actually present in the hallway and who witnessed the incident. This entire situation significantly prejudices Professor Smith's case.

By withholding crucial video evidence and providing limited access to MW's statement, the investigation has created an imbalanced and unfair environment, placing Professor Smith at a distinct disadvantage. The unavailability of the video footage and the lack of transparency regarding the credibility of the student statements contribute to the overall prejudicial treatment against Professor Smith.[4]

## B. Failure of the University to Investigate Immediately and Wait Over 90 Days

As mentioned above, the University's failure to promptly investigate this matter for a period of over 90 days showcases a clear case of negligence. Furthermore, the University's inability to preserve crucial video evidence only adds to its negligent handling of the situation. The passage of time may have resulted in the fading of witnesses' memories, which potentially explains Compliance's decision to show MW's statement to MW's witnesses. If the incident that took place in October 2022 genuinely involved fear or threats, it is inconceivable that the University would have waited for such an extended period before launching an investigation. This prolonged delay raises concerns and suggests a lack of seriousness in addressing the issue and clear retaliation.

---

[4] The Court will likely allow Professor Smith an adverse inference instruction on the failure to preserve this key evidence.

8

APP 676

Case 6:24-cv-00457-PGB-RMN Document 14-1 Filed 07/09/2023 Page 9 of 89 PageID 2893

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

The fact that this investigation appears to be a contrived effort, fueled by my equal pay complaints, is not only unjust but also illegal. The University's attempt to initiate a witch hunt against me based on stale matters after my equal pay action is a clear violation of the law.

## C.  The University Failed to Follow Its Own Procedures (Code of Conduct)

University Code of Conduct 1.109 (17) states: *"Investigation. Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe. If an investigation takes more than 30 business days from the date of intake, the principal investigator will notify both parties to the complaint of such need."*

As indicated below, the University has not and is not following its own Code of Conduct.

1. The University's lack of seriousness in addressing Professor Smith's concerns reported on October 20, 2022, as well as the alleged student complaint reported a week after, is deeply concerning. It took nearly 100 days for the University to notify Professor Smith and initiate an investigation into the October 2022 incident. Professor Smith had assumed that Associate Dean Green (COL) was looking into the matter as he had indicated in his email on October 20, 2022, or that the University had determined that the "appropriate course of action" was to not investigate the incident based on its inaction. This prolonged period of inaction and delay raises doubts about the University's commitment to addressing issues promptly and effectively.

2. Intake of the incident occurred by both parties when they submitted information about an incident in October 2022 – Professor Smith's on October 20, 2022 and MW's a week later. Professor Smith was not notified 30 days later that there was a need to extend an investigation or that an investigation was ongoing. The University's procedures mandate a 30-update on the progress, which did not happen.

3. Professor Smith was notified on January 26, 2023, via email from the investigator, that an investigation into the October 2022 incident was deemed necessary. It was astonishing to learn that the given reason for the significant 100-day delay in initiating the investigation was attributed to the University's apparent lack of available personnel to handle the matter. This explanation is truly difficult to believe, as it raises concerns about the University's capacity to handle such incidents promptly and effectively. Timely investigations are crucial in ensuring a fair and timely resolution for all parties involved. Moreover, this excuse is concerning because if there was a lack of available personnel to handle the Compliance complaint then under Dean Green's post-hoc theory that EOP and Student Conduct could not be investigated concurrently, this does not explain why Professor Smith's complaint was not acted upon since there was available personnel to handle that matter.

4. The initial investigation into the October 2022 incident seemingly commenced on January 26, 2023, when Professor Smith was informed about an interview regarding the matter. However, there was no subsequent notification provided after 30 days to indicate any need for extending the investigation. It is important to note that this investigation has continued well beyond the duration of the spring semester, which is both unreasonable and has caused

9

APP 677

Case 6:24-cv-00457-PGB-RMN   Document 4-41   Filed 03/04/28   Page 13 of 26 PageID 1354

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Professor Smith significant distress and anxiety. The prolonged nature of the investigation has created an undue burden on her well-being and has hindered her ability to focus on her professional responsibilities. This is so mainly because Professor Smith was never allowed to see the allegations against her. Professor Smith thought Ms. Baker provided them in their interview on ZOOM, but when Professor Smith read them in the Report, she was floored as to the student's dishonesty. Professor Smith requested the actual student complaint several times, and her request was denied; yet student witnesses were allowed to review the student complaint – that is so prejudicial against Professor Smith.

5. During the course of the investigation, Professor Smith discovered that the investigator (Ms. Baker) claimed Professor Smith had not properly filed her initial complaint on October 20, 2022.[5] As a result, Professor Smith diligently re-filed the complaint through the appropriate channels in March. However, to her surprise, the investigator subsequently wrote a memo to the law deans, suggesting that they discuss potential retaliation with Professor Smith. It is perplexing how Professor Smith's actions, which involved promptly re-reporting the student's misconduct, could be construed as retaliation. Every step Professor Smith has taken to report this incident has allegedly been deemed improper and met with resistance, despite her adherence to the University's procedures. It is evident that the University, through its investigation, is not adhering to its own Code of Conduct or Charter. Neither did Dean Green adhere to proper procedure.

6. In January 2023, Professor Smith reached out to Shira Thomas, the University Associate General Counsel, regarding employee issues dealing with Professor Reyes and requesting a phone call. Regrettably, Ms. Thomas did not respond to Professor Smith's request, even though she promptly replied to her colleagues' requests. Such selective behavior on the part of the General Counsel's office is indicative of retaliation. As an employee of the University, Professor Smith expects and is entitled to fair treatment, and the General Counsel's office should not cherry-pick whom they engage with based on the employee's pursuit of their legitimate rights or litigation history with the University.

7. On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the investigator via email to inquire about the progress of the investigation. In response, the investigator stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of allegations the University ignored for nearly 100 days further compounds the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, has caused significant distress because these types of investigations may result in termination.

8. On April 28, 2023, Professor Smith asked the investigator: "Who does compliance report to?" Professor Smith never received a response.

9. Professor Smith has expressed her concerns to the investigator, Ms. Calhoun, the General Counsel (Ms. Wallace), and Professor Cavazos (Faculty Senate President and University trustee who did ensure Ms. Calhoun called Professor Smith on this matter) multiple times regarding Professor Smith's lack of clarity regarding the specific allegations of the investigation. Despite this, Professor Smith has not been provided with the written complaint or any formal documentation outlining the nature of the allegations. Given that

---

[5] Compliance also said Dean Green did not follow procedures.

10

APP 678

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

this was not an anonymous complaint, it is perplexing why Professor Smith has been denied access to this information.

10. The absence of prompt and decisive action from the University following the incident in October 2022 is odd. According to a University representative during the February 2023 faculty senate meeting, all serious complaints result in immediate action even before an investigation. Thus, this incident raises doubts about the severity of the alleged misconduct and the University's belief in the student's facts.

11. It appears increasingly likely that the current investigation is a retaliatory response to Professor Smith's civil rights complaint concerning pay equity. The timing of these events is highly suspicious, suggesting a concerted effort to discredit and undermine her position, as well as threaten her employment. Professor Smith firmly believes that this entire process is a witch hunt fueled by fabricated charges stemming from her pay lawsuit. The University's dilatory actions, including its failure to adhere to its own Code of Conduct, further demonstrate its disregard for proper procedures and fairness.

12. As per the University's Code of Conduct, Professor Smith is duty-bound to report these illegal activities perpetrated by the University. By memorandum to the GC on May 2, 2023, Professor Smith formally reported the University's illegal conduct as described above (and does so again by this memorandum), and Professor Smith urges immediate action to rectify this situation and ensure justice is served.

## III.   REPORT'S INCONSISTENCIES

1. On October 20, 2022, Professor Smith promptly filed a complaint against MW by texting Dean Reginald Green, who immediately ran to the site of the incident. In his email response later that day, Dean Green assured her that he would determine who the student was, offered to receive further details and thanked me for the notification by text. Then, he started the process to investigate Professor Smith's complaint when he went to see Dean Cooper but stopped because by the MW had filed a complaint, but Dean Green did not stop investigating Professor Smith's complaint because he did not think it was a real complaint. On November 1, 2022, just eight business days after the incident, Professor Smith personally visited Dean Green's office to discuss the matter. Unfortunately, Dean Green was away on vacation at the time. Nonetheless, Professor Smith informed his secretary about the purpose of Professor Smith's visit and Dean Green's secretary assured Professor Smith that the secretary would inform Dean Green about Professor Smith's visit. Regrettably, despite Professor Smith's proactive approach, Dean Green did not reach out to her with any information regarding the identity of the student or any updates on the situation. Now, the University claims Professor Smith's text to Dean Green was never considered a complaint. Contrary to what is stated in the Report, Professor Smith did follow up on her complaint, and Dean Green never got back with her, even though he was instructed to take appropriate action by Provost Edington. Professor Smith has submitted supporting documentation to Compliance that clearly demonstrates efforts to address the issue.

2. Upon reading the allegations made by MW for the first time, Professor Smith is appalled by the outrageous and blatantly false allegations. It is important to note that any responsible University, bound by legal obligations, is required to promptly address such allegations against a professor or a student. Failure to do so is a clear violation of University policies

11

APP 679

Case 6:24-cv-00457-PGB-RMN Document 4-1 Filed 03/04/24 Page 32 of 42 PageID 256

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

and protocols. Given the circumstances, Professor Smith strongly believes that the University had received these baseless allegations and was fully aware of their lack of merit. However, it is deeply concerning that the University chose not to initiate an investigation until Professor Smith filed her pay lawsuit rebuttal, nearly 100 days later. This sudden change in the University's stance raises serious concerns about the retaliatory nature of the actions towards her. It appears that the University deliberately delayed taking action on these allegations, despite knowing their lack of validity, until it became strategically advantageous for the University to do so. This blatant retaliation against Professor Smith undermines the principles of fairness, integrity, and justice that should guide any institution of higher learning.

3. This whole paragraph is poorly written and false as written:

> Patricia Broussard, College of Law Professor, February 1, 2023: On February 2, 2023, Professor Broussard acknowledged that she advised Professor Smith to reach out to Ms. Wanamaker. Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset about her actions. Professor Broussard said that she told Professor Smith that this was a way to show Ms. Wanamaker that would not hurt her and how women could uplift one another.

It should read as follows:

> Patricia Broussard, College of Law Professor, February 1, 2023: On February 2, 2023, Professor Broussard acknowledged that she supported Professor Smith's idea to send an email to Ms. Wanamaker because Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset, ashamed and embarrassed about her [Ms. Wanamaker's own] actions. Professor Broussard said that she told Professor Smith that sending an email was a way to show Ms. Wanamaker that Professor Smith would not seek to destroy Ms. Wanamaker's reputation at the firm where Professor Smith was a partner and would show how women could uplift one another.

Thus, Professor Smith emailed MW the following email in December 2022:[6]

> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*

4. In October 2022, both MW and Professor Smith filed separate complaints regarding the incident. However, it is deeply troubling that the University neglected to preserve the crucial video evidence related to the incident. The Report includes a section titled "Video Footage" and states "OCE requested video footage from room 253 on October 20, 2023,

---

[6] Professor Smith is reviewing Bar guidelines and will report to the Bar as she is obligated, and, after reading MW's blatant falsities in this matter, is re-assessing her obligations to disclose details to a place in which she was a partner and department chair.

APP 680

Case 6:24-cv-00457-PGB-RMN Document 44-1 Filed 07/09/28 Page 39 of 42 PageID 1357

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police." The Report omits any explanation for its own delay in requesting the video. Additionally, the Report appears to be clairvoyant because October 20, 2023 has not happened yet and this would explain why no footage is available. The University's failure to promptly request the footage until over three months later demonstrates a clear lack of competence and disregard for preserving vital evidence. The University scrivener's error or failure to request footage from the correct date demonstrates negligence and incompetence by OCE. At bottom, the absence of this video evidence raises serious questions about the University's handling of the situation. One cannot help but wonder whether the University intentionally failed to preserve the evidence, or worse, deliberately destroyed it because it could have potentially supported my position. This casts a shadow of doubt on the University's motives and lends further weight to the argument that their subsequent accusations against me, made 98 days later, are rooted in retaliation. It is imperative that the University upholds its responsibility to preserve evidence in a timely and impartial manner. Failing to do so not only undermines the integrity of the investigation but also raises concerns about fairness and due process. The University must be held accountable for its actions and the potential consequences of its failure to preserve evidence in a case of this nature.

5. The statement provided in the report regarding the circumstances surrounding Professor Smith's December email to MW is inaccurate and presents a biased perspective. The Report claims that on February 1, 2023, I stated that I **only** emailed the Complainant because Professor Broussard advised me to do so, as MW felt remorseful about her behavior. This portrayal is misleading and does not accurately reflect the sequence of events. In reality, it was Professor Smith who suggested the idea of sending an email to MW in order to provide her with some peace regarding her disruptive conduct. Professor Broussard agreed with my suggestion, acknowledging that MW expressed remorse and nervousness due to my previous association as a former partner at Holland & Knight. The decision to send the email was a voluntary act on Professor Smith's part, driven by a desire to mitigate any negative impact the incident may have had on MW's career aspirations – again before Professor Smith read MW's false allegations. It is important to clarify these details to prevent any misinterpretation or misrepresentation of the events that transpired. The Report's portrayal of the situation inaccurately suggests a different motive for Professor Smith's actions, which undermines the fairness and objectivity of the investigation.

6. The Student Handbook clearly outlines the Student Code of Academic Conduct, which serves as a reference for addressing student misconduct. However, faculty allegations of student misconduct that fall outside the scope of the Student Code of Conduct should be directed to the Associate Dean for Student Services and Administration. The manner of reporting such incidents to our deans is not explicitly specified or restricted within the University's guidelines. In Professor Smith's case, she reported the incident through a text message, which served as an instant and written form of communication. This method of communication has been Professor Smith's usual means of contacting Dean Green, even during her tenure as the chair of the student disciplinary committee. She opted for text communication because it allows for prompt responses from Dean Green. Moreover, Professor Smith has never been informed that text messages were an inappropriate or improper form of filing a complaint – all deans have a University cell phone for school business. It is crucial to clarify that Dean Green did not explicitly state that he would not

13

APP 681

Case 6:24-cv-00457-PGB-RMN   Document 4-4   Filed 03/04/28   Page 40 of 42 PageID 1358

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

investigate the incident or that Professor Smith's chosen method of filing was incorrect. He expressed his intention to investigate the matter, but unfortunately, Professor Smith did not receive any follow-up from him, even after visiting him for an in-person meeting on November 1, 2022.

7.  It came to Professor Smith's attention, **after** she re-filed my complaint against MW, that Ms. Baker informed Professor Smith that MW was also the subject of a complaint. However, upon reviewing this Report, it is evident that MW was not investigated as the instigator of the entire incident. This raises concerns about the fairness and integrity of the investigation process. Furthermore, the reason Professor Smith re-filed her complaint in March was because she became aware in February that MW intentionally disrupted her class. Professor Smith obtained this new information through an email sent by Professor Reyes.

8.  It is important to note that based on this Report, MW may not be aware that she was the subject of a complaint during her time in law school. It is crucial for MW to understand that as an applicant for the Florida Bar, she has reporting obligations regarding this incident, as outlined in Bar Application Rule 9. Similarly, as an instructor at the law school and a practicing lawyer, Professor Smith also has a responsibility to maintain the integrity of the legal profession by addressing student misconduct. MW must be made aware that failure to disclose this incident on her Bar application could lead to significant consequences, including potential delays in the Bar admission process. It is essential for MW to provide truthful and accurate information on her application to avoid any accusations of dishonesty or misrepresentation. It is recommended that appropriate measures be taken to ensure that MW is informed of her reporting obligations to the Florida Bar, emphasizing the potential implications of failing to disclose this incident.

9.  It is crucial to highlight a significant omission in this Report, which fails to mention the intentional disruption of my class by MW. This omission undermines the trustworthiness and completeness of the Report. The fact that MW instigated both interactions with Professor Smith – a professor who she had never spoken with – on October 20, 2022 cannot be overlooked. This intentional disruption not only impacted the flow and integrity of Professor Smith's class but also raises concerns about the overall environment and professionalism within the academic setting. To ensure the accuracy and comprehensiveness of the Report, it is imperative that the intentional interruption of Professor Smith's class by MW be acknowledged and thoroughly investigated so that similar conduct is not repeated by other students. Failing to address this significant fact undermines the validity of the findings and calls into question the integrity of the entire investigative process. Professor Smith requests that this oversight be rectified and that a comprehensive examination of the circumstances surrounding MW's deliberate disruption of Professor Smith's class be conducted to ensure a fair and unbiased evaluation of the incident. MW's interruption of Professor Smith's class in such a hostile and unhinged manner made the learning environment for Professor Smith and her students unsafe.

10. It is important to address the inconsistency regarding the characterization of the complaint filed by Professor Smith. The report indicates that Professor Smith filed an "additional" complaint, which implies the existence of an initial complaint filed in October. This confirms that there was indeed an initial complaint made by me in October 2022, and it is essential for the University to acknowledge and address this fact. If the University recognizes the second complaint as an "additional" one, it signifies that it can in no way be

14

APP 682

Case 6:24-cv-00457-PGB-RMN Document 41 Filed 03/04/24 Page 41 of 42 PageID 1359

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

retaliatory in nature. Moreover, it is crucial to note that the second complaint was prompted by new information that came to light after the initial filing in October 2022. This demonstrates that Professor Smith's intention was to ensure that all relevant information regarding MW's conduct was properly investigated and addressed. However, regardless of the characterization of the complaints, the University has yet to provide any resolution or investigation into Professor Smith's initial complaint against MW from October 2022. This failure to address MW as a subject of a legitimate complaint goes against the University's own compliance standards and raises concerns about the thoroughness and fairness of the investigative process. It is imperative that the University rectify this oversight and conduct a proper investigation into MW's improper conduct, which was the primary purpose of Professor Smith's initial filing in October 2022 and subsequent re-filing in March 2023. The failure to investigate MW's intentionally hostile behavior undermines the credibility of the University's commitment to maintaining a safe and respectful academic environment.

11. This Report is retaliatory and punitive, as it fails to include crucial facts that support Professor Smith's position and attempts to re-penalize her for "potential" retaliation after she was "warned" in March and with no additional conduct the "potential" retaliation has now turned into a determination that Professor Smith retaliated against MW. One glaring omission is the fact that MW was the instigator in both incidents that occurred on October 20, 2022. This critical information, which clearly establishes MW's role in creating a hostile environment, has been disregarded in favor of a biased perspective for MW. The Report also fails to acknowledge that MW stated she "never engaged in a conversation with Jennifer Smith before today," but somehow and for some reason MW chose to take it upon herself to interrupt a professor with whom she had no history. The Report's failure to address the actions of MW as instigator raises concerns about the integrity and fairness of the investigation. The University has not taken any measures to investigate MW for creating this hostile environment. This one-sided approach further undermines the credibility of the Report and fails to meet the University's obligations to provide a safe and supportive academic environment for its faculty. Moreover, the University's accusation of retaliation against Professor Smith for filing another complaint to address MW's instigating behavior is deeply troubling. Instead of conducting a thorough investigation into MW's actions, the University has chosen to reprimand Professor Smith for seeking resolution and justice. These actions not only violate the University's own policies but also infringe upon the rights afforded to Professor Smith by both Florida and Federal laws. It is imperative that the University rectify these shortcomings, conduct a fair and unbiased investigation into the incidents involving MW as the instigator, and uphold its commitment to providing a safe and equitable environment for all members of its academic community. Anything short of this would be a failure on the part of the University to uphold its own standards and legal obligations.

## IV.    CONCLUSION

Professor Smith finds herself at a loss as to how she could have prevented this incident from occurring. She did everything "by the book." As a professor, she reserved the classroom on October 6, 2022, which is optional, but reserving is the most responsible action. Even if that were not the case, students are instructed not to enter classrooms without a professor for their personal

APP 683

Case 6:24-cv-00457-PGB-RMN   Document 41   Filed 03/04/28   Page 42 of 42 PageID 2660

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

study purposes, and certainly when the classrooms are already occupied by professors. Moreover, if a student accidentally walks into a classroom, the appropriate response should be to apologize for the intrusion and swiftly exit the premises. There should never have been a prolonged argument with a student in the midst of another student's examination. Additionally, Professor Smith should not have had to encounter the student as Professor Smith was leaving the classroom. The student had no reason to position herself at the doorway, prepared for a second confrontation as Professor Smith exited. The classroom has two exits, so MW could have waited to enter at the "back" door, which is the door she used for her first intrusion.

When Professor Smith reported the incident of being confronted by an aggressive student, Associate Dean Green assured Professor Smith that it would be promptly addressed. Professor Smith assumed that the University was handling the matter and would contact me if necessary. However, Professor Smith had no knowledge that she was the subject of an investigation until over 90 days later. This lack of communication is highly problematic and unprofessional. If the student was so afraid and in fear, wouldn't the University take immediate actions to prevent Professor Smith and the student from interacting?

Professor Smith did not retaliate against the student. On the contrary, Professor Smith sent MW an email in an attempt to alleviate her concerns regarding her behavior during the incident. It is evident that MW relayed this information to others, as Professor Smith continued to hear about MW's remorse and shame over her own conduct, mainly because of Professor Smith's past association with the firm where MW may soon be working (seems MW filed the complaint to retaliate against Professor Smith). In an act of goodwill, Professor Smith sent MW an email to reassure her that her disruptive conduct would not hinder her future career. Professor Smith possesses emails and witnesses attesting to the student's remorse regarding her OWN actions, not Professor Smith's. Professor Smith will revisit her course of conduct after reviewing the blatant falsities in MW's complaint that she was so comfortable in making even when she was the instigator.

The collection of documents Professor Smith has provided to Compliance attached to the several memoranda solidify Professor Smith's position that she reserved the room, encountered a confrontational student twice by the student's choice, promptly reported the incident, documented the student's alleged conversations about her disruptive conduct, and harbored no negative or retaliatory intentions in the email Professor Smith sent to MW. Throughout Professor Smith's 30-year career as a lawyer, she has never been accused of any employee misconduct. The evidence at hand overwhelmingly supports Professor Smith's stance.

The University's delay in taking action until evidence is destroyed and witness memories become distorted is entirely unacceptable. This unfortunate course of events by the University only strengthens Professor Smith's assertion of retaliation by the University. It is evident that such a delay was intentional, further contributing to the prejudicial treatment Professor Smith has experienced. The University's failure to address the situation promptly and appropriately raises serious concerns about its commitment to fairness and justice. It is clear retaliation by the University for Professor Smith's pursuit of equal pay, and Professor Smith has emails and texts that she provided to Compliance for the facts she advances.

16

APP 684

# 151-12 - FAMU Salary Adjust

# 08/18/2024

Case 4:14-cv-00540-RH-CAS   Document 153-1   Filed 11/17/16   Page 45 of 59   2861

## MEMORANDUM

TO:      College of Law Faculty

FROM:    A. Felecia Epps

           Dean and Professor of Law

DATE:     January 19, 2016

RE:       Salary Adjustments

In 2013 the Board of Trustees directed the University to conduct a salary compression study. Last year at the request of Provost David, Interim Dean Darryll Jones reviewed the salaries at the College of Law. As a result of Dean Jones' efforts, salaries of some faculty will be adjusted to address compression issues. Faculty affected by the salary adjustments will receive additional information in the near future.

Many thanks to Dean Jones for his work on this issue.

APP 686

## MEMORANDUM

**TO:**  Marcella David
Provost and Professor of Law

**FROM:**  Darryll K. Jones
Interim Dean and Professor of Law

**DATE:**  August 21, 2015

**RE:**  Salary Equity Adjustment Proposal


Irrational salary distributions within the College of Law have detrimental impact on faculty morale and performance. This memorandum proposes adjustments to address the irrationality. The proposal assumes, solely for the purpose of this memorandum, that there are no significant qualitative differences in job performance amongst faculty members of the same rank and tenure status. This proposal also assumes that salaries for higher ranked professors should be higher than lower ranked professors, and salaries for tenured professors should be higher than salaries for tenure track or non-tenured professors. Superior performance, however defined, may defeat those assumptions but this proposal assumes away differences in job performance.

Exhibit 1 contains faculty salaries as of academic year 2015-16, organized from highest to lowest. Green highlight is used to indicate faculty with the rank of "professor," purple indicates "associate professor," and brown indicates "instructor." "T" indicates that the faculty member is tenured, "TT" indicates that the faculty member is on a tenure track, and "NT" indicates that the faculty member is neither tenured nor on a tenure track.

By listing salaries from highest to lowest and then designating rank and tenure status, Exhibit 1 demonstrates salary inversions, defined here to mean that at least one higher ranked faculty earns less than at least one lower ranked faculty. Inversion is also used when at least one tenured faculty member earns less than at least one tenure track or non-tenured faculty member. Exhibit 1 shows that three tenured professors are paid less than one or more tenured

**APP 687**

associate professors. Faculty members 18, 19, and 31 are tenured professors but are paid less than faculty members 16 and 17, two tenured associate professors. In addition, seven tenured associate professors are paid less than at least one non-tenured, tenure track associate professor. Faculty members 21, 22, 23, 25, 26, 27 and 30, all tenured associate professors, are paid less than faculty member 20, a non-tenured, tenure track faculty member; faculty members 25, 26, 27, and 30, tenured associate professors, are paid less than faculty member 24, a non-tenured tenure track associate professor.

Exhibit 2 shows a salary distribution proposed in resolution of the foregoing. Column O shows current salaries, Column Q shows proposed salaries and Column R shows the cost of the adjustment per faculty member. The overall goal is that salaries will be grouped according to rank from highest to lowest and then within ranks by tenure status. Except for faculty with administrative duties the resulting distribution would eliminate inversions shown in Exhibit 2. The total cost to eliminate the inversions is approximately $140,000. The proposal assumes no increase in the College's budget allocation from the University or any other source. Although the proposal results in salaries being ordered according to rank, it does not address temporary differences in salaries resulting from administrative supplement. Changes in administrative assignments, for which additional compensation is provided, would change the ordering of salaries and in some cases re-introduce salary inversion.

The College expects to pay for the adjustments through savings generated by attrition and, in one instance, savings derived from the conversion of one 12 month contract to a 9 month contract. Faculty member 7 on Exhibit 1 is currently on a 12 month contract. That faculty member's services are necessary only for 9 months (Dean Pernell informed the faculty member at the start of this academic year that his next contract would be for 9 months). The conversion to a 9 month contract would save approximately $40,000 (cash and rate) to be reallocated in partial payment of the total adjustment costs. The College expects an additional savings of approximately $81,000 from one senior faculty member's stated intention to request part-time status. In addition, the College is currently realizing a savings of an additional $80,000 from an administrative vacancy but that vacancy is expected to be filled by the end of the academic year. The total available rate and cash to meet the costs of this proposal are shown on Exhibit 3.

The foregoing proposal can be implemented at the start of academic year 2016-17. Additional adjustments would still need to be made within faculty ranks and may be affordable via future attrition. For example, three instructors on 12 month contracts are paid approximately the same or less salary as instructors on 9 months. Those instructors have made a specific request for adjustment to their salaries. Unlike faculty member 7 (Exhibit 1), the services of instructors on 12 month contracts are necessary (the three instructors comprise the College's bar preparation courses each summer).

APP 688



# Florida Agricultural and Mechanical University
## COLLEGE OF LAW

TELEPHONE: (407) 254-3268
FAX: (407) 254-3213

Excellence With Caring

201 BEGGS AVENUE
ORLANDO, FLORIDA 32801

<u>MEMORANDUM</u>

February 23, 2016

TO:         Faculty

FROM:    Darryll K. Jones
             Professor of Law

RE:         Rationale for Salary Adjustments

Dean Epps announced at the last faculty meeting that the University has adopted a plan to make certain adjustments to faculty salaries. The purpose of this memorandum is to explain the rationale used to determine which salaries were adjusted and how adjustments were calculated. The plan was created and all but approved by December 2015 after consultation between me, in my role as Interim Dean, Associate Dean Green, the Office of Institutional Research, and Provost David. The proposal is not intended as a complete or perfect response to all salary inequities.

Compensation inequities at the College of Law, whether real or perceived, have stunted our growth and need to be addressed if the College is to mature. Different people perceive different inequities, but most agree that the most obvious problem is "salary inversion." Salary inversion occurs when faculty of lower rank and tenure status earn more than faculty with higher rank and tenure status. Inversion can occur for many reasons, but we found that salary inversion at the College of Law resulted from the State's inability to provide regular cost of living raises to present or current faculty, combined with new faculty hiring under the economic conditions prevailing on the date of new hiring. As a result, a later hired faculty member often commanded a higher salary than earlier hired faculty of the same or in some instances lower rank.

The plan is based on comparisons of each faculty member's 9 month compensation. Salaries for faculty on twelve month contracts were converted to 9 month contracts solely to make accurate comparisons. Currently, there are four tenured Professors whose salaries are significantly less than other tenured Professors and in some instances even less or almost the same as tenured and untenured Associate Professors. There are eight tenured Associate Professors whose salaries are less than one or more untenured Associate Professors. There are high end "outliers" in each category. The plan does not attempt to make the level of compensation paid to outliers the norm or a goal for all faculty within the relevant class.

FAMU IS AN EQUAL OPPORTUNITY/EQUAL ACCESS UNIVERSITY

APP 689

To eliminate inversions, the College determined an appropriate minimal amount for each rank and tenure status. The minimal amount in each category is the amount necessary so that no faculty member of lower rank and tenure status is paid more than a faculty of higher rank and tenure status. If each faculty member is paid the minimal amount pertaining to his or her rank and tenure status, salary inversion will be eliminated. The plan does not adopt a prohibition against inversion. It merely implements a restart. Salary inversion may reoccur but it should only do so when a faculty member of lower rank or tenure status demonstrates exceptional performance or qualifications. The plan is not intended to reduce a Dean's sole discretion to recommend merit increases or in any way reduce a Dean's customary role with regard to salary recommendations.

The minimum amount necessary per faculty member to eliminate salary inversion is $140,000 for tenured Professors and $120,000 for tenured Associate Professors. Twelve faculty salaries were adjusted, thereby eliminating all salary inversions. Salaries already at or above the minimum amount for each rank and tenure status were not adjusted even though there are, of course, arguments for adjustments within each class. The plan is intended as a first step to address the most obvious problem first. Adjustments were calculated by subtracting each faculty member's current salary from the minimal amount for the appropriate rank and tenure status. Adjustments therefore ranged from approximately $2,300 to $24,000 annually. The plan makes no salary reductions.

Faculty whose salaries are adjusted will be notified individually and asked to sign a new contract retroactive to January, 2016. Unfortunately, we cannot make retroactive adjustments to benefits except as required by law. For example, the University will not make retroactive contributions based on the adjusted salary for faculty who makes voluntary contributions to a 403(b) plan.

There may be salary inversion issues relating to instructor and other non-tenure track compensation. Unfortunately, there are insufficient resources to address those issues at this time. If resources become available, the College and University will endeavor to address all other salary inversion issues within the faculty. If it appears necessary, Dean Epps will schedule a special faculty meeting so that faculty may ask questions about the plan. Neither she, I nor Associate Dean Green will discuss any particular faculty member's compensation publicly.

cc: Associate Dean Green

APP 690

# 151-13 - FAMU Resp to Smith Interr

# 08/18/2024

**APP 691**

Case 6:24-cv-00457-PGB-RMN   Document 81   Filed 07/09/24   Page 1 of 2 PageID 2866

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIA
ORLANDO DIVISION

JENNIFER SMITH,

       Plaintiff,

v.                          CASE NO.: 6:24-cv-00457-PGB-RMN

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

       Defendant.

_____/

## FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

COMES NOW the Defendant, FLORIDA AGRICULTURAL & MECHANICAL UNIVERSITY BOARD OF TRUSTEES, hereinafter referenced as ("The University,") by and through its undersigned counsel, and pursuant to Rule 33, Fed. R. Civ. P., hereby responds to Plaintiff's First Set of Interrogatories to Defendant.

### General Objections

The University objects to all discovery requests and files herewith its Time Sensitive Opposed Short Form Discovery Motion requesting a protective order that this discovery not be answered and seeking a stay of discovery [Doc. 56].

**APP 692**

12. List all personnel involved in the compensation decisions for the Plaintiff and her male comparator, specifying their understanding and interpretation of the factors other than sex used to justify pay differences and provide.[sic]

**ANSWER: Objection. The question is incomplete, requires speculation to respond, the male comparator is not defined, and the relevant time period is not defined.**

13. Identify the source of the University's definition of retaliation and explain how the allegations of retaliation in the December 5, 2023 Notice of Termination to Professor Smith met that definition.

**ANSWER: The University uses the ordinary meaning of the term and the letter speaks for itself.**

14. Explain the employer contributions for the pension yearly since 2018 and health insurance contributions each year.

**ANSWER: Objection. The question is irrelevant and not likely to lead to admissible evidence.**

15. Explain the impact, if any, of Professor Smith's promotion history on her salary.

**ANSWER: This issue was addressed in detail in the University's motions for summary judgment filed in Smith v. FAMU, Case No. 4:14-cv-540-RH/CAS and Smith v. FAMU, Case No. 4:18-cv-409-RH-CAS.**

**APP 693**

# 151-14 - Provost Watson Dec #1

# 08/18/2024

**APP 694**

DocuSign Envelope ID: 1516D205-3EE5-4733-9CB7-503D57AB645A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

      Plaintiff,

v.                             Case No: 6:24-cv-457-PGB-RMN

THE FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

      Defendant.

_____/

## DECLARATION OF PROVOST ALLYSON WATSON

1.     My name is Dr. Allyson Watson and I am over the age of eighteen (18) years of age and competent to make this Declaration upon my own personal knowledge and belief.

2.     I serve as Provost and Vice President for Academic Affairs for the Florida Agricultural and Mechanical University (FAMU).

3.     Jennifer Smith was employed as a visiting professor for the College of Law on August 8, 2004.

4.     I received the Office of Compliance and Ethics' Investigative Reports 2022-11-117 and Supplemental Report 2022-11-117 regarding Jennifer Smith's retaliatory conduct toward a student and inappropriate and unprofessional conduct

Page 1 of 3

**APP 695**

DocuSign Envelope ID: 1516D205-3FE5-4733-9CB7-503D57AB645A

towards students. The Reports sustained some of these allegations against Ms. Smith. A true and correct copy of the Reports are attached to the Notice of Intent to Dismiss from Employment, which is hereto as **Exhibit 1**.

5. My decision to termination Ms. Smith's employment was based on her unprofessional and inappropriate behavior towards students as articulated in the Investigative Reports.

6. On December 5, 2023, I sent a Notice of Intent to Dismiss from Employment to Ms. Smith, which advised her of her rights and process under University Regulation 10.120. A true and correct copy of the Notice and the attachments to that Notice, attached hereto as **Exhibit 1**.

7. Ms. Smith convened a panel on January 11, 2024 that recommended I rescind my Notice of Intent to Dismiss, however given the gravity of the situation, I declined to take their recommendation and moved forward with issuing a Notice of Dismissal from Employment.

8. The Notice of Dismissal of Employment was issued on January 23, 2024 and sent to Ms. Smith via email and certified mail, return receipt requested. A true and correct copy of the Notice of Dismissal is attached hereto as **Exhibit 2**.

9. As stated in this Notice, Smith's employment with FAMU ended at the close of business on Tuesday, January 30, 2023.

Page 2 of 3

**APP 696**

DocuSign Envelope ID: 1516D205-3FE5-4733-9CB7-503D57AB645A

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2024.

_Allyson Watson_
Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida A&M University

Page 3 of 3

**APP 697**

# 151-15 - Provost Watson Dec #2

# 08/18/2024

**APP 698**

Case 6:24-cv-00457-PGB-RMN   Document 42-1   Filed 04/19/24   Page 21 of 93 PageID 1261

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JENNIFER SMITH,

      **Plaintiff,**

v.

                                 **Case No: 6:24-cv-457-PGB-RMN**

THE FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

      **Defendant.**

_____/

## AMENDED DECLARATION OF PROVOST ALLYSON WATSON

1.     My name is Dr. Allyson Watson and I am over the age of eighteen (18) years of age.

2.     This is an Amended Declaration to clarify and replace the Declaration of the undersigned filed in support of Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction submitted to this Court on March 25, 2024.

3.     I make this Declaration upon my own personal knowledge and belief.

4.     I serve as Provost and Vice President for Academic Affairs for the Florida Agricultural and Mechanical University (FAMU).

Page 1 of 3

APP 699

Case 6:24-cv-00457-CEM-RMN   Document 42-1   Filed 04/19/24   Page 2 of 3 PageID 2262

5.    Jennifer Smith was employed as a visiting professor for the College of Law on August 8, 2004.

6.    I received the Office of Compliance and Ethics' Investigative Reports 2022-11-117 and Supplemental Report 2022-11-117 regarding Jennifer Smith's retaliatory conduct toward a student. The Report substantiates one allegation of misconduct made against Ms. Smith.

7.    My decision to terminate Ms. Smith's employment was based on the substantiated finding of retaliation documented in the Investigative Reports.

8.    On December 5, 2023, I sent a Notice of Intent to Dismiss from Employment to Ms. Smith, which advised her of her rights and process under University Regulation 10.120.

9.    Pursuant to University Regulations, Ms. Smith requested a conference, which was convened at her request and met on January 11, 2024. The panel that facilitated the conference recommended that I rescind my Notice of Intent to Dismiss.

10.    Given the disruption caused by Ms. Smith's behavior at the College of Law, I declined to take their recommendation and issued a Notice of Dismissal from Employment to Ms. Smith.

11.    I issued the Notice of Dismissal of Employment on January 23, 2024 and sent it to Ms. Smith via email and certified mail, Return Receipt requested.

Page 2 of 3

**APP 700**

12.    As stated in the Notice of Dismissal, Ms. Smith's employment with FAMU ended at the close of business on Tuesday, January 30, 2023.

13.    Ms. Smith was paid beyond the termination date by mistake. The overpayment will be deducted from any additional paid benefits due to Ms. Smith upon reconciliation of said benefits.

14.    The College of Law Faculty website retained a profile for Ms. Smith after her termination date due to the workload of the webmaster, and not because Ms. Smith was still employed at the University.

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2024.

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida A&M University

Page 3 of 3

**APP 701**

# 151-16 - Reyes Depo

# 08/18/2024

**APP 702**

Case 6:22-cv-01525-WWB-EJK   Document 85-1   Filed 07/08/2024   Page 1 of 8 PageID 2874

Maritza Reyes
May 24, 2024

                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                        ORLANDO DIVISION

     CASE NO.:  6:22-cv-1525-WWB-EJK


     MARITZA REYES,

          Plaintiff,

     v.

     THE FLORIDA AGRICULTURAL AND
     MECHANICAL UNIVERSITY BOARD
     OF TRUSTEES,

          Defendant.
     _____/

                 VIDEO-RECORDED DEPOSITION OF

                       MARITZA REYES



                   Friday, May 24, 2024

                  9:31 a.m. - 5:36 p.m.

             Location:  GrayRobinson, PA
                   301 East Pine Street
                      Suite 1400
                   Orlando, Florida 32801



             Stenographically reported by
              Leah S. Cooney, RPR, FPR




     Job No.:  362459

APP 703

Case 6:22-cv-01525-WWB-RMN Document 56-15 Filed 07/09/24 Page 40 of 65 PageID 7101

Maritza Reyes
May 24, 2024

Page 234

situations where I have, you know -- that's part of the hostile work environment.  Are we still talking about that?

Q.    I'm asking you generally about your interactions with the co-workers.

A.    There have been situations where I have had negative interactions as part of committee work too.

Q.    But right now what I'm talking about is just your daily interactions when you run into people in the hallway or you initiate a conversation as you sit and small talk or something.

Have -- have you experienced any discrimination with respect to the conversations that you've engaged in?

A.    I don't -- I didn't seek out conversations -- and by the way, it's from a period of 2009 until we're talking about 2024 before I was dismissed.

So and there were some situations, like, for example, with Jeremy Levitt when I first got there.  He made comments to me that were discriminatory.  Darryll Jones made comments to me, discriminatory.  So I avoided small talk with them or I avoided having conversations with them.

Q.    Okay.

A.    I also avoided having conversations with people

APP 704

# 151-17 - Bailey Email

# 08/18/2024

**APP 705**

https://mail.aol.com/d/search/keyword=bailey/messages/AJ7706tuSa2P...

## RE: Two things

From:  jensmithesq (jensmithesq@aol.com)

To:    herbert.bailey@famu.edu; reginald.perry@famu.edu

Cc:    lakeisha.brooks@famu.edu

Date:  Monday, June 24, 2024 at 09:14 AM EDT

Please send me an official financial breakdown from December to present. I don't accept this or understand it. Also send my 1099.

> -------- Original message --------
> From: "Bailey, Herbert G" <herbert.bailey@famu.edu>
> Date: 6/24/24 9:10 AM (GMT-05:00)
> To: "Perry, Reginald J." <reginald.perry@famu.edu>, Jen Smith <jensmithesq@aol.com>
> Cc: "Brooks, Lakeisha O." <lakeisha.brooks@famu.edu>
> Subject: RE: Two things
>
> Ms. Smith,
>
> Please see below the breakdown of the payout for the 9 over 12 deferred payment:
>
> | | |
> |---|---|
> | Amount paid into the program: | $6,500.00 (September 2023 thru February 2024) |
> | Amount overpaid to employee: | ($3,971.52) (Pay date 2/09/24) |
> | Amount overpaid to employee: | ($1,269.11) (Pay date 2/23/24) |
> | Balance due from Program: | $1,269.37 (Paid on 4/24/24) |
>
> The total amount has been paid out for the 9 over 12 program to Ms. Smith.  If there are any questions, please feel free to call me.
>
> Herbert Bailey
>
> Associate Vice President
>
> Provost Office
>
> 300 Lee Hall
>
> Florida A&M University
>
> (850) 599-3276 Office
>
> (850) 561-2551 Fax
>
> Herbert.bailey@famu.edu

7/4/2024, 11:21 AM

**APP 706**

Case 6:24-cv-01457-PGB-RMN   Document 84-1   Filed 07/09/24   Page 2 of 5   PageID 2877

**From:** Perry, Reginald J. <reginald.perry@famu.edu>
**Sent:** Thursday, June 20, 2024 12:54 PM
**To:** Jen Smith <jensmithesq@aol.com>
**Cc:** Bailey, Herbert G <herbert.bailey@famu.edu>
**Subject:** Re: Two things

Hello Professor Smith,

I've reminded him of your email this afternoon.

Regards,

Reginald

-----------------------------------

Reginald J. Perry, Ph.D.

Associate Provost for Academic and Faculty Affairs

Florida A&M University

Professor of Electrical and Computer Engineering
FAMU-FSU College of Engineering
Tallahassee, Fl. 32307

850.599.3276

Please note:  The State of Florida has a very broad public records law.
Most written communications to or from state officials regarding state business are public records available to the public and media upon request. Your e-mail communications may be subject to public disclosure.

**From:** Jen Smith <jensmithesq@aol.com>
**Sent:** Wednesday, June 19, 2024 8:59 AM
**To:** Perry, Reginald J. <reginald.perry@famu.edu>
**Subject:** Re: Two things

**This email originated outside of Florida A&M University. If you think this is a phishing (scam) email, please forward to phishbowl@famu.edu or call 412-HELP.**

**APP 707**

Case 6:24-cv-00457-RMN-DAF Document 17-4 Filed 07/09/24 Page 3 of 5 PageID 2878

Hi. Still have not heard anything.

On Friday, June 14, 2024 at 10:52:33 AM EDT, Perry, Reginald J. <reginald.perry@famu.edu> wrote:

Good morning Professor Smith,

I spoke with Mr. Bailey.    He will reach out to you early next week.

Thanks,

Reginald

-----------------------------------

Reginald J. Perry, Ph.D.

Associate Provost for Academic and Faculty Affairs

Florida A&M University

Professor of Electrical and Computer Engineering
FAMU-FSU College of Engineering
Tallahassee, Fl. 32307

850.599.3276

Please note:  The State of Florida has a very broad public records law.
Most written communications to or from state officials regarding state business are public records available to the public and media upon request. Your e-mail communications may be subject to public disclosure.

**From:** jensmithesq <jensmithesq@aol.com>
**Sent:** Thursday, June 13, 2024 11:42 AM
**To:** Perry, Reginald J. <reginald.perry@famu.edu>
**Subject:** Re: Two things

This email originated outside of Florida A&M University. If you think this is a phishing (scam) email, please forward to phishbowl@famu.edu or call 412-HELP.

Hi. I never heard back from Herb Bailey.

APP 708

-------- Original message --------

From: "Perry, Reginald J." <reginald.perry@famu.edu>

Date: 6/4/24 5:13 PM (GMT-05:00)

To: jensmithesq <jensmithesq@aol.com>

Cc: "Bailey, Herbert G" <herbert.bailey@famu.edu>

Subject: Re: Two things

Dear Professor Smith,

I will reach out to Dean Matthews about the Step Two meeting.   Please contact Mr. Bailey (copied on this email) regarding your summer payment.

Regards,

Reginald

-----------------------------------

Reginald J. Perry, Ph.D.

Associate Provost for Academic and Faculty Affairs

Florida A&M University

Professor of Electrical and Computer Engineering
FAMU-FSU College of Engineering
Tallahassee, Fl. 32307

850.599.3276

Please note:  The State of Florida has a very broad public records law.
Most written communications to or from state officials regarding state business are public records available to the public and media upon request. Your e-mail communications may be subject to public disclosure.

**From:** jensmithesq <jensmithesq@aol.com>
**Sent:** Tuesday, June 4, 2024 1:01 PM
**To:** Perry, Reginald J. <reginald.perry@famu.edu>
**Subject:** Two things

This email originated outside of Florida A&M University. If you think this is a phishing (scam) email, please forward to phishbowl@famu.edu or call 412-HELP.

APP 709

AOL Mail - RE: Two things                                    https://mail.aol.com/d/search/keyword=bailey/messages/AJ7706tuSa2P...

1) I never heard back from Dr. Matthews for my Step Two Hearing, but I assume she's busy.

2) Each year, I direct money from my 9 mos salary to be paid in the summer. Please make sure those funds are released to me this month.

Thanks, Jen Smith

# 151-18 - FAMU EEOC Pos Statement

# 08/18/2024

**APP 711**

## DENNIS, JACKSON, MARTIN & FONTELA, P.A.

PROFESSIONAL ASSOCIATION
ATTORNEYS AND COUNSELORS AT LAW

Craig A. Dennis *
Rogelio J. Fontela
William T. Jackson
Jessica E. Keeler
William Peter Martin ‡
C. Todd Owen
Tiffany Rohan-Williams
Maria A. Santoro *

*Of Counsel*
Teresa C. Ward

‡ Board Certified as a Civil Trial Lawyer
by the Bar
* Certified as a Circuit Mediator by the
Supreme Court of Florida

**TALLAHASSEE**
1591 SUMMIT LAKE DRIVE, SUITE 200
TALLAHASSEE, FLORIDA 32317
(850) 422-3345
FAX (850) 422-1325

**JACKSONVILLE**
1300 RIVERPLACE BOULEVARD, SUITE 101
JACKSONVILLE, FL 32256
(904) 683-6686
FAX (904) 619-1369

Cathy E. McMullian
Firm Administrator

Robin B. Campbell
Jessica H. Gallmon
Nikki W. Garrett, FRP
Jennifer C. Kjellerup, ACP, FRP
Julia Lunt
Jessica N. Mauer
Hester H. Pennington
Dina Sadeq
Karen Weimer
Legal Assistants

**REPLY TO TALLAHASSEE**

December 12, 2022

VIA Email: Kelly.Collins.McMurry@eeoc.gov

Kelly Collins-McMurry
Federal Investigator
U.S. Equal Employment Opportunity Commission
Miami District Office
100 S.E. 2nd St., Suite 1500
Miami, Florida 33131

RE:  Jennifer Smith v. Florida A&M University College of Law
     EEOC Charge No.: 510-2023-00072

Ms. Collins-McMurry:

On behalf of the University, enclosed is the Position Statement and supporting documents regarding the above referenced Charge filed by Jennifer Smith. The Position Statement has been uploaded to the EEOC portal.

Should you have any questions, please do not hesitate to contact my office.

Very truly yours,

Maria A. Santoro

MAS/mjl
Enclosures

**APP 712**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072

**Position Statement**

The undersigned counsel for the Florida Agricultural and Mechanical University Board of Trustees ("University"), submits this letter and accompanying documents as the position statement to the above-referenced employment charge of discrimination ("Charge").

The current position statement is provided to the Equal Employment Opportunity Commission ("Commission") solely for the investigation of the instant charge and with the understanding that this matter will remain confidential and will not be disclosed for any other purpose, except as provided for by law.

Further, this position statement is not intended to raise all legal theories and/or defenses which the University may ultimately raise in this matter. The University also reserves the right to alter, amend or supplement this statement if new or additional information is alleged or discovered or for other reasons.

## 1. Respondent - Florida Agricultural & Mechanical University

Pursuant to Article IX, Section 7(d), of the Florida Constitution, and the Florida Board of Governors Regulation 1.001, Florida Agricultural and Mechanical University Board of Trustees is a public body corporate and constitutionally created to oversee an institution of higher education and learning.

The University serves approximately 10,000 students and is dedicated to their academic progress as well as the advancement of knowledge, resolution of complex issues and productive empowerment of citizens and communities throughout the nation and world. As the public employer, the University employs approximately 2,329 full-time employees, who are primarily located on its main campus in Tallahassee.

## 2. Position Summary

The University, having independently investigated the allegations of the Charging Party, Jennifer Smith ("Smith") internally, wholly denies that Smith has been subjected to any unlawful employment practice based upon her gender, and further denies that she was denied equal pay based on her sex.

**APP 713**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page **2** of 7

Accordingly, the Commission should issue a no cause determination in this matter.

### 3. Facts Summary

Smith was hired in 2004 at the College of Law as a non-tenured earning Visiting Assistant Professor. Smith's Offer/Appointment Letter and her first contract of employment showing her rank and salary is attached as [Exhibit 1]. Her initial salary was $100,000 for a nine-month teaching contract. *Id.*

Professor Smith subsequently claimed that her negotiated position upon hire was associate professor and not assistant professor. That is not supported by the records maintained at the University, attached [Exhibit 2]. Although the evidence did not support Smith's claim[1] and after much discourse, the University reclassified[2] Smith as an Associate Professor at her initial salary.[3] Her "promotion" did not carry with it the raise in salary that would have occurred had the University's promotion process been used. Smith did not go through the proper procedure for the promotion. Further, Smith did not assert that her negotiated salary was incorrect. Accordingly, the University did not adjust her negotiated salary as Smith did not follow University procedure.[4] As a result, though she has received all percentage increases to which she has been entitled, and all lump sums to which she has been entitled, Smith's salary has lagged behind other professors at the University.

Prior to Smith filing the lawsuits referred to in this position statement, Smith filed an internal complaint with the Office of Equal Opportunity Programs. The investigation revealed that Smith's salary inequity complaint (based on sex) was unsubstantiated, refer to [Exhibit 3].

---

[1] Smith based her claim that she was hired as an "associate" professor because of a clerical error which listed her as an associate and not an "assistant" professor. However, Smith's title and rank in all previous communications with FAMU had her rank as "assistant" professor,

[2] Professor Smith did not go through the established promotional process but instead was reclassified based on her claims and the clerical error.

[3] University ranking is as follows: Assistant Professor, Associate Professor, and Full Professor. In addition, there is tenure earning and tenured. Faculty Handbook pp. 40-44.
*See*, http://www.famu.edu/facultysenate/Faculty%20Handbook%20-%20%20Spring%202008.pdf. An instructor does not fall within the scholarly ranks of professors.

[4] Generally, when a tenured-earning faculty member is promoted through the promotion/tenure process, a salary increase is associated with the granting of the promotion. However, since Smith claimed she was hired as an associate, and she did not subject herself to the promotion process, a salary increase did not occur as her salary remained based on her negotiations.

**APP 714**

Case 6:24-cv-01457-RMN-DAF   Document 18-1   Filed 07/09/24   Page 4 of 8 PageID 2884

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page 3 of 7

Smith sued the University in 2014 in federal court, and the jury determined that Smith suffered no discrimination when she was hired in 2004, and that her salary was behind others at the University for other reasons:

> Professor Jennifer Smith sued her employer, Florida A&M University ("FAMU"), alleging pay inequity, sex discrimination, and retaliation. She claimed that FAMU discriminated against its female law professors by paying them less than comparable male law professors and retaliated against her when she voiced opposition. The district court denied summary judgment, and the case went to trial. The jury found FAMU not liable on any of Professor Smith's claims. While the jury found that Professor Smith was paid less than comparable male professors, it was persuaded that the difference was for reasons other than her sex.

*Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 687 Fed. Appx. 888 (11th Cir. 2017). [Exhibit 4].

In 2016, Smith filed another EEOC charge, and another lawsuit against the University, which resulted in another judgment in favor of the University and another appeal affirming that judgment:

> Jennifer Smith, a law professor, appeals the district court's grant of summary judgment in favor of her employer, the Board of Trustees at the Florida Agricultural and Mechanical University ("FAMU"), on her claims of gender discrimination in pay and retaliation under the Equal Pay Act,1 Title VII,2 and the Florida Civil Rights Act ("FCRA").3 This lawsuit is Smith's second one against FAMU for gender discrimination in pay. She brought the first one in 2014 based on her original salary. Smith's claims here, however, center on salary adjustments made by FAMU which applied generally to law professors and occurred after the verdict in Smith's first (and unsuccessful) lawsuit. On appeal, Smith asserts that the district court erred by applying collateral estoppel and granting summary judgment on each of her claims. After a full review of the record, we affirm.

**APP 715**

Case 6:24-cv-01457-RMN-DAB   Document 18   Filed 07/09/24   Page 5 of 8 PageID 2885

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page 4 of 7

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 435 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021). [Exhibit 5].

The University attaches these cases, Exhibits 4 & 5, to this Position Statement for the convenience of the Commission.

Smith now claims another comparator, but the result is the same. This issue has been litigated by two trial courts, two appeal courts, and the result has been affirmed that Smith was not discriminated based on sex. Smith was promoted to associate professor over a dozen years ago summarily by way of paperwork. As a result, she did not receive the pay raise that the promotion process would have afforded her, and her salary has remained proportionate ever since. Smith reached out to the Interim Provost at the time and argued that her contract was incorrect because she was hired as an associate professor. The Interim Provost signed the change, thinking it had been a mistake. [Exhibit 6]. As a Visiting/Assistant professor, Smith was limited in the number of academic years she could stay without promotion. Ergo, Smith was more concerned at that time about her ability to stay employed at FAMU. There was also the possibility that if she went through the promotion process, she would not have been supported by her colleagues or the Dean at the law school.

### 4. Legal Analysis

#### a. The Equal Pay Act

"An employee establishes a prima facie case under the Equal Pay Act by showing that the employer paid differing wages to employees of opposite sexes for 'equal work on jobs ... which require[ ] equal skill, effort, and responsibility, and which are performed under similar working conditions.' 29 U.S.C. § 206(d)(1); *see Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003)." *Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021)

A burden-shifting framework is applied to analyze EPA claims. *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994).

**APP 716**

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page **5** of 7

Once the employee has established a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the payments were made pursuant to:

(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee. 29 U.S.C. § 206(d)(1) (emphasis in original). "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided no basis for the wage differential.' " *Steger*, 318 F.3d at 1078 (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995).

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021).

> "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided no basis for the wage differential.'"

*Smith v. Florida A & M Univ. Bd. of Trustees*, 831 Fed. Appx. 434, 439 (11th Cir. 2020), cert. denied sub nom. *Smith v. Florida Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (2021).

"The employee may then rebut the employer's defense by putting forth evidence demonstrating that the employer's alternative bases for the pay disparity were pretextual or offered as a post-event justification for a sex-based differential." *Id.*

Applying the law to these facts, it is clear that Smith has produced nothing to show she actually performs the same work. Smith and Areto Imoukhuede are filling completely different needs for the University. Thus, while Smith alleges that she is paid less than the newly hired comparator professor she rests her assumption on that she and the new professor perform substantially similar jobs. This is an issue of fact that Smith carries the burden in order to show a prima facie case. *Equal Employment*

**APP 717**

*Opportunity Comm'n v. Univ. of Miami*, 19-23131-CIV, 2021 WL 4459683, at *9 (S.D. Fla. Sept. 29, 2021).

In fact, they do not perform substantially similar jobs. Areto Imoukhuede is a Constitutional Law specialist. His CV shows a concentration in that area. [Exhibit 7 – CV]. The College of Law requires 6 hours of Constitutional Law of its students. The net effect is that there are 9 hours of Constitutional Law being taught every semester. The faculty of the College of Law interviewed three candidates to fill the additional need for a professor to teach Constitutional Law. The faculty only approved one candidate, Areto Imoukhuede. [Exhibit 8]. The College of Law has other professors already teaching Constitutional Law. Smith does not teach Constitutional Law and her publication and service history are not concentrated in that area. [Exhibit 9]. Thus, Smith has not provided facts to support her allegations and so her prima facie case fails.

Even assuming a prima facie case, which is not conceded, the University may dispel it by articulating "any factor other than sex" for the disparity. The "factors other than sex" for the pay disparity are, in short: A) that Smith was not promoted to associate professor through regular channels, leaving her continuing salary lower, and B) that the University needed a Constitutional Law professor because of the workload in that area. Imoukhuede has concentrated his efforts in a specialty – Constitutional Law. His salary is in line with the other professors teaching and specializing in that area. These are not contrived reasons and the decision to offer that salary to Imoukhuede had nothing to do with his gender. The University "may consider factors such as the "'unique characteristics of the job; ... an individual's experience, training, or ability; or ... special exigent circumstances connected with the business.'" [citation omitted]. *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003). The unique characteristics of the job and the new professor's unique specialty were the legitimate reasons for his salary offer.

### 5. Conclusion

Based on the evidence and documentation provided in this Position Statement, the University shows that it did not discriminate against Professor Smith by hiring Areto Imoukhuede at a higher salary than Smith's. Smith's lack of going through proper procedures for a promotion limited her salary for the future. The University needed a Constitutional Law professor to teach its required curriculum and therefore Smith and the new male professor are not performing substantially similar jobs. Further,

**APP 718**

Case 6:24-cv-00457-RMW-NDF    Document 18    Filed 07/09/24    Page 8 of 8 PageID 2888

Jennifer Smith v. Florida A&M University
EEOC Charge No.: 510-2023-00072
University's Position Statement
Page **7** of **7**

the University offers legitimate business reasons in that the College of Law faculty interviewed three candidates and approved only one, while the need for a specialized professor was immediate.

The University would request that this Commission terminate its investigation as to the charge with findings that the University has complied with all applicable laws and that it is within the Commission's jurisdiction to investigate and make a determination of no cause and the dismissal of this charge.

## 6. Exhibits

| | |
|---|---|
| 1 | 07/29/2004 Offer Letter and 08/02/2004 Employment Contract |
| 2 | Smith employment status at University 2008 |
| 3 | EOP investigation and report 2012 |
| 4 | Smith v FAMU 2017 case – written opinion |
| 5 | Smith v FAMU 202 case – written opinion |
| 6 | Smith Promotion to Associate paperwork approved only by Interim Provost Austin |
| 7 | Areto Imoukhuede CV |
| 8 | Excerpts Faculty handbook and Faculty meeting Feb 17, 2021, approving only Professor Imoukhuede for hire |
| 9 | Course schedules 2021-2022 |

**APP 719**

# 151-19 - Baker Emails

# 08/18/2024

Case 6:24-cv-01457-PGB-RMN   Document 84-19   Filed 07/09/24   Page 1 of 5 PageID 2889

## Fw: FAMU-2022-11-117 Interview Request

From:  Smith, Jennifer (jennifer.smith@famu.edu)

To:      jensmithesq@aol.com

Date:  Wednesday, January 3, 2024 at 10:59 AM EST

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Friday, January 27, 2023 2:49 PM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Fyi

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Friday, January 27, 2023 2:34 PM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Good afternoon,

Florida A&M University is committed to transparency and takes complaints received seriously. As a follow-up to your question regarding the topic, the Office of Compliance and Ethics (OCE) is in the process of reviewing allegations referred to our office, identifying you as a subject. The complaint details allegations regarding employee misconduct as is related to an incident involving you and a student (Michelle Wanamaker) on Thursday October 20, 2022. The review will be based on Regulation 10.111 Disruptive Conduct and 1.019 University Code of Conduct.

 As a result, any action or information requested as part of an ongoing investigation or management request will be done by the OCE. ***Therefore, you should not take any atypical actions, conduct interviews and/or request information from any employee as it relates to this matter.***  This letter also serves as notice that impeding any ongoing investigation or management request is strictly prohibited and will not be tolerated.

Please note that retaliation against any individual for their actual or perceived involvement in an investigation is prohibited and constitutes a separate cause for complaint.

Best,

*La'Tonya Baker MPA, CFE, CIGI, CCEP, COSO-RMCP, FCCM*
Compliance Manager
Florida Agricultural and Mechanical University
Office of Compliance and Ethics
Foote- Hilyer Administration Center, Suite, 105
Tallahassee, FL 32307

**APP 721**

AOL Mail - Fw: FAMU-2022-11-117 Interview Request                    https://mail.aol.com/d/folders/34/messages/ACwp685KroOoZZWEZ...

Case 6:24-cv-01457-PGB-RMN   Document 10-15   Filed 07/09/24   Page 2 of 5   PageID 2890

(850)561-2279





People of character do the right thing even if no one else does, not because they think it will change the world but because they refused to be changed by the world.

*Michael Josephson*

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Thursday, January 26, 2023 12:09 PM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Hi. Spoke to lawyers. What's topic so I can prepare or determine if I need representation.

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Thursday, January 26, 2023 9:09 AM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

You're welcome and the link is below. I look forward to speaking with you on Wednesday.

https://famu.zoom.us/my/latonyabaker

## Join our Cloud HD Video Meeting

Zoom is the leader in modern enterprise video communications, with an easy, reliable cloud platform for video and audio conferencing, chat, and webinars across mobile, desktop, and room systems. Zoom Rooms is the original software-based conference room solution used around the world in board, conference, huddle, and training rooms, as well as executive offices and classrooms. Founded in 2011, Zoom helps businesses and organizations bring their teams together in a frictionless environment to get more done. Zoom is a publicly traded company

famu.zoom.us

*La'Tonya Baker MPA, CFE, CIGI, CCEP, COSO-RMCP, FCCM*
Compliance Manager
Florida Agricultural and Mechanical University
Office of Compliance and Ethics
Foote- Hilyer Administration Center, Suite, 105
Tallahassee, FL 32307

**APP 722**

AOL Mail - Fw: FAMU-2022-11-117 Interview Request            https://mail.aol.com/d/folders/34/messages/ACwp685KroOoZZWEZ...

Case 6:24-cv-00457-RMW-NDf Document 19-10 Filed 07/09/24 Page 3 of 5 PageID 2891

(850)561-2279





People of character do the right thing even if no one else does, not because they think it will change the world but because they refused to be changed by the world.

*Michael Josephson*

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Thursday, January 26, 2023 9:03 AM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Okay, thank you.

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Thursday, January 26, 2023 8:55 AM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Ok great! I'll send you a link for 2:30p.m.


*La'Tonya Baker MPA, CFE, CIGI, CCEP, COSO-RMCP, FCCM*
Compliance Manager
Florida Agricultural and Mechanical University
Office of Compliance and Ethics
Foote- Hilyer Administration Center, Suite, 105
Tallahassee, FL 32307
(850)561-2279





People of character do the right thing even if no one else does, not because they think it will change the world but because they refused to be changed by the world.

*Michael Josephson*

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>

**APP 723**

AOL Mail - Fw: FAMU-2022-11-117 Interview Request

https://mail.aol.com/d/folders/34/messages/ACwp685KroOoZZWEZ...

Case 6:24-cv-00457-PGB-RMN   Document 84-19   Filed 07/09/24   Page 4 of 5 PageID 2892

**Sent:** Thursday, January 26, 2023 8:44 AM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Wed 2:30-4pm

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Thursday, January 26, 2023 8:24 AM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Subject:** FAMU-2022-11-117 Interview Request

The Office of Compliance and Ethics (OCE) is committed to the University's core values, including accountability, integrity, and ethics. To that end, our office takes each complaint seriously. OCE investigates misconduct related to compliance and ethics, including, but not limited to, the following violations or concerns:

- **Workplace Health and Safety Violations**
- **University Code of Conduct Violations**
- **Legal or Regulatory Violations**
- **Misuse or Theft of University Property**
- **Research Misconduct**

As a result, OCE received an inquiry naming you as the subject of the investigation. This investigation relates to employee misconduct. Please advise of your availability for the following dates for an interview:

Tuesday January 31st   10a.m.- 1p.m. or  2:30 p.m.- 4:00p.m.

Wednesday February 1st  9a.m.- 1p.m. or  2:30 p.m.- 4:00p.m.

Please respond confirming receipt of this email and an interview date and time. I don't anticipate needing more than 45 minutes of your time.

Thanks,

*La'Tonya Baker MPA, CFE, CIGI, CCEP, COSO-RMCP, FCCM*
Compliance Manager
Florida Agricultural and Mechanical University
Office of Compliance and Ethics
Foote- Hilyer Administration Center, Suite, 105
Tallahassee, FL 32307
(850)561-2279





People of character do the right thing even if no one else does, not because they

**APP 724**

think it will change the world but because they refused to be changed by the world.

*Michael Josephson*

 Screenshot_20221218-191933_Chrome(1).jpg
439.3kB

**APP 725**

# 151-20 - Baker Emails 2

# 08/18/2024

AOL Mail - Fw: FAMU-2022-11-117 Interview Request

https://mail.aol.com/d/folders/34/messages/AFLShrJpqxPWZZWEe...

## Fw: FAMU-2022-11-117 Interview Request

From:  Smith, Jennifer (jennifer.smith@famu.edu)

To:      jensmithesq@aol.com

Date:  Wednesday, January 3, 2024 at 10:59 AM EST

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Saturday, January 28, 2023 5:40 AM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Cc:** Jen Smith <jensmithesq@aol.com>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Great. Also, here are 2 texts I sent to Associate Dean Green immediately after incident on Oct. 20, 2023 at 10:30am.

Thx,

JS

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Friday, January 27, 2023 11:54 PM
**To:** Smith, Jennifer <jennifer.smith@famu.edu>
**Cc:** Jen Smith <jensmithesq@aol.com>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Received. Thank you.

Get Outlook for iOS

---

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Friday, January 27, 2023 8:39:04 PM
**To:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Cc:** Jen Smith <jensmithesq@aol.com>
**Subject:** Re: FAMU-2022-11-117 Interview Request

Hello. I reviewed the relevant provisions that you cited, but none apply. Nonetheless, here are additional documents (attached), showing that I properly reserved the room for my makeup classes due to the hurricane cancellations and immediately reported the student conduct to Assoc Dean Green, but there was no follow up by the University on this issue. I am concerned about the timing of this investigation -- over 90 days after the incident.

JS

---

**From:** Baker, LaTonya <Latonya.Baker@famu.edu>
**Sent:** Friday, January 27, 2023 2:34 PM

**APP 727**

# 151-21 - Smith Affidavit

# 08/18/2024

APP 728

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
CIRCUIT CIVIL**

JENNIFER SMITH,

      Plaintiff,

                                 CASE NO.:
                                 2023-CA-016035-O

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,

      Defendant.

_____/

## DECLARATION OF JENNIFER SMITH

I, Jennifer Smith, being over the age of eighteen, make this declaration on personal knowledge of the following facts:

In 2004, I took a significant pay cut and left a secure place of employment after ten years at a big law firm to do something I thought would love, teaching. But not only would I be teaching, but I would be near the foundation of the start of a law school with a mission that resonated with me – to teach students from underserved communities. Although my formal start date at Florida A&M University College of Law was August 2004, I started in May 2004 without pay to create the student clinics at the law school. The then-dean rewarded my efforts with a monetary grant several months later. Teaching at FAMU COL allowed me to feel that I was continuing my "pro bono" efforts in helping the students and helping the students help the community in service in the clinics. I love teaching the students at the FAMU COL.

### Teaching and Student Mentorship

Having ascended to partnership at the law firm, I knew that I could work hard and earn



PLAINTIFF'S
EXHIBIT
1

**APP 729**

tenure. I have always been one of the most published of the COL faculty and one of the most advanced in learning new courses to teach our students. I have been proactive in integrating in the law school curriculum cutting-edge course topics that respond to emerging global and societal issues.

Significantly, I have proposed and taught several new courses that are billion-dollar industry courses or at the forefront of the legal landscape in law or society, such as Fashion Law; Marijuana Law & Policy; Intersectionality: Racism, Sexism, Classism, Colorism, Spiritualism & the Law; International Arbitration; Sneaker Law; and Comparative Analysis of Global Marijuana Laws, which have been well-received by students. These courses not only add to our curriculum's diversity but also place our institution at the forefront of emerging legal education trends.

I have also proposed and been working on the creation of Historic Preservation Law and a Survey of Electives Seminar, which would allow students an introduction to various niche areas of the law, such as Wine Law, Historic Preservation Law, Fashion Law, Marijuana Law, Natural Gas Law, International Business Arbitration, in one class. These innovative courses not only garner student interest but also position our law school as a forward-thinking institution. These courses not only enrich our curriculum but also foster a more diverse and inclusive learning environment. Personally, ensuring our students have access to a cutting-edge legal education also keeps me actively engaged in new learning subjects.

Beyond classroom teaching, I am deeply committed to mentoring students, offering guidance in academic pursuits, career choices, and professional development. This mentorship extends to supervising independent studies and guiding students in their research projects, discussing career opportunities, and connecting students with local lawyers in their areas of interest.

2

APP 730

Case 4:24-cv-00450-GBH-MAF Document 17-4 Filed 07/08/24 Page 3 of PageID 92897

## Scholarship

My scholarly contributions are a testament to my commitment to advancing legal scholarship and continue to contribute significantly to the field of law. This year, I was excited about the forthcoming publication of my book, WORTH THE FIGHT: ADVANCING THE CAUSE OF EQUAL PAY. Additionally, my law review article, *AI-Powered Educational Equity: Leveraging ChatGPT for Inclusive Legal Education*, reflects my dedication to addressing contemporary legal challenges and promoting inclusive education. This article has already been accepted for publication in the Touro Law Journal of Race, Gender and Ethnicity for Winter 2024.

My recent publications include a new edition of A STUDENT ELECTRONIC DISCOVERY PRIMER AN ESSENTIAL COMPANION FOR CIVIL PROCEDURE COURSES, SECOND ED. (2023), which has been updated to reflect the latest developments in electronic discovery, including artificial intelligence. It serves as an essential guide for students navigating this increasingly important area of law. This is a companion book that I have used in my Civil Procedure (1L) class since the first edition in 2016.

In addition, *Colorism, Shades of Freedom* (S. Cal. Rev. L. & Soc. Just., Vol. 32) was published in 2023. In this law review article, I delve into the legal implications of colorism within the United States justice system, highlighting an often-overlooked aspect of racial and social justice. This article also includes a student essay within it to allow students to place significant writing credits on their resumes. Also, *Historically Black Colleges & Universities: A Model for American Education* (14 Fla. A&M U. L. Rev. 103) was published in 2021 and is a comprehensive law review article on HBCUs and Black history. I began this piece in 2016 and promised it to the FAMU Law Review when it was seeking articles for its journal. This piece reflects on the role of HBCUs in shaping American education, underscoring their significance and offering insights for

3

**APP 731**

Case 4:24-cv-00450-GB-MW-MAF   Document 115   Filed 07/09/24   Page 44 of 94 PageID 92898

educational reform.

Over the five-year span of the article's development, several students assisted me with the research, but one student was particularly helpful, and he is recognized as a co-author on the article to allow him to develop his book of scholarship. My work on petitions for certiorari to the United States Supreme Court drafted in 2018 and 2021, and a federal appellate brief drafted in 2019, not only reflects my engagement with pressing legal issues but also demonstrates my commitment to influencing national legal discourse. These writings involved civil rights (Section 1981 as well as an area of Civil Procedure that the federal courts are grappling with) and equal pay issues (Equal Pay Act). Issues like these enhance my teaching in Civil Procedure and other courses, as well as bring the University one step closer to racial and gender equality.

My legal scholarship stands as a beacon of influence and authority. My research and thought-provoking insights have not only captured the attention of peers but have also resonated profoundly within the highest echelons of the judicial system. My work has been cited by an array of prestigious courts, including state supreme and federal appellate and district courts, a testament to the practical impact and relevance of my scholarship. These citations are a clear indicator of the weight and significance my contributions hold in shaping legal discourse and practice. Furthermore, the recognition from fellow scholars and authoritative legal treatises underscores the depth, originality, and rigor of my work. My scholarship not only enriches the academic community but also actively informs and guides judicial reasoning, shaping the contours of legal precedent and policy.

Service

My service to the community through diverse yet interconnected activities reflects a commitment to leveraging my professional skills and personal passion for the betterment of

4

**APP 732**

society. These roles have allowed me to make significant contributions in areas of democratic participation, legal advocacy, educational development, and community empowerment, resulting in recognition as a "Community Star" from the African American Women's History Month Project, Inc. in 2020. I remain dedicated to continuing these efforts, aiming to make a lasting and positive impact on our COL, University and broader community.

I also created and funded (co-sponsoring with another COL professor) a $500 law review scholarship to encourage student engagement in research and publication of student scholarship. In addition, I donated $10,000 to the University in 2019 for a student emergency fund, but because the University/COL seemed not to be able to figure out how to advance these "emergency" funds to students, the money was given to another HBCU.

Legal Battles

**Equal Pay**

While leading in faculty publications, teaching excellence and service, I was also engaged in a decade-long battle against the University for equal pay. I have not only carved a path as a formidable law professor but also emerged as a trailblazer for gender equity in the legal profession. This relentless pursuit of justice transcended personal struggle, molding me into a professor who embodies resilience, integrity, and an unwavering commitment to fairness. In the classroom, these experiences have translated into a more nuanced and empathetic approach to teaching. My ability to interweave real-world legal battles with academic rigor has not only captivated students but also instilled in them a profound understanding of the law's transformative power.

By sharing my own public experiences of confronting systemic disparities, I hope to have illuminated the path for future lawyers, equipping them with the courage and moral compass to challenge injustices. Furthermore, my fight for equality has had a resounding impact on my

APP 733

development as a legal educator. It has deepened my engagement with issues of social justice, workplace equity, and the complexities of legal advocacy. My teachings are now imbued with a richness and authenticity that only comes from lived experience, fostering an environment where critical thinking and social consciousness are not just encouraged but are deemed essential.

As a mentor, I have become an inspiring figure, whose journey resonates profoundly with students, particularly those who face or witness inequities. I have transformed the classroom into a crucible where the next generation of lawyers are not only educated but also galvanized to become agents of change. Significantly, my fight for equal pay has also contributed substantially to advancing gender equity in the law. My battle, which echoes the struggles of many women in academia and beyond, has raised critical awareness about gender-based pay disparities and systemic biases in the legal field.

My ultimate victory resulted in 1) individual salary increases for women up to $23,000, 2) closing the $20,000 pay gap between men and women holding the title of "associate dean" and 3) obtaining overdue promotions for women faculty is not just a personal triumph but a landmark achievement in the ongoing struggle for gender equality. Notwithstanding the equal pay battle, I have continued to be one of the few leaders in scholarship productivity and teaching excellence at the COL. That said, the battle for gender equality continues as the gender pay inequities remain fresh.

**FMLA**

In addition to the equal pay battles, I was compelled to file an FMLA (Family and Medical Leave Act) complaint against the University while on FMLA leave in the fall of 2021 because Dean Keller, Associate Dean Cooper, and the University general counsel were reassigning me on my return from a law professor from FMLA to work in the University general counsel's office,

6

APP 734

specifically under the supervision of the University general counsel to perform legal tasks, and threatening my employment for failure to comply. This was in stark violation of FMLA provisions. The Department of Labor found the University in violation and required it to return leave hours to me, and this has yet to be confirmed as done.

## Performance

Notwithstanding my legal battles with Defendant and its negative, retaliatory responses to me in return, I have continued to stand as a model of excellence for the University, the law school and the students.

My evaluations from the deans – only 3 in ten years even though the Faculty Handbook required evaluations annually – have been superior on a scale of 1-5 with 5 the highest.[1]

| Dean | Pernell 2012-13 | Pernell 2013-14 | Keller 2021-22[2] |
|---|---|---|---|
| Teaching Effectiveness | 5.0 | 5.0 | No rating but comments: "You are an active and engaged teacher and scholar." |
| Research | 5.0 | 4.8 | 4.8 |
| Service | 4.6 | 5.0 | 5.0 |
| Other Univ. Duties | 5.0 | 5.0 | 5.0 |

Similarly, my student evaluations have overall been superior. Some of the sample comments from the last few years in my courses are below.

**Civil Procedure (79 students-1Ls):** "Demands excellence from her students. Fair professor. She provides each student with the same opportunity as others. Professor Smith is the most hands on professor at FAMU, which helps us better understand the material and how it applies or does not apply in the legal field. Professor Smith is very intelligent and knows how to teach."

**Comparative Analysis of Global Marijuana Laws, Stetson Law School in the Hague, Netherlands:** "Professor Smith was phenomenal. Prof. Smith did a great job of providing material

---

[1]   The evaluations for all faculty ended in 2014 when I filed a gender pay lawsuit, and the evaluations revealed that my male comparator was being paid more than I was, but he was not performing at the same high level of excellence as I was in teaching, scholarship, or service.

[2]   Based on the standard universal meanings of 1-5 rating.

7

that was not biased and presented both perspectives for and against. Great professor in an area of law that is newer and constantly changing. This class was <u>great</u>."

**Remedies (12 students -2Ls/3Ls):** "One of, if not the best professor I have taken at FAMU Law. She asks a lot of us as students, I think this was the only class we actually were required to read the whole textbook. She assigned us an additional oral argument and memo assignment. Professor Smith was very helpful and creative in the ways that she taught this class. Her methods will indefinitely stick with me as I pursue my path in the law field. She was always willing to help students understand the material, but made sure that they understood that in order to be successful in her class, students must also do their part and come prepared. She holds her students to a high standard and I believe that is what helps them be successful."

**Fashion Law (9 students -2Ls/3Ls):** "Professor Jennifer Smith was very professional, engaging, knowledgeable on the subject area of Fashion Law and very helpful and informative with insight on writing upper-level writing papers and Seminar papers."

**Health Care Law (14 students -2Ls/3Ls):** "Truly enjoyed Professor Smith's course on Health Care Law. I now have a well-rounded understanding of HCL and I look forward to working in the Health Care Law field. I know what I have learned in class will help me in practice. Overall great professor & the course definitely was a good survey course for health care law."

**Civil Procedure (60 students -1Ls):** "Great class, well organized. Great Professor! Blessing to FAMU COLLEGE OF LAW. I have never in my collegiate experience had a professor like Jennifer Smith. She has to be tough because civil procedure is tough, she is very particular because courts will be particular. Professor Smith truly wants the best for her students and will do whatever it takes (zooms, office hours, emails) to ensure that students understand any misconceptions. I will never forget her and I will always remember what she taught me."

**Marijuana Law & Policy (16 students -2Ls/3Ls):** "The material in this course was very interesting! The controversial material made class discussions very engaging. The professor was knowledgeable and offered legals tips that we can use outside of the class. I feel like a better writer after taking this course."

**Civil Procedure (15 students, evening program-1Ls):** "Professor Smith was phenomenal. Her teaching method is highly engaging, and she does a great job communicating the various nuances of the material covered as it relates to the class examination, bar examination, and in practice. She also makes the class fun. I will look to take as many classes with Professor Smith as possible in the future. Being a part time student that works a demanding full time job, Professor Smith's skill at teaching and ability to make the class time enjoyable makes going through the grind a lot easier to deal with. This course was reading-heavy for sure! Professor Smith gave helpful examples and would go over any questions we had thoroughly to ensure our understanding."

My student evaluations estimated average score on the "overall rating of instructor" is

below.

8

Case 4:24-cv-00457-RM-MAF   Document 215   Filed 07/08/24   Page 9 of PageID 92903

| Student Evaluations |
| --- |
| 4.31 |

Sadly, because of my excellence at my job as a law professor and my love for it, the only way to finally get rid of me would have to be a manufactured charge of misconduct to circumvent my tenure security. I have dealt with much in the way of nonsense at the COL, but my love for teaching and the unique mission of the law school allowed me to enjoy my job there, nonetheless. There is no money that can compensate me for my love of teaching or repair my professional reputation or resume.

As a tenured law professor at the COL, my work is not simply what I do – it is who I am. It is my contribution to the social order of this community and my source of great satisfaction, fulfillment, and accomplishment. I am the sole caretaker of my elderly father, who I cannot relocate because of his medical condition. Despite the heavy responsibility of caring for my father, teaching and serving the students at the COL allows me to do something that I love every single day. Terminating me for a manufactured "cause" that is pretext for retaliation would destroy my reputation, nullify my scholarship, breach my employment contract, penalize me for exercising my right to equal pay and the right to petition, and likely prevent me from ever teaching again.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE INFORMATION AND BELIEF.**

1/29/24
Date

Jennifer Smith

# 164 - Order Denying Motion for Preliminary Injunction

# 08/30/2024

APP 738

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JENNIFER SMITH,

          **Plaintiff,**

v.                              **Case No: 6:24-cv-457-PGB-RMN**

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,
ALLYSON WATSON, DENISE D.
WALLACE, LATONYA BAKER,
LATRECHA SCOTT, RICA
CALHOUN, GRAY ROBINSON,
P.A., JULIE ZOLTY, RICHARD
E. MITCHELL and SARAH
REINER,

          **Defendants.**
_____/

## ORDER

This cause is before the Court on the Plaintiff's Motion for Preliminary Injunction, (Doc. 86 (the "**Motion**")), and request for a hearing, (Doc. 87). Defendant Florida Agricultural & Mechanical University ("**FAMU**") Board of Trustees filed a Response in Opposition to the Motion. (Doc. 125). The Court does not require a hearing on the merits, and the Motion is denied upon consideration.

## I.    BACKGROUND

The Plaintiff is a tenured professor employed by the FAMU College of Law. (Doc. 151, ¶¶ 28–29). On October 27, 2022, the Office of Compliance and Ethics ("**OCE**") received a referral via email from the Office of Equal Opportunity

**APP 739**

Programs Director, Dr. Latrecha Scott. A law student reported a negative interaction with the Plaintiff and asserted her belief that Professor Smith violated the University Code of Conduct by her behavior. (Doc. 151-6, p. 6). The investigative report includes the student's complaint describing the Plaintiff's allegedly unprofessional and threatening behavior. (*Id.* at pp. 7–8). On November 15, 2022, the student provided five witness statements corroborating her account. (*Id.* at p. 8). Before the student filed her complaint, the Plaintiff notified Associate Dean Reginald Green to report her encounter with the student. (*Id.* at p. 11). The Plaintiff described the student as acting rudely when the Plaintiff would not let her enter the classroom to prepare for an upcoming class. (*Id.*). The Plaintiff's statement of the encounter is outlined in the investigative report. (*Id.* at pp. 11–13).

The OCE expressed concern over the Plaintiff's behavior after she learned about the complaint. (*Id.*). On March 9, 2023, the Plaintiff filed a complaint through the University's Compliance and Ethics Hotline, reporting that a student knowingly and intentionally disrupted her class on October 20, 2022. (*Id.* at p. 18). Concerned that this constituted retaliation against the student, the OCE sent a Notice regarding Non-Retaliation to the Dean of the College of Law reiterating the University prohibition on retaliation. (*Id.*). OCE stated that "[f]iling a complaint for the purpose of making a student 'understand she is also the subject of an investigation' is inappropriate." (*Id.*).

APP 740

The administration discussed the OCE's position on non-retaliation with the Plaintiff, and, in response, the Plaintiff clarified that she filed the complaint to ensure the student reported the investigation to the bar when applying for admission. (*Id.* at pp. 18–19). The investigation found that Plaintiff retaliated against the student by filing a complaint to force the student to report the complaint on her bar application.[1] (*Id.* at p. 19). On December 5, 2023, the Provost and Vice President for Academic Affairs informed the Plaintiff of the University's intent to dismiss her from employment on January 19, 2024. (*Id.* at p. 1). She was placed on Administrative Leave with pay, pending her termination. (*Id.*).

In 2015, the Plaintiff sued FAMU for equal pay based on gender inequity of up to $20,000 in its law faculty salaries. (Doc. 151, ¶ 27). Plaintiff asserts that on August 9, 2021, Defendant hired a male professor who performed substantially equal work in terms of skill, effort, and responsibility, under similar working conditions as other tenured law professors, but is paid $25,000 more than her. (*Id.* ¶¶ 30–31). On June 28, 2022, Plaintiff filed an informal gender equity complaint with Defendant FAMU's Equal Opportunity Program. (*Id.* ¶ 39). In September 2022, the Equal Opportunity Program denied the existence of pay inequality between her and her male colleague. (*Id.* ¶¶ 40–41). On October 18, 2022, the

---

[1]    The Plaintiff noticed Defendant FAMU for a conference which occurred on January 11, 2024. (Doc. 151, ¶¶ 106–10). The next day, the panel's report unanimously recommended the "Notice of Intent to Dismiss from Employment" be rescinded and determined that re-filing "what was believed to be a previously filed complaint" is not an act of retaliation. (*Id.* ¶ 112; Doc. 151-7, p. 3). On January 23, 2024, Defendant FAMU notified Plaintiff that her employment would terminate effective January 30, 2024. (*Id.* at p. 1).

**APP 741**

Plaintiff filed a Charge of Discrimination under the Equal Pay Act with the EEOC. (*Id.*). The incident involving the student occurred two days later. Plaintiff contends that Defendant launched the investigation and terminated her employment in retaliation for filing the Equal Pay complaint. (*Id.* ¶¶ 57, 77–78, 82).

On October 17, 2023, Plaintiff filed a Complaint against Defendant FAMU in the Ninth Judicial Circuit in Orange County, Florida. (Doc. 1, ¶ 1). Plaintiff amended the complaint before it was served on Defendant FAMU. (*Id.* ¶ 2). Defendant FAMU removed the matter to the Middle District of Florida, Orlando Division on March 4, 2024. (*Id.* ¶¶ 8–13). Plaintiff filed a Motion for Temporary Restraining Order on March 6, 2024 (Doc. 6), and the motion was denied on March 8, 2024. (Doc. 10). Three days later, the Plaintiff filed a Motion for Preliminary Injunction. (Doc 11). This motion violated Rule 3.01(a) and 6.02(a) of the Middle District of Florida Local Rules, and so the Court struck the motion. (Docs. 11, 34). Plaintiff renewed her motion and then in response to Defendant FAMU's Motion to Dismiss sought, and was granted, leave to file an Amended Complaint. (Docs. 72, 80, 81). The Court denied the Motion for Preliminary Injunction as moot because of the filing of the Second Amended Complaint ("**SAC**"). (Doc. 82).

On July 10, 2024, Plaintiff again renewed the Motion for Preliminary Injunction (Doc. 86), and a week later, Defendant FAMU moved to strike the SAC, because the version Plaintiff filed differed from the version attached to the motion

**APP 742**

for leave to amend.[2] (Doc. 112). Two weeks later, the Court granted Defendant's motion to strike. (Doc. 132). Three weeks after Plaintiff sought leave to file the most recent version of the SAC, the Court granted the motion to amend and the operative SAC was filed on August 18, 2024.[3] (Docs. 133, 149).

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation omitted). A plaintiff must clearly establish these requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)). "Where the facts are bitterly contested and credibility

---

[2]    Defendant FAMU correctly observed that filing an amended complaint that differs from the version attached to Plaintiff's motion for leave to amend amounts to amending the complaint without leave of court. (Doc. 112).

[3]    The Plaintiff complains that she "has sought injunctive relief for months — for a court to seriously consider this — and prays for a ruling before the first week of August 2024," which is when the fall semester begins. (Doc. 86, p. 1). The Plaintiff's suggestion that the Court has not taken her motion "seriously" is misplaced. Any delay occasioned in ruling on Plaintiff's motion is due to counsel's inability to comply with the Local Rules and the Federal Rules of Civil Procedure. The rules matter and are not mere suggestions. Moreover, the Defendant has a right to know which version of the Complaint is operative before responding to a motion for injunctive relief. The SAC was not properly filed until August 16 because of Plaintiff's numerous procedural missteps. Counsel's condescending tone is beneath the dignity expected of practitioners appearing in federal court.

determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998).

That said, a showing of irreparable injury is "the sin qua non of injunctive relief." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted). The Eleventh Circuit has cautioned that "even if [a plaintiff] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). As the Supreme Court held:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Leigh v. Artis-Naples, Inc.*, No. 2:22-cv-606-JLB-NPM, 2022 WL 18027780, at *16 (M.D. Fla. Dec. 30, 2022) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). "An irreparable injury is one that 'cannot be undone through monetary remedies.'" *Id.* at *17 (citation omitted). Moreover, the mere "possibility of irreparable harm" and speculative future injury cannot, by themselves, invoke the "extraordinary remedy" of a preliminary injunction. *Id.* (citation omitted).

**APP 744**

### III.   DISCUSSION

#### A.   Irreparable Harm

Plaintiff asserts that "[i]rreparable harm has been presumed in employment discrimination cases, such as Title VII." (Doc. 86, p. 5). Plaintiff relies on *Middleton-Keirn v. Stone*, 655 F.2d 609, 612 (5th Cir. 1981).[4] The Court in *Stone* held that where "the employee has exhausted all administrative remedies and has filed suit in the district court . . . irreparable injury is presumed." *Id.* When the Plaintiff filed the instant Motion for Preliminary Injunction, the operative pleading was the First Amended Complaint. (Docs. 1-1, 81, 132). The First Amended Complaint does not include a Title VII claim, and the Plaintiff has not sought leave to amend the Motion for Preliminary Injunction to include the Title VII claim. (Doc. 1-1). Plaintiff concedes in the Motion for Preliminary Injunction that "this case [unlike *Stone*] centers on an EPA claim. (Doc. 86, p. 18). Plaintiff argues that the distinction between a Title VII claim and an EPA claim is "essentially moot," because Plaintiff exhausted administrative remedies under her EPA claim as would be required under Title VII.[5] (*Id.*).

In *Baker v. Buckeye Cellulose, Corp.*, 856 F.2d 167, 169 (11th Cir. 1988), the Eleventh Circuit declared that "[i]n this circuit . . . courts are to presume

---

[4]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[5]   Plaintiff's argument that the holding in *Stone* should extend to an EPA case may be persuasive, but *Stone* is controlling only in a Title VII case.

**APP 745**

irreparable harm in Title VII cases." But as the trial court observed in *Leigh v. Artis-Naples, Inc.*, "[l]ater decisions have cast doubt on the degree to which *Baker* is a controlling authority." 2022 WL 18027780, at *17. In *Baker*, the plaintiff moved for preliminary injunction to enjoin alleged retaliatory actions taken by her employer due to her having filed suit. 856 F.2d at 169. In *McDonald's Corp. v. Robertson*, the Court explained that the presumption of irreparable harm applies only when the plaintiff seeks to enjoin actions viewed as retaliatory. 47 F.3d at 1312. Thus, the trial court in *Leigh* reasoned that *Baker* does not apply where there are no ongoing retaliatory actions. *Leigh*, 2022 WL 18027780, at *17. As in *Leigh*, the alleged retaliatory actions have already occurred, because the Plaintiff has been terminated from her position. Therefore, the presumption of irreparable harm outlined in *Baker* is inapplicable here.[6] *Id.*

Since irreparable harm is not presumed, the Court turns to whether the Plaintiff's loss of a tenured position constitutes irreparable harm. In *Van Arsdel v. Texas A&M University*, 628 F.2d 344, 345–46 (5th Cir. 1980), the Court reversed the trial court's order granting a preliminary injunction and reinstating a tenured associate professor who allegedly resigned under duress. The Court held "[s]ince reinstatement after trial, coupled with back pay, would suffice to redress appellee's

---

[6] Additionally, in *Sambrano v. United Airlines, Inc.*, the Fifth Circuit distinguished the reparability of harm caused by an employer's placing the employee on unpaid leave for violating a vaccination mandate versus an employer forcing an employee to abandon religious convictions or face loss of pay and benefits. No. 21-11159, 2022 WL 486610, at *2 (5th Cir. 2022). In the former employment action, economic harm does not equate to irreparable harm. *Id.* at *9. In the latter, "ongoing coercion of being forced to choose either to contravene their religious convictions or to lose pay indefinitely" constitutes irreparable harm. *Id.*

**APP 746**

alleged wrong, we find that the preliminary injunction must be vacated." *Id*. Should she prevail on the merits, the Plaintiff's alleged harm can also be remedied with reinstatement and back pay. While Plaintiff also asserts reputational damage within the academic community and the potential loss of career advancement opportunities, (Doc. 86, p. 22), the alleged harm is entirely speculative. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (noting irreparable harm must "be neither remote nor speculative, but actual and imminent"). Plaintiff does not contend that she has applied for and been denied other equivalent tenured positions based on her termination by Defendant FAMU, and Plaintiff does not proffer any basis for the claim that she was on track for a deanship. The balance of the harms Plaintiff identifies falls within the category of economic harm, which is not irreparable.[7]

---

[7] In *Assaf v. Univ. of Tex. Sys.*, 399 F. Supp. 1245, 1245–47 (S.D. Tex. 1975), injunctive relief was granted *before* the Plaintiff was terminated, and the court criticized the university's lack of transparency leading up to the hearing. In *Schrank v. Bliss*, 412 F. Supp. 28, 37 (M.D. Fla. 1976), injunctive relief was awarded where the "state-regulated system . . . ensures all future employers are informed of the plaintiff's termination, leading to actual and official stigmatization." The court distinguished the stigma associated with mandatory reporting of the termination to law enforcement agencies to which the plaintiff may apply from the embarrassment of discharge in the presence of co-workers, which the Supreme Court rejected in *Sampson v. Murray*, 415 U.S. 61, 89 (1974), as not irreparable. Plaintiff alleges no such mandatory reporting requirement here. Similarly, in *Blaine v. N. Brevard Cnty. Hosp. Div.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018), the court found the employer's action involving the physicians constituted a reportable event to the National Practitioner Data Bank and implicated the plaintiffs' right to practice, which cannot be monetized. The termination of a tenured professor does not implicate counsel's license to practice law and earn a living. Finally, *Keyer v. Civil Serv. Comm'n of the City of N.Y.*, 397 F. Supp. 1362 (E.D.N.Y. 1975), is inapposite. In *Keyer*, the plaintiffs were fired without being notified of the reason, unlike this case.

**APP 747**

### B.    The Public Interest

Reinstatement of the Plaintiff before the resolution of the case on its merits disserves the public interest. The Plaintiff notes that injunctions protecting First Amendment freedoms are always in the public interest. (Doc. 86, p. 24). As a general principle, this is true—but context matters. This case is not only about the Plaintiff's speech in standing up for equal pay; it also involves termination based on a finding that the Plaintiff retaliated against a student. While Plaintiff contests the student's version of the encounter giving rise to the decision to terminate her employment, the student's version—corroborated by five witnesses—led Defendant FAMU to terminate Plaintiff for improper conduct. Forcing Defendant FAMU to reinstate the Plaintiff also forces students enrolled at FAMU to attend classes taught by the Plaintiff. On the record before the Court, the imposition of a mandatory injunction compelling Defendant FAMU to reinstate Plaintiff is contrary to public policy.

### C.    Likelihood of Success on the Merits

Since irreparable harm is the sin qua non of injunctive relief, the Court will not address the likelihood of success on the merits. "[E]ven if [the plaintiff] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176. The Court has determined that the Plaintiff's alleged injuries are not irreparable, and so preliminary injunctive relief is denied, regardless of the merits of the asserted claims.

**D.    Motion for Hearing**

When the facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. *McDonald's Corp.*, 147 F.3d at 1312. While the parties contest whether Plaintiff's termination for retaliation was justified and whether Defendant FAMU's decision to fire Plaintiff is pretextual and retaliation for filing an Equal Pay claim, there is no disagreement over the harm Plaintiff alleges she sustained from her termination. Since whether those harms are irreparable does not require credibility determinations or the resolution of contested facts, an evidentiary hearing is unwarranted.

## IV.    CONCLUSION

For these reasons, Plaintiff's Motion for Preliminary Injunction (Doc. 86) and Motion for Oral Argument and Evidentiary Hearing (Doc. 87) are **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on August 30, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

11

**APP 749**

# 165 - Notice of Appeal

# 09/03/2024

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**JENNIFER SMITH,**

     **Plaintiff,**

                                      **CASE NO: 6:24-cv-00457-PGB-RMN**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES, et al.**

     **Defendants.**

_____/

### PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Plaintiff Jennifer Smith ("Professor Smith"), hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the Order, (Doc. 164), issued by Judge Paul G. Byron on August 30, 2024. Professor Smith also provides notice that she plans to seek expedited consideration in light of the ongoing harm that Plaintiff continues to suffer as a result of the denial of the preliminary injunction.

Dated: September 3rd, 2024

**APP 751**

Respectfully submitted,


/s/ Jennifer Smith
Jennifer Smith
Florida Bar No. 964514 (*pro se*)
Law Office of Jennifer Smith
13506 Summerport Village Pkwy.
Suite 108
Windermere, FL 34786
407-455-0712
407-442-3023 (facsimile)
jensmithesq@aol.com


**CERTIFICATE OF SERVICE**

I, HEREBY CERTIFY that on this 3rd of September 2024, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to all registered users.


/s/ Jennifer Smith
Jennifer Smith (*pro se)*
Law Office of Jennifer Smith

2

**APP 752**

# 178 - Order Granting Motion to Transfer Venue


# 09/11/2024

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JENNIFER SMITH,**

        **Plaintiff,**

**v.**                                    **Case No: 6:24-cv-457-PGB-RMN**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES,**
**ALLYSON WATSON, DENISE D.**
**WALLACE, LATONYA BAKER,**
**LATRECHA SCOTT, RICA**
**CALHOUN, GRAY ROBINSON,**
**P.A., JULIE ZOLTY, RICHARD**
**E. MITCHELL and SARAH**
**REINER,**

        **Defendants.**
                                  /

## ORDER

This cause is before the Court on Defendant Florida Agricultural & Mechanical University ("**FAMU**") Board of Trustees' ("**Defendant FAMU**") Motion to Transfer Venue. (Doc. 161 (the "**Motion**")). The Plaintiff Jennifer Smith ("**Plaintiff**") filed a Response in Opposition. (Doc. 167). Upon consideration, Defendant FAMU's Motion is granted, and the litigation is transferred to the United States District Court for the Northern District of Florida, Tallahassee Division.

**APP 754**

## I.    BACKGROUND

The Plaintiff was a tenured professor employed by the FAMU College of Law. (Doc. 151, ¶¶ 28–29). A law student reported a negative interaction with the Plaintiff and asserted her belief that the Plaintiff violated the University Code of Conduct by her behavior. (Doc. 151-6, p. 6). On December 5, 2023, following an investigation by the Office of Compliance and Ethics, the Provost and Vice President for Academic Affairs informed the Plaintiff of the University's intent to dismiss her from employment on January 19, 2024. (*Id.* at p. 1).

Plaintiff initially filed a Complaint and an Amended Complaint against Defendant FAMU in the Ninth Judicial Circuit in Orange County, Florida. (Doc. 1, ¶¶ 1–2). Defendant FAMU removed the matter to the Middle District of Florida, Orlando Division on March 4, 2024. (*Id.* ¶¶ 8–13). On August 18, 2024, the Second Amended Complaint was filed after a previous attempt to amend the complaint was denied on procedural grounds. (Docs. 132, 149, 151). Thus far, only Defendant FAMU is a party Defendant in this lawsuit, and Defendant FAMU moves to transfer venue from the Middle District of Florida to the Northern District of Florida under the home venue privilege.[1]

---

[1]    Plaintiff amended the allegations to include eight individual defendants and a law firm. (Doc 151). Summonses were issued on July 16, 2024, but the record does not indicate the newly-added defendants have been served. (Docs. 100, 101, 102, 103, 104, 105, 106, 107, 110). Moreover, the Second Amended Complaint that had been filed by Plaintiff immediately prior to the issuance of these summonses was later stricken by this Court. (Doc. 132).

**APP 755**

## II.    LEGAL STANDARD

"The home venue privilege provides that, absent waiver or exception, venue in a suit against the State, or an agency or subdivision of the State, is proper only in the county in which the State, or the agency or subdivision of the State, maintains its principal headquarters." *Fla. Dep't of Children & Families v. Sun-Sentinel, Inc.*, 865 So. 2d 1278, 1286 (Fla. 2004). The purpose of this rule is to promote "orderly and uniform handling of state litigation." *Carlile v. Game & Fresh Water Fish Comm'n*, 354 So. 2d 362, 363-64 (Fla. 1977). That said, because this privilege is merely a state procedural rule, it does not bind a federal court, and federal law controls the question of proper venue. *See Stewart Org. v. Ricoh, Corp.*, 487 U.S. 22, 29–30 (1988) (noting that the Federal Rules govern the transfer of venue and that focusing on a single state policy or venue rule would defeat Congress's command that multiple considerations govern transfer within the federal court system); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010) ("The appropriate venue of an action is a procedural matter that is governed by federal rule and statutes." (citations omitted)); *Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1299 (11th Cir. 2001) (holding that "the question of venue is governed by federal law, not state law"); *Murphree v. Miss. Pub. Corp.*, 149 F.2d 138, 140 (5th Cir. 1945)[2] (noting that "where a federal statute fixed the venue of the federal courts, state laws are inapplicable").

---

[2]    The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

3

**APP 756**

Under Federal Rule of Civil Procedure 12(h), the defense of improper venue is waived unless the defendant includes it in defendant's first Rule 12 motion or, if no such motion is filed, in the answer to the complaint. *See Tucker v. Blackfisk Marine, LLC*, No. 22-61953-CIV-DIMITROULEAS, 2023 WL 1429762, at \*2 (S.D. Fla., Jan. 31, 2023); *Laptev v. Wallendorf*, No. 1:21-cv-20281-GAYLES, 2022 WL 16745308, at \*2 (S.D. Fla. Nov. 7, 2022).[3] As the Court noted in *Hollis*, 28 U.S.C. § 1441(a) "does not give a removing defendant a choice of districts to remove to," and once an action is removed the Defendant may seek a transfer under 28 U.S.C. § 1404(a).[4]  259 F.3d at 1300 (citations omitted).

## III.   DISCUSSION

Defendant FAMU was required to remove the state court action to the Orlando Division of the Middle District of Florida under § 1441(a). In doing so, Defendant FAMU did not waive the right to seek a transfer of venue to the Northern District of Florida, Tallahassee Division. *See Hollis*, 259 F.3d at 1300 ("Because § 1441(a) does not give a removing defendant a choice of districts to remove to, it may not be entirely accurate to characterize removal as the voluntary relinquishment of a legal right."). The Court therefore rejects Plaintiff's argument

---

[3]   Even so, the trial court may exercise its inherent authority to allow a motion to dismiss to be amended to include an otherwise waivable defense. *See Tucker*, 2023 WL 1429762, at \*2 (citing *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002)).

[4]   The Court need not address whether the Defendant waived the Rule 12(b)(3) defense of improper venue, since the issue before the Court is whether a transfer of venue under § 1404(a) is proper.

**APP 757**

that, by stating in the notice of removal that venue is proper under § 1441(a), (Doc. 1, ¶ 11), FAMU waived its right to relief under § 1404(a), (Doc. 167, p. 3). *Hollis* stands for precisely the opposite proposition. Defendant FAMU thus retained the right to seek a transfer of venue to the Northern District of Florida.[5] The question before the Court is whether a transfer of venue to the Northern District of Florida is appropriate here.

The Court is mindful that cases should be brought and tried in the district "in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). This is a matter of judicial economy. As a result, § 1404(a) empowers the Court to "transfer any civil action to any other district or division where it might have been brought." In considering whether to transfer a case pursuant to § 1404(a), absent consent among the parties, the district court must engage in a two-step inquiry. The court must determine whether the case could have been filed in the proposed district. *Eye Care Int'l, Inc. v. Underhill*, 119 F. Supp. 2d 1313, 1318 (M.D. Fla. 2000). Next, the Court must consider "whether the transfer would be for the convenience of the parties and witnesses and in the interest of justice." *Id.* "[U]nder section 1404(a), the burden is on the movant to

---

[5] The Court rejects Plaintiff's argument that Defendant FAMU should have ignored § 1441(a) and removed the matter to the Northern District of Florida. (Doc. 167, p. 9). Plaintiff cites *Peterson v. BMI Refractories*, 124 F.3d 1386, 1388 (11th Cir. 1997), where the defendant removed the state court action to the Northern District of Alabama instead of the Middle District where the state action had been commenced. (*Id.* at pp. 9–10). The Eleventh Circuit noted that failure to comply with the geographic requirements of 28 U.S.C. § 1441(a) is a procedural defect that does not deprive a district court of subject matter jurisdiction over the removed action. *Peterson*, 124 F.3d at 1338. That said, if a motion to remand is filed it must be granted. Defendant FAMU's decision to adhere to the unambiguous mandate in § 1441(a) does not constitute a waiver of its right to seek a change of venue under § 1404(a).

establish that the suggested forum is more convenient." *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989). In making this determination, courts consider several factors. These factors include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight given a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*See Colo. Boxed Beef Co. v. Coggins*, No. 8:07-cv-00223-T-24-MAP, 2007 WL 917302, at *3 (M.D. Fla. Mar. 23, 2007).

The Plaintiff is correct that Defendant FAMU's reliance on § 1406 is misplaced. (Doc. 167, p. 15). Nevertheless, in its motion to transfer venue, Defendant FAMU discussed the factors pertinent to the Court's analysis under § 1404(a). Defendant FAMU avers that venue is proper in the Northern District of Florida, because Plaintiff "sued the University twice in Leon County, [the] situs of the Northern District of Florida, both times claiming violation[s] of 29 U.S.C. §§ 206 and 215" ("**The Equal Pay Act**" or "**EPA**"). (Doc. 161, p. 2). The Second Amended Complaint ("**SAC**") includes claims arising under the EPA and for retaliation under the EPA. (Doc. 151, ¶¶ 150–60). Accordingly, Plaintiff could have commenced this action in the Northern District of Florida, Tallahassee Division.

The other claims raised in the SAC also have a nexus to the Northern District of Florida. Plaintiff alleges breach of the contract between Plaintiff and the FAMU

6

Board of Trustees, which is located in Tallahassee. (*Id.* ¶¶ 161–68). Plaintiff asserts a claim for First Amendment Retaliation with her termination being the penultimate step in the retaliation. (*Id.* ¶¶ 169–76). The SAC also contains claims for Title VII sex discrimination and retaliation, and the Plaintiff identifies Provost Allyson Watson, whose office is in Leon County, as the decisionmaker with regard to her termination. (*Id.* ¶ 188).

Plaintiff also sued the law firm Gray Robinson and some of its lawyers for allegedly conspiring with the FAMU Board of Trustees to violate her civil rights and failure to prevent the conspiracy. (*Id.* ¶¶ 191–209). It is unclear from the SAC where Gray Robinson attorneys Richard E. Mitchell, Julie Zolty, and Sarah Reiner reside. The alleged involvement of the law firm and counsel is outlined with broad and conclusory language. But the crux of the allegations is that the firm and counsel conspired with the University, and FAMU's General Counsel Ms. Wallace, to terminate Plaintiff in retaliation for her exercise of protected activity. (*Id.* ¶¶ 7, 91–98, 191–209). The SAC asserts a single claim for Section 1983 Civil Conspiracy against the "University Employees." (*Id.* ¶¶ 210–21). The role of each "university employee" in the conspiracy is described with generalities. The gist of the alleged conspiracy claim is that the university employees undertook actions designed to support "Defendants Watson and Wallace['s] . . . ultimate decision to terminate Plaintiff," and that they "communicated with reviewers in the process of Plaintiff's internal appeals to influence or otherwise suggest she be terminated." (*Id.* ¶ 217). Finally, Plaintiff asserts a Due Process claim and avers that Defendant FAMU

7

employed "biased and partial internal complaint reviewers who acted as the cat's paw for Defendants Wallace and Watson, who themselves had knowledge of Plaintiff's pending Equal Pay Act lawsuit, rendering any internal appeal futile and violating Plaintiff's right to an impartial decisionmaker." (*Id.* ¶ 225).

Defendant correctly observes that "[t]he University is a public university within the State University System of Florida, and the University Board of Trustees is constitutionally created and empowered to govern it." (Doc. 161, pp. 3–4). *See* FLA. CONST. art. IX, § 7(b), (c); FLA. STAT. § 1000.21(9)(c) ("'State university,' except as otherwise specifically provided, includes the following institutions and any branch campuses, centers, or other affiliates of the institution: . . . The Florida Agricultural and Mechanical University."). The principal headquarters of FAMU is located in Tallahassee, Leon County, Florida. Plaintiff alleges in the SAC that Ms. Watson, the Provost of the University, whose office is in Leon County, was the "decisionmaker" in her termination. (Doc. 151, ¶ 188). Moreover, the Office of Compliance and Ethics that investigated the student complaint against Plaintiff is in Leon County. (*See generally* Doc. 151). Plaintiff alleges that "the Compliance report dated June 5, 2023, recommended that Provost Watson and Dean Keller '[c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices.'" (*Id.* ¶ 51). The Investigative Report advising Mr. Robinson, President of FAMU, that Plaintiff retaliated against the student was authored by Rita Calhoun. (Doc. 151-6, p. 5). Both Ms. Calhoun and Mr. Robinson are in

8

Tallahassee. (*Id.*). And the review panel for Plaintiff's due process conference is located in Tallahassee. (*Id.* at pp. 1–2, 52–53; Doc. 151-7).

The Plaintiff avers that witnesses, including the student who filed the complaint, and FAMU employees who "are likely to give the most substantive testimony about the Equal Pay violation and complaints giving rise to this lawsuit" are in Orlando, Florida. (Doc. 167, p. 16). Recognizing Defendant FAMU has the burden of proving venue should be transferred under § 1404(a), Plaintiff is still required to support the contention that the bulk of the relevant witnesses are located in this District. Plaintiff does not explain how "Dean Keller, . . . Patricia Broussard, Markita Cooper, Associate Dean Reginald Green, [and] other professors who teach Constitutional Law" are relevant to the Equal Pay claim. (*Id.* at p. 16). The SAC only lists Ewanrinareto Imoukhuede as a comparator. (*See* Doc. 151, ¶ 29). The mere speculation that these witnesses "are likely to give the most substantive testimony about the Equal Pay violation" is not persuasive. (Doc. 167, p. 17). Similarly, Plaintiff's assertion that the "added defendants" are located in the Middle District of Florida is not substantiated. The Court also notes that it has no proof that any of the added defendants have been served with the SAC, and none of the added defendants are currently parties to this action. On balance, the investigation and subsequent decision to terminate Plaintiff was made in Tallahassee, and the witnesses relevant to that decision and the alleged retaliation

9

are located in Leon County.[6] The convenience of the witnesses favors the Northern District of Florida.

Plaintiff concedes that the location of documents is neutral or "slightly favors" her. (*Id*.). The latter is evidenced only by the employment contract having been signed in Orlando. (*Id*.). The Court finds the location of documents to be neutral. As Plaintiff notes, "the rise of electronic discovery and media [is] such that most documents are kept digitally." (*Id*.). The availability of process to serve witnesses also favors Tallahassee as the proper venue. The key players in this dispute reside in the Northern District, outside the subpoena power of the Court. The Northern District is familiar with the governing law and has presided over the Plaintiff's two prior EPA suits against Defendant FAMU. (Doc. 161, p. 4). The Plaintiff contends that litigating the case in Tallahassee is inconvenient because she cares for her elderly father who cannot travel with her to the Northern District. (Doc. 167, p. 17). Litigating in Tallahassee, a four-hour drive, does not require relocating to Tallahassee. While the Court is mindful of the weight given to a plaintiff's choice of forum, the other considerations heavily weigh in favor of transferring venue to the Northern District of Florida. The home venue privilege does not dictate the outcome here. However, transferring the case to the Northern District of Florida, where FAMU resides, promotes the "orderly and uniform

---

[6]    Plaintiff asserts the student who filed the complaint is in Orlando. (Doc. 167, p. 16). Plaintiff notes that the student's complaint was unsubstantiated, but the Compliance report found Plaintiff's retaliation was substantiated. It is thus unlikely that evidence of the underlying complaint is relevant to the issue of retaliation or breach of contract.

handling of state litigation." *See Carlile*, 354 So. 2d at 363-64. Further, trial efficiency and the interests of justice are served by transferring the case to the Northern District of Florida.

## IV.    CONCLUSION

For these reasons, Defendant FAMU's Motion to Transfer Venue (Doc. 161) is **GRANTED**. The Clerk of Court is directed to transfer this case to the Northern District of Florida, Tallahassee Division, and to close the case.

**DONE AND ORDERED** in Orlando, Florida on September 11, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

11

**APP 764**